# 22-1175

## United States Court of Appeals
## for the Second Circuit



DONALD J. TRUMP and TRUMP ORGANIZATION LLC,

*Plaintiffs-Appellants,*

v.

LETITIA JAMES in her official capacity as
Attorney General for the State of New York,

*Defendant-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK (Syracuse)

---

## JOINT APPENDIX
## VOLUME I OF II (Pages A1-A202)

---

LETITIA JAMES
ATTORNEY GENERAL,
STATE OF NEW YORK
*Attorneys for Defendant-Appellee*
New York, New York 10005
(212) 416-8020
*eric.delpozo@ag.ny.gov*

HABBA MADAIO & ASSOCIATES LLP
*Attorneys for Plaintiffs-Appellants*
1430 US Highway 206, Suite 240
Bedminister, New Jersey 07921
(908) 869-1188
*ahabba@habbalaw.com*

---

# <u>TABLE OF CONTENTS</u>

*Page(s)*

U.S. District Court Docket Sheet ........................................................................ A1-A7

Complaint for Declaratory and Injunctive Relief, dated
December 20, 2021 ............................................................................................. A8-A37

Civil Cover Sheet ................................................................................................. A38

Notice of Plaintiffs' Motion for Preliminary Injunction,
dated January 10, 2021 ...................................................................................... A39-A40

Declaration of Alina Habba, in Support of Plaintiffs'
Motion, dated January 10, 2022 ....................................................................... A41-A43

Proposed Order Granting Plaintiffs' Motion for a
Preliminary Injunction ...................................................................................... A44-A45

    Exhibit A – Complaint for Declaratory and Injunctive
    Relief, dated December 20, 2021 (reproduced at
    pages 8-37)

Defendant's Notice of Motion to Dismiss, dated January
26, 2022 ............................................................................................................... A46-A47

Declaration of Colleen K. Faherty, in Support of
Defendant's Motion, dated January 26, 2022 ................................................. A48-A53

    Exhibit A – Stipulation and Proposed Order, dated
    December 30, 2021 ........................................................................................ A54-A58

    Exhibit B – Hearing Before the Committee on
    Oversight and Reform House of Representatives,
    held on February 27, 2019 ........................................................................... A59-A79

*Table of Contents(cont'd)*                                                    *Page(s)*

Exhibit C – Excerpt from Memorandum of Law,
dated September 16, 2020 .......................................................................A80-A82

Exhibit D – Stipulation and Order, dated September
2, 2021 ...................................................................................................A83-A90

Exhibit E – Excerpt from Memorandum of Law in
Opposition, dated December 7, 2020 .......................................................A91-A93

Exhibit F – Excerpts from Transcript of Proceedings,
held on September 23, 2020...................................................................A94-A101

Exhibit G – Letter, dated November 1, 2021 with
Supporting Tabs A through H ..............................................................A102-A154

Exhibit H – Memorandum of Law in Support of
Motion to Quash, in the Matter of *People v. Trump,*
dated January 3, 2022...........................................................................A155-A165

Exhibit I – Supplemental Verified Petition, dated
January 18, 2022 ..................................................................................A166-A280

Exhibit J – Excerpts from Videoconference
Examination Under Oath of Eric F. Trump, held on
October 5, 2020 ...................................................................................A281-A298

Declaration of Alina Habba, in Opposition to Defendant's
Motion, dated February 16, 2022...........................................................A299-300

Exhibit A – Complaint for Declaratory and Injunctive
Relief, dated December 20, 2021 (reproduced at
pages 8-37)

ii

*Table of Contents(cont'd)*                                              *Page(s)*

Reply Declaration of Colleen K. Faherty, in Further
Support of Defendant's Motion, dated February 23, 2022 .........................A301-A303

    Exhibit A – Letter, dated February 9, 2022 ........................A304-A305

    Exhibit B – Decision and Order on Motion, in the
    Matter of *People v. Trump,* dated February 17, 2022 ........................A306-A313

    Exhibit C – Memorandum of Law, in Further Support
    of Motion to Quash and in Opposition to Motion to
    Compel, in the Matter of *People v. Trump*, dated
    February 1, 2022 ................................................................A314-A351

    Exhibit D – Statement by Donald J. Trump, dated
    February 17, 2022 ......................................................................... A352

Letter, dated February 28, 2022 .......................................................... A353

    Exhibit A – Notice of Appeal, dated February 28,
    2022, of Decision and Order, in the Matter of *People
    v. Trump*, dated February 17, 2022, with Notice of
    Entry ..............................................................................A354-A373

Declaration of Alina Habba, in Further Support of
Plaintiffs' Motion, dated April 15, 2022.....................................A374-A375

    Exhibit A – Excerpt from Transcript of Proceedings,
    held on February 17, 2022 .................................................A376-A380

Letter, dated May 3, 2022 ................................................................ A381

    Exhibit 1 – Decision and Order on Motion, in the
    Matter of *People v. Trump*, dated April 26, 2022 ...............................A382-A384

iii

*Table of Contents(cont'd)*                                    *Page(s)*

Exhibit 2 – Opinion and Order, in the Matter of
*People v. Trump*, dated April 29, 2022 ...............................A385-A386

Exhibit 3 – Affidavit of Alina Habba, sworn to April
27, 2022 ...............................................................................A387-A401

Exhibit 4 – Summary Statement on Application for
Expedited Service and/or Interim Relief, dated May
2, 2022 .................................................................................A402-A403

Notice of Appeal, dated May 27, 2022 ......................................A404-A405

iv

**Query**    Reports    **Utilities**    Help    **Log Out**

APPEAL,CLOSED

# U.S. District Court
# Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.7 (Revision 1.7.1)] (Albany)
# CIVIL DOCKET FOR CASE #: 1:21-cv-01352-BKS-CFH

Trump et al v. James
Assigned to: Judge Brenda K. Sannes
Referred to: Magistrate Judge Christian F. Hummel
Cause: 42:1983 Civil Rights Act

Date Filed: 12/20/2021
Date Terminated: 05/27/2022
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Donald J. Trump**                    represented by    **Alina Habba**
                                                         Habba Madaio & Associates LLP
                                                         1430 US Highway 206 - Suite 240
                                                         Bedminister, NJ 07921
                                                         908-869-1188
                                                         Email: ahabba@habbalaw.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Michael T Madaio**
                                                         Habba Madaio & Associates LLP
                                                         1430 US Highway 206 - Suite 240
                                                         Bedminster, NJ 07921
                                                         908-869-1188
                                                         Email: mmadaio@habbalaw.com
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Trump Organization LLC**            represented by    **Alina Habba**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Michael T Madaio**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Letitia James**                     represented by    **Andrew Amer**
*in her official capacity as Attorney General*          New York State Attorney General - New
*for the State of New York*                             York Office
                                                        28 Liberty Street

**A2**

New York, NY 10005
212-416-6127
Email: andrew.amer@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Colleen K Faherty**
NYS Office of The Attorney General
28 Liberty St. - 18th Floor
New York, NY 10005
212-416-6046
Fax: 212-416-6009
Email: colleen.faherty@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin C. Wallace**
Office of Attorney General - NY Office
28 Liberty Street
New York, NY 10005
212-416-6376
Email: kevin.wallace@ag.ny.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/20/2021 | 1 | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF with Jury Demand against Letitia James (Filing fee $402 receipt number ANYNDC-5748409) filed by Donald J. Trump, Trump Organization LLC. (Attachments: # 1 Civil Cover Sheet)(hmr) (Entered: 12/20/2021) |
| 12/20/2021 | 2 | G.O. 25 FILING ORDER ISSUED: Initial Conference set for 3/21/2022 at 09:00 AM in Albany before Magistrate Judge Christian F. Hummel. Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 3/14/2022. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) (hmr) (Entered: 12/20/2021) |
| 12/21/2021 | | CLERK'S CORRECTION OF DOCKET ENTRY #3: Clerk deleted DKT Entry # 3 Letter as it was filed in error. (gmd, ) (Entered: 12/21/2021) |
| 12/21/2021 | 3 | REQUEST FOR ISSUANCE OF SUMMONS(ES): Donald J. Trump, Trump Organization LLC is requesting summons(es) be issued as to (Habba, Alina) (Main Document 3 replaced on 12/22/2021) (hmr, ). (Entered: 12/21/2021) |
| 12/22/2021 | | CLERK'S CORRECTION OF DOCKET ENTRY re 3 Request for Issuance of Summons(es): Clerk replaced this document with a completed document, the original proposed summons did not have the attorney's name and address listed on it. (hmr) (Entered: 12/22/2021) |
| 12/22/2021 | 4 | Summons Issued as to Letitia James. (hmr) (Entered: 12/22/2021) |
| 01/06/2022 | 5 | AFFIDAVIT of Service for Summons, Complaint, and Civil Cover Sheet served on LETITIA JAMES on 01/05/2022, filed by Donald J. Trump, Trump Organization LLC. (Habba, Alina) (Entered: 01/06/2022) |
| 01/06/2022 | | ***Answer due date updated for Letitia James answer due 1/26/2022. (hmr) (Entered: |

| | | |
|---|---|---|
| | | 01/06/2022) |
| 01/10/2022 | 6 | MOTION for Preliminary Injunction filed by Donald J. Trump, Trump Organization LLC. Motion returnable before Judge Brenda K. Sannes Response to Motion due by 1/31/2022. Reply to Response to Motion due by 2/7/2022 (Attachments: # 1 Declaration, # 2 Memorandum of Law, # 3 Proposed Order/Judgment) (Habba, Alina) (Additional attachment(s) added on 1/10/2022: # 4 Exhibit(s) A) (egr, ). (Attachment 4 replaced on 1/10/2022) (egr, ). (Entered: 01/10/2022) |
| 01/10/2022 | | CLERK'S CORRECTION OF DOCKET ENTRY re 6 Motion for Preliminary Injunction, filed by Donald J. Trump, Trump Organization LLC - Clerk added Exhibit A, which was to have been filed at time of motion - received via email from Plaintiff's Attorney's. (egr) (Entered: 01/10/2022) |
| 01/11/2022 | 7 | NOTICE of Appearance by Colleen K Faherty on behalf of Letitia James (Faherty, Colleen) (Entered: 01/11/2022) |
| 01/11/2022 | 8 | MOTION for Limited Admission Pro Hac Vice of Andrew Stuart Amer Filing fee $100, receipt number ANYNDC-5768507. (Attachments: # 1 Declaration Declaration of Colleen K. Faherty, # 2 Exhibit(s) Petition for admission, # 3 Exhibit(s) Attorney registration form, # 4 Exhibit(s) Certificate of good standing, # 5 Proposed Order/Judgment Proposed order for pro hac vice admission) Motions referred to Christian F. Hummel. (Faherty, Colleen) (Entered: 01/11/2022) |
| 01/12/2022 | 9 | TEXT ORDER granting 8 Motion for Limited Admission Pro Hac Vice of Andrew Stuart Amer, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. <u>You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.</u>** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Authorized by Magistrate Judge Christian F. Hummel on 1/12/2022. (tab) (Entered: 01/12/2022) |
| 01/12/2022 | 10 | NOTICE of Appearance by Kevin C. Wallace on behalf of Letitia James (Wallace, Kevin) (Entered: 01/12/2022) |
| 01/13/2022 | 11 | NOTICE of Appearance by Andrew Amer on behalf of Letitia James (Amer, Andrew) (Entered: 01/13/2022) |
| 01/24/2022 | 12 | Letter Motion from AAG Colleen K. Faherty for Letitia James requesting 5-page extension of the 25-page limit submitted to Judge Brenda K. Sannes . (Faherty, Colleen) (Entered: 01/24/2022) |
| 01/26/2022 | 13 | TEXT ORDER: granting 12 letter motion requesting an extension of the 25 page limit. Defendant may file an oversized brief, not to exceed 30 pages in length, in support of a motion to dismiss. SO ORDERED by Judge Brenda K. Sannes on 1/26/2022. (nmk) (Entered: 01/26/2022) |
| 01/26/2022 | 14 | MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Judge Brenda K. Sannes, MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Judge Brenda K. Sannes Response to Motion due by 2/16/2022. Reply to Response to Motion due by 2/23/2022 (Faherty, Colleen) (Entered: 01/26/2022) |
| 01/26/2022 | 15 | MEMORANDUM OF LAW re 14 Motion to Dismiss for Failure to State a Claim,, Motion to Dismiss/Lack of Subject Matter Jurisdiction, filed by Letitia James. (Faherty, Colleen) (Entered: 01/26/2022) |

| 01/26/2022 | 16 | AFFIDAVIT in Support re 14 MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Judge Brenda K. Sannes MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Judge Brenda K. Sannes filed by Letitia James. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D, # 5 Exhibit(s) E, # 6 Exhibit(s) F, # 7 Exhibit(s) G, # 8 Exhibit(s) H, # 9 Exhibit(s) I, # 10 Exhibit(s) J)(Faherty, Colleen) (Entered: 01/26/2022) |
|---|---|---|
| 01/31/2022 | 17 | RESPONSE in Opposition re 6 MOTION for Preliminary Injunction filed by Donald J. Trump, Trump Organization LLC. Motion returnable before Judge Brenda K. Sannes filed by Letitia James. (Amer, Andrew) (Entered: 01/31/2022) |
| 02/03/2022 | 18 | Letter Motion from Alina Habba, Esq. for Donald J. Trump, Trump Organization LLC requesting 5-page extension of the 25-page limit, permission to file a reply brief in response to Defendants opposition to the preliminary injunction motion, and permission for Plaintiffs reply brief to Defendants motion to dismiss be due on February 16, 2022 submitted to Judge Brenda K. Sannes . (Habba, Alina) (Entered: 02/03/2022) |
| 02/04/2022 | 19 | TEXT ORDER: granting 18 letter request. Plaintiffs may file an oversized memorandum of law, not to exceed 30 pages in length, in response to the 14 motion to dismiss. Further, plaintiffs may file a reply, not to exceed 10 pages in length, regarding their 8 motion for preliminary injunction. Both filings are due by 2/16/2022. SO ORDERED by Judge Brenda K. Sannes on 2/4/2022. (nmk) (Entered: 02/04/2022) |
| 02/16/2022 | 20 | TEXT NOTICE: The Rule 16 Initial Conference scheduled for March 21, 2022 at 9:00 AM before Magistrate Judge Christian F. Hummel and the deadline to submit a proposed Civil Case Management Plan and exchange Mandatory Disclosures are ADJOURNED without date pending a decision on the dispositive motion. (tab) (Entered: 02/16/2022) |
| 02/16/2022 | 21 | RESPONSE in Opposition re 14 MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Judge Brenda K. Sannes MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Judge Brenda K. Sannes filed by Donald J. Trump, Trump Organization LLC. (Attachments: # 1 Declaration)(Habba, Alina) (Attachment 1 replaced on 2/18/2022) (hmr, ). (Entered: 02/16/2022) |
| 02/16/2022 | 22 | REPLY to Response to Motion re 6 MOTION for Preliminary Injunction filed by Donald J. Trump, Trump Organization LLC. Motion returnable before Judge Brenda K. Sannes filed by Donald J. Trump, Trump Organization LLC. (Habba, Alina) (Entered: 02/16/2022) |
| 02/18/2022 | 23 | EXHIBIT A to Declaration (Dkt. 21-1) by Donald J. Trump, Trump Organization LLC re 21 RESPONSE in Opposition re 14 MOTION to Dismiss for Failure to State a Claim (Habba, Alina) (Main Document 23 replaced on 2/18/2022) (egr). Modified on 2/18/2022 (egr). (Entered: 02/18/2022) |
| 02/18/2022 | | CLERK'S CORRECTION OF DOCKET ENTRY re 23 EXHIBIT A to Declaration (Dkt. 21-1). Main document replaced at request of Plaintiff's Attorney to include full Exhibit A rather than previous 1 page document; provided to Clerk via e-mail attachment. Docket Entry association changed to reflect Docket 21 rather than Docket 22. (egr) (Entered: 02/18/2022) |
| 02/18/2022 | | CLERK'S CORRECTION OF DOCKET ENTRY re 21 Response in Opposition to Motion: Clerk replaced attachment 1 - Declaration with a corrected Declaration which has the correct motion (motion to dismiss instead of motion for preliminary injunction) listed in paragraph 2. (hmr) (Entered: 02/18/2022) |
| 02/23/2022 | 24 | REPLY to 21 RESPONSE re 14 MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Judge Brenda K. Sannes MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Judge |

| | | |
|---|---|---|
| | | Brenda K. Sannes *REPLY Memorandum of Law* filed by Letitia James. (Faherty, Colleen) Modified on 2/24/2022 to reflect that this is Defendants Reply not Response (ztc, ). (Entered: 02/23/2022) |
| 02/23/2022 | 25 | REPLY AFFIDAVIT re 14 MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Judge Brenda K. Sannes MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Judge Brenda K. Sannes *Reply Declaration of Colleen K. Faherty* filed by Letitia James. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D) (Faherty, Colleen) Modified on 2/24/2022 to reflect that this is part of Defendant's Reply(ztc, ). (Entered: 02/23/2022) |
| 02/24/2022 | | CLERK'S CORRECTION OF DOCKET ENTRY re 25 Reply Affidavit in Support of Motion, 24 REPLY, Clerk updated docket text to reflect that these two docket entries are Defendants Reply to the 14 Motion to Dismiss not the Response. (ztc, ) (Entered: 02/24/2022) |
| 02/28/2022 | 26 | NOTICE by Letitia James re 14 MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Judge Brenda K. Sannes MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Judge Brenda K. Sannes *Notice of a development pertinent to Defendant's motion to dismiss* (Attachments: # 1 Exhibit(s) A - notice of appeal)(Faherty, Colleen) (Entered: 02/28/2022) |
| 03/18/2022 | 27 | NOTICE by Letitia James re 14 MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Judge Brenda K. Sannes MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Judge Brenda K. Sannes *Notice of supplemental authority* (Faherty, Colleen) (Entered: 03/18/2022) |
| 03/28/2022 | 28 | NOTICE by Letitia James re 14 MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Judge Brenda K. Sannes MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Judge Brenda K. Sannes *Notice of a factual development pertinent to Defendant's motion to dismiss* (Attachments: # 1 Exhibit(s) A - 3-28-22 NY Proceeding Order)(Amer, Andrew) (Entered: 03/28/2022) |
| 03/30/2022 | 29 | TEXT ORDER: The Court has reviewed the parties' submissions in connection with Plaintiffs' motion for a preliminary injunction (Dkt. No. 6 ) and Defendant's motion to dismiss (Dkt. No. 14 ). Plaintiffs are directed to file, by April 15, 2022, a letter brief not to exceed 15 pages which (1) addresses Defendant's argument that the orders issued in the New York proceeding, including the February 17, 2022 order denying the motion to quash, are "final appealable judgments that have preclusive effect" (Dkt. No. 24 , at 13); and (2) explains, with supporting authority, why Plaintiffs could not raise the constitutional issues or relief they seek in this action in the state proceeding (e.g., Dkt. No. 21 , at 22, 23). SO ORDERED by Judge Brenda K. Sannes on March 30, 2022. (rep) (Entered: 03/30/2022) |
| 04/15/2022 | 30 | LETTER BRIEF by Donald J. Trump, Trump Organization LLC. (Attachments: # 1 Declaration Declaration of Alina Habba, # 2 Exhibit(s) Exhibit A - Hearing Transcript) (Habba, Alina) (Entered: 04/15/2022) |
| 04/29/2022 | 31 | TEXT ORDER: Defendant's request for oral argument 14 is granted. Oral argument on the pending motions 6 , 14 is set for 5/13/2022 at 10:00 AM via Microsoft Teams. The parties should be prepared to address: (1) whether the New York proceeding is a pending state civil enforcement proceeding "akin to a criminal prosecution in important respects," see Smith & Wesson Brands, Inc. v. Attorney General of New Jersey, 27 F.4th 886 (3d Cir. 2022); (2) whether the New York proceeding involves orders "uniquely in furtherance of the state courts' ability to perform their judicial functions" in light of the recent contempt |

| | | ruling, see Cavanaugh v. Geballe, 28 F.4th 428 (2d Cir. 2022); and (3) the issues raised by Plaintiffs' most recent submission (Dkt. No. 30). SO ORDERED by Judge Brenda K. Sannes on 4/29/2022. (nmk) (Entered: 04/29/2022) |
|---|---|---|
| 05/03/2022 | 32 | NOTICE by Letitia James re 14 MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Judge Brenda K. Sannes MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Judge Brenda K. Sannes *Notice to provide the Court with supplemental information concerning the procedural posture of the New York Proceeding* (Attachments: # 1 Exhibit(s) 1, # 2 Exhibit(s) 2, # 3 Exhibit(s) 3, # 4 Exhibit(s) 4)(Faherty, Colleen) (Entered: 05/03/2022) |
| 05/11/2022 | 33 | NOTICE by Letitia James re 14 MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Judge Brenda K. Sannes MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Judge Brenda K. Sannes *Notice to provide the Court with further, supplemental information concerning the procedural posture of the New York Proceeding* (Attachments: # 1 Exhibit(s) 1)(Faherty, Colleen) (Entered: 05/11/2022) |
| 05/12/2022 | 34 | NOTICE of Appearance by Michael T Madaio on behalf of Donald J. Trump, Trump Organization LLC (Madaio, Michael) (Entered: 05/12/2022) |
| 05/13/2022 | | TEXT Minute Entry for Motion Hearing held on 5/13/2022 held via Microsoft Teams before Judge Brenda K. Sannes re 6 motion for a preliminary injunction and 14 Defendant's motion to dismiss: After a lengthy discussion, questioning counsel and allowing supplemental arguments, the court reserves decision. A written order will be issued. Appearances: Alina Habba, Esq. and Michael Adaio, Esq. for plaintiffs; Andrew Amer, Esq. and Colleen Faherty, Esq. for defendant. (Court Reporter: Jodi Hibbard. Time: 10:00 AM - 11:00 AM) (nmk) (Entered: 05/13/2022) |
| 05/26/2022 | 35 | NOTICE by Letitia James re 14 MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Judge Brenda K. Sannes MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Judge Brenda K. Sannes *Notice to provide the Court with supplemental information concerning the the New York Proceeding, specifically related to the portion of the proceeding that has been under review on appeal with the First Department* (Attachments: # 1 Exhibit(s) 1) (Faherty, Colleen) (Entered: 05/26/2022) |
| 05/27/2022 | 36 | MEMORANDUM-DECISION AND ORDER: It is hereby ORDERED that Defendant's motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) based upon the *Younger* abstention doctrine (Dkt. No. 14 ) is GRANTED, and the complaint is dismissed without prejudice. It is further ORDERED that Plaintiffs' motion for a preliminary injunction (Dkt. No. 6 ) is DENIED as moot, and the Clerk of Court is respectfully requested to close this case. Signed by Judge Brenda K. Sannes on 5/27/2022. (nmk) (Entered: 05/27/2022) |
| 05/27/2022 | 37 | JUDGMENT: It is ORDERED and ADJUDGED that Defendant's motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) based upon the *Younger* abstention doctrine (Dkt. No. 14 ) is GRANTED, and the complaint is dismissed without prejudice. It is further ORDERED that Plaintiffs' motion for a preliminary injunction (Dkt. No. 6 ) is DENIED as moot. (nmk) (Entered: 05/27/2022) |
| 05/27/2022 | 38 | NOTICE OF APPEAL as to 37 Judgment, 36 Order on Motion for Preliminary Injunction,,, Order on Motion to Dismiss for Failure to State a Claim,,, Order on Motion to Dismiss/Lack of Subject Matter Jurisdiction,, by Donald J. Trump, Trump Organization LLC. Filing fee $ 505, receipt number ANYNDC-5918951. (Habba, Alina) (Entered: 05/27/2022) |

| 05/31/2022 | [39](#) | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals re [38](#) Notice of Appeal. (hmr) (Entered: 05/31/2022) |
|---|---|---|
| 07/20/2022 | [40](#) | TRANSCRIPT REQUEST by Letitia James for proceedings held on 5/12/2022 before Judge Brenda K. Sannes.. (Faherty, Colleen) (Entered: 07/20/2022) |
| 07/20/2022 | [41](#) | TRANSCRIPT of Proceedings: Video Motion Hearing held on 5/13/2022 before Judge Brenda K. Sannes, Court Reporter: Jodi L. Hibbard, Telephone number: (315) 234-8547. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/10/2022. Redacted Transcript Deadline set for 8/22/2022. Release of Transcript Restriction set for 10/18/2022. Notice of Intent to Redact due by 7/25/2022 (jlh, ) (Entered: 07/20/2022) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/28/2022 16:11:52 | | | |
| **PACER Login:** | Db00092016 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-01352-BKS-CFH |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Attorney ID No.: 4931630
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
         -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiffs,*
*Donald J. Trump and Trump Organization LLC*

<div align="center">

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

</div>

| | |
|---|---|
| DONALD J. TRUMP and TRUMP ORGANIZATION LLC,<br><br>Plaintiffs,<br><br>v.<br><br>LETITIA JAMES, in her official capacity as Attorney General for the State of New York,<br><br>Defendant. | Civil Action No.:<br><br>1:21−cv−01352 (BKS/CFH) |

<div align="center">

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

</div>

    The plaintiffs, Donald J. Trump and Trump Organization LLC (collectively, "Plaintiffs"),

by and through their undersigned attorneys, Habba Madaio & Associates LLP, commence this

action seeking declaratory relief and injunctive relief, in the form preliminary and permanent

injunctions, against the above-named defendant and allege as follows:

## PRELIMINARY STATEMENT

1.      In the words of Letitia James, "no one is above the law" — not even the Attorney General of the State of New York.  Law enforcement officials have a sacred duty to wield the state's police power in a fair and impartial manner, without the slightest hint of favor, animus, or personal bias.  This duty is founded in the United States Constitution and is a bedrock principle of our democracy.  For this reason, it is particularly egregious when a prominent government official abandons this solemn oath in service of her own self-interests.

2.      A prosecutor's duty is not to "win a case, but that justice shall be done."[1]  Indeed, prosecutors possess enormous power and that is why they are, as the United States Supreme Court has emphasized, subject to strict professional and ethical constraints.[2]  "The law…seeks to protect against…prosecutors with political motivations" by, among other things, prohibiting them from engaging in "arbitrary fishing expeditions" and "initiating investigations out of malice or an intent to harass."[3]

3.      As Attorney General, Letitia James is the highest-ranking law enforcement official in the State of New York.  She is entrusted with a great deal of power which she is obligated to use in a resolute and unbiased manner.  Rather than embrace this responsibility, James has instead chosen to exploit it.  For years, she has flagrantly abused her investigatory powers to target her political adversaries and advance her career.  Her relentless attacks on Donald J. Trump serve as a prime example. Since taking office, she has tirelessly bombarded him, his family and his business, Trump Organization LLC, with unwarranted subpoenas in a bitter crusade to "take on" the President.

---

[1] *See Berger v. United States*, 295 U.S. 78, 88 (1935).
[2] *See, e.g., Trump v. Vance*, 140 S.Ct. 2412, 2428 (2020).
[3] *Id.*

4.      As outlined below, James's bias is immediately apparent.  Among other things, she has referred to the Trump presidency as "illegitimate," has promised to weaponize her resources against him and "anyone in [his] orbit," and has boasted about suing him "76 times."  Most troubling, James began making these threats before she was even elected at a time when she possessed no actual information or insight into Trump's business.

5.      The investigations commenced by James are in no way connected to legitimate law enforcement goals, but rather, are merely a thinly-veiled effort to publicly malign Trump and his associates.  Her mission is guided solely by political animus and a desire to harass, intimidate, and retaliate against a private citizen who she views as a political opponent.

6.      James has deprived, and will continue to deprive, Plaintiffs of their rights under federal law, state law and common law by virtue of her callous acts.  Even worse, rather than diligently prosecuting actual crimes in the State of New York—which are steadily on the rise— James has instead allocated precious taxpayer resources towards a frivolous witch hunt.  Plaintiffs now come before this Court to hold James accountable for her official misconduct and to preserve the integrity of the office she holds.

## THE PARTIES

7.      Plaintiff, Donald J. Trump ("Trump"), is a private citizen of the United States and a resident of the State of Florida in the County of Palm Beach.

8.      Plaintiff, Trump Organization LLC (the "Trump Organization"), is a corporation doing business in the State of New York with a principal place of business at Trump Tower, 725 Fifth Avenue, New York, New York.

9.      Defendant, Letitia James ("Defendant"), is the Attorney General for the State of New York and is being sued in her official capacity.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 since this case arises under the Constitution and laws of the United States, as well as 42 U.S.C. § 1983 since Plaintiffs bring this suit to vindicate the deprivation of "rights, privileges, or immunities secured by the Constitution." This Court also has jurisdiction under 28 U.S.C. §1343.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the defendant resides in and performs her official duties in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  In the alternative, to the extent 28 U.S.C. § 1391(b)(2) is not applicable, venue is proper in accordance with 28 U.S.C. § 1391(b)(3).

12.     The relief requested is authorized pursuant to 28 U.S.C. §§ 2201, 2202 (declaratory and related relief), 28 U.S.C. § 1651 (injunctive relief), 42 U.S.C. § 1983 (relief for deprivation of rights, privileges, and immunities secured by the constitution), 28 U.S.C. § 1343 (relief for the protection of civil rights), and 42 U.S.C. § 1988 (award for attorneys' fees and costs).

## STATEMENT OF FACTS

**I.      Defendant's Longstanding Animosity Toward Plaintiffs**

13.     Defendant is an outspoken political activist and member of the Democratic Party.

14.     Prior to serving as Attorney General of the State of New York, Defendant served as a Democratic member of the New York City Council and New York City Public Advocate for over a decade.

15.     After Trump's victory in the 2016 Presidential Election, Defendant began displaying severe animosity towards the president-elect.

16.      Prior to Trump's inauguration, Defendant retweeted calls for sit-ins to protest Trump's nomination of Jeff Sessions to be United States Attorney General.[4]

17.      Five days after Trump's inauguration, Defendant joined public protests and declared that his "administration ha[d] shown its true and ugly colors, but we will not be silent."

18.      Over the next several months, Defendant continued to publicly voice her disdain for Trump and his administration.[5]

19.      Six and a half months into Trump's term, Defendant was already leading "die-in" protests against Trump because, according to her, "we are all being killed by this administration."[6] Defendant punctuated her tweet with the hashtag, "Resist."

20.      The hashtag "#Resist" was widely recognized as shorthand for fighting Trump at every level in an effort to make Trump and his supporters "uncomfortable and not able to rest well" and thus unable to effectively implement his policies.[7]

21.      Defendant's embrace of the "resistance" mentality from the earliest days of the Trump presidency foreshadowed her relentless abuse of power as Attorney General.

22.      Eight and a half months into Trump's term, Defendant accused him of "blatant disregard for human lives."[8]

---

[4] Letitia James (@TishJames), Twitter (Jan. 25, 2017) archived at https://bit.ly/3jEjeJ0  ("Please [retweet] if you support @NAACP sit-ins protesting Jeff Sessions for Attorney General.").

[5] *See, e.g.*, *id.*, (Feb. 11, 2017, 12:01 PM ET) https://bit.ly/3liyZpK  ("@villagedemocrat out in full force today calling on our elected officials to fight for us against this administration."); *id.*, (Mar. 5, 2017, 5:01 PM ET) https://bit.ly/2Gl6c56 ("Hey @realDonaldTrump, we're in Queens, your hometown, rising up against your xenophobic policies, & we're ready to act."); *id.*, (June 3, 2017, 10:18 AM ET) https://bit.ly/33z0XYj ("Always proud to be with strong New York women standing up & speaking out against an administration that doesn't represent out values.").

[6] *id.* (Aug. 14, 2017, 5:55 PM ET)  https://bit.ly/3lu9fqz .

[7] *'Resist' is a Battlecry, But What Does It Mean?* The New York Times, Feb. 14, 2017, https://nyti.ms/2GLln77 .

[8] Letitia James (@TishJames), Twitter (Sep. 5, 2017, 11:06 AM ET) https://bit.ly/3lhVStj  "Trump admin once again showing blatant disregard for human lives.").

23.     Roughly ten months into Trump's term, Defendant announced: "I've been leading the resistance against Donald Trump in NYC and will only continue to do so in every way possible."[9]

24.     In her capacity as New York City Public Advocate, Defendant demonstrated a willingness to wield the government's power against those whose political beliefs differed from her own.[10]   That willingness took center stage in Defendant's political campaign for attorney general and her subsequent actions as New York's chief law enforcement officer.

## II.     Defendant Campaigned for Attorney General on a Promise to Target Trump and the Trump Organization.

25.     In May of 2018, after Attorney General Eric Schneiderman's resignation, Defendant declared her candidacy for Attorney General of the State of New York.

26.     As a candidate for Attorney General, Defendant made "taking on Donald Trump"[11] the focal point of her campaign, often comparing herself to Special Prosecutor Robert Mueller, who, at the time, was leading the now-debunked investigation into whether the Trump campaign colluded with Russians to interfere in the 2016 election.

27.     Defendant's campaign website not only repeated derogatory and inaccurate statements concerning Trump's policies but also stated—with no evidentiary basis whatsoever— that Trump had engaged in "public corruption."[12]

28.     Though it appears to have since been removed, the website at one time provided a link to a detailed outline of Defendant's strategy for rooting out corruption, with a section

---

[9] *Id.*, (Oct. 16, 2017, 7:57 PM ET) https://bit.ly/3d4wBQr emphasis added).do so in every way possible." *Id.*, (Oct. 16, 2017, 7:57 PM ET) https://bit.ly/3d4wBQr (emphasis added).

[10] *See id.*, (July 19, 2017, 10:32 AM ET) https://bit.ly/2F3wHLt ("We will not allow companies that build Trump's wall, a monument to racism and bigotry, to also do business with NYC.")

[11] See, e.g., Letitia James (@TishJames), Twitter (June 27, 2018, 10:48 AM ET) https://bit.ly/2GG4uuy  ("Congrats [now-Congresswoman Alexandria Ocasio Cortez] on your victory. Looking forward to working with you to help Democrats take on Donald Trump.")

[12] http://www.tishjames2018.com/corruption/

specifically devoted to Trump, his family, and the Trump Organization entitled "*Investigate Trump's New York Business*."

29.     As stated in the outline, the investigation would include:

> "a review of Trump-related real estate transactions, especially those in which the Trump family suddenly started paying cash for properties after years of operating their businesses exclusively by borrowing money."

30.     Of course, Defendant had no personal knowledge about any "Trump-related real estate transactions" at the time that she made these statements, as she had not yet been elected Attorney General and possessed no information or insight into Trump's business other than what she had presumably seen in the media.

31.     Nonetheless, Defendant continued to shamelessly campaign on her unfounded allegations against Trump and his family in a misguided effort to garner media attention and promote her fundraising efforts.

32.     On June 26, 2018, Defendant spoke at a protest opposing the Supreme Court's decision in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), telling the crowd that "it's critically important that we all understand that this was a result of the fact that [Republicans] stole the Supreme Court seat.   An illegitimate president and an illegitimate member of the Supreme Court."[13]

33.     On July 1, 2018, Defendant tweeted "New Yorkers need a fighter who will take on Donald Trump … I'll be that fighter.  Join my campaign."[14]

---

[13] *Letitia James Foley Sq Opposing Travel Ban Supreme Court Decision*, YouTube, 0:55 (June 26, 2018) https://bit.ly/3d58PDS .
[14] Letitia James (@TishJames), Twitter (July 1, 2018, 2:56 PM ET) https://bit.ly/3nh8rH4

34.     On July 11, 2018, Defendant posted on Democratic fundraising platform ActBlue with messages such as "I need your help in this fight against Donald Trump," and "[i]n this fight against Donald Trump and his harmful administration, I need your help."[15]

35.     By promising to prosecute a political opponent as a way of enticing voters to provide donations to her campaign, Defendant likely violated numerous campaign finance laws.

36.     On July 19, 2018, in the midst of a politically-charged speech before The Bronx Democratic Party, Defendant promised to use the law as a "sword" to relentlessly bombard Trump, proclaiming that that "no one is above the law, including this illegitimate president…and so *I look forward to going into the office of Attorney General every day, suing him, defending your rights, and then going home*!"[16]  Her pledge to utilize her position as a means of harassing a political opponent foreshadowed her future actions as Attorney General and demonstrated her irreverence for the duty to remain impartial in the role.

37.     On August 6, 2018, Defendant stated that "[t]he president of the United States has to worry about three things: [Special Counsel Robert] Mueller, [Michael] Cohen, and Tish James. We're all closing in on him."[17]

38.     Yet again, Defendant boldly alleged that Trump was actively engaged in criminal conduct, despite having no knowledge of any specific wrongdoing or any insight into Trump's business activities.

---

[15] *Id*. (July 11, 2018, 5:03 PM ET) https://twitter.com/tishjames/status/1017152409720754177
[16] Letitia James, Facebook, 1:18 (July 19, 2018) (emphasis added), https://m.facebook.com/LetitiaJamesforNY/videos/203059860348974.
[17] Hunter Walker, *New York Race Could Spark New Trump Investigation*, Yahoo News, Aug. 6, 2018, https://yhoo.it/36yLzwT .

39.     On the same day, Defendant tweeted "I've got my eyes on Trump Tower,"[18] and promised to "work with Mueller to make sure justice is served."[19]  Defendant assured that her retaliation against Trump was "just getting started."[20]

40.     On August 13, 2018, Defendant announced that she was "getting ready to ask [Trump] some questions — under oath."[21]  Defendant emphasized again that "Trump should be worried about three people: 1. Robert Mueller 2. Michael Cohen 3. Tish James."[22]

41.     In what can only be construed as an attempt to threaten and intimidate Trump, Defendant tweeted that Trump is "running out of time," and warned him that she would immediately investigate him and his "cronies" when she took office.[23]

42.     Defendant issued a similar threat on August 22, 2018, when she said, among other things, that Trump "should be scared" about her upcoming term.[24]

43.     On September 1, 2018, Defendant renewed her commitment to "take on [Trump] & his business in New York."[25]  Her statement about Trump's "business in New York" was undeniably a reference to the Trump Organization.

44.     On September 10, 2018, Defendant vowed to "stand up" to Trump.[26]

45.     Later that evening, Defendant declared once more that she was "just getting started" in "tak[ing] on" Trump.[27]

---

[18] Letitia James (@TishJames), Twitter (Aug. 6, 2018, 3:47 PM ET) https://bit.ly/3lmNPvs
[19] *id.*, (Aug. 6, 2018, 5:34 PM ET) https://bit.ly/3iCnSpM
[20] *Id.*
[21] *Id.*, (Aug. 13, 2018, 11:37 AM ET) https://bit.ly/2HTj1Un.
[22] *Id.*
[23] *Id.*, (Aug. 21, 2018, 1:01 PM ET) https://bit.ly/33Dqi3j.  ("Just wait until I'm in the Attorney General's office.")
[24] *Id.*, (Aug. 22, 2018, 9:09 AM ET) https://bit.ly/3nq7OuM.
[25] *Id.*, (Sept. 1, 2018, 10:44 AM ET) https://bit.ly/3ll6VBQ.
[26] *Id.*, (Sept. 10, 2018, 7:36 AM ET) https://bit.ly/34CaE7E.
[27] *Id.*, (Sept. 10, 2018, 10:38 PM ET) https://bit.ly/34yQkE3.

46.     In a troubling September 12, 2018 video, released during the Democratic primary, Defendant pledged that she would "never be afraid to challenge this illegitimate president."[28]

47.     In the very same video, Defendant baselessly accused Trump of a slew of crimes, including obstruction of justice and laundering money from foreign governments, and demanded that he be indicted.[29]   Defendant promised to "join with law enforcement and other attorney generals across this nation *in removing this President from office*."[30]   Mirroring her previous allegations, Defendant's call for Trump to be investigated was devoid of both fact and merit. Nevertheless, Defendant concluded the video by promising that "the days of Donald Trump are coming to an end."[31]

48.     On the same day, Defendant reiterated her warrantless claim that Trump is an "illegitimate president" and promised once more to "fight back" against Trump if New Yorkers voted for her.[32]

49.     On September 13, 2018, Defendant secured her party's nomination for Attorney General.   In her victory speech, Defendant proudly admitted that her campaign was only ever premised on "that man in the White House who can't go a day without threatening our fundamental rights."[33]

50.     On the same day, Defendant tweeted a quote from Congresswoman Maxine Waters, in which Waters stated that "New York has a chance to elect an attorney general who will investigate Trump."[34]   Defendant followed up on that theme a few hours later, accusing Trump of

---

[28] NowThis News, YouTube, https://bit.ly/34zB7Tj.
[29] *Id*.
[30] *Id*. (emphasis added).
[31] *Id*.
[32] Letitia James (@TishJames), Twitter (Sept. 12, 2018, 1:51 PM ET) https://bit.ly/3ln1Ysa.
[33] Jeffrey C. Mays, *Letitia James Makes History by Winning Attorney General Primary in New York,* The New York Times, September 13, 2018, https://nyti.ms/3IXFkU9
[34] *Id*., (Sept. 13, 2018, 11:04 AM ET) https://bit.ly/2GzxRix.

being "an illegitimate president" and saying that she was "running for Attorney General so [she could] standup to" Trump.[35]

51.     On October 3, 2018, Defendant tweeted that Trump's "days of defrauding Americans are coming to an end" and called upon "any agency with jurisdiction–from the IRS to the NY AG–to follow the facts wherever they may lead."[36]

**III.   As Attorney General, Defendant Repeatedly Made and Continues to Make Public Pronouncements of Wrongdoing by Trump and the Trump Organization Notwithstanding Investigations of Such Wrongdoing Were/Are Not Complete or Even Commenced.**

52.     On November 6, 2018, Defendant was elected Attorney General of the State of New York.  During her victory speech, she made a solemn promise to "shin[e] a bright light into every dark corner of [Trump's] real estate holdings."[37]

53.     Immediately following her election to the Office of Attorney General of the State of New York, Defendant—with no evidentiary or investigatory basis—laid bare her intent to employ the resources and authority of her elected office to impermissibly target the President of the United States, the political opponent on whom she had staked her campaign for election.

54.     The day after her election, Defendant prejudged the outcome of her promised investigation – before taking office, before establishing a legal predicate for such an investigation, and before gathering any facts or requesting even a single document from Trump.

55.     In an interview with political activist and former Democratic candidate for New York City Council Adina Sash, Defendant was asked if she planned to "sue [Trump and the Trump

---

[35] *Id.*, (Sept. 13, 2018, 4:41 PM ET) https://bit.ly/36Ff14i.
[36] Letitia James (@TishJames), Twitter (October 3, 2018) https://bit.ly/3pf1ol2
[37] Jeffrey C. Mays, *Breaking Barriers, Letitia James is Elected New York Attorney General,* The New York Times, November 6, 2018, https://nyti.ms/3IXFkU9

Organization].”[38]    Defendant laughingly responded “[o]h, we're definitely going to sue him. We're going to be a real pain in the ass.  He's going to know my name personally.”[39]

56.    On December 12, 2018, during an NBC News interview given eighteen days before assuming office, Defendant vowed to “use every area of the law to investigate President Trump and his businesses transactions and that of his family as well.”[40]  Defendant did not curtail her persecution of Trump and his family, however, promising to also investigate “anyone in [Trump's] orbit.”[41]

57.    Defendant's intent to weaponize her office to target Plaintiffs was readily apparent to even the most casual observer of her campaign and during the transition period after her election.[42]

58.    Defendant's open threats and promises to investigate Trump were so appalling that even members of her party condemned them as unlawful.

59.    Daniel Goldman, the Democratic Party's counsel for the impeachment process against Trump and a former Assistant United States Attorney in Manhattan, warned that Defendant's statements “give the appearance of an individualized political vendetta . . . It's essential that prosecutors maintain their neutrality and an objective view of the facts and the

---

[38] Adina Sash (@FlatBushGirl), Instagram (Nov. 7, 2018) https://bit.ly/34zVOhE
[39] *Id*.
[40] Chris Mills Rodrigo, *Incoming New York AG: 'We Will Use Every Area of the Law to Investigate President Trump'*, The Hill, Dec. 12, 2018, 9:20 AM ET, https://bit.ly/33CybpG .
[41] *Id*.
[42] *See*, e.g., Jeffery C. Mays, N.Y.'s Attorney General Is Targeting Trump. Will Judges See a 'Political Vendetta?', The New York Times, Dec. 31, 2018, https://nyti.ms/2GsA2oa (“Letitia James, the incoming New York attorney general, has made no secret of how she feels about President Trump. She calls him an 'illegitimate president.' She says her decision to run for attorney general was largely 'about that man in the White House who can't go a day without threatening our fundamental rights.'”).

evidence, no matter the politics involved."[43]  By abandoning even the pretext of such neutrality, Defendant "[went] too far in allowing politics to shape her agenda."[44]

60.     The intraparty criticisms of Defendant's conduct speak for themselves.  However, the reactions of attorneys *within Defendant's own office* are even more compelling.  Numerous officials within the New York Attorney General's office—who themselves had frequently litigated against Plaintiffs under Defendant's predecessors—examined Defendant's actions with "apprehension and uneasiness."[45] Those officials left Defendant's office after her election.[46]

61.     In sum, Defendant promised to investigate Trump dozens of times over seven months, all before she ever assumed office or was privy to a single fact known to law enforcement. Defendant did not state a legal or factual basis for such promises.  She could not.  After all, her knowledge of Trump's business activities was no greater than that of any other citizen.  Rather, her only justification for the forthcoming investigation was her political opposition to Trump.

62.     It is clear that Defendant lacked any basis to investigate Trump, but she did so anyway, and in doing so, she abandoned all pretenses of acting with impartiality and in accordance with prosecutorial standards.

63.     Defendant took the oath of office as Attorney General of New York on January 1, 2019.  In so doing, Defendant swore to support the Constitution of the United States and faithfully discharge the duties of Attorney General.

64.     Defendant immediately disregarded that oath, dismissing any doubt that her fixation on investigating Trump was idle campaign talk.

---

[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*

65.     On January 3, 2019, three days after she was sworn in as Attorney General, Defendant told CNN that she would "ensure that the man currently occupying the Oval Office is held accountable to [sic] any and everything he has done."[47]

66.     Defendant further stated that she would "never be afraid to challenge this illegitimate president" and that investigating Trump "fuels [her] soul."[48]

67.     On March 11, 2019, Defendant employed the authority and vast array of resources of the Office of the Attorney General to formally open an investigation of the Trump Organization and issued subpoenas to Deutsche Bank and Investors Bank "for records relating to the financing of four major Trump Organization projects."[49]

68.     The subpoenas were "a culmination of months of threats from [Defendant] that she would aggressively investigate Mr. Trump" and, by extension, the Trump Organization.[50]

69.     Defendant has claimed that she relied upon testimony given by Michael Cohen ("Cohen") before Congress as grounds for initiating the investigation of Plaintiffs.[51]

70.     Defendant is well-aware that, based on his prior history, Cohen is an unreliable source whose sworn testimony lacks any semblance of credibility:

     a.     Cohen was previously convicted of committing a federal offense in connection with the precise act that Defendant claims to have relied upon – testifying before Congress.

---

[47] Athena Jones, *New NY Attorney General Vows to Target Trump*, CNN.com, Jan. 3, 2019, https://cnn.it/3d48gu1 .
[48] *Id*.
[49] William K. Rashbaum & Danny Hakim, *New York Attorney General Opens Investigation of Trump Projects*, The New York Times, Mar. 11, 2019, https://nyti.ms/2GKALRa.
[50] *Id*.
[51] First Affirmation of Matthew Colangelo in Support of the Office of the Attorney General's Order to Show Cause to Compel Compliance with Investigatory Subpoenas, p. 23, *People of the State of New York v. Trump Organization*, *LLC*, Index No. 451685/2020.

b.  In particular, on November 29, 2018, Cohen was convicted of making false statements to Congress in violation of 18 USC § 1001(a)(2) as well as seven additional federal felonies which "each involved deception."[52]

c.  In the words of presiding district court judge William H. Pauley III, Cohen was guilty of a "veritable smorgasbord of fraudulent conduct."[53]

d.  In connection with Cohen's consolidated sentencing proceedings, the United States of America submitted two scathing sentencing memoranda, each dated December 7, 2018, one signed by the Special Counsel's Office (SCO) and another by the United States Attorneys' Office (USAO).

e.  In the SCO's Sentencing Memorandum, which was signed by Special Counsel Robert S. Mueller and focused on Cohen's false statements to Congress, Mueller detailed how Cohen's lies were "deliberate and premeditated" and part of a "deliberate effort to use his lies as a way to set the tone and shape the course of the hearings in an effort to stymie the inquiries."[54]

f.  In the USAO's Sentencing Memorandum, which was signed by Acting United States Attorney Robert Khuzami and focused more generally on Cohen's character and credibility, Khuzami described Cohen as "a man who knowingly sought to undermine core institutions of our democracy"[55] and "repeatedly used his power and influence for deceptive ends" by engaging in "extensive, deliberate, and serious

---

[52] Sentencing Tr. at 31:10-15, *United States v. Cohen*, No. 18 Cr. 602 (WHP) (S.D.N.Y. Dec. 12, 2018).
[53] *Id.*
[54] SCO Sentencing Memorandum at 2, *United States v. Cohen*, No. 18 Cr. 850 (WHP) (S.D.N.Y. Dec. 7, 2018).
[55] USAO Sentencing Memorandum at 27, *United States v. Cohen*, No. 18 Cr. 602 (WHP) (S.D.N.Y. Dec. 7, 2018).

criminal conduct" which was "motivated by personal greed and ambition" and consistent with a "pattern of deception that permeated his professional life."[56]

g.  Cohen, formerly an attorney at law, was eventually disbarred for his fraudulent and deceitful misconduct.[57]

h.  Cohen has also publicly admitted that his cooperation with law enforcement officials has, at times, been coerced and given under duress.  For example, on November 28, 2021, in discussing his cooperation with federal authorities, Cohen stated "[t]he threat against me was that they were going to file an 85-page indictment that was going to include my wife.  They were going to say that she was a co-conspirator […] which is absolutely non-sensical. […] There was no chance in the world that I was going to put her at risk with these animals."[58]

71.  Defendant further carried out her intent to prosecute "anyone in Trump's orbit" by issuing subpoenas to the Eric Trump Foundation (now doing business as "Curetivity") (the "Foundation") for its charitable donations to St. Jude Children's Research Hospital, a leading cancer center in Memphis, Tennessee.

72.  Eric Trump has helped raise over $16.3 million dollars for St. Jude over the span of a decade, yet Defendant felt it was necessary to scrutinize funds that were donated to provide medical care to children in need.

73.  After the Foundation complied with Defendant's request, Defendant's investigation ultimately led nowhere, another indication of Defendant's pernicious intent in probing a charitable donation tangentially tied to Plaintiffs.

---

[56] *Id.* at 1-2.
[57] *See generally Matter of Cohen*, 2019 NY Slip Op 01381 (Feb. 26, 2019)
[58] NBC News, Meet The Press, November 28, 2021, https://www.youtube.com/watch?v=Y6gEK6hExxI.

74.     On April 23, 2019, Defendant repeated her prior, unfounded allegation that Trump and the Trump Organization were engaged in criminal activity: "We need to focus on Donald Trump and his abuses . . . we need to follow his money . . . we need to find out where he's laundered money . . . all of those transactions have happened here in New York City."[59]

75.     After nearly three years of formal investigation, five years of targeted public attacks, and millions of dollars and thousands of hours spent, it is clear that neither Trump nor any of his companies have ever laundered money.  Not one dollar. Defendant fabricated the allegations out of thin air, and this is prima facie evidence of her unconstitutional actions in her official capacity.

76.     By predetermining the outcome of her investigation into the Trump Organization and leveling conclusory allegations of wrongdoing against it, Defendant exposed—yet again—that her investigation was merely a pretext for achieving her overall goal of harassing the Trump Organization due to Trump's ownership of it.

77.     Openly flouting her duty to remain neutral in her public comments on an ongoing investigation, Defendant continued to disparage Trump and the Trump Organization throughout the summer of 2019.

78.     On July 23, 2019, Defendant tweeted that Trump "has spent his career hiding behind lawsuits" and promised to "vigorously fight" him.[60]

79.     On September 30, 2019, Defendant accused Trump of waging a "cruel crusade against . . . invaluable members of our society."[61]

---

[59] MSNBC, *New York Attorney General on Plan to Thwart Trump Pardons*, YouTube, April 23, 2019, https://bit.ly/33z1WaG.
[60] Letitia James (@NewYorkStateAG) Twitter, July 23, 2019, 3:36 PM ET, https://bit.ly/2GEQykG.
[61] Letitia James (@NewYorkStateAG), Twitter, Sep. 30, 2019, 10:50 AM ET, https://bit.ly/30HC0b7 .

80.    On December 10, 2019, Defendant accused Trump of "abuse of power."[62]

81.    Two and a half weeks later, she served a subpoena *duces tecum* on Trump, the Trump Organization's corporate officers, and third parties for information and testimony about a wide range of properties owned by Trump across the country.

82.    On January 16, 2020, Defendant retweeted the following statement: "Let's be clear — Donald Trump has never known what it's like to struggle, let alone for food, but he has no problem stripping protections for those who do.  Luckily we have allies like [Defendant] who will lead the legal fights against these unfair and immoral attacks on the poor."

83.    On February 21, 2020, Defendant alleged that Trump "doesn't believe in the rights and liberties of marginalized and vulnerable populations."[63]

84.    On July 24, 2020, Defendant announced her intention to sue the Trump Administration for the purported unlawful practice of excluding undocumented immigrants in the 2020 census (a case which was ultimately thrown out by the Supreme Court).[64]  In her tweet, Defendant boasted "We beat the president before in court, and we will beat him again."[65]

85.    Under Defendant's leadership, the Office of the Attorney General has been reduced to nothing more than the right arm of the Democratic party.  This was made abundantly clear when Defendant chose to file a motion to compel Eric Trump's deposition on August 24, 2020, which was conveniently filed on the first day of the Republican National Convention.  The timing of this Motion further cements Defendant's transparent effort to further her own political agenda.[66]

---

[62] Letitia James (@NewYorkStateAG), Twitter, Dec. 10, 2019, 1:21 PM ET, https://bit.ly/2F5RcXV .
[63] WBLS 1075 NYC, YouTube, *1st Black Person Elected Attorney General of NY, Letitia James, Talks Career & Has Message for Trump*, Feb. 21, 2020, https://bit.ly/3jCo1KZ .
[64] *U.S. Supreme Court throws out challenge to Trump census immigrant plan*, December 18, 2020 https://reut.rs/3EbBrr1
[65] Letitia James (@NewYorkStateAG), Twitter, July 24, 2020, 3:48 PM ET, https://twitter.com/NewYorkStateAG/status/1286750166041735169
[66] *New York attorney general files legal action against Trump Organization, revealing state investigation into the company's financial dealings*, The Washington Post, August 24, 2020, https://wapo.st/3p7uOlb.

86.     Upon information and belief, she intentionally leaked this information on the commencement of the Republican National Convention, with the sole intention of disrupting the convention and generating publicity for herself.

87.     On May 18, 2021, Defendant compounded her efforts to prosecute Trump by relentlessly pushing New York County District Attorney, Cyrus Vance, into a criminal investigation of the Trump Organization.[67]  By doing so, Defendant is inappropriately heading parallel civil and criminal probes into Plaintiffs' alleged unlawful business practices as a further attempt to erode their constitutional rights.

88.     Despite Defendant's biased and inflammatory statements, and the unconstitutional nature and scope of the civil investigation, Plaintiffs produced over 8 million pages of documents in response to Defendant's subpoenas.

89.     Defendant's campaign of harassing Plaintiffs has been publicly condemned by other attorney generals.

90.     For example, Jeff Landry, Attorney General of the State of Louisiana, has described Defendant's investigations as "anti-Trump fishing expeditions," which are a "gross abuse of her office."[68]  As AG Landry has explained: "[w]hile these actions may be popular with a liberal base that doesn't respect the rule of law, they politicize the office of attorney general and create an unrealistic and shameful public perception of how a state attorney general operates. James' conduct disgraces all of us who are privileged to bear the title of attorney general."[69]

---

[67] Defendant cross-designated two attorneys from her office to assist in the New York County DA's criminal probe. *New York AG has 2 lawyers working with DA on Trump Probe*, https://bit.ly/3pcCT8l; *see also New York's Attorney General Joins Criminal Inquiry Into Trump Organization*, New York Times, May 18, 2021. https://nyti.ms/3sjpEEP
[68] See, e.g., *Jeff Landry, Tish James' Endless Anti-Trump Suits Betray the AG's Mission*, The New York Post, Sept. 22, 2020, 8:21 PM ET https://bit.ly/2Sx1mnw.
[69] *Id.*

91.     On October 29, 2021, Defendant declared her candidacy for Governor of New York State.

92.     In her announcement video, she boasted that she "sued the Trump Administration 76 times, but who is counting?"[70]   In making this statement, Defendant signaled that she had planned to make 'taking on Trump' the centerpiece of yet another campaign.

93.     Amid poor polling numbers, on December 9, 2021, Defendant announced that she is suspending her campaign for Governor of New York and will instead run for re-election as Attorney General.[71]

94.     In a statement that accompanied her withdrawal, she stated "I have come to the conclusion that I must continue my work as attorney general.  There are a number of important investigations and cases that are underway, and I intend to finish the job.  I am running for re-election to complete the work New Yorkers elected me to do."[72]

95.     Defendant left little to no doubt that her involvement in the Trump investigation was the primary reason she intended to stay on as Attorney General.

96.     On December 15, 2021, Defendant appeared on *The View* to discuss the suspension of her gubernatorial campaign and the status of her ongoing investigations.[73]

97.     When asked what led to her decision to exit the race, Defendant explained that she has "unfinished businesses," among them being her "investigations into the Trump Organization

---

[70] Letitia James (@TishJames), Twitter, October 29, 2021, 1:31 PM ET.
https://www.nytimes.com/2021/10/29/nyregion/letitia-james-governor.html
[71] Carl Campanile, *Kathy Hochul Hold Solid Lead Over Letitia James In NY Governor Poll*, The New York Post, November 28, 2021, 6:23 PM ET, https://nypost.com/2021/11/28/hochul-holds-solid-lead-over-james-in-ny-governor-poll.
[72] *N.Y. Attorney General Letitia James exits governor's race, will run for re-election*, NBC News, December 9, 2021, https://www.nbcnews.com/politics/elections/n-y-attorney-general-letitia-james-exits-governor-s-race-n1285671.
[73] The View, *Letitia James Speaks To 'The View' Exclusively On Suspending Run For Governor*, YouTube, December 14, 2021, https://www.youtube.com/watch?v=BK56ZH8Pvt8 .

and into certain individuals." Joy Behar, a fanatical Trump critic, then quipped "you believe in loyalty, I believe in putting Trump in jail." Behar's comment was met by Defendant's exuberant laughter. Behar then followed up and stated "some people think that you dropped out of the Governor's race because you are about to drop a bombshell on us in your civil investigations into Trump's business practices. There are reports that you are trying to depose Trump under oath next month, tell me that's true." Defendant put her personal disdain for Trump on full display by responding to Behar's comment with laughter.[74]

98.     When Defendant was asked what would happen if Trump chose not to comply with Defendant's deposition notice. Defendant then stated "Joy, you know I love you right? I do, I do, I do, so you know I can't admit or deny (laughter). I cannot admit and/or deny those allegations in the preface of your question. I can just say … we have conducted a civil investigation into the Trump Organization. We also have a parallel investigation, a criminal investigation."[75]

99.     In a telling admission of her own motivations, when further commenting on her decision to stay on as Attorney General, she stated "I'd rather be turning red to blue."[76] Defendant made it clear that she prioritizes advancing her personal and political mission over the impartial enforcement of the law.

100.     Defendant's endless public promises to investigate Plaintiffs, her open disparagement of Plaintiffs, her accusations that Plaintiffs broke the law despite admitting she possessed no evidence to substantiate those allegations, and her aggressive and wide-sweeping investigation into Plaintiffs' business activities all lead to only one reasonable conclusion: Defendant prioritized her "desire to pound an opponent into oblivion" over her "obligations" as

---

[74] *Id.*
[75] *Id.*
[76] The View, *New York AG Letitia James Plans to Follow Gov. Newsom's Anti-Gun Law Model*, YouTube, December 14, 2021, https://www.youtube.com/watch?v=FNyb95YDdB0 .

New York's highest law enforcement officer to enforce the law equally without regard to citizens' political opinions.[77]

101.   Absent judicial relief, James will continue to violate Plaintiffs' rights in an unconstitutional manner and Plaintiffs will suffer imminent and irreparable harms.

<u>**COUNT I**</u>
**VIOLATION OF THE FOURTEENTH AMENDMENT**
**42 U.S.C. § 1983**

102.   Plaintiffs re-assert and re-allege the allegations contained within the preceding paragraphs as if set forth at length herein.

103.   The Fourteenth Amendment of the United States Constitution, also known as the Due Process Clause, guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

104.   An action for violation of constitutional rights, such as those afforded under the Fourteenth Amendment, may be brought pursuant to 42 U.S.C. § 1983, which states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State […], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the [United States] Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

105.   Defendant maliciously weaponized the state police power of the Attorney General by commencing and continuing baseless investigations and fishing expeditions against Plaintiffs.

106.   Defendant commenced the investigations against Plaintiffs in bad faith and without a legally sufficient basis.

---

[77] <u>Freeport-McMoRan Oil & Gas Co.</u>, 962 F.2d at 48.

107.    Defendant knew that her investigations were unsupported, unjustified, and unfounded in fact or in law.

108.    Defendant's actions were motivated by an improper purpose, namely her malice, political animus, and a desire to harass, intimidate, threaten, oppress, coerce, injure and/or retaliate against Trump, and his business, the Trump Organization, for his political views and his official acts as president.

109.    Defendant's improper public comments concerning her open investigations into Plaintiffs—often prejudging Plaintiffs' guilt without respect for the presumption of innocence—are a further example of Defendant's bias, prejudice, and callous indifference for due process of the law.

110.    Defendant's flagrant misuse of state investigatory powers contravened Plaintiffs' constitutional rights and deprived them of life, liberty, and/or property without due process of law.

111.    At all relevant times, Defendant was acting in an official capacity and under the pretense and color of the law.

112.    Defendant's actions, including but not limited to her abuse of criminal and civil process, the commencement of arbitrary fishing expeditions, and collective misconduct in targeting Plaintiffs in bad faith and solely for political purposes, deprived Plaintiffs of due process of law and impermissibly infringed upon their constitutional rights.

113.    As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered, and will continue to suffer, significant, imminent and irreparable harm in the form of deprivation of their constitutionally protected rights, privileges, and immunities afforded under the Fourteenth Amendment, as secured by 42 U.S.C. § 1983.

114.    Absent injunctive relief, Plaintiffs will continue to suffer irrevocable loss and irreparable harm as a result of Defendant's deprivation of their constitutional rights.

115.    In addition to the declaratory and injunctive relief sought herein, Plaintiffs are also entitled to an award of attorneys' fees, costs, and disbursements pursuant to 42 U.S.C. § 1988.

<div align="center">

**COUNT II**
**VIOLATION OF THE FIRST AMENDMENT**
**42 U.S.C. § 1983**

</div>

116.    Plaintiffs re-assert and re-allege the allegations contained within the preceding paragraphs as if set forth at length herein.

117.    The First Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, guarantees the right to freedom of speech. U.S. Const. amend. I.

118.    The United States Supreme Court has recognized that political speech is the most protected form of speech under the First Amendment.

119.    Trump, the Forty-Fifth President of the United States, is a prominent political figure and member of the Republican Party.

120.    Trump's political views, beliefs, and affiliations, and those acts he has taken in furtherance of his political career, are a form of political speech subject to constitutional protection under the First Amendment.

121.    Defendant is a fervent supporter of the Democratic Party, having served as a member of the party in public office since at least 2005 and even announcing in October 2021 that she intended to run for the office of Governor of New York in the 2022 Democratic Primary.

122.    As described in the preceding paragraphs, Defendant has made many public statements expressing her radical contempt for Trump and his political views.

123.    As a member of the Democratic Party, Defendant has served as an outspoken critic of Trump throughout the entirety of his presidency.

124.    Defendant's conduct in commencing and continuing baseless investigations and fishing expeditions against Plaintiffs was intended to stifle Plaintiffs' free speech because Defendant disfavors the political ideologies, perspectives, opinions and/or views held by Trump.

125.    Defendant's actions were further motivated by an improper purpose, namely a desire to harass, intimidate, threaten, oppress, coerce, and injure Plaintiffs in retaliation for Trump's political views and his official acts as President.

126.    Defendant's attempts to silence Plaintiffs' free speech were both discriminatory and retaliatory in nature.

127.    At all relevant times, Defendant was acting under the pretense and color of the law.

128.    Plaintiffs' First Amendment rights have been, and continue to be, wrongfully infringed upon by way of Defendant's deployment of state power to discriminate against, retaliate against and otherwise suppress the rights of free speech of Trump and his business, the Trump Organization, based on Trump's political ideologies, perspectives, opinions and/or views and his official acts as President.

129.    Defendant caused the issuance of multiple subpoenas and commenced a pretextual investigations against Plaintiffs based entirely upon her own personal disagreement, and the disagreement of the Democratic party, with Trump's political speech and the political position of the Trump Organization, for the sole purpose of intimidating and harassing Plaintiffs and to suppress Plaintiff's political views and associated speech and political action.

130.    Defendant's conduct constitutes impermissible viewpoint discrimination against Plaintiffs and/or a retaliatory violation of Plaintiffs' First Amendment rights.

131.    As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered, and will continue to suffer, significant, imminent and irreparable harm in the form of deprivation of their constitutionally protected rights, privileges, and immunities afforded under the First Amendment, as secured by 42 U.S.C. § 1983.

132.    Absent injunctive relief, Plaintiffs will continue to suffer irrevocable loss and irreparable harm as a result of Defendant's deprivation of their constitutional rights.

133.    In addition to the declaratory and injunctive relief sought herein, Plaintiffs are also entitled to an award of attorneys' fees, costs, and disbursements pursuant to 42 U.S.C. § 1988.

<u>**COUNT III**</u>
**VIOLATION OF THE FOURTH AMENDMENT**
**42 U.S.C. § 1983**

134.    Plaintiffs re-assert and re-allege the allegations contained within the preceding paragraphs as if set forth at length herein.

135.    The Fourth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, guarantees "[t]he right of the people to be secure in their persons, houses, papers, and affects, against unreasonable searches and seizures." U.S. Const. amend. IV.

136.    Defendant issued numerous overbroad, overreaching and irrelevant subpoenas to Plaintiffs without any legally sufficient or justifiable reason for doing so.

137.    The subpoenas were not in any way limited in scope, relevant in purpose, or specific in directive.

138.    Defendant was aware that there was no justifiable legal or factual basis for the issuance of the subpoenas; she was purposefully engaging in an arbitrary fishing expedition against Plaintiffs.

139.    Defendant's actions were motivated by an improper purpose, namely her desire to harass, intimidate, threaten, oppress, coerce, and injure Plaintiffs.

140.    At all relevant times, Defendant was acting under the pretense and color of the law.

141.    The subpoenas issued by Defendant imposed an undue burden on Plaintiffs and violated their Fourth Amendment right to be free from unreasonable searches and seizures.

142.    As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered, and will continue to suffer, significant, imminent and irreparable harm in the form of deprivation of their constitutionally protected rights, privileges, and immunities afforded under the Fourth Amendment, as secured by 42 U.S.C. § 1983.

143.    Absent injunctive relief, Plaintiffs will continue to suffer irrevocable loss and irreparable harm as a result of Defendant's deprivation of their constitutional rights.

144.    In addition to the declaratory and injunctive relief sought herein, Plaintiffs are also entitled to an award of attorneys' fees, costs, and disbursements pursuant to 42 U.S.C. § 1988.

**COUNT IV**
**ABUSE OF PROCESS**

145.    Plaintiffs re-assert and re-allege the allegations contained within the preceding paragraphs as if set forth at length herein.

146.    Defendant initiated regularly issued criminal and civil processes, in the form of subpoenas, against Plaintiffs.

147.    By issuing the above-mentioned subpoenas, Defendant intended to compel Trump to discontinue his political career, to hinder his bid for re-election in the 2020 Presidential Election, and/or to compel Plaintiffs to cease business operations in the State of New York.

148.    Through her wrongful, malicious, and egregious actions, Defendant sought to harm Plaintiffs without excuse or justification.

149.    Defendant is, and at relevant all times was, aware that her office's investigations were unsupported, unjustified, and unfounded in fact or in law.

150.    Defendant was aware that her office's investigations were unsupported, unjustified, and unfounded in fact or in law.

151.    Defendant's actions were motivated by malice, political animus, and a desire to harass, intimidate, threaten, oppress, coerce, injure and/or retaliate against Trump and his business, the Trump Organization.

152.    Defendant weaponized the legal process against Plaintiffs in a perverted manner for the purpose of obtaining inappropriate collateral objectives outside the legitimate ends of the process:

a.    Defendant intended to obtain a collateral advantage for herself inasmuch as Defendant sought to promote her public image, to advance her political career, and to increase her likelihood of being re-elected as New York Attorney General and/or elected as Governor of the State of New York.

b.    Defendant also intended to obtain a collateral detriment to Plaintiffs inasmuch as Defendant sought to tarnish Trump's reputation personally, professionally and politically, in order to, among other things, diminish Trump's likelihood of winning the 2020 Presidential Election, bring about the end of Trump's political career, and injure Plaintiffs' business relations in the State of New York.

153.    At all relevant times, Defendant was acting in her official capacity and under the pretense and color of the law.

154.    Absent injunctive relief, Plaintiffs will continue to suffer irrevocable loss and irreparable harm as a result of Defendant's malicious abuse of process.

155.    As a direct and proximate result of Defendant's actions, Plaintiffs have suffered and will continue to suffer, significant, imminent and irreparable harm, deprivation of their rights under state law, and special damages in the form of costs of defense and attorneys fees incurred in defending against Defendant's baseless investigations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment be awarded in their favor as follows:

a.  For a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that Defendant has violated Plaintiffs' rights, privileges and immunities under the First, Fourth and Fourteenth Amendments to the United States Constitution;

b.  For a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that Defendant's investigations constitute impermissible state action and an abuse of process that harness state police power to retaliate against, injure and harass a political opponent in violation of the Unites States Constitution, federal law, state law, and/or common law;

c.  For a preliminary and permanent injunction pursuant to 28 U.S.C. § 1651(a), 42 U.S.C. § 1983, Rule 65 of the Federal Rules of Civil Procedure, and Local Rule 65.1 requiring Defendant to immediately cease or, at a minimum, appropriately limit all ongoing investigations of Plaintiffs pending resolution of this action;

d.  For a preliminary and permanent injunction pursuant to 28 U.S.C. § 1651(a), 42 U.S.C. § 1983, Rule 65 of the Federal Rules of Civil Procedure, and Local Rule 65.1 granting Plaintiffs relief from Defendant's ongoing, unbounded investigations and enjoining her from being involved in any manner in any civil or criminal actions against Plaintiffs;

e.   For such other declaratory and/or injunctive relief that Plaintiffs are entitled;

f.   For an award for Plaintiffs' attorneys' fees, costs, and disbursements; and

g.   For such other relief as the Court deems equitable, just, and proper.

### JURY DEMAND

Plaintiffs hereby requests a trial by jury of any issue so triable as of right pursuant to Rule

38(b) of the Federal Rules of Civil Procedure.

Dated:   December 20, 2021
        New York, New York

 

Alina Habba, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
        -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiffs,*
*Donald J. Trump and Trump Organization LLC*

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS

DONALD J. TRUMP and TRUMP ORGANIZATION LLC

### DEFENDANTS

LETITIA JAMES, in her official capacity as Attorney General for the State of New York

**(b)** County of Residence of First Listed Plaintiff   Palm Beach, FL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Albany, NY
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Habba Madaio & Associates LLP, 112 West 34th Street, 17th & 18th Floors, NY, NY 10120, (908)869-1188

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>[ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | **CIVIL RIGHTS**<br>[x] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>[ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act | **SOCIAL SECURITY**<br>[ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | |
| | | **IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC § 1983
Brief description of cause:
Violation of constitutional rights under the First, Fourth and Fourteenth Amendments; abuse of process under state law.

### VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

### VIII. RELATED CASE(S) IF ANY

*(See instructions)*
JUDGE _____ DOCKET NUMBER _____

DATE
December 20, 2021

SIGNATURE OF ATTORNEY OF RECORD
s/Alina Habba

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT $402.00 APPLYING IFP _____ JUDGE BKS MAG. JUDGE CFH

ANYNDC-5748409

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Attorney ID No.: 4931630
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
    -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiffs,*
*Donald J. Trump and Trump Organization LLC*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONALD J. TRUMP and TRUMP ORGANIZATION LLC,<br><br>          Plaintiffs,<br><br>v.<br><br>LETITIA JAMES, in her official capacity as Attorney General for the State of New York,<br><br>          Defendant. | Civil Action No.: 1:21-cv-01352-BKS-CFH<br><br><br><br>**NOTICE OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

PLEASE TAKE NOTICE that pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs Donald J. Trump and Trump Organization LLC ("Plaintiffs") by their undersigned counsel of record, hereby move this Court before the Honorable Brenda K. Sannes, in the United States District Court, Northern District of New York, Albany, New York, for a preliminary injunction against the Defendant, Letitia James ("Defendant"), for an order: (1) granting Plaintiffs a preliminary injunction staying the Defendant's and the Office of the New York Attorney General's active civil investigation of Plaintiffs for the duration of this action and pending resolution thereof; or (2) in the alternative, requiring that Defendant recuse herself from

involvement in any capacity in the active civil and criminal investigation of Plaintiffs for the duration of this action and pending resolution thereof. Plaintiffs' motion is based on the attached memorandum of law, Declaration of Alina Habba, Esq. in Support of Plaintiffs' Motion for Preliminary Injunction (the "Motion") dated January 4, 2022, other filings, and any oral argument or evidence presented at the preliminary injunction hearing. Plaintiffs are entitled to a preliminary injunction because they have shown "'(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

Dated:  January 10, 2021.                    Respectfully submitted,
        New York, New York

                                             _____
                                             Alina Habba, Esq.
                                             **HABBA MADAIO & ASSOCIATES LLP**
                                             1430 U.S. Highway 206, Suite 240
                                             Bedminster, New Jersey 07921
                                                          -and-
                                             112 West 34th Street, 17th & 18th Floors
                                             New York, New York 10120
                                             Telephone: (908) 869-1188
                                             Facsimile: (908) 450-1881
                                             E-mail: ahabba@habbalaw.com
                                             *Attorneys for Plaintiffs,*
                                             *Donald J. Trump and Trump Organization LLC*

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Attorney ID No.: 4931630
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
         -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiffs,*
*Donald J. Trump and Trump Organization LLC*

<div align="center">

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

</div>

| | |
|---|---|
| DONALD J. TRUMP and TRUMP ORGANIZATION LLC, | Civil Action No.: 1:21-cv-01352-BKS-CFH |
| Plaintiffs, | |
| v. | **DECLARATION OF ALINA HABBA, ESQ. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| LETITIA JAMES, in her official capacity as Attorney General for the State of New York, | |
| Defendant. | |

I, Alina Habba, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am managing partner of the firm of Habba Madaio & Associates LLP, counsel for Donald J. Trump and Trump Organization LLC (collectively, "Plaintiffs") in the above-captioned matter (the "Action").

2.      I submit this declaration pursuant to Federal Rule of Civil Procedure 65 and Local Rule 7.1, in support of Plaintiffs' Motion for Preliminary Injunction.  The facts herein are true and correct and, unless otherwise stated, are within my personal knowledge.

3.      As counsel for Plaintiffs, I have reviewed pleadings, and other documents related to the Action, and I am familiar with the facts and circumstances of this case.

4.      Attached hereto as **Exhibit A** is a true and accurate copy of the original Complaint filed with this Court on December 20, 2021.

5.      For the reasons set forth more fully in the Complaint, Plaintiffs will suffer immediate and irreparable injury unless this Court grants an Order staying the Office of the New York Attorney General's active civil investigation of Plaintiffs for the duration of this action and pending resolution thereof, or, in the alternative, requiring that Defendant recuse herself from involvement in any capacity in the active civil investigation of Plaintiffs for the duration of this action and pending resolution thereof.

6.      Since 2019, the defendant, Letitia James ("Defendant"), Attorney General of the State of New York, has conducted a civil investigation of Plaintiffs.  Most recently, Defendant has also become involved in a concurrent criminal investigation of Plaintiffs.  As part of both investigations, which are still open and pending to date, Defendant has served multiple subpoenas on plaintiff, Donald J. Trump, as well as on his family members and officers of plaintiff, Trump Organization LLC.  Over the course of the past almost three (3) years, Plaintiffs have produced numerous pages of documents and furnished testimony from numerous witnesses.

7.      Plaintiffs have filed the instant application for injunctive relief because, as set forth in the memorandum of law accompanying Plaintiffs' motion, the continuation of the current investigations and proceedings against Plaintiffs will interfere with this Court's adjudication of Plaintiffs' First Amendment and Equal Protection claims.

Dated: January 10, 2022,                           Respectfully submitted,

By: _____

Alina Habba, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiffs,*
*Donald J. Trump and Trump Organization*
*LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DONALD J. TRUMP and TRUMP ORGANIZATION LLC, | Civil Action No.: 1:21-cv-01352-BKS-CFH |
| Plaintiffs, | |
| v. | |
| LETITIA JAMES, in her official capacity as Attorney General for the State of New York, | **ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUCTION** |
| Defendant. | |

After considering Plaintiffs' motion for a preliminary injunction, the parties' briefs, and the evidence and oral argument presented at the preliminary-injunction hearing, Plaintiffs' motion is GRANTED. Plaintiffs have demonstrated "'(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

**IT IS HEREBY ORDERED THAT**, until this Court adjudicates the merits of Plaintiffs' claims and enters final judgment:

1. Plaintiffs' Motion is hereby granted in its entirety;

2. The Office of the New York Attorney General's active civil investigation of Plaintiffs be stayed for the duration of this action and pending resolution thereof; and

3.  In the alternative, Defendant must recuse herself from any involvement in any

capacity in the active civil and criminal investigations of Plaintiffs for the duration

of this action and pending resolution thereof.

DATED:

_____

Hon. Brenda K. Sannes
United States District Judge

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONALD J. TRUMP and TRUMP ORGANIZATION LLC,<br><br>                              *Plaintiffs*,<br><br>v.<br><br>LETITIA JAMES, in her official capacity as Attorney General for the State of New York,<br><br>                              *Defendant*. | Case No. 1:21-cv-1352 (BKS)(CFH)<br><br>**NOTICE OF MOTION**<br>Oral argument requested |

    **PLEASE TAKE NOTICE** that, upon the accompanying memorandum of law and declaration of Colleen K. Faherty, and the exhibits annexed thereto, Defendant Letitia James, Attorney General of the State of New York, sued in her official capacity, will move this Court before the Honorable Brenda K. Sannes, United States District Judge, at the James M. Hanley Federal Building & United States Courthouse, 100 S. Clinton St., Syracuse, New York, 13261, on a date set by the Court, for an order  dismissing the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and for such further relief as this Court deems just and proper.

    **PLEASE TAKE FURTHER NOTICE** that Defendant requests oral argument on the motion to dismiss based on the need to help familiarize the Court with the facts and procedural history of the related ongoing state court proceedings involving Defendant's investigation of allegations of Plaintiffs' fraud and misrepresentation that is pending in New York Supreme Court, entitled *People v. The Trump Organization*, Index No. 451685/2020 (the "NY Proceeding"), as well as to advise the Court about the status of cross-motions filed in the NY Proceeding, which are scheduled for oral argument on February 17, 2022, concerning compliance with an administrative

subpoena served by Defendant on Plaintiff Donald J. Trump in December 2021 in connection with Defendant's investigation.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Rule 7.1(a)(1), any opposing affidavits and answering memoranda shall be served within twenty-one days after service of these moving papers; and reply papers due no more than seven days after service of the response papers.

Dated: New York, New York
      January 26, 2022

                                    LETITIA JAMES
                                    Attorney General
                                    State of New York

                                    */s/ Colleen K. Faherty*
                                    Colleen K. Faherty
                                    Assistant Attorney General
                                    NDNY Bar Number 703288
                                    Andrew S. Amer (admitted *pro hac vice*)
                                    Special Counsel
                                    Kevin Wallace
                                    Senior Enforcement Counsel
                                    28 Liberty Street, 18th Floor
                                    New York, New York 10005
                                    P: (212) 416-6046; -6127; -6376
                                    F: (212) 416-6009
                                    Colleen.Faherty@ag.ny.gov
                                    Andrew.Amer@ag.ny.gov
                                    Kevin.Wallace@ag.ny.gov

                                    *Attorney for Defendant*

To:  Alina Habba, Esq. (via ECF)
     *Counsel for Plaintiffs*

**A48**

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| DONALD J. TRUMP and TRUMP ORGANIZATION LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> LETITIA JAMES, in her official capacity as Attorney General for the State of New York, <br><br> *Defendant*. | Case No. 1:21-cv-1352 (BKS)(CFH) |

### DECLARATION OF COLLEEN K. FAHERTY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

I, Colleen Kelly Faherty, an attorney duly admitted to practice law in this Court, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is correct:

1.      I am an Assistant Attorney General in the Office of LETITIA JAMES, Attorney General of the State of New York, attorney for Defendant Letitia James, sued in her official capacity.  I submit this declaration in support of Defendant's Motion to Dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

2.      This declaration addresses information related to the New York State Office of the Attorney General's (OAG) ongoing investigation into, *inter alia*, whether Plaintiffs Donald J. Trump and the Trump Organization, and various affiliated entities, had a practice of falsely inflating and deflating the value of Mr. Trump's assets when it served their purposes, such as to secure loans and obtain economic and tax benefits (the "Investigation").  *See People v. The Trump Organization*, No. 451685/2020, 2020 WL 5775887, at *1 (Sup. Ct., N.Y Cty. Sept. 23, 2020),

*modified on reargument*, 2020 WL 5992323 (Sup. Ct., N.Y Cty. Oct. 7, 2020), *further modified on reargument*, 2020 WL 7360811 (Sup. Ct., N.Y Cty. Dec. 15, 2020).  I submit this declaration based upon personal knowledge and my review of documents and records in possession of OAG, where I am employed and for which I am an Assistant Attorney General participating in the Investigation.

3.      OAG opened the Investigation in March 2019, following the Congressional testimony of Michael Cohen (on February 27, 2019), in which Cohen produced copies of Donald J. Trump's financial statements for years 2011-2013 and testified that the financial statements inflated the values of Mr. Trump's assets to obtain favorable terms for loans and insurance coverage, while also deflating assets in order to reduce any associated real estate taxes. OAG subsequently determined that the financial statements were provided to financial institutions, and thus issued dozens of subpoenas for documents and testimony to investigate whether such submissions were a violation of law.

4.      Since August 24, 2020, OAG has been engaged in ongoing aspects of a special proceeding before Justice Arthur Engoron of the New York Supreme Court, New York County, regarding certain subpoena enforcement issues that have arisen during the course of the Investigation *entitled People v. The Trump Organization*, Index No. 451685/2020 (the "NY Proceeding").

5.      Whereas Justice Engoron expressed his willingness to make himself "available to resolve matters as they have arisen among the parties" in the NY Proceeding, after disputes arose "regarding the Trump Organization's document collection and production in response to OAG subpoenas," the Trump Organization and OAG stipulated on September 2, 2021, to certain terms concerning the company's ongoing subpoena responses, as well as the need to "retain at [the

Trump Organization's] expense, an independent third-party e-discovery firm…to oversee the identification, collection, and review of electronically stored information…responsive to OAG's subpoenas." *See infra*, ¶ 10(g).  The Trump Organization subsequently complied with the request to retain a third party eDiscovery firm.

6.     Similarly, based on the New York Supreme Court's willingness to retain jurisdiction over the NY Proceeding, on December 30, 2021, counsel for Donald J. Trump, Ivanka Trump, and Donald Trump, Jr. stipulated to appear in the NY Proceeding before Justice Engoron in order to "make any motion to quash [subpoenas issued to Donald J. Trump, Ivanka Trump, and Donald Trump, Jr.] or for related relief."  Justice Engoron "so ordered" the stipulation on January 3, 2022.  *People v. The Trump Organization*, Index No. 451685/2020 at NYSCEF docket number 318.  A true and correct copy of that stipulation is attached hereto as "Exhibit A."

7.     All of the OAG attorneys primarily responsible for work conducted on the Investigation are based out of the New York City office of OAG, located at 28 Liberty Street, New York, NY. Based on my search of the relevant firm biographical information for counsel for the various Trump-related parties in this action and the NY Proceeding, the following attorneys have appeared in the NY Proceeding for those parties associated with office locations as follows:

   a.  Alina Habba (*Attorney for NDNY Plaintiffs Donald J. Trump and Trump Organization LLC*) – Habba Madaio & Associates LLP, 1430 U.S. Highway 206, Suite 240, Bedminster, NJ 07921; and 112 West 34th St., 17th & 18th floors, New York, NY 10120;

   b.  Ronald P. Fischetti (*Attorney for NY Proceeding respondent Donald J. Trump*) – Fischetti & Malgieri LLP, 565 5th Ave., 7th floor, New York, NY;

   c.  Lawrence Rosen & Amy Carlin (*Attorney for NY Proceeding respondents Trump Organization, Inc., DJT Holdings LLC, DJT Holdings Managing Member LLC*) – LaRocca Hornik Rosen & Greenberg LLP, 40 Wall Street, 42nd floor, New York, NY; and

    d.   Alan Futerfas (*Attorney for NY Proceeding respondents Ivanka Trump and Donald Trump, Jr.*) – Law Offices of Alan S. Futerfas, 565 5th Ave., 7th floor, New York, NY.

8.     The relevant properties which have been included as the subject of the Investigation are not located in Syracuse, nor anywhere else within the jurisdiction of the Northern District of New York.

9.     Based on information collected during the Investigation, OAG understands that Plaintiff Donald J. Trump is the beneficial owner of the collection of entities he styles the "Trump Organization." According to required disclosures, from May 1, 1981 to January 19, 2017, Mr. Trump was Director, President, and Chairman of the Trump Organization, Inc. From at least July 15, 2015 until May 16, 2016, Mr. Trump was the sole owner of the Trump Organization, Inc. As of 2017, the Trump Organization, Inc. was wholly owned by DJT Holdings Managing Member LLC. On information and belief, Mr. Trump is the sole beneficiary of The Donald J. Trump Revocable Trust, a trust created and operating under the laws of New York that is the legal owner of the above entities.

10.    I have attached hereto as exhibits true and correct copies of the following documents, excerpted where designated:

    a.   Attached as "Exhibit B" - the excerpted hearing transcript as produced by the U.S. Government Publishing Office for the "Hearing with Michael Cohen, Former Attorney to President Donald Trump" before the Committee on Oversight and Reform, House of Representatives, One Hundred Sixteenth Congress, First Session; dated February 27, 2019, Serial No. 116-03.

    b.   Attached as "Exhibit C" – the excerpted and redacted "Memorandum of Law of the Trump Organization, Inc., DJT Holdings LLC, DJT Holdings Managing Member LLC, Seven Springs, LLC, and Eric Trump in Opposition to the Office of the Attorney General's Pe[t]ition and Motion to Compel Compliance with Investigatory Subpoenas" filed in the NY Proceeding; also available at *People v. The Trump Organization*, Index No. 451685/2020 NYSCEF docket number 237.

    c.   Attached as "Exhibit D" - the stipulation and order signed by OAG and the Trump Organization and "so ordered" by Justice Arthur Engoron on September 2, 2021; also available at *People v. The Trump Organization*, Index No. 451685/2020 NYSCEF docket number 314.

    d.   Attached as "Exhibit E" – the excerpted and redacted "Memorandum of Law in Opposition to the Office of the Attorney General's Motion for Leave to Reargue" filed in the NY Proceeding; also available at *People v. The Trump Organization*, Index No. 451685/2020 NYSCEF docket number 293.

    e.   Attached as "Exhibit F" - the September 23, 2020 excerpted hearing transcript from oral arguments in the NY Proceeding, before New York County, New York Supreme Court Justice Arthur Engoron.

    f.   Attached as "Exhibit G" - a November 1, 2021 letter written by OAG to the Trump Organization, invoking an "independent third-party e-discovery firm…to oversee the identification, collection, and review of electronically stored information…responsive to OAG's subpoenas."

    g.   Attached as "Exhibit H" - the "Memorandum of Law in Support of Respondents/Moving Parties Donald J. Trump, Donald J. Trump, Jr. and Ivanka Trump's Motion to Quash [OAG's] Subpoenas or, in the Alternative, to Stay Enforcement of the Subpoenas Pending Resolution of the Criminal Investigation" filed in the NY Proceeding; also available at NYSCEF docket number 354.

    h.   Attached as "Exhibit I" - OAG's "Supplemental Verified Petition" filed in the NY Proceeding; also available at *People v. The Trump Organization*, Index No. 451685/2020 NYSCEF docket number 630.

    i.   Attached as "Exhibit J" - excerpted transcript testimony from the examination of Eric Trump, dated October 5, 2020.

   11.   New York Supreme Court Justice Engoron has scheduled February 17, 2022 for oral argument in the NY Proceeding on Donald J. Trump, Donald Trump, Jr., and Ivanka Trump's motion to quash and OAG's cross-motion to compel.

Dated: New York, New York
     January 26, 2022

LETITIA JAMES
Attorney General
State of New York

/s/ *Colleen K. Faherty*
Colleen K. Faherty
Assistant Attorney General
NDNY Bar Number 703288
Andrew S. Amer (admitted *pro hac vice*)
Special Counsel
Kevin Wallace
Senior Enforcement Counsel
28 Liberty Street, 18th Floor
New York, New York 10005
P: (212) 416-6046; -6127; -6376
F: (212) 416-6009
Colleen.Faherty@ag.ny.gov
Andrew.Amer@ag.ny.gov
Kevin.Wallace@ag.ny.gov

*Attorneys for Defendant*

To:  Alina Habba, Esq. (via ECF)
    *Counsel for Plaintiffs*

INDEX NO. 451685/2020

NYSCEF DOC. NO. 318   Case 1:21-cv-01352-BKS-CFH   Document 16-1   Filed 01/26/22   Page 2 of 6   RECEIVED NYSCEF: 01/03/2022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Index No. 451685/2020 |
| Petitioner, | **STIPULATION AND [PROPOSED] ORDER** |
| -against- | |
| THE TRUMP ORGANIZATION, INC.; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; SEVEN SPRINGS LLC; ERIC TRUMP; CHARLES MARTABANO; MORGAN, LEWIS & BOCKIUS, LLP; and SHERI DILLON, | |
| Respondents. | |

WHEREAS, in this special proceeding, the People of the State of New York, by Letitia James, Attorney General of the State of New York ("OAG"), have sought judicial resolution with respect to an application to compel compliance with certain OAG subpoenas;

WHEREAS, this Court has made itself available to resolve matters as they have arisen among the parties, including during testimonial examinations;

WHEREAS, OAG has previously advised this Court that, because of the ongoing nature of the investigation set forth in the Verified Petition in this action (Docket No. 181) and the anticipated need for potential judicial resolution of additional issues, it would be beneficial for the Court to retain jurisdiction over this proceeding, and this Court kept the proceeding open;

WHEREAS, OAG recently issued subpoenas (the "Subpoenas") to Donald J. Trump, Ivanka Trump, and Donald Trump, Jr., (together, the "Individual Trump Parties") for testimony and documents "in connection with an investigation into the valuation of properties owned or

INDEX NO. 451685/2020

NYSCEF DOC. NO. 318    Case 1:21-cv-01352-BKS-CFH    Document 16-1    Filed 01/26/22    Page 3 of 6    RECEIVED NYSCEF: 01/03/2022

controlled by Donald J. Trump or the Trump Organization, or any matter which the Attorney

General deems pertinent thereto";

WHEREAS, a dispute has arisen between the OAG and the Individual Trump Parties

regarding the Subpoenas;

WHEREAS, the Subpoenas to the Individual Trump Parties arise from the same ongoing

investigation and facts alleged in the Verified Petition;

WHEREAS, the Verified Petition asked this Court to grant "such other and further relief

as is just and proper";

**IT IS HEREBY STIPULATED AND AGREED that:**

1.      Donald J. Trump, Ivanka Trump, and Donald Trump, Jr. are added to this

proceeding as Respondents.

2.      The caption of this proceeding shall be amended, and the clerk is directed to

amend the caption, as follows:

PEOPLE OF THE STATE OF NEW
YORK, by LETITIA JAMES,
Attorney General of the State of New
York,

                    Petitioner,

        -against-

THE TRUMP ORGANIZATION,
INC.; DJT HOLDINGS LLC; DJT
HOLDINGS MANAGING
MEMBER LLC; SEVEN SPRINGS
LLC; ERIC TRUMP; CHARLES
MARTABANO; MORGAN, LEWIS
& BOCKIUS, LLP; SHERI DILLON;
DONALD J. TRUMP; IVANKA
TRUMP; and DONALD TRUMP,
JR.,

                    Respondents.

INDEX NO. 451685/2020
NYSCEF DOC. NO. 318    Case 1:21-cv-01352-BKS-CFH    Document 16-1    Filed 01/26/22    Page 4 of 6
RECEIVED NYSCEF: 01/03/2022

3.      The Individual Trump Parties will make any motion to quash the Subpoenas or for related relief during the week of December 27, 2021, or upon entry of this Order, whichever is later.

4.      OAG will oppose any motion to quash or for related relief within 14 days of the filing of the motion. OAG will file any cross motion to enforce its Subpoenas to the Individual Trump Parties, and will file any necessary amendments to the pleadings, simultaneously with the filing of any opposition to the motion to quash.

5.      The Individual Trump Parties will file any reply on the motion to quash or for related relief and opposition to any cross motion to compel within 14 days of the filing of the opposition and cross motion.

6.      OAG will file any reply on the cross motion within 7 days of the filing of the opposition to the cross motion.

Dated: New York, New York
        December **30**, 2021


STIPULATED AND AGREED:


LETITIA JAMES
Attorney General of the State of New York


By: _Austin Thompson_

      Digitally signed by Austin Thompson
      DN: cn=Austin Thompson, o=Office of the
      New York State Attorney General, ou,
      email=Austin.Thompson@ag.ny.gov, c=US
      Date: 2021.12.30 10:54:01 -05'00'

      Austin Thompson
      28 Liberty Street
      New York, New York 10005
      (212) 416-8464

*Counsel for the People of the State of New York*

3.      The Individual Trump Parties will make any motion to quash the Subpoenas or for related relief during the week of December 27, 2021, or upon entry of this Order, whichever is later.

4.      OAG will oppose any motion to quash or for related relief within 14 days of the filing of the motion. OAG will file any cross motion to enforce its Subpoenas to the Individual Trump Parties, and will file any necessary amendments to the pleadings, simultaneously with the filing of any opposition to the motion to quash.

5.      The Individual Trump Parties will file any reply on the motion to quash or for related relief and opposition to any cross motion to compel within 14 days of the filing of the opposition and cross motion.

6.      OAG will file any reply on the cross motion within 7 days of the filing of the opposition to the cross motion.

Dated: New York, New York
       December **30**, 2021

STIPULATED AND AGREED:

LETITIA JAMES
Attorney General of the State of New York

By:     Austin
        Thompson

        Digitally signed by Austin Thompson
        DN: cn=Austin Thompson, o=Office of the
        New York State Attorney General, ou,
        email=Austin.Thompson@ag.ny.gov, c=US
        Date: 2021.12.30 10:54:01 -05'00'

        Austin Thompson
        28 Liberty Street
        New York, New York 10005
        (212) 416-8464

*Counsel for the People of the State of New York*

INDEX NO. 451685/2020

NYSCEF DOC. NO. 318   Case 1:21-cv-01352-BKS-CFH   Document 16-1   Filed 01/26/22   Page 6 of 6   RECEIVED NYSCEF: 01/03/2022

FISCHETTI & MALGIERI LLP

By:

     Ronald P. Fischetti, Esq.
     565 5th Avenue, 7th Floor
     New York, New York 10017
     (212) 593-7100

*Counsel for Donald J. Trump*

ALAN S. FUTERFAS

By:

     Alan S. Futerfas
     565 Fifth Ave., 7th Floor
     New York, NY 10017
     (212) 684-8400

*Counsel for Ivanka Trump and Donald Trump, Jr.*

**SO ORDERED:**

Hon. Arthur Engoron, J.S.C.
January 3, 2022

Authenticated
U.S. GOVERNMENT
INFORMATION
GPO

# HEARING WITH MICHAEL COHEN, FORMER ATTORNEY TO PRESIDENT DONALD TRUMP

# HEARING

BEFORE THE

## COMMITTEE ON
## OVERSIGHT AND REFORM
## HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTEENTH CONGRESS

FIRST SESSION

———

FEBRUARY 27, 2019

———

## Serial No. 116–03

———

Printed for the use of the Committee on Oversight and Reform



Available on: *http://www.govinfo.gov*
*http://www.house.gov/reform*

———

U.S. GOVERNMENT PUBLISHING OFFICE

35–230 PDF          WASHINGTON : 2019

COMMITTEE ON OVERSIGHT AND REFORM

ELIJAH E. CUMMINGS, Maryland, *Chairman*

| | |
|---|---|
| Carolyn B. Maloney, New York | Jim Jordan, Ohio, *Ranking Minority Member* |
| Eleanor Holmes Norton, District of Columbia | Justin Amash, Michigan |
| Wm. Lacy Clay, Missouri | Paul A. Gosar, Arizona |
| Stephen F. Lynch, Massachusetts | Virginia Foxx, North Carolina |
| Jim Cooper, Tennessee | Thomas Massie, Kentucky |
| Gerald E. Connolly, Virginia | Mark Meadows, North Carolina |
| Raja Krishnamoorthi, Illinois | Jody B. Hice, Georgia |
| Jamie Raskin, Maryland | Glenn Grothman, Wisconsin |
| Harley Rouda, California | James Comer, Kentucky |
| Katie Hill, California | Michael Cloud, Texas |
| Debbie Wasserman Schultz, Florida | Bob Gibbs, Ohio |
| John P. Sarbanes, Maryland | Clay Higgins, Louisiana |
| Peter Welch, Vermont | Ralph Norman, South Carolina |
| Jackie Speier, California | Chip Roy, Texas |
| Robin L. Kelly, Illinois | Carol D. Miller, West Virginia |
| Mark DeSaulnier, California | Mark E. Green, Tennessee |
| Brenda L. Lawrence, Michigan | Kelly Armstrong, North Dakota |
| Stacey E. Plaskett, Virgin Islands | W. Gregory Steube, Florida |
| Ro Khanna, California | |
| Jimmy Gomez, California | |
| Alexandria Ocasio-Cortez, New York | |
| Ayanna Pressley, Massachusetts | |
| Rashida Tlaib, Michigan | |

DAVID RAPALLO, *Staff Director*
PETER KENNY, *Counsel*
ELISA LANIER, *Chief Clerk and Director of Operations*
CONTACT NUMBER: 202-225-5051

(II)

C O N T E N T S

                                                                                          Page
Hearing held on February 27, 2019 ...............................................................   1

WITNESSES

Michael Cohen, Former Attorney to President Donald Trump
   Oral Statement  .................................................................................................   9
   Written Statement  ..........................................................................................   16

INDEX OF INSERTS

                                                                                          Page
Statement of Lynne Patton  ...........................................................................   35
Referral of Michael Cohen for Potential Violation  .....................................   39
Common Cause Letter  ....................................................................................   108
Dr. Darrell Scott Tweet  .................................................................................   154
Bo Dietl Tweet  ................................................................................................   156
Letter to Chairman Cummings  .....................................................................   158
Cohen Sentencing Statement  ........................................................................   168
State of New York Court Order on Cohen  ...................................................   172

# HEARING WITH MICHAEL COHEN, FORMER ATTORNEY TO PRESIDENT DONALD TRUMP

———————

**Tuesday, February 27, 2019**

HOUSE OF REPRESENTATIVES
COMMITTEE ON OVERSIGHT AND REFORM
*Washington, D.C.*

The committee met, pursuant to notice, at 10:02 a.m., in room 2154, Rayburn House Office Building, Hon. Elijah Cummings (chairman of the committee) presiding.

Present: Representatives Cummings, Maloney, Norton, Clay, Lynch, Cooper, Connolly, Krishnamoorthi, Raskin, Rouda, Hill, Wasserman Schultz, Sarbanes, Welch, Speier, Kelly, DeSaulnier, Lawrence, Plaskett, Khanna, Gomez, Ocasio-Cortez, Pressley, Tlaib, Jordan, Amash, Gosar, Foxx, Massie, Meadows, Hice, Grothman, Comer, Cloud, Gibbs, Higgins, Norman, Roy, Miller, Green, Armstrong, and Steube.

Chairman CUMMINGS. The committee will come to order. Without objection, the chair is authorized to declare a recess of the committee at any time. The full committee hearing is convening to hear the testimony of Michael Cohen, former attorney to President Donald Trump.

Mr. MEADOWS. Mr. Chairman, I have a point of order.

Chairman CUMMINGS. You'll state your point of order.

Mr. MEADOWS. Rule 9(f) of the committee rules say that any testimony from your witness needs to be here 24 hours in advance. The committee and the chairman know well that at 10:08, we received the written testimony, and then we received evidence this morning at 7:54.

Now, if this was just an oversight, Mr. Chairman, I could look beyond it. But it was an intentional effort by this witness and his advisors to, once again, show his disdain for this body.

With that, I move that we postpone this hearing.

Chairman CUMMINGS. I want to thank the gentleman.

Let me say this, that we got the testimony late last night. We did. And we got it to you all pretty much the same time that we got it.

I want to move forward with this hearing.

Mr. MEADOWS. Mr. Chairman, with all due respect, Mr. Chairman, this is a violation of the rule. And if it was not intentional, I would not have a problem. I'm not saying it was intentional on your part. I'm saying it's intentional on his part, because Mr. Dean, last night on a cable news network, actually made it all very evident. John Dean. And I'll quote, Mr. Chairman. He said, "As a former committee counsel in the House Judiciary Committee, and

9

Chairman CUMMINGS. You yielded back, sir. You yielded back.

Mr. JORDAN. Mr. Chairman, you took 7 minutes. I took 4.

Chairman CUMMINGS. Well, the gentleman yielded back.

Mr. JORDAN. That's how you're going to operate?

First you don't follow the rules, and now you're going to say—so you don't get—you get to——

Chairman CUMMINGS. Point of order. You—regular order.

Mr. JORDAN. You get to deviate from the rules.

Chairman CUMMINGS. Regular order.

Mr. JORDAN. I just have a simple motion, Mr. Chairman.

Ms. PLASKETT. Regular order.

Chairman CUMMINGS. Thank you.

Mr. JORDAN. It's a regular order to have the testimony 24 hours in advance.

Chairman CUMMINGS. Excuse me. I wanted to note that——

Mr. CONNOLLY. We've addressed that.

Chairman CUMMINGS [continuing]. until Rule 11 Clause 4, all media and photographers must be officially credentialed to record these proceedings and take photographs.

I also wanted to briefly address the spectators in the hearing room today. We welcome you and we respect your right to be here. We also ask, in turn, for your respect as we proceed with the business of the committee today. It is the intention of the committee to proceed without any disruptions. Any disruption of this committee will result in the United States Capitol Police restoring order, and that protesters will be removed. And we are grateful for your presence here today and your cooperation.

Now I want to welcome Mr. Cohen and thank him for participating in today's hearing.

Mr. Cohen, if you would please rise, and I will begin to swear you in.

Raise your right hand. Do you swear or affirm that the testimony that you are about to give is the whole truth and nothing but the truth, so help you God?

Mr. COHEN. I do.

Chairman CUMMINGS. Let the record show that the witness answered in the affirmative. And thank you. And you may be seated.

The microphones are sensitive, so please speak directly into them. Without objection, your written statement will be made a part of the record.

With that, Mr. Cohen, you are now recognized to give an oral presentation of your testimony.

### STATEMENT OF MICHAEL COHEN, FORMER ATTORNEY TO PRESIDENT DONALD TRUMP

Mr. COHEN. Chairman Cummings, Ranking Member Jordan, and members of the committee, thank you for inviting me here today. I have asked this committee to ensure that my family be protected from Presidential threats, and that the committee be sensitive to the questions pertaining to ongoing investigations. I thank you for your help and for your understanding.

I am here under oath to correct the record, to answer the committee's questions truthfully, and to offer the American people what I know about President Trump. I recognize that some of you

10

may doubt and attack me on my credibility. It is for this reason that I have incorporated into this opening statement documents that are irrefutable, and demonstrate that the information you will hear is accurate and truthful.

Never in a million years did I imagine when I accepted a job in 2007 to work for Donald Trump that he would one day run for the presidency, to launch a campaign on a platform of hate and intolerance, and actively win. I regret the day I said yes to Mr. Trump. I regret all the help and support I gave him along the way. I am ashamed of my own failings and publicly accepted responsibility for them by pleading guilty in the Southern District of New York. I am ashamed of my weakness and my misplaced loyalty of the things I did for Mr. Trump in an effort to protect and promote him.

I am ashamed that I chose to take part in concealing Mr. Trump's illicit acts rather than listening to my own conscience. I am ashamed, because I know what Mr. Trump is. He is a racist, he is a con man, and he is a cheat.

He was a Presidential candidate who knew that Roger Stone was talking with Julian Assange about a WikiLeaks drop on Democratic National Committee emails. And I will explain each in a few moments.

I am providing the committee today with several documents, and these include a copy of a check Mr. Trump wrote from his personal bank account, after he became President, to reimburse me for the hush money payments I made to cover up his affair with an adult film star, and to prevent damage to his campaign. Copies of financial statements from 2011, 2012, and 2013 that he gave to such institutions such as Deutsche Bank, a copy of an article with Mr. Trump's handwriting on it that reported on the auction of a portrait of himself that he arranged for the bidder ahead of time and then reimbursed the bidder from the account of his nonprofit charitable foundation, with the picture now hanging in one of his country clubs, and copies of letters I wrote at Mr. Trump's direction that threatened his high school, colleges, and the College Board not to release his grades or SAT scores.

I hope my appearance here today, my guilty plea, and my work with law enforcement agencies are steps along a path of redemption that will restore faith in me and help this country understand our President better.

Before going further, I want to apologize to each member, to you as Congress, as a whole. The last time I appeared before Congress, I came to protect Mr. Trump. Today, I am here to tell the truth about Mr. Trump. I lied to Congress when Mr. Trump stopped negotiating the Moscow tower project in Russia. I stated that we stopped negotiating in January 2016. That was false. Our negotiations continued for months later during the campaign.

Mr. Trump did not directly tell me to lie to Congress. That's not how he operates. In conversations we had during the campaign, at the same time, I was actively negotiating in Russia for him, he would look me in the eye and tell me, there's no Russian business, and then go on to lie to the American people by saying the same thing. In his way, he was telling me to lie.

11

There are at least a half a dozen times between the Iowa caucus in January 2016 and the end of June when he would ask me how's it going in Russia, referring to the Moscow tower project.

You need to know that Mr. Trump's personal lawyers reviewed and edited my statement to Congress about the timing of the Moscow tower negotiations before I gave it. So to be clear, Mr. Trump knew of and directed the Trump-Moscow negotiations throughout the campaign and lied about it. He lied about it because he never expected to win. He also lied about it because he stood to make hundreds of millions of dollars on the Moscow real estate project.

So I lied about it too, because Mr. Trump had made clear to me, through his personal statements to me that we both knew to be false and through his lies to the country, that he wanted me to lie. And he made it clear to me, because his personal attorneys reviewed my statement before I gave it to Congress.

Over the past two years, I have been smeared as a rat by the President of the United States. The truth is much different. And let me take a brief moment to introduce myself.

My name is Michael Dean Cohen, and I am a blessed husband of 24 years and a father to an incredible daughter and son.

When I married my wife, I promised her that I would love her, I would cherish her, and I would protect her. As my father said countless times throughout my childhood, you, my wife, and you, my children, are the air that I breathe.

So to my Laura and to my Sami, and to my Jake, there is nothing I wouldn't do to protect you.

I have always tried to live a life of loyalty, friendship, generosity, and compassion. It is qualities my parents engrained in my siblings and me since childhood. My father survived the Holocaust. Thanks to the compassion and selfless acts of others, he was helped by many who put themselves in harm's way to do what they knew was right. And that is why my first instinct has always been to help those in need. And Mom and Dad, I am sorry I let you down.

As the many people that know me best would say, I am the person that they call at 3 a.m. if they needed help. And I proudly remember being the emergency contact for many of my children's friends when they were growing up, because their parents knew that I would drop everything and care for them as if they were my own.

Yet last fall, I pled guilty in Federal court to felonies for the benefit of, at the direction of, and in coordination with individual No. 1. And for the record, individual No. 1 is President Donald J. Trump.

It is painful to admit that I was motivated by ambition at times. It is even more painful to admit that many times I ignored my conscience and acted loyal to a man when I should not have. Sitting here today, it seems unbelievable that I was so mesmerized by Donald Trump that I was willing to do things for him that I knew were absolutely wrong. For that reason, I have come here to apologize to my family, to my government, and to the American people.

Accordingly, let me now tell you about Mr. Trump.

I got to know him very well working very closely with him for more than 10 years as his executive vice president and special counsel, and then as personal attorney when he became President.

12

When I first met Mr. Trump, he was a successful entrepreneur, a real estate giant, and an icon. Being around Mr. Trump was intoxicating. When you were in his presence, you felt like you were involved in something greater than yourself, that you were somehow changing the world. I wound up touting the Trump narrative for over a decade. That was my job. Always stay on message. Always defend. It monopolized my life.

At first, I worked mostly on real estate developments and other business transactions. Shortly thereafter, Mr. Trump brought me into his personal life and private dealings. Over time, I saw his true character revealed.

Mr. Trump is an enigma. He is complicated, as am I. He is both good and bad, as are we all. But the bad far outweighs the good. And since taking office, he has become the worst version of himself.

He is capable of behaving kindly, but he is not kind. He is capable of committing acts of generosity, but he is not generous. He is capable of being loyal, but he is fundamentally disloyal.

Donald Trump is a man who ran for office to make his brand great, not to make our country great. He had no desire or intention to lead this Nation, only to market himself and to build his wealth and power.

Mr. Trump would often say this campaign was going to be the greatest infomercial in political history. He never expected to win the primary. He never expected to win the general election. The campaign for him was always a marketing opportunity.

I knew early on in my work for Mr. Trump that he would direct me to lie to further his business interests. And I am ashamed to say that when it was for a real estate mogul in the private sector, I considered it trivial. As the President, I consider it significant and dangerous.

In the mix, lying for Mr. Trump was normalized, and no one around him questioned it. In fairness, no one around him today questions it either. A lot of people have asked me about whether Mr. Trump knew about the release of the hacked documents, the Democratic National Committee emails ahead of time. And the answer is yes.

As I earlier stated, Mr. Trump knew from Roger Stone in advance about the WikiLeaks drop of emails. In July 2016, days before the Democratic Convention, I was in Mr. Trump's office when his secretary announced that Roger Stone was on the phone. Mr. Trump put Mr. Stone on the speaker phone. Mr. Stone told Mr. Trump that he had just gotten off the phone with Julian Assange, and that Mr. Assange told Mr. Stone that within a couple of days, there would be a massive dump of emails that would damage Hillary Clinton's campaign.

Mr. Trump responded by stating to the effect, Wouldn't that be great.

Mr. Trump is a racist. The country has seen Mr. Trump court white supremacists and bigots. You have heard him call poorer countries shitholes. His private—in private he is even worse.

He once asked me if I can name a country run by a black person that wasn't a shithole. This was when Barack Obama was President of the United States. And while we were once driving through a struggling neighborhood in Chicago, he commented that only

13

black people could live that way. And he told me that black people would never vote for him because they were too stupid. And yet, I continued to work for him.

Mr. Trump is a cheat. As previously stated, I am giving to the committee today three years of Mr. Trump's personal financial statements from 2011, 2012, and 2013, which he gave to Deutsche Bank to inquire about a loan to buy the Buffalo Bills and to Forbes. These are exhibits 1A, 1B,and 1C to my testimony. [Exhibits are available at: *https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Michael%20Cohen.02.27.2019.Exhibits.pdf.*]

It was my experience that Mr. Trump inflated his total assets when it served his purposes, such as trying to be listed amongst the wealthiest people in Forbes and deflated his assets to reduce his real estate taxes.

I'm sharing with you two newspaper articles side-by-side that are examples of Mr. Trump inflating and deflating his assets, as I said, to suit his financial interests. These are exhibit 2 to my testimony.

As I noted, I'm giving the committee today an article he wrote on and sent to me that reported on an auction of a portrait of Mr. Trump. This is exhibit 3A to my testimony. Mr. Trump directed me to find a straw bidder to purchase a portrait of him that was being auctioned off at an art Hampton's event. The objective was to ensure that this portrait, which was going to be auctioned last, would go for the highest price of any portrait that afternoon. The portrait was purchased by the fake bidder for $60,000.

Mr. Trump directed the Trump Foundation, which is supposed to be a charitable organization, to repay the fake bidder, despite keeping the art for himself. And please see exhibit 3B to my testimony.

It should come as no surprise that one of my more common responsibilities was that Mr. Trump directed me to call business owners, many of whom are small businesses, that were owed money for their services and told them that no payment or a reduced payment would be coming. When I asked Mr. Trump—or when I told Mr. Trump of my success, he actually reveled in it. And yet, I continued to work for him.

Mr. Trump is a con man. He asked me to pay off an adult film star with whom he had an affair, and to lie about it to his wife, which I did. And lying to the First Lady is one of my biggest regrets, because she is a kind, good person, and I respect her greatly. And she did not deserve that.

I am giving the committee today a copy of the $130,000 wire transfer from me to Ms. Clifford's attorney during the closing days of the Presidential campaign that was demanded by Ms. Clifford to maintain her silence about her affair with Mr. Trump. And this is exhibit 4 to my testimony.

Mr. Trump directed me to use my own personal funds from a home equity line of credit to avoid any money being traced back to him that could negatively impact his campaign. And I did that too, without bothering to consider whether that was improper much less whether it was the right thing to do, or how it would impact me, my family, or the public. And I am going to jail, in part, because of my decision to help Mr. Trump hide that payment from the American people before they voted a few days later.

14

As exhibit 5A to my testimony shows, I am providing a copy of a $35,000 check that President Trump personally signed from his personal bank account on August 1 of 2017, when he was President of the United States, pursuant to the coverup which was the basis of my guilty plea to reimburse me, the word used by Mr. Trump's TV lawyer for the illegal hush money I paid on his behalf.

This $35,000 check was one of 11 check installments that was paid throughout the year while he was President. Other checks to reimburse me for the hush money payments were signed by Donald Trump, Jr., and Allen Weisselberg. And see that example, 5B.

The President of the United States thus wrote a personal check for the payment of hush money as part of a criminal scheme to violate campaign finance laws. And you can find the details of that scheme directed by Mr. Trump in the pleadings in the U.S. District Court for the Southern District of New York.

So picture this scene. In February 2017, one month into his presidency, I'm visiting President Trump in the oval office for the first time, and it's truthfully awe-inspiring. He's showing me all around and pointing to different paintings. And he says to me something to the effect of, Don't worry, Michael. Your January and February reimbursement checks are coming. They were FedEx'd from New York. And it takes a while for that to get through the White House system.

As he promised, I received the first check for the reimbursement of $70,000 not long thereafter.

When I say con man, I'm talking about a man who declares himself brilliant, but directed me to threaten his high school, his colleges, and the College Board to never release his grades or SAT scores. As I mentioned, I'm giving the committee today copies of a letter I sent at Mr. Trump's direction, threatening these schools with civil and criminal actions if Mr. Trump's grades or SAT scores were ever disclosed without his permission. And these are under exhibit 6.

The irony wasn't lost on me at the time that Mr. Trump, in 2011, had strongly criticized President Obama for not releasing his grades. As you can see in exhibit 7, Mr. Trump declared, Let him show his records, after calling President Obama a terrible student.

The sad fact is that I never heard Mr. Trump say anything in private that led me to believe he loved our Nation or wanted to make it better. In fact, he did the opposite. When telling me in 2008 or 2009 that he was cutting employees' salaries in half, including mine. He showed me what he claimed was a $10 million IRS tax refund. And he said that he could not believe how stupid the government was for giving someone like him that much money back.

During the campaign, Mr. Trump said that he did not consider Vietnam veteran and prisoner of war, Senator John McCain, to be a hero because he likes people who weren't captured. At the same time, Mr. Trump tasked me to handle the negative press surrounding his medical deferment from the Vietnam draft.

Mr. Trump claimed it was because of a bone spur. But when I asked for medical records, he gave me none and said that there was no surgery. He told me not to answer the specific questions by reporters, but rather, offer simply the fact that he received a med-

15

ical deferment. He finished the conversation with the following comment. "You think I'm stupid? I'm not going to Vietnam." And I find it ironic, Mr. President, that you are in Vietnam right now. And yet, I continued to work for him.

The questions have been raised about whether I know of direct evidence that Mr. Trump or his campaign colluded with Russia. I do not. And I want to be clear. But I have my suspicions.

Sometime in the summer of 2017, I read all over the media that there had been a meeting in Trump Tower in June 2016 involving Don Jr. and others from the campaign with Russians, including a representative of the Russian Government, and an email setting up the meeting with the subject line, Dirt on Hillary Clinton.

Something clicked in my mind. I remembered being in a room with Mr. Trump, probably in early June 2016, when something peculiar happened. Don Trump, Jr. came into the room and walked behind his father's desk, which in and of itself was unusual. People didn't just walk behind Mr. Trump's desk to talk to him.

I recalled Don Jr. leaning over to his father and speaking in a low voice, which I could clearly hear, and saying, The meeting is all set. And I remember Mr. Trump saying, "OK. Good. Let me know."

What struck me as I look back and thought about the exchange between Don Jr. and his father was, first, that Mr. Trump had frequently told me and others that his son Don Jr. had the worst judgment of anyone in the world. And also that Don Jr. would never set up any meeting of significance alone, and certainly not without checking with his father.

I also knew that nothing went on in Trump world, especially the campaign, without Mr. Trump's knowledge and approval. So I concluded that Don Jr. was referring to that June 2016 Trump Tower meeting about dirt on Hillary with the Russian representatives when he walked behind his dad's desk that day, and that Mr. Trump knew that was the meeting Don Jr. was talking about when he said, That's good. Let me know.

Over the past year or so, I have done some real soul searching. And I see now that my ambition and the intoxication of Trump power had much to do with the bad decisions in part that I made. And to you, Chairman Cummings and Ranking Member Jordan, the other members of this committee, the members of the House and Senate, I am sorry for my lies and for lying to Congress. And to our Nation, I am sorry for actively working to hide from you the truth about Mr. Trump when you needed it most.

For those who question my motives for being here today, I understand. I have lied. But I am not a liar. And I have done bad things, but I am not a bad man. I have fixed things, but I am no longer your fixer, Mr. Trump. And I am going to prison and have shattered the safety and security that I tried so hard to provide for my family.

My testimony certainly does not diminish the pain that I have caused my family and my friends. Nothing can do that. And I have never asked for, nor would I accept a pardon from President Trump.

16

By coming today, I have caused my family to be the target of personal, scurrilous attacks by the President and his lawyer trying to intimidate me from appearing before this panel.

Mr. Trump called me a rat for choosing to tell the truth, much like a mobster would do when one of his men decides to cooperate with the government. And as exhibit 8 shows, I have provided the committee with copies of tweets that Mr. Trump posted attacking me and my family. Only someone burying his head in the sand would not recognize them for what they are. It's encouragement to someone to do harm to me and my family.

I never imagined that he would engage in vicious, false attacks on my family, and unleash his TV lawyer to do the same. And I hope this committee, and all Members of Congress on both sides of the aisle, make it clear that, as a Nation, we should not tolerate attempts to intimidate witnesses before Congress, and attacks on family are out of bounds and not acceptable.

I wish to especially thank Speaker Pelosi for her statements, it's exhibit 9, to protect this institution and me, and the chairman of the House Permanent Select Committee on Intelligence, Adam Schiff, and you, Chairman Cummings, for likewise defending the institution and my family against the attacks by Mr. Trump, and also the many Republicans who have admonished the President as well.

I am not a perfect man. I have done things I am not proud of. And I will live with the consequences of my actions for the rest of my life. But today, I get to decide the example that I set for my children, and how I attempt to change how history will remember me. I may not be able to change the past, but I can do right by the American people here today.

I thank you for your attention, and I'm happy to answer the committee's questions.

[Prepared Statement of Mr. Cohen follows:]

**WRITTEN TESTIMONY OF MICHAEL D. COHEN COMMITTEE ON OVERSIGHT AND REFORM U.S. HOUSE OF REPRESENTATIVES**

FEBRUARY 27, 2019

Chairman Cummings, Ranking Member Jordan, and Members of the Committee, thank you for inviting me here today.

I have asked this Committee to ensure that my family be protected from Presidential threats, and that the Committee be sensitive to the questions pertaining to ongoing investigations. Thank you for your help and for your understanding.

I am here under oath to correct the record, to answer the Committee's questions truthfully, and to offer the American people what I know about President Trump.

I recognize that some of you may doubt and attack me on my credibility. It is for this reason that I have incorporated into this opening statement documents that are irrefutable, and demonstrate that the information you will hear is accurate and truthful.

Never in a million years did I imagine, when I accepted a job in 2007 to work for Donald Trump, that he would one day run for President, launch a campaign on a platform of hate and intolerance, and actually win. I regret the day I said yes to Mr. Trump. I regret all the help and support I gave him along the way.

I am ashamed of my own failings, and I publicly accepted responsibility for them by pleading guilty in the Southern District of New York.

I am ashamed of my weakness and misplaced loyalty — of the things I did for Mr. Trump in an effort to protect and promote him.

I am ashamed that I chose to take part in concealing Mr. Trump's illicit acts rather than listening to my own conscience.

I am ashamed because I know what Mr. Trump is.

17

He is a racist.

He is a conman.

He is a cheat.

He was a presidential candidate who knew that Roger Stone was talking with Julian Assange about a WikiLeaks drop of Democratic National Committee emails.

I will explain each in a few moments.

I am providing the Committee today with several documents. These include:

- A copy of a check Mr. Trump wrote from his personal bank account — after he became president — to reimburse me for the hush money payments I made to cover up his affair with an adult film star and prevent damage to his campaign;
- Copies of financial statements for 2011 – 2013 that he gave to such institutions as Deutsche Bank;
- A copy of an article with Mr. Trump's handwriting on it that reported on the auction of a portrait of himself — he arranged for the bidder ahead of time and then reimbursed the bidder from the account of his non-profit charitable foundation, with the picture now hanging in one of his country clubs; and
- Copies of letters I wrote at Mr. Trump's direction that threatened his high school, colleges, and the College Board not to release his grades or SAT scores.

I hope my appearance here today, my guilty plea, and my work with law enforcement agencies are steps along a path of redemption that will restore faith in me and help this country understand our president better.

  *    *    *    *    *    *    *

Before going further, I want to apologize to each of you and to Congress as a whole.

The last time I appeared before Congress, I came to protect Mr. Trump. Today, I'm here to tell the truth about Mr. Trump.

I lied to Congress about when Mr. Trump stopped negotiating the Moscow Tower project in Russia. I stated that we stopped negotiating in January 2016. That was false — our negotiations continued for months later during the campaign.

Mr. Trump did not directly tell me to lie to Congress. That's not how he operates.

In conversations we had during the campaign, at the same time I was actively negotiating in Russia for him, he would look me in the eye and tellme there's no business in Russia and then go out and lie to the American people by saying the same thing. In his way, he was telling me to lie.

There were at least a half-dozen times between the Iowa Caucus in January 2016 and the end of June when he would ask me "it going in Russia?" referring to the Moscow Tower project.

You need to know that Mr. Trump's personal lawyers reviewed and edited my statement to Congress about the timing of the Moscow Tower negotiations before I gave it.

To be clear: Mr. Trump knew of and directed the Trump Moscow negotiations throughout the campaign and lied about it. He lied about it because he never expected to win the election. He also lied about it because he stood to make hundreds of millions of dollars on the Moscow real estate project.

And so I lied about it, too — because Mr. Trump had made clear to me, through his personal statements to me that we both knew were false and through his lies to the country, that he wanted me to lie. And he made itclear to me because his personal attorneys reviewed my statement before I gave it to Congress.

  *    *    *    *    *    *    *

Over the past two years, I have been smeared as "a rat" by the President of the United States. The truth is much different, and let me take a brief moment to introduce myself.

My name is Michael Dean Cohen.

I am a blessed husband of 24 years and a father to an incredible daughter and son. When I married my wife, I promised her that I would love her, cherish her, and protect her. As my father said countless times throughout my childhood, "you my wife, and you my children, are the air that I breathe." To my Laura, my Sami, and my Jake, there is nothing I wouldn't do to protect you.

I have always tried to live a life of loyalty, friendship, generosity, and compassion — qualities my parents ingrained in my siblings and me since childhood. My father survived the Holocaust thanks to the compassion and selfless acts of others. He was helped by many who put themselves in harm's way to do what they knew was right.

That is why my first instinct has always been to help those in need. Mom and Dad...I am sorry that I let you down.

18

As many people that know me best would say, I am the person they would call at 3AM if they needed help. I proudly remember being the emergency contact for many of my children's friends when they were growing up because their parents knew that I would drop everything and care for them as if they were my own.

Yet, last fall I pled guilty in federal court to felonies for the benefit of, at the direction of, and in coordination with Individual #1.

For the record: Individual #1 is President Donald J. Trump.

It is painful to admit that I was motivated by ambition at times. It is even more painful to admit that many times I ignored my conscience and acted loyal to a man when I should not have. Sitting here today, it seems unbelievable that I was so mesmerized by Donald Trump that I was willing to do things for him that I knew were absolutely wrong.

For that reason, I have come here to apologize to my family, to the government, and to the American people.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Accordingly, let me now tell you about Mr. Trump.

I got to know him very well, working very closely with him for more than 10 years, as his Executive Vice President and Special Counsel and then personal attorney when he became President. When I first met Mr. Trump, he was a successful entrepreneur, a real estate giant, and an icon. Being around Mr. Trump was intoxicating. When you were in his presence, you felt like you were involved in something greater than yourself — that you were somehow changing the world.

I wound up touting the Trump narrative for over a decade. That was my job. Always stay on message. Always defend. It monopolized my life. At first, I worked mostly on real estate developments and other business transactions. Shortly thereafter, Mr. Trump brought me into his personal life and private dealings. Over time, I saw his true character revealed.

Mr. Trump is an enigma. He is complicated, as am I. He has both good and bad, as do we all. But the bad far outweighs the good, and since taking office, he has become the worst version of himself. He is capable of behaving kindly, but he is not kind. He is capable of committing acts of generosity, but he is not generous. He is capable of being loyal, but he is fundamentally disloyal.

Donald Trump is a man who ran for office to make his brand great, not to make our country great. He had no desire or intention to lead this nation — only to market himself and to build his wealth and power. Mr. Trump would often say, this campaign was going to be the "greatest infomercial in political history."

He never expected to win the primary. He never expected to win the general election. The campaign — for him — was always a marketing opportunity.

I knew early on in my work for Mr. Trump that he would direct me to lie to further his business interests. I am ashamed to say, that when it was for a real estate mogul in the private sector, I considered it trivial. As the President, I consider it significant and dangerous.

But in the mix, lying for Mr. Trump was normalized, and no one around him questioned it. In fairness, no one around him today questions it, either.

A lot of people have asked me about whether Mr. Trump knew about the release of the hacked Democratic National Committee emails ahead of time. The answer is yes.

As I earlier stated, Mr. Trump knew from Roger Stone in advance about the WikiLeaks drop of emails.

In July 2016, days before the Democratic convention, I was in Mr. Trump's office when his secretary announced that Roger Stone was on the phone. Mr. Trump put Mr. Stone on the speakerphone. Mr. Stone told Mr. Trump that he had just gotten off the phone with Julian Assange and that Mr. Assange told Mr. Stone that, within a couple of days, there would be a massive dump of emails that would damage Hillary Clinton's campaign.

Mr. Trump responded by stating to the effect of "wouldn't that be great."

Mr. Trump is a racist. The country has seen Mr. Trump court white supremacists and bigots. You have heard him call poorer countries "shitholes."

In private, he is even worse.

He once asked me if I could ever name a country run by a black person that wasn't a "shithole." This was when Barack Obama was President of the United States.

While we were once driving through a struggling neighborhood in Chicago, he commented that only black people could live that way.

And, he told me that black people would never vote for him because they were too stupid.

And yet I continued to work for him.

Mr. Trump is a cheat.

19

As previously stated, I'm giving the Committee today three years of President Trump's financial statements, from 2011-2013, which he gave to Deutsche Bank to inquire about a loan to buy the Buffalo Bills and to Forbes. These are Exhibits 1a, 1b, and 1c to my testimony.

It was my experience that Mr. Trump inflated his total assets when it served his purposes, such as trying to be listed among the wealthiest people in Forbes, and deflated his assets to reduce his real estate taxes.

I am sharing with you two newspaper articles, side by side, that are examples of Mr. Trump inflating and deflating his assets, as I said, to suit his financial interests. These are Exhibit 2 to my testimony.

As I noted, I'm giving the Committee today an article he wrote on, and sent me, that reported on an auction of a portrait of Mr. Trump. This is Exhibit3A to my testimony.

Mr. Trump directed me to find a straw bidder to purchase a portrait of him that was being auctioned at an Art Hamptons Event. The objective was to ensure that his portrait, which was going to be auctioned last, would go for the highest price of any portrait that afternoon. The portrait was purchased by the fake bidder for $60,000. Mr. Trump directed the Trump Foundation, which is supposed to be a charitable organization, to repay the fake bidder, despite keeping the art for himself. Please see Exhibit 3B to my testimony.

And it should come as no surprise that one of my more common responsibilities was that Mr. Trump directed me to call business owners, many of whom were small businesses, that were owed money for their services and told them no payment or a reduced payment would be coming. When I advised Mr. Trump of my success, he actually reveled in it.

And yet, I continued to work for him.

Mr. Trump is a conman.

He asked me to pay off an adult film star with whom he had an affair, and to lie to his wife about it, which I did. Lying to the First Lady is one of my biggest regrets. She is a kind, good person. I respect her greatly — and she did not deserve that.

I am giving the Committee today a copy of the $130,000 wire transfer from me to Ms. Clifford's attorney during the closing days of the presidential campaign that was demanded by Ms. Clifford to maintain her silence about her affair with Mr. Trump. This is Exhibit 4 to my testimony.

Mr. Trump directed me to use my own personal funds from a Home Equity Line of Credit to avoid any money being traced back to him that could negatively impact his campaign. I did that, too — without bothering to consider whether that was improper, much less whether it was the right thing to do or how it would impact me, my family, or the public.

I am going to jail in part because of my decision to help Mr. Trump hide that payment from the American people before they voted a few days later.

As Exhibit 5 to my testimony shows, I am providing a copy of a $35,000 check that President Trump personally signed from his personal bank account on August 1, 2017 — when he was President of the United States — pursuant to the cover-up, which was the basis of my guilty plea, to reimburse me — the word used by Mr. Trump's TV lawyer — for the illegal hush money I paid on his behalf. This $35,000 check was one of 11 check installments that was paid throughout the year — while he was President.

The President of the United States thus wrote a personal check for the payment of hush money as part of a criminal scheme to violate campaign finance laws. You can find the details of that scheme, directed by Mr. Trump, in the pleadings in the U.S. District Court for the Southern District of New York.

So picture this scene — in February 2017, one month into his presidency, I'm visiting President Trump in the Oval Office for the first time. It's truly awe-inspiring, he's showing me around and pointing to different paintings, and he says to me something to the effect of ...Don't worry, Michael, your January and February reimbursement checks are coming. They were Fed- Exed from New York and it takes a while for that to get through the White House system." As he promised, I received the first check for the reimbursement of $70,000 not long thereafter.

When I say conman, I'm talking about a man who declares himself brilliant but directed me to threaten his high school, his colleges, and the College Board to never release his grades or SAT scores.

As I mentioned, I'm giving the Committee today copies of a letter I sent at Mr. Trump's direction threatening these schools with civil and criminal actions if Mr. Trump's grades or SAT scores were ever disclosed without his permission. These are Exhibit 6.

20

The irony wasn't lost on me at the time that Mr. Trump in 2011 had strongly criticized President Obama for not releasing his grades. As you can see in Exhibit 7, Mr. Trump declared "Let him show his records" after calling President Obama "a terrible student."

The sad fact is that I never heard Mr. Trump say anything in private that led me to believe he loved our nation or wanted to make it better. In fact, he did the opposite.

When telling me in 2008 that he was cutting employees' salaries in half including mine he showed me what he claimed was a $10 million IRS tax refund, and he said that he could not believe how stupid the government was for giving "someone like him" that much money back.

During the campaign, Mr. Trump said he did not consider Vietnam Veteran, and Prisoner of War, Senator John McCain to be "a hero" because he likes people who weren't captured. At the same time, Mr. Trump tasked me to handle the negative press surrounding his medical deferment from the Vietnam draft.

Mr. Trump claimed it was because of a bone spur, but when I asked for medical records, he gave me none and said there was no surgery. He told me not to answer the specific questions by reporters but rather offer simply the fact that he received a medical deferment.

He finished the conversation with the following comment. "You think I'm stupid, I wasn't going to Vietnam."I find it ironic, President Trump, that you are in Vietnam right now. And yet, I continued to work for him.

\*       \*       \*       \*       \*       \*       \*

Questions have been raised about whether I know of direct evidence that Mr. Trump or his campaign colluded with Russia. I do not. I want to be clear. But, I have my suspicions.

Sometime in the summer of 2017, I read all over the media that there had been a meeting in Trump Tower in June 2016 involving Don Jr. and others from the campaign with Russians, including a representative of the Russian government, and an email setting up the meeting with the subject line, "Dirt on Hillary Clinton." Something clicked in my mind. I remember being in the room with Mr. Trump, probably in early June 2016, when something peculiar happened. Don Jr. came into the room and walked behind his father' desk — which in itself was unusual. People didn't just walk behind Mr. Trump's desk to talk to him. I recalled Don Jr. leaning over to his father and speaking in a low voice, which I could clearly hear, and saying: "The meeting is all set."I remember Mr. Trump saying, "Ok good...let me know."

What struck me as I looked back and thought about that exchange between Don Jr. and his father was, first, that Mr. Trump had frequently told me and others that his son Don Jr. had the worst judgment of anyone in theworld. And also, that Don Jr. would never set up any meeting of any significance alone — and certainly not without checking with his father.I also knew that nothing went on in Trump world, especially the campaign, without Mr. Trump's knowledge and approval. So, I concluded that Don Jr. was referring to that June 2016 Trump Tower meeting about dirt on Hillary with the Russian representative when he walked behind his dad's desk that day — and that Mr. Trump knew that was the meeting Don Jr. was talking about when he said, "That's good...let me know."

\*       \*       \*       \*       \*       \*       \*

Over the past year or so, I have done some real soul searching. I see now that my ambition and the intoxication of Trump power had much to do with the bad decisions I made.

To you, Chairman Cummings, Ranking Member Jordan, the other members of this Committee, and the other members of the House and Senate, I am sorry for my lies and for lying to Congress.

To our nation, I am sorry for actively working to hide from you the truth about Mr. Trump when you needed it most.

For those who question my motives for being here today, I understand. I have lied, but I am not a liar. I have done bad things, but I am not a bad man. I have fixed things, but I am no longer your "fixer," Mr. Trump.

I am going to prison and have shattered the safety and security that I tried so hard to provide for my family. My testimony certainly does not diminishthe pain I caused my family and friends — nothing can do that. And I have never asked for, nor would I accept, a pardon from President Trump.

And, by coming today, I have caused my family to be the target of personal, scurrilous attacks by the President and his lawyer — trying to intimidate me from appearing before this panel. Mr. Trump called me a "rat" for choosing to tell the truth

21

— much like a mobster would do when one of his men decides to cooperate with the government.

As Exhibit 8 shows, I have provided the Committee with copies of Tweets that Mr. Trump posted, attacking me and my family — only someone burying his head in the sand would not recognize them for what they are: encouragement to someone to do harm to me and my family.

I never imagined that he would engage in vicious, false attacks on my family — and unleash his TV-lawyer to do the same. I hope this committee and all members of Congress on both sides of the aisle will make it clear: As a nation, we should not tolerate attempts to intimidate witnesses before congress and attacks on family are out of bounds and not acceptable.

I wish to especially thank Speaker Pelosi for her statements in Exhibit 9 to protect this institution and me, and the Chairman of the House PermanentSelect Committee on Intelligence Adam Schiff and Chairman Cummings for likewise defending this institution and my family against the attacks by Mr. Trump, and also the many Republicans who have admonished the President as well.

I am not a perfect man. I have done things I am not proud of, and I will live with the consequences of my actions for the rest of my life.

But today, I get to decide the example I set for my children and how I attempt to change how history will remember me. I may not be able to change the past, but I can do right by the American people here today.

Thank you for your attention. I am happy to answer the Committee's questions.

Chairman CUMMINGS. Thank you very much, Mr. Cohen. I now recognize myself.

Mr. Cohen, before I start, I want to make sure you really understand something. You have admitted lying to Congress, to this very body, and now you're going to prison for it.

Do you, Mr. Cohen, recognize the gravity of your offenses?

You are a lawyer, right?

Mr. COHEN. As of yesterday, I am no longer a lawyer. I have lost my law license, amongst other things.

Chairman CUMMINGS. But you understand the gravity of this moment?

Mr. COHEN. I most certainly do, Mr. Chairman.

Chairman CUMMINGS. I want you to really hear this, Mr. Cohen. We will not tolerate lying to this Congress by anybody. We're in search of the truth.

Do you understand that?

Mr. COHEN. I do.

Chairman CUMMINGS. The President has also made numerous statements that turned out to be inaccurate. For example, he said he knew nothing about the hush money payments to Ms. Clifford. And his 2017 financial disclosure form said he never owed money to reimburse you for those payments. Yet in your testimony, Mr. Cohen, you said that you met with the President in the Oval Office in February 2017 and discussed his plans to reimburse you for money you paid.

You say he told you, and I quote, "Don't worry, Michael. Your January and February reimbursement checks are coming." Is that accurate? And was that in the oval office?

Mr. COHEN. The statement is accurate, but the discussions regarding the reimbursement occurred long before he became President.

Chairman CUMMINGS. Would you explain that?

Mr. COHEN. Back in 2017 when—actually, I apologize. In 2016, prior to the election, I was contacted by Keith Davidson, who is the attorney—or was the attorney for Ms. Clifford, or Stormy Daniels.

22

And after several rounds of conversations with him about purchasing her life rights for $130,000, what I did, each and every time, is go straight into Mr. Trump's office and discuss the issue with him, when it was ultimately determined, and this was days before the election, that Mr. Trump was going to pay the $130,000, in the office with me was Allen Weisselberg, the chief financial officer of the Trump Organization. He acknowledged to Allen that he was going to pay the 130,000, and that Allen and I should go back to his office and figure out how to do it.

So, yes, sir I stand by the statement that I gave, but there was a history to it.

Chairman CUMMINGS. In your testimony, you said you bought some checks; is that right?

You said you brought some checks?

Mr. COHEN. Yes, sir.

Chairman CUMMINGS. Let me ask you about one of these.

This is from the Trump Trust that holds the President's businesses, can you tell me who signed this check?

Mr. COHEN. I believe that the top signature is Donald Trump, Jr., and that the bottom signature, I believe, is Allen Weisselberg's.

Chairman CUMMINGS. And can you tell me the date of that check?

Mr. COHEN. March 17 of 2017.

Chairman CUMMINGS. Now, wait, wait a minute. Hold up. The date on the check is after President Trump held his big press conference claiming that he gave up control of his businesses. How could the President have arranged for you to get this check if he was supposedly playing no role in his business?

Mr. COHEN. Because the payments were designed to be paid over the course of 12 months, and it was declared to be a retainer for services that would be provided for the year of 2017.

Chairman CUMMINGS. Was there a retainer agreement?

Mr. COHEN. There was no retainer agreement.

Chairman CUMMINGS. Would Don Jr. or Mr. Weisselberg have more information about that?

Mr. COHEN. Mr. Weisselberg for sure about the entire discussions and negotiations prior to the election, and Don Jr. would have cursory information.

Chairman CUMMINGS. Now here's another one. This one appears to be signed by Donald Trump himself. Is that his signature?

Mr. COHEN. That is Donald Trump's signature.

Chairman CUMMINGS. So let me make sure I understand. Donald Trump wrote you a check out of his personal account while he was serving as President of the United States of America to reimburse you for hush money payments to Ms. Clifford. Is that what you are telling the American people today?

Mr. COHEN. Yes, Mr. Chairman.

Chairman CUMMINGS. One final question. The President claimed he knew nothing about these payments. His ethics filing said he owed nothing to you. Based on your conversations with him is there any doubt in your mind that President Trump knew exactly what he was paying for?

**A77**

38

Mr. CLAY. In November 2017 Crain's New York Business reported that The Trump Organization provided, quote, flagrantly untrue revenue figures going back to at least 2010 to influence Crane's ranking of the largest private companies in New York. According to the reports, while The Trump Organization reported nearly $9.5 billion in revenues in 2016, public filings suggested revenues were actually less than one–tenth of that.

To your knowledge, did the President or his company ever inflate assets or revenues?

Mr. COHEN. Yes.

Mr. CLAY. And was that done with the President's knowledge or direction?

Mr. COHEN. Everything was done with the knowledge and at the direction of Mr. Trump.

Mr. CLAY. Tell us why he would do that and what purpose did it serve.

Mr. COHEN. It depends upon the situation. There were times that I was asked, again with Allen Weisselberg, the CFO, to go back and to speak with an individual from Forbes, because Mr. Trump wanted each year to have his net worth rise on the Forbes wealthiest individuals list.

And so, what you do is you look at the assets and you try to finds an asset that has, say, for example, 40 Wall Street, which is about 1.2 million square feet, find an asset that is comparable, find the highest price per square foot that's achieved in the area, and apply it to that building.

Or, if you are going off of your rent roll, you go by the gross rent roll times a multiple and you make up the multiple, which is something that he had talked about, and it is based upon what he wanted to value the asset at.

Mr. CLAY. You know, you have provided this committee with copies of the President's financial statements or parts of them from 2011, 2012, and '13.

And, Mr. Chairman, I would like to submit those for the record. Mr. Chairman, I would like to submit the statements to the record.

Chairman CUMMINGS. Without objection, so ordered.[Cohen exhibits are available at: *https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Michael%20Cohen.02.27.2019.Exhibits.pdf.*]

Mr. CLAY. Thank you.

Can you explain why you had these financial statements and what you used them for?

Mr. COHEN. So these financial statements were used by me for two purposes. One was discussing with media, whether it was Forbes or other magazines, to demonstrate Mr. Trump's significant net worth. That was one function.

Another was when we were dealing later on with insurance companies we would provide them with these copies so that they would understand that the premium, which is based sometimes on the individual's capabilities to pay, would be reduced.

Mr. CLAY. And all of this was done at the President's direction and with his knowledge?

Mr. COHEN. Yes, because whatever the numbers would come back to be we would immediately report it back.

39

Mr. CLAY. And did this information provided to us inflate the President's assets?

Mr. COHEN. I believe these numbers are inflated.

Mr. CLAY. And, of course, inviting—inflating assets to win a newspaper poll to boost your ego is not a crime. But to your knowledge, did the President ever provide inflated assets to a bank in order to help him obtain a loan?

Chairman CUMMINGS. The gentleman's time has expired, but you may answer that question.

Mr. COHEN. These documents and others were provided to Deutsche Bank on one occasion where I was with them in our attempt to obtain money so that we can put a bid on the Buffalo Bills.

Mr. CLAY. Thank you for your answers.

Chairman CUMMINGS. Mr. Hice of Georgia.

Mr. HICE. I would like to yield a second to the gentleman from North Carolina.

Mr. MEADOWS. I thank the gentleman for yielding.

I want to ask unanimous consent to put into the record an article from Stat, which indicates that Mr. Cohen's promise to access not just Trump, but also the circle around him, it was almost as if we were hiring a lobbyist, close quote. I ask unanimous consent.

Chairman CUMMINGS. Without objection.

[The Stat article is available at: *https://www.statnews.com/pharmalot/2018/05/08/novartis-paid-400000-trump-attorney/*]

Mr. MEADOWS. I ask unanimous consent that we put into the record a criminal referral for violating Section 22 U.S.C. of the statute number 611. I ask unanimous consent that my letter referring Mr. Cohen for violating FARA for illegal lobbying activity be entered into the record.

Chairman CUMMINGS. Without objection, so ordered.

**A79**

160

Mr. COHEN. Mr. Chairman, can I respond?

Chairman CUMMINGS. Just one second, all right?

The article that Mr. Brand, I just want to deal with this one right away. When we saw that article, Mr. Ranking Member, we knew that it was inaccurate. I mean, just on basics, I mean, that the case is that Mr. Brand's views are definitely distinguishable for what's going on here.

And so we got Irvin B. Nathan, former general counsel of the House from 2007 to 2010, and he says in short, the committee has ample jurisdiction and responsibility to hear and consider the upcoming voluntary testimony of Mr. Cohen. That's dated February 25, 2019.

And I want to enter that into the record. Without objection, so ordered. Where are we?

Ms. Ocasio-Cortez.

Ms. OCASIO-CORTEZ. Thank you, Mr. Chair.

Mr. Cohen, I would like to quickly pick up on some previous lines of questioning before getting into my own. So I may go a little quickly to get it all in in five minutes.

First, my colleague from Vermont had asked you several questions about AMI, the parent company of the National Enquirer, and in that you mentioned a treasure trove, a, quote, treasurer trove of documents in David Pecker's office relating to information assembled from all these catch and kill operations against people who potentially had damaging information on the President. You also mentioned that the President was very concerned about the whereabouts of these documents and who possessed them.

Does that treasure trove of documents still exist?

Mr. COHEN. I don't know. I had asked David Pecker for them.

Ms. OCASIO-CORTEZ. So you would say the person who knows the whereabouts of these documents would be David Pecker?

Mr. COHEN. David Pecker, Barry Levine, or Dylan Howard.

Ms. OCASIO-CORTEZ. OK. Thank you.

Second, I want to ask a little bit about your conversation with my colleague from Missouri about asset inflation. To your knowledge, did the President ever provide inflated assets to an insurance company?

Mr. COHEN. Yes.

Ms. OCASIO-CORTEZ. Who else knows that the President did this?

Mr. COHEN. Allen Weisselberg, Ron Lieberman, and Matthew Calamari.

Ms. OCASIO-CORTEZ. And where would the committee find more information on this? Do you think we need to review his financial statements and his tax returns in order to compare them?

Mr. COHEN. Yes, and you would find it at The Trump Org.

Ms. OCASIO-CORTEZ. Thank you very much.

The last thing here. The Trump Golf organization currently has a golf course in my home borough of the Bronx, Trump Links. I drive past it every day going between The Bronx and Queens. In fact, The Washington Post reported on the Trump Links Bronx course in an article entitled "Taxpayers Built This New York Golf Course and Trump Reaps the Rewards."

That article is where many New Yorkers and people in the country learned that taxpayers spent $127 million to build Trump Links

FILED: NEW YORK COUNTY CLERK 09/17/2020 12:52 AM          INDEX NO. 451685/2020
NYSCEF DOC. NO. 237          Case 1.21-cv-01352-BKS-CFH   Document 16-3   Filed 01/26/22   Page 2 of 4          RECEIVED NYSCEF: 09/17/2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

PEOPLE OF THE STATE OF NEW YORK, by
LETITIA JAMES, Attorney General of the
State of New York,

                         Petitioner,                  Index No. 451685/20

           -against-

                                             **Motion Seq. No.: 002**

THE TRUMP ORGANIZATION, INC.,
DJT HOLDINGS LLC, DJT HOLDINGS MANAGING
MEMBER LLC, SEVEN SPRINGS LLC,
ERIC TRUMP, CHARLES MARTABANO,
MORGAN, LEWIS & BOCKIUS, LLP, and
SHERI DILLON,

                         Respondents.
-------------------------------------------------------------------X

**MEMORANDUM OF LAW OF THE TRUMP ORGANIZATION, INC.
DJT HOLDINGS LLC, DJT HOLDINGS MANAGING MEMBER LLC,
SEVEN SPRINGS, LLC AND ERIC TRUMP IN OPPOSITION TO
THE OFFICE OF THE ATTORNEY GENERAL'S PEITION
AND MOTION TO COMPEL COMPLIANCE
<u>WITH INVESTIGATORY SUBPOENAS</u>**

**LAROCCA HORNIK ROSEN
& GREENBERG LLP**
40 Wall Street, 32nd Floor
New York, NY 10005
T: (212) 530-4823
*Attorneys for Respondents
The Trump Organization, Inc.,
DJT Holdings LLC,
DJT Holdings Managing Member LLC and
Seven Springs LLC*

**MUKASEY FRENCHMAN & SKLAROFF, LLP**
2 Grand Central Tower
140 East 45th Street, 17th Floor
New York, NY 10017
T: (212) 466-6400

                -and-

**LAW OFFICES OF ALAN S. FUTERFAS**
565 Fifth Avenue, 7th Floor
New York, NY 10017
T: (212) 684-8400
*Attorneys for Respondent
Eric Trump*

FILED: NEW YORK COUNTY CLERK 09/17/2020 12:52 AM          INDEX NO. 451685/2020
NYSCEF DOC. NO. 237          RECEIVED NYSCEF: 09/17/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-3   Filed 01/26/22   Page 3 of 4

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████.[9] Based on these definitions, ██████████ fall well outside the scope of the OAG's

investigation.

Indeed, during "meet and confer" communications with TTO, the OAG confirmed to

counsel for TTO that the OAG ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████ ████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

TTO has fully cooperated with the OAG's investigation during the last 18 months, having

produced voluminous records and multiple witnesses, interspersed with numerous meet-and-

confer sessions. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

_____

[9] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████

15

Dated: New York, New York
September 16, 2020

/s/ *Amy Carlin*
_____

LAROCCA HORNIK ROSEN
& GREENBERG LLP
40 Wall Street, 32nd Floor
New York, NY  10005
T: (212) 530-4823
*Attorneys for Respondents*
*The Trump Organization, Inc.,*
*DJT Holdings LLC,*
*DJT Holdings Managing Member LLC and*
*Seven Springs LLC*

/s/ *Alan S. Futerfas*
_____

MUKASEY FRENCHMAN & SKLAROFF, LLP
2 Grand Central Tower
140 East 45th Street, 17th Floor
New York, NY  10017
T: (212) 466-6400

-and-

Law Offices of Alan S. Futerfas
565 Fifth Avenue, 7th Floor
New York, NY  10017
T: (212) 684-8400
*Attorneys for Respondent*
*Eric Trump*

42

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PEOPLE OF THE STATE OF NEW
YORK, by LETITIA JAMES,
Attorney General of the State of New
York,

                  Petitioner,

      -against-

THE TRUMP ORGANIZATION,
INC.; DJT HOLDINGS LLC; DJT
HOLDINGS MANAGING
MEMBER LLC; SEVEN SPRINGS
LLC; ERIC TRUMP; CHARLES
MARTABANO; MORGAN, LEWIS
& BOCKIUS, LLP; and SHERI
DILLON,

           Respondents.

Index No. 451685/2020

**STIPULATION AND
ORDER**

WHEREAS, in this special proceeding, the People of the State of New York, by Letitia

James, Attorney General of the State of New York ("OAG"), have sought judicial resolution

with respect to applications to compel compliance with certain OAG subpoenas by the parties,

including the Trump Organization;[1]

WHEREAS, this Court has made itself available to resolve matters as they have arisen

among the parties, including during testimonial examinations;

WHEREAS, OAG has previously advised this Court that, because of the ongoing nature

of OAG's investigation and the anticipated need for potential judicial resolution of additional

---

[1] The Trump Organization, Inc.; DJT Holdings LLC; DJT Holdings Managing Member LLC; Seven Springs LLC; and any predecessors, successors, present or former parents, subsidiaries, and affiliates, whether direct or indirect (collectively with OAG, the "Stipulating Parties").

issues, it would be beneficial for the Court to retain jurisdiction over this proceeding, and this Court kept the proceeding open;

WHEREAS, disputes have arisen regarding the Trump Organization's document collection and production in response to OAG subpoenas, including the December 27, 2019 subpoena, which by this Stipulation and Order the Stipulating Parties are addressing;

**IT IS HEREBY STIPULATED AND AGREED that:**

1.     The Trump Organization, by September 30, 2021, shall provide a report, in reasonable detail, of actions taken to preserve, collect, and produce hard-copy and electronic documents responsive to the OAG subpoenas. The choice of the final form and content of the report is the responsibility of the Trump Organization.

2.     The Trump Organization shall work diligently to comply with each of the production and other responsibilities described in Exhibit A to this stipulation.

3.     If OAG reasonably concludes, after October 15, 2021 (but no later than December 31, 2021), and so notifies the Trump Organization (setting forth in reasonable detail the basis for its conclusion) that the Trump Organization has not met its obligations to comply with any subpoenas outstanding as of the date hereof, then the Trump Organization will retain, at its expense, an independent third-party e-discovery firm (the "eDiscovery Firm") to oversee the identification, collection, and review of electronically stored information ("ESI") responsive to OAG's subpoenas. The eDiscovery Firm shall be chosen by the Trump Organization, subject to the approval of OAG, such approval to not be unreasonably withheld.

4.     If the OAG withholds approval of the eDiscovery Firm chosen by the Trump Organization, and provided that same was not unreasonable, then the Court shall appoint an eDiscovery Firm upon letter application by OAG including suggested appointees from the

Stipulating Parties. The Trump Organization shall bear all costs of the eDiscovery Firm's

identification, collection, and examination of ESI in connection with this stipulation.

5.      An eDiscovery Firm chosen or appointed under paragraphs 3 or 4 shall have the

responsibilities reflected in Exhibit A.

Dated: New York, New York
       September ⅄, 2021

        STIPULATED AND AGREED:

LETITIA JAMES
Attorney General of the State of New York

By:     **Colleen K. Faherty**   Digitally signed by Colleen K. Faherty
                                  Date: 2021.09.02 15:58:04 -04'00'

        Colleen K. Faherty
        28 Liberty Street
        New York, New York 10005
        (212) 416-6046

*Counsel for the People of the State of New York*

LAROCCA HORNIK ROSEN & GREENBERG LLP

By: _____

        Amy D. Carlin
        40 Wall Street, 32nd Floor
        New York, NY 10005
        (212) 530-4835

*Counsel for the Trump Organization*

**SO ORDERED:**

_____  9/2/2021
Hon. Arthur Engoron, J.S.C.

3

**Exhibit A: eDiscovery Responsibilities**

An eDiscovery Firm chosen or appointed under paragraphs 3 or 4 of the stipulation to which this exhibit is attached (or, if no such firm is chosen or appointed, the Trump Organization) shall have the following responsibilities:

1.      To obtain and verify a log of all devices issued to each custodian listed in Exhibit B from January 1, 2014 to December 18, 2020, including, for each custodian, the type of device, a unique identifier for the device (e.g., serial number, inventory tag number), the date issued, the date returned (if applicable), and the current location of the device.  OAG acknowledges that on August 26, 2021, the Trump Organization provided the OAG with a log of devices (prepared by Eric Brunnett) issued to certain custodians in response to this request.

2.      To identify all other custodians of hard copy or electronic materials that may be responsive to the OAG subpoenas, such materials to include any appraisals or other valuations, purchase records, and any balance sheets, income statements, general ledgers, financial statements, or similar materials reflecting the value or financial performance of any Trump Organization property whose value is identified in or incorporated into any Statement of Financial Condition, or whose value is identified as being excluded from any Statement of Financial Condition.

3.      To ascertain the likely locations of responsive records, including by means of documented interviews with potential custodians and other current and former Trump Organization personnel (except, with respect to former Trump Organization personnel, where commercially reasonable efforts are unsuccessful in procuring such an interview).

4.      To ensure that one or more backups of Trump Organization data from before or after a data migration that occurred in 2016 is restored to a standalone system where it may be searched.

5.     To perform, against all data collected by the Trump Organization or by the

eDiscovery Firm, in connection with OAG's investigation, searches using search terms provided

by OAG (the "Search Terms"). The Search Terms shall be reasonably related to OAG's ongoing

investigation. The data searches shall follow the following procedures:

 a.   Search Procedures. When OAG provides the Search Terms, the eDiscovery Firm

shall identify items that result from a search using those terms and create a set of

production materials (the "Production Materials"). The eDiscovery Firm shall

then run an additional set of search terms agreed to by the Stipulating Parties to

identify potentially privileged items (the "Privilege Search Terms"). Any items in

the Production Materials that do not hit on one of the Privilege Search Terms shall

be turned over to OAG. Any materials that hit on one of the Privileged Search

Terms shall be turned over to the Trump Organization. The Trump Organization

shall have three weeks to identify any items over which the Trump Organization

concludes a privilege attaches (the "Privilege Review"). The Trump Organization

shall be entitled to seek to extend, for a reasonable period, the time for it to

complete the Privilege Review, upon written request to the OAG, consent to

which shall not unreasonably be withheld by the OAG.  At the conclusion of the

Privilege Review, the eDiscovery Firm shall produce all remaining items which

are not subject to a claim of privilege. Two weeks after the conclusion of the

Privilege Review, the Trump Organization shall provide OAG with a privilege log

identifying all items over which it asserts privilege with a specific basis for the

assertion (the "Privilege Log"). The Trump Organization shall be entitled to seek

to extend, for a reasonable period, the time for it to complete the Privilege Log,

upon written request to the OAG, consent to which shall not unreasonably be withheld by the OAG.

b. <u>Clawback Procedures</u>. If the Trump Organization identifies any items in the Production Materials that were not part of the Privilege Review and have been turned over to OAG, that the Trump Organization determines are subject to a claim of privilege, the Trump Organization shall promptly provide notice to OAG along with the basis for the assertion of privilege. OAG shall immediately segregate any such item and delete it from its system. OAG shall further provide confirmation to the Trump Organization that it has taken the steps to segregate and delete any item that is the subject of the notice. If the Trump Organization, within thirty days of production, identifies any items in the Production Materials that are not responsive to an OAG subpoena, they may provide notice to OAG and request segregation and deletion of the document. OAG will not unreasonably withhold consent to any such request. If OAG disagrees with the designation of any item, then the OAG shall promptly notify the Trump Organization of same and begin good faith meet and confer discussions with the Trump Organization to resolve the dispute.  In the event that the dispute is not resolved within 5 business days, either party may apply to the court by letter application for a determination.

c. Upon retention of the eDiscovery Firm the Stipulating Parties agree to negotiate in good faith regarding: (i) the automatic removal and logging of Production Materials containing an individual's non-business, highly sensitive personal information and (ii) deduplication and reasonable steps to avoid the production of information identical to what has already been produced to OAG.

6.     To issue monthly reports to the Stipulating Parties articulating its progress carrying out the responsibilities described herein, and identifying any source of potentially responsive materials to which it has not been provided access.

**Exhibit B: <u>Custodians</u>**

1.   Patrick Birney
2.   Troy Bonjavanni
3.   Matthew Calamari
4.   Alex Cannon
5.   David Cohen
6.   Alan Garten
7.   Hal Goldman
8.   Jaclyn Maraynes
9.   Jill Martin
10.  Jeff McConney
11.  Heidi Mitchell
12.  Rhona Graff
13.  Jason Greenblatt
14.  Donna Kidder
15.  Ron Lieberman
16.  David Orowitz
17.  Adam Rosen
18.  Owen Reidy
19.  Joshua Seidner
20.  Debe Stellio
21.  Donald J. Trump
22.  Donald Trump Jr.
23.  Eric Trump
24.  Ivanka Trump
25.  Allen H. Weisselberg

FILED: NEW YORK COUNTY CLERK 12/07/2020 09:11 PM
INDEX NO. 451685/2020
NYSCEF DOC. NO. 293
RECEIVED NYSCEF: 12/07/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-5   Filed 01/26/22   Page 2 of 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

PEOPLE OF THE STATE OF NEW YORK, by
LETITIA JAMES, Attorney General of the
State of New York,

                       Petitioner,                   Index No.  451685/20

                 -against-

                                     **Motion Seq. No.: 007**

THE TRUMP ORGANIZATION, INC.,
DJT HOLDINGS LLC, DJT HOLDINGS MANAGING
MEMBER LLC, SEVEN SPRINGS LLC,
ERIC TRUMP, CHARLES MARTABANO,
MORGAN, LEWIS & BOCKIUS, LLP, and
SHERI DILLON,

                      Respondents.

-------------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO
## THE OFFICE OF THE ATTORNEY GENERAL'S MOTION
## <u>FOR LEAVE TO REARGUE</u>

**LAROCCA HORNIK ROSEN
& GREENBERG LLP**
40 Wall Street, 32nd Floor
New York, NY  10005
T: (212) 530-4823
*Attorneys for Respondents*
*The Trump Organization, Inc.,*
*DJT Holdings LLC,*
*DJT Holdings Managing Member LLC and*
*Seven Springs LLC*

**GEORGE CALCAGNINI, ESQ.**
376 Route 202
Somers, NY  10589
T: (914) 277-2255
*Attorneys for Respondent*
*Charles Martabano*

**MUKASEY FRENCHMAN &
SKLAROFF, LLP**
2 Grand Central Tower
140 East 45th Street, 17th Floor
New York, NY  10017
T: (212) 466-6400

               -and-

**LAW OFFICES OF ALAN S. FUTERFAS**
565 Fifth Avenue, 7th Floor
New York, NY  10017
T: (212) 684-8400
*Attorneys for Respondent*
*Eric Trump*

FILED: NEW YORK COUNTY CLERK 12/07/2020 09:11 PM
NYSCEF DOC. NO. 293
INDEX NO. 451685/2020
RECEIVED NYSCEF: 12/07/2020

logs that 'an engineering consultant qualifies as a privileged agent under *Spicer v GardaWorld Consulting (UK) Ltd*., 181 A.D.3d 413 (1st Dep't 2020).'" *NYSCEF Doc. No. 286 at 1.* Far from "rubber-stamping" TTO's privilege assertions, this Court (as did the court in *Spicer*) combed through hundreds of documents, many of which involved Mr. Mastromonaco's communications. The Court's careful and thoughtful analysis of privilege on a document-by-document basis is reflected in its singular rulings on each of the 824 documents listed on the privilege logs. In fact, the Court did order TTO to produce 11 communications involving Mr. Mastromonaco relating to the communication of purely engineering and business information, which the Court deemed to be non-privileged.[3]

The Court properly drew the line at, and protected from disclosure, communications in which Mr. Mastromonaco overtly assisted Mr. Martabano in providing legal advice to TTO. It is obvious, based on the face of each privileged document, that Mr. Mastromonaco was serving as an adjunct to counsel and his presence and involvement in the communication was necessary to facilitate communications between Mr. Martabano and TTO and/or for Mr. Martabono to understand details and information concerning complex land use and other regulations in order to formulate legal strategies and provide legal advice to TTO.[4] Such communications -- very similar to other communications involving accountants and other experts that courts have held necessary to the provision of legal services -- fall squarely under the *Kovel* doctrine. *See, e.g., United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (privilege extended to communications

---

[3] *See e.g., October 16 Court rulings on the TTO Privilege Log at entries NYAGREV00049786, 00049790, 00049793, 00049853, 00049854, 00049856, 00049859, 00049866, 00049869, 00049897, and 00049917.*

[4] It is ironic that in the instant motion the OAG now takes the position that Mr. Mastromonaco's assistance to Mr. Martabano was not necessary because Mr. Martabano was *an experienced land-use attorney.* (*NYSCEF Doc. No. 286 at 2*). In its underlying compel application, however, the OAG minimized Mr. Martabano's role, going so far as to assert that Mr. Martabano was "essentially acting as a lobbyist." *NYSCEF Doc. No. 13 at 41.*

7

| | |
|---|---|
| /s/ *Amy Carlin* | /s/ *Alan S. Futerfas* |
| _____ | _____ |
| LAROCCA HORNIK ROSEN | MUKASEY FRENCHMAN & SKLAROFF, LLP |
| & GREENBERG LLP | 2 Grand Central Tower |
| 40 Wall Street, 32nd Floor | 140 East 45th Street, 17th Floor |
| New York, NY 10005 | New York, NY 10017 |
| T: (212) 530-4823 | T: (212) 466-6400 |
| *Attorneys for Respondents* | |
| *The Trump Organization, Inc.,* | -and- |
| *DJT Holdings LLC,* | |
| *DJT Holdings Managing Member LLC and* | Law Offices of Alan S. Futerfas |
| *Seven Springs LLC* | 565 Fifth Avenue, 7th Floor |
| | New York, NY 10017 |
| | T: (212) 684-8400 |
| | *Attorneys for Respondent* |
| | *Eric Trump* |

/s/ *George J. Calcagnini*

_____
GEORGE J. CALCAGNINI
Office & P.O. Box Address
376 Route 202
Somers, NY 10589
T: (914) 277-2255
*Attorney for Respondent*
*Charles Martabano*

20

1

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF NEW YORK : CIVIL TERM : PART 37
     -----------------------------------------X
 3   THE PEOPLE OF THE STATE OF NEW YORK,
     BY LETITIA JAMES, ATTORNEY GENERAL OF THE
 4   STATE OF NEW YORK,

 5                        Petitioner,
                                             INDEX NO:
 6                                           451685/2020

 7              -against-

 8   THE TRUMP ORGANIZATION, INC.;
     DJT HOLDINGS, LLC; DJT HOLDINGS MANAGING
 9   MEMBER, LLC; SEVEN SPRINGS, LLC;
     ERIC TRUMP; CHARLES MARTABANO; MORGAN,
10   LEWIS & BOCKIUS, LLP; SHERI DILLON; AND
     ALLEN WEISSELBERG,
11
                         Respondents.
12   -----------------------------------------X
                        VIA SKYPE
13                      New York, New York
                        September 23, 2020
14

15   B E F O R E:

16
             HONORABLE ARTHUR F. ENGORON, Supreme Court Justice
17

18
     A P P E A R A N C E S:
19
             ATTORNEY GENERAL OF THE STATE OF NEW YORK
20           Attorneys for the Petitioner
             28 Liberty Street
21           New York, New York 10005
             BY:  MATTHEW COLANGELO, ESQ.
22                ERIC HAREN, ESQ.
                  COLLEEN FAHERTY, ESQ.
23                ALEX FINKELSTEIN, ESQ.
                  LOUIS SOLOMON, ESQ.
24                AUSTIN THOMPSON, ESQ.

25                      -continued-
```

2

```
1   A P P E A R A N C E S:   (Cont'd)

2           LAROCCA HORNIK ROSEN & GREENBERG, LLP
            Attorneys for the Trump Organization
3           40 Wall Street, 32nd Floor
            New York, New York 10005
4           BY:  AMY CARLIN, ESQ.
                 LAWRENCE ROSEN, ESQ.
5

6           THE TRUMP ORGANIZATION
            725 Fifth Avenue
7           New York, New York 10022
            BY:  ALAN GARTEN, ESQ.
8

9           ALAN S. FUTERFAS, ESQ.
            Attorney for Eric Trump
10          565 Fifth Avenue, 7th Floor
            New York, New York 10017
11

12          MORGAN LEWIS & BOCKIUS, LLP
            1701 Market Street
13          Philadelphia, Pennsylvania 19103
            BY:  NATHAN J. ANDRISANI, ESQ.
14               ZANE D. MEMEGER, ESQ.
                 TIMOTHY J. STEPHENS, ESQ.
15

16          GEORGE J CALCAGNINI, ESQ.
            Attorney for Charles Martabano
17          376 Route 202
            Somers, New York 10589
18

19          ZUCKERMAN SPAEDER, LLP
            Attorneys for Sheri Dillon
20          1800 M Street, N.W., Suite 1000
            Washington, D.C. 20036
21          BY:  GRAEME W. BUSH, ESQ.
                 CATHERINE S. DUVAL, ESQ.
22

23

24                      Stefanie Johnson
                     Senior Court Reporter
25
```

3

**Proceedings**

1           THE COURT:  Good morning and welcome, parties,

2    counsel, and anyone else following these proceedings.  My

3    name is Arthur Fredrickson Engoron and I am a New York

4    State Supreme Court justice presiding virtually over

5    Part 37 of the Supreme Court New York County, located at

6    60 Centre Street, New York, New York.

7           In the present case titled the People of the

8    State of New York by Letitia James, Attorney General of

9    the State of New York, against the Trump Organization,

10   Inc.; DJT Holdings, LLC; DJT Holdings Managing Member,

11   LLC; Seven Springs, LLC; Eric Trump; Charles Martabano;

12   Morgan, Lewis, & Bockius; Index Number 451685/2020,

13   brought pursuant to Executive Law 63(12), the Attorney

14   General referred to in all the papers as OAG, as in

15   office of the Attorney General, who I will refer to as

16   the AG, seeks to compel the respondents to appear to be

17   deposed, that is, to answer questions under oath and/or

18   to turn over documents analog or digital.  The AG is

19   conducting a confidential ongoing civil investigation

20   into potential fraud and legality.

21           I also preside over special proceedings brought

22   pursuant to Real Property Action and Proceedings Law

23   Section 881, pursuant to which the owner of real property

24   seeks access to an adjoining property to construct or

25   repair a building.  If the adjoining property owner

4

**Proceedings**

1    refuses to grant access or license to this, this Court

2    has the power to grant a license.  The adjoining property

3    owner often complains "I don't want a tall building next

4    to me, I did nothing wrong," and I typically respond,

5    "Nobody wants a tall building next door and we know you

6    did nothing wrong."

7            Well, here nobody wants the AG to investigate

8    him or her or it.  The law and I certainly presume no

9    fraud and/or illegality.  However, as Justice Oliver

10   Wendell Holmes Junior said, "Taxes are the price we pay

11   for civilization."  Well, investigations and prosecutions

12   are not a price we pay for civilization.  The AG has the

13   right to conduct this investigation.

14           As an old saying has it, The law is entitled to

15   every person's evidence.  Those being investigated have

16   rights too.  One is the right to confidentiality that the

17   law provides to a client's communication with his, her,

18   or its attorney seeking legal advice for a lawful purpose

19   and this is known as the attorney-client privilege, a

20   well-established and bedrock principle that a client

21   receive confidential, complete, and competent advice from

22   their attorneys without fear of disclosure.  Attorney

23   work product, essentially the thought processes of an

24   attorney, is also immunized from disclosure as the

25   attorney prepared for litigation and/or for trial.

38
**Proceedings**

1    was valued at $21 million.  It was taken for that, your

2    Honor.

3            I don't really understand what the AG's office

4    is looking for beyond what they have and what we've given

5    to them already.  There's no dispute that the deduction

6    was for 21.1 million.  They have the tax returns.  They

7    have the tax returns for the Seven Springs entity.  Those

8    tax returns clearly reflect the $21.1 million donation.

9    They have the Form 1065.  They have the Schedule K-1s

10    listing all of the ownership interest.  They have the

11    Schedule M-3 showing the net income or loss on

12    reconciliation, which specifically expressly includes the

13    $21.1 million charitable donation.  It had the Schedule A

14    attached to that.  They had the Schedule M-3, which also

15    spells out the $21.1 million donation.  And they have the

16    Schedule K-1 that is issued to the partners of Seven

17    Springs.

18            Again, your Honor, we've been very cooperative

19    with the Attorney General throughout this investigation.

20    They think something is there that's not there.  They

21    don't have to believe us, we understand they have a right

22    to investigate this, but the question is ultimately how

23    did the Trump Organization value the Seven Springs

24    property in their statement of financial condition.

25    There's no dispute that we valued it at exactly what the

61

**Proceedings**

1    that.

2              At the time Eric Trump was being represented by

3    counsel for the Trump Organization, which is still the

4    same counsel, obviously, on this call.  Excellent,

5    excellent counsel, but they're representing the

6    organization.  That was sometime in mid July.  Toward the

7    end of July, it was decided, I think correctly, that new

8    counsel come on board for Mr. Eric Trump, which we did.

9    I did, Mr. Mukasey did, and that resulted in a series of

10   letters back and forth, a couple of letters back and

11   forth with respect to our position and some questions to

12   the Attorney General to the nature and scope of their

13   investigation, whether they're sharing materials, things

14   like that.  Your Honor has the letters before you.

15             The bottom line is where we are today is this,

16   your Honor, Mr. Mukasey and I -- there is a massive

17   amount of material that is involved in this

18   investigation, as your Honor has just heard.  Your Honor

19   has been listening to lawyers for one hour and 50

20   minutes.  Your Honor has heard about thousands, if not

21   hundreds of thousands, of documents being turned over.

22             Mr. Mukasey and I need time to prepare

23   Mr. Trump, we need to work with him and prepare him for

24   testimony.  Obviously, we're willing for him to -- as

25   we've written to the Court and as we asserted to the

62

**Proceedings**

1   Attorney General, we're happy for him to sit down and be

2   deposed, but we need time to go through these materials.

3   We need time to prepare our client.  And I think, as the

4   world knows, there is an election going on in about four,

5   five weeks in this country.  Mr. Trump, Eric Trump, is a

6   vital and integral part of that and he is traveling just

7   about seven days a week, if not, in fact, seven days a

8   week.

9            What we proposed in our papers and what we

10  proposed to Mr. Colangelo is this.  We know the Attorney

11  General has depositions into October.  By the time other

12  depositions will go -- we're fairly confident there are

13  depositions that the attorney will be taking in October.

14  The election is November 3rd.  What we did is proposed

15  some dates after November 3rd when we'll have time to

16  meet with Eric Trump, the time for Mr. Mukasey and I to

17  review the voluminous materials, prepare him and be ready

18  for a deposition.  That's all we asked for, your Honor.

19  I think it's reasonable under all the circumstances.  And

20  it was also reasonable, I think, also for Mr. Eric Trump

21  to get independent counsel just for him alone, which he

22  did, and so we're trying to do that and properly fulfill

23  that obligation and fulfill that duty.  That's our only

24  request, your Honor, to have the deposition after --

25  basically, any point after November 3rd.

70

1   review.  All documents submitted to the Court should be

2   Bates stamped with a privilege log that includes a place

3   for the Court to mark its individual rulings.

4        Now, I am going to change a word here, a word

5   there, but in a "that," but in a "hereby," absolutely not

6   changing the substance.  You got it all.  I just want

7   this to be as well written and unambiguous as possible.

8   After I do that, I'll get this done today, I will sign it

9   and upload it to NYSCEF, New York State Court Electronic

10  Filing System, and it should be public that way.

11        If anybody wants to say anything briefly, I'll

12  listen.  I think I've done all I can do.  I'm listening.

13        MS. GREENFIELD:  We are going to give you all

14  our cell phone numbers as the EBTs get scheduled.

15        THE COURT:  I'm here every day.  I don't break

16  for lunch.  You can call me any time, you're 97 percent

17  sure to get me.

18        *(Proceedings concluded.)*

19              *    *    *    *

20        C  E  R  T  I  F  I  C  A  T  I  O  N

21        It is hereby certified that the foregoing is
    a true and accurate transcript of the original
22  stenographic minutes taken of this proceeding.

23

24                  _____

25                  **STEFANIE JOHNSON**
                    **Senior Court Reporter**

*Stefanie Johnson - Senior Court Reporter*



STATE OF NEW YORK

OFFICE OF THE ATTORNEY GENERAL

November 1, 2021

Lawrence S. Rosen
LaRocca Hornik Rosen & Greenberg LLP
The Trump Building
40 Wall Street, 32nd Floor
New York, NY 10005

       RE:    *People v. Trump Organization*, Index No. 451685/2020 N.Y. Cty. Sup. Ct.

Dear Larry,

       We write on behalf of the Office of the Attorney General ("OAG") and further to the Stipulation and Order entered on September 2, 2021 in the above-referenced proceeding (Docket No. 314) (the "Stipulated Order"). Item 3 of the Stipulated Order provides that if "OAG reasonably concludes, after October 15, 2021 (but no later than December 31, 2021), and so notifies the Trump Organization (setting forth in reasonable detail the basis for its conclusion) that the Trump Organization has not met its obligations to comply with any subpoenas outstanding as of the date hereof, then the Trump Organization will retain, at its expense, an independent third-party e-discovery firm (the 'eDiscovery Firm') to oversee the identification, collection, and review of electronically stored information ('ESI') responsive to OAG's subpoenas."

       This letter serves as notice that OAG has reasonably concluded that the Trump Organization has not met its obligations to comply with a number of subpoenas outstanding as of September 2, 2021. As a result, the Trump Organization must retain an independent eDiscovery Firm. At this time, we would only ask that the eDiscovery Firm undertake the procedures outlined in Items 1-4 of Exhibit A to the Stipulated Order. We will determine whether the remaining responsibilities laid out in Exhibit A need to be undertaken once we have a clear understanding of what data exists and has been collected (and what has not been collected).

       The basis for our conclusion is laid out in additional detail below, but this determination should not come as a surprise. Over the last several months, we have been engaged with you in a painstaking effort to determine why the Trump Organization's document productions since the issuance of subpoenas nearly two years ago have been so plainly inadequate as compared to the productions from other parties.[1] Only now, when under court order, has the Trump Organization begun divulging hundreds of thousands of

---

[1] These issues have been detailed in a series of letters and related email exchanges, including our letters dated March 19, 2021, April 8, 2021, April 15, 2021 and July 27, 2021,

Lawrence Rosen
November 1, 2021
Page 2

pertinent documents and communications that should have been produced years ago before the testimony of important witnesses. Moreover, the Trump Organization has never provided basic, clear information regarding the collection and production process—such as what occurred with the still-unexplained email migration process that resulted in substantial production deficiencies and delays. Far from signifying a good faith effort to comply, the present state of affairs confirms at a minimum that the Trump Organization has not been, and is not, a reliable subpoena respondent. It is therefore imperative that we obtain a clear understanding from an independent third-party of what has been collected and reviewed to date and if there are any additional collections of potentially responsive documents that remain to be searched.

As a result, please submit your choice of eDiscovery Firm by November 8, 2021 for OAG review and approval.

## 1. The Trump Organization has not complied with its subpoena obligations

Although OAG's initial subpoena duces tecum was served in December 2019, productions from the Trump Organization only seem to have begun in earnest over the past two months; since the execution of a tolling agreement and entry of the Stipulated Order. During that time the Trump Organization has produced 751,035 documents which constitutes more than 97 percent of its total production of 769,813 documents. While OAG is still in the process of reviewing these documents, significant issues are already apparent. First, we still do not have a production of custodial documents for Donald J. Trump. Indeed, we have received no production of custodial documents for Mr. Trump since the production of the three letters from Mr. Trump on July 22, 2021, which we noted in our letter of July 27, 2021. All of this is despite testimony from the General Counsel, Alan Garten that there were file cabinets at the Trump Organization holding Mr. Trump's files, that Mr. Trump had assistants who maintained files on his behalf, that he received and maintained hard copy documents, and that he used Post-It Notes to communicate with employees. Moreover, while the Trump Organization has interviewed 64 custodians to date, Rhona Graff is the only executive assistant to Donald J. Trump on that list. Attached at Tab A is a list of executive assistants at the Trump Organization and addresses for scanners and other imaging machines they used. At least five of those executive assistants worked for Donald J. Trump, nearly all of whom have sent documents to or on behalf of Mr. Trump.[2] The failure to fully search these custodians and sources is a significant gap in compliance.

Second, we note that there still appear to be gaps in the productions based on documents produced by third parties in this investigation. For example: Attached at Tab B is an email from Donald Bender at Mazars to Jeff McConney, Senior Vice President and Controller at the Trump Organization. The email is dated November 2, 2015 and attaches the engagement letter for the preparation of the "statement of financial condition of Donald J. Trump as of June 30, 2015." Attached at Tab C is an email from Jeff McConney to Peter Welch at Capital One, copying Allen Weisselberg and others, dated January 22, 2013, attaching a memo and "information relating to 40 Wall Street." That attachment includes plainly relevant and responsive financial information

---

[2] The exhibit also includes executive assistants to other Trump Organization personnel and scanners or other machines they may have used.

Lawrence Rosen
November 1, 2021
Page 3

concerning the valuation of 40 Wall Street. Attached at Tab D is an email from Jeff McConney
to Dave Guerrero at Deutsche Bank, dated December 10, 2015, concerning an audit of the
financial statements for the Old Post Office property. And the gaps are not limited to electronic
communications. Attached at Tab E is a letter sent express mail from Allen Weisselberg to Peter
Welch at Capital One stating that 40 Wall Street LLC will prepay the note on its $160,000,000
loan for the property at 40 Wall Street. Each of these documents are responsive and were
produced by third parties, but not the Trump Organization.

In addition to these gaps, we would note that the inclusion of a significant volume of
irrelevant material raises questions for us about the process for collecting, reviewing and
producing responsive documents. To take just two examples, attached at Tab F is an email to
Eric Trump regarding a hunter safety course at the Cos Cob Revolver and Rifle Club, and
attached at Tab G is an email exchange with Rhona Graff about hosting a Serena Williams 5K.
Whatever the specifics of the search and production process to date, the production of these
irrelevant materials does not instill confidence that the process is thorough and effective. Indeed
we have identified a number of problems with the collection, review and production process to
date:

    a.  *Failure to search relevant shared and local drives*

Testimony from multiple witnesses has established that the Trump Organization
maintains a series of shared network drives. For example back in February 2021, Assistant
Controller Donna Kidder testified that the accounting department utilized an "O drive," a
network shared drive for work performed by employees in the department. Ms. Kidder further
testified that she would save work-related documents to the drive. In a letter dated March 19,
2021 we explicitly asked for the O Drive to be searched along with custodial records for Ms.
Kidder. The Trump Organization, however, did not make a production from the O Drive until
October 15, 2021. That production also included materials from a "P Drive." We have never had
a full explanation of the shared network drives utilized by the Trump Organization or what steps
have been taken to preserve and search for those locations. Attached at Tab H is a document
discussing a "G Drive" containing "40 Wall Street executed leases and amendments," and an "L
Drive." At this late stage we need a full disclosure of the shared network drive structure and an
assurance all drives have been searched for responsive documents in all places on such drives
where responsive documents may exist.

    b.  *Failure to produce metadata*

Many of the recent productions lack metadata information as called for by the subpoenas.
We first raised the issue of missing metadata over one year ago and the subpoenas insist upon
inclusion of this information. To take one example, TTO_02397315 is an email with several
attachments, but none of said attachments shows up as a family to the parent email. Without
seeing family information, it is not readily apparent whether all attachments were collected and
produced. Given the email migration issues the Trump Organization has experienced, it is critical
that we be able to verify all parts of responsive emails have been collected and received.
Furthermore, the lack of metadata means OAG cannot determine the source path of the files in
Trump Organization productions. Without a source path, we cannot verify where in the Trump

Lawrence Rosen
November 1, 2021
Page 4

Organization's network any particular document came from—which is responsive information called for by the subpoena and relevant to determining subpoena compliance. Moreover, the absence of metadata may be responsible for the apparent failure in deduplication of recent productions. Successful deduplication would reduce burden on all parties.

c. *Failure to produce a complete set of text messages, voicemail, and mobile phone records*

The Trump Organization's production of text messages and voicemails appears to be incomplete. At the outset, the process involving the preservation and collection methods for these materials has been opaque. But even more critically the limited productions we have received to date suggest on their face that they are incomplete. For example, on August 26, 2021 the Trump Organization produced a list of devices for 25 custodians issued from January 1, 2014 through December 18, 2020. The Trump Organization declined to provide a sworn affirmation as to the accuracy of the list and offered no description of the process for collecting the list apart from noting that it was prepared by Eric Brunnett and was not maintained during the routine course of business. But that list appears to be inaccurate. The document lists Allen Weisselberg as having one mobile device; however in the status report dated September 24, 2021, the Trump Organization stated that he used three mobile phones for business including one that has been in use since late 2018 which was omitted from the list. More recently, on October 22, 2021, we were informed that three Trump Organization employees – Patrick Birney, Jeff McConney and Donna Kidder – used personal phones and not phones issued by the Trump Organization. Four days later you informed us that that disclosure was incorrect and Mr. Birney used a Trump Organization issued phone. Then on Friday, October 29, 2021 you "confirmed that Patrick Birney has used both a personal cell phone and a TTO-issued cell phone for business purposes." In short, we have no reason to believe the Trump Organization has accurately tracked the electronic devices utilized by its employees.

Beyond merely tracking the devices used, the productions from devices collected to date also appear to be incomplete. To date we have only received text message files (ufdr) for Allen Weisselberg, Donald Trump Jr., Eric Trump, and Ray Flores. Those productions amount to roughly two dozen conversations in total. But evidence gathered to date would suggest substantially greater volume of conversations exist. Indeed, it would appear that Trump Organization employees regularly text and call each other about business matters. Alan Garten testified that he texted at least 10 other employees about Trump Organization business. Patrick Birney testified that he has texted about Trump Organization business. Ray Flores received multiple voice messages from other Trump Organization employees, including Jeff McConney and Eric Trump, regarding valuations for properties on the statement of financial condition.[3] The texts we have received suggest they were part of a regular flow of communication concerning

---

[3] Voicemail from Jeff McConney to Ray Flores (Dec. 24, 2020) "Hey, Ray, it's Jeff McConney, I'll leave you a short message. I know it's Christmas Eve and we are still working on the financial statement. Bender is giving us a hard time on the cap rate for Niketown and Trump Tower."; Voicemail from Eric Trump to Ray Flores (Mar. 28, 2016) "Hey, Ray, it's Eric, I hope you are doing well, I just wanted to give you a call quickly and ask you about Las Vegas and that final value. Give me a call anytime on my cellphone."

Lawrence Rosen
November 1, 2021
Page 5

Trump Organization business and not limited to one-off exchanges commensurate with the handful of communications we have received.

Other documents in the production indicate the existence of responsive documents that we have not received. In December 2019, Eric Trump apparently exchanged text messages with Eric Lipton of the New York Times about subjects of obvious relevance to the OAG investigation: the strength of the Trump Organization's commercial portfolio and its debt load. OAG alerted the Trump Organization to the existence of this text message exchange during Alan Garten's examination. While Mr. Garten disclaimed any knowledge of the exchange—"Yeah, I don't have his phone, I don't know what's on his phone" —the Trump Organization should have searched for the exchange. If the exchange no longer exists, Instruction C.3 to the December 27, 2019 subpoena obligates the Trump Organization to submit a statement under oath about its destruction.

And finally, we have not received a comprehensive or even partially complete report on devices held by former employees or private devices utilized by employees. While the Trump Organization has indicated it does not control personal devices, Mr. Brunnett testified that the company did retain some control over such devices. A full, independent report is required.

### d.   Failure to produce hard copy documents

We specifically flagged the failure to make an adequate production of hard copy documents in our letter of July 27, 2021. That letter noted that:

> A review of the productions from the Trump Organization to date appears to demonstrate that less than four hundred hard copy documents have been produced in total. In large part these appear to be contracts and other finalized documents, not the files of individual custodians. Indeed, none of the metadata related to hard-copy documents produced to date reflects any individual custodian. There appears to be almost no individual notes or other records.

Since that time there appear to have been no additional hard copy documents produced. Indeed, the table included in your September 30, 2021 letter indicated that the last hard copy document production was made on January 27, 2020 and consisted of "Hard copy files from J. McConney, J. Maraynes, A. Weisselberg, P. Birney, and storage relating to Seven Springs." Given the fact that Donald J. Trump did not personally use email, a search for his hard copy documents in particular is especially critical.

### e.   Other failures

We still have not received a comprehensive, final report on the server migration issues that were first disclosed in April 2021. We do not know which employee records were affected, whether existing volumes have been successfully restored, whether they have been searched and are included in the production, or whether the fact that the Trump Organization has in recent weeks produced more than one hundred times the number of documents it had produced before the stipulation was signed was caused by the migration process or by other factors. Given the

Lawrence Rosen
November 1, 2021
Page 6

ongoing issues and questions regarding this significant event, an independent review is
necessary.

We also do not appear to have a complete production of documents regarding challenges
to property tax assessments for Trump Organization properties. The Trump Organization
recently produced a document titled "Real Estate Tax Appeal Summary 1-8-19." It includes
several properties that are valued on the statement of financial condition and undergoing an
appeals process. To take one example, TNGC Hudson Valley authorized Paradigm Tax Group
LLC to represent it in any tax appeals for tax year 2015 and forward. "PARADIGM TAX
GROUP is authorized to file real estate returns, to review and receive copies of any prior tax
year's tax returns, to investigate appraisals and assessments, to submit income and expense
information, to appeal property values and taxes, to receive tax bills, to appear before
administrative boards or agencies, and to prepare to take such actions in our offices as
necessary to effectuate same." TTO_01534725. However, the documents, communications, and
material submitted to support the appeals on many of these properties have not appeared in
previous productions. Any material submitted to a county or municipality including income and
expense statements, appraisals, and challenges to appraisals as a part of the tax appeal process,
would not be privileged and responsive material should have been produced.[4]

## 2. The September 30, 2021, status report was insufficient and should be supplemented by the third-party eDiscovery firm

In light of the above issues, OAG has reasonably concluded that the Trump Organization
has not complied with its subpoena obligations and seeks to initiate the process for the
appointment of the independent third-party eDiscovery Firm. The duties and responsibilities of
the firm upon its appointment are outlined in Exhibit A to the Stipulated Order. The eDiscovery
Firm shall: (i) obtain and verify a log of devices issued to each custodian; (ii) identify all other
custodians of responsive hard-copy and electronic material; (iii) ascertain the locations of likely
responsive records, through interviews and other means; and (iv) verify that one or more backups
of Trump Organization data is restored to a standalone system. Through the completion of these
steps, the eDiscovery Firm should be ready to issue a detailed status report expanding on the
limited information disclosed by the Trump Organization pursuant to Paragraph 1 of the
Stipulated Order. OAG will wait for the issuance of that report before providing the firm with
search terms pursuant to Item 5 of Exhibit A to the Stipulated Order.

---

[4] Relatedly, documents recently produced indicate that the Trump Organization engaged a firm called McGladrey
LLP to perform tax and accounting-related work with respect to Trump Organization properties. Documents in your
possession regarding those engagements, or under your control (because held by your agent), ought to be produced.

Lawrence Rosen
November 1, 2021
Page 7

\*\*\*\*\*

We remain committed to resolving this investigation as quickly as possible and would therefore ask that you provide us with your proposed third party eDiscovery Firm as soon as possible. In any event, we ask that you submit your proposal no later than November 8, 2021.

Sincerely,

*/s/ Kevin Wallace*
Kevin Wallace

# TAB A

### Executive Assistants and Additional Custodians List

| Name | Position |
| --- | --- |
| Deborah Tarasoff | Accounts payable supervisor |
| Holly Lorenzo | Executive Assistant to Allen Weisselberg |
| Rebecca Manochio | Executive Assistant to Allen Weisselberg |
| Chelsea Frommer | Executive Assistant to Donald J. Trump |
| Jessica Macchia | Executive Assistant to Donald J. Trump |
| Katie Murphy | Executive Assistant to Donald J. Trump |
| Kelli Rose | Executive Assistant to Donald J. Trump |
| Thuy Colayco | Executive Assistant to Donald J. Trump |
| Lindsay Santoro | Executive Assistant to Donald J. Trump Jr. |
| Kimberly Benza | Executive Assistant to Eric Trump and Corporate Communications |
| Elizabeth Hickey | Executive Assistant to Ivanka Trump |
| Kelly Malley | Executive Assistant to Jeff McConney and Allen Weisselberg |
| Cammie Artusa | Leasing Coordinator and Executive Assistant to George Ross |
| 26-copier-pantry | N/A |
| scanemail@trumporg.com | N/A |
| scanner@trumporg.com | N/A |
| Meredith McIver | Staff Writer |

# TAB B

**From:** Bender, Donald
**Sent:** Thursday, February 25, 2016 9:28 AM
**To:** jmcconney@trumporg.com
**CC:** Pagan, Ellen
**Subject:** DJT engagement letter
**Attachments:** 2016_02_25_09_26_22.pdf

**FOIA/FOIL CONFIDENTIAL TREATMENT REQUESTED**                                MAZARS-NYAG-00123419

 

November 2, 2015

**Mr. Allen Weisselberg**
Executive Vice President
Chief Financial Officer
The Trump Organization
725 Fifth Avenue
New York, NY 10022

Dear Mr. Weisselberg:

This letter is to confirm our understanding of the terms and objectives of our engagement and the nature and limitations of the services we will provide.

We will perform the following services:

We will compile, from information you provide, the statement of financial condition of Donald J. Trump as of June 30, 2015 and issue an accountant's report thereon in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

As part of our engagement, we will also perform other accounting services as needed.

**Compilation Objective**
The objective of a compilation is to assist you in presenting financial information in the form of financial statements. We will utilize information that is your representation without undertaking to obtain or provide any assurance that there are no material modifications that should be made to the financial statements in order for the statements to be in conformity with accounting principles generally accepted in the United States of America.

**Compilation Procedures**
We will conduct our compilation in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

A compilation differs significantly from a review or an audit of financial statements. A compilation does not contemplate performing inquiry, analytical procedures, or other procedures performed in a review. Additionally, a compilation does not contemplate obtaining an understanding of the Donald J. Trump's internal control; assessing fraud risk; testing accounting records by obtaining sufficient appropriate audit evidence through inspection, observation, confirmation, or the examination of source documents (for example, cancelled checks or bank images); or other procedures ordinarily performed in an audit. Accordingly, we will not express an opinion or provide any assurance regarding the financial statements being compiled.

WeiserMazars LLP
60 Crossways Park Drive West, Suite 301 – Woodbury, New York – 11797
Tel: 516.488.1200 – Fax: 516.488.1238 – www.weisermazars.com

WeiserMazars LLP is an independent member firm of Mazars Group.



  

November 2, 2015
Page 2

Our accountants' compilation report is expected to include references to the following departures from generally accepted accounting principles.

1.   Generally accepted accounting principles require that in order to reflect amounts to be received in the future at estimated current values the rights must be non-forfeitable, fixed and determinable and not require any future services.  Several of the values that will be expressed will be based on future interests that, in some instances, are not for fixed or determinable amounts, and, in some instances, are based on performance of future services.

2.   Generally accepted accounting principles require that with respect to each closely held business entity, summarized information about assets, liabilities and results of operations for the most current year be disclosed in the financial statements.  In addition, the current estimated value of each closely held business should be recorded as a net investment (assets net of liabilities).   The statement of financial condition will not include the required summarized disclosures and will report some closely held business entities in a manner that separately states gross assets and liabilities and states certain cash positions separately from their related operating entity.

3.   Generally accepted accounting principles require that financial statements include a disclosure of subsequent events and their effects on the statement of financial condition, if any.  The statement of financial condition will not include such disclosure.

4.   Generally accepted accounting principles require that the receipt of non-interest bearing deposits in exchange for rights or privileges be recorded at the present value of the liability. The present value of the liability for non-interest bearing deposits received as a condition of membership in club facilities will not be included in the accompanying statement of financial condition, other than in the case where the valuation of the asset is subject to the refunding of said deposit.

5.   Generally accepted accounting principles require that personal financial statements include a provision for current income taxes, as well as estimated income taxes on the differences between the estimated current values of assets and the estimated current amounts of liabilities and their tax bases.  The statement of financial condition will not include such provisions.

6.   Accounting principles generally accepted in the United States of America require that personal financial statements report cash and marketable securities as separate amounts. The accompanying statement of financial condition reports cash and marketable securities as a single amount.

7.   Generally accepted accounting principles require that personal financial statements include all assets and liabilities of the individual whose financial statements are presented.  The accompanying statement of financial condition does not include the following for Trump International Hotel & Tower Chicago: (1) real property and related assets, (2) mortgages and loans payable, and (3) guarantees which Donald J. Trump may have provided.

The effects of the above departures from generally accepted accounting principles as described above will not be determined or disclosed in our accountants' compilation report.

 

November 2, 2015
Page 3

Further, our report will include the following:

Because the significance and pervasiveness of the matters discussed above make it difficult to assess their impact on the statement of financial condition, users of this financial statement should recognize that they might reach different conclusions about the financial condition of Donald J. Trump if they had access to a revised statement of financial condition without the above referenced exceptions to generally accepted accounting principles.

Our engagement cannot be relied upon to disclose errors, fraud, or illegal acts. However, we will inform the appropriate level of management of any material errors, and of any evidence or information that comes to our attention during the performance of our compilation procedures, that fraud may have occurred. In addition, we will inform you of any evidence or information that comes to our attention during the performance of our compilation procedures regarding illegal acts that may have occurred, unless they are clearly inconsequential. We have no responsibility to identify and communicate deficiencies in your internal control as part of this engagement.

If, for any reason, we are unable to complete the compilation of your financial statements, we will not issue a report on such statements as a result of this engagement.

**Management Responsibilities**
You are responsible for:

a) the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, other than previously noted.

b) designing, implementing, and maintaining internal controls relevant to the preparation and fair presentation of the financial statements.

c) preventing and detecting fraud.

d) identifying and ensuring that Donald J. Trump complies with the laws and regulations applicable to his activities.

e) the selection and application of accounting principles.

f) making all financial records and related information available to us and for the accuracy and completeness of that information.

You are responsible for making management decisions and performing management functions, and for designating an individual with suitable skill, knowledge, or experience to oversee any bookkeeping services, tax services, or other services we provide, if any. You are responsible for evaluating the adequacy and results of the services performed and accepting responsibility for such services. You are responsible for establishing and maintaining internal controls, including monitoring ongoing activities.

 

November 2, 2015
Page 4

If you intend to publish or otherwise reproduce our compilation report on the financial statements and make reference to WeiserMazars LLP, you agree to provide us in advance with copies for our review and approval before distribution. You also agree to provide us with a copy of the final reproduced material for our approval before it is distributed. If you intend to distribute in electronic format, you must provide us both the electronic version as well as an actual print-out for our approval.

**Administration**
Donald Bender is the engagement partner and is responsible for supervising the engagement and signing the report or authorizing another individual to sign it.

To the best of your knowledge, you are unaware of any facts, which might impair our independence with respect to this engagement.

Please be advised that the independence rules provide that an accountant will not be independent with respect to a client where the client employs a current or former partner or professional employee of the firm within a specified period of time. Accordingly, you agree not to enter into any discussion regarding employment with any current or former partner or professional employee of WeiserMazars LLP without our permission.

We may from time to time, and depending on the circumstances, use contract professionals in performing certain limited tasks on your engagement. We hold these professionals to the same standards of confidentiality as all Firm professionals.

You agree to hold WeiserMazars LLP, its successors and assigns harmless from any liability arising out of knowing misrepresentation from management.

This engagement is for the provision of annual compilation services for the periods described herein, and it is understood that such services, and all services related to this engagement, are provided as a single annual engagement. Our compilation engagement ends on delivery of our compilation report. Any subsequent services after this date will be considered a new engagement.

Any and all claims by Donald J. Trump arising under this engagement must be commenced by Donald J. Trump by the later of one (1) year following the date on which WeiserMazars LLP delivered the Statement of Financial Condition associated with this engagement or the date when a new Statement of Financial Condition is issued by WeiserMazars LLP, if WeiserMazars LLP is engaged within one year of the date of this letter. If the completed work product is not delivered to the client, for any reason, any and all claims by Donald J. Trump arising under this engagement must be commenced by Donald J. Trump within one (1) year following the date Donald J. Trump is informed of the engagement's termination in writing.





November 2, 2015
Page 5

You agree to reimburse WeiserMazars LLP, its successors and assigns, partners, principals and employees, to the fullest extent permitted by law for any expense, including compensation for our time and reimbursement for our out-of-pocket expenses and attorneys' fees, incurred in complying with or responding to any request (by subpoena or otherwise) for testimony, documents or other information concerning this engagement by any governmental agency or investigative body or by a party in any litigation or dispute other than litigation or disputes involving claims pertaining to this engagement against WeiserMazars LLP. This paragraph will survive termination of this engagement.

WeiserMazars LLP shall not be liable to Donald J. Trump for any actions, damages, claims, liabilities, costs, expenses or losses in any way arising out of or relating to the services performed under this engagement letter for an aggregate amount in excess of four (4) times the fees paid or owing to WeiserMazars LLP for all entities wholly owned by Donald J. Trump as outlined in the annual billing schedule for the twelve months ending October 15, 2015. In no event shall WeiserMazars LLP be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including, without limitation, lost profits and opportunity costs).

In connection with the performance of our services we may communicate with you or others via e-mail transmission. As e-mails can be intercepted and read, disclosed or otherwise used or communicated by an unintended third party, or may not be delivered to each of the parties to whom they are directed and only to such parties, we cannot warrant that e-mails from us will be properly delivered and read only by the addressee. Therefore, we specifically disclaim any liability whatsoever for interception or unintentional disclosure of e-mail transmissions, or for the unauthorized use or failed delivery or receipt of e-mails transmitted by us in connection with the performance of this engagement. In that regard, you agree that we shall have no liability for any loss or damage to any person or entity resulting from the use of e-mail transmissions, including any consequential, incidental, direct, indirect or special damages, such as loss of revenues or anticipated profits, or disclosure or communication of confidential or proprietary information or missed deadlines.

We may also elect to resign upon our determination that Donald J. Trump's personnel have not been forthcoming in providing information or have not been truthful. If we elect to terminate our services, our engagement will be deemed to have been concluded upon written notification of termination, even if we have not completed our report. You will be obligated to compensate us for all time expended and to reimburse us for all out-of-pocket expenditures through the date of termination.

 

November 2, 2015
Page 6

**Dispute Resolution**

Any controversy or claim ("dispute") arising out of or relating to this engagement, the services provided thereunder, or any other services provided by or on behalf of WeiserMazars LLP or any of its subcontractors or agents to Donald J. Trump or at its request (including any dispute involving any person or entity for whose benefit the services in question are or were provided), shall be resolved in accordance with the dispute resolution procedures set forth below, which constitute the sole methodologies for the resolution of all such disputes. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

*Mediation*

Any dispute arising out of or relating to this engagement, or breach thereof, shall first be submitted for good faith mediation administered by the American Arbitration Association ("AAA") under its Mediation Rules. The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach a consensual resolution of the dispute. The mediation shall be treated as a settlement discussion and shall be confidential. The mediator may not testify for any party in any later proceeding related to the dispute. No recording or transcript shall be made of the mediation proceeding. Each party shall bear its own costs in the mediation. Absent an agreement to the contrary, the fees and expenses of the mediator shall be shared equally by the parties.

Mediation shall take place at a place to be designated by the parties.

*Arbitration*

If the matter is not resolved by mediation within 60 days of its submission to the mediator, then the parties shall submit the dispute for arbitration administered by the American Arbitration Association under its Professional Accounting and Related Services Dispute Resolution Rules (the "Rules").

The arbitration will be conducted before a single arbitrator selected by agreement between the parties from the AAA's Panel of Accounting Professionals and Attorneys and shall take place in New York, New York. The arbitrator shall be a fit and impartial person and shall have at least ten (10) years' experience in commercial litigation, accounting or a similar field connected to the subject matter of the dispute. The arbitrator, with the aforementioned requisite qualifications, shall be selected pursuant to Section 13 of the Rules.

The arbitrator shall issue its final award in a written and reasoned decision to be provided to each party. In its decision, the arbitrator will declare one party the prevailing party and shall have the power to award all reasonable legal fees associated with the arbitration and prior mediation to the prevailing party. The arbitrator shall have no authority to award non-monetary or equitable relief of any sort. The arbitrator shall not have authority to award damages that are punitive in nature, or that are not measured by actual compensatory loss.

 

November 2, 2015
Page 7

Any discovery sought in connection with the arbitration must be expressly approved by the arbitrator only upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitrator may disclose the existence, content or result of the arbitration only as expressly provided by the Rules.

The award reached as a result of the arbitration will be binding on the parties and confirmation of the arbitration award may be sought in any court having jurisdiction.

Any dispute relating in any way to this engagement will be governed by the laws of the State of New York, without giving effect to any provisions relating to conflict of laws that would require the laws of another jurisdiction to apply. In applying the terms of this engagement letter, the Arbitrator shall apply the laws of the State of New York.

**Fees**
Our fee for these services will be at our standard hourly rate. You will also be billed for travel and other out-of-pocket costs such as report production, typing, postage, etc.

The fee is based on anticipated cooperation from your personnel and the assumption that unexpected circumstances will not be encountered during the engagement. If significant additional time is necessary, we may revise our fee.

**Additional Services**
You may request that WeiserMazars LLP perform additional services not addressed in this engagement letter. If such a request is made, we will communicate with you regarding the scope of the additional services and the estimated fees. Depending upon the scope and time required to perform these services, we may issue a separate engagement letter covering the additional services. In the absence of any other written communication from us documenting such additional services, our services will be governed by the terms of this engagement letter, however, these additional services are a separate engagement.

**Agreement**
This letter comprises the complete and exclusive statement of the agreement between the parties superseding all proposals, oral or written, and all other communications between the parties with respect to the subject matter hereof. If any provision of this letter is determined to be unenforceable, all other provisions shall remain in force.





November 2, 2015
Page 8

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes all the terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us.

Sincerely yours,

WEISERMAZARS LLP

Acknowledged:

_____

Allen Weisselberg
Executive Vice President
Chief Financial Officer
The Trump Organization

_____

Date

EPACE/08292/2015C/1030.03

# TAB C

| From: | Jeff McConney [jmcconney@trumporg.com] |
|---|---|
| Sent: | 1/22/2013 12:04:51 PM |
| To: | Welch, Peter [Peter.Welch@capitalone.com] |
| CC: | Allen Weisselberg [weisselberg@trumporg.com]; Galaburri, Matthew [Matthew.Galaburri@capitalone.com]; Glanville, Terry [Terry.Glanville@capitalone.com] |
| Subject: | 40 Wall Street |
| Attachments: | 20130122114453421.pdf |

Hi Peter,

Please see the attached information relating to 40 Wall Street.

Should you have any questions, please feel free to contact me.

Thanks
Jeff


Jeffrey S. McConney
Senior Vice President/Controller
725 Fifth Avenue | New York, NY | 10022
p. 212.715.7231 | f. 212.832.5396
jmcconney@trumporg.com | Trump.com


-----Original Message-----
From: Jennifer Walsh [mailto:jwalsh@trumporg.com]
Sent: Tuesday, January 22, 2013 11:45 AM
To: Jeff McConney
Subject: Message from "RNPFC77CE"

This E-mail was sent from "RNPFC77CE" (MP 8001/LD380).

Scan Date: 01.22.2013 11:44:53 (-0500)
Queries to: scanner@trumporg.com

This e-mail message, and any attachments to it, are for the sole use of the intended recipients, and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of this email message or its attachments is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. Finally, while the company uses virus protection, the recipient should check this email and any attachments for the presence of viruses. The company accepts no liability for any damage caused by any virus transmitted by this email.

CONFIDENTIAL

CONFIDENTIAL



THE TRUMP CORPORATION

January 22, 2013

Capital One, NA
275 Broadhollow Road
Melville, NY 11747

Attn:   Mr. Peter Welch
        Senior Vice President

Re:     40 Wall Street LLC

Dear Peter,

Pursuant to Section 2 of Exhibit B of the Second Amended, Consolidated and Restated
Mortgage Note dated November 19, 2010 between Capital One, N.A. and 40 Wall Street
LLC, enclosed please find:

- Income and Expense Statement for the calendar quarter ended December 31, 2012
- January 2013 Rent Roll

Also enclosed is a twelve month cash basis Income and Expense Statement which covers
the period January 2012 - December 2012.

Should you have any questions related to enclosed information, please do not hesitate to
contact me at (212) 715-7231

Very truly yours,

Jeffrey McConney
SVP/ Controller

Enclosures

725 FIFTH AVENUE • NEW YORK, NY 10022 • (212) 832-2000 • FAX (212) 935-0141

CAPITALONE-00254441

**A124**

CONFIDENTIAL

40 WALL STREET
INCOME AND EXPENSE STATEMENT
CASH BASIS

October 1, 2012 -
December 31, 2012
Total Annual

**Receipts**

| | |
|---|---|
| STORAGE ROOM INCOME | 1,020 |
| RETAIL INCOME | 768,598 |
| OFFICE RENT INCOME FIXED | 5,435,206 |
| OPER EXP ESCALATION INCOM | 404,450 |
| LEASE CANCELLATION INCOME | 0 |
| RETRO OPERATING EXP ESCALATION | 48,940 |
| MANAGEMENT FEE INCOME | 0 |
| IMONES INCOME | 300 |
| REAL ESTATE TAX INCOME | 282,996 |
| ELECTRIC INCOME | 374,127 |
| TELECOMMUNICATIONS SVC INCOME | 88,749 |
| BUILDING SERVICES INCOME | 500,103 |
| | 8,366,499 |

**Other Receipts**

| | |
|---|---|
| OTHER INC-MISCELLANEOUS | 17,426 |
| OTHER INC-MISC INTEREST | 9,836 |
| OTHER INC-ADMIN FEES | 29,078 |
| OTHER INC-INT ON TENANT SEC | 2,367 |
| OTHER INC-R E TAX REFUND | 0 |
| | 58,708 |

**Total Receipts** | 8,367,497

**General Expenses**

| | |
|---|---|
| PAYROLL | 29,438 |
| INSURANCE EXPENSA | (67) |
| INSURANCE CLAIMS | 3,972 |
| REAL ESTATE TAX EXPENSE - BID TAX | 98,093 |
| | 131,436 |

**Administrative Expenses**

| | |
|---|---|
| INTEREST EXPENSE - OTHER | 0 |
| ADVERTISING & PROMOTION | 9,083 |
| COMPUTER PAYROLL EXPENSE | 834 |
| LEGAL EXPENSE | 44,745 |
| AUDITING | 0 |
| DUES & SUBSCRIPTIONS | 675 |
| OFFICE EXPENSE & SUPPLIES | 495 |
| STATIONERY/PRINTING/POSTAGE | 0 |
| TELEPHONE & TELEX | 7,875 |
| MANAGEMENT FEES AND EXPENSES | 25,000 |
| 32BJ TRAINING BENEFIT | 1,886 |
| 32.BJ ANNUITY BENEFIT | 6,981 |
| 32 BJ PENSION BENEFIT | 40,589 |
| 32BJ WELFARE BENEFIT | 149,689 |
| ELECTRIC SUB-METERING EXPENSES | 864 |
| BANK CHARGES | 65 |
| EMPLOYEE BENEFITS | (32) |
| 32B LEGAL FUND | 2,222 |
| LOCAL 94/LOCAL 6 TRAINING BENE | 1,029 |
| LOCAL 94/LOCAL 6 ANNUITY BEN | 17,144 |
| LOCAL 94/LOCAL 6 PENSION BENEF | 15,919 |
| LOCAL 94/LOCAL 6 SICKNESS BENE | 8,900 |
| LOCAL 94/ LOCAL 6 WELFARE BENE | 55,367 |
| GROUND RENT EXPENSE | 375,000 |
| RENT EXPENSE | 174,438 |
| PROFESSIONAL FEES | 15,000 |
| | 934,361 |

**Operating Expenses**

| | |
|---|---|
| SECURITY GUARDS | 146,601 |
| FUEL STEAM/GAS | 106,669 |
| WATER AND SEWER CHARGES | 29,640 |
| WALKIE TALKIES | 300 |
| ELECTRICITY USAGE EXPENSE | 316,583 |
| UNIFORM EXPENSE | 722 |
| CHRISTMAS EXPENSE | 0 |
| ENTERTAINMENT | 691 |
| MESSENGER & DELIVERY | 375 |
| TEMPORARY HELP | 716 |
| TRAVEL | 222 |
| FLOWERS | 1,933 |
| CLEANING | 0 |
| COMPUTER SERVICES | 3,597 |
| INVESTIGATION FEE EXPENSE | 0 |
| | 607,914 |

CAPITALONE-00254442

CONFIDENTIAL

**60 WALL STREET**
**INCOME AND EXPENSE STATEMENT**
**CASH BASIS**

January 1, 2012
December 31, 2012
Total Actual

| Repairs and Maintenance | |
|---|---|
| PAINTING SUPPLIES | 0 |
| HARDWARE SUPPLIES | 0 |
| REPAIRS MATERIALS & SUPPLIES | (13,709) |
| PLUMBING REPAIRS MATL & SUP | 3,337 |
| IN INTERIOR DECORATING & SUPPLIES | 4,036 |
| RUBBISH REMOVAL | 6,912 |
| ROOF REPAIRS | 0 |
| WINDOW WASHING | (3) |
| MARBLE MAINTENANCE:CONTRACT | 5,799 |
| IN/OUT METAL MAINT. CONTRACT | 9,601 |
| HVAC MAINTENANCE | 16,173 |
| LOCKS & DOORS REPAIR | 542 |
| FIRE & SECURITY SYSTEM | 14,996 |
| MARBLE MAINT/PAVER REPAIRS | 0 |
| METAL MAINTENANCE: REPAIRS | 0 |
| TIME RECORDER | 414 |
| ELEVATOR CONTRACT | 36,090 |
| | 0 |
| EXTERMINATING | 0 |
| SIGNS | 0 |
| MISCELLANEOUS REP & MAINT. | 3,269 |
| LOCAL LAW 10/11 | 0 |
| ESCALATOR R&M | 0 |
| ELEVATOR REPAIRS | 0 |
| WINDOW REPAIRS | 0 |
| HVAC P/R, P/R TAXES & BENEFITS | 184,771 |
| BUILDING CLEANING P/R | 490,638 |
| EQUIPMENT RENTAL & EXPENSES | 2,010 |
| PAINTING AND DECORATING | 0 |
| SECURITY EQUIPMENT | 1,265 |
| | 776,630 |
| **Other Taxes** | |
| FEDERAL INCOME TAX | 0 |
| STATE FRANCHISE TAX | 25 |
| FICA EXPENSE | 48,578 |
| PAYROLL TAX EXPENSE-SUI | (133) |
| LICENSES AND PERMITS | 1,250 |
| MISCELLANEOUS OTHER TAXES | 250 |
| PAYROLL TAX EXPENSE-Fui | 0 |
| DISABILITY INSURANCE | 492 |
| WORKERS COMP INSURANCE-EXPENSE | 81,507 |
| NY METRO TAX ER | 378 |
| | 132,853 |
| **Total Expenses and Disbursements** | 2,887,394 |
| Operating Cash Flow Before Debt Service, Escrow Deposits and Capital Disbursements) | 6,779,803 |
| **Debt Service** | |
| ESC DEP-RE TAXES/INSURANCE | 1,978,643 |
| INTEREST ON MORTGAGE | 2,309,378 |
| | 4,287,521 |
| **Capital Disbursements** | |
| BUILDING IMPROVEMENTS | 2,492,162 |
| FURNITURE, FIXTURES & EQUIPMENT | 0 |
| LEASEHOLD IMPROVEMENTS | 205,648 |
| LEASING COMMISSIONS | 488,061 |
| | 3,185,861 |
| **Excess Cash Flow (Deficit)** | (1,593,579) |

CAPITALONE-00254443

CONFIDENTIAL

# A126

**40 WALL STREET**
**INCOME AND EXPENSE STATEMENT**
**CASH BASIS**

12 Month Period Ended
31-Dec-12

**Receipts**

| | |
|---|---|
| STORAGE ROOF INCOME | 4,080 |
| RETAIL INCOME | 1,816,466 |
| OFFICE RENT INCOME PORT | 21,399,934 |
| OPER EXP ESCALATION INCOM | 1,128,940 |
| LEASE CANCELLATION INCOME | 50,443 |
| RETRO OPERATING EXP ESCALATION | 447,748 |
| MANAGEMENT FEE INCOME | 196,449 |
| GROUND INCOME | 1,989 |
| REAL ESTATE TAX INCOME | 936,933 |
| ELECTRIC INCOME | 1,004,421 |
| TELECOMMUNICATIONS SVC INCOME | 223,515 |
| BUILDING SERVICES INCOME | 997,055 |
| | **27,990,028** |

**Other Receipts**

| | |
|---|---|
| OTHER INC-MISCELLANEOUS | 38,664 |
| OTHER INC-MISC INTEREST | 49,442 |
| OTHER INC-ADMIN FEES | 62,739 |
| OTHER INC-INT ON TENANT SEC | 10,668 |
| OTHER INC-R E TAX REFUND | 41,265 |
| | **160,749** |

**Total Receipts** | **28,150,778**

**General Expenses**

| | |
|---|---|
| PAYROLL | 100,779 |
| INSURANCE EXPENSES | 1,500 |
| INSURANCE CLAIMS | 25,442 |
| REAL ESTATE TAX EXPENSE - BID TAX | 194,340 |
| | **322,061** |

**Administrative Expenses**

| | |
|---|---|
| INTEREST EXPENSE - OTHER | 517 |
| ADVERTISING & PROMOTION | 87,750 |
| COMPUTER PAYROLL EXPENSE | 4,454 |
| LEGAL EXPENSE | 227,189 |
| AUDITING | 40,000 |
| DUES & SUBSCRIPTIONS | 2,385 |
| OFFICE EXPENSE & SUPPLIES | 5,590 |
| STATIONERY/PRINTING/POSTAGE | 1,837 |
| TELEPHONE & TELEX | 33,746 |
| MANAGEMENT FEES AND EXPENSES | 100,000 |
| 32BJ TRAINING BENEFIT | 6,353 |
| 32 BJ ANNUITY BENEFIT | 24,232 |
| 32 BJ PENSION BENEFIT | 163,105 |
| 32BJ WELFARE BENEFIT | 501,807 |
| ELECTRIC SUB-METERING EXPENSES | 20,915 |
| BANK CHARGES | 156 |
| EMPLOYEE BENEFITS | (140) |
| 32BJ LEGAL FUND | 1,417 |
| LOCAL 94/LOCAL 6 TRAINING BENE | 4,147 |
| LOCAL 94/LOCAL 6 ANNUITY BEN | 69,779 |
| LOCAL 94/LOCAL 6 PENSION BENEF | 64,764 |
| LOCAL 94/LOCAL 6 SICKNESS BENE | 28,734 |
| LOCAL 94/LOCAL 6 WELFARE BENE | 149,230 |
| GROUND RENT EXPENSE | 1,503,000 |
| RENT EXPENSE | 951,152 |
| PROFESSIONAL FEES | 139,249 |
| | **1,051,688** |

**Operating Expenses**

| | |
|---|---|
| SECURITY GUARDS | 607,298 |
| FUEL STEAM/GAS | 608,586 |
| WATER AND SEWER CHARGES | 147,253 |
| WALKIE TALKIES | 909 |
| ELECTRICITY USAGE EXPENSE | 1,261,435 |
| UNIFORM EXPENSE | 4,731 |
| CHRISTMAS EXPENSE | 9,710 |
| ENTERTAINMENT | 818 |
| MESSENGER & DELIVERY | 896 |
| TEMPORARY HELP | 1,414 |
| TRAVEL | 258 |
| FLOWERS | 12,412 |
| CLEANING | 9,842 |
| COMPUTER SERVICES | 528.76 |
| INVESTIGATION FEE EXPENSE | 51 |
| | **2,893,546** |

CAPITALONE-00254444

CONFIDENTIAL

40 WALL STREET
INCOME AND EXPENSE STATEMENT

CASH BASIS

12 Month Period Ended
31-Dec-12

**Repairs and Maintenance**

| | |
|---|---|
| PAINTING SUPPLIES | 4,769 |
| HARDWARE SUPPLIES | 4,769 |
| REPAIRS MATERIALS & SUPPLIES | 14,667 |
| PLUMBING REPAIRS MATL & SUP | 38,605 |
| ELECTRIC REPAIRS & SUPPLIES | 31,588 |
| RUBBISH REMOVAL | 37,942 |
| ROOF REPAIRS | 167,253 |
| WINDOW WASHING | (0) |
| MARBLE MAINTENANCE CONTRACT | 58,795 |
| IN/OUT METAL MAINT. CONTRACT | 51,607 |
| HVAC MAINTENANCE | 314,234 |
| LOCKS & DOORS REPAIR | 8,680 |
| FIRE & SECURITY SYSTEM | 58,655 |
| MARBLE MAINT/PAVER REPAIRS | 0 |
| METAL MAINTENANCE  REPAIRS | 0 |
| TIME RECORDER | 514 |
| ELEVATOR CONTRACT | 414,793 |
| CLEANING SUPPLIES | 448 |
| EXTERMINATING | 0 |
| SIGNS | 3,502 |
| MISCELLANEOUS REP  & MAINT. | 14,501 |
| LOCAL LAW 10/11 | 9,000 |
| ESCALATOR RAM | 1,450 |
| ELEVATOR REPAIRS | 28,541 |
| WINDOW REPAIRS | 0 |
| HVAC P/R, P/R TAXES & BENEFITS | 754,588 |
| BUILDING CLEANING P/R | 1,602,695 |
| EQUIPMENT RENTAL & EXPENSES | 8,903 |
| PAINTING AND DECORATING | 11,680 |
| SECURITY EQUIPMENT | 17,423 |
| | 3,898,997 |

**Other Taxes**

| | |
|---|---|
| FEDERAL INCOME TAX | 8 |
| STATE FRANCHISE TAX | 4,525 |
| FICA EXPENSE | 195,554 |
| PAYROLL TAX EXPENSE-SUI | 10,144 |
| LICENSE AND PERMITS | 19,884 |
| MISCELLANEOUS TAXES | 2,321 |
| PAYROLL TAX EXPENSE-FUI | 2,392 |
| DISABILITY INSURANCE | 3,491 |
| WORKERS COMP INSURANCE-EXPENSE | 94,899 |
| NY METRO TAX ER | 3,362 |
| | 336,359 |

| | |
|---|---|
| **Total Expenses and Disbursements** | **11,306,511** |

| | |
|---|---|
| Operating Cash Flow Before Debt Service, Escrow Deposits and Capital Disbursements) | 10,874,289 |

**Debt Service**

| | |
|---|---|
| ESC DEP-RE TAXES/INSURANCE | 8,886,992 |
| INTEREST ON MORTGAGE | 9,289,187 |
| | 18,174,149 |

**Capital Disbursements**

| | |
|---|---|
| BUILDING IMPROVEMENTS | 15,940,207 |
| FURNITURE, FIXTURES & EQUIPMENT | 184,331 |
| LEASEHOLD IMPROVEMENTS | 256,616 |
| LEASING COMMISSIONS | 3,309,916 |
| | 19,690,070 |

| | |
|---|---|
| **Excess Cash Flow (Deficit)** | **(26,990,870)** |

CAPITALONE-00254445

OFFICE SPACE

| Unit No. | Floor No. | Square Feet | Tenant | Lease Term | Rent Term | Annual Rent | Monthly Rent | PSF | | RE Tax Base Year | RE Tax % | Operating Exp Base Year | Operating Exp % | Electric Inclusion | Security Deposit | Lease Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COM 9 | 50TH | 8,248 | AMERICAN PRECIOUS METAL EXCHANGE | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 1/7/12 | 0.75600 | 2012 | 0.94000 | METERED | 171,[illegible] | [illegible] |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | [illegible] |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | [illegible] |
| COM 11 | [illegible] | 7,481 | BAYTREE ASSOCIATES INC. | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | 6/06 | 0.381 | 2007 | 0.703 | METERED | NONE | [illegible] |
| | | | 1ST AMENDMENT [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | [illegible] |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | [illegible] |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | AMENDMENT | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 2012/2013 | | 2012 | | | | |
| COM 15 | 48TH | [illegible] | BROKERAGE & MANAGEMENT CORP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 10/11 | 0.501 | 10/11 | 0.852 | METERED | 277,[illegible] | [illegible] |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| COM 46 | 27TH | 7,987 | BUREAU VAN DIJK | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 10/11 | 0.891 | 2011 | 0.735 | METERED | 287,[illegible] | |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | 49TH | 8,[illegible] | [illegible] | [illegible] | 1 MONTH FREE | [illegible] | [illegible] | [illegible] | [illegible] | AVG 1/1/12 AND 13 Dec | 0.78 80[illegible] | NONE | NONE | 90,056.00 | [illegible] | [illegible] |
| | | | [illegible] | | 1ST YEAR | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | [illegible] |
| | | | | | 2ND YEAR | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | | 3RD YEAR | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | APPROX. [illegible] | 4TH YEAR | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | | 5TH YEAR | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | | 6TH YEAR | 497,240.24 | 41,437.10 | 53.77 | | | | | | | | |
| | | | | | 7TH YEAR | 506,649.00 | 42,220.82 | 54.81 | | | | | | | | |
| | | | | | 8TH YEAR | 517,274.18 | 43,106.51 | 55.93 | | | | | | | | |
| | | | | | 9TH YEAR | 526,618.60 | 43,884.88 | 56.94 | | | | | | | | |
| | | | | | 10TH YEAR | 536,803.56 | 44,733.60 | 58.05 | | | | | | | | |
| COM 37 | 17TH | 4,706 | COASTAL TRADE SECURITIES | 03/05/12-02/28/17 | 03/05/12-03/04/14 | 141,180.00 | 11,765.00 | 30.00 | 141,180.00 | 10/11 | 0.40700 | 2012 | 0.495 | 15,294.50 | 70,590.00 | SECURITY TO BE REDUCED BY $11,766 AFTER EXP. OF 2ND YEAR OF TERM. NO EVENT SECURITY TO BE LESS THAN $58,826. / ELECTRIC $3.25 PSF |
| | | | | | 03/05/14-02/28/17 | 155,298.00 | 12,941.50 | 33.00 | | | | | | | | |
| COM 45 | 7TH 12TH | 181,239.00 | CONTINENTAL CASUALTY COMPANY | 05/06/96-03/31/14 | 05/01/96-02/28/02 | 4,[illegible] | 358,476.00 | 24.00 | 6,375,315.08 | 03/02 | 17.235 | 1999 | 18.025 | METERED | | NONE ON FILE |
| | | | | | 03/01/02-02/28/05 | 5,273,808.92 | 439,483.07 | 28.55 | 76,387.48 * | | | | | | | * SUB LEASE RENT ENTERED INTO AGREEMENT 2004 ENDS SIMULANEOUSLY W/ COM 45 LEASE |
| | | | | | 03/01/05-02/28/08 | 5,575,683.92 | 464,506.63 | 28.00 | | | | | | | | SUB LEASE RENT FOR 11TH FL (WHICH WE LEASE TO HAKS ENGINEERING, 33,026 SQ.FT) |
| | | | | | 03/01/08-03/31/11 | 5,877,143.00 | 489,795.83 | 30.50 | | | | | | | | |
| | | | | | 10/01/11-03/31/14 | 6,375,615.96 | 531,301.33 | 32.90 | | | | | | | | |
| COM 77 | 18TH | 5,845 | CORE STAFFING SERVICES | 05/14/10-09/30/17 | 10/01/10-11/30/13 | 187,040.04 | 15,586.67 | 32.00 | 188,684.02 | 06/11 | 0.50600 | 2010 | 0.538 | METERED | 65,000.00 | LANDLORD T 303,795.00 |
| | | | | | 12/01/13-09/30/17 | 205,675.01 | 17,131.25 | 35.17 | | | | | | | | |
| COM 47 | 3RD 12TH 11TH | 76,398 | COUNTRYWIDE INSURANCE COMPANY | 04/01/11-03/31/26 | 05/01/11-09/30/14 | 1,909,974.96 | 159,164.58 | 25.00 | 1,808,974.83 | 2011 | 6.13600 | 2011 | 6.05600 | METERED | 376,631.00 | TENANTS PROPORTIONATE SHARE FOR RE TAX SHALL INCREASE TO 9.21% AS OF 4/01/2014. SQ FT TO INCREASE TO 106,341 4/1/14 |
| | | | | | 10/01/14-03/31/18 | 2,709,[illegible].06 | 225,710.42 | 25.00 | | | | | | | | TENANTS PROPORTIONATE SHARE FOR OPEX SHALL INCREASE TO 8.65% AS OF 4/01/2014 |
| | | | | | 04/01/15-03/31/21 | 2,976,077.52 | 248,291.46 | 27.50 | | | | | | | | TENANTS RENTABLE SQUARE FEET SHALL INCREASE TO 106,341 AS OF 4/08/14 |
| | | | | | | | | | | | | | | | | 12TH FL LANDLORD SHARE OF WORK COST SHALL BE 2,163,322.00 (1,577,680 TO BE USED ANYTIME 585,643 TO BE USED AFTER 4/1/14) TENANT IS USING THE FIRST ALLOTMENT AS RENT CREDIT |
| | | | | | | | | | | | | | | | | OFFSETTING CHARGES 9/11 THROUGH 3/31/2012 BASE RENT AND ADD'TL |
| COM | 40TH FL | 8,317 | CSA GROUP NY | LICENSE AGREEMENT * 12/1/12-02/28/13 MTM THEREAFTER | 12/1/12-02/28/13 | 130,740.00 | 30,580.00 | 43.25 | 67,103.00 | N/A | N/A | N/A | N/A | N/A | 33,535.55 | CAS - SECURITY ELECTRIC INCLUDED IN LICENSE FEE |
| COM 74 | 42, 43 | 10,618 | DIRECT ACCESS PARTNERS | 12/17/09-12/31/16 | 06/25/10-02/28/15 | 449,427.00 | 37,452.25 | 38.00 | 449,427.00 | 2010 | 1.176 | 2010 | 1.253 | METERED | 337,050.00 | LC |
| | | | | | 03/01/15-12/31/16 | 499,284.00 | 41,657.00 | 39.00 | | | | | | | | |
| COM 63 | 21ST-12TH | 54,500 | DUANE READE | 10/01/12-03/31/28 | 04/01/13-03/31/15 | 562,125.02 * | 93,354.17 | | 933,187.53 | 11/12 | 4.710 | 2012 | 5.012 | METERED | NONE | REDUCTION IN FIRST 6 MOS IS A RENT CREDIT NILE J OF TI |
| | | | | | 04/01/15-03/28/17 | 1,447,250.00 | 120,354.17 | 26.30 | | | | | | | | |
| | | | | | 04/01/17-03/28/21 | 1,607,700.00 | 133,970.17 | 29.50 | | | | | | | | |
| | | | | | 04/01/21-03/31/28 | 1,825,750.00 | 152,140.83 | 33.50 | | | | | | | | |
| | | | | | 6 months free rent | | | | | | | | | | | |
| COM 57 | 25TH FL | 4,417 | EMAJ SOLUTIONS LLC | 12/01/10-02/28/15 | 12/01/10-11/30/11 | 154,595.00 | 12,882.92 | 35.00 | 145,761.00 | 11/11 | 0.38200 | 2010 | 0.485 | 11,902.75 | 38,675.54 | |
| | | | | | 12/01/11-10/31/12 | 145,761.00 | 12,146.75 | 33.00 | | | | | | | | |
| | | | | | [illegible] | 145,761.00 | 12,146.75 | 33.00 | | | | | | | | |

OFFICE SPACE

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| | | | | *4/1/2012 substantial completion* | *[illegible]* | *244,496.00* | *20,374.67* | *68.00* | | | | | | | | | |
| | | | | *Second Amendment signed 6/22/12 (free rent to tenant)* | *[illegible]* | *244,496.00* | *20,374.67* | *68.00* | | | | | | | | | |
| COM 32 | 51ST FL | 23,243.00 | GDS PUBLISHING INC | 08/04/09-09/30/16 | 12/23/09-02/28/13<br>03/01/13-09/30/16 | 647,380.08<br>698,160.04 | 53,973.34<br>57,840.67 | 32.00<br>34.33 | 631,411.73 | 10/11 | 1.75 | 2010 | 1.66 | METERED | 323,940.00 | LC ISSUED AUTO RENEWAL NOT BEYOND 7/31/16; TO BE REDUCED BY 53,973 AFTER 12 MOS AND AN ADDITIONAL 53,973 AFTER 24 MONTHS NOT TO BE REDUCED LESS THAN 215,894.66 |
| COM 34 | 17TH FL | 34,976 | HAKS ENGINEERS & LAND SURVEYORS | 05/31/06-12/31/20 | 12/01/05-11/30/09<br>12/01/09-11/30/13<br>12/01/13-11/30/16<br>12/01/16-12/31/20 | 852,363.00<br>818,215.00<br>935,087.00<br>1,165,910.00 | 71,030.25<br>76,184.25<br>82,172.65<br>97,202.50 | 24.37<br>26.28<br>28.19<br>33.45 | 224,785.00 | 06/07 | 7.26700 | 2007 | 3.07500 | METERED | 245,516.75 | |
| CON 63 | 4TH FL | 10,675.00 | HAKS ENGINEERING & LAND SURVEYORS | 08/20/10-12/31/20 | 12/01/10-12/31/15<br>12/20/15-12/31/20 | 311,822.81<br>376,333.04 | 25,985.57<br>31,361.17 | 32.00<br>35.25 | 341,600.04 | 10/11 | 0.823 | 10 | 0.382 | METERED | 68,403.10 | |
| COM 10 | 5th, 37th part 36th | 12,134 | HALPERIN BATTAGLIA RAICHT, LLC | 07/17/12-08/31/23<br>subs comp 1/17/13<br>(pending revised rec. ...)<br>3 mos free | 06/17/13-08/31/18<br>09/01/18-08/31/23 | 467,159.00<br>503,561.00 | 38,929.92<br>41,963.42 | 38.50<br>41.50 | 329,606.66 | AVG 12/13 AND 13/14 | 1.050% | 2012 | 1.112% | METERED | 457,150.00 | LC - SIGNATURE BANK AUTO RENEW FINAL EXPIRATION 9/30/23<br>IN THE EVENT TENANT IS NOT IN DEFAULT LC MIGHT BE REDUCED ON THE 3RD,4TH,5TH ANNIVERSARY BY 77,359.59; IN NO EVENT WILL SECURITY BE LESS THAN $233,673.22; NULL AND VOID IF TENANT DEFAULTS AT ANYTIME PRIOR TO 12/31/18<br>TENANT WILL PAY FOR LANDLORD TO FURNISH AND INSTALL INTERNAL STAIRCASE BETWEEN 36TH AND 37TH FLOORS (BY CERTIFIED CHECK UPON ACCEPTANCE OF LANDLORD BID) WILL ALSO BE RESPONSIBLE FOR COST OF REMOVAL UPON VACATING SPACE |
| COM 31 | 41ST FL | 8,878 | THE HILTON HOTELS CORP<br>**ASSUMES EXTENSION** | 07/01/09-06/30/14 | 07/01/04-06/30/05<br>07/01/05-06/30/08<br>[illegible] | 292,974.00<br>310,770.04<br>318,308.00 | 24,414.50<br>25,254.17<br>26,024.00 | 33.00<br>35.00<br>36.00 | 316,635.00 | 04/05 | 3.73580 | 2005 | 0.07 | METERED | NONE | |
| COM 59 | 30TH FL | 21,843 | ELROY CONSULTING SERVICES LLC | [illegible]-07/31/22 | [illegible]-07/31/17<br>07/01/17-07/31/22 | 777,624.00<br>884,990.00 | 64,522.00<br>72,990.00 | 27.00<br>30.00 | 777,624.00 | 11/12 | 2.49000 | 2012 | 2.09 | METERED | 380,734.00 | SECURITY [illegible] LANDLORD TO $1,725,720 (PAID BACK TO TENANT TO DATE) |
| COM 42 | 19TH FL | 16,200.00 | IBS WORLD INC | 12/15/11-02/28/22 | 02/10/12-05/18/12<br>05/19/12-05/18/17<br>05/19/17-02/28/22 | 226,627.44<br>549,000.00<br>[illegible] | 18,885.62<br>46,250.00<br>49,302.38 | 13.99<br>33.63<br>36.53 | 510,000.00 | 2011 | 1.402 | 2011 | 1.491 | METERED | 274,500.00 | UNION BANK LC AUTO RENEWAL UNTIL 3/31/18<br>SECURITY TO BE REDUCED BY [illegible] AT THE END OF THE 3RD YR AND 4TH YEAR BUT IN NO EVENT TO BE LESS THAN $183,000.00 |
| COM 62 | 34TH FL | 12,562 | CF CONSULTING GROUP INC | 06/01/11-01/31/22 | 07/01/12-06/30/16<br>07/01/16-01/31/22 | 427,107.96<br>464,793.96 | 35,592.33<br>38,732.83 | 34.00<br>37.00 | 427,107.96 | 2011 | 1.08700 | 2011 | 1.11600 | METERED | 106,777.00 | |

OFFICE SPACE

| Unit No. | Floor No. | Square Feet | Tenant | Lease Term | Rent Schedule | Annual Rent | Monthly Rent | PSF | 2013 Rent Roll | RE Tax Base Year | RE Tax % | Operating Exp. Base Year | Operating Exp. % | ELECTRIC INCLUSION | Security Deposit | LEASE NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] (STORAGE SPACE) | [illegible] | [illegible] | [illegible] | [illegible] | 2010 | 0.416 | 2013 | 0.442 | METERED | 193,625.00 | SECURITY TO BE REDUCED BY 32,256.75 END OF 2ND YEAR AND SAME AMT END OF 4TH YEAR NOT LESS THAN 129,016; EFFECTIVE 8/1/13 TENANT MAY CANCEL LEASE W/6 MOS NOTICE AND FEE OF 64,140.00 |
| [redacted] | | | | | | | | | | | | | | | | |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] FREE RENT (IF NOT IN DEFAULT) | [illegible] | [illegible] | [illegible] | [illegible] | 1/12 | 1.1700 | 2011 | 1.177 | METERED | 327,270.20 | LC AT THE END OF THE 2ND YEAR AND 5TH YEAR THE SECURITY WILL BE REDUCED BY 109,575.25 (21,190.5?) BUT IN NO EVENT WILL THE SECURITY BE LESS THAN 218,725.75 CURRENT LC CAN NOT BE EXTENDED BEYOND 04/29/21 |
| [redacted] | | | | | | | | | | | | | | | | |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 1/12 | 0.92300 | 2011 | 0.94100 | INCLUDED | 42,572.00 | SECURITY TO BE REDUCED BY 10,715 AFTER 9/30/13 IF TENANT NOT IN DEFAULT; IN NO EVENT LESS THAN 32,154 SHALL BE HELD AS SECURITY. |
| [redacted] | | | | | | | | | | | | | | | | |
| [illegible] | 33RD FL | [illegible] | LAW OFFICES OF EDWARD M. ROSENSTEEL | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 12/15 | 0.318 | 2012 | 0.329 | 11,905.20 | 59,024.00 | |
| [redacted] | | | | | | | | | | | | | | | | |
| [illegible] | [illegible] | [illegible] | [illegible] ASSOCIATES | [illegible] SUBS COMP 4/02/12 | [illegible] FREE RENT; 02/06/13-02/05/19; 02/06/14-02/05/23; 02/06/23-02/29/28 | 539,106.00; 599,010.00; 555,894.00 | 44,825.75; 49,917.50; 46,741.24 | 27.00; 30.00; 33.00 | [illegible] | 2012 | 1.277 | 2012 | 1.336 | METERED | 169,256.00 | TENANT HAS A POSITIVE CREDIT FOR ADDITIONAL WORK ACCOUNT TO COVER THE COST OF KNOWN EXTRAS; SECURITY TO BE REDUCED 44,825.75 3RD, 4TH AND 5TH YEARS IN NO EVENT LESS THAN 134,777.25 |
| [redacted] | | | | | | | | | | | | | | | | |
| COM 43 | 38TH FL | 5,554 | MASSCOMM, INC. d/b/a MASS COMMUNICATIONS | 11/15/12-04/30/28 SIGNED 7/11/12 | 6 MOS FREE; 05/15/13-05/14/18; 05/15/18-04/30/28 | 0.00; 180,281.90; 206,497.08 | 0.00; 15,273.50; 17,124.23 | 0.00; 33.00; 37.00 | 114,797.80 | 12/13 | 0.00481 | 2013 | 0.51100 | 10,352.52 | 91,541.07 | IN THE EVENT TENANT HAS NOT DEFAULTED AT ANY TIME ... THE SECURITY AMOUNT WILL BE REDUCED BY (I)$14,156.67 ON 4/30/16 AND (II)$14,156.67 ON APRIL 30,2018. IN NO EVENT SHALL SECURITY BE LESS THAN $50,629.68 |
| [redacted] | | | | | | | | | | | | | | | | |
| COM 8 | 39RD | 2,526 | MURPHY & O'CONNELL | 01/01/08-04/30/14 | 04/01/05-03/31/08; 07/01/08-04/30/11; 05/01/11-04/30/14 | 60,000.00; 85,200.00; 68,263.00 | 5,000.00; 7,100.00; 5,689.00 | 23.75; 33.74; 27.04 | 64,263.00 | 06/09 | 0.14700 | 2006 | 0.15700 | METERED | 21,300.00 | LC EXPIRES 6/30/12 AUTO RENEW AMENDMENT REDUCED BASE RENT 5/1/11 |
| [redacted] | | | | | | | | | | | | | | | | |
| NEW | 25TH FL | 15,304 | NEWMAN MYERS KREINES GROSS HARRIS P.C. | 7/2/12-12/31/22 | 01/01/13-12/31/17; 01/01/18-12/31/22; $1,058 RENT ABATEMENT TO BE TAKEN IN 2013 (RECEIVED AS TI REIMB 2012) | 428,512.00; 489,728.00 | 35,709.33; 40,810.67 | 28.00; 32.00 | 282,912.00 | 12/13 | 1.326 | 2012 | 1.412 | METERED | 322,494.00 | LC JP MORGAN CHASE 1 YEAR AUTO RENEW FINAL EXP 1/31/23 TO BE REDUCED BY 107,478 ON 1/1/18 TENANT HAS GIVEN LL A CHECK FOR $138,300.50 TO COVER THE ESTIMATED COST OF ADDITIONAL IF THE ADDITIONAL WORK IS LESS THAN 138K THE TENANT MAY UTILIZE THE EXCESS FOR FF&E AND ANY UNUSED BALANCE WILL BE RETURNED TO TENANT IF THE WORK IS IN EXCESS OF 138K TENANT MUST REIMBURSE LL |
| [redacted] | | | | | | | | | | | | | | | | |
| COM 1 | 38TH FL | 5,510 | NYC CAPITAL LLC | [illegible]-08/31/15 | 09/01/10-08/31/15 | 180,545.00 | 15,045.00 | 34.00 | 180,545.00 | 2010 | 0.4582 | 2010 | 0.4954 | METERED | 135,625.00 | |
| [redacted] | | | | | | | | | | | | | | | | |
| COM 75 | 37TH FL | 2,050 | OAKWOOD ASSET MGMT LLC | 12/01/09-02/28/15 | 02/01/10-02/28/15 | 68,828.00 | 5,735.50 | 33.00 | 68,838.00 | 10 | 0.1805 | 10 | 0.1919 | METERED | 17,239.30 | |
| [redacted] | | | | | | | | | | | | | | | | |
| COM 5 | 26TH-29TH | 27,858 | OFFICE SPACE SOLUTIONS INC | 08/08/06-05/31/17 | 08/01/07-07/31/07; 08/01/07-05/31/11; 06/01/11-05/31/14; 06/01/14-05/31/17 | 448,104.96; 857,396.00; 940,372.00; 1,025,348.00 | 37,342.08; 71,449.83; 78,364.33; 85,279.03 | 16.20; 31.00; 34.00; 37.00 | 940,377.00 | 06/07 | 2.380 | 06/07 | 2.544 | METERED | 255,935.48 | PER LEASE ONE SECURITY DRAW DOWN OF 55,275.83 OCCURRED 7/10: TWO OTHERS REMAIN SAME AMOUNT 5/11 AND 5/12 SECURITY IN NO EVENT CAN BE LESS THAN 255,935.48 LETTER OF CREDIT |
| [redacted] | | | | | | | | | | | | | | | | |
| COM 29 | 25TH | 6,166 | ORACLE AMERICA INC ASSUMES EXTENSION | 04/01/08-03/31/13 | 04/01/08-03/31/10; [redacted] | 308,249.02; 332,934.00 | 25,691.00; 27,747.00 | 50.00; 54.00 | 302,084.00 | 06/09 | 0.53 | 2008 | 0.56 | METERED | | F/K/A SUN MICROSYSTEMS |
| [redacted] | | | | | | | | | | | | | | | | |
| COM 53 | 49TH | 8,280 | PUBLIC FINANCIAL MANAGEMENT INC. | 7/2/12-12/31/22 | FIVE MONTHS FREE; 12/13/12-12/12/17; 12/13/17-12/31/22 | 370,520.00; 348,648.00 | 30,876.67; 29,420.00 | 40.00; 42.00 | 370,520.00 | 11/13 | 0.6012 | 2012 | 0.662 | METERED | 277,890.00 | SUSQUEHANNA BANK LC 1 YR AUTO RENEWING LC CAN BE REDUCED 30,875.67 AT THE END OF YRS 1 AND 2 BUT SECURITY CAN NOT BE LESS THAN 192,260.00 |
| [redacted] | | | | | | | | | | | | | | | | |
| COM 78 | 51ST | 3,216 | PHOENIX NETWORKS NY LLC | 01/05/12-01/31/22 | 01/05/12-01/04/17; 01/05/17-01/31/22 | 125,108.52; 117,074.00 | 10,346.33; 11,352.50 | 35.00; 38.00 | 178,550.00 | 11/12 | 0.313 | 2011 | 0.339 | 11,751.22 | 42,186.67 | |
| [redacted] | | | | | | | | | | | | | | | | |
| COM 24 | 52ND | 9,248 | PWM INVESTMENT LTD | 00/00/23 [redacted] | 3 MOS FREE RENT; [redacted]; 01/01/14-01/31/14; 02/01/14-12/31/14; 01/01/15-01/31/15; 02/01/15-01/31/17; 02/01/17-01/31/23 | 0.00; 406,912.00; 0.00; 406,912.00; 0.00; 406,912.00; 453,000.00 | 0.00; 33,909.33; 0.00; 33,909.33; 0.00; 33,909.33; 36,752.00 | 0.00; 44.00; 0.00; 44.00; 0.00; 44.00; 49.00 | 305,184.00 (AVG OF 12/13 AND 13/14) | 12/14 | 0.80% | 2013 | 0.85% | METERED | 203,456.00 | 135% SECURITY REDUCED BY 33,906.50 AFTER 72 MONTHS AND AGAIN AFTER 90 MONTHS AND AGAIN AFTER IN NO EVENT WILL SECURITY AMOUNT BE LESS THAN $203,456.00 THIS REDUCTION IS ONLY TO OCCUR IF TENANT HAS NOT EXERCISED ITS SECOND RIGHT OF |

**OFFICE SPACE**

| Unit No | Floor No | Square Feet | Tenant | Lease Term | | | | | | RE TAX Base Year | RE TAX % | OPERATING EXP Base Year | Operating Exp % | ELECTRIC INCLUSION | Security Deposit | LEASE NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COM 23 | 33RD | 3,418 | HOLA ADVISORS | 05/01/07-04/30/17 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 2007 | 0.7255 | 2007 | 0.3142 | METERED | 145,654.56 | |
| COM 90 | 49TH | 9,972 | RG MICHALS | 06/07/11-08/31/21 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 11/12 | 0.911 | 2011 | 0.802 | METERED | 77,012.50 | LC issued by JP Morgan Chase Bank<br>Expires 08/31/21; renews in one year increments starting 5/31/12 |
| COM 35 | 20TH | 5,433 | ROSABIANCA & ASSOCIATES | 12/02/11-02/28/18 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 2012 | 0.469 | 2010 | 0.499 | 17,856.87 | 66,896.00 | LC FROM OLD SPACE TO BE REVISED TO 106,516.50 |
| COM 49 | 30TH | 3,450 | ROSEN GREENBERG BLAHA LLP | 01/01/10-02/28/15 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 10/11 | 0.2964 | 2010 | 0.3173 | METERED | NONE | |
| COM 70 | 35TH | 8,262 | SOLOMON BLUM | 09/01/00-07/31/20 | [illegible]<br>[illegible]<br>03/01/04-12/31/06<br>01/01/07-07/31/10<br>08/01/10-07/31/15<br>08/01/15-07/31/20<br>FREE RENT<br>8/17<br>8/18<br>8/19<br>8/14<br>8/15<br>8/16 | [illegible]<br>[illegible]<br>231,523.04<br>243,085.96<br>265,215.96<br>290,075.83 | [illegible]<br>[illegible]<br>27,625.67<br>19,701.33<br>22,101.33<br>24,173.23<br><br>(22,101.33)<br>(22,101.33)<br>(22,101.33)<br>(22,101.33)<br>(24,173.33)<br>(24,173.33) | [illegible]<br>40.00<br>42.12<br>35.55<br>36.00 | [illegible] | 10/11 | 0.717 | 2010 | 0.7533 | METERED | 58,112.00 | USE TENANT ESCROW ACCOUNT @ ROSS<br>amendment in 2010 reduced psf |
| COM 12 | 15TH | 12,068 | SOSO TECHNOLOGIES HOLDINGS INC. | 01/07/12-12/31/22 | 11/07/12-09/30/17<br>10/07/17-10/31/22 | 337,648.00<br>356,112.00 | 28,154.00<br>32,176.00 | 28.00<br>32.00 | 337,648.00 | 11/12 | 1.042 | 2011 | 1.109 | METERED | 112,510.00 | |
| COM 95 | 5TH | 7,500 | STAR ALLIANCE GROUP LLC | 12/15/09-12/31/14 | 12/15/09-12/31/14 | 240,000.00 | 20,000.00 | 32.00 | 240,000.00 | 2010 | 0.049 | 2010 | 0.78 | METERED | 120,000.00 | STIPULATION AGREEMENT SIGNED 8/5/11. PAYS EXTRA 14,566.15 A MONTH UNTIL 177,081.74<br>(ARREARS BAL AT 8/5/11) IS PAID OFF. PAID THAT STIP AS AGREED.<br>CURRENTLY WORKING ON ANOTHER STIP AGREEMENT FOR NEW ARREARS |
| COM 59 | 27TH | 1,377 | TACKLESS INTERNATIONAL | 09/27/12-11/30/17 | 2 MONTHS FREE<br>12/01/12-11/30/13<br>12/01/13-11/30/14<br>12/01/14-11/30/15<br>12/01/15-11/30/16<br>12/01/16-11/30/17 | 0.00<br>48,195.00<br>49,396.87<br>50,594.87<br>51,900.73<br>53,121.27 | 0.00<br>4,016.25<br>4,116.88<br>4,215.57<br>4,325.06<br>4,426.36 | 0.00<br>35.00<br>35.87<br>36.77<br>37.69<br>38.63 | 48,195.00 | 2012 | 0.125 | NONE | N/A | 4,151.00 | 12,048.75 | NO OPERATING OR RETAX INCREASES PER LEASE. |
| COM 14 | 43RD & 44TH | 14,424 | TELSTRA INC. | 10/01/10-09/30/20 | 10/01/10-09/30/15<br>10/01/15-09/30/20 | 535,365.00<br>572,879.50 | 44,596.56<br>48,323.33 | 37.00<br>40.00 | 535,365.00 | 10/11 | 1.254 | 2010 | 1.355 | METERED | 535,368.00 | LC AUTO RENEW EXP 11/30/15 |
| COM 78 | 30TH | 4,384 | THE CLANCY LAW FIRM PC | 03/07/10-02/28/17 | 08/01/10-08/31/13<br>09/01/13-02/28/17 | 149,055.96<br>166,684.52 | 12,421.33<br>13,882.01 | 34.00<br>38.00 | 164,502.28 | 09/10 | 0.379 | 2010 | 0.403 | METERED | 24,862.82 | SECURITY WAS TO BE 74,526.00 NEVER SENT THE 1/2 THEY OWE. ONE LC IN THE AMOUNT<br>OF 37,262.98 @ ROSS + 24,862.82 IS IN CASH<br>STIPULATION SIGNED AUGUST 2012, 4 PAYMENTS OF 33,341.32 (10/15/12, 1/15/13, 4/15/13 AND 7/15/13)<br>MUST PAY CURRENT MONTH ON THE 15TH. |
| COM 4 | 24TH | 26,327 | THE GLOBAL ALLIANCE FOR TB DRUG DEV | 05/15/07-12/31/17 | 01/12/08-12/31/10<br>01/01/11-12/31/13<br>01/01/14-12/31/17 | 1,114,567.50<br>1,140,756.00<br>1,184,082.50 | 92,880.79<br>95,063.00<br>98,749.54 | 38.24<br>43.40<br>44.69 | 1,145,785.24 | 07/08 | 2.08 | 2006 | 2.10 | METERED | 632,218.75 | LC AUTO RENEWAL NOT BEYOND 12/31/17 |
| COM 82 | 6TH | 38,971 | THE HARRY FOX AGENCY INC | 05/23/12-05/31/26 | ONE YEAR FREE RENT<br>05/23/13-05/22/17<br><br>05/23/17-05/22/22<br>05/23/22-05/31/26 | <br>985,067.03<br><br>1,107,833.05<br>1,218,993.00 | 0.00<br>82,072.25<br><br>92,320.36<br>101,582.75 | <br>27.00<br><br>30.00<br>33.00 | 902,943.07 | 12/13 | 3.1098 | 2012 | 5,898 | METERED | 747,060.25 | LC W/ SIGNATURE BANK, AUTO RENEW 1 YEAR INCREMENTS UNTIL 6/1/26<br>AFTER 5TH YEAR CAN BE REDUCED TO 498,433.50 |
| COM 52 | 35TH | 4,299 | THE JUDGE GROUP | 06/06/08-05/31/18 | 10/06/08-09/30/11<br>10/01/11-09/30/15<br>10/01/15-05/31/18 | 217,719.00<br>230,525.00<br>248,333.00 | 18,142.25<br>19,210.50<br>20,277.75 | 51.00<br>54.00<br>57.00 | 232,026.00 | 2009 | 0.363 | 2008 | 0.363 | METERED | 51,111.00 | LC AUTO RENEW |

CONFIDENTIAL

CAPITALONE-00254449

OFFICE SPACE

| Unit No. | Floor No. | Square Feet | Tenant | Lease Term | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | R/E Tax Base Year | R/E Tax % | Operating Esc. Base Year | Operating Esc. % | ELECTRIC INCLUSION | Security Deposit | LEASE NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 12011 | 0.024<br>0.602 | 11 | 0.451<br>0.647 | METERED | 116,196.00 | [illegible]<br>EXP. SPACE COMMENCEMENT 7/6/12(PENDING GROSS LETTER)<br>EXP. SPACE RENT STEPS W FOR RE TAX AND OP ESC KICK IN 7/6/12<br>(per amendment 90 days after subs comp) |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 04/05 | 0.232 | 2004 | 3.247 | METERED | NONE | PER THIRD LEASE MOD INC RE TAX / OPERATING ESC W PEE ESC |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 11/12 | 3.785 | 2011 | 0.344 | METERED | 47,725.84 | |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 2013 | 5.284 | 2013 | 5.612 | METERED | 324,600.00 | TI CONTRIBUTION $3,970,300.00<br>LC<br>$1,616,906.17 to be used July 15, 2012 |
| | | | | | RENT ABATEMENTS [illegible] | [illegible] | | | | | | | | | | |
| | | | | | 18-Feb | (125,741.00) | | | | | | | | | | |
| COM 72 | 18TH FL | 70,582 | XO COMMUNICATIONS LLC | 03/25/10-12/31/22 | 01/01/11-12/31/14<br>01/01/15-12/31/18<br>01/01/18-02/31/22 | 617,060.00<br>679,998.00<br>741,003.00 | 51,475.00<br>56,611.50<br>61,756.00 | 20.00<br>33.00<br>25.00 | 288,115.00 | 2010 | 1.181 | 2010 | 1.864 | METERED | 307,320.00 | LC BANK OF AMERICA AUTO RENEW THRU 2/28/22<br>LC CAN BE REDUCED BY 102,930 AT THE END OF THE 1ST AND 2ND YEAR AND 34,450 AT THE END OF THE THIRD YEAR<br>LC NOT TO BE LESS THAN 202,085.00<br>LC DECREASED BY 205,860.00 7/6/12 IN ACCORDANCE WITH THEIR LEASE |
| | | | | | RENT ABATEMENTS | | | | | | | | | | | |
| | | | | | 1/1/2012 | (51,465.00) | | | | | | | | | | |
| | | | | | 1/1/2013 | (51,465.00) | | | | | | | | | | |
| | | | | | 1/1/2014 | (51,465.00) | | | | | | | | | | |
| | | | | | 1/1/2015 | (38,611.50) | | | | | | | | | | |
| COM 77 | 8TH FL | 5,266 | XO TEX SOLUTIONS PLUS LLC | 10/25/10-04/01/20 | 02/25/11-10/31/16<br>11/01/16-10/31/20 | 201,218.00<br>221,064.00 | 16,768.00<br>18,420.00 | 32.00<br>35.00 | 201,218.00 | 10/11 | 0.536 | 10/11 | 0.5734 | METERED | 67,072.00 | LC TO BE REDUCED IN THREE INCREMENTS BY 10.7 NOT TO BE LESS THAN 50,304<br>TWO REDUCTIONS ALREADY TAKEN NEXT 7/13 |
| COM 79 | 27TH FL | 3,854 | ZARENBA BROWNELL & BROWN PLLC | 01/27/10-01/31/25 | 11/28/10-11/30/15<br>12/01/15-11/30/20<br>12/01/20-01/31/25 | 135,390.00<br>150,252.00<br>160,114.00 | 11,282.50<br>12,521.00<br>13,509.50 | 35.00<br>39.00<br>41.00 | 130,360.50 | 2010 | 0.342 | 2010 | 0.354 | METERED | 80,105.00 | LC AUTO RENEW TO 11/30/24 CAN REDUCE AT END OF YEAR 3 BY 11,032.00 AND 11,372.00 AT END OF YEAR 5 BUT LC CAN NOT BE LESS THAN 45,130.00 |
| COM 81 | 27TH FL | 2,109 | ZARENBA BROWNELL & BROWN PLLC | 08/18/11-01/31/25 | 04/18/12-04/30/17<br>05/01/17-04/30/22<br>05/01/22-01/31/25 | 73,710.00<br>80,226.00<br>85,313.00 | 6,142.00<br>6,689.00<br>7,105.00 | 35.00<br>38.00<br>41.00 | 73,713.00 | 11 | 0.182 | 2011 | 0.184 | METERED | 30,575.00 | LC CAN BE REDUCED BY 6,142.50 AT THE END OF THE THIRD YEAR AND 5TH YEAR SECURITY CAN NOT BE LESS THAN 24,750 |

GRAND TOTAL OFFICE RENT 2013: 26,389,518.33 — 130,829.91 — 11,052,307.04

| | |
|---|---|
| TOTAL OCCUPIED OFFICE SPACE SQ.FT.: | 805,102 |
| TOTAL VACANT OFFICE SQ.FT.: | 309,933 |
| TOTAL OFFICE SQ.FT.: | 1,115,035 |

NET OF COM 45 PER AGRMNT/SUB LEASED BY 40 WALL TO HAKS AT 38.42% (31,500.00)

CONFIDENTIAL

CAPITALONE-00254450

40 WALL STREET LLC
2013 RENT ROLL

**RETAIL SPACE**

| Unit No. | Floor No. | Square Feet | Tenant | Lease Terms | [illegible] | [illegible] | [illegible] | [illegible] | 2013 ANNUALIZED | RE Tax Base Year | RE Tax % | Operating Exp. Base Year | Operating Exp. % | ELECTRIC INCLUSION | Security Deposit | LEASE NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | DUANE READE | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 10/11 | [illegible] | N/A | N/A | METERED | NONE | 100% METERED (NO LL % INCREASE) |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| [illegible] | MAIN | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | N/A | N/A | METERED | [illegible] | AS PER 3RD AMENDMENT, [illegible] FOR $12,000.00 DEFERRAL) |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | LC extended through June 30, 2015 |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | ASSUMED EXT. | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| [illegible] | BSMT | [illegible] | [illegible] CAFE | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | N/A | N/A | METERED | NONE | MONTH TO MONTH (VERBAL) AS PER GEORGE ROSS |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | | | DV0106-CURRENT | 12,000.00 | 1,000.00 | 5.32 | | | | | | | | |
| NEWSTAND | | 731 | VACANT | | | | | | | | | | | | | |
| 2nd WEST | | 9,447 | VACANT | | | | | | | | | | | | | |
| RESTAURANT | | 14,500 | VACANT | | | | | | | | | | | | | |

RETAIL SQ. FOOTAGE

| | |
|---|---|
| Occupied Sq. Ft: | 25,813.00 |
| Vacant Sq. Ft: | 24,735.00 |
| Total Sq. Ft: | 50,548.00 |

2013 TOTAL BASE RENT: 1,549,060.00

CONFIDENTIAL

CAPITALONE-00254451

Case 1:21-cv-01352-BKS-CFH Document 16-7 Filed 01/26/22 Page 34 of 54

| Square Feet | Tenant | Lease Term | | | | 2013 ANNUALIZED | RE Tax Base Year | RE Tax % | Operating Esc Base Year | Operating Esc % | ELECTRIC INCLUSION | Security Deposit | LEASE NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| N/A | AT&T ORE LEASE ADMINISTRATION | [illegible] | [illegible] | 9,000.00 | 750.00 | 15,000.00 | N/A | N/A | N/A | N/A | METERED | NONE | THE THIRD RENEWAL TERM FEE WILL BE 1,300 A MONTH; THE THIRD RENEWAL PERIOD OPTION WOULD START 2/1/15-01/31/20 |
| | | | [illegible] | 12,000.00 | 1,000.00 | | | | | | | | |
| | | | [illegible] | [illegible] | [illegible] | | | | | | | | |
| N/A | [illegible] COMMUNICATIONS LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | N/A | N/A | N/A | N/A | [illegible] | [illegible] | |
| | 1ST AMENDMENT | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | [illegible] | [illegible] | [illegible] | | | | | | | | |
| N/A | CYPRESS COMMUNICATIONS INC. | [illegible] - CURRENT | [illegible] - CURRENT | [illegible] | [illegible] | [illegible] | N/A | N/A | N/A | N/A | METERED | NONE | MTM PER GEORGE ROSS |
| N/A | [illegible] | [illegible] | [illegible] | 7,200.00 | [illegible] | [illegible] | N/A | N/A | N/A | N/A | METERED | NONE | MTM PER GEORGE ROSS |
| | LEASE ADMIN | | [illegible]-CURRENT | [illegible] | 750.00 | | | | | | | | |
| N/A | METRO PCS NEW YORK LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | N/A | N/A | N/A | N/A | METERED | NONE | |
| | | | [illegible] | [illegible] | [illegible] | | | | | | | | |
| | | | 09/05/10-09/04/11 | 53,045.00 | 4,420.42 | | | | | | | | |
| | | | 09/05/11-09/04/12 | 54,636.35 | 4,553.03 | | | | | | | | |
| | | ASSUMES EXT. | [illegible] | 56,275.44 | 4,689.62 | | | | | | | | |
| N/A | NORTH AMERICAN MOBILE | 10/23/10-12/31/30 | 12/1/2010 | 24,000.00 | 2,000.00 | 28,482.12 | N/A | N/A | N/A | N/A | | | |
| | | | 2/1/2011 | 24,000.00 | 2,000.00 | | | | | | | | |
| | | | 11/1/2012 | 27,675.00 | 2,306.25 | | | | | | | | |
| | | | 11/1/2013 | 28,365.92 | 2,363.01 | | | | | | | | |
| | | | 11/1/2014 | 29,076.12 | 2,423.01 | | | | | | | | |
| | | | 11/1/2015 | 29,803.06 | 2,483.59 | | | | | | | | |
| | | | 11/1/2017 | 30,548.16 | 2,545.68 | | | | | | | | |
| | | | 11/1/2018 | 31,311.84 | 2,609.32 | | | | | | | | |
| | | | 11/1/2019 | 32,094.60 | 2,674.66 | | | | | | | | |
| | | | 11/1/2020 | 32,896.92 | 2,741.41 | | | | | | | | |
| | | | 11/1/2022 | 33,719.40 | 2,809.95 | | | | | | | | |
| | | | 11/1/2023 | 34,562.40 | 2,880.20 | | | | | | | | |
| | | | 11/1/2024 | 35,426.40 | 2,952.20 | | | | | | | | |
| | | | 11/1/2025 | 36,312.12 | 3,026.01 | | | | | | | | |
| | | | 11/1/2027 | 37,219.92 | 3,101.66 | | | | | | | | |
| | | | 11/1/2028 | 38,150.40 | 3,179.20 | | | | | | | | |
| | | | 11/1/2029 | 39,104.10 | 3,258.68 | | | | | | | | |
| N/A | SPRINT NATIONAL LEASE MGMT | 02/01/01-01/31/16 | 2/1/2001 | 21,600.00 | 1,800.00 | 46,811.12 | N/A | N/A | N/A | N/A | METERED | NONE | 4% ABOVE PRIOR YEAR ANNUAL |
| | | | 2/1/2002 | 22,464.00 | 1,872.00 | | | | | | | | |
| | | | 2/1/2003 | 23,362.56 | 1,946.88 | | | | | | | | |
| | | | 2/1/2004 | 24,297.00 | 2,024.75 | | | | | | | | |
| | | | 2/1/2005 | 25,268.88 | 2,105.74 | | | | | | | | |
| | | | 2/1/2006 | 26,279.76 | 2,189.98 | | | | | | | | |
| | | | 2/1/2007 | 27,330.96 | 2,277.58 | | | | | | | | |
| | | | 2/1/2008 | 28,424.28 | 2,368.69 | | | | | | | | |
| | | | 2/1/2011 | 31,973.04 | 2,664.42 | | | | | | | | |
| | | | 2/1/2012 | 33,251.88 | 2,770.99 | | | | | | | | |
| | | | 11/11/2012 | 45,251.88 | 3,770.99 | | | | | | | | |
| | | | 2/1/2013 | 47,061.96 | 3,921.83 | | | | | | | | |
| | | | 2/1/2014 | 48,944.44 | 4,078.70 | | | | | | | | |
| | | | 2/1/2015 | 50,902.22 | 4,241.85 | | | | | | | | |
| N/A | TIME WARNER AxS OF NY | 04/01/97- | 5/1/1997 | 6,000.00 | 500.00 | 7,500.00 | N/A | N/A | N/A | N/A | METERED | N/A | MTM G.ROSS IS AWARE |
| | | | 4/1/2002 | 7,500.00 | 625.00 | | | | | | | | |
| N/A | XO COMMUNICATIONS | 11/01/99-01/31/15 | 11/01/99-03/31/10 | 9,000.00 | 750.00 | 15,000.00 | N/A | N/A | N/A | N/A | METERED | N/A | THIRD EXTENSION OPTION IF WRITTEN NOTICE IS GIVEN BY 2/1/14 FOR AN ADDITIONAL TERM COMMENCING 2/1/15-1/31/2020 AT THE RATE OF $10,000.00 PER YEAR |
| | | | 04/01/10-01/31/15 | 15,000.00 | 1,250.00 | | | | | | | | |
| N/A | VIPES ENTERPRISES SERVICES INC | 09/01/03-08/31/16 | 09/01/03-08/31/04 | 6,000.00 | 500.00 | 9,042.40 | N/A | N/A | N/A | N/A | METERED | N/A | MTM W/5% BUMPS EACH SEPTEMBER |
| | | | 09/01/04-08/31/05 | 6,300.00 | 525.00 | | | | | | | | |
| | | | 09/01/05-08/31/06 | 6,615.00 | 551.25 | | | | | | | | |
| | | | 09/01/06-08/31/07 | 6,945.75 | 578.81 | | | | | | | | |
| | | | 09/01/07-08/31/08 | 7,293.00 | 607.75 | | | | | | | | |
| | | | 09/01/08-08/31/09 | 7,657.65 | 638.14 | | | | | | | | |
| | | | 09/01/09-08/31/10 | 8,040.53 | 670.04 | | | | | | | | |
| | | | 09/01/10-08/31/11 | 8,442.56 | 703.55 | | | | | | | | |
| | | | 09/01/11-08/31/12 | 8,864.69 | 738.72 | | | | | | | | |
| | | | 09/01/12-08/31/13 | 9,307.92 | 775.66 | | | | | | | | |

GRAND TOTAL 2013 TEL ROOM 219,[illegible]

CONFIDENTIAL

CAPITALONE-00254452

# TAB D

| | |
|---|---|
| **From:** | Jeff McConney <jmcconney@trumporg.com> |
| **Sent:** | Thursday, December 10, 2015 12:25 PM |
| **To:** | Dave Guerrero (dave.guerrero@db.com) |
| **Cc:** | Oberlies, Patrick (Patrick.Oberlies@WeiserMazars.com) |
| **Subject:** | FW: Confirms Needed |
| **Attachments:** | Deutsche Bank Loan Confirmation.pdf |

Hi Dave,

It was good talking to you again.

Attached is a copy of the mortgage confirm that our accounting firms needs completed.  Can you please ask whoever completes it to send it directly to Patrick Oberlies, copied on this email?

The f/s are due to DB by 12/31 so if you can expedite this I'd appreciate it.

Thanks
Jeff


Jeffrey S. McConney
Senior Vice President/Controller
725 Fifth Avenue | New York, NY | 10022
p. 212.715.7231 | f. 212.832.5396
jmcconney@trumporg.com | Trump.com



-----Original Message-----
From: Oberlies, Patrick [mailto:Patrick.Oberlies@WeiserMazars.com]
Sent: Thursday, December 10, 2015 10:55 AM
To: Jeff McConney <jmcconney@trumporg.com>
Cc: Bender, Donald <Donald.Bender@WeiserMazars.com>; Schreiber, Christopher
<Christopher.Schreiber@WeiserMazars.com>; Stepnowski, Kevin <Kevin.Stepnowski@WeiserMazars.com>
Subject: Confirms Needed

Hi Jeff,

See attached.  Also need the insurance schedule from Aon used as a confirmation.



Patrick Oberlies, CPA | Senior Accountant, Real Estate Group



WeiserMazars LLP

1

DB-NYAG-022368

60 Crossways Park Dr. West
Woodbury, NY  11797
(P) 516-620-8741
(Email) patrick.oberlies@weisermazars.com www.weisermazars.com

------------------------------

CONFIDENTIALITY NOTICE: The information contained in this communication may be privileged, confidential and protected from use and disclosure. If you are not the intended recipient, or responsible for delivering this message to the intended recipient, you are hereby notified that any review, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer. Thank you for your cooperation. WeiserMazars LLP Please consider the environment before printing this document

------------------------------

This e-mail message, and any attachments to it, are for the sole use of the intended recipients, and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution of this email message or its attachments is prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. Finally, while the company uses virus protection, the recipient should check this email and any attachments for the presence of viruses. The company accepts no liability for any damage caused by any virus transmitted by this email.

FOIL CONFIDENTIAL TREATMENT REQUESTED

DB-NYAG-022369

# TRUMP OLD POST OFFICE LLC
## C/O THE TRUMP ORGANIZATION
## 725 FIFTH AVENUE
## NEW YORK, NEW YORK 10022

November 17, 2015

Deutsche Bank
345 Park Avenue – 14th Floor
New York, NY 10154
Attn: Emily S. Schroeder

Our auditors, WeiserMazars LLP, are now performing their audit of our financial statements.
Please furnish directly to them the following information concerning Trump Old Post Office
LLC's indebtedness to you as of August 31, 2015.

1. Unpaid principal balance
2. Interest rate and applicable fees payable under loan agreement
3. Terms for payment of principal
4. Date to which interest has been paid and interest paid from September 1, 2014 to August 31, 2015
5. Nature of loan and description or address of mortgaged premises
6. Amounts on deposit with you in escrow for, if applicable:
   a. Insurance
   b. Real estate taxes
   c. Other
7. Amounts paid during the period September 1, 2014 to August 31, 2015, if applicable:
   a. Insurance
   b. Taxes
   c. Other
8. Other amounts on deposit with you (for repairs, for example)
9. The nature of defaults, if any
10. Description of personal guarantees (if none, please indicate so)

After signing and dating your reply, please mail it directly to WeiserMazars LLP, 60 Crossways
Park Drive West, Suite 301, Woodbury, NY 11797. A return envelope is enclosed for your
reply. In addition, please respond via email to Kevin.Stepnowski@weisermazars.com with a
copy of the confirmation that has been mailed the address mentioned above. A prompt reply will
be greatly appreciated.

Very truly yours,

X ~~~~~~~~~

Donald J. Trump

   DB-NYAG-022370

# TAB E

# 40 Wall Street LLC

725 Fifth Avenue, 26th Floor
New York, New York 10022

Allen Weisselberg
p. 212.715.7224 | f. 212.832-5396
weisselberg @trumporg.com

May 28, 2015

**VIA EXPRESS MAIL/USPS**
Capital One, N.A.
275 Broadhollow Road; P.O. Box 8914
Melville, New York 11747
Attn: Peter A. Welch, Senior Vice President

Re:  40 Wall Street

Dear Peter:

Reference is hereby made to that certain Second Amended, Consolidated and Restated Mortgage Note dated November 19, 2010 (the "Note") in the initial principal amount of $160,000,000, made by 40 Wall Street LLC, a New York limited liability company ("Borrower") in favor of Capital One, N.A. ("Lender").

Pursuant to Section 3 of the Note, this letter shall serve as notice that Borrower intends to prepay the outstanding principal balance of the Note, together with all accrued and unpaid interest then required, if any, on or about July 2, 2015. The undersigned is hereby requesting that Lender provide an assignment of the Note and the related mortgage documents to Borrower's new lender, in lieu of a release or satisfaction of such loan documents, and deliver to the assignee of the Note the originals of the Note together with the Original Note (as defined in the Note) and the originals of all promissory notes consolidated by the Original Note.

Please provide a formal "payoff letter" at your earliest convenience to Mr. Allen Weisselberg by mail at the address above and via e-mail to weisselberg@trumporg.com.

If Borrower determines to terminate the remaining balance of the notional amount of the transaction evidenced by the Swap Confirmation included in the Swap Agreement (as defined in the Note), then, at a later date, Borrower will separately provide notice of termination as required under Part 5 of the Schedule to the ISDA Master Agreement included in the Swap Agreement.

Please contact Mr. Weisselberg at (212) 715-7224 if you have any questions.

CAPITALONE-00351375

**40 WALL STREET LLC,** a
New York limited liability company

**By: 40 Wall Street Member Corp.,** a
New York corporation, its managing
member

By: _____
Name:     Allen Weisselberg
Title:   Vice President and Treasurer

cc:

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**
Capital One, National Association
1680 Capital One Drive
McLean, Virginia 22102
Attn: Treasury Trading Operations

CONFIDENTIAL

RETURN RECEIPT REQUESTED

1361 1

Capital One National Association
1680 Capital One Drive
McLean, Virginia 22102
Attn: Treasury Trading Operations

7013 1710 0000 3759 6280

CERTIFIED MAIL




U.S. POSTAGE
PAID
NEW YORK, NY
10022
MAY 25, 15
AMOUNT
$6.49
00106437-07

UNITED STATES
POSTAL SERVICE®

1000     22102

CONFIDENTIAL

CAPITALONE-00351377

# TAB F

Message

| From: | noreply@salesforce.com [noreply@salesforce.com] |
|---|---|
| on behalf of | CCRRC Secretary [secretary@ccrrc.com] |
| Sent: | 8/22/2016 6:23:28 PM |
| To: | Eric Trump [etrump@trumporg.com] |
| Subject: | Hunter Safety Course |

8/22/2016

Dear Eric,

For those of you who wish to get your hunting license, we will be hosting the two day course at the club !

The Connecticut Department of Environmental Protection Conservation Education and Firearms Safety Course (hunter safety course) will be offered free of charge at the Cos Cob Revolver and Rifle Club on Sat. Oct. 1st and Sun. Oct. 2nd 2016 from 8 a.m. to 5 p.m.

To register please call the DEEP at (860) 424-3017 (Trish) or (860) 424-3015 (Samantha) starting Monday August 22nd. When you call, identify yourself as a member of the club and say that Stan Esposito asked you to call.

Jude Collins
CCRRC Recording Secretary
secretary@ccrrc.com

FOIL EXEMPT | HIGHLY CONFIDENTIAL

# TAB G

Message
───────────────────────────────────────────────────────────────

| | |
|---|---|
| From: | David Feder [dfeder@trumphotels.com] |
| Sent: | 6/4/2015 9:59:19 PM |
| To: | Rhona Graff [rgraff@trumporg.com] |
| CC: | Sonia Espinosa [sespinosa@trumphotels.com]; Jennifer Santini [jsantini@trumphotels.com] |
| Subject: | Re: FW: As Per Mr. Trump's request-Serena Williams Fund |
| | |
| Flag: | Follow up |

We`re researching and will back to you shortly.


**DAVID FEDER**
*Vice President and Managing Director*
dfeder@trumphotels.com
p  305.591.6447 | f. 305.591.6480

TRUMP NATIONAL DORAL MIAMI
4400 NW 87th Avenue | Miami, FL | 33178
trumphotelcollection.com/miami/ | facebook.com/TrumpDoral | twitter.com/TrumpDoral

NEW YORK: CENTRAL PARK ● SOHO  CHICAGO  LAS VEGAS  WAIKIKI  PANAMA  TORONTO  MIAMI | DORAL  IRELAND |
DOONBEG
*Coming Soon* VANCOUVER  WASHINGTON D.C.  RIO DE JANEIRO  BAKU

[image]

On Thu, Jun 4, 2015 at 4:41 PM, Rhona Graff <rgraff@trumporg.com> wrote:

Hi David:


I have been approached by Serena Williams' people regarding an annual charity event, Serena's 5K run, which she hosts
in the South Florida area in December. Serena recently did a huge favor for Mr. Trump by flying up to Trump National
Washington to help inaugurate  the opening of our new tennis facility there. In return, Mr. Trump would like to do
something very nice for her.


One of the ways would be to assist with a venue for the event's "Charity Gala" which is already scheduled for Friday,
December 11th. They had 200 people attending last year but anticipate possibly doubling that number this year.  Before
we go any further, can you or someone on your team tell me if we have availability in one of the ballrooms for that
night?


Thank you.


Rhona

FOIL EXEMPT | HIGHLY CONFIDENTIAL                                                              TTO_01150564

# T R U M P

## THE TRUMP ORGANIZATION

**Rhona Graff**
Senior Vice President – Assistant to the President
725 Fifth Avenue | New York, NY | 10022
p. 212.832.2000 | p. 212.715.7209 | f. 212.755.3230

rgraff@trumporg.com | trump.com

**From:** Marc Wachter [mailto:marc@liveultimate.com]
**Sent:** Sunday, May 31, 2015 10:08 AM
**To:** Jenny Goldstock Wright
**Cc:** Rhona Graff; Michael Rose
**Subject:** Re: As Per Mr. Trump's request-Serena Williams Fund

Thank you Jenny!

Rhona, it is a pleasure to connect with you. Please let me know when you have time to get on a call with Michael Rose and myself to discuss the Serena Williams Run and Charity Gala.

Warmest regards,

Marc

Marc S. Wachter

President & CEO

FOIL EXEMPT | HIGHLY CONFIDENTIAL



LIVE ULTIMATE

1691 Michigan Ave. Suite 310
Miami Beach , FL 33139
Office: (305) 538-8899

Fax. (305) 538-0065

www.LiveUltimate.com

On May 28, 2015, at 4:08 PM, Jenny Goldstock Wright wrote:

Rhona-

Apologies for the delaying in getting back to you with a definitive answer on Serena's 5k run to raise money for charity.  We now know she is going ahead with the run.  We are partnering, for the second year in a row, with Live Ultimate who will plan and execute the run as well as a pre-run evening event to raise funds for the Serena Williams Fund and her charitable partners.  The run will be on Sunday, December 13th and the pre-event on Friday, December 11th.  I am using this email to introduce you to Marc Wachter, the President of Live Ultimate and Michael Rose, a member of our Board of Directors.  They are both based in South Beach and will be spearheading the entire weekend.  I have told them about Mr. Trump's generous offer to contribute to Serena's charitable efforts is some way, including underwriting the Friday evening at one of his properties (if that makes sense for all)  and they will be contacting you directly to discuss options.  Thanks to all three of you!

Jenny

On Mon, May 11, 2015 at 12:02 PM, Rhona Graff <rgraff@trumporg.com> wrote:

Hi Jenny:

Mr. Trump asked that I follow up on your e mail below.  Please call me at your convenience so we can further discuss.


Thank you.


Rhona


<image001.png>

Rhona Graff
Senior Vice
President – Assistant
to the President
725 Fifth Avenue |
New York, NY | 10022
p. 212.832.2000 | p.
212.715.7209 | f.
212.755.3230

rgraff@trumporg.com
| trump.com

**From:** Jessica Macchia
**Sent:** Monday, May 11, 2015 12:01 PM
**To:** Rhona Graff; Kelli Rose
**Subject:** Fwd: As Per Mr. Trump's request-Serena Williams Fund


Sent from my iPhone


Begin forwarded message:

> **From:** Jenny Goldstock Wright <jenny@wishboneconsultinggroup.com>
> **Date:** May 5, 2015 at 8:19:14 PM EDT
> **To:** Jessica Macchia <jmacchia@trumporg.com>
> **Subject: As Per Mr. Trump's request-Serena Williams Fund**
>
> Jessica-
>
>
> As Per Mr. Trump's request, attached please find basic information on the Serena Williams' Fund. There is a likely (not yet confirmed) event in

December, for which a specific ask of Mr. Trump may make the most sense. I was hoping to know before I sent this email, but as he was kind enough to follow up on Serena's charity last week, I did not want to delay further before responding.

In short, last year we teamed up with a group called Live Ultimate for the first Serena Williams Ultimate 5k run.  There was a fundraiser for Serena's charitable partners the night before hosted and underwritten by Marc Leder, CEO of Sun Trust in his Miami Beach home. If there is 2nd Serena Williams Ultimate Run and Fundraiser again this year, our ask would be if Mr. Trump could host/underwrite the fundraiser the night before the race at his hotel in Miami or a venue that works for him in the Miami Beach area.

We look forward to hearing initial thoughts.  If Mr. Trump is interested, I will be sure to circle back as soon as I have a definite "yes" from Serena on the run and fundraising event.

With Appreciation,

Jenny

--

Jenny Goldstock Wright

Principal

Wishbone Consulting Group

This e-mail message, and any attachments to it, are for the sole use of the intended recipients, and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of this email message or its attachments is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. Finally, while the company uses virus protection, the recipient should check this email and any attachments for the presence of viruses. The company accepts no liability for any damage caused by any virus transmitted by this email.

TTO_01150568

...

Jenny Goldstock Wright

Principal

Wishbone Consulting Group

FOIL EXEMPT | HIGHLY CONFIDENTIAL

TTO_01150569

# TAB H

Message

**From:**        Donna Kidder [FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=DKIDDER]
**Sent:**        5/5/2015 12:58:38 PM
**Subject:**     RE: 40 wall current leases and amendments
**Attachments:** image001.jpg

Thanks Jae.

Michael,

Please let me know everything is in order.

**From:** Jae H. Cho
**Sent:** Tuesday, May 05, 2015 12:17 PM
**To:** Donna Kidder
**Cc:** Jack Weisselberg; Michael Bette; Jeff McConney; Allen Weisselberg
**Subject:** RE: 40 wall current leases and amendments

Donna,

Files has been sent to Jack and Michael.

**From:** Donna Kidder
**Sent:** Monday, May 4, 2015 2:32 PM
**To:** Jae H. Cho
**Cc:** Jack Weisselberg; Michael Bette; Jeff McConney; Allen Weisselberg
**Subject:** FW: 40 wall current leases and amendments
**Importance:** High

Jae please find the link for 40 Wall lease agreements and amendments below to send to Ladder Capital.  If this does not work let me know.

Thanks.

**From:** Cammie Artusa
**Sent:** Monday, May 04, 2015 2:29 PM
**To:** Donna Kidder
**Subject:** FW: 40 wall current leases and amendments

All copies of 40 Wall Street executed leases and amendments can be found in:

G:\40 Wall\40 Wall Street Executed Lease Agreements

FOIL EXEMPT | HIGHLY CONFIDENTIAL

**From:** Donna Kidder
**Sent:** Monday, May 04, 2015 2:15 PM
**To:** Cammie Artusa
**Subject:** RE: 40 wall current leases and amendments

Can you tell me the path? So I can have Jae send to prospective lender for due diligence? This is great!!!

**From:** Cammie Artusa
**Sent:** Monday, May 04, 2015 2:13 PM
**To:** Donna Kidder
**Subject:** RE: 40 wall current leases and amendments

I have all of the pdf's for the current leases and amendments saved on the computer in a "bundle" folder on the G: drive
: )

**From:** Donna Kidder
**Sent:** Monday, May 04, 2015 2:12 PM
**To:** Cammie Artusa
**Subject:** 40 wall current leases and amendments

Any chance you have all of the pdf's for the current leases and amendments saved on the computer in a "bundle" a folder or something to that effect? On the L:drive?

**Donna Kidder**
Assistant Controller
725 Fifth Avenue | New
York, NY | 10022
p 212.715.7225 | f.
212.832.5396
dkidder@trumporg.com
| trump.com

FILED: NEW YORK COUNTY CLERK 01/03/2022 05:47 PM    INDEX NO. 451685/2020
NYSCEF DOC. NO. 354    RECEIVED NYSCEF: 01/03/2022

Case 1:21-cv-01352-BKS-CFH    Document 16-8    Filed 01/26/22    Page 2 of 12

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Index No. 451685/20 |
| Petitioner, | **Motion Seq. No.: ___** |
| -against- | **<u>Oral Argument Requested</u>** |
| THE TRUMP ORGANIZATION, INC.; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; SEVEN SPRINGS LLC; ERIC TRUMP; CHARLES MARTABANO; MORGAN, LEWIS & BOCKIUS, LLP; SHERI DILLON; DONALD J. TRUMP; IVANKA TRUMP; AND DONALD TRUMP, JR., | |
| Respondents. | |

**MEMORANDUM OF LAW IN SUPPORT OF RESPONDENTS/MOVING PARTIES
DONALD J. TRUMP, DONALD J. TRUMP, JR. AND IVANKA TRUMP'S MOTION TO
QUASH SUBPOENAS OR, IN THE ALTERNATIVE, TO STAY ENFORCEMENT OF
<u>THE SUBPOENAS PENDING RESOLUTION OF THE CRIMINAL INVESTIGATION</u>**

**<u>PRELIMINARY STATEMENT</u>**

This motion is brought because, in an unprecedented and unconstitutional maneuver,

Letitia James, the Attorney General for the State of New York ("OAG" or "Attorney General"),

has subpoenaed (the "Subpoenas") and seeks to take the depositions of Former President Donald

J. Trump ("Mr. Trump"), his son, Donald J. Trump, Jr., and daughter, Ivanka Trump (hereinafter

and for the puposes of this Motion collectively "Moving Parties"), as part of an ongoing, multi-

year investigation into all aspects of the business dealings of Mr. Trump and his namesake

company, The Trump Organization while, at the very same time, according to published reports,

FILED: NEW YORK COUNTY CLERK 01/03/2022 05:47 PM    INDEX NO. 451685/2020
NYSCEF DOC. NO. 354    RECEIVED NYSCEF: 01/03/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-8   Filed 01/26/22   Page 3 of 12

## POINT I

### THE SUBPOENAS SHOULD BE QUASHED
### TO AVOID CIRCUMVENTING MOVING PARTIES'
### CONSTITUTIONAL AND STATUTORY RIGHTS

The Subpoenas should be quashed because they seek to compel testimony in furtherance

of the OAG/DANY investigation and thereby deprive Moving Parties of the constitutional and

statutory protections available to witnesses compelled to testify in a pending criminal case. The

OAG's claimed "administrative" Subpoenas, generally referred to as an "office subpoena," may

be challenged by a motion to quash. *Matter of Condon v. Inter-Religious Found. For Community*

*Org., Inc.,* 18 Misc.3d 874, 882, 85 N.Y.S. 841 (N.Y. Co 2008), *citing Virag v. Hynes*, 54

N.Y.2d 437 (1981); see CPLR § 2304; *Matter of Brunswick Hosp. Ctr. V. Hynes*, 152 N.Y.2d

333, 339, 438 N.Y.S.2d 253 (1981) (motion to quash or vacate is proper and exclusive vehicle to

challenge validity of subpoena or jurisdiction of issuing authority).

We recognize that, ordinarily, the OAG has the authority to conduct a civil investigation

into whether any person has engaged in "repeated fraudulent illegal acts or otherwise

demonstrate[d] persistent fraud or illegality in the carrying on, conducting or transaction of

business." McKinney's Executive Law § 63(12). In the usual course, "the attorney general is

authorized to take proof and make a determination of the relevant facts and to issue subpoenas in

accordance with the civil practice law and rules. Such authorization shall not abate or terminate

by reason of any action or proceeding brought by the attorney general under this section." *Id.*

*See Matter of Harlem Teams for Self-Help v. Department of Investigation of City of N.Y.,* 122

Misc.2d 1066, 1074, 472 N.Y.S.2d 967 (N.Y. Co. 1984).

But as the Court of Appeals detailed in *Virag v. Hynes*, there is a "fundamental

distinction between a nonjudicial, office subpoena and a Grand Jury subpoena." *Virag v Hynes*,

12

Case 1:21-cv-01352-BKS-CFH   Document 16-8   Filed 01/26/22   Page 4 of 12

54 N.Y.2d at 441. "An office subpoena is executed and the witness examined pursuant to it without direct judicial supervision." *Id.* Further, the civil office subpoena poses risks to any witness deciding between disclosing evidence in the civil investigation or invoking his or her constitutional right not to testify. Where a witness chooses not to testify in response to a civil subpoena, an adverse inference may be drawn in the civil action. *Kuriansky v. Bed-Stuy Health Care Corp.*, 135 A.D.2d 160, 178-79, 525 N.Y.S.2d 22 (2d Dep't 1988)("In New York, unlike the rule in a criminal case, a party's invocation of the privilege against self-incrimination in a civil case may be considered by the finder of the facts in assessing the strength of the evidence offered by the opposing party on the issue which the witness was in a position to controvert"), *citing Marine Midland Bank v. Russo Produce Co.*, 50 N.Y.2d 31, 427 N.Y.S.2d 961 (1980); *see Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97-98 (2d Cir. 2012), *quoting Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551 (1976); *Keating v. Office of Thrift Supervision,* 45 F.3d 322, 326 (9th Cir.1995); *United States v. 4003–4005 5th Ave.,* 55 F.3d 78, 83 (2d Cir.1995); *LiButti v. United States,* 178 F.3d 114, 120 (2d Cir.1999)

But where the very same agency issuing the supposed "office" subpoena is also conducting a criminal investigation, the office subpoena is unavailable. "The law does not confer upon a prosecutor the power to employ a subpoena solely to conduct an investigation or to subpoena witnesses to attend his office or any other place where a grand jury or court is not convened." *Rodrigues v. City of New York,* 193 A.D.2d 79, 602 N.Y.S.2d 337, 342 (1st Dep't 1993). "It has long been recognized that District Attorneys may not issue subpoenas except through the process of the court, and they exercise the power to compel witnesses to produce physical evidence only before a Grand Jury or a court where a proceeding is pending." *People v. Natal*, 75 N.Y.2d 379, 385 N.Y.S.2d 650 (1993); *see* CPL § 610.20 ("a district attorney, or other

13

FILED: NEW YORK COUNTY CLERK 01/03/2022 05:47 PM INDEX NO. 451685/2020
NYSCEF DOC. NO. 354   Case 1:21-cv-01352-BKS-CFH   Document 16-8   Filed 01/26/22   Page 5 of 12   RECEIVED NYSCEF: 01/03/2022

prosecutor where appropriate, as an officer of a criminal court . . . may issue a subpoena…for the attendance in such court or a grand jury thereof of any witness whom the people are entitled to call in such action or proceeding.")

By law, rather than having to risk an adverse inference, any witness compelled to testify in response to a grand jury subpoena receives transactional immunity for his or her testimony. McKinney's CPL § 190.40 ("A witness who gives evidence in a grand jury proceeding receives immunity …") Thus, because transactional immunity is automatic, prosecutors are loath to use subpoena power to compel grand jury testimony from an individual whom it wishes to target in its investigation. *Matter of Gammarano v. Gold*, 51 A.D.2d 1012-1013 (2d Dep't 1976)(it is "factually impossible" for a grand jury witness to be a target of the District Attorney's investigation since grand jury subpoenas grant "automatic transactional immunity for his testimony"), *citing* CPL § 190.40. The exception to the automatic grant of immunity occurs only when a target in a criminal case requests to appear before the grand jury voluntarily; in that event, the target receives no immunity. *See* CPL § 190.50(5).

Here, DANY and the OAG are conducting a unified criminal investigation. The Attorney General herself acknowledged that OAG lawyers are part of the joint criminal investigative effort. While the OAG may also have tasked attorneys to a civil investigation, the very agency itself – the OAG – is front and center in the criminal investigation, so much so that Attorney General James boasted on national television that "we" indicted Mr. Weisselberg and two Trump companies. And there is no question that testimony provided to the OAG will be immediately available to that very same Office - the OAG – in its OAG/DANY investigation. Under these unprecedented circumstances, where the OAG is part and parcel of the criminal grand jury investigation, it cannot circumvent the rules and protections embodied in Grand Jury practice.

14

The fact is that the OAG is one, singular agency running a criminal investigation. It may

claim to split itself into two to avoid complying with grand jury practice, but this it cannot do. In

more distant but analogous circumstances, courts have not permitted illusory and fanciful

distinctions between different agencies, much less amongst a single agency. "Where the

investigation has been converted from its original lawful purpose…to one of another purpose,

i.e., to conduct an investigation to find criminal acts, the abuse of process would be sufficiently

clear to warrant quashing these subpoenas." *Matter of Harlem Teams for Self-Help v.*

*Department of Investigation of City of N.Y.*, 122 Misc.2d 1066, 472 N.Y.S.2d 967 (N.Y.Co.

1984). "Where there is evidence that the relevance of the materials sought [in an office

subpoena] is not to an administrative investigation, but, 'in preparation or in aid of a criminal

prosecution, not within the purview of [the agency's] jurisdictional powers, the subpoena will be

quashed.'" *Id., quoting Matter of Temporary State Comm. on Living Costs & Economy v*

*Bergman*, 80 Misc 2d 448, 453, 363 N.Y.S.2d 977 (N.Y. Co. 1975), *citing Matter of Grand Jury*

*Proceedings*, 485 F.2d 85 (3d Cir. 1973). *See also People v. Rutter*, 202 A.D.2d 123, 131, 616

N.Y.S.2d 598 (1st Dep't 1994) (granting habeas relief on ineffective assistance grounds where

prosecution had not timely disclosed exculpatory polygraph transcript in possession of

Philadelphia police). *See United States v. Ferguson*, 478 F. Supp.2d 220, 238 (D. Conn.  2007)

(prosecutor's duty to turn over *Brady* material in the possession of other agencies "is triggered

by any joint investigation conducted between federal, state, and local agencies or across different

federal agencies").

Here, we needn't pause to even question whether the OAG and DANY are running a joint

investigation. *See Ferguson*, 478 F. Supp.2d at 238, *citing United States v. Risha,* 445 F.3d 298,

304 (3d Cir. 2006). The Attorney General has made crystal clear in myriad public statements and

<center>15</center>

FILED: NEW YORK COUNTY CLERK 01/03/2022 05:47 PM
INDEX NO. 451685/2020
NYSCEF DOC. NO. 354
RECEIVED NYSCEF: 01/03/2022

Case 1:21-cv-01352-BKS-CFH    Document 16-8    Filed 01/26/22    Page 7 of 12

actions that the OAG is a co-equal in the prosecutions to date and in the ongoing criminal grand jury investigation.

The OAG is engaged in a criminal investigation that has an active Grand Jury. It cannot issue subpoenas for testimony under the guise of a civil investigation that will immediately become available – to its own OAG/DANY criminal investigation. New York State's statutory and constitutional protections were not designed to be so easily avoided. The subpoenas are an obvious improper end-run around the rules.

Given the seemingly unprecedented nature of the OAG's actions, significant public policy concerns are at play. For this reason, the OAG cannot be permitted to co-mingle its criminal and civil investigations in such a way that will deprive Moving Parties of their constitutional rights. Doing so would set a truly dangerous precedent. Not only would it significantly erode the protections afforded to our citizens by the New York Constitution and related CPL rules, but it would also greatly expand the government's ability to investigate criminal defendants under the guise of a civil investigation. The Supreme Court has already expressed concern that "[p]rosecutors have available a terrible array of coercive methods to obtain information," such as "police investigation and interrogation, warrants, informers and agents whose activities are immunized, authorized wiretapping, civil investigatory demands, [and] enhanced subpoena power" and that the "misuse of those methods would unfairly harass citizens, give unfair advantage to [the prosecutor's personal interests], and impair public willingness to accept the legitimate use of those powers." *Young v. U.S. ex re. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987). Thus, it is vital that the public "have assurance that those who would wield this [prosecutorial] power will be guided solely by their sense of public responsibility for the attainment of justice." *Id.* at 814.

16

FILED: NEW YORK COUNTY CLERK 01/03/2022 05:47 PM

NYSCEF DOC. NO. 354

INDEX NO. 451685/2020

RECEIVED NYSCEF: 01/03/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-8   Filed 01/26/22   Page 8 of 12

These public policy considerations are all the more significant in the instant matter where the target of the government speech and action is a political figure, a former President of the United States, and the government actor is a state Attorney General who vehemently opposes him. Given the significant public attention that the subject investigation has received, and will continue to receive, there is a substantial risk that permitting the OAG to so clearly circumvent grand jury protections and otherwise exceed the bounds of its investigatory authority would "create an appearance of impropriety" which could ultimately "diminish faith in the fairness of the criminal justice system in general." *Id.* at 812.

Based on the foregoing, the subpoena must be quashed.

## POINT II

### ALTERNATIVELY, THE COURT SHOULD STAY ENFORCEMENT OF THE SUBPOENAS PENDING THE CONCLUSION OF THE CRIMINAL CASE

A court may, in its discretion, grant a stay of civil proceedings "in a proper case, upon such terms as may be just." CPLR 2201. For example, courts will commonly grant a stay of a civil proceeding when it overlaps with a pending criminal proceeding. Indeed, "although the pendency of a criminal proceeding does not give rise to an absolute right under the United States or New York State Constitutions to a stay of a related civil proceeding . . . there is no question that the court may exercise its discretion to stay proceedings in a civil action until a related criminal dispute is resolved." *Matter of Astor*, 62 A.D.3d 867, 868-869, 879 N.Y.S.2d 560 (2d Dep't 2009).[7]

Whether to grant a stay pending resolution of a related criminal action "is directed to the

---

[7] The Court in the criminal case, the Hon. Juan M. Merchan, has stated that the trial will be held in late July or August 2022. Thus, the stay contemplated by this motion is of limited and finite duration.

17

sound discretion of the trial court." *Britt v. Intl. Bus Services, Inc.*, 255 A.D.2d 143, 144 (1st Dep't 1998)(quotations omitted); *see also Securities and Exchange Com'n v. Dresser Industries, Inc.*, 628 F.2d 1372, 1375 (D.C. Cir. 1980)("a court may decide in its discretion to stay civil proceedings ... 'when the interests of justice seem[ ] to require such action'") (*quoting U.S. v. Kordel*, 397 U.S. at 12, n. 27, 90 S. Ct. at 770, n. 27); *Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir.1986) ("[A] court *may* decide in its discretion to stay civil proceedings when the interests of justice seem to require such action")(emphasis in original). Where a stay is sought due to a pending criminal matter, the invocation of the Fifth Amendment privilege is a critical factor:

> Factors to consider include avoiding the risk of inconsistent adjudications, [duplication] of proof and potential waste of judicial resources. A compelling factor is a situation where a defendant will invoke his or her constitutional right against self-incrimination.

*Britt v. Intl. Bus Services, Inc.*, 255 A.D.2d 143, 144 (1st Dep't 1998); *see Zonghetti v Jeromack*, 150 A.D.2d 561, 563 (2d Dep't 1989); *DeSiervi v Liverzani*, 136 A.D.2d 527, 528 (2d Dep't 1988); *Puiatti v Panos*, 39 Misc.3d 1211(A), 2013 Slip. Op. 50566(U) at *4 (Duchess Co. 2013) (granting stay upon finding invocation of the Fifth Amendment right against self-incrimination to be a "compelling factor").

The Supreme Court has acknowledged that a stay or postponement of civil discovery pending the outcome of criminal proceedings is justified when the government brings a civil action "solely to obtain evidence for its criminal prosecution," *United States v. Kordel*, 397 U.S. 1, 11-12, 90 S.Ct. 763, 769-770 (1970), or where other circumstances suggest that parallel proceedings are unconstitutional or improper. *Id.* In this context, a stay is "most likely to be granted where the civil and criminal actions involve the same subject matter ... and is even more appropriate when both actions are brought by the government." *Brock v Tolkow*, 109 F.R.D. 116, 119 (E.D.N.Y

18

FILED: NEW YORK COUNTY CLERK 01/03/2022 05:47 PM

NYSCEF DOC. NO. 354

INDEX NO. 451685/2020

RECEIVED NYSCEF: 01/03/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-8   Filed 01/26/22   Page 10 of 12

1985). In such a scenario, a stay is warranted to guard against the "special danger that the government can effectively undermine rights that would exist in a criminal investigation by conducting a de facto criminal investigation using nominally civil means," *Sterling Bank v. A-1 Hotels Int's Inc.*, 175 F.Supp.2d 573, 579 (S.D.N.Y. 2001), a maneuver which "undercuts" a defendant's constitutional rights. *Id.* at 120.

Turning to the instant matter, the OAG is intimately involved in a criminal investigation dealing with precisely the same subject matter as the Subpoenas. The OAG's role is highly prejudicial since it is in a position to use its civil investigation to improperly advance its criminal investigation. Indeed, since the OAG boasts about its criminal investigation, there is no question that testimony obtained by the OAG, will be used – by the OAG. Thus, the potential for abuse here is unique, both in the fact the OAG is deeply enmeshed in the criminal case, and because of Attorney General James's unusual and well-documented threats, noted above, including her self-proclaimed mission to "take on" the Trump family, deploy the law as a "sword" in discussing Mr. Trump, who she called "illegitimate" in 2018 (*see* **Exhibit EE**), and to make use of "*every area of the law* to investigate [him] … his businesses transactions … his family … [and] anyone in his orbit."

Thus, a stay is warranted here for all of the reasons previously discussed. It is not appropriate for an agency of the state government, particularly its highest law enforcement agency, to endeavor to circumvent Grand Jury rules used to protect our citizenry. Indeed, this is a rather transparent gambit. By attempting to play both sides, Ms. James is in a position to cherry pick her investigatory methods – civil or criminal – in a calculated manner to, for example, leverage a Fifth Amendment assertion and obtain an adverse inference. *See A-1 Hotels Int's Inc.*, 175 F.Supp.2d at

19

579. It is not appropriate for any state actor – let alone the highest-ranking law enforcement official in the state – to endeavor to circumvent the grand jury procedural safeguards of our judicial system.

Were there no criminal case, the Moving Parties might well be inclined to testify. But there is a criminal investigation into the very same matters at issue in the Subpoenas being conducted by the very same office. Attorneys may well instruct witnesses to invoke Fifth Amendment rights solely because rights under CPL 190.40 have been circumvented. An adverse inference under these circumstances would be grossly unfair when this stratagem can easily be avoided by a stay pending completion of the criminal investigation.

Therefore, a stay is warranted here for all of the reasons set forth herein.

### CONCLUSION

For the forgoing reasons, it is respectfully requested that the Court quash the Subpoenas or, in the alternative, stay enforcement of the Subpoenas until the conclusion of the pending criminal case. Oral argument is respectfully requested.

Dated: January 3, 2022

Respectfully submitted,

Law Offices of Alan S. Futerfas
By: Alan S. Futerfas
565 Fifth Avenue, 7th Fl
New York, New York 10017

*Attorneys for Respondents/Moving Parties Donald J. Trump, Jr., and Ivanka Trump*

Fischetti & Malgieri
By: Ronald P. Fischetti
565 Fifth Avenue, 7th Fl
New York, New York 10017

20

Case 1:21-cv-01352-BKS-CFH   Document 16-8   Filed 01/26/22   Page 12 of 12

Michael T. van der Veen
Van der Veen, Hartshorn and Levin
1219 Spruce Street
Philadelphia, PA 19107

Alina Habba
Habba Madaio & Associates LLP
112 West 34th St, 17th & 18th Floors
New York, New York 10120

*Attorneys for Respondent/Moving Party Donald J.
Trump*

21

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 2 of 116

NYSCEF DOC. NO. 830                                                    RECEIVED NYSCEF: 01/24/2022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Index No. 451685/2020 |
| Petitioner, | **SUPPLEMENTAL VERIFIED PETITION** |
| -against- | |
| THE TRUMP ORGANIZATION, INC.; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; SEVEN SPRINGS LLC; ERIC TRUMP; CHARLES MARTABANO; MORGAN, LEWIS & BOCKIUS, LLP; SHERI DILLON; DONALD J. TRUMP; IVANKA TRUMP; and DONALD TRUMP, JR., | |
| Respondents. | |

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 3 of 116    RECEIVED NYSCEF: 01/24/2022

Petitioner, the People of the State of New York, by Letitia James, Attorney General of the State of New York, as and for her Supplemental Verified Petition, respectfully alleges:

## PRELIMINARY STATEMENT

1.      The Office of the Attorney General ("OAG") is currently investigating whether the Trump Organization and Donald J. Trump ("Mr. Trump") misstated the value of Mr. Trump's assets on annual financial statements, tax submissions, and other documents and made other material misrepresentations provided to third parties in order to secure loans and insurance coverage and obtain other economic and tax benefits.

2.      This investigation is being conducted pursuant to the New York Executive Law and other applicable laws. OAG has identified facts and evidence indicating that the annual financial statements, tax submissions, and other documents under investigation contain material misstatements and omissions. It intends to make a final determination about who is responsible for those misstatements and omissions. OAG requires the testimony and evidence sought herein to determine which Trump Organization employees and affiliates—and which other entities and individuals—may have assisted the Trump Organization and Mr. Trump in making, or may have relevant knowledge about, the misstatements and omissions at issue.

3.      The factual basis for OAG's investigation is set out below and in OAG's previous filings in this proceeding, which are incorporated herein, including the Second Affirmation of Matthew Colangelo dated August 21, 2020 ("Second Aff."), filed *in camera* to protect the confidentiality of this ongoing investigation. *See Michaelis v. Graziano*, 5 N.Y.3d 317, 323 (2005); *American Dental Coop., Inc. v. Attorney-General*, 127 A.D.2d 274, 280 (1st Dep't 1987).

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 4 of 116    RECEIVED NYSCEF: 01/24/2022

4.      Upon this Supplemental Verified Petition; the Affirmation of Colleen Faherty, dated January 18, 2022; and its attachments (incorporated herein), OAG moves to compel the testimony of Donald J. Trump, Donald Trump, Jr., and Ivanka Trump, and to compel the production of documents in the possession, custody, or control of Donald J. Trump.

5.      As alleged in detail below, OAG has obtained documents and testimony from numerous witnesses that were involved in creating and disseminating the misleading statements and omissions at issue in this investigation. However, witnesses closest to the top of the Trump Organization have asserted their Fifth Amendment rights against self-incrimination. Certain others have professed faulty memories or asserted that they were following instruction from more senior employees. And as the Court is well aware, other testimony and documents have been withheld under assertions of privilege, including assertions on behalf of Mr. Trump himself: for instance, Sheri Dillon, a respondent in OAG's motion that began this proceeding, was Mr. Trump's personal tax counsel.

6.      The knowledge and actions of Mr. Trump's agents and attorneys can be imputed to Mr. Trump himself. *See, e.g.*, *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465-66 (2010). But Mr. Trump's actual knowledge of—and intention to make—the numerous misstatements and omissions made by him or on his behalf are essential components to resolving OAG's investigation in an appropriate and just manner. Likewise, Donald Trump, Jr. and Ivanka Trump worked as agents of Mr. Trump, acted on their own behalves, and supervised others in connection with the transactions at issue here; their testimony is necessary for appropriate resolution of OAG's investigation as well.

7.      For all these reasons, there is a heightened need for testimony from these respondents. Specifically:

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630      Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 5 of 116    RECEIVED NYSCEF: 01/24/2022

8.      <u>Respondent Donald J. Trump.</u> Mr. Trump is the beneficial owner of the Trump Organization. He had ultimate authority over a wide swath of conduct by the Trump Organization involving misstatements to counterparties, including financial institutions, and the Internal Revenue Service. The Trump Organization has responded to OAG's document and testimonial subpoenas, producing more than 930,000 documents. Although approximately a dozen current and former Trump Organization employees have testified before OAG, and Mr. Trump personally authorized the production of federal income tax information to OAG, Mr. Trump himself has declined to comply with OAG subpoenas for documents and testimony, moving to quash the subpoenas in this proceeding and (along with the Trump Organization) seeking to enjoin this investigation in its entirety in a recently-filed action in the United States District Court for the Northern District of New York. Mr. Trump should be compelled by this Court to testify before OAG and produce to OAG relevant documents in his possession, custody, or control.

9.      <u>Respondent Donald Trump, Jr.</u> Donald Trump, Jr. manages the Trump Organization with Eric Trump. He is also the trustee of the Donald Trump Revocable Trust and is responsible for issuing annual financial statements regarding the assets the Trust holds for his father. Since 2017, Donald Trump, Jr. has had authority over numerous financial statements containing misleading asset valuations. Donald Trump, Jr. should be compelled to testify before OAG.

10.      <u>Respondent Ivanka Trump.</u> Respondent Ivanka Trump was an Executive Vice President for Development and Acquisitions of the Trump Organization through at least 2016. Among other responsibilities, Ms. Trump negotiated and secured financing for Trump Organization properties. Until January 2017, Ms. Trump was a primary contact for the Trump

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630   Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 6 of 116   RECEIVED NYSCEF: 01/24/2022

Organization's largest lender, Deutsche Bank. In connection with this work, Ms. Trump caused

misleading financial statements to be submitted to Deutsche Bank and the federal government.

Ivanka Trump should be compelled to testify before OAG.

11.    Petitioner seeks an order pursuant to C.P.L.R. 2308(b) to enforce its subpoenas

without further delay and therefore respectfully requests that the Court grant OAG's motion in its

entirety and reject the motions by the moving respondents. Exs. 301-303.[1]

### THE PARTIES

12.    The Attorney General is responsible for overseeing the activities of New York

corporations and the conduct of their officers and directors, in accordance with the New York

Executive Law and other applicable laws. She is expressly tasked by the Legislature with

policing fraud and illegal conduct in business. *See, e.g.*, Executive Law § 63(12).

13.    Respondent Donald J. Trump is the beneficial owner of the collection of entities

he styles the "Trump Organization." As previously alleged, according to required disclosures,

from May 1, 1981 to January 19, 2017, Mr. Trump was Director, President, and Chairman of the

Trump Organization, Inc. From at least July 15, 2015 until May 16, 2016, Mr. Trump was the

sole owner of the Trump Organization, Inc. As of 2017, the Trump Organization, Inc. was

wholly owned by DJT Holdings Managing Member LLC. On information and belief, Mr. Trump

is the sole beneficiary of The Donald J. Trump Revocable Trust, a trust created and operating

under the laws of New York that is the legal owner of the above entities.

---

[1] Citations to "Ex. ___" are to true copies of the referenced documents as annexed to the Affirmation of Colleen Faherty, dated January 18, 2022, and filed with this petition. Certain exhibits to this Affirmation have been excerpted in order to avoid presenting the Court with extraneous material. As the parties requested, the Court has granted OAG leave to file exhibits under seal where they contain investigatory information. Docket No. 356.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630                                          RECEIVED NYSCEF: 01/24/2022

14.     Respondent Donald Trump, Jr. is an Executive Vice President of the Trump

Organization. According to the Trump Organization, Donald Trump, Jr. and Respondent Eric

Trump took over management of the Trump Organization from Mr. Trump in 2017. Donald

Trump, Jr. oversees the Trump Organization's property portfolio and is involved in all aspects of

the company's property development. Donald Trump, Jr. and former Trump Organization Chief

Financial Officer Allen Weisselberg were trustees of the Donald J. Trump Revocable Trust until

Mr. Weisselberg resigned in June 2021. As of October 29, 2021, Donald Trump, Jr. was the sole

Trustee of the Donald J. Trump Revocable Trust.

15.     Respondent Ivanka Trump was an Executive Vice President for Development and

Acquisitions of the Trump Organization through at least 2016. Among other responsibilities, Ms.

Trump negotiated and secured financing for Trump Organization properties. While at the Trump

Organization she "direct[ed] all areas of the company's real estate and hotel management

platforms." Ex. 330. This included active participation in all aspects of projects, "including deal

evaluation, pre-development planning, financing, design, construction, sales and marketing" as

well as "involve[ment] in all decisions—large and small." *Id*. Among other duties, she negotiated

the ground lease with the federal government related to the Old Post Office property as well as

financing related to that property.

### JURISDICTION, APPLICABLE LAW, AND VENUE

16.     The Attorney General commenced this special proceeding on behalf of the People

of the State of New York pursuant to the New York Executive Law and C.P.L.R. Article 4.

17.     Executive Law § 63(12) allows the Attorney General to bring a proceeding

"[w]henever any person shall engage in repeated fraudulent or illegal acts or otherwise

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630   Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 8 of 116   RECEIVED NYSCEF: 01/24/2022

demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business."

18.     Fraudulent conduct as used in § 63(12) has been defined as "whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud." *People v. Applied Card Sys., Inc.*, 27 A.D.3d 104, 107 (3d Dep't 2005), *aff'd on other grounds*, 11 N.Y.3d 105 (2008).

19.     A violation of any federal, state, or local law or regulation constitutes "illegality" within the meaning of § 63(12). *See, e.g.*, *Applied Card Sys.*, 27 A.D.3d at 104; *Oncor Commc'ns, Inc. v. State,* 165 Misc. 2d 262, 267 (Sup. Ct. Albany Cty. 1995), *aff'd*, 218 A.D.2d 60 (3d Dep't 1996); *People v. Am. Motor Club, Inc.*, 179 A.D.2d 277 (1st Dep't 1992), *appeal dismissed*, 80 N.Y.2d 893; *State v. Winter*, 121 A.D.2d 287 (1st Dep't 1986).

20.     The requirement to show "persistent" or "repeated" acts is met by, among other things, a showing of "separate and distinct fraudulent or illegal acts which affected more than one individual." *People v. 21st Century Leisure Spa Int'l Ltd.*, 153 Misc. 2d 938, 944 (Sup. Ct. N.Y. Cty. 1991); *see also State of New York v. Wolowitz*, 96 A.D.2d 47, 61 (2d Dep't 1983) (recognizing that § 63(12) allows "the Attorney-General to bring a proceeding when the respondent was guilty of only one act of alleged misconduct, providing it affected more than one person"); Exec. Law § 63(12) (defining "persistent" and "repeated").

21.     The Attorney General has broad authority to issue subpoenas and take sworn testimony to determine whether a proceeding should be brought. The Attorney General is "authorized to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules." Exec. Law § 63(12).

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630          Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 9 of 116          RECEIVED NYSCEF: 01/24/2022

22.      A sufficient factual basis for a subpoena under § 63(12) exists as long as there is a "reasonable relation to the subject-matter under investigation and to the public purpose to be achieved." *Matter of La Belle Creole Int'l, S.A. v. Attorney-General of the State of N.Y.*, 10 N.Y.2d 192, 196 (1961).

23.      Because the Attorney General is presumed to be acting in good faith when issuing a subpoena, *Am. Dental Coop.*, 127 A.D.2d at 280, a § 63(12) subpoena will not be quashed unless it seeks material "utterly irrelevant to any proper inquiry" or where the futility of the process "to uncover anything legitimate is inevitable or obvious." *La Belle Creole*, 10 N.Y.2d at 196.

24.      Venue is properly set in New York County pursuant to C.P.L.R. 503, 505, and 509, because Petitioner is resident in New York County and has selected New York County, and because Petitioner is a public authority whose facilities involved in the action are located in New York County.

### PRELIMINARY FACTUAL FINDINGS

**I.      Misleading Statements of Financial Condition of Donald J. Trump**

25.      Since no later than 2004, Mr. Trump and the Trump Organization have prepared an annual "Statement of Financial Condition of Donald J. Trump" (the "Statements" or "Statements of Financial Condition"). Since 2017, commencing with the Statement for the year ending June 30, 2016, the Statements have been issued by the Trustees of the Donald J. Trump Revocable Trust. These Statements contain Mr. Trump's or the Trustees' assertions of net worth, based principally on asserted values of particular assets minus outstanding debt.

26.      From 2004 until 2020, Mr. Trump's Statements of Financial Condition were compiled by accounting firm Mazars USA LLP ("Mazars"). Mazars ceased work on the Statements after the Statement reflecting Mr. Trump's financial condition as of June 30, 2020.

INDEX NO. 451685/2020
NYSCEF DOC. NO. 630     Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 10 of 116     RECEIVED NYSCEF: 01/24/2022

Another firm, Whitley Penn LLP, compiled the June 30, 2021 statement. The relevant Statements of Financial Condition obtained by OAG from 2004 to 2021 are attached to the Affirmation as exhibits 304-319.

27.     The Statements relied upon a supporting data spreadsheet and backup material prepared by the Trump Organization; Mazars compiled that information into financial-statement format. *E.g.*, Ex. 313 at MAZARS-NYAG-00000689. The relevant supporting data spreadsheets obtained by OAG from 2011 to 2020 are attached to the Affirmation as exhibits 320-329.

28.     The Trump Organization and its affiliates, including Mr. Trump, Donald Trump, Jr., and Ivanka Trump, submitted the Statements or arranged for their submission to counterparties, including financial institutions, other lenders, and insurers. The Trump Organization and its affiliates made these submissions to induce counterparties' consent to transactions or comply with the terms of transactions in which the parties were already engaged. The counterparties relied on the Statements and additional information provided by the Trump Organization in evaluating Mr. Trump's financial condition.

### A.     Misleading asset valuations in Trump financial statements

29.     The Statements described Mr. Trump's (or the Trustees of the Revocable Trust's) valuation process in broad terms and in ways which are often inaccurate or misleading to a reader when compared with the supporting data and documentation that the Trump Organization submitted to Mazars. Among other things, the Statements or the backup material:

a.  Misstated objective facts, like the size of Mr. Trump's Trump Tower penthouse;

b.  Miscategorized assets outside Mr. Trump's or the Trump Organization's control as "cash," thereby overstating his liquidity;

c.  Misstated the process by which Mr. Trump or his associates reached valuations.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630                                                  RECEIVED NYSCEF: 01/24/2022

     d.   Failed to use fundamental techniques of valuation, like discounting future revenues and expenses to their present value;

     e.   Misstated the purported involvement of "outside professionals" in reaching the valuations; and

     f.   Failed to advise that certain valuation amounts were inflated by an undisclosed flat percentage for brand value, despite express language on the Statements asserting that the value of Mr. Trump's brand was not reflected the Statements pursuant to generally accepted accounting principles ("GAAP").

30.     Since 2019, OAG has taken testimony from Trump Organization employees and others involved in these and other valuations. As detailed below, those involved have not been able to provide plausible justification for the valuation decisions at issue, their description of the Statements, or representations about the Statements made to counterparties. In light of the pervasive and repeated nature of the misstatements and omissions, it appears that the valuations in the Statements were generally inflated as part of a pattern to suggest that Mr. Trump's net worth was higher than it otherwise would have appeared.

31.     OAG is investigating a number of issues with the Statements. Other than appearing in New York Supreme Court beginning in August 2020 in this proceeding to compel production of necessary documents, and to seek the Court's intervention regarding the Trump Organization's documentary subpoena-compliance failures, OAG has largely maintained its investigation out of the public eye. However, because the Respondents have questioned whether OAG is pursuing in good faith a civil inquiry that may lead to civil remedial action within OAG's statutory power, OAG now presents to the Court a showing that reflects the progress of that inquiry. Below are seven issues that OAG believes are appropriate for disclosure to the

**A176**

Court now. The disclosure of these examples will not impede OAG's investigation; OAG is also investigating other conduct not discussed here.

        **1.**    **"Other assets": Seven Springs and the Mr. Trump's Trump Tower Triplex**

    32.    The Seven Springs Estate ("Seven Springs") is a parcel of real property that consists of approximately 212 acres within the towns of Bedford, New Castle, and North Castle in Westchester County. Seven Springs LLC, a Trump Organization subsidiary, purchased the property in December 1995 for $7.5 million.[2]

    33.    A 2000 appraisal prepared for the Royal Bank of Pennsylvania and sent to the Trump Organization estimated that Seven Springs had an "as-is" market value of $25 million for residential development. Ex. 335 at C&W_0048781, -88-91.

    34.    The same bank's records further indicate that a 2006 appraisal showed an "as-is" market value of $30 million. Ex. 336 at 00046009.12.2019.

---

[2] From December 1995 to January 19, 2017, Mr. Trump was President of Seven Springs LLC. Seven Springs LLC is 99.9% owned by DJT Holdings LLC, an entity wholly owned by Mr. Trump until approximately 2016, when ownership was transferred to the Donald J. Trump Revocable Trust. Seven Springs LLC is 0.1% owned by Bedford Hills Corp., which was wholly owned by Mr. Trump until at least May 16, 2016, and is now wholly owned by DJT Holdings LLC. Ex. 331 at A4; Ex.332 at A2, A4; Ex. 333 at 4, A2; Ex. 334 at 00027709.12.2019.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630                                              RECEIVED NYSCEF: 01/24/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 13 of 116

| Year | Stated Value | Citation |
|------|-------------|----------|
| 2004 | $80 million | Ex. 304 at 12. |
| 2007 | $200 million | Ex. 305 at 17. |
| 2008 | $200 million | Ex. 306 at 17. |
| 2009 | $251 million | Ex. 307 at 15. |
| 2010 | $251 million | Ex. 308 at 00165209.12.2019. |
| 2011 | $261 million | Ex. 309 at MAZARS-NYAG-00003148. |
| 2012 | $291 million | Ex. 310 at MAZARS-NYAG-00006325. |
| 2013 | $291 million | Ex. 311 at MAZARS-NYAG-00000052. |
| 2014 | $291 million | Ex. 312 at MAZARS-NYAG-00000733. |

35.     The Statements of Financial Condition listed the above valuations of Seven

Springs for the indicated year.[3]

36.     The 2012, 2013, and 2014 Statements of Financial Condition reported a value for

Seven Springs of $291 million and asserted that "[t]his property is zoned for 9 luxurious homes."

Ex. 310 at MAZARS-NYAG-00006325; Ex. 311 at MAZARS-NYAG-00000052; Ex. 312 at

MAZARS-NYAG-00000733. Each financial statement asserted that the valuation was "based on

an assessment made by Mr. Trump in conjunction with his associates of the projected net cash

flow which he would derive as those units are constructed and sold, and the estimated fair value

of the existing mansion and other buildings." *Id.*

37.     As depicted below, supporting data that the Trump Organization provided to

Mazars for the purpose of compiling the 2012 financial statement recorded a "telephone

---

[3] Mr. Trump's Statements of Financial Condition represent that valuations of Seven
Springs were "based on an assessment made by Mr. Trump in conjunction with his associates . . .
." *See, e.g.*, Ex. 312 (2012 Statement at 16).

INDEX NO. 451685/2020
NYSCEF DOC. NO. 630   Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 14 of 116   RECEIVED NYSCEF: 01/24/2022

conversation with Eric Trump (9/24/2012)" as one basis of this valuation, and also noted that portions of the Seven Springs property were "land to be donated." *See* Ex. 321 at rows 679-680. The supporting data for 2013 and 2014 reflected similar conversations with Eric Trump. Ex. 322 at cell B640; Ex. 323 at cell B660.

| PROPERTIES UNDER DEVELOPMENT | | 6/30/2011 | 6/30/2012 |
|---|---|---|---|
| Westchester, NY - Seven Springs | | | |
| Valuation is based on the sale of luxury homes | | | |
| net of cost. | | | |
| 6/30/2011-Per telephone conversation with Hal Goldman (9/16/2011) | | | |
| New Castle - 2 mansions - still in application process | | | |
| North Castle - 5 mansions - still in application process | | | |
| 6/30/2012-Per telephone conversation with Eric Trump (9/24/2012) | | | |
| New Castle-land to be donated | | | |
| North Castle-land to be used as part of Main Mansion | | | |
| Bedford - 7 mansions approved | | | |
| Selling Price | | 35,000,000 | 35,000,000 |
| Cost | | 12,000,000 | 12,000,000 |
| Profit | | 23,000,000 ↻ | 23,000,000 |
| Number of homes | | 7 | 7 |
| Value | | 161,000,000 ↻ | 161,000,000 |
| Current selling price of existing structures | | | |
| Main mansion | | 70,000,000 | |
| Main mansion + North Castle land (150 acres) | | | 100,000,000 |
| None Such Mansion | | 30,000,000 | 30,000,000 |
| Total value | | 261,000,000 | 291,000,000 |
| **809 NORTH CANNON DRIVE MOVE TO OTHER ASSETS-6/30/2011 "Per financials" amounts not adjusted for removal of 809 N Cannon Drive)** | | | |
| **Per financials** | | **273,200,000** | **291,000,000** |

38.    Mr. McConney, Senior Vice President and Controller of the Trump Organization, testified that this valuation includes the full amount that would be generated from the sale of the non-existent homes without taking into account the years it would take to construct infrastructure, build homes, obtain necessary approvals, and sell the number of homes identified in the supporting data. Ex. 337 at 230:10-231:11. He provided similar testimony with regard to the 2013 and 2014 valuations. *Id.* at 240:6-20; also 242:22-243:20.

12

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 15 of 116    RECEIVED NYSCEF: 01/24/2022

39.     Asked to explain various aspects of the 2012 and 2013 valuations, Eric Trump repeatedly invoked his Fifth Amendment privilege. Ex. 338 at 262:5-266:7; 271:19-272:3. And asked whether he discussed the valuation of Seven Springs with Mr. McConney on September 12, 2014, Eric Trump invoked his Fifth Amendment privilege. *Id*. at 274:10-16.

40.     Notably, the September 12, 2014 conversation described by Mr. McConney occurred after the completion of a valuation of the development potential for Seven Springs by a Cushman & Wakefield, Inc. ("Cushman") appraiser. In July 2014, the law firm Vinson & Elkins LLP (by an attorney, Sheri Dillon), had engaged Cushman to "provide consulting services related to an analysis of the estimated value of a potential conservation easement on all or part of the Seven Springs Estate." Ex. 339 at C&W_0016742. Vinson & Elkins acted "in its capacity as legal counsel for Seven Springs, LLC, the owner of the Seven Springs Estate." *Id.*

41.     David McArdle, an appraiser at Cushman, performed this engagement. Mr. McArdle testified that this engagement was to provide, verbally, a "range of value" of the Seven Springs property. Ex. 340 at 50:06-51:08, 96:19-98:09.

42.     Mr. McArdle valued the sale of eight lots in the Town of Bedford, six lots in New Castle, and ten lots in North Castle. Spreadsheets he prepared reflecting his opinion on the range of values show that McArdle used two different techniques to reach this range of values.

43.     In one spreadsheet, which he called "a sellout analysis," McArdle reached an average per-lot sales value of $2 million for the New Castle and North Castle lots, and $2.25 million for the Bedford lots. Ex. 341 at 458:6-459:8; Ex. 342 at C&W_0048563. After preparing a cashflow anticipating the sale of the lots and 10% rounded costs over five years, McArdle reached a rounded present value for all 24 lots of $29,950,000. In other words, Mr. McArdle—

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630                                    RECEIVED NYSCEF: 01/24/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 16 of 116

accounting for the time it would take to develop the property and discounting revenues and expenses to their present value—computed a value.

44.     Using another valuation technique, Mr. McArdle also sought to establish a value "Before" and "After" an easement donation. He assumed the eight Bedford lots were presently worth $1.5 million to $2.5 million each, for a range of $12 million to $18 million. He assumed six lots in New Castle at an estimated range of $1.5 million to $2 million for a total of $9 million to $12 million. Likewise, he assumed ten lots in North Castle at an estimated range of $1.5 million to $2 million, for totals of $15 million to $20 million, respectively. Ex. 343 at C&W_0048562. McArdle testified that he provided these individual ranges of value per lot to the client. Ex. 341 at 454:2-21. These ranges put the current value of the lots at a range of $36 million to a maximum of $50 million.

45.     McArdle testified that he conveyed his estimated range of value to the Trump Organization in late August or September 2014. Ex. 341 at 506:5-15. In an email he wrote on September 8, 2014, Mr. McArdle stated that he had "completed the research and all verbal consulting." Ex. 344.

46.     The Trump Organization was thus in possession of McArdle's "range of value" of $29,500,000 to a maximum of $50,000,000 for the developable lots at Seven Springs before Mr. McConney's September 12, 2014 telephone conversation with Eric Trump, and well before the finalization of the 2014 Statement of Financial Condition on November 7, 2014.

47.     Despite the Trump Organization's receipt of a valuation of twenty-four lots across three Westchester townships reflecting a value between $29.5 million and $50 million, the 2014 Statement of Financial Condition valued seven non-existent mansions in Bedford at $161

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630   Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 17 of 116   RECEIVED NYSCEF: 01/24/2022

million—without factoring in the valuation the Trump Organization commissioned or the time it would take to build and sell such homes. Those failures are objectively misleading.

48.     As described in previous submissions and alleged in detail below, in March 2016, two Cushman appraisers completed an appraisal of Seven Springs and concluded that the entire property (including undeveloped land and existing buildings) as of December 1, 2015 was worth $56.5 million. *See* 345 at MLB_EM00009124 (the "March 2016 Appraisal"). Like Mr. McArdle's verbal consultation, this March 2016 Appraisal—reporting less than one-fifth of the value that Mr. Trump had most recently asserted on his financial statements and certified as accurate to financial institutions—substantially undermines the assertions in Mr. Trump's Statements of Financial Condition: from 2008 through 2014, the Statements assigned valuations for Seven Springs that range from $200 million to $291 million. Ex. 312 at MAZARS-NYAG-00000733; Ex. 346. And as noted below, OAG has identified evidence that the March 2016 Appraisal itself relied on questionable assumptions indicating misrepresentations and significant omissions—such that even the $56.5 million valuation in that appraisal was improperly inflated.

49.     Further, after receiving the March 2016 Appraisal, Mr. Trump's subsequent Statement of Financial Condition was changed in a manner that disguised what would otherwise have appeared as a more than 80% drop in the value of Seven Springs, which had been reported to be worth $291 million for the three preceding years.

50.     In prior years, the asserted value for Seven Springs was listed individually on the summary page or property description for each financial statement. *See* Ex. 305 at 17; Ex. 306 at 17; Ex. 307 at 15; Ex. 308 at 16; Ex. 309 at MAZARS-NYAG-00003148; Ex. 310 at MAZARS-NYAG-00006325; Ex. 311 at MAZARS-NYAG-00000052; Ex. 312 at MAZARS-NYAG-00000733.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

RECEIVED NYSCEF: 01/24/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 18 of 116

51.    Mr. Trump's financial statement as of June 30, 2015 (which was not issued until March 2016), does not identify any value for the Seven Springs property. Ex. 313 at MAZARS-NYAG-00000691-92.

52.    The property was instead moved into a catch-all category entitled "other assets," where its value was part of that category's total but not separately itemized. *See* Ex. 313 at MAZARS-NYAG-00000710-12.

53.    Between the 2014 and 2015 financial statements, the "other assets" category was reported to have increased in value by $219.6 million, with the Seven Springs property representing a significant asset transferred to this category. *Compare* Ex. 312 at MAZARS-NYAG-00000717 (reporting "other assets" worth $338 million), *and id.* at MAZARS-NYAG-00000736-37 (listing assets included in this category); *with* Ex. 313 at MAZARS-NYAG-00000691 (reporting "other assets" worth $557.6 million), *and id.* at MAZARS-NYAG-00000710-12 (listing assets included in this category).

54.    In that same "other assets" category in 2015, the data supporting the financial statement reflects that there was a $127 million increase in the reported value of Mr. Trump's triplex apartment in Trump Tower from $200 million to $327 million, a 64 percent increase in reported value in a single year. Ex. 324 at rows 819-904.

55.    Because none of the assets in the "other assets" category were given individual line-item values on the Statement of Financial Condition, the $127 million increase in asserted value for Mr. Trump's triplex apartment helped disguise a substantial drop in the value of Seven Springs, which had been transferred to the same "other assets" category.

56.    With respect to Mr. Trump's triplex apartment in Trump Tower, OAG has discovered that the valuations of this asset as incorporated into the Statements of Financial

16

Condition since at least 2012 were based on the assertion that the triplex apartment was 30,000 square feet in size. Evidence indicates that Mr. Weisselberg and Mr. McConney both participated in such valuations. *See, e.g.*, Ex. 347 at MAZARS-NYAG-00003611.

57.     Further, there is evidence that documents demonstrating that the actual size of Mr. Trump's triplex apartment was only 10,996 square feet (namely the condominium offering plan and associated amendments for Trump Tower) were easily accessible inside the Trump Organization, were signed by Mr. Trump, and were sent to Mr. Weisselberg in 2012. *See* Ex. 348; Ex. 349 at LC00132530, -37.

58.     The supporting data for Mr. Trump's 2015 financial statement reported the value of Mr. Trump's triplex apartment as $327 million, based on the apartment having 30,000 square feet of space multiplied by a certain price per square foot. Ex. 324 at rows 882-883. This assertion was repeated in the supporting data for Mr. Trump's 2016 financial statement. Ex. 325 at row 913.

59.     Without mention in the financial statement, the supporting data for Mr. Trump's 2017 financial statement presented yet another change in the valuation, stating the value of Mr. Trump's triplex apartment as $116.8 million. Ex. 326. But for the first time in 2017, the supporting data states that the triplex apartment had only 10,996.39 square feet. Ex. 326. Because these valuations were performed by multiplying the number of square feet times a price per square foot, the reduction in the apartment's square footage in the valuation from 30,000 to 10,996 indicates that the valuations of Mr. Trump's triplex in the 2015 and 2016 were overstated almost by a factor of three, as Mr. Weisselberg conceded in his testimony. Mr. Weisselberg admitted that this amounted to an overstatement of "give or take" $200 million. Ex. 351 at 507:05-22 ("Q: In fact, overstated by a factor of 3, is that correct? A: I didn't do the math, but it

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 20 of 116    RECEIVED NYSCEF: 01/24/2022

should be one third, yes, I would agree with that. Q: So, it's on the order of a $200 million overstatement, give or take? A: Give or take.").

60.     A Trump Organization employee who assisted in these valuations testified that he had prepared the spreadsheets. He accepted that there was "a fairly large discrepancy in the square footage listed for this asset in the two spreadsheets [he] prepared." He stated that he had "probably" discussed the discrepancy with "either Jeff McConney or Allen Weisselberg." Ex. 352 at 267:17-271:12

61.     Publicly available information indicates that Mr. Trump himself has stated his triplex apartment in Trump Tower was approximately 30,000 square feet in size or larger. For example, a 2017 article in *Forbes* magazine states: "During the presidential race, Donald Trump left the campaign trail to give Forbes a guided tour of his three-story Trump Tower penthouse— part of his decades-long crusade for a higher spot on our billionaire rankings. . . . [Mr. Trump] bragged that people have called his Manhattan aerie the 'best apartment ever built' and emphasized its immense size (33,000 square feet) and value (at least $200 million). 'I own the top three floors—the whole floor, times three!'" Ex. 353. The article evaluated whether the apartment was actually 30,000 square feet or more in size, and referred to a review of records, "[t]he end result [of which was] 10,996 square feet of prime Manhattan real estate—a massive residence, no doubt, but much smaller than what Trump claims to own." Ex. 353.

### 2.    Trump International Golf Club Scotland – Aberdeen

62.     Trump International Golf Club Scotland ("Trump Aberdeen") is a parcel of land containing a golf course, a country club, and undeveloped land in Aberdeen, Scotland. The entire property was purchased in 2006 for $12.6 million by the Trump Organization. Ex. 354 at 2.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630          Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 21 of 116          RECEIVED NYSCEF: 01/24/2022

63.     Trump Aberdeen has been included as an asset on Mr. Trump's Statements of

Financial Condition each year from 2011 to 2019. Ex. 309 at MAZARS-NYAG-00003144; Ex.

310 at MAZARS-NYAG-00006321; Ex. 311 at MAZARS-NYAG-00000046; Ex. 312 at

MAZARS-NYAG-00000729; Ex. 313 at MAZARS-NYAG-00000703; Ex. 314 at MAZARS-

NYAG-00001995; Ex. 315 at MAZARS-NYAG-00001854; Ex. 316 at MAZARS-NYAG-

00002737; Ex. 317 at DB-NYAG-230542.

64.     The Statements of Financial Condition do not list an individual value for the

property. Instead, the value of Trump Aberdeen, as recorded in the supporting data for the

respective financial statements, is grouped together with a series of other properties in a

category called "Club Facilities and Related Real Estate." Ex. 309 at MAZARS-NYAG-

00003140; Ex. 310 at MAZARS-NYAG-00006317; Ex. 311 at MAZARS-NYAG-00000043;

Ex. 312 at MAZARS-NYAG-00000723; Ex. 313 at MAZARS-NYAG-00000697; Ex. 314 at

MAZARS-NYAG-00001989; Ex. 315 at MAZARS-NYAG-00001848; Ex. 316 at MAZARS-

NYAG-00002731; Ex. 317 at DB-NYAG-230536. The result is that a recipient of the financial

statement receives a bottom-line figure for all of those clubs and related properties—but is kept

from learning, from the statement, the value assigned to any particular club in that category.[4]

65.     In 2011, the valuation for Trump Aberdeen in the supporting data that the Trump

Organization provided to Mazars was based on capital contributions from inception and an

estimate of value for the undeveloped land on the property of £75,000,000 "per George Sorial

email 9/6/2011." Ex. 321 at row 533.

---

[4] The Statements of Financial Condition claim, among other things, that the valuations of
the category "Club Facilities and Related Real Estate" were reached in an "assessment [that] was
prepared by Mr. Trump working in conjunction with his associates and outside professionals."
Ex. 312 (2014 Statement at 8). *See also* Ex. 309 at MAZARS_NYAG_00003140; Ex. 307 at 8.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 22 of 116    RECEIVED NYSCEF: 01/24/2022

66.     The referenced email had the subject line "Forbes Magazine," and contained a quote Mr. Sorial provided to an accountant in Scotland who was then expected to pass the information on to *Forbes* Magazine. Ex. 355. The quote stated: "Although a formal appraisal has not been prepared at this point, after speaking with specialists in the field and having closely watched this development transform itself over the last five years, we are informed that the value for the residential/hotel land parcels could achieve a value in excess of 75 million [British pounds sterling]." Ex. 355 at TTO_008977.

67.     It thus appears that the valuation of Trump Aberdeen used for Mr. Trump's financial statement was prepared for purposes of providing information to *Forbes* magazine in a quote. Ex. 355.

68.     Converted to U.S. dollars, the Trump Organization's asserted value of Trump Aberdeen in 2011 was $161 million. *See* Ex. 356 at rows 527-543.

69.     In April 2012, Donald Trump testified to the Scottish Government that he "cannot proceed with [the development] if the hotel is going to be looking at industrial turbines, and no one here would do so if they were in my position."[5]

70.     Mr. Sorial's "Forbes Magazine" email was a component of the Trump Organization's 2012 and 2013 valuations of Trump Aberdeen as well. *See* Ex. 356 at rows 527-543; Ex. 322 at rows 487-503.

71.     The Trump Organization valued Trump Aberdeen at $435.56 million for purposes of Mr. Trump's 2014 financial statement; that figure was more than double the 2013 valuation for the same property. Ex. 323 at cell H527. Of the asserted $435.563 million valuation in 2014,

---

[5] Donald Trump Testifies on Wind Turbines to the Scottish Parliament - April 25, 2012, at 01:47:31 - 01:47:58, https://www.youtube.com/watch?v=HX4J1a8gy6I&t=6465s. Transcript available at https://factba.se/transcript/donald-trump-testimony-wind-scotland-april-25-2017.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630   Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 23 of 116   RECEIVED NYSCEF: 01/24/2022

more than four-fifths of the value ($361.393 million) was derived from the Trump

Organization's estimate of the residential development potential of the property. Ex. 323 at

rows 519-526.

72.     The 2014 Statement of Financial Condition reports that the Trump Organization

"received outline planning permission in December 2008 for . . . a residential village consisting

of 950 holiday homes and 500 single family residences and 36 golf villas." Ex. 312 at

MAZARS-NYAG-00000729. This is a total of 1,486 homes. But the supporting data for the

2014 valuation contained a residential parcel valuation based on the development potential of

2,500 homes. Ex. 323 at row 521. Mr. Weisselberg testified that he could not explain this

discrepancy. Ex. 357 at 299:03-300:09, 302:06-17.

73.     In 2014, shortly before the Trump Organization finalized Mr. Trump's Statement

of Financial Condition (including the $361.393 million asset valuation for the residential

development potential at Aberdeen), the Trump Organization, consistent with Donald Trump's

testimony to the Scottish government, represented in an audited financial statement that it did

not intend any residential development on the property for the foreseeable future. Ex. 358 at

TTO_009941. Specifically, in the "Director's report and financial statements for the year ended

31 December 2013," submitted to a UK regulator and signed on September 29, 2014, the Trump

Organization wrote: "the hotel, second golf course, and future phases of the project have been

postponed until such time that the Scottish Government and regional Councils have reversed

their stance on supporting the wind farm development being considered for Aberdeen Bay." Ex.

358 at TTO_009941-42, -9947.

74.     Mr. Weisselberg signed the audited statement as an officer of Trump International

Golf Club Scotland. Ex. 358 at TTO_009942, -9946, -9948.

21

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

RECEIVED NYSCEF: 01/24/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 24 of 116

75.    The valuation of Trump Aberdeen in the 2014 supporting data which was ultimately reflected on the 2014 Statement of Financial Condition did not account for this indefinite postponement of residential development. Ex. 351 at 357:09-15.

76.    As was the case with the valuation of the Seven Springs residential development (see *supra* at ¶¶ 37-38), the valuation for Trump Aberdeen did not account for the time it might take to secure any needed approvals, develop the property, and market the property. Ex. 351 at 398:24-399:24; Ex. 323 at rows 519-526. Supporting data for the Statements of Financial Condition for 2015 and 2016 do not reflect, in the valuation of Trump Aberdeen, any consideration of the time it might take to secure any needed approvals, develop the property, and market the property. Ex. 324 at rows 530-539; Ex. 325 at rows 563-571.

77.    OAG has learned of additional information that further calls into question the valuation of the Aberdeen property on the Statement of Financial Condition.

78.    For example, the Trump Aberdeen valuations described above—computing a valuation principally based on building 2,500 homes—assumes that 2500 homes would have the same characteristics (and the same value per home). This ignores that, as the Statements notes, of the 1,486 homes that were purportedly the recipient of some level of approval, 950 of the homes were to be "holiday homes" and 36 were to be "golf villas." OAG has obtained evidence indicating that such properties—under the terms governing Trump Aberdeen—would be rental properties and no individual could rent one for more than six weeks at a time. Ex. 359 at 5.

79.    In 2017 the Trump Organization commissioned an appraisal which suggested that if 557 private homes (which exceed the approved amount) were built that would result in a total net present valued profit of £16-19 million. Ex. 360 at TTO_242033. The Trump Organization

22

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 25 of 116    RECEIVED NYSCEF: 01/24/2022

valued the undeveloped residential land at more than ten times that amount, £212,160,000, that

year. Ex. 326 at G582.

### 3. The "Trump" brand

80.     The financial statements explicitly state that, according to GAAP, the statements

do not incorporate any intangible brand value. In particular, the financial statements assert that,

although Mr. Trump's name "enhances the value of the properties reflected in this statement,"

that value "has not been reflected in the preparation of this financial statement." Ex. 309 at

MAZARS-NYAG-00003136. A similar proviso is included each year from 2012-2020. Ex. 310

at MAZARS-NYAG-00006313; Ex. 311 at MAZARS-NYAG-00000039; Ex. 312 at MAZARS-

NYAG-00000719; Ex. 313 at MAZARS-NYAG-00000693; Ex. 314 at MAZARS-NYAG-

00001986; Ex. 315 at MAZARS-NYAG-00001845; Ex. 316 at MAZARS-NYAG-00002731;

Ex. 317 at MAZARS-NYAG-161792; Ex. 318 at MAZARS-NYAG-00162250.

81.     The language in the 2016 Statement is depicted below:

> This financial statement does not reflect the value of Donald J. Trump's worldwide
> reputation; however, the brand value has afforded Mr. Trump the opportunity to
> participate in licensing deals around the globe as reflected on the statement of financial
> condition herein (see Note 5). Mr. Trump's name conveys a high degree of quality and
> profitability. This prestige significantly enhances the value of the properties reflected
> in this financial statement, as well as that of future projects. The brand along with the
> level of quality of Mr. Trump's residential developments has allowed the selling price
> per square foot in Trump properties to be amongst the highest among prominent real
> estate developers. The goodwill attached to the Trump name has significant financial
> value that has not been reflected in the preparation of this financial statement.

Ex. 314 at MAZARS-NYAG-00001986.

82.     Mr. Trump was personally aware of the fact that his Statement of Financial

Condition represented that no brand value was included. In a letter to CSG Investments Inc., for

example, Mr. Trump wrote:

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 26 of 116    RECEIVED NYSCEF: 01/24/2022

I am also enclosing a letter that establishes my brand value, which is not included in my net worth statement, from Predictiv, the most respected branding valuation company in the country. Among the companies they represent are Major League Baseball, Southwest Airlines, Pfizer, Petrobras, General Motors, UPS, Visa, BASF, and United Technologies.

With best wishes,



Sincerely

Donald J. Trump

Ex. 534.

83.    The Statement's representation regarding the absence of brand value is false (or, at a minimum, misleading). As described below, the Statement of Financial Condition includes an added brand premium for most of the properties in the Club Facilities and Related Real Estate category.

84.    The Statements of Financial Condition include a category of assets called "Club Facilities and Related Real Estate." *See, e.g.*, Ex. 309 at MAZARS-NYAG-00003134. Values assigned to the assets in this category are summed together, with only the overall figure reported to recipients of the financial statement, who are kept from learning, from the statement, the value assigned to any particular club in that category.

85.    Beginning in the year 2013 nearly all properties in this category are valued based on, at least in part, a metric entitled "fixed assets." Ex. 322; Ex. 323; Ex 324; Ex. 325; Ex. 326 at MAZARS-NYAG-00002024; Ex. 327 at MAZARS-NYAG-00002772; Ex. 328 at MAZARS-NYAG-00161836; Ex. 329 at MAZARS-NYAG-00162291.

86.    According to the Trump Organization Controller Jeffrey McConney, when the Trump Organization was valuing golf clubs, the label "fixed assets" encompassed cash spent to build the clubhouse and any improvements. Ex. 337 at 64:06-11.

INDEX NO. 451685/2020
NYSCEF DOC. NO. 630                                    RECEIVED NYSCEF: 01/24/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 27 of 116

87.     For the 2013 and 2014 Statements, the Trump Organization added thirty percent to the "fixed assets" metric it had used for several clubs. The label associated with that 30% premium was, "fully operational branded facility." That premium was applied to the Trump Organization's golf clubs at Colts Neck, Washington D.C., Hudson Valley, Philadelphia, Jupiter (Florida), Charlotte, and Los Angeles. Ex. 322; Ex. 323.

88.     For each Statement from 2015 to 2020 the value of the Trump golf clubs at Colts Neck, Washington D.C., Hudson Valley, Philadelphia, Jupiter, Charlotte, and Los Angeles included a fifteen-percent premium in addition to fixed assets for a "fully operational branded facility." Ex. 324; Ex. 325; Ex. 326 at MAZARS-NYAG-00002024; Ex. 327 at MAZARS-NYAG-00002772; Ex. 328 at MAZARS-NYAG-00161836; Ex. 329 at MAZARS-NYAG-00162291.

89.     For the Statements from 2013 to 2018, the brand premiums for Colts Neck, Washington D.C., Hudson Valley, Philadelphia, Jupiter, Charlotte, and Los Angeles were all purportedly based on a 2013 phone call with an outside golf club professional. *See e.g.*, Ex. 324 at rows 383-386. The supporting data from the Trump Organization asserts, as a basis for the premium, that the Organization was told by the professional that "Trump branded clubs are more valuable than most golf courses." Ex. 322 at rows 306-307.

90.     That outside professional testified that it would never be his practice to value a golf course based on fixed assets or add a premium to fixed assets to value a golf course. Ex. 361 at 82:10-25.

91.     That outside golf club professional, who is the only outside professional listed on the Colts Neck, Washington D.C., Hudson Valley, Philadelphia, Jupiter, Charlotte, and Los Angeles golf club valuations for the Statements from 2013-2018, denied ever having provided a

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

RECEIVED NYSCEF: 01/24/2022

valuation of, or a brand premium number for, any Trump golf courses during this time period. Ex. 361 at 70:19-21, 95:04-96:16.

92.     As discussed below at ¶¶ 160-190, Mr. Trump's Statements of Financial Condition were submitted to counterparties to seek or obtain credit and insurance, and to comply with covenants on existing loans that required periodic submission of financial statements. Ex. 362 at DB-NYAG-003049; Ex. 363 at DB-NYAG-059810-13.

93.     Mr. Trump personally guaranteed several of those loans and at least one insurance program, and those personal guarantees required that Mr. Trump certify that he accurately represented his financial condition. See, e.g., Ex. 363 at DB-NYAG-059810, -059813, -059821-22; Ex. 346 at DB-NYAG-060415.

94.     Donald Trump was required to submit his Statement of Financial Condition and maintain a certain minimum net worth in order to comply with covenants on loans that he personally guaranteed. See Exs. 356, 364, 365, 366.

95.     The agreed upon definition of net worth in the loan documentation of one bank excluded brand value. "For purposes hereof, the goodwill attached to the Trump name shall be excluded from the calculation of Guarantor's assets, as stated in Note 1 of the Notes to Statement of Financial Condition of Guarantor's Statement of Financial Condition, dated as of June 30, 2011." Ex. 356 at DB-NYAG-004173; Ex. 364 at DB-NYAG-038873 (relying on note 1 to the 2012 SOFC); Ex. 365 at DB-NYAG-003223 (relying on Note 1 to the 2012 SOFC); Ex. 366 at DB-NYAG-003279 (relying on Note 1 to the 2013 SOFC). Similarly, the underwriting guidelines of one insurer which provided coverage to the Trump Organization specify that intangible assets such as brand value be excluded from financial statements. Ex. 367 at 98:02-98:18.

INDEX NO. 451685/2020
NYSCEF DOC. NO. 630
RECEIVED NYSCEF: 01/24/2022

96.    Accordingly, at least one financial institution who lends to, and at least one insurer of, the Trump Organization have policies which treats brand value as worthless in their analysis and requires they not consider it for purposes of determining net worth. Ex. 368 at DB-NYAG-001697, 1701; Ex. 369 at 184:20-185:18; Ex. 367 at 98:02-98:18.

97.    The originating credit risk manager for those loans stated that if brand value were included in Mr. Trump's reported net worth that it would constitute a breach of the net worth covenant. Ex. 369 at 202:20-203:11.

98.    As is discussed below, an underwriter for the Trump Organization's surety program stated that if she were aware brand value had been included in Donald Trump's Statement of Financial Condition, she would have been required to reduce reported net worth accordingly. Ex. 367 at 98:02-98:18.

### 4.    Trump National Golf Club – Westchester

99.    Mr. Trump purchased Trump National Golf Club Westchester ("Briarcliff") for $8,500,000. Ex. 311 at MAZARS-NYAG-0000044. The property has been included as an asset on Mr. Trump's Statements of Financial Condition from 2004 to present.

100.    As discussed supra at ¶¶ 84-85, the Statements of Financial Condition do not list an individual value for the Briarcliff property; instead, the value of the property, as recorded in the supporting data for the financial statement, is grouped together with a series of other properties in a category called "Club Facilities and Related Real Estate." The result is that a recipient of the financial statement receives a bottom-line figure for all items in that category together—but cannot identify the value assigned to any particular club in that category.

101.    In the 2011 supporting data document the property was valued at $68,703,300. Ex. 320 at G300. That valuation was broken down into multiple components. First was the value of the initiation fee for 67 unsold memberships totaling $12,775,000. Although the supporting

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630                                                          RECEIVED NYSCEF: 01/24/2022

data spreadsheet states that the club was currently "getting $150,000" per membership, the

Trump Organization derived $12,775,000 in value by computing a value with 47 of the 67

unsold memberships priced higher than that amount, in many instances by $100,000 each. Ex.

320 at G265-284. Next, the valuation included $28 million for the cost to construct the clubhouse

and $2,828,300 in receivables from members. Ex. 320 at G288-293. Furthermore, the valuation

included an estimate of $25,100,000 for the expected profit from the sale of 31 mid-rise units

"put on hold." Ex. 320 at G295-298

102.    According to TTO membership records, even the representation that the club was

"getting $150,000 per membership" in June 2011 was false: Records indicate that many

members paid no deposit for their memberships in 2011. Ex. 370.

103.    In March 2012, the club sought to increase membership through a strategy that

"has been discussed several times with Mr. Trump and will be implemented per his instructions."

Ex. 371 at TTO_02360603. The goal was to bring in 75 new members in order to generate

maximum revenue for the club and the instructions note that memberships should be sold dues

only with no initiation fee in order to achieve that goal. Ex. 371 at TTO_02360603-04.

104.    According to TTO membership records no new members paid an initiation fee in

2012. Ex. 370.

105.    Increasing the number of new members and not collecting initiation fees would

reduce the remaining number of unsold memberships available for sale and thereby the listed

value of Briarcliff on the Statement of Financial Condition.

106.    However, after the strategy change directed by Mr. Trump, his Statement of

Financial Condition stopped computing the value of the Briarcliff property using unsold

memberships: The Briarcliff valuation was done using "fixed assets" instead of unsold

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630                                                      RECEIVED NYSCEF: 01/24/2022

membership prices for the 2012 Statement of Financial Condition. As discussed *supra,* ¶ 86,

"fixed assets" referred to the cost to build the clubhouse and any improvements to the property.

The value of fixed assets was $71,200,000. Ex. 321 at H280. When added to the receivables

from members of $3,207,000 and the estimate of $25,100,000 for the expected profit from the

sale of 31 mid-rise units "put on hold" the total reported value of the property reached

$99,507,000. Ex. 321 at H273-287.

107.    These valuations do not take into account the time value of money.

108.    The Briarcliff property increased in valuation on Mr. Trump's Statement of

Financial Condition by at least over $30 million from 2011 to 2012, mostly because of this

change in methods. The change in methods and the concomitant increase were concealed from a

reader of the statement of financial condition. This is because a reader of the statement only sees

a total value for the category "Club facilities and related real estate" rather than an individual

valuation for each property.

109.    Although the statement discloses that "cash expenditures to improve certain

facilities" is a method of valuation used in the club facilities and related real estate category,

there is no way to ascertain that the methodology switched for Briarcliff in particular.

110.    In the supporting data for the financial statement issued on October 28, 2013,

Briarcliff's "fixed assets" were $72,354,000, its receivables from members were $2,160,000, and

the spreadsheet listed an additional value of $101,748,600 for the profit from a sellout of "71

Mid Rise units approved but put on hold," for a total of $176,262,600. The source of this

valuation was a telephone conversation with Eric Trump. See Ex. 311 at Mazars-NYAG-

0000036; Ex.322 at G253-273.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 32 of 116    RECEIVED NYSCEF: 01/24/2022

111.    Without the supporting data document, a reader of the financial statement would be unaware that the value of Briarcliff increased by over $75 million from 2012 to 2013, and by over $100 million from 2011 to 2013. A reader of the statement would also be unaware that this increase in value came in part from adding 40 homes and over $75 million in additional profit to the forecast of a project that was "on hold."

112.    Starting in 2013, the Trump Organization considered donating a conservation easement over the land where the 71 undeveloped mid-rise units would go. During that process the Trump Organization and outside tax counsel Ms. Dillon hired an appraiser, who reached several preliminary valuations. Yet, as illustrated in the below chart, the Statement of Financial Condition value ignored the preliminary valuations.

| Year | Trump Statement Values[6] | Preliminary Appraised Values[7] | Citation for Appraised Values |
|---|---|---|---|
| 2013 | $101,748,600 | $45,000,000 | Ex. 372 at VE_00008043 |
| 2014 | $101,748,600 | $43,300,000. | Ex. 373 at C&W_0056373 |
| 2014 | $73,130,987 in golf club fixed assets | $16,500,000 value of golf club using income approach | Ex. 373 at C&W_0056373 |
| 2015 | $101,748,600 | $45,200,000. | Ex. 374 at C&W_0052753-54 |
| 2016 | $101,748,600 | $45,200,000. | Ex. 374 at C&W_0052753-54 |
| 2016 | $177,697,732 entire property | $8,960,000 market value or $15,124,300 "full value based on [assessed value]" | Ex. 375 at PDF 5. |

---

[6] Values refer to the 71 mid-rise units as listed in the supporting data (Ex. 322 at rows 277-281; Ex.323 at rows 263-267; Ex. 324 at 265-269) unless otherwise noted.

[7] Values refer to the 71 mid-rise units unless otherwise noted.

30

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

RECEIVED NYSCEF: 01/24/2022

113.    Each appraisal discussed in the table above appears to have been prepared using standard methodologies—such as reaching a market value for a business entity based on its income performance, and valuing proposed residential property based on comparable sales data and time factors. There was no apparent basis for the Trump Organization to disregard such professionally prepared information in favor of the "fixed assets" method that is an accounting of past expenditures or the method that Eric Trump used.

### 5.    Trump Park Avenue

114.    Mr. Trump's Statements of Financial Condition include a property called "Trump Park Avenue." *See, e.g*., Ex. 311 at MAZARS-NYAG-00000034, 42-43. Trump Park Avenue is reflected on Mr. Trump's Statement of Financial Condition for the years 2011 through 2020. Ex. 311 at MAZARS-NYAG-00000037, -42-43; Ex. 310 at MAZARS-NYAG-00006311, 6316-17; Ex. 311 at MAZARS-NYAG-00000037, 0042-43; Ex. 312 at MAZARS-NYAG-00000717, 722-23; Ex. 313 at MAZARS-NYAG-0000691, 96-97; Ex. 314 at MAZARS-NYAG-00001983, 1988-89; Ex. 315 at MAZARS-NYAG-00001842, 47-48; Ex. 316 at MAZARS-NYAG-00002725, 30-31; Ex. 317 at MAZARS-NYAG-00161790, 95-96; Ex. 318 at MAZARS-NYAG-00162248, 58. In these years, the property was reported as representing between $135 and $350 million of Mr. Trump's total assets. *Id*. Evidence obtained by the Attorney General establishes that unsold residential condominium units represented the lion's share of reported value (in excess of 95% in some years). On the 2011 Statement of Financial Condition, the reported value of the asset was $311,600,000, with unsold residential units comprising $293,122,750 of that value. Ex. 320 at G163-178.

115.    Evidence obtained by OAG indicates both that the reported values of the unsold residential units of the Trump Park Avenue building and representations regarding those values were inaccurate or misleading.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 34 of 116

RECEIVED NYSCEF: 01/24/2022

116. The earliest outside valuation of the property identified by OAG consists of an appraisal performed in 2010 by the Oxford Group in connection with a $23 million loan from Investors Bank. As the appraisal identified, the collateral consisted of twenty-three residential units (twelve of which were rent stabilized), two commercial spaces, and six storage spaces. Ex. 376 at TTO_233905; Ex. 377 at TTO_234022. The appraisal valued the collateral at $72.5 million. Ex. 376 at TTO_233905. Approximately $55.1 million of that was derived from the residential and storage units. Ex. 377 at TTO_234055-56.[8][9] The appraisal valued twelve rent-stabilized units at $750,000 total, noting that the rent-stabilized units "cannot be marketed as individual units" because the "current tenants cannot be forced to leave." Ex. 377 at TTO_234022.

117. Mr. Trump's Statements of Financial Condition in 2010, 2011, and 2012 valued the unsold residential units in Trump Park Avenue at more than $292 million, or roughly six times the 2010 appraised value attributable to the residential and storage units. Ex. 320 at H163-178; Ex. 320 at G163; Ex. 321 at H166.

118. Evidence indicates that the Trump Organization routinely prepared estimates of current market value for unsold residential units at Trump Park Avenue that conflicted with the much higher values reported on Mr. Trump's Statement of Financial Condition and failed to account for rent-stabilized units that could not be marketed.

---

[8] $55.1 million is a figure resulting from the percentage (76%) of a key valuation variable (effective gross revenue) attributable to income streams other than the building's commercial units. Ex. 377 at TTO_234044, 055.

[9] The appraisal also contained what is known as a "sum of gross sellout" of each unsold condominium unit using comparable properties totaling $164 million. Ex. 377 at TTO_234024-25, 56. The gross sellout figure determined the percentage of the loan collateral that was released if an unsold unit was sold to pay down the loan. Ex. 378 at TTO_03003564.

INDEX NO. 451685/2020
NYSCEF DOC. NO. 630                                                RECEIVED NYSCEF: 01/24/2022

119.    In the Statements of Financial Condition for 2010, 2011, 2012, 2013, 2014, and 2015 (the last of which was finalized in March 2016), the Trump Organization used offering plan[10] or selling prices to value unsold residential condominium units at Trump Park Avenue—not estimates of current market value. *See* Ex. 379 at TTO_009309; Ex. 380 at MAZARS-NYAG-00003290; Ex. 381 at MAZARS-NYAG-00003476; Ex. 382 at MAZARS-NYAG-00000184; Ex. 383 at MAZARS-NYAG-00000445; Ex. 384 at MAZARS-NYAG-00000846; *see also*, Ex. 352 at 398:15-399:15; 400:12-403:09.

120.    But the Trump Organization maintained its own internal estimates of current market value that were considerably lower than the values employed for Mr. Trump's Statements of Financial Condition. Evidence indicates that, as far back as 2012 (and perhaps earlier),[11] the Trump Organization's in-house real estate brokerage (Trump International Realty) prepared Sponsor Unit Inventory Valuation spreadsheets reflecting *both* offering plan prices and current market values that included unsold units at Trump Park Avenue. Ex. 385 (2012); Ex. 386 (2013); Ex. 387 (2014). These spreadsheets reflected market valuation information for multiple Trump Organization condominium buildings.

121.    Evidence indicates that Trump Organization employees used these sponsor unit valuation spreadsheets—reflecting internal estimates of market value and offering plan prices—

---

[10] Before the sponsor of a condominium may offer units for sale, it is required to file an offering plan with the New York State Department of Law. GBL §352-e. The offering plan must, at a minimum, contain in detail the terms of the transaction and be complete, current, and accurate, and disclose all material facts relevant to a decision to purchase a unit, including the maximum price, as determined by sponsor, for units that are offered for sale. A sponsor may not offer units for sale at prices higher than those disclosed in the offering plan without first filing an amendment to the offering plan changing the maximum offering prices.

[11] This practice may have occurred earlier. Jeff McConney testified that, when he was responsible for preparing the Statement of Financial Condition, he asked Trump International Realty for current market value figures on Trump Park Avenue. Ex. 388 at 745:04-17.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 36 of 116    RECEIVED NYSCEF: 01/24/2022

for day-to-day operations and business planning, but used offering plan prices rather than the company's actual estimates of current market value when reporting the current market value of those units for Mr. Trump's Statements of Financial Condition. *Compare* Ex. 381 at MAZARS-NYAG-3476 with Ex. 385 at TTO_01226369 Column C; Ex. 382 at MAZARS-NYAG-00000184] with Ex. 386 at Column F; Ex. 383 at MAZARS-NYAG-00000445 with Ex. 387 at Column F.

122.    The results were considerable differentials in reported value as shown in the following chart:

| Year | Total Offering Plan Price used for Statement of Financial Condition | Total Current Market Value Prepared by Trump | Difference in Value | Source |
|------|------|------|------|------|
| 2012 | $293,122,750 | $236,425,000 | $56,697,750 | Ex. 385 at TTO_01226369 |
| 2013 | $326,854,500 | $285,795,000 | $41,059,000 | Ex. 386 TTO_010644 |
| 2014 | $326,854,500 | $246,265,000 | $80,589,500 | Ex. 387 at TTO_010663 |

123.    The figures in the above charts, both offering plan prices and current market value prices, do not include any reductions to account for reduced marketability due to rent stabilization. If they had, information available to the Trump Organization indicates that the valuation of Trump Park Avenue would have significantly decreased. For instance, from 2010-2012 the twelve rent stabilized units were valued collectively at $49,596,000—a rate 98.5 percent higher than the $750,000 valuation for those units in the 2010 appraisal, which valued them based on their rent-stabilized status. Ex. 377 at TTO_234022; Ex. 379 at TTO_009309; Ex. 380 at MAZARS-NYAG-00003290; Ex. 381 at MAZARS-NYAG-3476.

124.    Valuations in future years also ignored the impact of rent stabilization on units owned by Mr. Trump or the Trump Organization. Unit 15A was rent stabilized and the subject of

litigation in which the Trump Organization intervened.[12] Yet the Trump Organization's internal sponsor unit valuation merely computed the value of that unit based on a price per square foot figure and the unit's square footage—without any consideration of the unit's rent-stabilized status. *See* Ex. 352 at 405:10-406:19; Ex. 389; Ex. 390; Ex. 391.

125.    The Trump Organization's own conduct beginning in late 2016 or early 2017 reflects an understanding that reporting offering plan prices as the estimated current values of unsold Trump Park Avenue units—rather than its own, lower assessment of these units' actual current market values—was incorrect and misleading. Beginning with the June 30, 2016 Statement of Financial Condition—finalized in March 2017—the Trump Organization changed its practice and began reporting its current market value estimates for purposes of that financial statement.[13] Ex. 315 at MAZARS-NYAG-00001982; Ex. 392 at MAZARS-NYAG-00001433; Ex. 326 at H182.

126.    Apart from those discrepancies, statements on Mr. Trump's Statements of Financial Condition reflecting the manner in which those valuations were reached appear to be inaccurate and misleading. In particular, the Statements of Financial Condition from at least 2011 through 2019 reflect, in sum and substance, that the reported values were **"based upon an evaluation made by Mr. Trump in conjunction with his associates *and outside professionals*,"**[14]

---

[12] *Blaise Cossalino v. The New York State Division of Housing and Community Renewal, Trump Park Avenue LLC, The Trump Corporation*, NYSCEF Doc. 33 INDEX NO. 161368/2020 (Sup. Ct. N.Y. Cty.).

[13] A Trump Organization Assistant Vice President, who evidence indicates had a substantial role in preparing the Statement of Financial Condition beginning with the June 30, 2016 statement, testified that he could "not recall a decision to change the practice to reporting current market value," but that he probably "would have been instructed" to do so by Jeff McConney or Allen Weisselberg. Ex. 352 at 404:06-25.

[14] In years from June 30, 2016 and later, "the Trustees" were referenced instead of "Mr. Trump," but the references to "outside professionals" remained.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

RECEIVED NYSCEF: 01/24/2022

thereby leading the reader to believe that the manner of valuation included consultation with outside professionals. Ex. 309 at MAZARS-NYAG-00003140; *see also* Ex. 310 at MAZARS-NYAG-00006317; Ex. 311 at MAZARS-NYAG-00000043; Ex. 312 at MAZARS-NYAG-00000724; Ex. 313 at MAZARS-NYAG-0000697; Ex. 314 at MAZARS-NYAG-00001989; Ex. 315 at MAZARS-NYAG-00001848; Ex. 316 at MAZARS-NYAG-00002731; Ex. 317 at MAZARS-NYAG-00161796.

127.    Despite review of considerable evidence, including backup material provided to the Mazars accounting firm, OAG has been unable to identify any evidence indicating that any consultation with any outside professional occurred in connection with reporting the value of unsold residential condominium units at Trump Park Avenue for the Statement of Financial Condition in those years.

128.    In 2020, Jeffrey McConney was questioned about various references to "outside professionals" on the Statements of Financial Condition. Ex. 337 at 272:22-273:13 (reference to outside professionals regarding Seven Springs); 277:25-279:10 (same); 320:05-321:12 (club facilities); Ex. 388 at 772:19-776:21 (Niketown).

129.    After Mr. McConney testified, the 2020 Statement of Financial Condition was issued. That Statement of Financial Condition, unlike those that came before it for many years, omitted any contention that any specific valuation was reached in consultation with any outside professional. Instead, the 2020 Statement references outside professionals as one factor that may have been included or "applicable" in preparing various unidentified valuations reflected on the statement. Ex. 318 at MAZARS-NYAG-00162251.