# 22-1175

## United States Court of Appeals for the Second Circuit



DONALD J. TRUMP and TRUMP ORGANIZATION LLC,

*Plaintiffs-Appellants,*

v.

LETITIA JAMES in her official capacity as
Attorney General for the State of New York,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK (Syracuse)

## JOINT APPENDIX
## VOLUME II OF II (Pages A203–A405)

LETITIA JAMES
ATTORNEY GENERAL,
STATE OF NEW YORK
*Attorneys for Defendant-Appellee*
New York, New York 10005
(212) 416-8020
*eric.delpozo@ag.ny.gov*

HABBA MADAIO & ASSOCIATES LLP
*Attorneys for Plaintiffs-Appellants*
1430 US Highway 206, Suite 240
Bedminister, New Jersey 07921
(908) 869-1188
*ahabba@habbalaw.com*

# TABLE OF CONTENTS

*Page(s)*

U.S. District Court Docket Sheet ......................................................A1-A7

Complaint for Declaratory and Injunctive Relief, dated
December 20, 2021 .......................................................................A8-A37

Civil Cover Sheet ........................................................................... A38

Notice of Plaintiffs' Motion for Preliminary Injunction,
dated January 10, 2021..............................................................A39-A40

Declaration of Alina Habba, in Support of Plaintiffs'
Motion, dated January 10, 2022................................................A41-A43

Proposed Order Granting Plaintiffs' Motion for a
Preliminary Injunction ..............................................................A44-A45

   Exhibit A – Complaint for Declaratory and Injunctive
   Relief, dated December 20, 2021 (reproduced at
   pages 8-37)

Defendant's Notice of Motion to Dismiss, dated January
26, 2022.....................................................................................A46-A47

Declaration of Colleen K. Faherty, in Support of
Defendant's Motion, dated January 26, 2022 ...........................A48-A53

   Exhibit A – Stipulation and Proposed Order, dated
   December 30, 2021 ...............................................................A54-A58

   Exhibit B – Hearing Before the Committee on
   Oversight and Reform House of Representatives,
   held on February 27, 2019 ....................................................A59-A79

i

*Table of Contents(cont'd)*                       *Page(s)*

Exhibit C – Excerpt from Memorandum of Law, dated September 16, 2020 ........................................................................A80-A82

Exhibit D – Stipulation and Order, dated September 2, 2021 ..............................................................................................A83-A90

Exhibit E – Excerpt from Memorandum of Law in Opposition, dated December 7, 2020 ......................................A91-A93

Exhibit F – Excerpts from Transcript of Proceedings, held on September 23, 2020................................................A94-A101

Exhibit G – Letter, dated November 1, 2021 with Supporting Tabs A through H ............................................A102-A154

Exhibit H – Memorandum of Law in Support of Motion to Quash, in the Matter of *People v. Trump,* dated January 3, 2022..........................................................A155-A165

Exhibit I – Supplemental Verified Petition, dated January 18, 2022 ................................................................A166-A280

Exhibit J – Excerpts from Videoconference Examination Under Oath of Eric F. Trump, held on October 5, 2020 ..................................................................A281-A298

Declaration of Alina Habba, in Opposition to Defendant's Motion, dated February 16, 2022....................................................A299-300

Exhibit A – Complaint for Declaratory and Injunctive Relief, dated December 20, 2021 (reproduced at pages 8-37)

ii

*Table of Contents(cont'd)*                                                    *Page(s)*

Reply Declaration of Colleen K. Faherty, in Further
Support of Defendant's Motion, dated February 23, 2022 .........................A301-A303

    Exhibit A – Letter, dated February 9, 2022 ........................A304-A305

    Exhibit B – Decision and Order on Motion, in the
    Matter of *People v. Trump,* dated February 17, 2022 ........................A306-A313

    Exhibit C – Memorandum of Law, in Further Support
    of Motion to Quash and in Opposition to Motion to
    Compel, in the Matter of *People v. Trump*, dated
    February 1, 2022 ....................................................................A314-A351

    Exhibit D – Statement by Donald J. Trump, dated
    February 17, 2022 ...................................................................... A352

Letter, dated February 28, 2022 ............................................................. A353

    Exhibit A – Notice of Appeal, dated February 28,
    2022, of Decision and Order, in the Matter of *People
    v. Trump*, dated February 17, 2022, with Notice of
    Entry ..................................................................................A354-A373

Declaration of Alina Habba, in Further Support of
Plaintiffs' Motion, dated April 15, 2022.....................................A374-A375

    Exhibit A – Excerpt from Transcript of Proceedings,
    held on February 17, 2022 .................................................A376-A380

Letter, dated May 3, 2022 ..................................................................... A381

    Exhibit 1 – Decision and Order on Motion, in the
    Matter of *People v. Trump*, dated April 26, 2022 ...............................A382-A384

iii

*Table of Contents(cont'd)*                                                        *Page(s)*

Exhibit 2 – Opinion and Order, in the Matter of
*People v. Trump*, dated April 29, 2022 ................................................A385-A386

Exhibit 3 – Affidavit of Alina Habba, sworn to April
27, 2022 ...............................................................................................A387-A401

Exhibit 4 – Summary Statement on Application for
Expedited Service and/or Interim Relief, dated May
2, 2022 .................................................................................................A402-A403

Notice of Appeal, dated May 27, 2022 .......................................................A404-A405

iv

**A203**

130.    That abrupt removal of specific references to outside-professional consultation appears, among other things, to acknowledge that references to such professionals in prior years was inaccurate and misleading.

131.    Evidence obtained by the Attorney General indicates that Ivanka Trump resided in two penthouse apartments in the Trump Park Avenue building and that Mr. Trump's Statement of Financial Condition reported values for one of those units much higher than the price at which Ivanka Trump had obtained an option to purchase.

132.    Ivanka Trump rented a penthouse unit in Trump Park Avenue starting in 2011. Ex. 380 at MAZARS-NYAG-00003293. Ms. Trump's rental agreement included an option to purchase the unit for $8,500,000. Ex. 394. For the 2011 and 2012 Statements of Financial Condition, this unit was valued at $20,820,000—approximately two and a half times as much as the option price, with no disclosure of the existence of the option. Ex. 380 at MAZARS-NYAG-00003292; Ex. 381 at MAZARS-NYAG-3476. For the 2013 Statement of Financial Condition, the unit was valued at $25,000,000—more than three times the option price, again, with no disclosure of the existence of the option. Ex. 382 at MAZARS-NYAG-00000184.

133.    The Trump Organization's own conduct acknowledges that reporting an offering plan price for a unit—instead of the price at which the Trump Organization already had agreed to sell the unit to Ms. Trump—was incorrect and misleading. In particular, in October 2015 Ivanka Trump acquired an option to purchase a different, larger penthouse unit at Trump Park Avenue for $14,264,000. Ex. 395 at TTO_02226839.

134.    After Ms. Trump acquired that option to purchase, the backup to the Statement of Financial Condition for Trump Park Avenue in 2015 used a value of $14,264,000 instead of the

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 40 of 116

NYSCEF DOC. NO. 630                                           RECEIVED NYSCEF: 01/24/2022

offering plan price of $45,000,000 that had been used in 2014. See Ex. 385 at MAZARS-NYAG-00000846; Ex. 383 at MAZARS-NYAG-00000445.

### 6. Liquidity

135.    As a general matter, when a financial statement reports "cash," it is referring to an amount of liquid currency or demand deposits. See Financial Accounting Standards Board ("FASB"), Master Glossary - Cash. Similarly, when a financial statement reports "cash equivalents," it is reporting "short-term, highly liquid investments" that both can be "readily converted to known amounts of cash" and is "so near their maturity that they present insignificant risk of changes in value because of changes in interest rates." See FASB, Master Glossary – Cash Equivalents. When a financial statement refers to "marketable securities," it refers to debt or equity securities for which market quotations are available, and such assets are valued at "their quoted market prices." See, e.g., FASB, Accounting Standards Codification ("ASC") 274-10-35-5.[15]

136.    Mr. Trump's Statements of Financial Condition for several years reported cash amounts in partnership entities Mr. Trump did not control as Mr. Trump's own liquidity. In some years these restricted funds accounted for almost one-third of all the cash reported by Mr. Trump (for example $24 million of the total $76 million in cash reported for 2018). For the sake of simplicity, these entities will be referred to here as the Vornado partnership entities.

---

[15] Such measures of liquidity can assist a bank in evaluating a borrower's ability to repay a loan, including if the property that is collateral for the loan does not generate sufficient income to cover loan payments. Misrepresentations regarding a person's liquidity may be actionable. *See, e.g.*, *Nairobi Holdings Limited v. Brown Brothers Harriman & Co.*, No. 02 CIV. 1230, 2002 WL 31027550, at *4-*5 (S.D.N.Y. Sept. 10, 2002) (misrepresentation regarding whether short-term investment qualified as a "marketable security").

137.    The Vornado partnership entities are entities through which Mr. Trump has a thirty-percent limited partnership stake in certain partnership entities that own 1290 Avenue of the Americas in New York, NY and 555 California Street in San Francisco, CA. Vornado Realty Trust ("Vornado"), in which Mr. Trump has no ownership interest, holds the other seventy-percent stake in the Vornado partnership entities and functions as the General Partner.

138.    Under the pertinent partnership agreements, the General Partner has "full control over the management, operation and activities of, and dealings with, the Partnership Assets and the Partnership's properties, business and affairs," and "the Limited Partners shall not take part in the management of the business or affairs of the Partnership or control the Partnership business." E.g., Ex. 396 at TTO_02545363.[16] Moreover, "[t]he Limited Partners may under no circumstances sign for or bind the Partnership." Id. The partnership agreements provide for cash distributions in an amount, if any, that is "determined by the General Partner in its sole discretion." *Id.* at -338-339.

139.    Internal Trump Organization records reflect an understanding that cash residing in the Vornado partnership entities could be distributed at Vornado's discretion only.[17] The Trump Organization maintained internal spreadsheets reflecting its own cash position and cash flow. One cash flow spreadsheet states, with respect to the Vornado partnerships: "Although there

---

[16] This document is entitled "Agreement of Limited Partnership of Hudson Waterfront Associates I, L.P." The partnership agreements for other pertinent entities—Hudson Waterfront Associates III LP, Hudson Waterfront Associates IV LV, and Hudson Waterfront Associates V LP—contain similar provisions. Without fully delineating the ownership structure, OAG understands that Vornado's 70% stake in 1290 Avenue of the Americas and 555 California Street is owned directly or indirectly by means of these partnerships, and that Mr. Trump's 30% stake is as well.

[17] Donald J. Trump took part in extensive litigation regarding these partnerships in which control over partnership cash was addressed. *See, e.g.*, *Trump v. Cheng*, 9 Misc. 3d 1120(A), at *7 (Sup. Ct. N.Y. Cty. Sept. 14, 2005) (quoting definition of "Cash Available for Distribution").

could be operating profits, distributions are at the discretion of Vornado at a rate of 30% to Trump. At this point we do not have all of the data that goes into Vornado's decision making, thus we are attributing no distribution for these properties." Ex. 397 (tab that says "Notes"). Similarly, spreadsheet documents with "cash position" in their filename include cash in a range of Trump Organization entities—but not cash in the Vornado partnership entities. See, e.g., Ex. 398 (email with attached document named "121517 Cash Position.xls").

140.    Contrary to what is reflected in these internal records (which are consistent with the terms of the governing trust documents), Mr. Trump's Statement of Financial Condition from at least 2013 through 2020 included cash in the Vornado partnership entities as Mr. Trump's "cash and marketable securities" or similarly identified liquid asset, often comprising a considerable portion of Mr. Trump's reported liquidity.[18]

141.    For example, the June 30, 2016 Statement of Financial Condition reported $114.4 million in cash, marketable securities, and hedge funds. Ex. 400. Approximately $19.6 million (17.6%) of that figure appears to have been derived from cash in or associated with the Vornado entities. Ex. 400. The June 30, 2018 Statement of Financial Condition reported $76.2 million in cash and cash equivalents. Ex. 401. Approximately $24.4 million (32%) of that figure apparently was derived from cash in or associated with the Vornado entities. Ex. 401. *See also* Ex. 402 (in 2019, $24.65 million out of $87 million); Ex. 403 (in 2020, $28.25 million out of $92.7 million).

### 7.    40 Wall Street

142.    Mr. Trump's Statements of Financial Condition refer to a property identified as "40 Wall Street," an office building located on Wall Street in New York, NY. The Trump

---

[18] This practice appears to have begun in 2013. *See* Ex. 399 (2012 schedule not including cash in or associated with Vornado properties).

Organization owns a "ground lease" pertaining to the property; in other words, it holds a

leasehold interest in the land and buildings on the land, but pays rent (known as ground rent) to

the fee owner. By the terms of the ground lease, the rent on 40 Wall Street would gradually

increase over a series of years, with a reset in 2032 based on the overall value of the building.

Ex. 388 at 612:16-23, 613:16-19; Ex. 311 at MAZARS-NYAG-00000041-42.

143.    For several years, the supporting data for Mr. Trump's Statement of Financial

Condition reported a valuation for 40 Wall Street that was calculated using the "income

capitalization approach," a method for estimating the value of real property based on the net

operating income the property generates. Under the valuation method used by the Trump

Organization, a property's net operating income is divided by a capitalization rate to arrive at an

estimate of market value.[19]

144.    Net operating income is typically defined as "[t]he actual or anticipated net

income that remains after all operating expenses are deducted from the effective gross income

but before mortgage debt service and book depreciation are deducted." Appraisal Institute, The

Dictionary of Real Estate Appraisal 158 (6th ed. 2015).

145.    OAG has obtained evidence raising questions regarding the true value of the

Trump Organization's leasehold interest in 40 Wall Street as reported on Mr. Trump's

Statements of Financial Condition.

146.    For example, evidence obtained by OAG suggests that Capital One (which held a

$160 million mortgage on the property at the time) raised substantial concerns about cash flow at

the property in approximately August and September 2009, leading to in-person meetings with

---

[19] For example, using the income capitalization approach, a property with a net operating
income of $100 and a capitalization rate of 5% would yield a value of $2,000 (100/0.05).

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 44 of 116    RECEIVED NYSCEF: 01/24/2022

Mr. Trump, Mr. Weisselberg, and others. *See, e.g.*, Ex. 404 at CAPITALONE-00348244 (notes from August 2009 meeting); Ex. 405 at CAPITALONE-00348333 (notes from September 2009 meeting).

147.    Those discussions led to a loan modification executed in 2010 attaching the Trump Organization's own 2010 budget for the property. Ex. 406 at CAPITALONE-00349593-96. That budget reflected a net operating income (described in the budget as "cash flow before debt service") of $12.3 million, *see* Ex. 406 at CAPITALONE-00349595; a figure bank personnel described as "very optimistic." Ex. 407 at CAPITALONE-00348988.

148.    Other materials indicate the Trump Organization's own budget as submitted to Capital One for 40 Wall Street for 2011 projected a net operating income of just over $4.4 million. Ex. 408 at CAPITALONE-00350719, -23 (figure results from starting with $25,183,244 in "total income accounts" and subtracting "total expense accounts" figure of $20,722,238; debt service and depreciation are not listed in such expenses).

149.    In connection with the 2010 Capital One loan modification, an appraisal was performed by Cushman & Wakefield valuing the Trump Organization's interest at $200 million as of August 1, 2010. Ex. 409 at CAPITALONE-00350131. Similar appraisals were performed in 2011 and 2012 reaching a similar valuation conclusion. Ex. 410; Ex. 411. In the 2012 appraisal, in addition to reaching a valuation of $220 million as of November 1, 2012, the appraisers also calculated a valuation "upon stabilized occupancy" as of November 1, 2015 at $260 million. Ex. 411 at TTO_220765. A key component of the 2012 appraisal and in valuing the Trump Organization's interest in the building was the reset value of the ground lease in 2032. The 2012 appraisal reached a conclusion that the ground lease rent (a Trump Organization

42

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630        Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 45 of 116        RECEIVED NYSCEF: 01/24/2022

expense) would reset from $2.8 million a year to more than $15.5 million a year beginning on January 1, 2033. Ex. 411 at TTO_220826-846.

150.    A copy of the 2012 appraisal was contained in the files of the Trump Organization.

151.    Mr. Weisselberg testified that he recalled having an appraisal of 40 Wall Street from approximately 2011 or 2012 that valued the property in the $200 million range, but he determined the property was worth a different amount and listed that amount on the Statement of Financial Condition. Ex. 357 at 134:25-138:02.

152.    During the same period, Mr. Trump presented a value for 40 Wall Street on his Statements of Financial Condition of $601.8 million in 2010, $524.7 million in 2011, $527.2 million in 2012, and $530.7 million in 2013.[20] Ex 308 at 3, 7; Ex. 309 at MAZARS-NYAG-00003134, -3139; Ex. 310 at MAZARS-NYAG-00006311, -6316; Ex. 311 at MAZARS-NYAG-00000037, -41-42. These values are between two and three times the value recorded in the three consecutive appraisals noted above. They rested, in part, on the use of figures for net operating income that differed markedly from the Trump Organization's own contemporaneous budgets which also were known to Mr. McConney or Mr. Weisselberg.[21]

---

[20] The Statements of Financial Condition represent that the reported valuations of 40 Wall Street were based upon an evaluation by Mr. Trump working with others. *See, e.g.*, Ex. 309 (2011 Statement at 7 ("The estimated current value of $524,700,000 is based upon a successful renegotiation of the ground lease *and an evaluation made by Mr. Trump in conjunction with his associates and outside professionals . . . .*")); Ex. 310 (2012 Statement at 7 (similar)); Ex. 311 (2013 Statement at 7 (similar)).

[21] *Compare, e.g.*, Ex. 320 (2011 supporting data at row 118 (using $26.2 million net operating income figure, based on years of future projections)), *with* Ex. 408 at CAPITALONE-00350719, -23 (2011 budget submitted to Capital One with $4.4 million figure); Ex. 321 (2012 supporting data at row 121 (using $22.72 million net operating income figure)) *with* Ex. 412 at CAPITALONE_00254432 (2013 projected budget sent to Capital One on December 13, 2012 subtracting expenses from receipts to arrive at "operating cash flow before debt service" of $14.3 million, accompanied by letter signed by Mr. McConney).

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 46 of 116

NYSCEF DOC. NO. 630                                              RECEIVED NYSCEF: 01/24/2022

153.    An exchange between the Trump Organization and Capital One in 2015 establishes that Capital One harbored great skepticism regarding the Trump Organization's valuations. In 2014 the Trump Organization valued 40 Wall Street at $550 million. Ex. 312 at MAZARS-NYAG-00000714, -717. Mr. Weisselberg then brought that valuation to Capital One on January 12, 2015 in an effort to restructure the loan on the building and avoid a principal payment of $5 million due in November 2015. Ex. 413 at TTO_123039, -40. Touting his own assertion of a favorable loan to value ratio of 30%, Mr. Weisselberg wrote to Capital One:

> This investment along with a very successful rental program has turned the Trump Building at 40 Wall St. into one of the great success stories post 2008. Mr. Trump's latest financial statement dated June 30, 2014 shows a valuation of $550,000,000 for the building based upon NOI & CAP rates on that date. This would put your loan at a 30% loan to value.
>
> In light of the aforementioned valuation and considerable capital investment, along with a much improved cash flow (which will continue to grow as new tenant free rent continues to burn off) and an occupancy rate of 91%, which will be 96% after pending leases totaling 34,862 square feet are signed, we respectfully request that the required $5 million principal payment due in November 2015 be waived.
>
> We look forward to a favorable response from Capital One Bank.
>
> Very truly yours,
>
> Allen Weisselberg
> EVP/CFO

Ex. 413 at TTO_123040.

154.    Capital One had performed its own internal valuation analysis as of October 31, 2014, however, which reached a starkly different conclusion. That analysis valued 40 Wall Street at $257 million and estimated a much less favorable loan to value ratio of 62%. Ex. 414 at CAPITALONE-06262020-00000170.

155.    Based on its valuation and analysis, Capital One declined to restructure the loan. Ex. 413 at TTO_123039.

44

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 47 of 116    RECEIVED NYSCEF: 01/24/2022

156.    Rebuffed by Capital One, Mr. Weisselberg then began working with his son, Jack

Weisselberg, a Director at Ladder Capital Finance LLC, in an effort to arrange financing on

more favorable terms using the valuation of 40 Wall Street from the 2014 Statement of Financial

Condition. Ladder Capital reached out to Cushman & Wakefield about preparing an appraisal for

40 Wall Street. Ex. 415.

157.    Cushman had prepared the 2012 appraisal valuing the property at $220 million

and the same team prepared the 2015 appraisal for Ladder Capital. *Compare* Ex. 411 at

TTO_220760 *with* Ex. 416 at C&W_0009325. But the 2015 appraisal more than doubled the

valuation of the building to $540 million.

158.    Evidence obtained by OAG suggests that the Cushman & Wakefield valuation in

the 2015 appraisal did not reflect a good faith assessment of value. The appraisal appears to have

used demonstrably incorrect facts and aggressive assumptions to arrive at this much higher

value.

159.    Still, even this increased valuation for 40 Wall Street was not sufficient for

purposes of Mr. Trump's Statement of Financial Condition for the year ending June 30, 2015

(also prepared at least in consultation with Mr. Weisselberg). That Statement tacked nearly $200

million in additional value onto the 2015 appraised value of the property, valuing the building at

$735.4 million. Ex. 313 at MAZARS-NYAG-00000691. Thereafter the valuation on Mr.

Trump's Statement of Financial Condition rose to $796.4 million in 2016 and settled at $702.1

million in 2017. Ex. 314 at MAZARS-NYAG-00001983; Ex. 315 at MAZARS-NYAG-

00001842.

**B.    Trump misrepresentations to counterparties**

160.    Mr. Trump's financial statements were submitted to financial institutions to seek

or obtain credit and insurance, and to comply with covenants on existing loans that required

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 48 of 116

RECEIVED NYSCEF: 01/24/2022

periodic submission of financial statements. *E.g.*, Ex. 362 at DB-NYAG-003049. Mr. Trump personally guaranteed certain financial obligations to these counterparties; and those personal guarantees required that Mr. Trump certify that his financial statements presented his financial condition fairly in all material respects. *E.g.*, Ex. 363 at DB-NYAG-059809-14; Ex. 346.

### 1.    Trump misrepresentations to banks

161.    OAG is investigating the Trump Organization's representations to banks and whether those institutions relied on Mr. Trump's financial statements. The evidence to date indicates that Mr. Trump's Statements of Financial Condition factored into banks' decisions and that banks relied on Mr. Trump's financial statements in granting Mr. Trump and the Trump Organization access to credit. Mr. Trump's Statements of Financial Condition were submitted to multiple banks to obtain credit and to comply with covenants on existing loans that required periodic submission of financial statements. Ex. 362 at DB-NYAG-003049; Ex. 363 at DB-NYAG-059810-13.

162.    One financial institution noted that it had "received CPA prepared financial statements by WeiserMazar LLP dated June 30, 2014 verifying Donald J. Trump's net worth of $5,777,540,000 and liquidity of $302,300,000." Ex. 417 at FSI-Investors-00000003_0005.

163.    That financial institution did not apply any adjustments to the reported net worth figure and treated it as a mitigant to potential weaknesses in the deal. Ex. 417 at FSI-Investors-00000003_0028. The loan officer on the deal testified that, if he had been aware of material misstatements in the Statement of Financial Condition, the loan officer would not have brought the deal to his financial institution's commercial lending committee. Ex. 418 at 100:10-101:04

164.    Another financial institution—Deutsche Bank—considered Mr. Trump's Statements of Financial Condition in the course of loan transactions related to three properties totaling more than $300 million. Ex. 368; Ex. 424; Ex. 419.

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 49 of 116

NYSCEF DOC. NO. 630                                      RECEIVED NYSCEF: 01/24/2022

165.    In particular, in evaluating whether to extend or maintain credit, Deutsche Bank accepted Mr. Trump's personal guaranty and Mr. Trump's Statements of Financial Condition, and the valuations listed thereon were incorporated into internal bank memoranda. At origination, the truth of Mr. Trump's representations was a condition precedent to the bank's obligation to lend. Ex. 420 at DB-NYAG-005911 (Doral); Ex. 421 at DB-NYAG-005025 (Old Post Office); Ex. 422 at DB-NYAG-006020 (Chicago hotel); Ex. 423 at DB-NYAG-005307-08 (Chicago residential). In addition, an "event of default" would occur if "[a]ny representation or warranty of Borrower or Guarantor herein or in any other Loan Document" (including a compliance certificate) "shall prove to have been false or misleading in any material respect at the time made or intended to be effective." Ex. 420 at DB-NYAG-005916.[22]

166.    Deutsche Bank's assessments included the values asserted on the Statements of Financial Condition, and then apply that financial institution's "haircuts"—or percentage reductions in estimated value—for arriving at adjusted net worth values to evaluate whether to extend or maintain credit. See, e.g., Ex. 362 at DB-NYAG-003054-55.

167.    OAG has received evidence that those haircuts are standardized reductions based on the class of asset. Ex. 369 at 76:11-77:10. For instance, the haircut on cash is very small compared to residential or commercial real estate because cash is assumed to be liquid. Ex. 369 at 76:11-77:10, 78:08-17. If the bank is aware of potential restrictions on cash the bank would likely apply a steeper haircut. Ex. 369 at 153:03-156:05.

---

[22] The term "Loan Document" included Mr. Trump's guaranty and "any other document, agreement, consent, or instrument which has been or will be executed in connection with" the loan agreement and guaranty. *Id.* at 5865. The same conditions applied to the Chicago and OPO properties. Ex. 422 at DB-NYAG-006019, -6023; Ex. 423 at DB-NYAG-005307-12; Ex. 421 at DB-NYAG-005025, 5031.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

RECEIVED NYSCEF: 01/24/2022

168.   When applying a haircut, the assumption is that the client had accurately stated the asset value. Ex. 369 at 76:11-77:10. The haircut percentages applied during origination are carried forward to subsequent annual reviews. Ex. 369 at 90:19-25.

169.   Incorrect or misleading valuations in the statement of financial condition would impact the adjusted net worth reached by the Bank, the risk rating for the loan, and the decision of whether or not to extend financing at all. Ex. 369 at 193:04-25, 200:25-202:09.

170.   Internal bank memoranda emphasize the reported financial strength of Mr. Trump as a factor in lending. One loan from Deutsche Bank was issued to Trump Endeavor 12 LLC, an entity in the Trump Organization, and personally guaranteed by Mr. Trump. This loan relates to a property known as the Trump National Doral in Miami, Florida. This loan (initially comprised of one secured tranche and one unsecured tranche) was for a total of $125 million and closed in June 2012. Ex. 420; Ex. 356. An internal bank credit memorandum makes clear that the "Financial Strength of the Guarantor" (referring to Mr. Trump) and his personal guaranty were factors in favor of approving the loan. Ex. 368 at DB-NYAG-001693.

171.   Deutsche Bank issued a second such loan (or group of two loans) to 401 North Wabash Venture LLC, an entity in the Trump Organization. Mr. Trump personally guaranteed this loan. The loan was issued in connection with the Trump International Hotel and Tower Chicago for up to $107 million. Ex. 249. The loan was comprised of two components: a portion related to the condominium component of that property for up to $62 million, and a portion related to the hotel component of that property for up to $45 million. Ex. 424.

172.   The bank's internal credit memorandum, in recommending approval, noted the "unique nature" of the loans and stated that "the credit exposure is being recommended based on the financial profile of the Guarantor," who was Mr. Trump. Ex. 424 at DB-NYAG-068526.

48

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 51 of 116    RECEIVED NYSCEF: 01/24/2022

173.    Deutsche Bank issued a third such loan to Trump Old Post Office LLC, an entity in the Trump Organization.[23] Mr. Trump personally guaranteed this loan. The loan was issued in connection with the Trump Organization's redevelopment of the Old Post Office building in Washington, D.C., and was for up to $170 million. Ex. 421 at DB-NYAG-005055.

174.    The internal bank approval memo for this loan stressed the unique nature of the loan and Mr. Trump's financial profile in recommending approval. Ex. 419. The memo also incorporated figures from Mr. Trump's 2011, 2012, and 2013 financial statements. Ex. 419.

175.    In furtherance of Mr. Trump's guaranty on the Doral loan, Mr. Trump provided certain prior financial statements (a Statement of Financial Condition), which he represented was "true and correct in all material respects" and "presents fairly Guarantor's financial condition."[24] Mr. Trump signed that guaranty.[25] Mr. Trump also provided a personal guaranty for a $170 million loan in connection with the Trump International Hotel, Washington, DC ("Old Post Office") property, and similarly provided his Statement of Financial Condition for the year ending June 30, 2013, which he represented was "true and correct in all material respects" and

---

[23] Donald J. Trump, Eric Trump, Ivanka Trump, and Donald Trump, Jr. were officers and owners (directly or indirectly) of Trump Old Post Office LLC in 2014 approximately when Deutsche Bank extended credit in connection with that entity. Ex. 425 (at DB-NYAG-004655, -656, -657, -678, -714.)

[24] *See* Ex. 356 (Guaranty dated as of June 11, 2012 (Doral Guaranty)) at DB-NYAG-004177-78; *id.* at 4173 (defining "Prior Financial Statements" to include Mr. Trump's "Statement of Financial Condition, dated as of June 30, 2011"). The loan document expressly states that this representation was made "[i]n order to induce Lender to accept this Guaranty and to enter into the Credit Agreement and the transactions hereunder." *Id.* at 4177-78.

[25] Ex. 356 at 4188 (Mr. Trump's signature).

49

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 52 of 116    RECEIVED NYSCEF: 01/24/2022

"presents fairly [Mr. Trump's] financial condition as of June 30, 2013."[26] Personal guaranties

signed by Mr. Trump signed concerning the Chicago property reflected similar representations.[27]

176.    Requisite documents in connection with these loans also required Mr. Trump to

annually deliver his Statement of Financial Condition for the ensuing years accompanied by a

similar certification, which Mr. Trump subsequently provided. For example, in a document dated

November 11, 2014, Mr. Trump "hereby certifie[d]" that his Statement of Financial Condition

for the year ending June 30, 2014 and other identified documents "presents fairly and accurately

in all material respects the financial condition of Guarantor for the period presented."[28]

177.    Evidence obtained by the OAG establishes that Donald Trump, Jr. personally

certified on an annual basis the truth and accuracy of the Statements of Financial Condition of

Donald J. Trump for 2016, 2017, 2018, and 2019. On some such certifications, Donald Trump,

Jr. specified that he was doing so as "attorney in fact" for Donald J. Trump.[29]

### 2.    Trump misrepresentations to an insurer

178.    The Trump Organization also submitted Mr. Trump's Statements of Financial

Condition to insurers and its insurance broker, by allowing underwriters to review a copy of the

---

[26] Ex. 366 at DB-NYAG-003287. Evidence obtained by the Attorney General indicates that the Trump Organization obtained the Old Post Office loan proceeds in stages—with the last draws on the loan (totaling millions of dollars) occurring in 2017. *Id*. at Ex. 366.

[27] Ex. 364 at DB-NYAG-038878 (Chicago residential portion guaranty); Ex. 365 at DB-NYAG-003229 (Chicago hotel portion guaranty); Ex. 426 at DB-NYAG-003191 (amended and restated Chicago guaranty).

[28] Ex. 346 at DB-NYAG-060415. For the June 30, 2015 statement, Trump Organization employees in May 2016 initially submitted a document signed by him certifying the June 30, 2014 statement, (*see* Ex. 427 at DB-NYAG-024830, Ex. 428 at DB-NYAG-024831), but soon corrected the error by submitting a corrected first page of the compliance certificate. Ex. 429 at DB-NYAG-015494; Ex. 430 at DB-NYAG-015495.

[29] Ex. 431 at DB-NYAG-059755 (certifying June 30, 2016 statement); Ex. 432 at DB-NYAG-210893 (certifying June 30, 2017 statement); Ex. 433 at DB-NYAG-059824 (certifying June 30, 2018 statement); Ex. 434 at TTO_03595053 (certifying June 30, 2019 statement).

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 53 of 116

NYSCEF DOC. NO. 630                                                          RECEIVED NYSCEF: 01/24/2022

financial statement at the Trump Organization's offices. One of those entities was Zurich North American ("Zurich").

179.    From 2007 through 2021, Zurich underwrote a surety bond program (the "Program") for the Trump Organization through insurance broker AON Risk Solutions ("AON"). Under the Program, Zurich issued surety bonds on behalf of the Trump Organization within specified dollar limits in exchange for a premium calculated based on a rate times the face amount of the bonds. Most of the bonds were statutorily required for the Trump Organization's real estate business, such as liquor license bonds for golf courses or release of lien bonds for construction projects.

180.    Over the course of the Program, based on the financial disclosures made by the Trump Organization, Zurich agreed to increasingly more favorable terms—periodically increasing the limits and decreasing the rate. For example, in 2011, the Program had a single bond limit of $500,000, an aggregate limit for all bonds of $2,000,000, and a rate of $20 per thousand. Ex. 435 at ZURICHNA_008481. When the Program was canceled in 2021, the single bond limit was $6,000,000, the aggregate limit was $20,000,000, and the rate was $10 per thousand. Ex. 436 at ZURICHNA_008993.

181.    In accordance with its standard underwriting guidelines for surety business, Zurich required the Trump Organization to provide an indemnification against any loss should Zurich be required to pay under a bond. From the inception of the Program, the Trump Organization met this indemnification requirement through a General Indemnity Agreement ("GIA") executed by Donald J. Trump, pursuant to which (similar to a personal guaranty on a loan) he personally agreed to indemnify Zurich for claims under the Program, and an annual requirement that Mr. Trump disclose to Zurich's underwriter his personal financial statements.

51

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 54 of 116

NYSCEF DOC. NO. 630                                                    RECEIVED NYSCEF: 01/24/2022

This annual financial disclosure requirement permitted Zurich to ensure that the indemnification from Mr. Trump was sufficient to support the continued renewal of the Program.

182.    Indeed, on multiple occasions when AON was unable to secure in a timely manner the required financial disclosure—which took the form of an on-site review of the financial statements in a conference room at the Trump Organization's offices—Zurich put the Program into "cut-off" status, which means Zurich ceased writing new bonds and would cancel existing bonds on expiration, until Mr. Trump's personal financial statements were made available for review. Ex. 437 at ZURICHNA_008345.

183.    The indemnity was such a critical aspect of the Program, that in early January 2017, with Mr. Trump's inauguration fast approaching, Zurich insisted as a condition to renewing the Program that the indemnification be modified to address the potential difficulty Zurich might have in seeking to enforce the GIA against a sitting president. After some negotiation, during which the Trump Organization's lawyers sought to persuade Zurich that there was no legal impediment to suing a sitting president, Zurich and the Trump Organization agreed to resolve the issue by adding DJT Holdings LLC as an additional indemnitor on the GIA effective January 17, 2017. Ex. 438 at ZURICHNA_008573; Ex. 439 at ZURICHNA_008276; Ex. 367 at 179:15:02-180:10.

184.    Evidence indicates that the Trump Organization obtained Zurich's approval to renew the Program on at least two occasions through intentional misrepresentations concerning Mr. Trump's personal financial statements. During the on-site review of Mr. Trump's Statement of Financial Condition that occurred on November 20, 2018 for the 2019 renewal, Zurich's underwriter was shown the June 30, 2018 Statement. The Statement listed as assets the Trump Organization's real estate holdings with valuations that CFO Allen Weisselberg represented to

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630                                                    RECEIVED NYSCEF: 01/24/2022

Zurich's underwriter were determined each year by a professional appraisal firm "such as

Cushman & Wakefield" "using cap rates and net operating income as factors." Ex. 440 at

ZURICHNA_008507.

185.    Zurich's underwriter considered the valuations to be reliable based on

Weisselberg's representation that they were prepared by a professional appraisal firm. Also,

based on her interactions with Weisselberg during the review, Zurich's underwriter found him to

be "highly professional, well educated, and conscientious about" his work. Ex. 440 at

ZURICHNA_ 008511. Weisselberg's representations about how the valuations were determined

and the underwriter's impressions of Weisselberg factored favorably into her analysis leading to

her recommendation that Zurich renew the Program for 2019 on the existing terms, which it did.

186.    During the on-site review for the next renewal, the Trump Organization disclosed

to Zurich's underwriter Mr. Trump's June 30, 2019 financial statement. Weisselberg again

represented to Zurich's underwriter that the valuations for the real estate holdings listed in the

statements were appraised annually by a professional appraisal firm. He noted more specifically

that the appraisals for the current statements were performed by Newmark Group and had

previously been prepared by Cushman, explaining that "[t]he reason for the change is the

individual at Cushman & Wakefield with whom [the Trump Organization] had a longstanding

relationship with moved to work at Newmark." Ex. 441 at ZURICHNA_009000.[30]

187.    Again, Zurich's underwriter considered the valuations to be reliable based on

Weisselberg's representation that they were prepared by the professional appraisal firm

Newmark Group, and specifically by the same individual (Larson) who had historically

---

[30] The individual Weisselberg was referring to was Douglas Larson, who left Cushman &
Wakefield to join Newmark Group in June of 2017.

**A220**

determined the previous valuations when he was an employee of Cushman & Wakefield. She

again assessed Weisselberg to be "highly professional, well educated, and conscientious about

the operations" of the Trump Organization. Ex. 441 at ZURICHNA_009004. Her impressions of

Weisselberg and the representation that Newmark prepared the valuations all factored favorably

into her analysis leading to her recommendation that Zurich renew the Program in 2020 on the

existing terms, which it did.

188.    Weisselberg's representations to Zurich's underwriter that the valuations listed in

Mr. Trump's personal financial statements were prepared annually by professional appraisal

firms were false. With respect to nearly all valuations, the Trump Organization did not retain

Cushman & Wakefield, Newmark Group, or any other professional appraisal firm to prepare the

valuations of the Trump Organization's real estate holdings that appeared in Mr. Trump's

personal financial statements shown to Zurich's underwriter. Rather, the valuations were

prepared by Trump Organization staff, contrary to what Zurich's underwriter was expressly told

and believed.

189.    Had Zurich's underwriter been advised that the valuations listed on the personal

financial statements she reviewed during her on-site visits had been determined by Trump

Organization staff and not a professional appraisal firm, she would have accorded them less

weight and it would have negatively impacted her underwriting analysis. Moreover, had Zurich's

underwriter discovered during the renewal process that Weisselberg had misrepresented to her

how the valuations were prepared, it would have caused her to doubt the veracity of the rest of

the information disclosed by the Trump Organization during the renewal and would have called

into serious question whether Zurich should continue its insurance relationship with the Trump

Organization, or renew on terms less favorable to the Trump Organization.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 57 of 116    RECEIVED NYSCEF: 01/24/2022

190.    The Trump Organization also failed to disclose that the valuation for the golf courses listed on Mr. Trump's personal financial statements, which was approximately $2.2 billion in the June 30, 2019 statement, Ex. 442 at ZURICHNA_008287, included a substantial brand premium baked into the reported valuations. *See supra* ¶¶ 80 - 98. Under Zurich's underwriting guidelines, intangible assets such as brand value are to be excluded. Had Weisselberg disclosed to Zurich's underwriter that the valuation listed for golf clubs included the Trump brand value, she would have been required under the guidelines to reduce that valuation to exclude the amount added for brand value.

## II.    The Misleading Appraisals Trump Submitted to the Internal Revenue Service

### A.    Trump National Golf Club – Los Angeles.

191.    On December 26, 2014, two Trump Organization subsidiaries donated a conservation easement over land used as a driving range on the Trump National Golf Course – Los Angeles ("Trump Golf LA") property. The donation meant foregoing the right to build 16 residential lots in the driving range's location but did not preclude the Trump Organization from continuing to use the site as a driving range. In a process quarterbacked by Mr. Trump's tax counsel, Sheri Dillon, two Cushman appraisers found that the development value donated was $25 million dollars. Mr. Trump submitted this valuation to the Internal Revenue Service to obtain a tax benefit.

192.    The appraisal substantially overstated the value of the Trump Golf LA donation by overstating the speed with which the site could be developed and failing to value a reduction in affordable housing requirements that the donation enabled. The Cushman appraisers made these misstatements in an atmosphere of pressure applied to them by the Trump Organization— which one appraiser said was "fighting for every $1"—and Ms. Dillon.

55

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

RECEIVED NYSCEF: 01/24/2022

### 1.     Trump Golf LA's misstated development timeline

193.     Trump Golf LA was originally known as Ocean Trails Golf Club. Construction on

the course started in 1997 and by June 1999, the golf course was almost complete—until a

landslide dropped 300 yards of the 18th hole fairway into the Pacific Ocean. The landslide also

caused most of the 18th hole to slide 50 feet toward the ocean, including the fairway and green.

Development on the property ceased after the landslide and the Ocean Trails Golf Course

construction project went into bankruptcy. VH Property Corp., a Trump Organization subsidiary,

acquired the property out of bankruptcy in November 2002 for a reported price of $27 million.

194.     Given the site's instability, the landslide, and the site's proximity to the Pacific

Coast, the Trump Organization needed approval from the City of Rancho Palos Verdes to

develop the site. The Trump Organization's geologist worked with a Rancho Palos Verdes

geologist to develop a geologic model and reach an understanding of any improvements

necessary before the site could be further developed. Ex. 443, at MLB_EM00004563. This

presented a particular hurdle for 16 planned lots on the driving range and putting green: In June

2011, the Trump Organization's geologist produced a report stating that 104 "shear pins,"

stabilizing implements drilled into the ground to provide engineering stability, would be required

to develop the lots safely.

195.     Instead of developing the lots, the Trump Organization began to consider another

option: donating a conservation easement over the 16 proposed lots that would allow it to

continue to use the area as a driving range and putting green.

196.     The Trump Organization's outside counsel Sheri Dillon engaged an engineer and

Cushman appraisers, Richard Zbranek and Brian Curry, to evaluate the value of a potential

easement on Trump Golf LA. The Cushman appraisers would provide "initial valuation

conclusions" for 16 lots on the Trump Golf LA driving range. This initial evaluation would not

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 59 of 116

RECEIVED NYSCEF: 01/24/2022

involve a formal written report or assess value enhancement for the full Trump-owned parcel. If this valuation met with the Trump Organization's approval, the appraisers would then move on to provide a valuation suitable for income tax purposes. Ex. 444 at MLB_EM00005568.

197.    The Trump Organization, through Bingham McCutchen LLP (Ms. Dillon's law firm at the time), conveyed to the appraisers that it believed the lots might be worth $40 or $50 million. Ex. 445.

198.    In December 2012, Cushman, relying on costs and other information prepared by an engineer (also retained by Dillon and Bingham), reached a preliminary value conclusion for the development potential of the lots of $17,725,000. Ex. 571 at MLB_EM00014024; Ex. 447 at MLB_EM00014028. As Mr. Curry described it to Mr. Zbranek, "They did paper napkin analysis and suggested 40 to 50 million dollars. I sent them my analyses, we walked through the whole thing, and they couldn't argue with it. More like. 'Oh'." Ex. 445 at C&W_0079159.

199.    After this valuation, the Trump Organization put the conservation easement project on hold and did not pursue it further in 2012 or 2013. Despite receiving a valuation of sixteen lots at $17,725,000 (or roughly $1.1 million per lot after accounting for development time), Mr. Trump's Statements of Financial Condition for 2012 and 2013 valued unsold lots at the Trump Golf LA property at $4.5 million per lot and $2.5 to $4.5 million per lot. *See* Ex. 13 at row 471-477.

200.    In August 2014, Ms. Dillon contacted the appraisers again. MLB_EM00014026. On September 8, 2014, Dillon's law firm, Vinson & Elkins LLP, retained the appraisers to provide "a prospective market value estimate of the estimated value of 16 proposed lots, i.e., the development rights, on the driving range site of TNGC, as of December 15, 2014." Ex. 448.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630                                              RECEIVED NYSCEF: 01/24/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 60 of 116

201. The engineer retained to provide hypothetical maps and cost estimates that Cushman would use to value the site sought estimates to build the shear pins, and also evaluated another hypothetical plan that would involve reconfiguring the Site. He estimated that approval of the final drawings, as required under the current approvals, would require a year, and that the necessary shear pins would cost about $1.5 million.

202. Alternatively, the Trump Organization could reconfigure the layout of the entitled map to yield the same number of lots without constructing the shear pins. This reconfiguration "would take at least 2-3 years to obtain the necessary planning approvals from the City and Coastal and about one year to obtain final engineering approval." The planning and engineering cost would be about $2.5 million. Ex. 449 at MLB_EM00014148.

203. Higher development costs would decrease the imputed value of any easement donation. As Cushman appraiser Brian Curry explained in forwarding this email to Trump Organization attorney Ms. Dillon, writing, "Sheri. FYI. Higher costs of development decrease the value of the property." Ex. 449 at MLB_EM00014148.

204. On September 29, 2014, the engineer provided preliminary cost estimates for the plan that involved reconfiguring the lots without shear pins. In forwarding the estimates to Cushman appraiser Mr. Curry and Trump Organization attorney Ms. Dillon, the engineer reiterated the need for further approvals for the new plan. Ex. 446 at MLB_EM00014214. Later that day, Mr. Curry provided Ms. Dillon with a value for the sixteen lots. Calculating that value in two ways—"lot sales" and "home construction"—Mr. Curry reached valuations of $27,991,535 and $25,461,652, respectively. Ex. 450 at MLB_EM00014195, -204, -205.

205. On or about October 8, 2014, Ms. Dillon and Mr. Curry had a conference call with Mr. Trump to discuss the valuation of the lots. On the call, Mr. Trump claimed that the 16

58

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630          Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 61 of 116          RECEIVED NYSCEF: 01/24/2022

lots should be valued higher than previously sold lots in the Trump Golf LA project because they were in a "more prestigious" zip code and could thus command a "'zip code' premium." Mr. Curry asked Ms. Dillon to confirm whether the lots were in a different zip code. Trump Organization in-house counsel concluded they were not. Ex. 451 at VE_00001662, -63.

206.    On October 14, 2014, Ms. Dillon wrote to Mr. Curry that "we are now getting closer to year end so I would like to see where the estimates are so a final decision can be made." Mr. Curry wrote back on October 16, 2014 with an increased estimate, reaching a value of "around $27 to $28MM for the driving range property." Mr. Curry asked Ms. Dillon to "Let us know where we go from here"—adding a smiley-face emoticon. Ex. 452 at MLB_EM00014210.

207.    In early November 2014, the Trump Organization engaged Mr. Curry and Mr. Zbranek for an appraisal to "document the value of a conservation easement placed over a parcel of land located on the Trump National Golf Club Los Angeles for Federal and State income tax purposes." Ex. 453.

208.    As the project neared the end of the tax year, Mr. Curry warned Ms. Dillon that his previous estimates may have been too high, writing on December 5, 2014, "I would like to go over the numbers, which may not be as favorable as expected due to recent Trump lot sales, and then coordinate a delivery of the 'draft.'" Ms. Dillon replied, "I definitely would like to see the numbers first and am hopeful they don't dramatically vary from the prior range." C&W_0066474. On December 8, 2014, Mr. Curry provided a preliminary valuation of $20.5 million. Ex. 455; Ex. 456.

209.    After providing this conclusion (reduced from his initial estimates), Mr. Curry learned that the engineer might increase his cost estimates. The engineer explained that a

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 62 of 116

NYSCEF DOC. NO. 630                                              RECEIVED NYSCEF: 01/24/2022

contractor providing an estimate for the cost of the stabilizing shear pins had said the engineer's estimates could be too low. Ex. 457 at C&W_0079824.

210.    Mr. Curry forwarded this email to Ms. Dillon who asked if there was "something wrong with the initial cost estimates." Mr. Curry explained that the engineer had "underestimated." Ex. 458 at C&W_0066566, -67. Mr. Curry explained that this cost increase would make him reconsider the lot arrangement he would choose to value. Ex. 459 at C&W_0066569, at -69.

211.    On December 10, 2014, the engineer provided a final cost budget to Mr. Curry that reflected his updated view of the cost of shear pins to stabilize the Trump Golf LA site. The budget included $40,000 for shear pin design, $10,000 for the City of Rancho Palos Verdes to review the shear pin plans, and $2,376,500 for installation of 99 shear pins. Ex. 460 at C&W_0079836, -37, -38. As the engineer had predicted to Mr. Curry, his estimates had risen-- substantially.

212.    The estimates and final appraisal generated by the Cushman appraisers after this date did not reflect the engineer's updated estimates, which would have decreased the value of the conservation easement. Rather, Cushman's estimates continuously rose: indeed, value estimates rose from $20.5 on December 8, to $22.1 million on December 11, and finally to $25 million on December 12. Ex. 461 at 182:17-184:07, 188:21-190:18; Ex. 462 at MLB_EM00014577 (value conclusion of $22.1 million while noting "the engineer increased development costs by $1.25MM"); Ex. 463 at VE_00010729 (value conclusion of $25 million); Ex. 464 at C&W_0066803 (using costs of $8,086,050).[31] In short, despite the engineer's

_____

[31] This last estimate clearly conflicted with the December 10 costs of $10,099,165. *See* Ex. 460 at 798355.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 63 of 116

RECEIVED NYSCEF: 01/24/2022

increased costs, the appraisers increased their valuation by an average of more than a million

dollars a day from December 8 and December 12, 2014.

213.    The final appraisal report made clear that it relied on the engineer's estimates for

the development timeline and cost estimates. The appraisal states, "According to the engineer,

the planning and approvals could be completed in 1.5 years." Ex. 466 at MLB_EM00005409, at

-501. It further states, "Land development costs were prepared and provided by the development

engineer….The appraisers relied upon the cost budgets which were deemed reliable and assumed

true and correct." Ex. 460 at MLB_EM-00005419.

214.    But instead of using the engineer's final costs and estimates, the appraisal

incorporated the *preliminary* cost budgets that the engineer had prepared in September 2014.

These cost budgets did not include any provision for shear pins. Ex. 465 at VE_00010369-376.

Rather, they were the estimates the engineer had said "would take at least 2-3 years to obtain the

necessary planning approvals from the City and Coastal and about one year to obtain final

engineering approval"—i.e., that planning and approvals would take at least three to four years,

not 1.5 years. Ex. 449 at MLB_EM00014148.

215.    By using the "1.5 year" timeline the appraisal misattributes to the engineer—

shortening the timeline by *at least* one-and-a-half to two-and-a-half years—the Trump Golf LA

appraisal significantly overstates the development value of the 16 lots. The reason, in colloquial

terms, is that development revenue in the appraisal is worth much less for each year into the

future in which it occurs. In particular, the appraisal assumes discount rates of 15% to 18%,

meaning that a dollar received one year later is worth only 85 or 82 cents, and a dollar received

two years later is worth only $.7225 or $0.6724, and so on. Ex. 466 at MLB_EM00005409, -

5523. Thus, under the appraisal's methodology, revenue earned (for example) in year 3 would be

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 64 of 116    RECEIVED NYSCEF: 01/24/2022

worth much less than revenue earned in year 1. Conversely, moving revenue to earlier years considerably increased estimated value. And, because the appraisal assumes that the 16 lots will sell for an average of $5,000,000 each (-5524), bringing forward the revenue from the sale of these lots by even a year and a half would increase the appraised value by millions of dollars.

216.    The engineer testified to OAG that he never changed his estimate for the timeline. He further testified that he never intended the preliminary cost budgets or the maps they included to be integrated into the appraisal. Ex. 467 at 124:14-125:13. Instead, the engineer had prepared the December cost estimates, which reflected a different layout—and which budgeted over $2.4 for the design and construction of stabilizing shear pins—for use in the appraisal. Ex. 460 at C&W_0079836, -37, -38.

217.    When asked to explain why he did not use the engineer's most current estimates, the appraiser did not have any record of his reasoning. Ex. 461 at 182:17-184:07, 188:21-190:18; 193:13-195:14. Moreover, when asked about the apparent contradiction between the engineer's timeline and the timeline stated in the appraisal, Mr. Curry admitted that, despite attributing the appraisal's timeline to the engineer, he had come up with it himself:

> You know, I'm talking two to three years. He didn't have any final timing. I looked at that and assessed my own timing and figured you could probably get through the process maybe a little more aggressively than [the engineer] estimated. I found that you could probably get lot sales done by quarter eleven started and home sales by quarter thirteen, which is a full three years subsequent.

Ex. 461 at 191:21-192:7.

### 2.    Omitted reduction in affordable housing requirements

218.    As a result of a settlement between the Trump Organization and the City of Rancho Palos Verdes over approvals for the Trump Golf LA development, the Trump Organization had agreed to build four affordable housing units offsite. However, the Trump Organization believed that, as a result of the Trump Golf LA easement donation, these

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 65 of 116    RECEIVED NYSCEF: 01/24/2022

requirements would be set aside. As Jill Martin, Trump Organization Assistant General Counsel, explained the requirement to Cushman appraiser Mr. Curry: the units "have not been buil[t] and ultimately may not need to be. The number of units is all dependent on the number of housing units built on the property. With our changes to the plan and elimination of several houses, I am optimistic that this requirement will go by the wayside." Ex. 468 at VE_00001705; Ex. 466 at MLB_EM00005452.

219.    Martin further explained that "the affordable housing component is based on the number of houses built on the property- thus by eliminating some of the lots due to the easement, we are hopeful for elimination or a reduction of the requirement." Ex. 469 at VE_00010655.

220.    The Internal Revenue Service requires that an appraisal incorporate any enhancement a conservation easement donation provides to the value of other property held by the donor. If the appraisal were to accurately represent the value after the donation, it should have reflected the Trump Organization's expectation that placement of the easement would reduce or eliminate the offsite affordable housing requirements—a significant cost to the Organization that Ms. Martin thought would be eliminated by the conservation easement donation.

221.    Rather than account for the reduction in required affordable housing which Jill Martin thought would occur and was reflected in city resolutions, Mr. Curry told Trump Organization outside counsel Ms. Dillon, "Hi Sheri. I am going to add an 'allowance' in the cash flows for offsite affordable housing. As it will be in all of the cash flows it will not affect the bottom line," adding a smiley-face emoticon. Ms. Dillon thanked Mr. Curry. Ex. 470 at C&W_0067736.

**A230**

222.    The Trump Golf LA appraisal includes a $1 million allowance for affordable housing. As Mr. Curry and Ms. Dillon discussed, it was included in both the "Before" and "After" scenarios, so the offsite affordable-housing requirement did not affect the valuation the Cushman appraisers reached. Ex. 466 at MLB_EM00005500.

223.    Consistent with the understanding reflected in the document Jill Martin received from Ranchos Palos Verdes that California Government Code Section 65590 required 10% affordable housing, when the Trump Organization received approval to add a driving range and reduce the total number of residential lots by 16, the City reduced the number of offsite affordable units required from 4 to 2. Ex. 471 at 5.

224.    The Trump Organization thus obtained a benefit by donating the Trump Golf LA conservation easement that Mr. Curry chose not to recognize in the appraisal. This decision was not justified; the appraisal is misleading because it fails to disclose the likely reduction in affordable housing.

### 3.    "Trump is fighting for every $1"

225.    Because the conservation easement allowed Trump Golf LA the continued use of the driving range, calculating the value of the donation required that the appraisers take into account the continued value of the driving range—i.e., any use value it derived was not considered "donated."

226.    In reaction to pressure from the Trump Organization, it appears that Mr. Zbranek, the appraiser responsible for the golf component, reduced this figure from $1.5 million to $1 million to increase the appraised value of what had been donated. On December 12, 2015, Mr. Curry wrote to Mr. Zbranek: "Rick. I know I asked to get the 'difference' higher between with and without golf course. How easy, and if your [sic] comfortable, could we get back to $1,000,000 difference. Trump is fighting for every $1. I know we were at $1MM before.

64

So....your call." Curry assured Zrbanek that he only wanted the change if it was "market supported." Ex. 472 at CW_0079851.

227.    Zbranek wrote back, "After looking at the numbers, I feel more comfortable with $16M with the range and $15M without the range, a variance of $1M." *Id.*

228.    The final appraisal indicated that the golf course without the driving range (before easement scenario) was worth $1 million less than the golf course with a driving range (post easement scenario). Ex. 466 at MLB_EM00005558.[32] This change, which Mr. Zbranek had made at Mr. Curry's request, had the effect of increasing the "donated" amount by $500,000.

229.    The Trump Organization was aware that this position was tenuous. Upon donation of the conservation easement, Mr. Trump held a press conference touting the value of the property and the donation—despite Ms. Dillon's view that it would call unwanted attention to the matter of purporting to have donated a "conservation" easement over a property that would continue to be used as a driving range on a golf course. She articulated those concerns in an email to inhouse counsel Ms. Martin. Among other things, Ms. Dillon expressed anxiety about the optics of a conservation easement that did not inhibit the use of driving range: as she explained, "effectively the US taxpayers are paying [Mr. Trump] to do what he would already do anyway, and perhaps this isn't the best use of taxpayer dollars." But she also expressed concern with the position the appraisers had taken about "the value enhancement to the other lots that Mr. Trump owns"—i.e., the golf course and other residential lots that Trump Golf LA would retain

---

[32] Despite commissioning this appraisal concluding based on financial performance and sales comparisons that the property as a golf course was worth either $15 million or $16 million (with and without the driving range), *see* Ex. 466 at MLB_EM00005562-63, supporting data for Mr. Trump's Statement of Financial Condition for the year ending June 30, 3014 asserted that the golf club at the property was worth $74.3 million—comprised of "fixed assets" and the brand premium described *supra* at ¶¶ 80-98. *See, e.g.*, Ex. 324 at rows 383-386.

65

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 68 of 116    RECEIVED NYSCEF: 01/24/2022

after the easement—and that Mr. Trump's legal position that he was not a "developer" could be

challenged because he "is developing the other lots" at the site. Ex. 473 at MLB_EM00012146.

```
1)  We are taking an untested legal position with regard to whether the public's access to the drive
range constitutes an "outdoor recreation use for the general public" conservation purpose - the law is
unclear whether the "'public use" needs to be "unfettered" such that the public has free access to "use"
the outdoor space for recreation purposes; we backstopped this purpose with an open space purpose but
that must provide a significant public benefit under a clearly delineated government conservation policy
(which we did find some evidence of).  Of note, these standards are highly subjective and therefore
subject to manipulation by the IRS.  I believe we satisfy both but prefer not to test my beliefs.
2)  We want to be careful regarding any value statements as they relate to benefits to abutting or nearby
land or homeowners - our position is that there is a small $ value enhancement to the other lots that Mr.
Trump owns (every $ increase reduces the value of the donation for tax purposes); further we don't
believe there is much more value than already exists, given the property is not under development anyway
3)  We also need to be clear that while Mr. Trump had the rights to develop the driving range for
residential use, he had no intent to develop the property (and hasn't for some time) - while he was
holding (and preserving) the rights, his present intent was to use the property for a driving range, and
to otherwise hold the property for investment (understanding that a future buyer would pay more than the
$25 million for the property because a future buyer would have the rights to develop the housing).  If
Mr. Trump is determined to be a "developer", his donation for tax  purposes would be substantially
reduced because it is limited to his cost basis in the driving range property.  We do not want him to
make any statements against our position that he is NOT a developer with regard to the driving range
parcel.  Given he is developing the other lots, we see some potential for tension here.
4)  Lastly, please remind him that Congress and the IRS hate it when taxpayers place easements over golf
course properties and continue to OWN the golf course and operate it for income.  Remind him that the
larger the value and the more he makes of it, then he is telling the world how large a tax deduction he
is taking for it.  In this case, this is tantamount to the US taxpayers paying Donald Trump to keep his
driving range and use it for exactly what he is already using it for - and some could argue that as long
as he is operating the golf course, he would continue to keep the driving range - effectively, the US
taxpayers are  paying him to do what he would already do anyway, and perhaps this isn't the best use of
taxpayer dollars.  Bottom line - the more publicity this gets, the more we invite scrutiny.  This may
cause renewed interest in the issue.
```

\* \* \* \* \*

230.    These matters were material to the Cushman Trump Golf LA appraisal. In

particular, shortening the described approval period by at least one-a-and-a-half to two-and-a-

half years would have had a significant effect on a hypothetical project in which 16 homes were

estimated to be sold at $5 million each. Because the discount rate adopted by the appraisers was

15% or 18%, moving the hypothetical project's revenues even a single year into the future could

have the effect of dramatically decreasing the project's profitability by millions of dollars. Ex.

466 at MLB_EM00005525.

231.    These matters were incorporated into the final valuation arrived at by the

Cushman appraisers and ultimately submitted to the Internal Revenue Service in connection with

a tax deduction Mr. Trump sought on the property.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 69 of 116

RECEIVED NYSCEF: 01/24/2022

232. Mr. Trump's accountants have told OAG that this deduction resulted in millions of dollars of tax benefit to Mr. Trump.

233. Ms. Dillon otherwise acted as a liaison between the Trump Organization, the engineer, and the Cushman appraisers. However, as the Court is aware, the Trump Organization has asserted privilege over many of Ms. Dillon's communications. In addition, Ms. Dillon has stated that she cannot remember numerous interactions related to the Trump Golf LA easement donation. Mr. Trump participated in phone calls with the appraisers and was familiar with the development's challenges. Mr. Trump's testimony is necessary to determine his role in the submission of the Trump Golf LA appraisal to the Internal Revenue Service.

**B.    Seven Springs**

234. Mr. Trump donated a conservation easement over a portion of the Seven Springs property in 2015. Mr. Trump had purchased the property in December 1995 for $7.5 million through Seven Springs LLC, which is part of the Trump Organization.

235. As described above, see ¶¶ 32-46, Cushman & Wakefield was retained by Morgan Lewis on behalf of the Trump Organization to prepare a formal appraisal of a conservation easement to be donated over the Seven Springs property, which it provided to the Trump Organization on March 15, 2016 (the March 2016 Appraisal). Ex. 345. The March 2016 appraisal was also provided to the lender that held the mortgage on the property, and to the North American Land Trust, which received the Seven Springs conservation easement donation. Ex. 474; Ex. 475.

236. OAG has identified information that raises serious questions regarding the March 2016 Appraisal's conclusions, including whether the value of the donated easement was improperly inflated because of actions by the Trump Organization, its agents, and attorneys.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 70 of 116    RECEIVED NYSCEF: 01/24/2022

237.    A key assumption in the March 2016 Appraisal related to the number of single-family residential lots into which the property could be subdivided. Specifically, Cushman assumed that the property's highest and best use was to subdivide the relevant portions into 24 single-family residential lots that could be developed. Ex. 345 at MLB_EM00009153-54, -9169.

238.    In reaching this conclusion, the March 2016 Appraisal relied on maps displaying potential subdivision lots prepared by an engineering firm, Insite Engineering, that showed ten potential lots in the town of Bedford, six potential lots in the town of New Castle, and ten potential lots in the town of North Castle. Ex. 345 at MLB_EM00009146-48, -9151; see also Ex. 476 at 75:05-81:25, 184:11-185:15, 188:02-188:20. It also concluded that the Trump Organization could begin building lots in Bedford in the first year of development, could sell six of those lots in the second year, and build and sell a total of 24 lots in Bedford, New Castle, and North Castle within five years. Ex. 345 at MLB_EM00009171.

### 1. Seven Springs' development history

239.    OAG has identified evidence that the number of lots relied upon to calculate the value of the conservation easement was more than double what was permitted by development restrictions imposed by Bedford—restrictions that the Trump Organization was long aware of and had agreed to through its agents, including at town meetings at which Eric Trump was present. It has also identified evidence suggesting that the development timeline used to calculate the value of the easement donation was inconsistent with the disturbance restrictions contained in the approvals.

240.    In March 2004, the Trump Organization began a lengthy process that ultimately resulted in a Bedford Planning Board resolution (the "Bedford Resolution") preliminarily approving a subdivision on the portion of Seven Springs in the Town of Bedford. As has been discussed before the Court, Respondents Eric Trump and Trump Organization land-use counsel

68

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 71 of 116

NYSCEF DOC. NO. 630                                    RECEIVED NYSCEF: 01/24/2022

Charles Martabano were heavily involved in negotiations with the Town of Bedford. The Bedford Resolution heavily restricted the use of a Bedford road to access hypothetical lots in New Castle and North Castle. It also explicitly stated a restriction on the speed with which the Trump Organization could build lots at the site, requiring that only five acres at one time be disturbed.

241.    Minutes and an audio recording of the May 14, 2013 meeting of the Planning Board reflect Eric Trump's and Mr. Martabano's participation in a detailed discussion of the lot-number restriction. In resolving a difference of opinion between the Town and the Trump Organization, Chair Courtney-Batson stated, "I believe we reached a potential compromise," and Mr. Martabano, attorney for the Trump Organization agreed, "I think we have." Martabano then described that compromise. Ex. 477 at 42:22-43:03.

242.    Mr. Martabano stated: "[W]e proposed to put a restrictive covenant on this portion of the road parcel south of the cul-de-sac and impose upon that a condition." Ex. 209 at 43:04-11. Mr. Martabano continued, "It'll only be used to potentially serve two new lots in the Town of North Castle, unless we are able to also provide access either from New Castle or North Castle so as to create access for additional lots." *Id* at 43:12-44:02. Mr. Martabano then stated: "This road, itself, can only be extended for two additional lots, and that's what we've described as that condition we provided to the board and to the town attorney." *Id.* at 44;02-05.

243.    The compromise was memorialized in the Bedford Resolution. Among the conditions Bedford imposed on this plan were requirements reflecting Bedford's enforcement of Chapter 107 of its Land Subdivision Regulation. Ex. 208 at 2-3. In particular, the Bedford Resolution provided: "The road parcel south of the cul-de-sac as shown on the subdivision plat

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 72 of 116    RECEIVED NYSCEF: 01/24/2022

shall be subject to a restrictive covenant which shall run with the land and be enforceable by the Town of Bedford." Ex. 478 at 2, ¶ 1(e)(2).

244.    The Bedford Resolution further stated that the covenant "shall provide" that "[u]nless an additional access road originating in either the Town of North Castle or the Town of New Castle is made available to provide access to the applicant's property located in the Town of North Castle to the south of the road parcel the Seven Springs subdivision road as constructed in said road parcel can only be extended to provide access to two additional, that is, in addition to the lot created containing the existing former Meyer main house, residential lots to be created in the Town of North Castle. As to such two additional residential lots, such lots shall not [be] further subdivided to create any additional lots." Ex. 478 at 2-3, ¶ 1(e)(2)(a).

245.    Finally, the Bedford Resolution provided that "No more than five acres of land shall be disturbed at any one time." Ex. 478 at 8, ¶ 14.

246.    While the wording of the Bedford Resolution was specifically negotiated at the March meeting, the substance of each of the requirements discussed above had long been part of the Bedford approval process. Among other documents, the restrictions had been previously discussed and memorialized in Draft Environmental Impact Statement ("DEIS") accepted by the Planning Board on June 10, 2008; the Final Environmental Impact Statement accepted on March 27, 2009; a March 2009 Findings Statement issued by the Planning Board; and a preliminary subdivision plat approval reached at a December 2010 Planning Board meeting. Each of these prior documents had significant legal consequence: the environmental impact statements and findings statements were required documents under the New York State Environmental Quality Review Act. And under New York law, when a locality approves a preliminary subdivision plat, it may not later decline to approve the layout of a final plat that conforms to the specifications

70

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 73 of 116

NYSCEF DOC. NO. 630                                      RECEIVED NYSCEF: 01/24/2022

prescribed by the board. *See Sun Beach Real Estate Dev. Corp. v. Anderson*, 98 A.D.2d 367, 373 (2d Dep't 1983), *aff'd sub nom. Matter of Sun Beach Real Estate Dev. Corp. v. Anderson*, 62 N.Y.2d 965 (1984).

247.    The Trump Organization, including Eric Trump and outside counsel Ms. Dillon, understood the Bedford Resolution's significance. For instance, a July 2014 email, Eric Trump wrote Ms. Dillon, "Please find the proposed layout for North Castle. Let's discuss item 2(a) on the attached which is the final draft of the zoning resolution (i.e we could record this anytime)." Ex. 479 at C&W_0270138. The email attached a version of the Bedford Resolution; the reference to item 2(a) appears to relate to the provision restricting access to additional lots in New Castle and North Castle through Bedford. Ex. 480 at C&W_0270141-42.

248.    The Bedford Resolution was a partial success for the Trump Organization: it could develop the Bedford lots. However, it was also a partial failure: The Trump Organization could not build the lots quickly because of the five-acre restriction, and it could not develop additional lots on the site without secondary access from New Castle or North Castle.

249.    Evidence in OAG's possession further indicates that no secondary access was available. The Nature Conservancy owns property to the south and west of Seven Springs. In May 2006, Seven Springs LLC sued the Nature Conservancy (and others) seeking a determination that the Seven Springs parcel had an easement entitling it to a right-of-way over the portion of Oregon Road that lay on the abutting parcel owned by the Nature Conservancy to the south. *See* Ex. 483. In the course of that litigation, Seven Springs LLC (a Trump Organization entity) pleaded that "[t]he only viable secondary access to the Seven Springs Parcel is from the south." Ex. 482 at 6; Ex. 481 at ¶ 45. In addition, Mr. Trump personally filed a sworn affidavit attesting that "the only means by which access can be had to any public highway, street,

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630                                                          RECEIVED NYSCEF: 01/24/2022

road or avenue from the Seven Springs Parcel to the south is via the road known as Oregon

Road." Ex. 484 at 4; Ex. 485 (Affidavit of Alfred Donnellan, attorney for Seven Springs LLC) ¶

31 (attesting that "secondary access" necessary to "develop the entire Seven Springs Parcel . . .

can only be from the south").

250.    In 2012, the Appellate Division, Second Department held against Seven Springs

LLC. The court concluded that Seven Springs LLC lacked the claimed easement over Oregon

Road—and accordingly had no ability to use the portion of Oregon Road at issue in the litigation

to connect to a public road to the south of the Seven Springs property. *See Seven Springs, LLC v.*

*Nature Conservancy*, 95 A.D.3d 867, 871-72 (2d Dep't 2012).

251.    Mr. Trump's sworn assertion regarding access to the site was not the only

evidence that access from the west (through the Town of New Castle) was unavailable: In the

Trump Organization's prior SEQRA filings, it had concluded that access to Seven Springs from

the west was not viable due to various legal, operational, and environmental constraints.[33] Ex.

486 at II-70 (item J); see also Ex. 487 at 43-44 (2001 draft findings statement that notes:

"Emergency access to the site from another roadway other than Oregon Road (north) would be

preferred; however, another alternative does not appear to be feasible based upon consideration

of legal, operational and environmental factors.").

---

[33] The 2008 Draft Environmental Impact Statement prepared by environmental
consultants retained by the Trump Organization states: "No development is currently proposed in
the New Castle portion of the site." Ex. 486 at II-70 (item J). The 2008 DEIS analyzed these
issues "for informational and cumulative impact analysis purposes only." *Id.* The DEIS noted
that five single-family homes could be developed on the New Castle portion of the site "utilizing
existing zoning and given existing environmental constraints," but noted that because access for
such homes "would be from the terminus of Oregon Road (north) at the New Castle/Bedford
town line with an additional 1,230 linear feet of roadway, ending in a cul-de-sac," any such
development "would violate the Bedford Land Subdivision Regulations regarding the maximum
number of lots permitted on a dead-end street." *Id.* (noting that "[t]here would be no access to
Sarles Street," referring to access exiting to the west of the Seven Springs parcel).

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

RECEIVED NYSCEF: 01/24/2022

252.    Based on these environmental impact reviews, the Town of Bedford determined in 2009 that "a secondary access to the [Seven Springs] site is not available at this time." Ex. 488 at 25.

### 2.    The misleading Seven Springs development plans

253.    The Cushman appraisal used to value Mr. Trump's donated conservation easement assumes 24 lots could be developed on the property across all three municipalities with access only through a single subdivision road exiting the subdivision to the north through Bedford. Ex. 345 at MLB_EM00009126, -9146-48.

254.    The following map (the "2015 Plan"), also appended as Ex. 287, shows the final plan for the proposed Seven Springs subdivision, depicting 24 vacant lots for development (as well as two existing homes), as prepared by Insite Engineering:

73

INDEX NO. 451685/2020
NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 76 of 116    RECEIVED NYSCEF: 01/24/2022



255.    As this map depicts (and as the engineer who drew it agreed), the subdivision

road extending to the southern-most lot on the property ends in a cul-de-sac (with no access

through North Castle), and the subdivision road extending to the west ends (with no access

through New Castle). Ex. 489; see Ex. 490 at 89:18-90:17, 94:8-95:20, 105:13-17, 171:2-173:10,

177:16-178:3, 180:18-22.

256.    Insite's lead engineer, Scott Blakely, testified in sworn testimony before OAG

that in the subdivision maps he prepared, the only access point out of the subdivision is north

through Bedford. Ex. 490 at 171:18-173:10.

257.    A single subdivision road serving 24 lots in Bedford, North Castle, and New

Castle with access only through Bedford would violate the restrictions imposed by Bedford that

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

RECEIVED NYSCEF: 01/24/2022

the Trump Organization negotiated and agreed to. *See Ex.* 491 at 246:04-19, 252:04-254:24, 256:07-257:23.

258. In addition, evidence obtained by OAG indicates Insite Engineering and the Cushman appraisers who prepared the 2016 appraisal were misled (or at a minimum not informed) about the obstacles to the potential development of 24 lots as described above.

259. On November 20, 2015, Mr. Martabano (the land-use attorney who worked with the Trump Organization in connection with the potential development of the Seven Springs property) emailed a copy of the Bedford Resolution to Mr. Blakely (Insite's lead engineer). Ex. 492.

260. Mr. Blakely gave sworn testimony to OAG that Mr. Martabano conveyed to him that "there may be a problem with the way that we laid out the subdivision," Ex. 490 at 214:3-5, and that "Martabano questioned the number of lots that we had shown on the sketch plan and forwarded [Blakely] a copy of a draft approval resolution from the Town of Bedford planning board." See id. at 164:19-25, 167:8-169:7; see also id. at 37:22-25 (testifying that Mr. Martabano sent Mr. Blakely the 2013 Bedford Resolution and "had some concerns over its relationship to the sketch plans that our office had prepared and the lot yield.").

261. That same day, November 20, 2015, Mr. Blakely forwarded Mr. Martabano's email (with a copy of the 2013 Bedford Resolution) to Eric Trump, writing: "Eric, Charlie [Martabano] referenced condition # 2 to me when we discussed the latest drawings. He was concerned about the # of lots we are indicating in North Castle and New Castle based on this condition. I told him I would mention[] this to you." Ex. 492.

262. Mr. Blakely testified that Eric Trump called him in response. Ex. 490 at 169:24-170:18. Mr. Blakely memorialized their discussion in a handwritten note on a printed copy of the

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

RECEIVED NYSCEF: 01/24/2022

email he had written to Eric Trump. Ex. 492. That note reads: "Tel conv. w Eric. 'Move forward as laid out. We have the rights.'" *Id.*

263.     In addition to memorializing his phone call with Eric Trump, Mr. Blakely sent an email two weeks later to Eric Trump and Sheri Dillon (along with other attorneys working on the Seven Springs conservation easement project) confirming that the final site-planning map for the 2015 Plan showing 24 lots was based on the assurances Mr. Blakely received from Eric Trump. Ex. 493. Mr. Blakely wrote: "Assumptions have been made in discussions with Eric regarding the proposed roads and access among the 3 municipalities." *Id.*

264.     Mr. Blakely testified that the "discussions with Eric" he noted in this email were a reference to his telephone call on November 20, 2015, during which Eric Trump assured him that "we have the rights." Ex. 490 at 187:10-189:19.

265.     Mr. Blakely testified that he relied on Eric Trump's assurance and representation: "Of course we relied on them, yeah." Ex. 490 at 215:3-9.

266.     Mr. Blakely further testified that, "if [Eric Trump] didn't have an answer, we would have had to look into it"; but given Eric Trump's answer, Mr. Blakely testified that he did not seek to verify the "statement that my client made to me." Ex. 490 at 215:3-17; see also id. at 209:12-19.

267.     Cushman, in turn, relied on the site-planning maps prepared by Insite Engineering to determine that 24 lots could feasibly be developed. Ex. 345 at MLB_EM00009125, -9146-48, -9153, -9163-64, -9170-71; see also Ex. 476 at 75:05-81:25, 184:11-185:15, 188:02-188:20.

268.     In the course of preparing the March 2016 Appraisal, the appraisers not only relied on the 2015 Plan, but requested zoning approvals and other information necessary to conduct their analysis. Ex. 494.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630 RECEIVED NYSCEF: 01/24/2022

Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 79 of 116

269.    The Trump Organization did not provide the 2013 Bedford Resolution to the appraisers preparing the 2016 appraisal. Instead, the Trump Organization—through Morgan Lewis—sent these appraisers only an approval of five zoning variances from another agency, the Bedford Zoning Board of Appeals. Ex. 495 at C&W_0043584-85; Ex. 496 at C&W_0043541.

**3.    The misleading statements in the March 2016 Seven Springs appraisal**

270.    The appraisers who prepared the March 2016 Appraisal testified that at the time they prepared the appraisal, (1) they were unaware of the restrictions in the Bedford Resolution; (2) they were unaware of the Nature Conservancy litigation preventing Seven Springs from using the extension of Oregon Road; (3) they would have wanted to know this information; and (4) had they been aware of the Bedford Resolution and the litigation, they would have questioned the subdivision plans that they received from Insite. Ex. 497 at 303:18-304:17, 431:4-433:14; Ex. 498 at 221:17-222:25, 223:15-224:17, 226:2-227:18; Ex. 499 at 368:10-13, 427:15-428:10, 435:9-24.

271.    Initially, the Trump Organization's outside counsel, Ms. Dillon, testified that she did not recall seeing the 2013 Bedford Resolution. Ex. 500 at 190:8-191:22, 202:7-19, 203:16-19, 262:4-263:3. In later testimony, she stated that she may have seen the document. Ex. 572 at 682:02-12.

272.    The appraisers who prepared the March 2016 Appraisal further testified that being able to develop fewer lots than shown on the 2015 Plan would be a significant issue that would be relevant to the value of the property—and in all likelihood would have reduced the appraised value. Ex. 497 at 304:25-305:22, 306:15-18; Ex. 499 at 339:21-340:4, 441:19-442:8, 443:14-444:13.

273.    On information and belief, reducing the number of potential subdivision lots that could be developed from 24 to 10 would have reduced the value reached by the appraisal by as

much as approximately fifty percent. As one of the appraisers testified, holding other factors

constant, a reduction in the number of lots would reduce the appraised value by the same

proportion. Ex. 497 at 421:10-422:10.

274.    Another issue with the March 2016 Appraisal involves the timeline for

construction of the hypothetical 24 lots. Referring to the table below, the appraisal states that "As

displayed . . . , it is our opinion that the Bedford lots will not be ready for sale until the second

year in the analysis, and the New Castle and North Castle lots will not be ready for sale until the

third and fourth years, respectively." Ex. 345 at -9171. Because of the use of present-value

technique (see *supra* at ¶ 214) to value the donated easement, the pace of development was a

significant factor in the valuation.

| Seven Springs - Sellout Analysis | | | | | |
|---|---|---|---|---|---|
| **Projection Period** | **1** | **2** | **3** | **4** | **5** |
| **Fiscal Year** | **2015/2016** | **2016/2017** | **2017/2018** | **2018/2019** | **2019/2020** |
| Beginning Inventory | 24 | 24 | 18 | 12 | 6 |
| Plots Sold | 0 | 6 | 6 | 6 | 6 |
| Remaining Inventory | 24 | 18 | 12 | 6 | 0 |
| Price per Plot | $2,100,000 | $2,205,000 | $2,315,250 | $2,431,013 | $2,552,563 |
| Potential Gross Income | $        – | $ 13,230,000 | $ 13,891,500 | $ 14,586,075 | $ 15,315,379 |

275.    This assumption is in tension with the lengthy, unsuccessful development history

of Seven Springs. For instance, it does not appear to acknowledge that the Trump Organization

had never submitted any plans for the development of the New Castle site, and that it had

withdrawn plans to develop lots in North Castle in 2007. The assumption also appears to ignore

the difficulty of developing real estate in Westchester County—amply illustrated by the fact that

the approval process that resulted in the Bedford Resolution was begun by the Trump

Organization in March 2004, roughly nine years before approval was obtained.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 81 of 116

RECEIVED NYSCEF: 01/24/2022

276. The development timeline also conflicts with another restriction imposed in the Bedford Resolution: while the appraisal anticipates developing a land area of 164.9 acres, including over 60 acres in Bedford, it does not consider the Bedford Resolution's restriction on disturbing more than five acres at a time. Ex. 345 at -9170. That restriction was well known to the Trump Organization.

277. Indeed, to abide by this requirement, the Trump Organization's engineer was required to prepare a "staging plan," showing how each lot in Bedford would be developed. In 2014, Trump Organization counsel Mr. Martabano reviewed this document with the Bedford town planner. The phasing plan, excerpted below, depicts a process by which lots and infrastructure would be constructed in stages:

| Work Item Description | Work Phase | Precedent Work |
|---|---|---|
| Entire Roadway Reconstruction | B | Temporary Sediment Basin on Parcel 'A' |
| | | Water Quality Basin 2 on Lot B-8 |
| Rebuild Driveway on Lot B-1 | C | Water Quality Basin 2 on Lot B-8 |
| House on Lot B-2 | D | Entire Roadway Reconstruction |
| | | Water Quality Basin 2 on Lot B-8 |
| House on Lot B-3 | E | Entire Roadway Reconstruction |
| | | Water Quality Basin 2 on Lot B-8 |
| | | Water Quality Basin 4 |
| | | Retention Basin Parcel 'A' |

Ex. 501 at TTO_023040.

278. Mr. Martabano described this process in a March 27, 2014 memorandum to Eric Trump and others. Ex. 502 at TTO_01250330.

279. Because this staging plan required a developer to proceed sequentially, instead of in parallel, in building lots and infrastructure, it would have materially affected the development of the Bedford lots, and the valuation reached by the appraisers.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 82 of 116    RECEIVED NYSCEF: 01/24/2022

280.    The lead appraiser on the project, Mr. Barnes, testified that, in generating the timeline for approvals, he relied on an "Insite Report." According to Barnes, the Insite Report stated that "the property was very long, very well down the road toward getting approvals." He further testified that he relied on the Insite Report completely, saying, "I accepted the InSite report as the expert report on the issue of subdivision approval and construction of the subdivision"—and on the "potential approval in other towns and status of applications." Ex. 499 at 343:04-25, 432:02-18.

281.    As discussed, OAG has issued subpoenas to Insite, the Trump Organization, Cushman, and both of Ms. Dillon's law firms. None of these productions has identified any "Insite Report" regarding the timing of the Seven Springs development. OAG has obtained no documentary evidence that Insite ever provided a written opinion on the length of the time it would take to develop lots on Seven Springs.

282.    However, there is evidence that Ms. Dillon and employees of the Trump Organization provided their views on development timing—and urged that the Cushman appraisers assume it was shorter. After Mr. Barnes provided Ms. Dillon an estimated value on December 11, 2015, she expressed the Trump Organization's disappointment with the valuation and suggested some ways in which she believed Cushman could adjust its projections. In a voicemail preserved on Cushman's email servers, Ms. Dillon stated,

> Just wanted to give you a call and follow up from our conversation this morning and in chatting with our clients and they were really quite disappointed which I think I told you I had expected. I was hoping to chat this through with you a little bit more. Either over the weekend or on first thing Monday. I did see a couple places where you know where perhaps would appreciate it if you'd at least [give] a little more consideration to some of the assumptions . . . since I don't know if it would really take a full year before things could get started or lots could be sold . . . . You know things along those lines or see [if] absorption is really gonna take that long etc.

80

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630                                    RECEIVED NYSCEF: 01/24/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 83 of 116

Ex. 503.

283.    This was the first of several communications from Morgan Lewis suggesting that the appraisal assume lots could be developed or sold sooner. Ms. Dillon emailed Mr. Barnes later that day, writing, "Thanks so much - maybe give some thought to whether a year is needed for approvals / permitting of lots, given the prior approvals. In addition, I recall Dave [McArdle] was using 2.5% inflation rate. Perhaps the absorption might also be reviewed." Ex. 504 at C&W_0053379. (The "absorption rate" refers to the rate at which hypothetical lots or homes are sold.)

284.    On February 4, 2016, a Morgan Lewis associate working with Ms. Dillon wrote, "We aren't sure if we previously had provided to you the fact that the Bedford subdivision area already has preliminary approvals; as a result, we understand from our client that final approvals would likely take another that 3-6 months, as opposed to one year. We would like you to consider whether this fact results in 6 or so lots being sold earlier in the sellout analysis."

285.    Ms. Dillon's and her associate's suggestions conflicted with the Bedford Resolution and reflect an intent to produce an appraisal that relied on the fact of the "preliminary approvals" the lawyers referenced—but that would not consider the restrictions imposed by those approvals.

**4.    "[I]t seems like they are hiding something": Morgan Lewis and the Trump Organization's efforts to "reduce discovery"**

286.    Evidence indicates that Mr. Trump adopted a practice of preventing the creation of written records with regard to his development efforts at Seven Springs. One witness, who described his role as the "direct representative of Donald Trump" for the Lower Hudson Valley testified that Mr. Trump directed his activities, that he spoke to Mr. Trump personally about Seven Springs "[a]bout once a week," and that he "seldom" communicated in writing with Mr.

81

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 84 of 116

RECEIVED NYSCEF: 01/24/2022

Trump because Mr. Trump stated to him "that he did not want things put in writing in communications between us."[34] Ex. 505 at 13-16.

287.    Ms. Dillon also appears to have made efforts to avoid the creation of discoverable material. On June 18, 2015, Ms. Dillon instructed a Morgan Lewis associate to "call [Cushman appraiser] Tim [Barnes] and advise him to limit substantive emails with Scott Blakely (engineer) and instead use the phone to the extent possible (want to avoid creating discovery unnecessarily)." Ex. 506 at MLB_EM00025936. On September 28, 2015, Ms. Dillon sent an email to another Morgan Lewis associate, "Please use a fresh email when communicating with appraisers so that we avoid to the extent possible, email chains." Ex. 507 at MLB_EM00009685. In testimony before OAG, the Morgan Lewis associate testified that both emails were attempts to prevent creating documents that might be uncovered by adversaries potentially challenging the easement donation—i.e., the United States Internal Revenue Service or Department of Justice. Ex. 508 at 310:25-316:2.

288.    The Cushman appraisers acceded to Ms. Dillon's request. As Mr. Barnes, the senior appraiser, wrote to the junior appraiser, "Bedford conversations with engineer, broker, or attorney should be phone calls, not email whenever possible. You and I can email no problem." Ex. 509 at C&W_0043607. The junior appraiser chafed under this instruction, writing to a Morgan Lewis associate who insisted on a phone call to discuss "factual changes" that, "If it is indeed just a few factual changes, wouldn't it be easier to just write them down and I can take care of it over the weekend? I understand the reluctance to put anything in writing, but since it's

---

[34] Even absent such direct testimony of Mr. Trump's involvement, knowledge of Mr. Trump's agents presumptively would be imputed to him as a matter of law in civil litigation. *See, e.g.*, *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010) ("Agency law presumes imputation even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud.").

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 85 of 116

NYSCEF DOC. NO. 630                                    RECEIVED NYSCEF: 01/24/2022

something factual, it would not be seen as anything controversial or influencing us one way or the other." As she explained in an email that she drafted—but never sent—to the senior appraiser, "I am only resistant to this because it seems like they are hiding something and want to push me to ask about stuff that you were reluctant to change . . . ." Ex. 510 at C&W_0062128.

289.    That same Morgan Lewis associate testified to using an unusual practice to provide comments to the Cushman appraisers. The associate inserted comments on a draft of the Cushman appraisal using Microsoft Word's "track changes" and commenting functions, including text stating "that there is nothing to indicate that all approvals will not be granted." Ex. 511 at MLB_EM00016341. But, instead of emailing the Word file reflecting the comments and tracked changes to the appraisers, he printed the Word document out with its tracked changes visible and sent the paper printout to the appraisers via Federal Express. He then left the junior appraiser a voicemail to make sure the appraisers reviewed the comments. Ex. 512 at C&W_0062105.

290.    The associate testified that providing the edits by email would have made implementing them easier for the appraisers and that it would have been faster to email the edits; he undertook these efforts as part of the practice of "avoiding email." Ex. 508 at 341:12-15. The associate could not recall any reason to have provided the edits in paper format other than to avoid creating unnecessary discovery, and he testified that he believed he had used this unusual practice at Ms. Dillon's instruction. Ex. 508 at 333:5-342:15.

291.    Although Ms. Dillon and Morgan Lewis had sent this document to Cushman—waiving any privilege—Respondent Morgan Lewis failed to disclose it until the Court ordered it produced. While Cushman has represented that it has performed a diligent search and document production, and OAG has raised the paper document's existence to Cushman, Cushman has

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630                                                    RECEIVED NYSCEF: 01/24/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 86 of 116

never produced the document—raising the possibility that the Cushman appraisers destroyed or did not preserve the document.

* * * * *

292.    Mr. Trump's accountants have told OAG that the Seven Springs deduction resulted in a multi-million-dollar benefit to Mr. Trump.

293.    At various times, Ms. Dillon and Eric Trump acted as liaisons between the Trump Organization, its land-use counsel, its engineers, and the Cushman appraisers. However, as the Court is aware, the Trump Organization has asserted privilege over many of Ms. Dillon's communications. In addition, Ms. Dillon has stated that she cannot remember numerous interactions related to the Seven Springs easement donation—indeed, at one point, asked about her work with Eric Trump and David McArdle in 2014, she stated that "I don't recall who I communicated with in 2014 and I'm not even sure there was a project in 2014." Ex. 500 at 79:23-25; *see also* at 80:20-24; 86:2-24; Ex. 572 at 832:6-17; 861:3-862:14. For his part, Eric Trump has asserted his Fifth Amendment privilege in declining to answer OAG's questions on these matters. Ex. 338 at 315:3-324:25.

294.    Combined with privilege assertions and unclear memories, Mr. Trump and his agents' conscious efforts to limit the creation of records have only heightened the need for testimony from individuals—like Mr. Trump—who were directly involved in the events relating to Cushman's valuation of the Seven Springs donation. Mr. Trump's testimony is necessary to determine his role in the submission of the March 2016 Seven Springs appraisal to the Internal Revenue Service.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630                Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 87 of 116

RECEIVED NYSCEF: 01/24/2022

## INVESTIGATION BACKGROUND

295.    The foundations and progress of this investigation are well known to the Court and are thoroughly documented in the record of this action. As is relevant to the consideration of the pending motions, OAG supplements that record as follows:

## I.    Respondents Were Properly Served with Subpoenas

296.    Respondents do not dispute that they were each properly served with subpoenas calling for their testimony. Docket No. 354 at 10.

297.    OAG first contacted counsel for the Trump Organization about obtaining sworn testimony from Donald J. Trump, Donald Trump, Jr., and Ivanka Trump on November 1, 2021.

298.    On November 5, 2021 counsel for the Trump Organization informed OAG that they would not be representing the three individuals and that counsel information would be forthcoming.

299.    On November 8, 2021, OAG was contacted by counsel for Donald Trump, Jr. and Ivanka Trump. After an exchange of emails and telephone calls, counsel accepted service on their behalf on December 2, 2021. Ex. 301, 302, 303.

300.    On November 8, after OAG received counsel information for Donald J. Trump, it circulated a series of emails and calls to discuss OAG's subpoena, as well as to identify Mr. Trump's legal team. After an exchange of emails and telephone calls, on November 16, counsel agreed that one of the legal team members would be willing to accept service of the subpoena electronically. Counsel for Mr. Trump said they could not accommodate testimony in December but were available the first week of January.

301.    On November 19, 2021 OAG proposed January 7, 2021 for Mr. Trump's testimony. Having not received confirmation of that specific date, OAG issued a subpoena dated December 1, 2021 calling for the production of documents by December 17, 2021 and testimony

85

on January 7, 2022. Ex. 301. Counsel accepted service on behalf of Mr. Trump and

acknowledged receipt on December 2, 2021.

302.    On December 3, 2021 counsel objected to the document return date and said he

could not commit to a date for testimony. Counsel also noted that Mr. Trump was not afraid to

testify and explained that Mr. Trump has previously testified about the valuations of his assets in

litigation before.

303.    On December 9, 2021 counsel for Mr. Trump informed OAG that Mr. Trump

would move to quash the subpoena; and by December 15, counsel for Ivanka Trump and Donald

Trump, Jr., indicated that all three Respondents would move to quash the subpoenas jointly.

## II.    Respondents Have Had Ample Notice and Disclosure Concerning the Nature of the OAG Investigation and the Ongoing DANY Criminal Investigation

304.    As alleged in the Verified Petition filed in this action (Docket No. 181), OAG

opened this investigation in March 2019 following sworn congressional testimony from Michael

Cohen, the former Executive Vice President and Special Counsel at the Trump Organization, that

Mr. Trump had a practice of falsely inflating and deflating the value of his assets when it served

his purposes. *See* Docket No. 181 ¶ 52.

305.    On December 27, 2019, OAG served a subpoena *duces tecum* on the Trump

Organization (and Seven Springs LLC) seeking records from TTO related to Mr. Trump's

Statements of Financial Condition, and both subpoenas sought records related to the

development potential and easement donation over Seven Springs. Docket No. 181 ¶¶ 83-84.

306.    By that time, Mr. Trump and the Trump Organization were already aware of a

grand jury investigation being conducted by DANY. Indeed, on September 19, 2019, Mr. Trump

filed an action in the United States District Court for the Sothern District of New York asking the

court to "declare invalid" and enjoin the enforcement of certain subpoenas DANY served on

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    RECEIVED NYSCEF: 01/24/2022

Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 89 of 116

Mazars seeking information concerning "all statements of financial condition, annual statements, periodic financial reports, and independent auditors' reports prepared, compiled, reviewed, or audited by Mazars," as well as tax return information. *Trump v. Vance*, 19 Civ. 8694, Docket No. 1 (Sept. 19, 2019) at ¶ 47.[35]

307.    That action was eventually fully litigated resulting in a decision by the U.S. Supreme Court and further decisions by the district court and Second Circuit on remand. *See Trump v. Vance*, 591 U.S. ___ (2020) ; 941 F. 3d 631 (2d Cir. 2019); 395 F. Supp. 283 (S.D.N.Y 2019); also 977 F. 3d 198 (2d Cir. 2020); 481 F. Supp. 3d 161 (S.D.N.Y. 2020)..

308.    The DANY investigation was covered extensively by the press, with Mr. Trump commenting publicly on that investigation on numerous occasions.

309.    The Trump Organization and members of the Trump family have repeatedly raised the ongoing DANY investigation during the pendency of this OAG civil investigation. In addition, OAG has provided multiple updates to the Trump Organization, members of the Trump family, and their counsel about the status of the OAG investigation and the potential for criminal liability for individuals.

310.    As described in the opening Verified Petition in this action, on July 20, 2020 counsel for the Trump Organization and Eric Trump raised questions about the "scope of [OAG's] civil inquiry" and sought confirmation that OAG was conducting a civil investigation. Docket No. 181 ¶ 136.

311.    Although not legally required to provide such confirmation, OAG responded the next day, on July 21, and informed the Trump Organization that "[t]his Office does not currently

---

[35] The complaint in *Trump v. Vance* cited many of the same statements now points to in the Motion. *Compare* Docket No. 354 at 3-4 *with Trump v. Vance*, 19 Civ. 8694, Docket No. 1 at ¶ 38.

INDEX NO. 451685/2020
Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 90 of 116
NYSCEF DOC. NO. 630                                          RECEIVED NYSCEF: 01/24/2022

have an open criminal investigation into these matters," that "we have not coordinated with

another criminal law enforcement agency on matters related to this investigation," and that "if at

any point we become aware of information that prompts this Office to open a criminal

investigation or referral, we will advise counsel and proceed accordingly." Docket No. 181 ¶

137.

312.    Consistent with the terms of that letter, OAG updated counsel on January 29,

2021. Specifically, on January 29, 2021, OAG informed counsel for the Trump Organization,

counsel for Eric Trump and the counsel representing Donald Trump, Jr. and Ivanka Trump in

this proceeding, that evidence reviewed to date could lead to criminal liability and prompt OAG

to open a criminal investigation or make a criminal referral:

> This letter is to provide you with notice that earlier today we informed counsel for Mr.
> Weisselberg that based on certain records we have reviewed, it appears that Mr.
> Weisselberg's residential apartment at 140 Riverside Boulevard, Apartment 2102, was
> paid for by the Trump Organization from at least 2013 through 2016. A review of Mr.
> Weisselberg's payroll records, including his form W-2's and 1099's, did not identify any
> reported compensation for said apartment.
>
> We confirmed to counsel that we do not have an open criminal investigation, that we
> have not coordinated with another criminal law enforcement agency, and that we have
> not sought a criminal referral for Mr. Weisselberg at this time. Nevertheless, we informed
> his counsel that the conduct that was the subject of our phone call could lead to criminal
> liability.
>
> Consistent with our July 21 letter, please also consider this our notice to the Trump
> Organization and its officers, directors and employees that the above information could
> prompt this Office to open a criminal investigation or referral into the matter to which
> that information relates. We will not be providing any further updates on decisions or
> communications concerning this subject matter, except as we may decide in our sole
> discretion. Nor will we be making any further representations concerning any
> coordination or communication with other civil or criminal law enforcement agencies
> about any subject matter under investigation, including those addressed in the July 21
> letter.

Ex. 513.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630          Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 91 of 116          RECEIVED NYSCEF: 01/24/2022

313.     OAG provided a further update on April 27, 2021. Again, OAG informed counsel

for the Trump Organization, counsel for Eric Trump and the counsel representing Donald

Trump, Jr. and Ivanka Trump in this proceeding, of the following:

> This letter constitutes further notice that in addition to our ongoing civil investigation,
> this Office is also engaged in a criminal investigation. The potentially criminal conduct
> under review goes beyond the scope of the issues identified in the January 29 letter and
> may implicate the actions of other current and former officers, directors and employees of
> the Trump Organization and its affiliates, including matters that are the subject of the
> ongoing civil investigation.
>
> As indicated in January, we will not be providing any further updates on decisions or
> communications concerning this investigation, except as we may determine in our sole
> discretion.

Ex. 514.

314.     As Respondents note in their papers, this change was also publicly disclosed

almost a month later in May 2021. Docket No. 354 at 6. Indeed, Respondents cite numerous

press articles discussing the investigation and the role of OAG personnel cross-designated to

DANY. *Id.* at 6-7.

315.     Given the public litigation between Mr. Trump and DANY, the public reporting

on the DANY investigation and the multiple disclosures from OAG, there is no risk that any

witness, much less these Respondents, would appear for civil testimony without being aware of

the possibility of criminal liability.

316.     In fact, as evidence of that knowledge, two Trump Organization witnesses

invoked their Fifth Amendment privilege against self-incrimination more than a year ago: Eric

Trump and Allen Weisselberg.

317.     During his examination on October 5, 2020, when asked a question that went

beyond basic background information, Eric Trump delivered extended prepared remarks

objecting to the investigation and invoked his rights against self-incrimination:

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 92 of 116

RECEIVED NYSCEF: 01/24/2022

```
                                                      Page 39
1              E. Trump
2  fundamental violation of due process.  It
3  is a fundamental violation of my rights as
4  a citizen.
5           Accordingly, under the direction
6  of my counsel and for all of the above
7  reasons, I respectfully decline to answer
8  the questions under the rights of
9  privileges afforded to every citizen under
10 the United States Constitution and all
11 parts thereof and thereto including, but
12 not limited, to the separation of powers
13 doctrine, the First Amendment, the Fourth
14 Amendment, the Fifth Amendment, the Sixth
15 Amendment, and the Fourteenth Amendment as
16 incorporated through the Fifth Amendment
17 due process clause.
18          This will be my answer to all
19 further statements.
20    Q.   Mr. Trump, when you joined The
21 Trump Corporation, what was your title?
22    A.   For all the reasons provided in
23 my answer which are incorporated herein in
24 its entirety, I decline to answer that
25 question.
```

318.    Eric Trump then invoked his Fifth Amendment right against self-incrimination in response to more than 500 questions over six hours.

319.    Counsel for Donald Trump, Jr. and Ivanka Trump participated in the examination of Eric Trump on October 5, 2020.

320.    At testimony held on September 24, 2020, after answering a number of preliminary questions, Allen Weisselberg invoked his Fifth Amendment right against self-incrimination to more than 500 questions over five-and-a-half hours.

90

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 93 of 116

NYSCEF DOC. NO. 630                                      RECEIVED NYSCEF: 01/24/2022

---

**Page 583**

```
 1        ALLEN WEISSELBERG
 2    A.   No.
 3        MR. WALLACE:  Alex, can I ask
 4    you to pull up the documents at tab
 5    One.  Can we go to the top -- we're
 6    at the top.
 7    Q.   Mr. Weisselberg, this document
 8    was designated Exhibit 16 during your
 9    testimony in July and it was identified as
10    a supporting data spreadsheet for 2011;
11    does that appear to be correct?
12    A.   Under advice of Counsel, I am
13    invoking my rights under the Constitution.
14    Q.   What Constitutional rights are
15    you invoking?
16    A.   Can I talk to my attorney?
17    Q.   You may.
18        VIDEOGRAPHER:  Do you want to
19    go off the record?
20        MR. WALLACE:  No, let's stay
21    on.
22    A.   That would be under the Fifth
23    Amendment.
24    Q.   Why are you invoking that
25    right?
```

**Page 584**

```
 1        ALLEN WEISSELBERG
 2    A.   I would like to consult with my
 3    attorney.
 4    Q.   You may.
 5    A.   It protects me against
 6    self-incrimination.
 7    Q.   Mr. Weisselberg, if you are
 8    going to invoke that right repeatedly, it
 9    would be helpful if you could cover all of
10    those statements that we just got through
11    each time, thank you.
12        Mr. Weisselberg, during your
13    prior testimony in July you stated that
14    Jeff McConney prepared a supporting data
15    spreadsheet for the purpose of calculating
16    asset values for the statement of financial
17    condition, do you recall that testimony?
18    A.   Again, under the advisement of
19    Counsel, I'm invoking my right under the
20    Constitution.
21    Q.   What right is that?
22    A.   Under the Fifth Amendment.
23    Q.   Why are you invoking that
24    right?
25    A.   Self-incrimination.
```

### III.  The Trump Organization and Respondents Still Have Not Produced a Complete Set of Responsive Documents for Donald J. Trump

321.    As the Court is aware, there have been ongoing issues with the production of documents by the Trump Organization.

322.    As a result of those delays, as of today, more than two years after the issuance of the initial subpoena to the Trump Organization, OAG still does not have a complete production of responsive custodial documents for Donald J. Trump.

323.    Background information concerning the documentary subpoenas issued to the Trump Organization is laid out in the opening Verified Petition. *See* Docket No. 181 at ¶¶ 82-126.

324.    In the course of preparing for the testimony of Trump Organization counsel Jill Martin, OAG determined that certain documents—responsive to the subpoenas issued to the Trump Organization and containing search terms agreed to as part of the production process—

91

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 94 of 116

NYSCEF DOC. NO. 630                                                    RECEIVED NYSCEF: 01/24/2022

had been produced by third parties but not the Trump Organization. Ex. 515. At that time, the

Trump Organization had produced roughly 7,400 documents in total, substantially fewer than

many third parties had produced.

325.   By July 27, 2021, after conducting an audit of the production and taking four days

of testimony from corporate representatives, OAG informed the Trump Organization that there

were "number of serious failures in the Trump Organization's subpoena responses." Ex. 516.

326.   Among the failures identified in that letter was the fact that the Trump

Organization "appears to have produced only three custodial documents for Donald J. Trump,

and these only in the last week." *Id.* at 1. As set out in the letter:

**5.   The Trump Organization Produced Only Three Custodial Documents for Donald J. Trump**

For more than 18 months, the Trump Organization failed to produce a single document held by its owner and former president Donald J. Trump – despite the fact that the focus of the subpoena, and the investigation, is Mr. Trump's statement of financial condition. Mr. Trump personally executed documents central to the issues under investigation, like certifications of his statement of financial condition and conservation easements. Moreover, the statements on their face purport to contain valuations based on his evaluation. Mr. Garten testified that there were file cabinets at the Trump Organization holding Mr. Trump's files, that Mr. Trump had assistants who maintained files on his behalf, that he received and maintained hard copy documents, and that he used Post-It Notes to communicate with employees. It is impossible to take at face value the Trump Organization's conclusion that there was no reason to believe Mr. Trump was in possession of responsive information about his own personal financial statements, or that his custodial files lacked such information.

And that conclusion was proven false based on the July 22, 2021 production by the Trump Organization. Three documents in that production are flagged as being from the custodial files of Donald J. Trump.[5] Each of the three documents is a personal letter from Mr. Trump to an executive of a financial institution expressly discussing and touting his statement of financial condition. For example, attached at Tab F is a letter from Mr. Trump to Richard Byrne, the CEO of Deutsche Bank Securities, dated November 2011 and enclosing his financial statement ("hopefully, you will be impressed!"), touting the prospects of the Doral property and enclosing a separate letter that "establishes my brand value, which is not included in my net worth statement." This document, as well as any other similar documents from Mr. Trump's individual files are of obvious relevance to the investigation and were plainly called for in the original subpoena.

*Id.* at 6.

92

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 95 of 116

NYSCEF DOC. NO. 630                                RECEIVED NYSCEF: 01/24/2022

327.    The Trump Organization offered no specific response to the point about the Donald J. Trump custodial files.

328.    Following receipt of the letter, on August 27, 2021, the Trump Organization entered into an agreement with OAG tolling the statute of limitations for potential civil claims until October 31, 2021 with an option for OAG to extend the period to April 30, 2022 in its "sole discretion." Ex. 517. OAG provided such notice extending the tolling agreement on September 28, 2021. Ex. 518.

329.    In addition to the tolling agreement, after the July 27 letter, the Trump Organization agreed to enter into the Stipulated Order signed by this Court and docketed on September 3, 2021. Docket No. 314. Pursuant to the terms of that Order, the Trump Organization would undertake diligent efforts to comply with all outstanding subpoenas by October 15, 2021. After that date, if OAG reasonably determined that the Trump Organization had not met its obligation to comply with any outstanding subpoenas, the Trump Organization would retain an independent third-party e-discovery firm ("eDiscovery Firm").

330.    On November 1, 2021, OAG provided notice to the Trump Organization of the need to retain an eDiscovery Firm pursuant to the Stipulated Order. That letter highlighted again the failure to produce a set of custodial documents for Donald J. Trump:

93

INDEX NO. 451685/2020
NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 96 of 116    RECEIVED NYSCEF: 01/24/2022

1. **The Trump Organization has not complied with its subpoena obligations**

Although OAG's initial subpoena duces tecum was served in December 2019, productions from the Trump Organization only seem to have begun in earnest over the past two months; since the execution of a tolling agreement and entry of the Stipulated Order. During that time the Trump Organization has produced 751,035 documents which constitutes more than 97 percent of its total production of 769,813 documents. While OAG is still in the process of reviewing these documents, significant issues are already apparent. First, we still do not have a production of custodial documents for Donald J. Trump. Indeed, we have received no production of custodial documents for Mr. Trump since the production of the three letters from Mr. Trump on July 22, 2021, which we noted in our letter of July 27, 2021. All of this is despite testimony from the General Counsel, Alan Garten that there were file cabinets at the Trump Organization holding Mr. Trump's files, that Mr. Trump had assistants who maintained files on his behalf, that he received and maintained hard copy documents, and that he used Post-It Notes to communicate with employees. Moreover, while the Trump Organization has interviewed 64 custodians to date, Rhona Graff is the only executive assistant to Donald J. Trump on that list. Attached at Tab A is a list of executive assistants at the Trump Organization and addresses for scanners and other imaging machines they used. At least five of those executive assistants worked for Donald J. Trump, nearly all of whom have sent documents to or on behalf of Mr. Trump.[2] The failure to fully search these custodians and sources is a significant gap in compliance.

Ex. 519.

331.   The Trump Organization has offered no specific response to the point about the Donald J. Trump custodial files.

332.   After initially objecting to the notice and a series of meet-and-confer discussions in advance of a potential court filing, on November 17, 2021 the Trump Organization agreed to retain an eDiscovery Firm. That eDiscovery Firm was formally retained on December 15, 2021. OAG has identified the custodial documents of Donald J. Trump as a priority item for the eDiscovery Firm.

333.   Since the July 27 letter highlighting the discovery failures by the Trump Organization, the company has produced more than 900,000 documents. Of the roughly 933,000 documents produced in total, only three documents, produced on July 22, 2021, have metadata indicating they are the from the custodial files of Donald J. Trump. Productions continue to come

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 97 of 116
NYSCEF DOC. NO. 630                                                        RECEIVED NYSCEF: 01/24/2022

in, with the most recent production on January 13, 2022, but there have been no further

productions of documents tagged as Donald J. Trump custodial files since July 22, 2021.

334.    The Trump Organization has provided more than a dozen weekly reports on the

status of their ongoing production. None of those reports have addressed the custodial files of

Donald J. Trump.

335.    Indeed, Trump Organization productions appear lack even the most basic

governing documents of the Donald J. Trump Revocable Trust—the trust entity that owns all or

substantially all of the entities or assets comprising the Trump Organization apparently for Mr.

Trump's sole benefit and thus can be viewed as directing the operations of the Trump

Organization. Some of what OAG has uncovered regarding this trust has been produced by third

parties. For example, Donald J. Trump appears to have been the donor, sole trustee and sole

beneficiary of the trust at one time. Ex. 520 (document dated January 4, 2017 and signed by Mr.

Trump and reflecting certain transfers of interests). Mr. Trump then resigned as trustee, Ex. 521,

and Allen Weisselberg and Donald Trump, Jr. accepted appointments as trustees effective

January 19, 2017, Ex. 522. Documents also indicate significant transfers of Mr. Trump's

business interests to this trust. *E.g.*, Ex. 523, Ex. 524.

336.    But neither the Trump Organization nor Mr. Trump has produced a set of records,

so far as OAG is aware, that comprehensively articulates how and under what rules this trust has

operated. For example, the Trump Organization produced a document signed by Donald Trump,

Jr. and Allen Weisselberg purporting to contain "true and correct portions of the Second

Amendment of The Donald J. Trump Revocable Trust dated April 7, 2014" and including a

document purporting to be such an amendment signed by Mr. Trump. Ex. 525. The attached

amendment identifies Donald Trump, Jr. as "initial Trustee" and "Allen Weisselberg" as "initial

INDEX NO. 451685/2020
NYSCEF DOC. NO. 630                                    RECEIVED NYSCEF: 01/24/2022

Business Trustee." *Id.* at -346. The amendment purports to be 34 pages long, but numerous pages

plainly are missing, because the document is only eleven pages long and the document skips, for

example, from "Page 2 of 34" to "Page 8 of 34." *Id.* at -346, -347. The amendment articulates

that "The trust shall be managed by my Trustees, including my Business Trustee (collectively,

my "Trustees"), acting unanimously and in consultation with the Advisory Board, if any, subject

to the limitations and requirements set forth therein." *Id.* at -347. Eric F. Trump was identified as

"initial Chairman of the Advisory Board" and empowered "in his sole discretion the number of

members of the Advisory Board and the qualifications for membership." *Id.*[36]

### OAG SUBPOENAS TO RESPONDENTS, THEIR MOTION TO QUASH, AND THEIR FAILURE TO COMPLY WITH THE SUBPOENAS

**I.     Donald J. Trump Must Be Compelled to Testify and Produce Relevant Documents**

**A.     Donald J. Trump must be compelled to testify about his misleading Statements of Financial Condition**

337.     The financial statements under investigation purport to reflect his financial

condition, purport to be his responsibility, and were the subject of certifications that he signed as

to their truth and accuracy in connection with obtaining more than $300 million in loan proceeds

(as well as other business transactions).

338.     The financial statements under investigation are entitled, "*Donald J. Trump

Statement of Financial Condition.*"[37] They purport to reflect assets owned or controlled, directly

or indirectly, by Donald J. Trump (or a revocable trust of which he is [sole] beneficiary)—and

the statements are replete with contentions that the valuations presented are assessments made

---

[36] Another document is a two-page document entitled "The Donald J. Trump Revocable Trust" in which the two pages are labeled "Page 1 of 46" and "Page 46 of 46." Ex. 526. This document contains Mr. Trump's signature and is dated April 7, 2014 (the date OAG understands was the trust's inception date) and reflects that the trustee of the trust "shall pay such part or all of the net income or principal of the trust to me as I may direct from time to time." *Id.* at -545.

[37] Exs. 304-319.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 99 of 116    RECEIVED NYSCEF: 01/24/2022

by, *inter alia*, Mr. Trump. *See, e.g.,* Ex. 307 at PDF 14 (2009); Ex. 313 at MAZARS-NYAG-0003139 (2011); Ex. 312 at MAZARS-NYAG-0000732 (2014).[38] For example, the June 30, 2012 Statement of Financial Condition claims that Mr. Trump's assets were identified at values "determined by Mr. Trump in conjunction with his associates and, in some instances, outside professionals" and asserts that a group of "club facilities and related real estate" was valued at more than $1.5 billion in an "assessment [that] was prepared *by Mr. Trump* working in conjunction with his associates and outside professionals." Ex. 310 at MAZARS-NYAG-00006313, -317. Moreover, in the years before Mr. Trump placed his assets into a revocable trust, the Statements of Financial Condition reflected that "*Donald J. Trump is responsible* for the preparation and fair presentation of the financial statement . . . ." Ex. 309 at MAZARS-NYAG-0003139 (2011) (emphasis added).

339.    Furthermore, some evidence obtained by the Attorney General indicates that Mr. Trump was personally involved in reviewing and approving the Statements of Financial Condition before their issuance—a natural and logical focus of an investigation into whether a financial statement was fraudulent or misleading and, if so, who was responsible. Jeffrey McConney, Senior Vice President and Controller at the Trump Organization, appears to have been one of the principal participants in preparing the Statements of Financial Condition.[39] When asked who reviewed these statements before they were finalized, he testified that his understanding was that "Allen Weisselberg I believe reviewed it with Mr. Trump," that "Allen

---

[38] The assets included therein include, for example, assets with which Mr. Trump has publicly associated himself—such as his own triplex apartment in Trump Tower in New York, NY; Trump Tower; the Mar-a-Lago social club in Palm Beach, Florida; and many other properties that colloquially considered part of the Trump Organization.

[39] Evidence obtained by the Attorney General to date indicates that an Assistant Vice President at the Trump Organization became a principal participant in the creation of the Statements of Financial Condition approximately in November 2016. Ex. 352 at 177.

97

spoke with Mr. Trump about something with the statement," and that "I guess we can assume"

that Mr. Trump approved the statements before their issuance.[40] Mr. McConney testified that he

"wasn't part of the conversations with Allen and Mr. Trump so I don't know what they said."[41]

340.    Mr. Weisselberg, the Chief Financial Officer of the Trump Organization during

the relevant period, similarly testified that it was "certainly possible" Mr. Trump discussed

valuations with him and that it was "certainly possible" Mr. Trump reviewed the Statement of

Financial Condition for a particular year before it was finalized.[42] When pressed about whether

Mr. Trump and he approved particular Statements of Financial Condition before their issuance,

Mr. Weisselberg repeatedly invoked his Fifth Amendment privilege.[43]

341.    Given the testimony of Mr. McConney and Mr. Weisselberg, Mr. Trump is the

next logical subject of questioning regarding his participation in the creation of the Statements of

Financial Condition and his approval of their contents.[44]

342.    Mr. Trump also was personally involved in using the Statements of Financial

Condition in numerous commercial transactions for his own financial benefit. Three loans issued

by Deutsche Bank are cases in point. Mr. Trump's personal guaranty in connection with that

lender's $125 million loan in connection with the Trump National Doral stated that Mr. Trump's

---

[40] Ex. 337 at 82:3-83:14.

[41] *Id.* at 83:4-14.

[42] Ex. 357 at 140:21-141:24.

[43] Ex. 527 at 589:03-08, 607:03-13, 627:06-16, 671:03-08, 697:08-698:02.

[44] Evidence obtained by the Attorney General also suggests that Donald J. Trump had awareness of the financial picture of the Trump Organization. A memo dated October 15, 2016 and addressed to Mr. Trump reads, "per your request enclosed please find a detailed analysis setting forth our various business segments and their resulting operations." Ex. 528 at TTO_658594. The financial performance of Trump Organization businesses is a matter relevant to their value.

98

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630        Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 101 of 116        RECEIVED NYSCEF: 01/24/2022

Statement of Financial Condition for a particular year was "true and correct in all material respects" and "presents fairly Guarantor's financial condition."[45] Mr. Trump signed that guaranty.[46] In the personal guaranty Mr. Trump signed in connection with the loan for the Old Post Office property, Mr. Trump stated that his Statement of Financial Condition for the year ending June 30, 2013 was "true and correct in all material respects" and "presents fairly [Mr. Trump's] financial condition as of June 30, 2013."[47] Personal guaranties Mr. Trump signed in connection with the Chicago property reflected similar representations.[48]

343.    Loan documents in connection with these loans also required Mr. Trump to annually deliver his Statement of Financial Condition for the ensuing years accompanied by a similar certification, and Mr. Trump in fact did so. For example, in a document dated November 11, 2014, Mr. Trump "hereby certifie[d]" that his Statement of Financial Condition for the year ending June 30, 2014 and other identified documents "presents fairly and accurately in all material respects the financial condition of Guarantor for the period presented."[49]

---

[45] *See* Ex. 356 (Guaranty dated as of June 11, 2012 (Doral Guaranty) DB-NYAG-004169), at 4178004177; *id.* at 4173 (defining "Prior Financial Statements" to include Mr. Trump's "Statement of Financial Condition, dated as of June 30, 2011"). The loan document expressly states that this representation was made "[i]n order to induce Lender to accept this Guaranty and to enter into the Credit Agreement and the transactions hereunder." *Id.* at 4177-78.

[46] *Id.* at 4188 (Mr. Trump's signature)

[47] Ex. 366 at DB-NYAG-003287. Evidence obtained by the Attorney General indicates that the Trump Organization obtained the Old Post Office loan proceeds in stages—with the last draw on the loan (totaling millions of dollars) occurring in 2017. [EH-18] at DB-NYAG-217183.

[48] Ex. 364 at DB-NYAG-038878 (Chicago residential portion guaranty); Ex. 365 at DB-NYAG-003229 (Chicago hotel portion guaranty); Ex. 426 at DB-NYAG-003191 (amended and restated Chicago guaranty).

[49] Ex. 346 at DB-NYAG-060415. For the June 30, 2015 statement, Trump Organization employees in May 2016 initially submitted a document signed by him certifying the June 30, 2014 statement (Ex. 427 at DB-NYAG-024830, Ex. 428 at DB-NYAG-024831) but soon corrected the error by submitting a corrected first page of the compliance certificate (Ex. 429 at DB-NYAG-015494, Ex. 430 at DB-NYAG-015495).

INDEX NO. 451685/2020
NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 102 of 116    RECEIVED NYSCEF: 01/24/2022

344.    Misrepresentations on such certifications and the Statements of Financial Condition to which they relate carried potentially serious consequences—even if only under the terms of these various loans. At origination, the truth of Mr. Trump's representations was a condition precedent to the bank's obligation to lend. Ex. 420 at DB-NYAG-005853, at 5911. In addition, an "event of default" would occur if "[a]ny representation or warranty of Borrower or Guarantor herein or in any other Loan Document" (including a compliance certificate) "shall prove to have been false or misleading in any material respect at the time made or intended to be effective." Ex. 420 at DB-NYAG-005916.[50]

345.    Mr. Trump also sent letters boasting to third parties about the contents of the Statements of Financial Condition—documents that are among the [extremely small] number of Mr. Trump's custodial documents produced to NYAG to date.[51]

346.    At the outset, Donald J. Trump offers no objection to that portion of his subpoena seeking the production of documents. To the contrary, on December 3, 2021, while leaving open the question of whether he would appear for testimony and objecting to the document return date of December 17, 2021, counsel for Mr. Trump agreed to produce responsive documents in advance of his testimony. At the same time, however, counsel indicated an understanding that all relevant documents were in the possession of the Trump Organization: "As I explained, I believe the documents you are seeking are in the possession of the Trump Organization and not in the possession of my client. We agreed that document production would not be addressed by the date

---

[50] The term "Loan Document" included Mr. Trump's guaranty and "any other document, agreement, consent, or instrument which has been or will be executed in connection with" the loan agreement and guaranty. *Id.* at 5865. The same conditions applied to the Chicago and OPO properties. Ex. 422 at DB-NYAG-006019, -6023; Ex. 423 at DB-NYAG-005307-12; Ex. 421 at DB-NYAG-005025, 5031.

[51] Ex. 529; Ex.533; Ex. 534.

100

of December 17. We will, of course, work on getting the documents you seek, if any, prior to his

testimony." Ex. 530.

347.     To date, Mr. Trump has made no production of documents. Nor for that matter

has the Trump Organization made anything approaching a complete production of documents for

Mr. Trump. While Mr. Trump famously does not use email or a computer, he regularly generated

handwritten documents.[52] In testimony as a corporate representative, General Counsel Alan

Garten testified that there were file cabinets at the Trump Organization holding Mr. Trump's

files, that Mr. Trump had assistants who maintained files on his behalf, that he received and

maintained hard copy documents, and that he used Post-It Notes to communicate with

employees.[53] Yet as of June 30, 2021—more than 18 months after receiving the initial subpoena

from OAG—the Trump Organization still had not searched for those documents. Indeed, Mr.

Garten testified that, despite maintaining a "chron file" of correspondence for Mr. Trump, this

file was never searched because the Trump Organization determined, improbably, that Mr.

Trump was not involved in the preparation of his own financial statements. Ex. 531 at 317:18-

318:03 ("Q. Was the chron file searched for responsive information? A. No, because we did not

believe he had any involvement in any of the areas that were the subject of the subpoenas. Q.

How did you reach that conclusion? A. By interviewing other key witnesses and determining

who was involved.")

---

[52] *See, e.g.*, Ashley Parker and Philip Rucker, Donald Trump waits in his tower — accessible yet isolated, Washington Post, January 17, 2017 ("He does not use email and rarely surfs the Internet, meaning that telephone calls, television appearances or physical proximity are the best ways to reach him."); Ex. 531 at 316:09-316:10 ("Well, he doesn't use e-mail, so there – so there is no e-mail.")

[53] *See* Ex. 531 at 310:09-310:24 (file cabinets containing DJT documents); 312:24-313:10 (assistant holding documents); 316:03-316:17 (DJT correspondence file); 318:09-318:21 (communication by Post-It Note).

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 104 of 116    RECEIVED NYSCEF: 01/24/2022

348.    The Trump Organization reached this conclusion despite the representation in the financial statements that, "Donald J. Trump is responsible for the preparation and fair presentation of the financial statement in accordance with accounting principles generally accepted in the United States of America and for designing, implementing, and maintaining internal control relevant to the preparation and fair presentation of the financial statement."[54] The Trump Organization reached this conclusion despite testimony from Jeff McConney that Donald J. Trump would review and approve the financial statement with Allen Weisselberg.[55]

349.    Less than a month later, the Trump Organization produced documents further demonstrating that its conclusion was unfounded. On July 22, 2021, the Trump Organization produced three letters from Mr. Trump, forwarding his financial statement an executive of a financial institution expressly discussing and touting his statement of financial condition.[56] In one example, Mr. Trump wrote to Richard Byrne, the CEO of Deutsche Bank Securities, dated November 2011 and enclosing his financial statement ("hopefully, you will be impressed!"), touting the prospects of the Doral property and enclosing a separate letter that "establishes my brand value, which is not included in my net worth statement."[57] Metadata included with the production of those documents indicated that they were the custodial files of Donald J. Trump. But there have been no further productions of Mr. Trump's custodial files since July 2021.

---

[54] Ex. 312 (2015 Statement of Financial Condition at MAZARS-NYAG-00000688.).

[55] McConney Tr. at 82 ("Prior to November of '16, once all the information was provided to Bender's firm, Bender would produce a paper document, a draft document, and Allen Weisselberg I believe reviewed it with Mr. Trump. So I would go through the paper document. Allen would go through it to see if there's any typos or any corrections or make sure everything was -- the interest rates were correct or whatever. But I believe Allen spoke with Mr. Trump about something with the statement."); McConney Tr. at 98 ("He would review it with Allen as the final review, I guess you would call it. But that's what I know about that.").

[56] See Ex. 529 at TTO_214580; Ex. 533 at TTO_214579; Ex. 534 at TTO_214581.

[57] Ex. 529 at TTO_214580

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 105 of 116    RECEIVED NYSCEF: 01/24/2022

350.    Beyond such direct correspondence about his financial statement, there are also documents concerning his involvement in the valuation of his property and the financial transactions that arose from those valuations. For example, Mr. Trump initialed and approved as "OK" an email from Allen Weisselberg providing for the Trump Organization to sign a 15 year master lease for retail space in 40 Wall Street as part of the refinancing of that property with Ladder Capital in 2015.[58] Likewise, files from the Trump Organization reflect Mr. Trump's signed and initialed certification attesting to certain aspects of his financial condition as part of the 2015 application to Ladder Capital.[59]

351.    Yet neither Mr. Trump nor the Trump Organization have confirmed that an adequate search has been conducted, much less that all of his responsive documents have been produced. Both parties should be ordered to produce all responsive documents and certify to the completeness of that production within two weeks of a decision from this Court, and two weeks in advance of any testimony from Mr. Trump.

**B.    Donald J. Trump must be compelled to testify about the misleading appraisals he submitted to the Internal Revenue Service**

352.    The Attorney General's investigation likewise has obtained evidence indicating Mr. Trump's intimate involvement in the development of the Seven Springs property. For example, one witness, who described his role as the "direct representative of Donald Trump" for counties including Westchester testified that Mr. Trump directed his activities, that he spoke to Mr. Trump personally about Seven Springs "[a]bout once a week," and that he "seldom" communicated in writing with Mr. Trump because Mr. Trump indicated to him "that he did not

---

[58] Ex. 535 at TTO_122958
[59] Ex. 536 at TTO_122961

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 106 of 116    RECEIVED NYSCEF: 01/24/2022

want things put in writing in communications between us."[60] Mr. Trump has also publicly

spoken about the development of the Seven Springs Property in a 2019 speech to the National

Association of Realtors—stating that he that he fired a consultant who identified wetlands at the

site:

> But, you know, the environmental stuff was very tough. It was getting worse and
> worse every year. And I actually had this beautiful piece of land — 216 acres —
> and I was going to do something with it, and then I decided to do this. I'm glad I
> did this, because I can help more people. But, Tracy, they had a little area where
> water would sort of form when it rained. And all of a sudden, I found out that I
> can't build on the land. Does that make sense to you? I can't build on the land
> because it was considered, for all intents and purposes, a lake. And how did people
> find out about the lake? My consultant told them. Because, this way, you have to
> use your environmental consultant longer, pay them more money to get you out of
> the jam. Isn't that nice? (Laughter.) I fired his ass so fast.

353.    Matters related to the Seven Springs easement donation were reflected on Mr.

Trump's personal federal income tax returns for a series of years, which were produced to the

Attorney General's Office with Mr. Trump's personal authorization. Moreover, the accounting

firm that participated in preparing his tax returns has advised that conservation easements at

Seven Springs and TNGC LA generated a federal tax benefit for Mr. Trump personally to the

tune of more than $5 million over the course of tax years 2014 through 2018. The Attorney

General's Office obtained that concession only after Mr. Trump personally authorized his

accounting firm to communicate it to this Office.

---

[60] Ex. 505, at 13:3-16:15. Even absent such direct testimony of Mr. Trump's
involvement, knowledge of Mr. Trump's agents presumptively would be imputed to him as a
matter of law in civil litigation. *See, e.g.*, *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010)
("Agency law presumes imputation even where the agent acts less than admirably, exhibits poor
business judgment, or commits fraud.").

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 107 of 116    RECEIVED NYSCEF: 01/24/2022

## II.    Donald Trump, Jr. Must Be Compelled to Testify

354.    Donald Trump, Jr.'s testimony similarly must be compelled because it similarly will bear a "reasonable relation" to matters under investigation by the Attorney General. Indeed, the Trump Organization (where Mr. Trump has been employed through much, if not all, of the relevant period) has already agreed that Donald Trump, Jr. is a custodian whose documentary evidence would be produced in response to the Attorney General's subpoenas. There is no basis to deny the Attorney General the ability to examine Donald Trump, Jr. regarding that evidence and evidence OAG has received from other sources.

355.    As set forth above, Donald Trump, Jr. is an Executive Vice President of the Trump Organization who manages the Trump Organization with Eric Trump. Evidence obtained by the Attorney General indicates that Donald Trump, Jr. was involved with certain Trump Organization properties that are valued on Mr. Trump's Statement of Financial Condition, including 40 Wall Street, and was consulted in connection with the matters on the Statements of Financial Condition. Ex. 537 at CAPITALONE-00348338 (email sent to Donald Trump, Jr. providing him with the bank's internal DCF projection of how the 40 Wall property will perform); Ex. 405 at CAPITALONE-00348333 (memo following September 2009 meeting attended by Donald Trump, Jr. discussing financial troubles at 40 Wall); Ex. 322 at C117-119 (2013 supporting data reflecting Donald Trump, Jr.'s consultation on vacant space); Ex. 538 at TTO_01158462 (email reflecting Donald Trump, Jr.'s participation in a phone call in which Mr. Trump told a reporter in 2012 that 40 Wall Street had been appraised as being worth $600 million).

356.    Moreover, after Mr. Trump became a federal official and his assets were placed into a revocable trust, Donald Trump, Jr. and Allen Weisselberg were the only two trustees of that trust. Ex. 521. The Statements of Financial Condition for the years ending June 30, 2016 and

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 108 of 116    RECEIVED NYSCEF: 01/24/2022

later purport to have been Donald Trump, Jr.'s responsibility, in addition to Mr. Weisselberg's. As the June 30, 2016 statement articulates: "The Trustees of the Donald J. Trump Revocable Trust dated April 7, 2014, as amended, on behalf of Donald J. Trump are responsible for the accompanying statement of financial condition . . . ." Ex. 314 at MAZARS-NYAG-00001982. Statements to that effect are included on the Statements of Financial Condition from 2016 through 2020. *E.g.*, Ex. 315 at MAZARS-NYAG-00001841; Ex. 316, Ex. 317, Ex. 318 at MAZARS-NYAG-00162247.

357.     Donald Trump, Jr. also was directly involved in the loan transactions identified above. In particular, evidence obtained by the Attorney General establishes that he personally certified on an annual basis the truth and accuracy of the Statements of Financial Condition of Donald Trump to Deutsche Bank for 2016 through 2019.[61] On some such certifications, Donald Trump, Jr. specified that he was doing so as "attorney in fact" for Donald J. Trump. Ex. 431 at DB-NYAG-059755 (certifying June 30, 2016 statement); Ex. 432 at DB-NYAG-210893 (certifying June 30, 2017 statement). In addition to those certifications, Donald Trump, Jr., signed other made representations concerning the financial performance of [individual properties] to Deutsche Bank in connection with those loans. Ex. 539 at DB-NYAG-026821 (certification of August 31, 2017 OPO financial statement); Ex. 540 at DB-NYAG-018107 (DSCR Certification as of December 31, 2017); Ex. 541 at DB-NYAG-266198 (certification of August 2018 OPO financial statement); Ex. 542 at DB-NYAG-407776 (certification of January 2019 OPO financial statement and DSCR); Ex. 543 at DB-NYAG-233879 (certification of

---

[61] Ex. 431 (certifying June 30, 2016 statement); Ex. 432 (certifying June 30, 2017 statement); Ex. 433 (certifying June 30, 2018 statement); Ex. 434 (certifying June 30, 2019 statement).

106

INDEX NO. 451685/2020
NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 109 of 116    RECEIVED NYSCEF: 01/24/2022

August 2019 OPO financial statement and DSCR); Ex. 544 at DB-NYAG-407789 (certification of DSCR as of January 2020).

358.    Beyond the Statements of Financial Condition and particular assets therein, documents obtained by the Attorney General establish that Donald Trump, Jr. received his own memoranda discussing the financial position of the Trump Organization as a general matter. There are multiple memoranda addressed to him enclosing spreadsheets which provided a "detailed financial analysis" on the business segments in the Trump portfolio. Ex. 545 at TTO_041325; Ex. 546 at TTO_041347; Ex. 547 at TTO_041326; Ex. 548 at TTO_658823; Ex. 549 at TTO_658601. The analyses contained projected cash flow figures, actual cash flow figures, and other data which would be relevant to the Statement of Financial Condition of Donald J. Trump. For example, the Statement of Financial Condition for 2017 includes cash in certain entities in which Mr. Trump is a minority limited partner in a figure reported as Mr. Trump's own liquidity—but other internal documents sent to Donald Trump, Jr. reflected that any cash distributions from those entities were "at the discretion of" the general partner, not Mr. Trump. *Compare* Ex. 315 at MAZARS-NYAG-00001842 *with* Ex. 549.

### III.    Ivanka Trump Must Be Compelled to Testify

359.    Ivanka Trump began serving as an Executive Vice President in the Trump Organization in 2005. Ex. 330 at TTO_01751760. She left the Trump Organization in or around 2017.

360.    While at the Trump Organization she "direct[ed] all areas of the company's real estate and hotel management platforms." Ex. 330 at TTO_01751760. This included active participation in all aspects of projects, "including deal evaluation, pre-development planning, financing, design, construction, sales and marketing" as well as "involve[ment] in all decisions—large and small." Ex. 330 at TTO_01751760.

INDEX NO. 451685/2020
NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 110 of 116    RECEIVED NYSCEF: 01/24/2022

361.    Ivanka Trump was the lead negotiator for the leasehold with the General Services Administration (GSA) for the Old Post Office Property. Ex. 550 at 9:02-10:22; Ex. 551 at TTO_03342133 at 15:21-16:04.

362.    As part of that process, she submitted the Trump Organization's proposal to the GSA in July 2011. Ex. 552 at TTO_02114052.

363.    That proposal incorporated the Statement of Financial Condition of Donald J. Trump. Ex. 552 at TTO_02114204. ("Trump's real estate investments are funded from Donald J. Trump's significant net worth, which is composed of a wide range of capitalized affiliates. Please find Trump's Statement of Financial Condition in an envelope submitted with each copy of this proposal.").

364.    The Trump Organization represented to the GSA that the Statement of Financial Condition was compiled under GAAP with any departures noted in the accountant's compilation report. Ex. 552 at TTO_02114204.

365.    While at the Trump Organization Ivanka Trump, along with Allen Weisselberg, was the primary point of contact for representatives of Deutsche Bank. Ex. 553 at 25:06-11.

366.    As part of an ongoing search for financing on the Doral property, she was copied on a letter from Donald Trump to the CEO of Deutsche Bank Securities along with which he transmitted his Statement of Financial Condition and an additional letter meant to "establish [his] brand value." Ex. 529 at TTO_214580.

367.    Ms. Trump also discussed other, less favorable terms with respect to Doral with another financial institution for financing options not personally guaranteed by Mr. Trump. Ex. 554 at Beal 001652-53; Ex. 555 at BEAL001510; Ex. 556 at BEAL001511.

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 111 of 116

NYSCEF DOC. NO. 630                                            RECEIVED NYSCEF: 01/24/2022

368.    In the course of negotiating with Deutsche Bank financing for the Doral property,

Ms. Trump was responsible for securing loan terms, which included a personal guaranty by Mr.

Trump for which his representations regarding his financial condition would be (and were) made.

Ex. 557 at DB-NYAG-012113. Deutsche Bank then issued a loan on Doral to Trump Endeavor

LLC, an entity in the Trump Organization, and personally guaranteed by Mr. Trump. This loan

(initially comprised of one secured tranche and one unsecured tranche) was for a total of $125

million and closed in June 2012. Ex. 368 at DB-NYAG-001693420; Ex. 356 at DB-NYAG-

004169.

369.    An internal bank credit memorandum makes clear that the "Financial Strength of

the Guarantor" (referring to Mr. Trump) and his personal guaranty were factors in favor of

approving the loan. Ex. 368 at DB-NYAG-001693.

370.    Following the Doral loan, Ivanka Trump was involved in negotiations regarding

the Trump International Hotel and Tower Chicago.

371.    As part of that transaction, she received term sheets from two different divisions

of Deutsche Bank. Some term sheets included recourse through a personal guaranty while others

did not. See Ex. 558 at TTO_01555089; Ex. 559 at TTO_01555090; Ex. 560 at TTO_01748494;

Ex. 561 at TTO_01748497; Ex. 562 at TTO_01748510.

372.    The bank's internal credit memorandum, in recommending approval, noted the

"unique nature" of the loans and stated that "the credit exposure is being recommended based on

the financial profile of the Guarantor." Ex. 424 at DB-NYAG-068526.

373.    The final Chicago loans included a personal guaranty wherein it was represented

that Mr. Trump's June 30, 2012 Statement of Financial Condition was "true and correct in all

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 112 of 116

RECEIVED NYSCEF: 01/24/2022

material respects" and that the statement "presents fairly Guarantor's financial condition as of

June 30, 2012." Ex. 364 at DB-NYAG-038878; Ex. 365 at DB-NYAG-003229.

374.    After winning the bid to lease the Old Post Office, Ivanka Trump helped negotiate

financing for the property. Ex. 563 at DB-NYAG-011630; Ex. 564 at DB-NYAG-011631. The

personal guaranty for this loan required submission of Mr. Trump's Statement of Financial

Condition annually, along with a compliance certificate attesting that the statement presented

fairly in all material respects Mr. Trump's financial condition. Ex. 366 at DB-NYAG-003290-91,

3300-02.

375.    In order to receive funds from Deutsche Bank, Ivanka Trump submitted several

requisition draw requests. Ex. 565 at DB-NYAG-133282, -285, -290; Ex. 566 at DB-NYAG-

139707, -710, -715; Ex. 567 at DB-NYAG-129968, -9971, -9976; Ex. 568 at DB-NYAG-

140534, -537, -542; Ex. 569 at DB-NYAG-136544, -547, -552.

376.    In her tenure at the Trump Organization, other employees would provide Ivanka

Trump with financial analyses and projections relevant to the Statements and assets valued

therein. Ex. 570 at 163:17-23; Ex. 545 at TTO_041325; Ex. 549 at TTO_658601.

377.    One such analysis was an overall picture of the Trump Organization's corporate

cashflow prepared, in part, by Allen Weisselberg. Ex 545 at TTO_041325; Ex. 546 at

TTO_041347; Ex. 549 at TTO_658601.

378.    That analysis contained information on the operations of the "various business

segments" in the Trump portfolio.

379.    The information contained in the analysis which was prepared for internal use

could provide insight into the valuations in the Statement of Financial Condition sent to lenders

and insurers. For example, the golf club properties were valued using purported fixed assets in

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 113 of 116

NYSCEF DOC. NO. 630                                          RECEIVED NYSCEF: 01/24/2022

the financial statements rather than through the net operating income figures listed on the sheet. Many of those net operating income figures are below \$1 million—while the clubs are valued in the tens or hundreds of millions—suggesting that the fixed assets approach could result in higher values for the golf clubs than a more typical income-based approach. Ex. 547 at TTO_041339.

380.    Ivanka Trump's Park Avenue Penthouse was incorporated into the valuation of the Trump Park Avenue asset on Donald Trump's Statement of Financial Condition.

381.    As discussed above, Ivanka Trump had an option to purchase a penthouse unit in Trump Park Avenue at \$8,500,000. Ex. 394.

382.    During the pendency of that option her unit was valued at between \$12 million and \$17 million higher than the option price. Ex. 380 at MAZARS-NYAG-00003290; Ex. 381 at MAZARS-NYAG-3476; Ex. 382 at MAZARS-NYAG-00000184.

383.    When Ivanka Trump acquired a different option on another penthouse unit, that option price was reflected in the SOFC backup. Ex. 395 at TTO_02226839; Ex. 384 at MAZARS-NYAG-00000846.

**CLAIM FOR RELIEF**

**Compelling Subpoena Compliance—C.P.L.R. § 2308**

384.    The Attorney General repeats and realleges the preceding paragraphs as though fully set forth herein.

385.    OAG's subpoenas to respondents Donald J. Trump, Donald Trump, Jr., and Ivanka Trump dated December 1, 2021 (Exs. 301-303) were issued in a legally authorized investigation for which there is a sufficient factual basis, and the requests in the subpoenas are reasonably related to that investigation.

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 114 of 116

NYSCEF DOC. NO. 630                                    RECEIVED NYSCEF: 01/24/2022

386.   Respondents have not identified any legally cognizable basis for withholding from OAG any testimony, documents, or other communications responsive to OAG's subpoenas.

387.   Expedited briefing and resolution of OAG's application to compel is necessary to prevent further unnecessary delay and interference with OAG's investigation.

**WHEREFORE**, Petitioner respectfully requests that the Court grant the Supplemental Verified Petition in all respects and that a judgment and order be entered:

1. Compelling Donald J. Trump, within fourteen (14) days of the Court's Order, to comply in full with that portion the OAG subpoena seeking documents and information, by producing all responsive records in his possession, custody and control, including but not limited to his documents held by the Trump Organization, and to certify such compliance in writing and under oath;

2. Compelling Donald J. Trump to testify pursuant to the OAG subpoena within twenty-one (21) days of certifying the completion of production of all documents, with every right to invoke the Fifth Amendment Privilege on the record in response to any specific question;

3. Compelling Ivanka Trump and Donald Trump, Jr. to testify pursuant to OAG's subpoenas *ad testificandum* within twenty-one (21) days of the Court's Order, with all Respondents being afforded every right to invoke the Fifth Amendment Privilege on the record in response to any specific question; and

4. For such further relief as this Court deems just and proper.

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630  Case 1:21-cv-01352-BKS-CFH  Document 16-9  Filed 01/26/22  Page 115 of 116  RECEIVED NYSCEF: 01/24/2022

DATED: January 18, 2022                    Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: _____
        Austin Thompson

Andrew Amer
Colleen K. Faherty
Alex Finkelstein
Wil Handley
Eric R. Haren
Louis M. Solomon
Austin Thompson
Stephanie Torre
Kevin Wallace
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-8464
Austin.Thompson@ag.ny.gov

*Attorneys for the People of the State of New York*

113

INDEX NO. 451685/2020

NYSCEF DOC. NO. 630    Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 116 of 116    RECEIVED NYSCEF: 01/24/2022

## VERIFICATION

Austin Thompson, an Attorney admitted to the Bar of this State, hereby affirms and certifies that:

I am an attorney in the Office of Letitia James, Attorney General of the State of New York, who appears on behalf of the People of the State of New York as Petitioner in this proceeding. I am duly authorized to make this verification and am acquainted with the facts in this matter.

I have read the annexed verified petition, know the contents thereof, and state that the same are true to my knowledge, except for those matters alleged to be upon information and belief, and as to those matters I believe them to be true.

Dated: New York, New York
       January 18, 2022

_____
Austin Thompson

114

Page 1

1

2  STATE OF NEW YORK

   OFFICE OF ATTORNEY GENERAL

3  ------------------------------------------------

4  In re:

5

6  FINANCIAL STATEMENTS INVESTIGATION

7  ------------------------------------------------

8

                        October 5, 2020

9                       9:35 a.m.

10

11

12

13        VIDEOCONFERENCE EXAMINATION

   UNDER OATH of ERIC F. TRUMP, held at 725

14 Fifth Avenue, New York, New York, before

   Wayne Hock, a Notary Public of the State

15 of New York.

16

17

18

19

20

21

22

23

24

25

```
                                                        Page 2
 1
 2    A P P E A R A N C E S:
 3
 4         STATE OF NEW YORK
           OFFICE OF ATTORNEY GENERAL
 5                  28 Liberty Street
                    New York, New York 10005
 6
           BY:      MATTHEW COLANGELO, ESQ.
 7                  (via videoconference)
                    ERIC R. HAREN, ESQ.
 8                  (via videoconference)
                    LOUIS M. SOLOMON, ESQ.
 9                  (via videoconference)
                    COLLEEN K. FAHERTY, ESQ.
10                  (via videoconference)
                    AUSTIN THOMPSON, ESQ.
11                  (via videoconference)
                    GARY FISHMAN, ESQ.
12                  (via videoconference)
                    ALEX FINKELSTEIN, ESQ.
13                  (via videoconference)
                    KEVIN WALLACE, ESQ.
14                  (via videoconference)
15
           THE LAW OFFICES OF ALAN S. FUTERFAS
16                  565 Fifth Avenue
                    New York, New York 10017
17
           BY:      ALAN S. FUTERFAS, ESQ.
18                  (via videoconference)
19                  -and-
20
21
22
23
24
25
```

```
                                              Page 3
 1

 2

    A  P  P  E  A  R  A  N  C  E  S:  (Continued)
 3

 4

 5      MUKASEY  FRENCHMAN  &  SKLAROFF  LLP
        Attorneys  for  Witness
 6              2  Grand  Central  Tower
               140  East  45th  Street
 7             New  York,  New  York  10017
 8      BY:     MARC  L.  MUKASEY,  ESQ.
               (via  videoconference)
 9

10      ALSO  PRESENT:

11
               SHAWN  BUDD,  Videographer
12             (via  videoconference)
13

14                      *      *      *
15

16

17

18

19

20

21

22

23

24

25
```

```
                                               Page 4

 1

 2             THE VIDEOGRAPHER:  We are on the

 3     record.

 4             This is the videographer

 5     speaking, Shawn Budd, with Veritext

 6     Legal Solutions.

 7             Today's date is October 4, 2020

 8     [sic] and the time is 9:35 a.m.

 9             We are here to take the remote

10     video deposition of Eric Trump in the

11     matter of Financial Statements

12     Investigation.

13             Will counsel please introduce

14     themselves for the record.

15             MR. COLANGELO: This is Matthew

16     Colangelo from the New York Attorney

17     General's office.

18             And just one correction to the

19     record, Mr. Budd, I believe you said

20     today was October 4.  Today is the 5th

21     of October.

22             THE VIDEOGRAPHER: My apologies,

23     yes.

24             MR. COLANGELO: Also attending

25     this morning from the Attorney
```

```
                                               Page 5

 1

 2       General's office are Colleen Faherty,

 3       Austin Thompson, Alex Finkelstein,

 4       Eric Haren, Gary Fishman, Kevin

 5       Wallace, and Lou Solomon.

 6             And before we swear the witness,

 7       let's have Mr. Trump's counsel

 8       introduce themselves as well.

 9             MR. FUTERFAS: Good morning, Alan

10       Futerfas for Mr. Trump.

11             Marc, you wanted to say hello?

12             MR. MUKASEY: Sure.

13             Good morning, Marc Mukasey of

14       Mukasey Frenchman and Sklaroff also

15       for Eric Trump.

16             And Matthew, let me ask, are all

17       the folks you just named employees of

18       the Attorney General's office and

19       lawyers on this case or do they have

20       different positions?  And is anybody

21       who's not employed by your office on

22       the phone?

23             MR. COLANGELO: Nobody not

24       employed by any office is on the

25       phone.  Everybody I introduced is an
```

```
                                              Page 6
 1
 2       attorney with the Attorney General's
 3       office working on this matter.
 4              MR. MUKASEY: Thank you.
 5              MR. COLANGELO: Wayne, can you
 6       swear the witness.
 7  E R I C    F.   T R U M P, having
 8          been first duly sworn by a
 9          Notary Public of the State of
10          New York, upon being examined,
11          testified as follows:
12  EXAMINATION BY
13  MR. COLANGELO:
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                    Page 31
 1                      E. Trump
 2        A.     Yes.
 3        Q.     So did you start working at The
 4    Trump Corporation immediately after
 5    graduating from college?
 6        A.     Virtually, yes.
 7        Q.     And can you tell me what --
 8               MR. COLANGELO: Withdrawn.
 9        Q.     You just said that you work for
10    The Trump Corporation.
11               Can you tell me what The Trump
12    Organization is?
13        A.     I will let somebody who's much
14    better at answering entity questions
15    answer that than me, meaning structural
16    ownership questions.  I would let somebody
17    else handle that.  They'd do a much better
18    job than I would.
19        Q.     Okay.
20               What's your understanding of The
21    Trump Organization?
22               MR. FUTERFAS: I think Mr. Trump
23        will respond to the question with an
24        assertion of rights from here on
25        forward.
```

```
                                              Page 32

 1                    E. Trump

 2           Mr. Trump, if you'd like to

 3      assert your -- he will read an

 4      assertion of rights at this point.

 5           THE WITNESS:  The Attorney

 6      General of the State of New York has

 7      abandoned fairness, justice,

 8      impartiality when it comes to my

 9      family and to our business.  Before

10      Letitia James even took office, she

11      publicly stated that she already

12      concluded that The Trump Organization

13      engaged in wrongdoing and that she was

14      going to use the power of her office

15      to investigate our company, target my

16      family, and go after my father, the

17      President of the United States.  She

18      said that, if elected, she would use

19      her office to look into every aspect

20      of my father's real estate deals.  She

21      swore that she would definitely sue

22      him.  She claimed that he was an

23      illegitimate president more times than

24      I can count.  She boasted on video

25      that she would be, and I quote, "a
```

```
                                              Page 33
 1                      E. Trump
 2        real pain in the ass."  And she
 3        declared, "just wait until I'm in the
 4        Attorney General's office.  I've got
 5        my eyes on Trump Tower."  In perhaps
 6        her most egregious statement while
 7        campaigning she said, "we must join
 8        with law enforcement and other
 9        attorney generals across this nation
10        in removing this President from
11        office.  It's important that everyone
12        understand that the days of Donald
13        Trump are coming to an end."
14        Q.    Mr. Trump, my question was
15     what's your understanding what The Trump
16     Organization is.
17             MR. FUTERFAS: And he's
18        responding to the question with an
19        assertion of rights which he will
20        make.
21             Please continue reading your
22        assertion and your response.
23             MR. COLANGELO: Hang on one
24        second.
25             Mr. Futerfas, I'm trying to
```

```
                                            Page 34
 1                    E. Trump
 2      conduct this examination as
 3      expeditiously as we can out of respect
 4      for the witness and the court reporter
 5      and the videographer and all the
 6      attorneys.  My question was simply:
 7      What's your understanding of what The
 8      Trump Organization is.
 9            MR. MUKASEY: And Matthew, if
10      you're just a little patient, he is
11      going to assert his rights under the
12      United States Constitution.  Just bear
13      with us.  We want this to go as
14      expeditiously as possible as well.
15      Let him make his response and assert
16      his rights.
17            Thank you.
18      Q.    Go ahead, Mr. Trump.
19      A.    I'd like to start again if I'm
20   going to be interrupted.
21      Q.    Mr. Trump, I'm not going to have
22   my time and all my colleagues' time
23   wasted.  You've already made part of your
24   statement on the record.  Why don't you
25   proceed.
```

```
                                      Page 35
 1                E. Trump
 2      A.      Thank you.
 3              Letitia James made those
 4   statements without a shred of evidence,
 5   all while using them to fundraise and
 6   solicit financial support for her
 7   campaign.
 8              After the Attorney General was
 9   elected, she followed through on these
10   promises, publicly stating that she'd use
11   every area of the law to investigate
12   President Trump, his business
13   transactions, and that of his family.
14   Almost immediately she launched what is
15   now an eighteen-month long fishing
16   expedition wasting tens of thousands of
17   hours and millions of taxpayer dollars.
18   She blatantly took an adversarial
19   political position leading the endorsement
20   of Attorney Generals for Joe Biden and
21   conveniently chose the first day of the
22   Republican National Conventions, moments
23   before my family was set to take the
24   stage, as an appropriate time to file a
25   lawsuit against our company.
```

```
                                          Page 36
 1                        E. Trump
 2              The Attorney General has
 3   continued to make public statements and
 4   pronouncements that reflect clear bias,
 5   and this conduct for an elected official
 6   who's supposed to act without prejudice or
 7   favor is unlawful, it's unethical, and
 8   it's grossly improper.
 9              As we sit here today less than a
10   month away from the United States
11   presidential election and with my father
12   in Walter Reed Hospital, it has never been
13   more clear that Letitia James has
14   weaponized her office to target my father
15   and influence the upcoming election.
16              The Attorney General's known
17   politicization of her duties and
18   responsibilities as an elected official
19   violate every known rule of ethics,
20   impartiality, and justice.  She has a
21   politically-motivated vendetta against my
22   father and our family, and her actions
23   blatantly my due process rights as well as
24   the oath that she swore to uphold.
25              After seeing Letitia James'
```

```
                                        Page 37
 1                     E. Trump
 2   videos and statements, the Attorney
 3   General of the State of Louisiana, Jeff
 4   Landry, stated, "this is what" --
 5        Q.    Mr. Trump, I'm sorry, but this
 6   answer is not responsive.  If you have an
 7   assertion of rights, please make your
 8   assertion of rights.  I can't spend the
 9   entire day with this sort of obstreperous
10   answer.  If you have an assertion of
11   rights, please make your assertion of
12   rights, but the answer you've been giving
13   so far is not responsive to my question.
14             MR. FUTERFAS: He'll have an
15        assertion of rights in ninety seconds.
16        Q.    Go ahead.
17        A.     After Letitia James' videos and
18   statements, Attorney General of Louisiana,
19   Jeff Landry, stated, "this is what an
20   abuse of prosecutorial discretion looks
21   like.  No prosecutor should run on a
22   platform of threatening an American
23   citizen, his family, and his private
24   business with investigations and lawsuits,
25   all for political gain."  The United
```

```
                                        Page 38
 1                  E. Trump
 2   States Supreme Court has stated that
 3   prosecutors are prohibited from engaging
 4   in arbitrary fishing expeditions,
 5   initiating investigations out of malice or
 6   an intent to harass, or using the power to
 7   try and interfere with a President's
 8   official duties.
 9             Furthermore, the Supreme Court
10   has made it very clear that any effort to
11   manipulate a President's policy decisions
12   or retaliate against a President for
13   official acts through the issuance of a
14   subpoena is unconstitutional.
15             Years ago the Supreme Court
16   ruled that one of the Fifth Amendment's
17   basic functions is to protect innocent
18   individuals.  Given the circumstances, it
19   is clear that the Attorney General is not
20   proceeding impartially and is not
21   proceeding without bias or favor.  She's
22   carrying out a deliberate biased political
23   agenda that she promised as a candidate in
24   order to hurt my family and to help the
25   opposing political party.  This is a
```

```
                                      Page 39
 1                    E. Trump
 2   fundamental violation of due process.  It
 3   is a fundamental violation of my rights as
 4   a citizen.
 5             Accordingly, under the direction
 6   of my counsel and for all of the above
 7   reasons, I respectfully decline to answer
 8   the questions under the rights of
 9   privileges afforded to every citizen under
10   the United States Constitution and all
11   parts thereof and thereto including, but
12   not limited, to the separation of powers
13   doctrine, the First Amendment, the Fourth
14   Amendment, the Fifth Amendment, the Sixth
15   Amendment, and the Fourteenth Amendment as
16   incorporated through the Fifth Amendment
17   due process clause.
18             This will be my answer to all
19   further statements.
20      Q.    Mr. Trump, when you joined The
21   Trump Corporation, what was your title?
22      A.    For all the reasons provided in
23   my answer which are incorporated herein in
24   its entirety, I decline to answer that
25   question.
```

Page 262

1                              E. Trump

2  ███████████████████████████████████████████

3  ███████████████████████████████████████████

4  ███████████████████████████████████████████

5       Q.    Do you have any reason to think

6  that Mr. McConney would have recorded a

7  telephone conversation with you that

8  didn't, in fact, happen?

9       A.    For all the reasons provided in

10 my answer, which is incorporated herein in

11 its entirety, I decline to answer the

12 question.

13      Q.    Did you tell Mr. McConney in

14 September, 2012 that New Castle was lands

15 to be donated?

16      A.    For all the reasons provided in

17 my answer, which is incorporated herein in

18 its entirety, I decline to answer the

19 question.

20      Q.    Had you, in fact, made a

21 decision that the New Castle portion of

22 the Seven Springs Estate was to be donated

23 by September 24, 2012?

24      A.    For all the reasons provided in

25 my answer, which is incorporated herein in

Page 263

```
 1                      E. Trump
 2   its entirety, I decline to answer the
 3   question.
 4       Q.    Did you tell Mr. McConney in
 5   September, 2012 that the North Castle land
 6   was to be used as part of the main
 7   mansion?
 8       A.    For all the reasons provided in
 9   my answer, which is incorporated herein in
10   its entirety, I decline to answer the
11   question.
12       Q.    And the main mansion in North
13   Castle is the Meyer Mansion or Meyer
14   House; right?
15       A.    For all the reasons provided in
16   my answer, which is incorporated herein in
17   its entirety, I decline to answer the
18   question.
19       Q.    Was any decision to donate the
20   New Castle land that was made in 2012 a
21   change from the prior year's plans?
22       A.    For all the reasons provided in
23   my answer, which is incorporated herein in
24   its entirety, I decline to answer the
25   question.
```

```
                                                      Page 338

 1

 2                CERTIFICATION BY REPORTER

 3

 4      I, Wayne Hock, a Notary Public of the

 5   State of New York, do hereby certify:

 6      That the testimony in the within

 7   proceeding was held before me at the

 8   aforesaid time and place;

 9      That said witness was duly sworn

10   before the commencement of the testimony,

11   and that the testimony was taken

12   stenographically by me, then transcribed

13   under my supervision, and that the within

14   transcript is a true record of the

15   testimony of said witness.

16      I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, that I am not

19   interested directly or indirectly in the

20   matter in controversy, nor am I in the

21   employ of any of the counsel.

22      IN WITNESS WHEREOF, I have hereunto

23   set my hand this 6th day of October, 2020.

24

25
```

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
             -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiffs,*
*Donald J. Trump and Trump Organization LLC*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONALD J. TRUMP and TRUMP ORGANIZATION LLC, | Civil Action No.: 1:21-cv-01352-BKS-CFH |
| Plaintiffs, | |
| v. | **DECLARATION OF ALINA HABBA, ESQ.** |
| LETITIA JAMES, in her official capacity as Attorney General for the State of New York, | |
| Defendant. | |

I, Alina Habba, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am managing partner of the firm of Habba Madaio & Associates LLP, counsel for Plaintiff, Donald J. Trump, and Trump Organization LLC (collectively, "Plaintiffs") in the above-captioned matter (the "Action").

2.      I submit this declaration pursuant to Federal Rule of Civil Procedure 65 and Local Rule 7.1, in opposition to Defendant's motion to dismiss. The facts herein are true and correct and, unless otherwise stated, are within my personal knowledge.

3.      Attached as Exhibit A is a true and accurate copy of the Complaint.

1

**A300**

    4.       On January 25, 2022, counsel for the Office of the Attorney General, Kevin Wallace,

informed me via e-mail correspondence that the OAG's New York office, located at 28 Liberty Street,

New York, NY, is closed and all staff is working remotely.

                        Respectfully submitted,

Dated: February 16, 2022
       New York, New York

                                    _____
                                      Alina Habba, Esq.
                                    **HABBA MADAIO & ASSOCIATES LLP**
                                    1430 U.S. Highway 206, Suite 240
                                    Bedminster, New Jersey 07921
                                         -and-
                                    112 West 34th Street, 17th & 18th Floors
                                    New York, New York 10120
                                    Telephone (908) 869-1188
                                    Facsimile: (908) 450-1881
                                    E-mail: ahabba@habbalaw.com
                                    *Attorneys for Plaintiffs,*
                                    *Donald J. Trump and Trump Organization LLC*

**A301**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF NEW YORK

DONALD J. TRUMP and TRUMP
ORGANIZATION LLC,

*Plaintiffs*,

v.

LETITIA JAMES, in her official capacity
as Attorney General for the State of New
York,

*Defendant*.

Case No. 1:21-cv-1352 (BKS)(CFH)

## REPLY DECLARATION OF COLLEEN K. FAHERTY IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

I, Colleen Kelly Faherty, an attorney duly admitted to practice law in this Court, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is correct:

1.      I am an Assistant Attorney General in the Office of LETITIA JAMES, Attorney General of the State of New York, attorney for Defendant Letitia James, sued in her official capacity.  I submit this reply declaration in further support of Defendant's Motion to Dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

2.      This declaration addresses information related to the New York State Office of the Attorney General's (OAG) ongoing investigation into, *inter alia*, whether Plaintiffs Donald J. Trump and the Trump Organization, and various affiliated entities, had a practice of falsely inflating and deflating the value of Mr. Trump's assets when it served their purposes, such as to

secure loans and obtain economic and tax benefits (the "Investigation"). *See People v. The Trump Organization*, No. 451685/2020, 2020 WL 5775887, at *1 (Sup. Ct., N.Y Cty. Sept. 23, 2020), *modified on reargument*, 2020 WL 5992323 (Sup. Ct., N.Y Cty. Oct. 7, 2020), *further modified on reargument*, 2020 WL 7360811 (Sup. Ct., N.Y Cty. Dec. 15, 2020).  I submit this declaration based upon personal knowledge and my review of documents and records in possession of OAG, where I am employed and for which I am an Assistant Attorney General participating in the Investigation.

3.      On February 9, 2022, Mazars USA LLP, Plaintiffs' longtime accountants who prepared Mr. Trump's financial statements that are the focus of OAG's Investigation, determined that the statements covering the period 2011 to 2020 "should no longer be relied upon" and that Plaintiffs "should inform any recipients thereof" that they "should not be relied upon." Attached as Exhibit A is a true and correct copy of the February 9, 2022 Mazars letter.

4.      On February 17, 2022, Justice Engoron issued a decision and order in *People v. The Trump Organization*, NY Index No. 451685/2020 (the "NY Proceeding"), denying Mr. Trump's motion to quash OAG's subpoena seeking his documents and testimony and granting OAG's cross-motion to compel compliance.  Attached as Exhibit B is a true and correct copy of the February 17, 2022 decision and order issued by Justice Engoron.

5.      Attached as Exhibit C is a true and correct copy of a brief filed in the NY Proceeding styled Moving Parties' Joint Memorandum of Law in Support of Their Motion to Quash and/or Stay Subpoenas and in Opposition to the Attorney General's Motion to Compel (NYSCEF No. 642).

6.      On February 17, 2022, I attended oral argument in the NY Proceeding before Justice Engoron on Mr. Trump's motion to quash OAG's subpoenas and OAG's cross-motion to compel.  During the argument, Mr. Trump's individual counsel Ronald P. Fischetti asserted on the record that, if the court were to deny his motion to quash and grant OAG's motion to compel, then

he would need time in order to file an immediate appeal from any such decision on behalf of his client.

7.     Attached as Exhibit D is a true and correct copy of the February 17, 2022 "Statement by Donald J. Trump, 45th President of the United States of America," as accessed via the following hyperlink located at https://www.donaldjtrump.com/news/news-ukythdh3581593.

Dated: New York, New York
          February 23, 2022

                                        LETITIA JAMES
                                        Attorney General
                                        State of New York

                                        /s/ Colleen K. Faherty
                                        Colleen K. Faherty
                                          Assistant Attorney General
                                        NDNY Bar Number 703288
                                        Andrew S. Amer (admitted *pro hac vice*)
                                          Special Counsel
                                        Kevin Wallace
                                          Senior Enforcement Counsel
                                        28 Liberty Street, 18th Floor
                                        New York, New York 10005
                                        P: (212) 416-6046; -6127; -6376
                                        F: (212) 416-6009
                                        Colleen.Faherty@ag.ny.gov
                                        Andrew.Amer@ag.ny.gov
                                        Kevin.Wallace@ag.ny.gov

                                        *Attorneys for Defendant*

To:  Alina Habba, Esq. (via ECF)
        *Counsel for Plaintiffs*

**mazars**

Mazars USA LLP
135 West 50th Street
New York, New York 10020

Tel: 212.812.7000
www.mazars.us

February 9, 2022

VIA ELECTRONIC MAIL
Alan Garten, Esq.
The Trump Organization
Executive Vice President and Chief Legal Officer
725 Fifth Avenue
New York, NY 10022

Re:     Statement of Financial Condition for Donald J. Trump - 2011-2020

Dear Alan,

We write to advise that the Statements of Financial Condition for Donald J. Trump for the years ending June 30, 2011 – June 30, 2020, should no longer be relied upon and you should inform any recipients thereof who are currently relying upon one or more of those documents that those documents should not be relied upon.

We have come to this conclusion based, in part, upon the filings made by the New York Attorney General on January 18, 2022, our own investigation, and information received from internal and external sources.  While we have not concluded that the various financial statements, as a whole, contain material discrepancies, based upon the totality of the circumstances, we believe our advice to you to no longer rely upon those financial statements is appropriate.

As we have stated in the Statements of Financial Condition, Mazars performed its work in accordance with professional standards.  A subsequent review of those workpapers confirms this.

Due in part to our decision regarding the financial statements, as well as the totality of the circumstances, we have also reached the point such that there is a non-waivable conflict of interest with the Trump Organization.  As a result, we are not able to provide any new work product to the Trump Organization.

As of this writing, there are only a limited number of tax returns that still remain to be filed, including those of Donald J. Trump and Melania Trump.  We will be providing you a list of those returns and their status towards completion separately.

The due date to file those returns is February 15, 2022.  We believe the only information left to complete those returns is the information regarding the Matt Calimari Jr. apartment.  As you know, Donald Bender has been asking for this information for several months but has not received it.  Once that information is provided to your new tax preparers, the returns can be

Mazars USA LLP is an independent member firm of Mazars Group.

**mazars**

completed.  However, if those returns are filed late, there may be a late filing penalty of $10,000 per return, which will likely be subject to abatement.  We also believe that due to prior tax payments, there was an overpayment of taxes, thus, there should be no late payment penalty if these returns are in fact filed late.

Mazars will continue to do everything reasonably possible to facilitate a smooth transition to your new tax preparers.

Best regards,

William J.
Kelly

William J. Kelly

**FOIA/FOIL CONFIDENTIAL TREATMENT
REQUESTED**

**MAZARS-NYAG-00525839**

FILED: NEW YORK COUNTY CLERK 02/17/2022 04:00 PM

INDEX NO. 451685/2020

NYSCEF DOC. NO. 654

RECEIVED NYSCEF: 02/17/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-2   Filed 02/23/22   Page 2 of 9

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:    **HON. ARTHUR ENGORON**

*Justice*

PART     37

-----------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK, BY
LETITIA JAMES, ATTORNEY GENERAL OF THE STATE
OF NEW YORK,

Petitioner,

- v -

THE TRUMP ORGANIZATION, INC., DJT HOLDINGS LLC,
DJT HOLDINGS MANAGING MEMBER LLC, SEVEN
SPRINGS LLC, ERIC TRUMP, CHARLES MARTABANO,
MORGAN, LEWIS & BOCKIUS LLP, SHERI DILLON,
DONALD J. TRUMP, IVANKA TRUMP, and DONALD
TRUMP, JR.,

Respondents.

-----------------------------------------------------------------X

| INDEX NO. | 451685/2020 |
| MOTION DATE | 01/26/2022 |
| MOTION SEQ. NO. | 008 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 008) 321, 322, 323, 324,
325, 326, 327, 328, 329, 330, 331, 332, 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 343, 344, 345,
346, 347, 348, 349, 350, 351, 352, 353, 354, 357, 358, 359, 360, 361, 362, 363, 364, 365, 366, 367, 368,
369, 370, 371, 372, 373, 374, 375, 376, 377, 378, 379, 380, 381, 382, 383, 384, 385, 386, 387, 388, 389,
390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410,
411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 423, 424, 425, 426, 427, 428, 429, 430, 431,
432, 433, 434, 435, 436, 437, 438, 439, 440, 441, 442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452,
453, 454, 455, 456, 457, 458, 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 472, 473,
474, 475, 476, 477, 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490, 491, 492, 493, 494,
495, 496, 497, 498, 499, 500, 501, 502, 503, 504, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514, 515,
516, 517, 518, 519, 520, 521, 522, 523, 524, 525, 526, 527, 528, 529, 530, 531, 532, 533, 534, 535, 536,
537, 538, 539, 540, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 554, 555, 556, 557,
558, 559, 560, 561, 562, 563, 564, 565, 566, 567, 568, 569, 570, 571, 572, 573, 574, 575, 576, 577, 578,
579, 580, 581, 582, 583, 584, 585, 586, 587, 588, 589, 590, 591, 592, 593, 594, 595, 596, 597, 598, 599,
600, 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 612, 613, 614, 615, 616, 617, 618, 619, 620,
621, 622, 623, 624, 625, 626, 627, 628, 629, 632, 633, 634, 635, 636, 637, 638, 639, 640, 641, 642, 643,
644, 645, 646, 647, 648, 649, 650, 651

were read on this motion to _____ QUASH SUBPOENAS _____.

Upon the foregoing documents, it is hereby ordered that the motion by respondents Donald J.
Trump, Ivanka Trump, and Donald Trump, Jr. to quash subpoenas issued by petitioner is denied,
and petitioner's cross-motion to compel is granted.

Background

The instant special proceeding arises out of an investigation commenced by petitioner, the People of
the State of New York, by Letitia James, Attorney General of the State of New York (hereinafter,
"OAG"), into the financial practices of respondent the Trump Organization, its employees, and its
affiliates.

451685/2020  PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.
Motion No. 008

Page 1 of 8

Specifically, OAG is investigating whether respondents misstated the value of certain assets on annual financial statements, loan applications, tax submissions, and other official documents, and whether respondents made other material misrepresentations to third parties to secure favorable loan terms and insurance coverage and to obtain tax and other economic benefits.

OAG now claims that it has identified additional facts indicating that the aforesaid documents and others under investigation contain material misstatements and omissions and are materially inconsistent. OAG further states that to determine who is responsible for such alleged misstatements and omissions, it requires the testimony and evidence sought in subpoenas issued to newly joined respondents, Donald J. Trump, Ivanka Trump, and Donald Trump, Jr. (hereinafter, "the New Trump Respondents").

The New Trump Respondents now move to quash the subpoenas or, in the alternative, to stay their enforcement until the conclusion of OAG and/or the Manhattan District Attorney's criminal investigations and/or any other prosecutions of the Trump Organization. OAG now cross-moves to compel compliance with the subject subpoenas.

More than a year ago, at the outset of this special proceeding, this Court held that OAG's investigation, undertaken pursuant to New York Executive Law § 63(12), was lawful. The New Trump Respondents now ask this Court to re-examine the lawfulness of the investigation, arguing that OAG is using the existence of parallel civil and criminal investigations to circumvent the New Trump Respondents' rights under the United States and New York State Constitutions and New York statutory law.

Since this Court last issued a substantive Decision and Order in this case, the nature of OAG's investigation has expanded from purely civil to a civil/criminal hybrid. In a letter dated January 29, 2021, OAG informed the New Trump Respondents and respondent Eric Trump that the evidence reviewed to date could lead to criminal liability and prompt OAG to open a criminal investigation or make a criminal referral. NYSCEF Doc. No. 571. Subsequently, in a letter dated April 27, 2021, OAG informed the New Trump Respondents that "in addition to [OAG's] ongoing civil investigation, [OAG] is also engaged in a criminal investigation." NYSCEF Doc. No. 572.

Additionally, OAG has made numerous public statements confirming its ongoing assistance to the Manhattan District Attorney's criminal investigation into the Trump Organization. See, e.g., Statement from Attorney General James on Criminal Indictment of Trump Organization and CFO Weisselberg, https://ag.ny.gov/press-release/2021/statement-attorney-general-james-criminal-indictment-trump-organization-and-cfo, last accessed February 16, 2022.

Discussion
The New Trump Respondents seek two alternative forms of relief: (1) quashing the subpoenas, on the ground that the hybrid civil/criminal investigation conducted by OAG is inherently unconstitutional and, therefore, the tools normally available to OAG (here, its subpoena power) are being used unlawfully; and (2) a stay of the civil investigation until the conclusion of any criminal investigations on the ground that a stay is necessary to protect the New Trump Respondents' constitutional rights.

FILED: NEW YORK COUNTY CLERK 02/17/2022 04:00 PM
NYSCEF DOC. NO. 654
INDEX NO. 451685/2020
RECEIVED NYSCEF: 02/17/2022

The Constitutional Arguments

Both the United States Constitution and the New York State Constitution, following in the footsteps of deep-rooted Anglo-Saxon law, guarantee that no witness may be compelled to give testimony that will incriminate himself or herself.

Additionally, New York Criminal Procedure Law 190.40 provides that:

> 1. Every witness in a grand jury proceeding must give any evidence legally requested of him regardless of any protest or belief on his part that it may tend to incriminate him.

> 2. A witness who gives evidence in a grand jury proceeding receives immunity unless:

> (a) He has effectively waived such immunity pursuant to section 190.45; or

> (b) Such evidence is not responsive to any inquiry and is gratuitously given or volunteered by the witness with knowledge that it is not responsive.

> (c) The evidence given by the witness consists only of books, papers, records or other physical evidence of an enterprise, as defined in subdivision one of section 175.00 of the penal law, the production of which is required by a subpoena duces tecum, and the witness does not possess a privilege against self-incrimination with respect to the production of such evidence. Any further evidence given by the witness entitles the witness to immunity except as provided in subparagraph1 (a) and (b) of this subdivision.

The New Trump Respondents argue that OAG is "endeavor[ing] to bypass the grand jury protections of New York's Constitution and CPL 190.40." NYSCEF Doc. No. 642 at 8. In support thereof, the New Trump Respondents assert that the issuance of civil subpoenas while a criminal investigation is ongoing allows OAG to extract information from them under the guise of a civil proceeding without OAG's having to offer them the immunity that a grand jury setting would afford them.

This argument completely misses the mark. Neither OAG nor the Manhattan District Attorney's Office has subpoenaed the New Trump Respondents to appear before a grand jury. Indeed, OAG affirms in its reply that it is not conducting a grand jury investigation of respondents. NYSCEF Doc. No. 645 at 2. Furthermore, New York prosecutors do not call the subjects of their criminal investigations to testify before grand juries about their suspected criminal conduct without first securing an immunity waiver. See Carey v Kitson, 93 AD2d 50, 64 (2nd Dep't 1983) (stating in dicta that that case "should again serve as a reminder to law enforcement officials of the consequences of calling a witness before a Grand Jury without obtaining a waiver of immunity"). There is no evidence to support the New Trump Respondents' suggestion that, in the absence of a

451685/2020 PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.
Motion No. 008                                                                Page 3 of 8

3 of 8

FILED: NEW YORK COUNTY CLERK 02/17/2022 04:00 PM

INDEX NO. 451685/2020

NYSCEF DOC. NO. 654        Case 1:21-cv-01352-BKS-CFH   Document 25-2   Filed 02/23/22   Page 5 of 9       RECEIVED NYSCEF: 02/17/2022

parallel civil investigation, OAG would have been forced to subpoena the New Trump Respondents to appear before a grand jury, in which case they would have been entitled to immunity under CPL 190.40.

The New Trump Respondents' reliance on United States v Kordel, 397 US 1, 10 (1970), is also unpersuasive. In Kordel, the United States Supreme Court addressed the constitutional implications at issue when a governmental entity conducts simultaneous civil and criminal proceedings. The Kordel Court upheld the lawfulness of the parallel investigations. Specifically, the Kordel Court held:

> For [respondent] need not have answered the interrogatories. Without question he could have invoked his Fifth Amendment privilege against compulsory self-incrimination. Surely [respondent] was not barred from asserting his privilege [simply] because the proceeding in which the Government sought information was civil rather than criminal in character.

Id. at 7-8. The New Trump Respondents' argument overlooks the salient fact that they have an absolute right to refuse to answer questions that they claim may incriminate them. Indeed, respondent Eric Trump invoked his right against self-incrimination in response to more than 500 questions during his one-day deposition arising out of the instant proceeding. NYSCEF Doc. No. 630 at 90.

The New Trump Respondents further cite to dicta in Kordel in which the Court stated:

> We do not deal here with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; nor with a case where the defendant is without counsel or reasonably fears prejudice from adverse pretrial publicity or other unfair injury; nor with any other special circumstances that might suggest the unconstitutionality or even the impropriety of this criminal prosecution.

Id. at 11-12. For all that appears, we are not presented with any of those situations either. OAG pursued its civil investigation for more than a year without the slightest hint that it was a subterfuge to garner evidence for a criminal investigation in the offing. Notably, as discussed during this morning's oral argument, Donald J. Trump was hardly a stranger to the Attorney General's Office when Ms. James was campaigning to head that office. Ms. James' predecessors had investigated Donald J. Trump's "University" and "Foundation" and achieved significant settlements both times. A candidate for Attorney General would have been completely cognizant that, if elected, she would not be writing on a clean slate.

The New Trump Respondents further assert that public statements made by Attorney General Letitia James demonstrate the "impropriety" of her investigation. In support of this argument, they cite to dozens of public statements that James made, during her election campaign and afterward,

451685/2020  PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.
Motion No.  008                                                          Page 4 of 8

4 of 8

indicating that she intended to investigate any illegal conduct of respondent Donald J. Trump. The statements range from relatively innocuous ("I believe that the President of these United States can be indicted for criminal offenses") to overtly aggressive ("Oh we're definitely going to sue him. We're gonna be a real pain in his ass. He's going to know my name personally"). NYSCEF Doc. No. 641. Citing Kordel, the New Trump Respondents claim that these statements demonstrate that OAG is acting with the "impropriety" upon which Kordel Court expressly withheld judgment.

However, the New Trump Respondents read Kordel's dicta for far more than it is worth. First, the Kordel Court expressly declined to rule on the situations described in its dicta, and the New Trump Respondents have failed to offer any more recent authority to support any implication that the facts presented here should merit a legal conclusion distinct from that in Kordel. Second, even assuming, *arguendo*, that the Kordel Court had held that those facts require a different outcome, the New Trump Respondents have failed to demonstrate that any of the factual criteria hypothesized in the Kordel dicta are present here. OAG has promptly and repeatedly informed the New Trump Respondents that they could be subject to both civil and criminal prosecution, and OAG's investigation is hardly unsubstantiated. Indeed, this Court's *in camera* review of the thousands of documents responsive to OAG's prior subpoenas demonstrates that OAG has a sufficient basis for continuing its investigation, which undercuts the notion that this ongoing investigation is based on personal animus, not facts and law.

Moreover, Attorney General James, just like respondent Donald J. Trump, was not deprived of her First Amendment rights to free speech when she was a politician running for a public office with investigatory powers. As the United States Court of Appeals for the 7th Circuit has observed:

> Any effort by the judiciary to stop one politician from proposing and advocating steps that injure another politician would do more to violate the First Amendment (the right to advocate one's view of good policy is the core of free speech) than to vindicate the Equal Protection Clause... A class-of-one claim cannot be used to attack political practices that are valid as a general matter but bear especially hard on one politician.

Jones v Markiewicz-Qualkinbush, 892 F3d 935, 939 (7th Cir 2018). As has often been said, that a prosecutor dislikes someone does not prevent a prosecution.

Furthermore, the New Trump Respondents' reliance on 303 W. 42nd St. Corp. v Klein, 46 NY2d 686 (1979), is misplaced. In that case the New York Court of Appeals examined whether the New York State and United States Constitutions require an evidentiary hearing when a petitioner challenging an administrative determination demonstrates with reasonable probability that the administrative determination was a result of unconstitutional First Amendment discrimination. While holding that petitioner was entitled to a hearing, the Court found:

> The underlying right asserted by petitioner is equal protection of the laws as guaranteed by the 14th Amendment and the New York State Constitution (art I, § 11), one of the governing principles of our society. As enunciated more than a century ago in *Yick Wo v Hopkins* (118 US 356, 373-374), it forbids a public authority from

FILED: NEW YORK COUNTY CLERK 02/17/2022 04:00 PM
NYSCEF DOC. NO. 654

INDEX NO. 451685/2020
RECEIVED NYSCEF: 02/17/2022

Case 1.21-cv-01352-BKS-CFH Document 25-2 Filed 02/23/22 Page 7 of 9

> applying or enforcing an admittedly valid law "with an evil eye
> and an unequal hand, so as practically to make unjust and illegal
> discriminations between persons in similar circumstances". We
> have recognized the principle in cases involving the enforcement
> of the criminal laws and the administrative regulation of public
> health, safety and morals. To invoke the right successfully,
> however, both the "unequal hand" and the "evil eye" requirements
> must be proven--to wit, there must be not only a showing that the
> law was not applied to others similarly situated but also that the
> selective application of the law was deliberately based upon an
> impermissible standard such as race, religion or some other
> arbitrary classification.

Id. at 693 (internal citations omitted). Here, the New Trump Respondents have failed to submit any evidence that the law was not applied to others similarly situated, nor have they submitted any evidence of discrimination based on race, religion, or any other impermissible or arbitrary classification.

For OAG not to have investigated the original respondents, and not to have subpoenaed the New Trump Respondents, would have been a blatant dereliction of duty (and would have broken an oft-repeated campaign promise). Indeed, the impetus for the investigation was not personal animus, not racial or ethnic or other discrimination, not campaign promises, but was sworn congressional testimony by former Trump associate Michael Cohen that respondents were "cooking the books." NYSCEF Doc. No. 644. See Anheuser-Busch, Inc. v Abrams, 71 NY2d 327, 332 (1988) ("[i]n defending his inquiry, the Attorney-General enjoys a presumption that he is acting in good faith").

Additionally, as the New Trump Respondents have failed to demonstrate a "reasonable probability" of success on the merits, unlike the petitioners in 303 W. 42nd St. Corp., they are not entitled to "an evidentiary hearing before a judicial tribunal." 46 NY2d at 690.

Accordingly, OAG is not violating any rights that CPL 190.40 and the United States and New York State Constitutions afford the New Trump Respondents.

This Court notes in passing, and in dicta, that by letter dated February 9, 2022, Mazars USA LLC ("Mazars") (long-time accountant to respondents the Trump Organization and Donald J. Trump), informed the Trump Organization as follows:

> [T]he Statements of Financial Condition for Donald J. Trump for
> the years ending June 30, 2011 - June 30, 2020, should no longer
> be relied upon and you should inform any recipients thereof who
> are currently relying upon one or more of those documents that
> those documents should not be relied upon.
>
> We have come to this conclusion based, in part, upon the filings
> made by the New York Attorney General on January 18, 2022, our
> own investigation, and information received from internal and
> external sources. While we have not concluded that the various

451685/2020 PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.
Motion No. 008

Page 6 of 8

FILED: NEW YORK COUNTY CLERK 02/17/2022 04:00 PM      INDEX NO. 451685/2020
NYSCEF DOC. NO. 654      Case 1.21-cv-01352-BKS-CFH   Document 25-2   Filed 02/23/22   Page 8 of 9
RECEIVED NYSCEF: 02/17/2022

> financial statements, as a whole, contain material discrepancies,
> based upon the totality of the circumstances, we believe our advice
> to you to no longer rely upon those financial statements is
> appropriate.
>
> As we have stated in the Statements of Financial Condition,
> Mazars performed its work in accordance with professional
> standards.

NYSCEF Doc. No. 646. Upon this statement becoming public, on February 14, 2022, a
spokesperson for the Trump Organization released the following statement to various media outlets:

> [Mazars'] February 9, 2022 letter confirms that after conducting a
> subsequent review of all prior statements of financial condition,
> Mazars' work was performed in accordance with all applicable
> accounting standards and principles and that such statements of
> financial condition do not contain any material discrepancies. This
> confirmation effectively renders the investigations by the DA and
> AG moot.

https://www.washingtonpost.com/business/2022/02/14/trump-accountant-financial-statements/, last
accessed February 16, 2022.

The idea that an accounting firm's announcement that no one should rely on a decade's worth of
financial statements that it issued based on numbers submitted by an entity somehow exonerates
that entity and renders an investigation into its past practices moot is reminiscent of Lewis Carroll
("When I use a word, Humpty Dumpty said … it means just what I chose it to mean – neither more
nor less"); George Orwell ("War is peace, freedom is slavery, ignorance is strength"); and
"alternative facts."

The New Trump Respondents' lawyers have submitted serious, substantive, sophisticated legal
arguments in support of quashing the subject subpoenas. Although this Court finds those arguments
wanting, they are plausible and learned, and counsel made them in good faith. To proclaim that the
Mazars' red-flag warning that the Trump financial statements are unreliable suddenly renders the
OAG's longstanding investigation moot is as audacious as it is preposterous.

The Discretionary Stay
As an alternative to quashing the subject subpoenas, the New Trump Respondents ask this Court to
exercise its discretion by granting a stay pursuant to CPLR 2201, which states: "Except where
otherwise prescribed by law, the court in which an action is pending may grant a stay of
proceedings in a proper case, upon such terms as may be just."

Relying on Access Cap., Inc. v DeCicco, 302 AD2d 48, 52 (1st Dep't 2002), which held "[i]t is
settled that invoking the privilege against self-incrimination is generally an insufficient basis for
precluding discovery in a civil matter," OAG asserts that the New Trump Respondents have not
demonstrated a sufficient basis for a stay. The New Trump Respondents argue that OAG's reliance
on Access Cap., Inc. is baseless, as the facts at issue in that case did not involve the same

451685/2020 PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.
Motion No. 008                                              Page 7 of 8

FILED: NEW YORK COUNTY CLERK 02/17/2022 04:00 PM INDEX NO. 451685/2020
NYSCEF DOC. NO. 654   Case 1:21-cv-01352-BKS-CFH   Document 25-2   Filed 02/23/22   Page 9 of 9   RECEIVED NYSCEF: 02/17/2022

prosecutor's office working on both a civil and criminal investigation. However, the legal principle remains the same regardless of any factual distinctions. Indeed, it is well settled: "[t]hat defendant's conduct also resulted in a criminal charge against him should not be availed of by him as a shield against a civil suit and prevent plaintiff from expeditiously advancing its claim." Paine, Webber, Jackson & Curtis Inc. v Malon S. Andrus, Inc., 486 F Supp 1118, 1119 (SDNY 1980); see also In re 650 Fifth Ave., 2011 WL 3586169 at 15 (SDNY Aug. 12, 2011), aff'd 2012 WL 363118 at 1 (SDNY Feb. 2, 2012) (denying stay and holding "the Constitution does not guarantee that the exercise of Fifth Amendment rights will be without cost in the civil arena").

The target of a hybrid civil/criminal investigation cannot use the Fifth Amendment as both a sword and a shield; a shield against questions and a sword against the investigation itself. When they are deposed, the New Trump Respondents will have the right to refuse to answer any questions that they claim might incriminate them, and that refusal may not be commented on or used against them in a criminal prosecution. However, there is no unfairness in allowing the jurors in a civil case to know these refusals and to draw their own conclusions. El-Dehdan v El-Dehdan, 26 NY3d 19, 37 (2015) ("a negative inference may be drawn in the civil context when a party invokes that right against self-incrimination").

Accordingly, the Court, in its discretion, declines to issue a stay of OAG's civil investigation into the New Trump Respondents.

The Court has considered the New Trump Respondents' other arguments, including that OAG is violating their right to equal protection, and finds them to be unavailing and/or non-dispositive.

In the final analysis, a State Attorney General commences investigating a business entity, uncovers copious evidence of possible financial fraud, and wants to question, under oath, several of the entities' principals, including its namesake. She has the clear right to do so.

Conclusion
Thus, for the reasons stated herein, the motion of respondents Donald J. Trump, Ivanka Trump, and Donald Trump, Jr. to quash the subpoenas that the New York State Office of Attorney General issued to them or, in the alternative, to stay petitioner's civil investigation, is hereby denied, and petitioner's cross-motion to compel is hereby granted. Respondent Donald J. Trump is hereby ordered: (1) to comply in full, within 14 days of the date of this order, with that portion of the Office of the Attorney General's subpoena seeking documents and information; and (2) to appear for a deposition within 21 days of the date of this order. Respondents Ivanka Trump and Donald Trump Jr. are also hereby ordered to appear for depositions within 21 days of the date of this order.



| 2/17/2022 | | | | |
|---|---|---|---|---|
| DATE | | | ARTHUR ENGORON, J.S.C. | |

| CHECK ONE: | CASE DISPOSED | | X | NON-FINAL DISPOSITION | |
|---|---|---|---|---|---|
| | GRANTED | DENIED | | GRANTED IN PART | X OTHER |
| APPLICATION: | SETTLE ORDER | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |

451685/2020  PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.        Page 8 of 8
Motion No. 008

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Index No. 451685/2020 |
| Petitioner, | Motion Seq. No.: 008 |
| -against- | Oral Argument Requested |
| THE TRUMP ORGANIZATION, INC.; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; SEVEN SPRINGS LLC; ERIC TRUMP; CHARLES MARTABANO; MORGAN, LEWIS & BOCKIUS, LLP; SHERI DILLON; MAZARS USA LLC; DONALD J. TRUMP; DONALD TRUMP, JR.; and IVANKA TRUMP, | |
| Respondents. | |

**MOVING PARTIES' JOINT MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO QUASH AND/OR STAY SUBPOENAS AND IN
OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO COMPEL**

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM          INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                        RECEIVED NYSCEF: 02/01/2022

## PRELIMINARY STATEMENT

In its 160 page response to Respondents' Motion showing that the Attorney General is seeking to use "office" subpoenas to avoid the grand jury protections guaranteed to every witness even though the OAG is entwined in a criminal grand jury investigation of the very same matters – the OAG punts. The OAG deliberately avoids addressing the extent of its coordination with the District Attorney's Office (DANY). And it studiously avoids any mention of the public statements of its leadership. Indeed, the OAG runs from the words of Letitia James, deliberately avoiding the fact that she has taken equal ownership of the current criminal case and the ongoing grand jury investigation. And the OAG runs from Letitia James's statements that have improperly and repeatedly threatened investigation and prosecution of former President Trump and his family as a campaign promise to garner votes, money and support, and now, as Attorney General, to gain political support.

And the OAG runs from the very issue presented in this case – which is certainly not about whether garden variety parallel investigations are permitted under federal law. In over 160 pages of memoranda and Declarations, the OAG's responsive papers avoid answering the question presented: whether the OAG -- a law enforcement agency in New York, actively participating in a criminal prosecution where a grand jury is impaneled and is targeting certain people and circumstances -- violates the rights of those same targeted people under the New York Constitution and CPL 190.40 when it simultaneously requests their testimony under the guise of a supposedly administrative "office" subpoena.

Instead, the OAG writes about something else – deciding to reveal *ad verbosus* the current state of its investigation, with a throw-in of some discovery disputes. While we appreciate the free disclosure, the OAG's response completely sidesteps the legal and factual issues presented in the

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM     INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                   RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 4 of 39

Movants' Motion to Quash (Movants' MOL) (ECF 354)(Jan. 3, 2022).[1] An evidentiary hearing is requested. (*See* POINTS ONE and TWO, *infra*).

We address the OAG's deficiencies head on. We demonstate that the OAG's attempt to rely on federal standards is misplaced since those standards are not consistent with New York's Constitution and CPL 190.40 (POINT ONE (A)); the OAG's response flatly admits an endeavor to circumvent New York's Constitution and CPL 190.40 (POINT ONE (B)); the OAG's plan squarely violates New York's Constitution and CPL 190.40 (POINT ONE (C));  the authorities cited by the OAG are inapplicable to the facts here and, indeed, fail to address relevant authorities (POINT ONE (D)); and as much as they wish to ignore them,  Letitia James's statements are material and  binding on the OAG (POINT ONE (E)). POINT TWO addresses the alternative request for a stay.

The OAG's MOL Response also cross-moves to compel document disclosure and testimony. For efficiency and the convenience of the Court, this Reply Memorandum of Law responds to that motion as well. In this regard, we cannot ignore the obvious. Many years ago, then United States Attorney General Robert Jackson famously warned that "the most dangerous power of the prosecutor" is that he "will pick people that he thinks he should get, rather than pick cases that need to be prosecuted." The Federal Prosecutor, an Address by Robert H. Jackson,

---

[1] The Memorandum of Law in Support of Respondents/Moving Parties Donald J. Trump, Donald J. Trump, Jr., and Ivanka Trump's Motion to Quash Subpoenas or, in the Alternative, to Stay Enforcement of the Subpoenas or, in the Alternative, to Stay Enforcement of the Subpoenas Pending Resolution of the Criminal Investigation (the "Movants' MOL") (ECF 354), filed January 3, 2022, includes their Amended Notice of Motion (ECF 321); the January 3, 2022 Affirmation of Alan S. Futerfas (the "First Futerfas Aff.") (ECF 322); the Exhibits attached to the First Futerfas Aff. (Exhibits A-EE) (ECF 323-253); and the Memorandum of Law in Support of Respondents/Moving Parties Donald J. Trump, Donald J. Trump Jr., and Ivanka Trump's Motion to Quash Subpoenas or, In the Alternative, to Stay Enforcement of the Subpoenas Pending Resolution of the Criminal Investigation (ECF 354). The Moving Parties incorporate by reference those filings herein.

3

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM        INDEX NO. 451685/2020

NYSCEF DOC. NO. 642        Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 5 of 39        RECEIVED NYSCEF: 02/01/2022

Attorney General of the United States (April 1, 1940). He warned that rather than "discovering the commission of a crime and then looking for the man who has committed it," a prosecutor may, instead, be "picking the man and then searching the law books, or putting investigators to work, to pin some offense on him." *Id.* "It is in this realm," Jackson explained, "in which the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies." *Id.*

As demonstrated below and in response to the OAG's Motion to Compel, what Attorney General Letitia James has done in this case is exactly what Justice Jackson warned against more than 80 years ago. For the last three years, Ms. James has relentlessly targeted former President Donald J. Trump, his family, his companies and his associates because of her dislike of his speech and political views. It is a blatant and obvious attempt to suppress his voice, interfere with his political ambitions and silence the will of millions of voters – a violation of our nation's most fundamental constitutional rights. Rather than follow the evidence, Ms. James has made clear in her own words – over and over again – that she would, "pick the entities and individuals they wanted to harass" and then "search[ ] the law books" and "put investigators to work" in an effort to "pin some offense" on them. *Id.*   Even more concerning, Ms. James has targeted these individuals and entities, not in secrecy but, rather, unabashedly and publicly without reservation and without expressing the slightest concern that her actions violate the most basic ethical and professional duties of prosecutors. We cannot ignore these facts. For these reasons, in response to the OAG's Motion to Compel, the Respondents/Movants raise the defense of Selective Prosecution. The claim of Selective Prosecution here is not just amply supported – the evidence is

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM          INDEX NO. 451685/2020
NYSCEF DOC. NO. 642     Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 6 of 39  RECEIVED NYSCEF: 02/01/2022

overwhelming from the record, as amplified in this Reply. An evidentiary hearing is requested.

(*See* POINT THREE, *infra*).

## ARGUMENT

## POINT ONE

### THE OAG'S SUBPOENAS VIOLATE CPL § 190.40 AND THE NEW YORK STATE CONSTITUTION AND SHOULD BE QUASHED

**A.     The OAG's Reliance on Federal Law and Standards is Misplaced. New York's Constitution and CPL 190.40 Enumerate More Protective Legal Standards Governing Witnesses in a Criminal Investigation**

The question presented in this case is whether the OAG, a law enforcement agency in New York actively participating in a criminal prosecution where a grand jury is impaneled, and which criminal investigation is targeting certain people and circumstances, violates the rights of those same targeted people under the New York Constitution and CPL 190.40 when it simultaneously requests testimony that will be used in the criminal investigation under the guise of a supposedly administrative "Office" subpoena?

The OAG avoids this question and cites, instead, to the federal DOJ Manual, federal cases and what it asserts is practice in the federal arena (OAG MOL Response at 21-25), to argue that because a federal agency such as the DOJ can simultaneously engage in civil and criminal investigations, the OAG can do the same here. *Id*. at 25-26.  But it is wrong. The New York Constitution, as interpreted by the Court of Appeals, and the CPL promulgated thereunder, created protections for subpoenaed witnesses that federal law does not provide. Under the New York Constitution and the CPL, an agency conducting a criminal investigation through an active grand jury is required, if the witness is subpoenaed, to examine the subject or target of the investigation before the grand jury.

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM
INDEX NO. 451685/2020
NYSCEF DOC. NO. 642
RECEIVED NYSCEF: 02/01/2022

New York Constitution Article I, § 6 guarantees that "No person shall be held to answer for a capital or otherwise infamous crime . . . unless on indictment of a grand jury . . . . No person shall . . . . be compelled in any criminal case to be a witness against himself or herself." N.Y. Const. art. I, § 6. In New York, the right against compelled incriminating testimony is broader than its federal counterpart. Under the New York Constitution, "a prospective defendant or one who is a target of an investigation may not be called and examined before a Grand Jury and, if he is, his constitutionally-conferred privilege against self-incrimination is deemed violated even though he does not claim or assert the privilege.'" *People v. Steuding*, 6 N.Y.2d 214, 216–17 (1959) citing *People v. De Feo*, 308 N.Y. 595, 603 (1955); *People v. Ferola*, 215 N.Y. 285, 288–89 (1915); *People v. Gillette*, 126 App. Div. 665, 667 et seq. (1st Dep't 1908); *People v. Bermel*, 71 Misc. 356, 359 (N.Y. Sup. Ct. 1911). "An automatic result of the violation of this constitutional privilege is that the defendant is protected not only from indictment based on any incriminating testimony which he may have given, but also from use of such evidence. And the right and protection thus accorded by the Constitution may not be taken away or cut down by statute." *People v. Steuding*, 6 N.Y.2d 214, 217 (1959).

The constitutional principal that no prospective defendant may be compelled to give testimony before the grand jury is codified in CPL 190.40, which provides that "A witness who gives evidence in a grand jury proceeding receives immunity[.]"[2]

As the Commentary explains:

The automatic immunity feature provided in this section was put forward as a method of solving a long and tangled history of confusing litigation revolving about the issue of the rights of a suspect or "target" subpoenaed to give evidence before the Grand Jury. The Court of Appeals has held that compelling a target to appear before the Grand Jury violates the New York constitutional Privilege

---

[2] CPL § 190.40(2) includes three excerptions not pertinent here.

6

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM
INDEX NO. 451685/2020
NYSCEF DOC. NO. 642
RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 8 of 39

Against Self-Incrimination (see e.g., *People v. Steuding*, 6 N.Y.2d 214, 189 N.Y.S.2d 166, 160 N.E.2d 468 (1959). Moreover, various other holdings have ruled that such witnesses not only would have immunity but also could not be charged with perjury or contempt for their answers or refusal to answer (see Judge Denzer's original practice commentary for the present section in the 1971 edition of this volume). Accordingly, the CPL neutralized the New York constitutional problems by granting automatic immunity to all witnesses, so that a subpoena to appear and give evidence would not violate the rights of any witness, whether target or not.

Peter Preiser, Commentary to CPL 190.40 (McKinney).

For these very reasons, the OAG's reliance on the federal DOJ Manual is misplaced. (*See* OAG MOL Response at 23-25). The U.S. Department of Justice operates within federal constitutional bounds, but it need not comply with New York's Constitution. Neither the federal Constitution, nor any federal statute, grants automatic immunity to a grand jury witness. Indeed, under federal law, immunity for a witness can only be obtained by application to a federal judge for a grant of immunity under 18 U.S.C. § 6002. There is thus no reason or motivation for DOJ agencies and prosecutors to circumvent the grand jury.

New York law is different; witnesses in grand jury investigations are granted automatic immunity in the grand jury. Accordingly, there is a strong motivation for New York City and State investigations to avoid putting witnesses before the grand jury, *ergo* the instant "office" subpoenas. Indeed, as we discuss directly below, the OAG's responsive papers effectively admit that they are endeavoring to circumvent CPL § 190.40 and deprive the Moving Parties of their constitutional rights.

### B.    In an Extraordinary Admission, the OAG Reveals that the Purpose of the "Office" Subpoena is to Support the Criminal Investigation in Direct Circumvention of the Moving Parties' New York Constitutional and Statutory Rights

In Movants' MOL, we asserted that the OAG and DANY were both investigating valuation matters involving the same properties. The OAG's 115 page Petition conclusively concedes this

7

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM    INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                 RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 9 of 39

fact: they are looking into the identical properties as the criminal investigation. But their responsive papers reveal much more. Utilizing the inapplicable (Federal) DOJ Manual, the OAG's papers admit that they fully intend to use the "office" subpoenas for testimony and documents to support, buttress and further the OAG's criminal investigation. *See* OAG's MOL Response at 23 ("The DOJ recognized [in 1997] that '[i]n order to maximize the efficient use of resources, it is essential that our attorneys consider whether there are investigative steps common to civil and criminal prosecutions' and '[w]hen appropriate, criminal [and] civil . . . attorneys should coordinate an investigative strategy,' underline{noting in particular that 'evidence can be obtained without the grand jury by administrative subpoenas' . . . and 'can then be shared among the various personnel responsible for the matter.'"}) (quoting from the 1997 DOJ Justice Manual) (emphasis added**);** OAG's MOL Response at 24 ("During the investigation, attorneys should consider investigative strategies that maximize the government's ability to underline{share information among criminal, civil, and agency administrative teams, including the use of investigative means other than grand jury subpoenas for documents or witness testimony . . . .}") *Id.* (emphasis in original).

The endeavor to bypass the grand jury protections of New York's Constitution and CPL 190.40 is thus made crystal clear for all to see. "The Attorney General's position calls to mind the venerable prohibition on public officials doing indirectly what they are forbidden from doing directly." *People ex rel. Spitzer v. Grasso*, 42 A.D.3d 126, 140, n. 9, 836 N.Y.S.2d 40 (1st Dept. 2007), citing *Matter of Diamond Asphalt Corp. v. Sander,* 92 N.Y.2d 244, 259, 678 N.Y.S.2d 567 (1998); *People ex rel. Burby v. Howland,* 155 N.Y. 270, 280–281, 49 N.E. 775 (1898). As starkly presented by the OAG here, the agency that is co-prosecuting the criminal case, and conducting an ongoing grand jury criminal investigation, is seeking testimony through an "office"

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 10 of 39

subpoena that it fully intends to use in the criminal case - without providing to the witnsses the

protections guaranteed under New York law. The OAG's improper plan is plain.

    **C.**    **The OAG's Plan Violates the New York Constitution and CPL 190.40. The Court Should Not Permit the OAG to Eviscerate New York's Constitutional Protections or the Legislature's Statutory Requirements**

As envisoned by the OAG, New York's Constitutional and statutory protections can be

easily avoided, indeed, eviscerated, if the same agency involved in the criminal investigation

simply opens a "civil" investigation into the very same matters. But the protections that New York

provides cannot be so easily nullified. The law is clear that constitutional provisions and statutes

are to be interpreted to effectuate the intent and purpose of the protections or obligations set forth

therein.

This principle was made clear in *People v. Coss*, 178 A.D.3d 25, 28, 111 N.Y.S.3d 137 (3d

Dept. 2019). There, the Third Department interpreted CPL 195.20 to be consistent with Article 1

§ 6 of the N.Y. Constitution which provides an exception to the requirement that felony charges

be prosecuted by indictment by a grand jury where "a person . . . may waive indictment by a grand

jury and consent to be prosecuted on an information."  CPL  195.20 provides that a superior court

information (SCI) "may include any offense for which the defendant was held for action of a grand

jury and any offense or offense properly joinable therewith . . ."  *Id.* at 27.

The question presented in *Coss* was whether, "under CPL  195.20, and consistent with the

constitutional waiver provision, an SCI that charges an offense for which a defendant was held for

action of the grand jury may also charge a *joinable* offense which is 'higher in grade or degree

than the triggering offense.'" *Id.* at 28.  The *Coss* Court recognized that the plain language of the

pertinent provision in CPL  195.20 did not appear to prohibit such a charge. However,  permitting

an offense of higher grade to be joinable in the SCI would frustrate the intent of the legislature

**A323**

INDEX NO. 451685/2020
NYSCEF DOC. NO. 642        Case 1:21-cv-01352-BKS-CFH    Document 25-3    Filed 02/23/22    Page 11 of 39        RECEIVED NYSCEF: 02/01/2022

which was to "strike a balance between judicial efficiency and the constitutional right to prosecution by indictment." *Id.* at 30.

In a holding directly applicable here, the Third Department held that a literal interpretation of CPL 195.20 would "circumvent" and "undermine[] the protections provided in N.Y. Constitution, article I, sec. 6."

> A literal interpretation of the phrase "any offense or offenses properly joinable therewith" in CPL 195.20 would permit the circumvention of this constitutional imperative by the simple expedient of permitting the inclusion of joinable offenses in a higher degree or grade that were never charged in a felony complaint. Such a statutory interpretation is inconsistent with and undermines the protections provided in N.Y. Constitution, article I, § 6. It is well settled "that the Legislature in performing its law-making function may not enlarge upon or abridge the Constitution" (*People v. Allen*, 301 N.Y. 287, 290, 93 N.E.2d 850 [1950)], and that "courts must avoid, if possible, interpreting a presumptively valid statute in a way that will needlessly render it unconstitutional." (*Overstock.com, Inc. v. New York State Dept. of Taxation & Fin.*, 20 N.Y.3d 586, 593, 965 N.Y.S.2d 61, 987 N.E.2d 621 [2013], *cert denied* 571 U.S. 1071, 134 S.Ct. 682, 187 L.Ed.2d 549 [2013] ).

*Id.* at 30. (Emphasis added) *See also People v. Reichman*, 26 N.Y.Crim.R. 313, 73 Misc. 212 (N.Y. Co. July 1, 1911)(prosecutor deprived defendant of his grand jury protections by hauling him before a judge to answer questions without the privilege against self-incrimination, resulting in his indictment. "There are certain constitutional protections thrown around those accused of crime that prosecuting officers are constantly striving to circumvent and destroy.")

Similarly, the Court of Appeals rejected a Freedom of Information Law (FOIL) request that would have effectively circumvented a statutory scheme designed to protect personnel records of police officers. In *Matter of New York Civ. Liberties Union v. New York City Police Dept,* 32 N.Y.3d 556, 94 N.Y.S.3d 185 (2018), the question was the enforcement and interpretation of Civil Rights Law § 50-a. That law requires police officer personnel records to be kept confidential and notice given to the police officer and a court order obtained before any disclosure was made. In response to the FOIL request, and recognizing compelling policy arguments in favor of disclosure,

10

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM
NYSCEF DOC. NO. 642

INDEX NO. 451685/2020
RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 12 of 39

the lower court ordered the NYPD to produce disciplinary records after redacting the identity of

the subject of the complaints. The Court of Appeals found that this solution would "eviscerate the

legislature's mandate" reflected in Civil Rights Law § 50-a.

> [T]he legislature made the "policy choice" to "shield the personnel records of these
> officers from disclosure" by extending broad statutory protection while providing
> only limited exceptions for their release [citation omitted]. We are not at liberty to
> second-guess the legislature's determination, or to disregard—or rewrite—its
> statutory text (*see Matter of Wolpoff v Cuomo*, 80 N.Y.2d 70, 79 (1992). The
> alternative "redacted disclosure" regime proposed by the parties would eviscerate
> the legislature's mandate. Civil Rights Law § 50-a sets up a "legal process whereby
> the confidentiality of the records may be lifted by a court, but only after an in
> camera inspection and affording affected parties notice and an opportunity to be
> heard" (*Daily Gazette*, 93 NY2d at 154). The parties' proposal would, instead,
> enable an agency to circumvent the host of statutory protections belonging to
> covered officers by simply applying redactions that the agency, in its sole
> discretion, deems adequate. That scheme would transform Civil Rights Law § 50-
> a into an optional mechanism applicable only when (and if) the agency chooses to
> invoke it.

Id., 32 N.Y.3d at 567. (Emphasis added).

These cases apply with full force here. The OAG's interpretation of CPL 190.40 is that it

applies, unless the investigating body has a "civil" investigation into the very same matters being

investigated by the grand jury – and then it doesn't. Under this interpretation, the OAG and/or the

DANY could strip grand jury witnesses of the protections guaranteed by Art. I § 6 and CPL 190.40

at will by the simple expedient of having the OAG serve civil subpoenas with the resulting

testimony provided to the joint criminal investigation. Neither the New York Constitution nor the

legislature intended for the OAG to, at will, "eviscerate the legislature's mandate" reflected in CPL

190.40 through the use of "office" subpoenas to obtain testimony it would use in a criminal

investigation.[3] That is not, and cannot be, the law.

---

[3] For these reasons, OAG cannot draw support from this Court's previous order compelling
Eric Trump's compliance with an office subpoena. (*See* OAG Response at 10)   While that

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM        INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                     RECEIVED NYSCEF: 02/01/2022

**D.** **The OAG's Cited Authorities are Inapplicable to the Facts Presented Here; and the OAG Failed to Provide the Relevant Authorities Cited Below**

Ignoring its boss's public statements,[4] the use of OAG prosecutors,[5] the sharing of information, and the display of a joint prosecution, evident from the conduct of Ms. James and Mr. Vance at the arraignment, the OAG pretends that this is a garden variety parallel investigation. That is simply not an honest description of this case.[6]

---

subpoena was pending, OAG represented in July 2020 that it was <u>not</u> conducting a criminal investigation nor coordinating with any other law enforcement agency in a criminal investigation of the matters at issue. *See* Movants' MOL at 5, *citing* Colangelo Aff. at ¶ 109. That representation implicitly acknowledged that Eric Trump's grand jury rights would otherwise be implicated, i.e., that OAG could not have obtained Eric Trump's testimony if it were pursuing its own criminal investigation or coordinating with DANY. These circumstances no longer adhere, and OAG cannot have it both ways. Having decided to pursue a criminal investigation into these matters, it cannot violate witnesses' grand jury rights by exercising an exclusively civil discovery tool available for civil investigations.

[4] *See Statement from Attorney General James on Criminal Indictment of Trump Organization and CFO Weisselberg*, Office of the N.Y. Attorney General Press Release, July 1, 2021 annexed to the First Futerfas Aff. as **Exhibit CC**); Transcript of Excerpts from *The View* (ABC television Broadcast Dec. 14, 2021) annexed as **Exhibit D** to the First Futerfas Aff.); Michael Sisak, *New York AG has 2 lawyers working with DA on Trump probe*, ABC News, May 21, 2021 annexed to the First Futerfas Aff as **Exhibit R**.

[5] *Id.*

[6] Though the OAG has publically stated on numerous occasions that her office is conducting a "joint" investigation with the DANY, the only place in the OAG's papers where it even ventures to characterize the nature of its joint investigation with the DANY is in footnote 22, where it obliquely refers to the "cross-designation of OAG attorneys to DANY." (OAG MOL Response at n. 22) While presumably accurate, the reference is hardly limiting, and the OAG studiously avoids any discussion of the "joint" OAG/DANY criminal investigation in its 115-page Petition, where it talks about everything <u>but</u> its work with DANY (which is why we request an evidentiary hearing). The decision in *Haggerty*, cited by the OAG in n. 22, is instructive. There, the Court of Appeals held that the cross-designation of Assistant Attorneys-General to the local District Attorney did not violate Executive Law §63(2) because "the record is devoid of any proof of any appearance by the Attorney-General in any of the criminal proceedings in this case, either personally or on his behalf." *Haggerty v Himelein*, 89 N.Y. 2d 431, 436 (1997) Here, the opposite is true. The Attorney General theatrically entered the courtroom with then-District Attorney Cyrus Vance and sat with him in the front row of the courtroom. (*See* Melissa Macaya, Melissa Mahtani, Maureen Chowdhury, Veronica Rocha and Fernando Alfonso III, *Trump Organization and its*

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM        INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                     RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 14 of 39

The cases cited by the OAG do not reflect the facts of this case and thus do not provide an answer to the question presented by the Motion to Quash.[7]  For example, the OAG cites to a federal decision, *United States v. Kordel*, 397 U.S. 1, 4-8 (1970), for the rather standard proposition that the government may pursue parallel civil and criminal investigations and that the government is not required to stay or forego either investigation.  OAG MOL Response at 27-28, citing *Kordel*, 397 U.S. at 11. But as the OAG recognizes, the *Kordel* court placed limitations on improper government conduct.  *Id.* at n. 24. Indeed, to salvage its reliance on *Kordel*, the OAG claims that "Respondents do not and cannot allege any improper purpose here." *Id.*

The OAG is mistaken. The Moving Parties have been crystal clear from the get-go that the OAG's purpose is improper.  Movants allege – and the OAG has now admitted – that the purpose of issuing the subpoenas is to circumvent the grand jury process. *See* Point One (B), *supra*. And, this investigation is predicated on improper animus toward President Trump and Letitia James's corresponding campaign promises to prosecute Mr. Trump, his family, associates, and companies. *See* Point Three, *infra*. Finally, federal law, including *Kordel*, sets a floor, not a ceiling, on constitutional protections. New York law affords prospective criminal defendants and targets of grand jury investigations greater protections than federal law. *See People v. Steuding*, 6 N.Y.2d 214 (1959); N.Y. Const. art. I, § 6; and CPL 190.40. *See* Discussion at Point One (A), *supra*.

---

*CFO Charged with Tax Crimes*, CNN, Jul. 1, 2021, annexed to the First Futerfas Aff. as **Exhibit AA**) She then proceeded to give a post-arraignment press conference.  And Ms. James has repeatedly asserted that her office indicted the Trump criminal case on July 1, 2021 and is fully engaged in the ongoing criminal grand jury investigation. *See generally,* Movants' MOL at 2, 6-10.

[7] Contrary to the OAG's assertions (*see* OAG's MOL Response at 26), Movants accurately described the law governing run of the mill parallel investigation cases. *See* Movants' MOL (ECF 354) at 12-14.

13

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM INDEX NO. 451685/2020
NYSCEF DOC. NO. 642 RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH Document 25-3 Filed 02/23/22 Page 15 of 39

The OAG also relies on *Access Capital v. DeCicco*, 302 A.D.2d 48, 49-50 (1st Dept 2002). *See* OAG MOL Response at 26. Other than its discussion of a stay, *Access Capital* bears no relationship to the facts in the case. *Access Capital* involves a private civil litigation over Super Bowl tickets, on the one hand, and a subsequent criminal prosecution about those same events, on the other. The defendant, DeCicco, asserted the fifth amendment in his answer to the civil complaint and apparently presented no other evidence to defeat summary judgment. The court found that plaintiff's evidence, combined with DeCicco's failure of proof, was sufficient to sustain summary judgment. That case in no manner compares to the facts here where New York's principal law enforcement agency, the OAG, working hand in hand with the DANY, and taking equal responsibility for criminal charges and an ongoing grand jury investigation, issues "civil" subpoenas to potential targets to deprive them of the protections afforded by that very same grand jury process.

Similarly, *New York State Comm'n on Gov't Integrity v. Congel*, 156 A.D.2d 274, 275 (1st Dep't 1987), also relied on by the OAG, concerns a real estate development group in Syracuse. It has nothing to do with joint investigations and whether an investigative agency, with an active grand jury, can evade the protections of CPL 190.40. There is no reference in the opinion to a simultaneous criminal investigation, and the decision turns on the First Department's interpretation of the scope of Executive Order No. 88.1 (9 NYCRR 4.88).

*Campbell v. New York City Transit Auth.*, 32 A.D.3d 350, 351 (1st Dep't 2006), also cited by the OAG (*see* OAG MOL Response at 27), concerns a civil arbitration proceeding for a fired Transit Authority employee, on the one hand, and an arrest and prosecution by DANY for the same

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM          INDEX NO. 451685/2020

NYSCEF DOC. NO. 642          RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 16 of 39

misconduct, on the other. Put simply, *Campbell* is a run of the mill parallel civil and criminal

proceedings case. It has no factual relevance to the unprecedented circumstances at issue here.[8]

Faced with a lack of factually relevant precedent under New York law, the OAG resorts

to federal constitutional and statutory law and process. But, as we have shown above (*see* Point

One (A)), those authorities are inapplicable because they arise under federal law, which is

markedly different from New York's Constitution and governing CPL 190.40.

Indeed, the most analogous and relevant federal authorities are not cited by the OAG. For

example, in *United States v. Bases*, No. 1:18-cr-00048 (N.D.Ill. February 24, 2021), information

in the possession of the DOJ from the Commodity Futures Trading Commission (CFTC) was held

discoverable under *Brady* because the DOJ and CFTC's extensive coordination and information

sharing constituted a "joint investigation." The investigation concerned trading activities among

various financial institutions and their traders, particularly market manipulation in the precious

metals futures markets. The evidence showed that from 2015 until charges were filed in 2018, the

DOJ and CFTC shared information and jointly participated in interviews, meetings, and calls.

In arguing against a finding of a joint investigation, the DOJ asserted that the CFTC's

involvement was limited, since it attended only some of the witness interviews and provided

trading data only in response to an access request. Similarly, the CFTC argued that its investigation

was conducted parallel to, not jointly with, the DOJ. Both agencies cited cases holding that jointly

attended witness interviews were not enough to find a joint investigation.

The Court rejected these arguments and found a coordination of efforts investigating the

same allegations. In particular, CFTC and DOJ sought production of the same documents from the

same investment bank around the same time, and the investment bank "made sure" in its response

---

[8] The *Campbell* decision's discussion of a Stay is addressed in POINT TWO *infra*.

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM
NYSCEF DOC. NO. 642

INDEX NO. 451685/2020
RECEIVED NYSCEF: 02/01/2022

to the DOJ's information requests that it included data it had already provided to the CFTC. *Id.* at *4. In addition, a chief trial attorney for CFTC, who was "detailed" to the DOJ's investigation to develop his attorney skills, "admit[ed] (without further elaboration) that he had multiple contacts and calls with the CFTC as part of the DOJ's prosecution team." *Id.*

Topping off this proof, the district court cited the press statements. Officials representing the CFTC and DOJ jointly announced criminal charges against eight individuals on the same day. *Id.* (citing press releases). The public statements praised their shared commitment to bringing the criminal case. "The DOJ's press release emphasized that the CFTC 'is committed to identifying individuals responsible for unlawful activity and holding them accountable' and that the DOJ received 'invaluable assistance from' the CFTC." *Id.* In sum, the *Bases* court found that "extensive cooperation, joint participation, and sharing of resources between the CFTC and DOJ related to the investigation of this case" constituted a joint investigation triggering *Brady* obligations. *Id.* at 6.

In *United States v. Connolly*, 2019 WL 2120523 (May 2, 2019)(McMahon, J), *rev'd on other grounds,* 2022 WL 244669  (2d Cir. Jan. 27, 2022), another case not cited by the OAG, the district court found that an outside entity, Deutsche Bank (DB), had effectively served as an arm of the government to extract statements from its own employees in the course of an internal investigation into the manipulation of the London Inter-Bank Offered Rate ("LIBOR"). *Id.* at *1. Accordingly, the Court held that DB's attorneys were essentially acting as agents of the US Attorney's office and thus statements made by a bank employee to DB's lawyers, Paul Weiss, were improperly obtained in violation of the employee's Fifth Amendment rights.

The *Connolly* court found that early in the investigation, Deutsche Bank cooperated in the hopes of receiving cooperation credit and "that the Government was kept abreast of developments

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM        INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                      RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 18 of 39

on a regular basis, and that the federal agencies gave considerable direction to the investigating

Paul Weiss attorneys, both about what to do and about how to do it." *Id.* at *3. Indeed, "Deutsche

Bank representatives and counsel continued to update the Government about their findings and

coordinate next steps" and directed DB and Paul Weiss's activites. *Id.*

Further, Paul Weiss procured numerous interviews of bank employees, the results of which

it provided to the government. Because there was a "close nexus" between the government and

the company interviews, Judge McMahon found that the Fifth Amendment rights of employees

of Deutsche Bank were triggered since Paul Weiss had conducted the interviews effectively as an

arm of the government. *Id.* at *11, 14-15.

The facts in the matter *sub judice* are far more compelling than those presented in *Connolly*.

Here, the OAG isn't a mere non-governmental party. It is the state's principal law enforcement

agency and is actively, admittedly, and publicly, stating that it is criminally prosecuting the Trump

Organization (TTO) and is investigating the Respondents/Movants with DANY. The obligations

and responsibilities in a criminal investigation are not subject to fanciful claims of severability.

Letitia James said that her office indicted TTO and Mr. Weisselberg and continues to investigate

with a grand jury with DANY. She and her office are bound by the same Criminal Procedure Law

protections that DANY is, just like SDNY's legal obligations carried over to the private, non-

governmental business, Deutsche Bank.[9]

---

[9] The degree of coordination and information sharing between the OAG and DANY in the grand jury investigation is clearly relevant to the issues presented, and a hearing is warranted.

17

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM        INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                     RECEIVED NYSCEF: 02/01/2022

### E. The OAG's Filings Deliberately Ignore Attorney General James' Statements, which are Binding on the OAG in this Litigation

Lastly, the OAG refuses to address Letitia James's numerous improper statements, but they cannot be ignored. In fact, as we show herein, they are admissible and binding on the OAG.

In Movants' MOL, the Moving Parties brought to the Court's attention numerous statements Attorney General James made to the public, including her appearance on the television show, *The View*, as well as the spectacle of Ms. James and then-DA Cyrus Vance entering the Courtroom together on the day of the criminal case arraignment (July 1, 2021), and sitting together during the proceedings in an obvious display of co-equals in the prosecution of the case.[10] In the course of 160 pages of responsive filings (*see* the OAG's Notice of Cross-Motion (ECF 357); OAG's MOL Response (ECF 359); Supplemental Verified Petition (ECF 630) (Jan. 18-19, 2022), the OAG utterly fails to address, refute, or even comment upon these statements and actions.[11]

---

[10] As if Letitia James's own statements were not enough, Michael Cohen, interviewed extensively by the OAG and DANY, stated that Ms. James is "working in concert as well with the District Attorney. I've seen the boxes, they have more than ten million documents." *See* Transcript of an excerpt from Michael Cohen's appearance on *CNN Newsroom with Alisyn Camerota and Victor Blackwell* (CNN television broadcast Jan. 19, 2022) annexed to the Second Futerfas Aff. as **Exhibit 2A**.

[11] On the other hand, the OAG chose to include (and publicize) irrelevant past discovery disputes it had with The Trump Organization ("TTO") that were previously resolved by the parties in the ordinary course following meet and confer calls. *See* OAG Supplemental Verified Petition dated January 19, 2022 at pp.91-95, para.'s 321-336. As this Court is aware, the production issues for TTO are covered by a Stipulation, and TTO's production is on-going. *See* Docket No. 314. As per its obligations under the Stipulation, TTO has continued to "work diligently" to comply with its production responsibilities. *See* Stipulation at para 2. Indeed, since the Stipulation was entered into, TTO has been producing thousands of documents each week (in excess of 750,000 by the OAG's own admission), all the while keeping the OAG updated on its progress with weekly progress reports. With respect to the OAG's subpoena duces tecum served on Donald J. Trump, counsel for Mr. Trump, Ronald P. Fischetti, and the OAG agreed to stay the subpoena pending the filing of the motion to quash and its resolution by this Court.

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM          INDEX NO. 451685/2020

NYSCEF DOC. NO. 642          Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 20 of 39   RECEIVED NYSCEF: 02/01/2022

The OAG's reticence is understandable. Ms. James' public statements express ownership of the criminal investigation; assume and imply wrongdoing on behalf of the moving parties; concern an active investigation; expose extraordinary animus on the part of Ms. James; and potentially poison the jury pool.[12] Her statements thus utterly refute the rather absurd notion raised in the OAG's responsive papers that this case presents a garden variety parallel investigation permitted under the law.

As Attorney General, Letitia James' statements are imputed to, and are binding upon, the OAG. Her statements have the force and effect of statements by the OAG. *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010) ("the acts of agents [i.e. the Attorney General], and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals [i.e. the OAG][.]"); *see also Loschiavo v. Port Authority*, 58 N.Y.2d 1040, 1041, 462 N.Y.S.2d 440 (1983)(statement admissible against employer where "the making of the statement is an activity within the scope of his authority") (citations omitted); *Fernandez v. State of New York*, 2002 WL 31955397, at *3, n. 3 (Ct. Cl. 2002) (superintendent had authority to speak for correctional facility, and statements made during labor management meeting were clearly within scope of his duties).

Indeed, the statements of a party can be used as direct evidence of the matters asserted. *See United States v. GAF Corp.*, 928 F.2d 1253, 1262 (2d Cir. 1991) (holding admissible the government's prior statements as inconsistent with the theory of the case it presented to the jury); *United States v. McKeon*, 738 F.2d 26, 33 (2d Cir. 1984) (holding that a prior statement made by

---

[12] They are wholly inappropriate coming from the Attorney General of the State of New York, the highest law enforcement position in the State. Indeed, by making these statements, Ms. James has potentially violated her ethical responsibilities as an attorney barred in New York. *See* POINT THREE *infra*.

19

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM INDEX NO. 451685/2020
NYSCEF DOC. NO. 642   RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 21 of 39

defendant's attorney during opening statement was properly admitted against the defendant in a subsequent trial.) "In a civil action, the admissions by a party of any fact material to the issues are always competent evidence against the party, wherever, whenever or to whomever made." *Reed v. McCord*, 160 N.Y. 330, 334, 54 N.E. 737 (1899); *People v. Chico*, 90 N.Y.2d 585, 665 N.Y.S.2d 5 (1997).

The public statements and press releases of Letitia James are, consequently, binding upon the OAG in this litigation. *See, e.g. United States v. Bases*, supra at *4(announcement by CFTC and DOJ of criminal charges, *inter alia*, "illustrate extensive cooperation, joint participation, and sharing of resources between the CFTC and DOJ related to the investigation").

*          *          *

### The Conclusion that the OAG is Violating Movants' Rights by Circumventing CPL 190.40 is Inescapable

There is little question that the framers of New York's Constitution and the drafters of CPL 190.40 did not envision, much less intend, that the protections built into these statutes could be easily and deliberately sidestepped by law enforcement conducting a criminal investigation. But that is precisely what the OAG is plainly and admittedly doing in this case. The OAG is conducting a criminal investigation via a grand jury – so says the Attorney General. The criminal investigation is investigating the very same matters sought by the subpoenas at issue. The OAG intends to use the "evidence obtained" in the OAG's criminal investigation – which is a grand jury investigation. The conclusion is inescapable that the OAG is violating CPL 190.40 and Movants' rights under the New York Constitution.

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM          INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                        RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 22 of 39

## POINT TWO

## IN THE ALTERNATIVE, THE COURT SHOULD GRANT THE MOTION TO STAY

### A.    *This Court Clearly has the Discretion to Grant a Stay*

The Moving Parties clearly set forth the law on the subject of staying an action (Movants' MOL at 17-20). The OAG attempts to convert the issue into whether an invocation of the privilege against self-incrimination <u>compels a court</u> in the routine case to stay a civil action where the defendant is being investigated in a related criminal action. At other places, the OAG appears to suggest that these cases stand for the proposition that a Court <u>does not have</u> the discretion to stay a civil action. *See* OAG's MOL Response at 26. Both of these premises are incorrect.

This Court has full discretion to grant a Stay. CPLR 2201 provides that "the court in which an action is pending may grant a stay of proceedings in a proper case, upon such terms as may be just."  The OAG cites to *Campbell v. New York City Transit Auth.,* 32 A.D.3d 350, 351 (1st Dept 2006), which stands for that very propostion. Indeed, the *Campbell* court stated the unremarkable propositions that "[t]he law is clear that a court is <u>not required</u> to stay a civil action until a pending related criminal prosecution," and that "the pendency of a criminal proceeding does not give rise to an absolute right….to a stay of a related civil proceeding…" *id. (emphasis added)*, which is just what Movants stated in their Motion to Quash. *See* Movants' MOL at 17-18; *see also Fortress Credit Opportunities I LP v. Netschi,* 59 A.D.3d 250 (1st Dept 2009) ("The motion court <u>appropriately exercised its discretion</u> in denying the motion for a stay of the action and a stay of discovery pending federal criminal investigation of defendant.")(emphasis added); *Access Capital v. DeCicco*, 302 A.D.2d 48, 49-50 (1st Dept 2002)(recognizing stay is discretionary).

This Court does have the discretion to stay the action, especially under the unprecedented circumstances presented in this case.

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM          INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                        RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 23 of 39

### B.    *Discretionary Factors Weigh in Favor of a Stay*

The OAG argues that none of the Moving Parties have been indicted, and the OAG will be prejudiced by a stay. *See* OAG's MOL Response at 32-34. First, if anyone is prejudiced it is Movants, whom the OAG is endeavoring to prejudice by circumventing the grand jury process. Indeed, the fallacy of the OAG's argument is so obvious – if the OAG wants the testimony, they merely need to comply with CPL 190.40 and bring Movants before the Grand Jury. The fact that they are resistant to this obvious solution belies their true intent, which is to circumvent the grand jury process.

The OAG also makes the obvious point that "Protecting the citizenry against fraud is undoubtedly a legitimate state interest." OAG's MOL Response (ECF 359) at 33 citing *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 43 (1980). Sure, but avoiding the grand jury and receiving the invocation of the fifth amendment hardly advances their investigation. If the OAG truly seeks testimony, they can call these witnesses before the very grand jury they are utilizing. In any event, staying this unique case pending the criminal investigation does not prevent the OAG from enforcing the laws.

For these reasons, if the Court decides not to quash the subpoenas, it should stay their enforcement pending the criminal investigation.

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM          INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                       RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 24 of 39

## POINT THREE – RESPONDING TO THE MOTION TO COMPEL

## THE COURT SHOULD DENY THE OAG'S MOTION TO COMPEL BECAUSE THE ATTORNEY GENERAL IMPERMISSIBLY SELECTED THE MOVING PARTIES FOR INVESTIGATION DUE TO THEIR POLITICAL VIEWS AND RELATIONSHIPS TO FORMER PRESIDENT TRUMP

Letitia James' extraordinary public statements—condemning Donald Trump's political views and promising to "take on" Mr. Trump and his family, associates, and companies—is powerful evidence that the OAG impermissibly targeted Donald Trump's associates and companies for investigation and prosecution based solely on political animus. Such selective prosecution violates the Equal Protection Clauses of the Federal and New York States Constitutions and requires that the subpoenas be quashed. At a minimum, Movants have made a sufficient showing of animus and disparate treatment to require the OAG to provide discovery on this selective prosecution claim and for the Court to then schedule an evidentiary hearing.

### A.     The Equal Protection Clauses in the Federal and New York State Constitutions Forbid Selective Prosecution Based on Disfavored Speech or Political Views

The Equal Protection Clauses in the United States Constitution (14th Amendment) and the New York State Constitution (Article I, § 11) "forbi[d] a public authority from applying or enforcing an admittedly valid law 'with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances.'" *303 W. 42nd St. Corp. v Klein*, 46 N.Y.2d 686, 693 (1979) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373–374 (1886)); *see also People v. Goodman*, 31 N.Y.2d 262, 268 (1972) (holding that the "intentional or

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM   INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                  RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 25 of 39

purposeful discrimination in the administration of an otherwise nondiscriminatory law violates equal protection").[13]

To succeed on a motion to dismiss based on selective prosecution "both the 'unequal hand' and the 'evil eye' requirements must be proven – to wit, there must be not only a showing that the law was not applied to others similarly situated but also that the selective application of the law was deliberately based upon an impermissible standard such as race, religion or some other arbitrary classification." *303 W. 42nd St. Corp.*, 46 N.Y.2d at 693 (1979). One such "impermissible" and "arbitrary classification" is targeting a person for prosecution based on his political views or speech. *See id.* ("At this stage, though, taken as a whole, the nature and quantum of petitioner's proposed proofs were more than adequate to justify a judicial hearing, all the more so because the alleged discrimination involved the exercise of 1st Amendment rights"); *Sonne v. Bd. of Trustees of Vil. of Suffern*, 67 A.D.3d 192, 203-204 (2d Dep't 2009) ("The person must be singled out for an impermissible motive not related to legitimate governmental objectives, which could include personal or political gain, or retaliation for the exercise of constitutional rights" such as "free speech under the First Amendment[.]"). The Court of Appeals has cautioned that ordinarily "a strong inference of illicit motive will be all that can be expected because admission of intentional discrimination is likely to be rare; law enforcement officials are unlikely to avow that their intent was to practice constitutionally proscribed discrimination." *Id.* Proof of intent, therefore, can be shown by a "showing of a grossly disproportionate incidence of nonenforcement

---

[13] This rule applies to corporations, as well as to individuals. *See, e.g., 303 W. 42nd St. Corp.* at 690 (remanding for a hearing on the selective prosecution claim raised by the "[p]etitioner corporation"); *Bower Assoc. v. Town of Pleasant Val.*, 2 N.Y.3d 617, 630 –632 (2004) (addressing a selective prosecution claim raised by Home Depot, U.S.A., Inc.).

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM    INDEX NO. 451685/2020
NYSCEF DOC. NO. 642    RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 26 of 39

against others similarly situated in all relevant respects save for that which furnishes the basis of

the claimed discrimination." *Id.*

> *1.* **Letitia James Repeatedly Said That She Despises Former President
> Trump's Politics and That She Intended to Investigate Every Aspect of His
> Life, as well as Sue Him, His Family, His Associates, and His Businesses, and
> Would Bring Civil and Criminal Charges to Punish Him for His Political
> Views**

Starting from the time she announced her candidacy for Attorney General in May 2018 –

well before she could have seen any evidence or known any facts – Ms. James made clear that she

despised Donald Trump's politics and policies and made "taking on Donald Trump" the focal point

of her campaign. In doing so, she made countless statements indicating that her opposition to

President Trump was meant to serve as a condemnation of his policies and views and a public

display of loyalty to her own political party. She promised that if she became Attorney General

she would go after him personally by investigating and prosecuting him. For example, in a

campaign video, Ms. James tied her political opposition to President Trump directly to her promise

to investigate and prosecute both him and his companies. Ms. James stated:

> I'm running for attorney general, because I will never be afraid to challenge this
> illegitimate president when our fundamental rights are at stake….
>
> I believe that this president is incompetent. I believe that this president is ill-
> equipped to serve in the highest office of this Land. And I believe that he is an
> embarrassment to all that we stand for. He should be charged with obstructing
> justice. I believe that the President of these United States can be indicted for
> criminal offenses and we would join with law enforcement and other attorneys
> general across this nation in removing this President from office.
>
> In addition to that, the office of attorney general will continue to follow the money
> because we believe he's engaged in a pattern and practice of money laundering.
> Laundering the money from foreign governments here in New York State, and

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM
INDEX NO. 451685/2020
NYSCEF DOC. NO. 642
RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 27 of 39

particularly related to his real estate holdings. It's important that everyone understand, the days of Donald Trump are coming to an end.[14]

Letitia James Video, September 28, 2018, available at

https://www.youtube.com/watch?v=D1yj0NKSsuU.

When Ms. James made this speech, she had no evidence that Donald Trump was engaged in any criminal activity. Nonetheless, she promised to investigate and prosecute him for money laundering, a baseless allegation as to which there is, to this day, no evidence. Throughout her campaign, Ms. James continued to promise to investigate President Trump and prosecute him, publicly: (i) accusing Mr. Trump of having engaged in "public corruption;"[15] (ii) stating that she had her "eyes on Trump Tower;"[16] (iii) stating that then-President Trump should be "worried" about her,[17] and "scared" about her upcoming term;[18] (iv) stating that Mr. Trump's "days of defrauding Americans are coming to an end;"[19] (v) stating that, if elected, she would "take on

---

[14] Letitia James Video, September 28, 2018 , available at
https://www.youtube.com/watch?v=D1yj0NKSsuU, at :17–:25; 1:50–2:36.

[15] Letitia James's 2018 campaign website, *Fighting Corruption No Matter Where It Lies*, TISH JAMES 2018 CAMPAIGN annexed to the First Futerfas Aff. as **Exhibit F**.

[16] Letitia James (@TishJames), TWITTER (Aug. 6, 2018, 3:47 PM), annexed to the First Futerfas Aff. as **Exhibit G**.

[17] Letitia James (@TishJames), TWITTER (Aug. 13, 2018, 11:37 AM), annexed to the First Futerfas Aff. as **Exhibit L**.

[18] Letitia James (@TishJames), TWITTER (Aug. 22, 2018, 9:09 AM), annexed to the First Futerfas Aff. as **Exhibit H**.

[19] Letitia James (@TishJames), TWITTER (October 3, 2018, 1:44 PM), annexed to the First Futerfas Aff. as **Exhibit I**.

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM    INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                RECEIVED NYSCEF: 02/01/2022

Donald Trump,"[20] and immediately investigate him and his "cronies;"[21] (vi) stating that she was

"getting ready to ask [Trump] some questions-under oath;"[22] and (vii) "call[ing] upon any agency

with jurisdiction – from the IRS to the NY AG – to follow the facts wherever they may lead, and

stressing that [n]o stone should be left unturned;"[23] (viii) stating that she "want[ed] to begin to

engage in an investigation into the Trump Administration with respect to [Trump's] finances in

the State of New York;"[24] and (ix) stating that planned to "focus on Donald Trump and his abuses

. . . we need to follow his money . . . we need to find out where he's laundered money."[25] And

though it appears to have since been removed, Ms. James' campaign website at one time even

contained a section entitled "*Investigate Trump's New York Business*" in which she promised to

undertake "a review of Trump-related real estate transactions, especially those in which the Trump

family suddenly started paying cash for properties after years of operating their businesses

---

[20] Letitia James (@TishJames), TWITTER (July 1, 2018, 2:56 PM), annexed to the First Futerfas Aff. as **Exhibit J**.

[21] Letitia James (@TishJames), TWITTER (Aug. 21, 2018 1:01 PM) ("Just wait until I'm in the Attorney General's office.", annexed to the First Futerfas Aff. as **Exhibit K**.

[22] Letitia James (@TishJames), TWITTER (Aug. 13, 2018, 11:37 AM), annexed to the First Futerfas Aff. as **Exhibit L**.

[23] Letitia James (@TishJames), TWITTER (October 3, 2018, 1:44 PM), annexed to the First Futerfas Aff. as **Exhibit I**.

[24] Letitia James On Her Run for Attorney General, Boosting Our Communities and Speaking Truth to Power, The Breakfast Club Power 105.1 FM, October 24, 2018), available at https://www.youtube.com/watch?v=dhH_nLfPUVU, from 5:21 to 5:28.

[25] *New York Attorney General on Plan to Thwart Trump Pardons*, The Beat with Ari Melber on MSNBC, April 23, 2019), available at https://www.youtube.com/watch?v=6onOx85SRbc, from 0:27 to 0:32.

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM    INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                       RECEIVED NYSCEF: 02/01/2022

exclusively by borrowing money."[26] Finally, in response to a question of what should motivate

people to vote, she responded: "Donald Trump – that should motivate you to vote" and promised

that "we're gonna definitely sue him. We're gonna be a real pain in the ass."[27]

It bears repeating that these allegations and threats of investigation were made when Ms.

James had no personal knowledge about "Trump-related real estate transactions," or any

information or insight into Donald Trump's business other than what she presumably had seen in

the media. Her statements, therefore, can only be understood to be based on personal animus to

then-President Trump, not those of an elected law enforcement officer following the evidence

where it may lead.

Nor did this targeting of President Trump cease once Ms. James was elected. Rather, during

her election night victory speech, she stated that she would "be shining a bright light into every

dark corner of his real estate dealings, and every dealing … ."[28] In November 2018, one month

before taking office, she told NBC News that she would "use every area of the law to investigate

President Trump and his business transactions and that of his family as well."[29]

---

[26] PDF downloaded from Letitia James' 2018 campaign website, annexed to the First
Futerfas Aff. as **Exhibit M**.

[27] This video, originally posted on Instagram, is now available on YouTube at
https://www.youtube.com/watch?v=V5-MLgPRejM&feature=youtu.be.

[28] Kristine Phillips, *New York's next attorney general targeted slumlords. Now she's
going after Trump,* THE WASHINGTON POST, Dec.19, 2018, annexed to the Second Futerfas Aff.
as **Exhibit 2D**. *Accord* Athena Jones, *New York AG Vows to Target Trump*, CNN (video),
available at https://www.cnn.com/videos/politics/2019/01/03/letitia-james-donald-trump-jones-
dnt-lead-vpx.cnn.

[29]Allan Smith, *Incoming New York attorney general plans wide-ranging investigations of
Trump and family*, NBC NEWS, Dec. 12, 2018, annexed to the Second Futerfas Aff. as **Exhibit
2E.**

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM    INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                    RECEIVED NYSCEF: 02/01/2022

In November 2020, Attorney General James made an appearance on the comedic news program *Full Frontal with Samantha Bee*. To understand that this investigation is premised entirely on the desire to "get" President Trump and his family, one only has to watch this video.

> Samantha Narration: Between the Attorney General's civil investigations of Trump, and the Manhattan DA's criminal investigation, things could get really legal. I don't want to get too excited, but a girl can dream, can't she?

> Samantha: I know you can't tell me anything too specific about any of the lawsuits, but can I just sit here and use my imagination to picture the outcomes that I desire.

> (both laugh)

> AG: When he leaves office as a private citizen, he will no longer have presidential immunity, so stay tuned.

Transcript from Excerpt of Letitia James' Appearance on *Full Frontal with Samantha Bee* (TBS television broadcast Nov. 19, 2020) annexed to the Second Futerfas Aff. as **Exhibit 2B**.

These intemperate and improper comments continue to this day. Indeed, just last month, Ms. James went on the television program *The View* to explain why she withdrew from the race for Governor and made clear that one of the main reasons was her desire to continue to investigate and prosecute Donald Trump and his companies. Then, in response to a statement by one of the show hosts, Joy Behar, that "I believe in putting Trump in jail," AG James laughed, adding . . . "Joy, you know I love you, right? I do, I do, I do. So, you know I can't admit or deny. [AG James laughing]. I cannot admit and/or deny those allegations in the preface of your question." *See* transcript of an excerpt from Letitia James' appearance on *The View* (ABC television Broadcast Dec. 14, 2021) annexed to the First Futerfas Aff. as **Exhibit D**. Notwithstanding her protestations, however, Ms. James went on to discuss the facts of the case and her Office's joint investigation of Donald Trump and the Trump Organization more generally, all while laughing as if a criminal

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM    INDEX NO. 451685/2020
NYSCEF DOC. NO. 642    RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH    Document 25-3    Filed 02/23/22    Page 31 of 39

prosecution, or a civil investigation of all of Trump's companies by the Attorney General's Office, was a joking matter.

A complete timeline of Ms. James's improper and inappropriate statements regarding Donald J. Trump and his companies is annexed to the Second Affirmation of Alan S. Futerfas as Exhibit **2G**. A video compilation of Ms. James making some of these improper statements is annexed to the Second Affirmation of Alan S. Futerfas as Exhibit **2H.** Finally, Exhibit **2I** annexed to the Second Affirmation of Alan S. Futerfas contains two demonstrative spreadsheets cataloging Ms. James's improper statements about Donald J. Trump and video clips of her making those statements.

Courts have consistently found statements like these to be evidence of an illicit motive sufficient to warrant the relief of the dismissal of criminal charges. *See, e.g., 303 W. 42nd St. Corp.*, 46 N.Y.2d at 696 (finding evidence of "illegitimate motive" where government officials "were unabashedly trumpeting: '[despite] all the constitutional limitations, we stop at nothing when we try to put one of these places out of business.'") (brackets in the original); *People v. Abram*, 178 Misc. 2d 120, 125 (City Ct. 1998) (dismissing the charges because the "court finds in this case the District Attorney 'avowed' his intent to practice 'constitutionally proscribed discrimination' based on an announced policy of his Office he outlined to the local newspaper.").

Further, many of Ms. James's statements are in blatant violation of the presumption of innocence, a hallmark of prosecutorial ethics which requires a prosecutor to "refrain from speaking in public about pending and impending cases except in very limited circumstances." *See* N.Y.R.P.C. 3.6 ("A lawyer who is participating in or has participated in a criminal or civil matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of

materially prejudicing an adjudicative proceeding in the matter."); *see also* ABA M.R.P.C. Rule 3.8 ("[A] [p]rosecutor shall…refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused"). Despite her well-founded obligation to refrain from commenting on an ongoing investigation, Ms. James has seemingly jumped at every opportunity to disseminate public statements about her investigation of Movants. Even worse, her comments imply—or even downright proclaim—that Movants are guilty of wrongdoing.[30]  Therefore, it cannot be reasonably disputed that Ms. James's repeated public pronouncements concerning Movants are highly prejudicial and have tainted the public's perception of Movants and their business.

### 2.    Shortly After She Became Attorney General, Letitia James Began a Massive Investigation into President Trump, His Businesses, Family, and Associates

Less than three months after being sworn in as Attorney General, Letitia James launched an investigation into virtually all aspects of the business dealings of Donald Trump and the Trump Organization.[31] While Ms. James has repeatedly claimed that her investigation was predicated on Michael Cohen's February 2019 testimony to Congress, it is clear from her campaign promises that Ms. James was looking for <u>any</u> excuse to investigate Donald Trump and his companies and merely seized on Mr. Cohen's testimony as a dubious justification for commencing her

---

[30] New York courts have consistently rebuked remarks which "bundle together unproven allegations regarding [a] [d]efendant with broader commentary on corruption and a lack of transparency in certain aspects of . . . politics," noting that these types of statements are inherently prejudicial because "it would not be unreasonable for members of the media or the public to interpret" them "as a commentary on the character or guilt of the individual or entity under investigation." *United States v. Silver*, 103 F. Supp. 3d 370, 378-79 (S.D.N.Y. 2015).

[31] *See* Redacted Affidavit of Matthew Colangelo, dated August 21, 2020 (ECF 10), filed in support of a Motion to Compel, dated Aug. 24, 2020, annexed to the First Futerfas Aff. as **Exhibit P**. The OAG filed an unredacted copy undersool as ECF 14.

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM

INDEX NO. 451685/2020

NYSCEF DOC. NO. 642

RECEIVED NYSCEF: 02/01/2022

investigation. It stretches all credibility to believe that the OAG put any legitimate stock into the testimony of Mr. Cohen, a man who has seemingly made his recent living off of publicly maligning Donald Trump and who has already been convicted of perjuring himself in connection with the very same act—testifying before Congress—that the OAG claims to have relied upon.[32]

Even other law enforcement agencies have acknowledged, in no uncertain terms, that Mr. Cohen is an untrustworthy source. For instance, around the same time the OAG supposedly commenced its investigations based upon Mr. Cohen's testimony, the United States Attorney's Office for the Southern District of New York (SDNY), interviewed Cohen, who sought leniency, and had very "substantial concerns about Cohen's credibility as a witness." Indeed, the SDNY found that "Cohen lied to the SCO (The Special Counsel) at [a] meeting, repeating many of the prior false statements he had made to the Congress." They also pointed to "material false statements" that he had made to both the SDNY and FBI. The SDNY also acknowledged that after Cohen's testimony before Congress, "members of one committee made a criminal referral for perjury, citing apparent contradictions between Cohen's testimony and his guilty pleas and certain filings in the SDNY case." Finally, the SDNY conveyed that "throughout the period of his purported cooperation, Cohen and his surrogates made a litany of public comments about his SDNY case, many of which minimized his acceptance of responsibility for conduct to which he had pled guilty and were inconsistent with his pleas or other undisputed facts." Government Opposition to Cohen's Application Pursuant to Rule 35 dated December 19, 2019, 18 Cr. 602

---

[32] In particular, on November 29, 2018, Cohen was convicted of making false statements to Congress in violation of 18 USC § 1001(a)(2) as well as seven additional federal felonies which "each involved deception." Sentencing Tr. at 31:10-15, *United States v. Cohen*, No. 18 Cr. 602 (WHP) (S.D.N.Y. Dec. 12, 2018). In the words of presiding district court judge William H. Pauley III, Cohen was guilty of a "veritable smorgasbord of fraudulent conduct." *Id*.

**A346**

(WHP)(ECF 58) at pages 1, 3-6 and n. 4.  As described by the SDNY, this behavior is entirely consistent with the "pattern of deception that permeate[s]" Cohen's life.[33]

Given the political motivation of this case, it is not surprising that this investigation was treated very differently than other investigations conducted by OAG. The OAG has devoted massive amounts of resources to this investigation, subpoenaing millions of pages of documents from both the Trump Organization and third parties, as well as taking dozens of lengthy depositions. The OAG has also ensured that significant aspects of its investigation receive media attention. Thus, as soon as the first subpoenas were served, that information was immediately leaked to the press (apparently on the very same day), with the New York Times reporting that the OAG had served subpoenas on various financial institutions, including Deutsche Bank and other banks, and was investigating "the financing of four major Trump Organization projects..."[34] And when there was a discovery dispute between OAG and the Trump Organization, OAG issued a press release, setting out the details of their investigation, a highly unusual thing for a government agency to do.

Letitia James's statements – which constitute powerful evidence of selective prosecution – continue unabated. As recently as January 9, 2022, Attorney General James sent an email blast soliciting her supporters to "stand with [her] in this fight [against President Trump.]" *See* January 9, 2022 James Campaign Email with the Subject "One Year Ago Today[,]" annexed to the Second Futerfas Aff. as **Exhibit 2C** In this extraordinary, unprecedented and frankly appalling email, Ms.

---

[33] USAO Sentencing Memorandum at 1-2, *United States v. Cohen*, No. 18 Cr. 602 (WHP) (S.D.N.Y. Dec. 7, 2018).

[34] William K. Rashbaum and Danny Hakim, *New York Attorney General Opens Investigation of Trump Projects*, NEW YORK TIMES, March 11, 2019, available at www.nytimes.com/2019/03/11/nyregion/deutsche-bank-trump.html. Annexed to the annexed to the Second Futerfas Aff. as **Exhibit 2F**.

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM          INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                        RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 35 of 39

James, the current Attorney General of the State of New York, asks recipients whether they "Approv[ed] of Donald Trump as president" and claims that "it now appears that the [January 6, 2021 riot] may be traced back to one person: Trump himself." *Id.* This email was sent less than a week after Moving Parties filed Movant's MOL, which referenced Ms. James' prior statements. There can be no stronger basis for a claim of selective prosecution than the evidence presented herein. It is truly unprecedented in the history of this state.

> **3.    Whether the OAG's Investigation is Viable or Not is Irrelevant to a Claim of Selective Prosecution**

The OAG may argue that its investigation is justified notwithstanding the Attorney General's admitted political motivations for investigating Donald Trump, his companies, and associates. This argument, if made, must be rejected.

Once an action is found to be the result of viewpoint discrimination, it is unconstitutional *per se*, regardless of whether it may have been reasonable for other reasons. *See, e.g., Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290, 297 (3d Cir. 2011) (quoting *Ridley v. Mass. Bay Transp. Autho.*, 390 F.3d 65, 86 (1st Cir. 2004)) (Because "[t]he government rarely flatly admits it is engaging in viewpoint discrimination," such a claim is not defeated by "the recitation of a nondiscriminatory rationale."). In other words, in a viewpoint discrimination case, whether the government action is justified or unjustified in its own right "is beside the point." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 396–97 (1993); *Accord Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 812 (1985) ("While we accept the validity and reasonableness of the justifications offered by petitioner … those justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view."). In short, governmental action that is viewpoint discriminatory is *prima facie* unconstitutional. *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 633 (2d

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM          INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                       RECEIVED NYSCEF: 02/01/2022

Cir. 2005) (holding a "viewpoint discriminatory restriction on school-sponsored speech is, prima

facie, unconstitutional, even if reasonably related to legitimate pedagogical interests").

As such, once it is established that Letitia James had unconstitutional motives for

investigating the Trump entities and family, any action, including the issuance of subpoenas, must

be estopped or dismissed, irrespective of any evidence or leads the OAG may have had.

> **4.     This Court Should Order a Hearing on the Issue of Selective
> Prosecution and Should Order the OAG to Produce Discovery on this Issue**

Where a party asserting a selective prosecution claim demonstrates a "reasonable

probability" of success on the merits, "an evidentiary hearing before a judicial tribunal is

mandated." *303 W. 42nd St. Corp.*, 46 N.Y.2d at 690. *See, e.g., People v. Bergen Beach Yacht

Club*, 160 Misc. 2d 939, 944 (N.Y. Crim. Ct. 1994) (granting a hearing on a selective prosecution

claim). In considering whether a defendant has carried his burden and is therefore entitled to a

hearing on his selective prosecution claim, the Court should recognize that the "difficulties in

obtaining detailed knowledge of unprosecuted violators in order to meet the burden of

demonstrating similarity are likely to be great" and therefore, in proving uneven enforcement,

"[l]atitude should be allowed in this complex area of proof.") *Id.* This flexibility in proof is

necessary because "the importance of the right to be free from impermissible selective enforcement

must be of more than theoretical value, [and so] the burden of demonstrating a violation, albeit

heavy, must not be so heavy as to preclude any realistic opportunity for success." *Id.*

In New York, "the claim of unequal protection is treated not as an affirmative defense to

criminal prosecution or the imposition of a regulatory sanction but rather as a motion to dismiss

or quash the official action." *303 W. 42nd St. Corp.*, 46 N.Y.2d at 693. "And, in its consideration

of the merits of such a claim … a court must conduct a hearing if, on the papers before it, a

strong showing of selective enforcement, invidiously motivated, appears." *Id.* Where, following

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM    INDEX NO. 451685/2020
NYSCEF DOC. NO. 642                                 RECEIVED NYSCEF: 02/01/2022

a hearing, a prosecution is found to be "invidiously motivated," the indictment must be dismissed as a matter of law. *Id.*

Accordingly, we respectfully request that the Court order a hearing as to whether the investigation in this case, including the issuance of subpoenas, should be quashed because of selective prosecution, allow the Movants discovery on this issue, and that, at the conclusion of the hearing, quash the subpoenas.

In addition, the Court should allow for discovery into this claim, including all OAG communications and memos regarding or referencing political calculations related to Trump-related investigations or charges. *Cf. United States v. Oaks,* 508 F.2d 1403, 1405 (9th Cir. 1974) ("At that hearing, the trial court may, in the exercise of its discretion, require disclosure of relevant privileged information."). In light of the unprecedented actions taken by Ms. James, including the endless tirade of public threats and promises, Movants are entitled to fully examine the clear political animus that propel the OAG's investigation.

We respectfully submit that given the extensive and extraordinary evidence detailed above, the OAG selectively initiated its Trump investigation and issued the subpoenas, "based on impermissible considerations such as … to inhibit or punish the exercise," *Bower Assoc. v. Town of Pleasant Val.*, 2 N.Y.3d 617, 631 (2004), of President Trump's Free Speech and political association rights under both the Federal and State Constitutions. Accordingly, the Court should quash the subpoenas. In the alternative, the Court should schedule a hearing on this claim.

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM INDEX NO. 451685/2020
NYSCEF DOC. NO. 642 RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 38 of 39

## CONCLUSION

For all of the foregoing reasons, the Court should:

(a)     Grant the Moving Parties' motion to quash the subpoenas or, in the alternative, stay

this action pending the criminal case;

(b)     Grant the requested hearings;

(c)     Deny the OAG's motion to compel;

(d)     Grant a hearing regarding whether the OAG's investigation was the result of

selective prosecution; and

(e)     Grant any further relief the Court deems just and proper.

Dated: New York, New York
February 1, 2022

_____
Alan S. Futerfas
Law Offices of Alan S. Futerfas
565 Fifth Avenue, 7th Fl
New York, NY 10017

*Attorneys for Respondents/Moving Parties*
*Donald J. Trump, Jr., and Ivanka Trump*

Ronald P. Fischetti
Fischetti & Malgieri
565 Fifth Avenue, 7th Fl
New York, New York 10017

Michael T. van der Veen
Van der Veen, Hartshorn and Levin
1219 Spruce Street
Philadelphia, PA 19107

Alina Habba
Habba Madaio & Associates LLO
112 West 34th Street
New York, New York 10120

FILED: NEW YORK COUNTY CLERK 02/01/2022 04:38 PM
INDEX NO. 451685/2020

NYSCEF DOC. NO. 642

RECEIVED NYSCEF: 02/01/2022

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 39 of 39

*Attorneys for Respondent/Moving Party*
*Donald J. Trump*

38

View this email in your browser



- February 17, 2022 -

## Statement by Donald J. Trump, 45th President of the United States of America

So, Crooked Hillary Clinton, one of the most corrupt politicians ever to run for President, can break into the White House, my apartment, buildings I own, and my campaign—in other words, she can spy on a Presidential candidate and ultimately, the President of the United States—and the now totally discredited Fake News Media does everything they can not to talk about it. On the other hand, failed Gubernatorial candidate, Letitia James, can run for the office of AG on saying absolutely horrendous and false things about Donald Trump, a man she doesn't know and has never met, go on to get elected, and then selectively prosecute him and his family. After viewing millions of pages of documents over many years, they come up with a "Fringe Benefits" case on a car, an apartment, and on grandchildren's education. She is doing everything within their corrupt discretion to interfere with my business relationships, and with the political process. With the rest of the case, even Cy Vance, who just left the DA's office without prosecuting anything additional, because there isn't anything additional to prosecute—THERE IS NO CASE! The targeting of a President of the United States, who got more votes while in office than any President in History, by far, and is a person that the Radical Left Democrats don't want to run again, represents an unconstitutional attack on our Country—and the people will not allow this travesty of justice to happen. It is a continuation of the greatest Witch Hunt in history—and remember, I can't get a fair hearing in New York because of the hatred of me by Judges and the judiciary. It is not possible!



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

EXECUTIVE DIVISION
OFFICE OF FEDERAL INITIATIVES

February 28, 2022

**By ECF**
Honorable Brenda K. Sannes
United States District Judge
United States District Court
Northern District of New York
P.O. Box 7336
Syracuse, NY 13261

   RE: *Trump v. James*, NDNY No. 21 Civ. 1352 (BKS)(CFH)

Dear Judge Sannes,

   The Office of the Attorney General ("OAG") represents Defendant, Attorney General Letitia James, in the above-captioned case. We write in connection with Defendant's pending motion to dismiss the complaint (Dkt. No. 14) to advise the Court that Plaintiff Donald J. Trump has today filed a notice of appeal from the February 17, 2022 decision issued by Justice Engoron in the NY Proceeding, a development that bears on the *res judicata* arguments raised in the parties' briefs. A copy of Mr. Trump's Notice of Appeal is annexed as Exhibit A to this letter.

       Respectfully submitted,

       */s/ Colleen K. Faherty*
       Colleen K. Faherty
       Assistant Attorney General
       (212) 416-6046

INDEX NO. 451685/2020

NYSCEF DOC. NO. 656

RECEIVED NYSCEF: 02/28/2022
UNASSIGNED

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 02/28/2022

Case 1:21-cv-01352-BKS-CFH    Document 26-1    Filed 02/28/22    Page 2 of 21

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of NewYork, | Index No. 451685/2020 |
| Petitioner-Respondent, | **Notice of Appeal** |
| -against- | |
| THE TRUMP ORGANIZATION, INC.; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; SEVEN SPRINGS LLC; ERIC TRUMP; CHARLES MARTABANO; MORGAN, LEWIS& BOCKIUS, LLP; SHERI DILLON, MAZARS USA LLC, DONALD J. TRUMP, DONALD TRUMP, JR. and IVANKA TRUMP, | |
| Respondents-Appellants. | |

PLEASE TAKE NOTICE that Respondent, Donald J. Trump, by and through his

attorneys, Fischetti & Malgieri and Habba Madaio & Associates LLP, and Respondents Donald

Trump, Jr., and Ivanka Trump, by and through their attorneys, the Law Offices of Alan S.

Futerfas, hereby appeal to the Appellate Division of the Supreme Court of the State of New

York, First Judicial Department, from an Order of the Supreme Court, New York County, dated

February 17, 2022.

1

INDEX NO. 451685/2020

NYSCEF DOC. NO. 656    Case 1:21-cv-01352-BKS-CFH    Document 26-1    Filed 02/28/22    Page 3 of 21    RECEIVED NYSCEF: 02/28/2022

Dated: New York, New York
      February 28, 2022

   */s/ Ronald P. Fischetti*                             */s/ Alan Futerfas*
Fischetti & Malgieri                                    Alan S. Futerfas
565 Fifth Avenue, 7th Fl                            Law Offices of Alan S. Futerfas
New York, New York 10017                         565 Fifth Avenue, 7th Fl
                                              New York, NY 10017

*Attorneys for Respondent*
*Donald J. Trump*                                    *Attorneys for Respondents Donald J.*
                                              *Trump, Jr., and Ivanka Trump*

   */s/ Alina Habba, Esq.*
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
      and
112 West 34th Street, 17th & 18th Floors
New York, New York 10120

*Attorneys for Respondent*
*Donald J. Trump*

2

INDEX NO. 451685/2020
NYSCEF DOC. NO. 656    Case 1:21-cv-01352-BKS-CFH    Document 26-1    Filed 02/28/22    Page 4 of 21    RECEIVED NYSCEF: 02/28/2022

# Supreme Court of the State of New York

# Appellate Division: First    Judicial Department

Informational Statement (Pursuant to 22 NYCRR 1250.3 [a]) - Civil

| Case Title: Set forth the title of the case as it appears on the summons, notice of petition or order to show cause by which the matter was or is to be commenced, or as amended. | For Court of Original Instance |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, Petitioner-Respondent, - against - DONALD J. TRUMP, DONALD TRUMP, JR. and IVANKA TRUMP, Respondents-Appellants. | Date Notice of Appeal Filed |
| | For Appellate Division |

| Case Type | | Filing Type | |
|---|---|---|---|
| ☐ Civil Action | ☐ CPLR article 78 Proceeding | ■ Appeal | ☐ Transferred Proceeding |
| ☐ CPLR article 75 Arbitration | ■ Special Proceeding Other | ☐ Original Proceedings | ☐ CPLR Article 78 |
| | ☐ Habeas Corpus Proceeding | ☐ CPLR Article 78 | ☐ Executive Law § 298 |
| | | ☐ Eminent Domain | ☐ CPLR 5704 Review |
| | | ☐ Labor Law 220 or 220-b | |
| | | ☐ Public Officers Law § 36 | |
| | | ☐ Real Property Tax Law § 1278 | |

**Nature of Suit:** Check up to three of the following categories which best reflect the nature of the case.

| | | | |
|---|---|---|---|
| ☐ Administrative Review | ☐ Business Relationships | ☐ Commercial | ☐ Contracts |
| ☐ Declaratory Judgment | ☐ Domestic Relations | ☐ Election Law | ☐ Estate Matters |
| ☐ Family Court | ☐ Mortgage Foreclosure | ☐ Miscellaneous | ☐ Prisoner Discipline & Parole |
| ☐ Real Property (other than foreclosure) | ■ Statutory | ☐ Taxation | ☐ Torts |

Informational Statement - Civil

INDEX NO. 451685/2020
NYSCEF DOC. NO. 656    Case 1:21-cv-01352-BKS-CFH    Document 26-1    Filed 02/28/22    Page 5 of 21    RECEIVED NYSCEF: 02/28/2022

| Appeal | |
|---|---|
| Paper Appealed From (Check one only): | If an appeal has been taken from more than one order or judgment by the filing of this notice of appeal, please indicate the below information for each such order or judgment appealed from on a separate sheet of paper. |

| | | | |
|---|---|---|---|
| ☐ Amended Decree | ☐ Determination | ■ Order | ☐ Resettled Order |
| ☐ Amended Judgement | ☐ Finding | ☐ Order & Judgment | ☐ Ruling |
| ☐ Amended Order | ☐ Interlocutory Decree | ☐ Partial Decree | ☐ Other (specify): |
| ☐ Decision | ☐ Interlocutory Judgment | ☐ Resettled Decree | |
| ☐ Decree | ☐ Judgment | ☐ Resettled Judgment | |

| Court: | Supreme Court | County: | New York |
|---|---|---|---|
| Dated: | 2/17/2022 | Entered: | 2/28/2022 |
| Judge (name in full): | Hon. Arthur F. Engoron | Index No.: | 451685/2020 |
| Stage: ☐ Interlocutory ■ Final ☐ Post-Final | | Trial: ☐ Yes ■ No    If Yes: ☐ Jury ☐ Non-Jury | |

| Prior Unperfected Appeal and Related Case Information |
|---|

Are any appeals arising in the same action or proceeding currently pending in the court?    ☐ Yes ■ No

If Yes, please set forth the Appellate Division Case Number assigned to each such appeal.

Where appropriate, indicate whether there is any related action or proceeding now in any court of this or any other jurisdiction, and if so, the status of the case:

| Original Proceeding |
|---|

| Commenced by: ☐ Order to Show Cause ■ Notice of Petition ☐ Writ of Habeas Corpus | Date Filed: 1/3/22 & 2/14/22 |
|---|---|
| Statute authorizing commencement of proceeding in the Appellate Division: CPLR § 5701 | |

| Proceeding Transferred Pursuant to CPLR 7804(g) | |
|---|---|
| Court: Choose Court | County: Choose County |
| Judge (name in full): | Order of Transfer Date: |

| CPLR 5704 Review of Ex Parte Order: | |
|---|---|
| Court: Choose Court | County: Choose County |
| Judge (name in full): | Dated: |

| Description of Appeal, Proceeding or Application and Statement of Issues |
|---|

Description: If an appeal, briefly describe the paper appealed from.  If the appeal is from an order, specify the relief requested and whether the motion was granted or denied.  If an original proceeding commenced in this court or transferred pursuant to CPLR 7804(g), briefly describe the object of proceeding.  If an application under CPLR 5704, briefly describe the nature of the ex parte order to be reviewed.

The Supreme Court entered an Order denying Respondent-Appellants' Motion to quash subpoenas served by the Office of the Attorney General or, in the alternative, grant a stay pending resolution of the criminal investigation.

Informational Statement - Civil

Issues:  Specify the issues proposed to be raised on the appeal, proceeding, or application for CPLR 5704 review, the grounds for reversal, or modification to be advanced and the specific relief sought on appeal.

(1) Whether the Office of the Attorney General (OAG) -- a law enforcement agency in New York actively participating in a criminal prosecution where a grand jury is impaneled and is targeting certain people and circumstances -- violates the rights of those same targeted people under the New York Constitution and CPL 190.40 when it simultaneously requests their testimony under the guise of a supposedly administrative "office" subpoena;

(2) Whether, as envisioned by the OAG, New York's constitutional and statutory grand jury protections can be easily avoided, indeed, eviscerated, if the same agency involved in the criminal investigation simply opens a "civil" investigation into the very same matters;

(3) Whether the Supreme Court erred in questions of fact and law in holding that AG Letitia James and her Office did not engage in impermissible selective prosecution.

## Party Information

Instructions:  Fill in the name of each party to the action or proceeding, one name per line.  If this form is to be filed for an appeal, indicate the status of the party in the court of original instance and his, her, or its status in this court, if any.  If this form is to be filed for a proceeding commenced in this court, fill in only the party's name and his, her, or its status in this court.

| No. | Party Name | Original Status | Appellate Division Status |
|---|---|---|---|
| 1 | Donald J. Trump, | Respondent | Appellant |
| 2 | Donald Trump, Jr. | Respondent | Appellant |
| 3 | Ivanka Trump | Respondent | Appellant |
| 4 | The Office of the Attorney General | Petitioner | Respondent |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |

Informational Statement - Civil

INDEX NO. 451685/2020

NYSCEF DOC. NO. 656    Case 1:21-cv-01352-BKS-CFH    Document 26-1    Filed 02/28/22    Page 7 of 21    RECEIVED NYSCEF: 02/28/2022

| Attorney Information |
|---|

Instructions:  Fill in the names of the attorneys or firms for the respective parties.  If this form is to be filed with the notice of petition or order to show cause by which a special proceeding is to be commenced in the Appellate Division, only the name of the attorney for the petitioner need be provided.  In the event that a litigant represents herself or himself, the box marked "Pro Se" must be checked and the appropriate information for that litigant must be supplied in the spaces provided.

Attorney/Firm Name:Law Offices of Alan S. Futerfas (representing Donald Trump, Jr. and Ivanka Trump)

Address:565 Fifth Ave, 7th Fl.

| City:New York | State:NY | Zip:10017 | Telephone No:212-684-8400 |
|---|---|---|---|

E-mail Address:asfuterfas@futerfaslaw.com

| Attorney Type: | ■ Retained | ☐ Assigned | ☐ Government | ☐ Pro Se | ☐ Pro Hac Vice |
|---|---|---|---|---|---|

Party or Parties Represented (set forth party number(s) from table above)See Attorney/Firm Field

Attorney/Firm Name: Fischetti & Malgieri (representing Donald J. Trump)

Address:565 Fifth Avenue, 7th Fl

| City:New York | State:NY | Zip:10017 | Telephone No:(212) 593-7100 |
|---|---|---|---|

E-mail Address:rpfischetti@gmail.com

| Attorney Type: | ■ Retained | ☐ Assigned | ☐ Government | ☐ Pro Se | ☐ Pro Hac Vice |
|---|---|---|---|---|---|

Party or Parties Represented (set forth party number(s) from table above)See Attorney/Firm Field

Attorney/Firm Name: Habba Madaio & Associates LLP (representing Donald J. Trump)

Address: 112 West 34th Street, 17th & 18th Floors

| City:NEW YORK | State: NY | Zip: 10120 | Telephone No:908-869-1188 |
|---|---|---|---|

E-mail Address: ahabba@habbalaw.com

| Attorney Type: | ■ Retained | ☐ Assigned | ☐ Government | ☐ Pro Se | ☐ Pro Hac Vice |
|---|---|---|---|---|---|

Party or Parties Represented (set forth party number(s) from table above)See Attorney/Firm Field

Attorney/Firm Name:Letitia James, as Attorney General for the State of New York

Address: 28 Liberty Street

| City:New York | State:NY | Zip:10005 | Telephone No:212.416.6046 |
|---|---|---|---|

E-mail Address:Kevin.Wallace@ag.ny.gov; Colleen.Faherty@ag.ny.gov

| Attorney Type: | ☐ Retained | ☐ Assigned | ■ Government | ☐ Pro Se | ☐ Pro Hac Vice |
|---|---|---|---|---|---|

Party or Parties Represented (set forth party number(s) from table above)See Attorney/Firm Field

Attorney/Firm Name:

Address:

| City: | State: | Zip: | Telephone No: |
|---|---|---|---|

E-mail Address:

| Attorney Type: | ☐ Retained | ☐ Assigned | ☐ Government | ☐ Pro Se | ☐ Pro Hac Vice |
|---|---|---|---|---|---|

Party or Parties Represented (set forth party number(s) from table above)See Attorney/Firm Field

Attorney/Firm Name:

Address:

| City: | State: | Zip: | Telephone No: |
|---|---|---|---|

E-mail Address:

| Attorney Type: | ☐ Retained | ☐ Assigned | ☐ Government | ☐ Pro Se | ☐ Pro Hac Vice |
|---|---|---|---|---|---|

Party or Parties Represented (set forth party number(s) from table above)See Attorney/Firm Field

Informational Statement - Civil

FILED: NEW YORK COUNTY CLERK 02/28/2022 09:44 AM                    INDEX NO. 451685/2020
NYSCEF DOC. NO. 655      Case 1:21-cv-01352-BKS-CFH   Document 26-1   Filed 02/28/22   Page 8 of 21    RECEIVED NYSCEF: 02/28/2022

SUPREME COURT OF THE STATE OF NEW
YORKCOUNTY OF NEW YORK
PEOPLE OF THE STATE OF NEWYORK, by
LETITIA JAMES,

Attorney General of the State of NewYork,

            Petitioner,

    -against-

THE TRUMP ORGANIZATION, INC.; DJT
HOLDINGS LLC; DJT HOLDINGS
MANAGING MEMBER LLC; SEVEN
SPRINGS LLC; ERIC TRUMP; CHARLES
MARTABANO; MORGAN, LEWIS&
BOCKIUS, LLP; SHERI DILLON, MAZARS
USA LLC, DONALD J. TRUMP, DONALD
TRUMP, JR. and IVANKA TRUMP,

         Respondents.

Index No. 451685/2020

**Notice of Entry**

PLEASE TAKE NOTICE that the within is a true copy of the Decision and Order of the

Hon. Arthur F. Engoron dated February 17, 2022 that was entered in the Supreme Court, New

York County Clerk's Office on February 17, 2022.

Dated: New York, New York
     February 28, 2022

       */s/ Alan Futerfas*
       Alan S. Futerfas
       Law Offices of Alan S. Futerfas
       565 Fifth Avenue, 7th Fl
       New York, NY 10017

       *Attorneys for Respondents*
       *Donald J. Trump, Jr., and Ivanka Trump*

[FILED: NEW YORK COUNTY CLERK 02/28/2022 04:49 PM]     INDEX NO. 451685/2020
NYSCEF DOC. NO. 655   Case 1:21-cv-01352-BKS-CFH   Document 26-1   Filed 02/28/22   Page 9 of 21   RECEIVED NYSCEF: 02/28/2022

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:     **HON. ARTHUR ENGORON**                PART                37
                                    *Justice*

-------------------------------------------------------------------------X
                                                       INDEX NO.         451685/2020
THE PEOPLE OF THE STATE OF NEW YORK, BY
LETITIA JAMES, ATTORNEY GENERAL OF THE STATE         MOTION DATE         01/26/2022
OF NEW YORK,
                                                    MOTION SEQ. NO.         008
                                Petitioner,

                    - v -

THE TRUMP ORGANIZATION, INC., DJT HOLDINGS LLC,
DJT HOLDINGS MANAGING MEMBER LLC, SEVEN
SPRINGS LLC, ERIC TRUMP, CHARLES MARTABANO,            **DECISION + ORDER ON
MORGAN, LEWIS & BOCKIUS LLP, SHERI DILLON,                   MOTION**
DONALD J. TRUMP, IVANKA TRUMP, and DONALD
TRUMP, JR.,

                                Respondents.

-------------------------------------------------------------------------X

The following e-filed documents, listed by NYSCEF document number (Motion 008) 321, 322, 323, 324,
325, 326, 327, 328, 329, 330, 331, 332, 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 343, 344, 345,
346, 347, 348, 349, 350, 351, 352, 353, 354, 357, 358, 359, 360, 361, 362, 363, 364, 365, 366, 367, 368,
369, 370, 371, 372, 373, 374, 375, 376, 377, 378, 379, 380, 381, 382, 383, 384, 385, 386, 387, 388, 389,
390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410,
411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 423, 424, 425, 426, 427, 428, 429, 430, 431,
432, 433, 434, 435, 436, 437, 438, 439, 440, 441, 442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452,
453, 454, 455, 456, 457, 458, 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 472, 473,
474, 475, 476, 477, 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490, 491, 492, 493, 494,
495, 496, 497, 498, 499, 500, 501, 502, 503, 504, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514, 515,
516, 517, 518, 519, 520, 521, 522, 523, 524, 525, 526, 527, 528, 529, 530, 531, 532, 533, 534, 535, 536,
537, 538, 539, 540, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 554, 555, 556, 557,
558, 559, 560, 561, 562, 563, 564, 565, 566, 567, 568, 569, 570, 571, 572, 573, 574, 575, 576, 577, 578,
579, 580, 581, 582, 583, 584, 585, 586, 587, 588, 589, 590, 591, 592, 593, 594, 595, 596, 597, 598, 599,
600, 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 612, 613, 614, 615, 616, 617, 618, 619, 620,
621, 622, 623, 624, 625, 626, 627, 628, 629, 632, 633, 634, 635, 636, 637, 638, 639, 640, 641, 642, 643,
644, 645, 646, 647, 648, 649, 650, 651

were read on this motion to              _____QUASH SUBPOENAS_____.

Upon the foregoing documents, it is hereby ordered that the motion by respondents Donald J.
Trump, Ivanka Trump, and Donald Trump, Jr. to quash subpoenas issued by petitioner is denied,
and petitioner's cross-motion to compel is granted.

Background

The instant special proceeding arises out of an investigation commenced by petitioner, the People of
the State of New York, by Letitia James, Attorney General of the State of New York (hereinafter,
"OAG"), into the financial practices of respondent the Trump Organization, its employees, and its
affiliates.

[FILED: NEW YORK COUNTY CLERK 02/28/2022 04:00 AM]     INDEX NO. 451685/2020
NYSCEF DOC. NO. 658     Case 1:21-cv-01352-BKS-CFH   Document 26-1   Filed 02/28/22   Page 10 of 21   RECEIVED NYSCEF: 02/28/2022

Specifically, OAG is investigating whether respondents misstated the value of certain assets on annual financial statements, loan applications, tax submissions, and other official documents, and whether respondents made other material misrepresentations to third parties to secure favorable loan terms and insurance coverage and to obtain tax and other economic benefits.

OAG now claims that it has identified additional facts indicating that the aforesaid documents and others under investigation contain material misstatements and omissions and are materially inconsistent. OAG further states that to determine who is responsible for such alleged misstatements and omissions, it requires the testimony and evidence sought in subpoenas issued to newly joined respondents, Donald J. Trump, Ivanka Trump, and Donald Trump, Jr. (hereinafter, "the New Trump Respondents").

The New Trump Respondents now move to quash the subpoenas or, in the alternative, to stay their enforcement until the conclusion of OAG and/or the Manhattan District Attorney's criminal investigations and/or any other prosecutions of the Trump Organization. OAG now cross-moves to compel compliance with the subject subpoenas.

More than a year ago, at the outset of this special proceeding, this Court held that OAG's investigation, undertaken pursuant to New York Executive Law § 63(12), was lawful. The New Trump Respondents now ask this Court to re-examine the lawfulness of the investigation, arguing that OAG is using the existence of parallel civil and criminal investigations to circumvent the New Trump Respondents' rights under the United States and New York State Constitutions and New York statutory law.

Since this Court last issued a substantive Decision and Order in this case, the nature of OAG's investigation has expanded from purely civil to a civil/criminal hybrid. In a letter dated January 29, 2021, OAG informed the New Trump Respondents and respondent Eric Trump that the evidence reviewed to date could lead to criminal liability and prompt OAG to open a criminal investigation or make a criminal referral. NYSCEF Doc. No. 571. Subsequently, in a letter dated April 27, 2021, OAG informed the New Trump Respondents that "in addition to [OAG's] ongoing civil investigation, [OAG] is also engaged in a criminal investigation." NYSCEF Doc. No. 572.

Additionally, OAG has made numerous public statements confirming its ongoing assistance to the Manhattan District Attorney's criminal investigation into the Trump Organization. See, e.g., Statement from Attorney General James on Criminal Indictment of Trump Organization and CFO Weisselberg. https://ag.ny.gov/press-release/2021/statement-attorney-general-james-criminal-indictment-trump-organization-and-cfo, last accessed February 16, 2022.

Discussion
The New Trump Respondents seek two alternative forms of relief: (1) quashing the subpoenas, on the ground that the hybrid civil/criminal investigation conducted by OAG is inherently unconstitutional and, therefore, the tools normally available to OAG (here, its subpoena power) are being used unlawfully; and (2) a stay of the civil investigation until the conclusion of any criminal investigations on the ground that a stay is necessary to protect the New Trump Respondents' constitutional rights.

451685/2020  PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.
Motion No. 008                                                    Page 2 of 8

92 of 187

**A363**

[FILED: NEW YORK COUNTY CLERK 02/28/2022 04:00 PM]    INDEX NO. 451685/2020
NYSCEF DOC. NO. 658    RECEIVED NYSCEF: 02/28/2022

Case 1:21-cv-01352-BKS-CFH   Document 26-1   Filed 02/28/22   Page 11 of 21

The Constitutional Arguments

Both the United States Constitution and the New York State Constitution, following in the footsteps of deep-rooted Anglo-Saxon law, guarantee that no witness may be compelled to give testimony that will incriminate himself or herself.

Additionally, New York Criminal Procedure Law 190.40 provides that:

> 1. Every witness in a grand jury proceeding must give any evidence legally requested of him regardless of any protest or belief on his part that it may tend to incriminate him.

> 2. A witness who gives evidence in a grand jury proceeding receives immunity unless:

> (a) He has effectively waived such immunity pursuant to section 190.45; or

> (b) Such evidence is not responsive to any inquiry and is gratuitously given or volunteered by the witness with knowledge that it is not responsive.

> (c) The evidence given by the witness consists only of books, papers, records or other physical evidence of an enterprise, as defined in subdivision one of section 175.00 of the penal law, the production of which is required by a subpoena duces tecum, and the witness does not possess a privilege against self-incrimination with respect to the production of such evidence. Any further evidence given by the witness entitles the witness to immunity except as provided in subparagraph1 (a) and (b) of this subdivision.

The New Trump Respondents argue that OAG is "endeavor[ing] to bypass the grand jury protections of New York's Constitution and CPL 190.40." NYSCEF Doc. No. 642 at 8. In support thereof, the New Trump Respondents assert that the issuance of civil subpoenas while a criminal investigation is ongoing allows OAG to extract information from them under the guise of a civil proceeding without OAG's having to offer them the immunity that a grand jury setting would afford them.

This argument completely misses the mark. Neither OAG nor the Manhattan District Attorney's Office has subpoenaed the New Trump Respondents to appear before a grand jury. Indeed, OAG affirms in its reply that it is not conducting a grand jury investigation of respondents. NYSCEF Doc. No. 645 at 2. Furthermore, New York prosecutors do not call the subjects of their criminal investigations to testify before grand juries about their suspected conduct without first securing an immunity waiver. See Carey v Kitson, 93 AD2d 50, 64 (2nd Dep't 1983) (stating in dicta that that case "should again serve as a reminder to law enforcement officials of the consequences of calling a witness before a Grand Jury without obtaining a waiver of immunity"). There is no evidence to support the New Trump Respondents' suggestion that, in the absence of a

[FILED: NEW YORK COUNTY CLERK 02/28/2022 04:00 PM]   INDEX NO. 451685/2020
NYSCEF DOC. NO. 656   Case 1:21-cv-01352-BKS-CFH   Document 26-1   Filed 02/28/22   Page 12 of 21   RECEIVED NYSCEF: 02/28/2022

parallel civil investigation, OAG would have been forced to subpoena the New Trump Respondents to appear before a grand jury, in which case they would have been entitled to immunity under CPL 190.40.

The New Trump Respondents' reliance on <u>United States v Kordel</u>, 397 US 1, 10 (1970), is also unpersuasive. In <u>Kordel</u>, the United States Supreme Court addressed the constitutional implications at issue when a governmental entity conducts simultaneous civil and criminal proceedings. The <u>Kordel</u> Court upheld the lawfulness of the parallel investigations. Specifically, the <u>Kordel</u> Court held:

> For [respondent] need not have answered the interrogatories. Without question he could have invoked his Fifth Amendment privilege against compulsory self-incrimination. Surely [respondent] was not barred from asserting his privilege [simply] because the proceeding in which the Government sought information was civil rather than criminal in character.

<u>Id.</u> at 7-8. The New Trump Respondents' argument overlooks the salient fact that they have an absolute right to refuse to answer questions that they claim may incriminate them. Indeed, respondent Eric Trump invoked his right against self-incrimination in response to more than 500 questions during his one-day deposition arising out of the instant proceeding. NYSCEF Doc. No. 630 at 90.

The New Trump Respondents further cite to dicta in <u>Kordel</u> in which the Court stated:

> We do not deal here with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; nor with a case where the defendant is without counsel or reasonably fears prejudice from adverse pretrial publicity or other unfair injury; nor with any other special circumstances that might suggest the unconstitutionality or even the impropriety of this criminal prosecution.

<u>Id.</u> at 11-12. For all that appears, we are not presented with any of those situations either. OAG pursued its civil investigation for more than a year without the slightest hint that it was a subterfuge to garner evidence for a criminal investigation in the offing. Notably, as discussed during this morning's oral argument, Donald J. Trump was hardly a stranger to the Attorney General's Office when Ms. James was campaigning to head that office. Ms. James' predecessors had investigated Donald J. Trump's "University" and "Foundation" and achieved significant settlements both times. A candidate for Attorney General would have been completely cognizant that, if elected, she would not be writing on a clean slate.

The New Trump Respondents further assert that public statements made by Attorney General Letitia James demonstrate the "impropriety" of her investigation. In support of this argument, they cite to dozens of public statements that James made, during her election campaign and afterward,

**451685/2020  PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.**   **Page 4 of 8**
**Motion No. 008**

154 of 807

FILED: NEW YORK COUNTY CLERK 02/28/2022 04:00 PM    INDEX NO. 451685/2020
NYSCEF DOC. NO. 658                                  RECEIVED NYSCEF: 02/28/2022

Case 1:21-cv-01352-BKS-CFH   Document 26-1   Filed 02/28/22   Page 13 of 21

indicating that she intended to investigate any illegal conduct of respondent Donald J. Trump. The statements range from relatively innocuous ("I believe that the President of these United States can be indicted for criminal offenses") to overtly aggressive ("Oh we're definitely going to sue him. We're gonna be a real pain in his ass. He's going to know my name personally"). NYSCEF Doc. No. 641. Citing <u>Kordel</u>, the New Trump Respondents claim that these statements demonstrate that OAG is acting with the "impropriety" upon which <u>Kordel</u> Court expressly withheld judgment.

However, the New Trump Respondents read <u>Kordel</u>'s dicta for far more than it is worth. First, the <u>Kordel</u> Court expressly declined to rule on the situations described in its dicta, and the New Trump Respondents have failed to offer any more recent authority to support any implication that the facts presented here should merit a legal conclusion distinct from that in <u>Kordel</u>. Second, even assuming, *arguendo*, that the <u>Kordel</u> Court had held that those facts require a different outcome, the New Trump Respondents have failed to demonstrate that any of the factual criteria hypothesized in the <u>Kordel</u> dicta are present here. OAG has promptly and repeatedly informed the New Trump Respondents that they could be subject to both civil and criminal prosecution, and OAG's investigation is hardly unsubstantiated. Indeed, this Court's *in camera* review of the thousands of documents responsive to OAG's prior subpoenas demonstrates that OAG has a sufficient basis for continuing its investigation, which undercuts the notion that this ongoing investigation is based on personal animus, not facts and law.

Moreover, Attorney General James, just like respondent Donald J. Trump, was not deprived of her First Amendment rights to free speech when she was a politician running for a public office with investigatory powers. As the United States Court of Appeals for the 7th Circuit has observed:

> Any effort by the judiciary to stop one politician from proposing and advocating steps that injure another politician would do more to violate the First Amendment (the right to advocate one's view of good policy is the core of free speech) than to vindicate the Equal Protection Clause... A class-of-one claim cannot be used to attack political practices that are valid as a general matter but bear especially hard on one politician.

<u>Jones v Markiewicz-Qualkinbush</u>, 892 F3d 935, 939 (7th Cir 2018). As has often been said, that a prosecutor dislikes someone does not prevent a prosecution.

Furthermore, the New Trump Respondents' reliance on <u>303 W. 42nd St. Corp. v Klein</u>, 46 NY2d 686 (1979), is misplaced. In that case the New York Court of Appeals examined whether the New York State and United States Constitutions require an evidentiary hearing when a petitioner challenging an administrative determination demonstrates with reasonable probability that the administrative determination was a result of unconstitutional First Amendment discrimination. While holding that petitioner was entitled to a hearing, the Court found:

> The underlying right asserted by petitioner is to equal protection of the laws as guaranteed by the 14th Amendment and the New York State Constitution (art I, § 11), one of the governing principles of our society. As enunciated more than a century ago in *Yick Wo v Hopkins* (118 US 356, 373-374), it forbids a public authority from

**451685/2020  PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.**
**Motion No. 008**                                                    **Page 5 of 8**

168 of 207

[FILED: NEW YORK COUNTY CLERK 02/28/2022 04:08 PM]                    INDEX NO. 451685/2020
NYSCEF DOC. NO. 656   Case 1:21-cv-01352-BKS-CFH   Document 26-1   Filed 02/28/22   Page 14 of 21   RECEIVED NYSCEF: 02/28/2022

> applying or enforcing an admittedly valid law "with an evil eye
> and an unequal hand, so as practically to make unjust and illegal
> discriminations between persons in similar circumstances". We
> have recognized the principle in cases involving the enforcement
> of the criminal laws and the administrative regulation of public
> health, safety and morals. To invoke the right successfully,
> however, both the "unequal hand" and the "evil eye" requirements
> must be proven--to wit, there must be not only a showing that the
> law was not applied to others similarly situated but also that the
> selective application of the law was deliberately based upon an
> impermissible standard such as race, religion or some other
> arbitrary classification.

Id. at 693 (internal citations omitted). Here, the New Trump Respondents have failed to submit any evidence that the law was not applied to others similarly situated, nor have they submitted any evidence of discrimination based on race, religion, or any other impermissible or arbitrary classification.

For OAG not to have investigated the original respondents, and not to have subpoenaed the New Trump Respondents, would have been a blatant dereliction of duty (and would have broken an oft-repeated campaign promise). Indeed, the impetus for the investigation was not personal animus, not racial or ethnic or other discrimination, not campaign promises, but was sworn congressional testimony by former Trump associate Michael Cohen that respondents were "cooking the books." NYSCEF Doc. No. 644. See Anheuser-Busch, Inc. v Abrams, 71 NY2d 327, 332 (1988) ("[i]n defending his inquiry, the Attorney-General enjoys a presumption that he is acting in good faith").

Additionally, as the New Trump Respondents have failed to demonstrate a "reasonable probability" of success on the merits, unlike the petitioners in 303 W. 42nd St. Corp., they are not entitled to "an evidentiary hearing before a judicial tribunal." 46 NY2d at 690.

Accordingly, OAG is not violating any rights that CPL 190.40 and the United States and New York State Constitutions afford the New Trump Respondents.

This Court notes in passing, and in dicta, that by letter dated February 9, 2022, Mazars USA LLC ("Mazars") (long-time accountant to respondents the Trump Organization and Donald J. Trump), informed the Trump Organization as follows:

> [T]he Statements of Financial Condition for Donald J. Trump for
> the years ending June 30, 2011 - June 30, 2020, should no longer
> be relied upon and you should inform any recipients thereof who
> are currently relying upon one or more of those documents that
> those documents should not be relied upon.
>
> We have come to this conclusion based, in part, upon the filings
> made by the New York Attorney General on January 18, 2022, our
> own investigation, and information received from internal and
> external sources. While we have not concluded that the various

451685/2020  PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.
Motion No. 008                                                          Page 6 of 8

FILED: NEW YORK COUNTY CLERK 02/28/2022 04:00 AM    INDEX NO. 451685/2020
NYSCEF DOC. NO. 656    RECEIVED NYSCEF: 02/28/2022

Case 1:21-cv-01352-BKS-CFH   Document 26-1   Filed 02/28/22   Page 15 of 21

> financial statements, as a whole, contain material discrepancies,
> based upon the totality of the circumstances, we believe our advice
> to you to no longer rely upon those financial statements is
> appropriate.
>
> As we have stated in the Statements of Financial Condition,
> Mazars performed its work in accordance with professional
> standards.

NYSCEF Doc. No. 646. Upon this statement becoming public, on February 14, 2022, a spokesperson for the Trump Organization released the following statement to various media outlets:

> [Mazars'] February 9, 2022 letter confirms that after conducting a
> subsequent review of all prior statements of financial condition,
> Mazars' work was performed in accordance with all applicable
> accounting standards and principles and that such statements of
> financial condition do not contain any material discrepancies. This
> confirmation effectively renders the investigations by the DA and
> AG moot.

https://www.washingtonpost.com/business/2022/02/14/trump-accountant-financial-statements/, last accessed February 16, 2022.

The idea that an accounting firm's announcement that no one should rely on a decade's worth of financial statements that it issued based on numbers submitted by an entity somehow exonerates that entity and renders an investigation into its past practices moot is reminiscent of Lewis Carroll ("When I use a word, Humpty Dumpty said … it means just what I chose it to mean – neither more nor less"); George Orwell ("War is peace, freedom is slavery, ignorance is strength"); and "alternative facts."

The New Trump Respondents' lawyers have submitted serious, substantive, sophisticated legal arguments in support of quashing the subject subpoenas. Although this Court finds those arguments wanting, they are plausible and learned, and counsel made them in good faith. To proclaim that the Mazars' red-flag warning that the Trump financial statements are unreliable suddenly renders the OAG's longstanding investigation moot is as audacious as it is preposterous.

The Discretionary Stay

As an alternative to quashing the subject subpoenas, the New Trump Respondents ask this Court to exercise its discretion by granting a stay pursuant to CPLR 2201, which states: "Except where otherwise prescribed by law, the court in which an action is pending may grant a stay of proceedings in a proper case, upon such terms as may be just."

Relying on Access Cap., Inc. v DeCicco, 302 AD2d 48, 52 (1st Dep't 2002), which held "[i]t is settled that invoking the privilege against self-incrimination is generally an insufficient basis for precluding discovery in a civil matter," OAG asserts that the New Trump Respondents have not demonstrated a sufficient basis for a stay. The New Trump Respondents argue that OAG's reliance on Access Cap., Inc. is baseless, as the facts at issue in that case did not involve the same

451685/2020  PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.
Motion No. 008                                                    Page 7 of 8

191 of 207

FILED: NEW YORK COUNTY CLERK 02/28/2022 04:00 AM                    INDEX NO. 451685/2020
NYSCEF DOC. NO. 656    Case 1:21-cv-01352-BKS-CFH   Document 26-1   Filed 02/28/22   Page 16 of 21   RECEIVED NYSCEF: 02/28/2022

prosecutor's office working on both a civil and criminal investigation. However, the legal principle remains the same regardless of any factual distinctions. Indeed, it is well settled: "[t]hat defendant's conduct also resulted in a criminal charge against him should not be availed of by him as a shield against a civil suit and prevent plaintiff from expeditiously advancing its claim." Paine, Webber, Jackson & Curtis Inc. v Malon S. Andrus, Inc., 486 F Supp 1118, 1119 (SDNY 1980); see also In re 650 Fifth Ave., 2011 WL 3586169 at 15 (SDNY Aug. 12, 2011), aff'd 2012 WL 363118 at 1 (SDNY Feb. 2, 2012) (denying stay and holding "the Constitution does not guarantee that the exercise of Fifth Amendment rights will be without cost in the civil arena").

The target of a hybrid civil/criminal investigation cannot use the Fifth Amendment as both a sword and a shield; a shield against questions and a sword against the investigation itself. When they are deposed, the New Trump Respondents will have the right to refuse to answer any questions that they claim might incriminate them, and that refusal may not be commented on or used against them in a criminal prosecution. However, there is no unfairness in allowing the jurors in a civil case to know these refusals and to draw their own conclusions. El-Dehdan v El-Dehdan, 26 NY3d 19, 37 (2015) ("a negative inference may be drawn in the civil context when a party invokes that right against self-incrimination").

Accordingly, the Court, in its discretion, declines to issue a stay of OAG's civil investigation into the New Trump Respondents.

The Court has considered the New Trump Respondents' other arguments, including that OAG is violating their right to equal protection, and finds them to be unavailing and/or non-dispositive.

In the final analysis, a State Attorney General commences investigating a business entity, uncovers copious evidence of possible financial fraud, and wants to question, under oath, several of the entities' principals, including its namesake. She has the clear right to do so.

Conclusion
Thus, for the reasons stated herein, the motion of respondents Donald J. Trump, Ivanka Trump, and Donald Trump, Jr. to quash the subpoenas that the New York State Office of Attorney General issued to them or, in the alternative, to stay petitioner's civil investigation, is hereby denied, and petitioner's cross-motion to compel is hereby granted. Respondent Donald J. Trump is hereby ordered: (1) to comply in full, within 14 days of the date of this order, with that portion of the Office of the Attorney General's subpoena seeking documents and information; and (2) to appear for a deposition within 21 days of the date of this order. Respondents Ivanka Trump and Donald Trump Jr. are also hereby ordered to appear for depositions within 21 days of the date of this order.



| 2/17/2022 | | | | ARTHUR ENGORON, J.S.C. |
|-----------|--|--|--|------------------------|
| DATE | | | | |

| CHECK ONE: | | CASE DISPOSED | | X | NON-FINAL DISPOSITION | |
|------------|--|---------------|--|---|------------------------|--|
| | | GRANTED | DENIED | | GRANTED IN PART | X | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | | REFERENCE |

451685/2020  PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.                    Page 8 of 8
Motion No.  008

SUPREME COURT OF THE STATE OF NEW YORKCOUNTY OF NEW YORK

PEOPLE OF THE STATE OF NEWYORK, by LETITIA JAMES,

Attorney General of the State of NewYork,

Petitioner,

-against-

THE TRUMP ORGANIZATION, INC.; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; SEVEN SPRINGS LLC; ERIC TRUMP; CHARLES MARTABANO; MORGAN, LEWIS& BOCKIUS, LLP; SHERI DILLON, MAZARS USA LLC, DONALD J. TRUMP, DONALD TRUMP, JR. and IVANKA TRUMP,

Respondents.

Index No. 451685/2020

**Affirmation of Service**

RICHARD F. BRUECKNER affirms:

1.      I am not a party to the within action, am over the age of eighteen (18) years of age and reside in Morristownship, New Jersey.

2.      On the 28th day of February 2022, through the New York State Courts Electronic Filing System, I filed with the Court and served electronically the Notice of Entry on the Petitioner, Letitia James as Attorney General of the State of New York.  I served an additional copy of the above via email to:

Colleen Faherty
THE OFFICE OF THE ATTORNEY GENERAL of the State of NEW YORK
Colleen.Faherty@ag.ny.gov

Kevin Wallace
THE OFFICE OF THE ATTORNEY GENERAL of the State of NEW YORK
Kevin.Wallace@ag.ny.gov

  */s/  Richard Brueckner*
  RICHARD F. BRUECKNER

INDEX NO. 451685/2020

NYSCEF DOC. NO. 656    Case 1:21-cv-01352-BKS-CFH    Document 26-1    Filed 02/28/22    Page 18 of 21    RECEIVED NYSCEF: 02/28/2022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES,<br>Attorney General of the State of NewYork,<br><br>        Petitioner-Respondent,<br><br>   -against-<br><br>THE TRUMP ORGANIZATION, INC.; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; SEVEN SPRINGS LLC; ERIC TRUMP; CHARLES MARTABANO; MORGAN, LEWIS& BOCKIUS, LLP; SHERI DILLON, MAZARS USA LLC, DONALD J. TRUMP, DONALD TRUMP, JR. and IVANKA TRUMP,<br><br>        Respondents-Appellants. | Index No. 451685/2020<br><br><br>**Affirmation of Service** |

RICHARD F. BRUECKNER affirms:

1.    I am not a party to the within action, am over the age of eighteen (18) years of age and reside in Morris Township, New Jersey.

2.    On the 28th day of February 2022, through the New York State Courts Electronic Filing System, I filed with the Court and served electronically the Notice of Appeal on the Petitioner, Letitia James as Attorney General of the State of New York.  I served an additional copy of the above via email to:

Colleen Faherty
THE OFFICE OF THE ATTORNEY
GENERAL OF THE STATE OF NEW
YORK
Colleen.Faherty@ag.ny.gov

Kevin Wallace
THE OFFICE OF THE ATTORNEY
GENERAL OF THE STATE OF NEW
YORK
Kevin.Wallace@ag.ny.gov

      */s/  Richard Brueckner*
      RICHARD F. BRUECKNER

3

**A371**




# NYSCEF Confirmation Notice

## New York County Supreme Court

The NYSCEF website has received an electronic filing on 02/28/2022 03:43 PM. Please keep this notice as a confirmation of this filing.

**451685/2020**

**The People of the State of New York, by Letitia James, Attorney General of the State of New York v. The Trump Organization, Inc. et al**

**Assigned Judge: Arthur F. Engoron**

| Documents Received on   02/28/2022 03:43 PM |
|---|

| Doc # | Document Type |
|---|---|
| 656 | NOTICE OF APPEAL |

| Filing User |
|---|

Alan Samuel Futerfas | asfuterfas@futerfaslaw.com

565 5th Ave Fl 7, New York, NY 10017

---

**Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court**
Phone: 646-386-5956      Website: http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml

**NYSCEF Resource Center, nyscef@nycourts.gov**

Phone: (646) 386-3033 | Fax: (212) 401-9146 | Website: www.nycourts.gov/efile



# NYSCEF Confirmation Notice

## New York County Supreme Court



### 451685/2020

**The People of the State of New York, by Letitia James, Attorney General of the State of New York v. The Trump Organization, Inc. et al**

**Assigned Judge: Arthur F. Engoron**

### E-mail Notifications

An email regarding this filing has been sent to the following on 02/28/2022 03:43 PM:

Nathan J. Andrisani - nathan.andrisani@morganlewis.com

GRAEME W. BUSH - gbush@zuckerman.com

GEORGE J. CALCAGNINI - gcalcagnin@aol.com

GEORGE J. CALCAGNINI - GCalcagnin@aol.com

AMY D. CARLIN - acarlin@lhrgb.com

COLLEEN K. FAHERTY - colleen.faherty@ag.ny.gov

ALEX W. FINKELSTEIN - Alex.Finkelstein@ag.ny.gov

RONALD P. FISCHETTI - rpfischetti@gmail.com

ALAN S. FUTERFAS - asfuterfas@futerfaslaw.com

ALAN G. GARTEN - agarten@trumporg.com

ALINA S. HABBA - ahabba@habbalaw.com

ERIC R. HAREN - eric.haren@ag.ny.gov

SANFORD J. HAUSLER - Shausler@lhrgb.com

DAVID N. KITTREDGE - DKITTREDGE@lhrgb.com

MARC L. MUKASEY - marc.mukasey@mukaseylaw.com

MARY MULLIGAN - mmulligan@fklaw.com

Zane D. Memeger - zane.memeger@morganlewis.com

LAWRENCE S. ROSEN - LROSEN@lhrgb.com

LOUIS M. SOLOMON - louis.solomon@ag.ny.gov

TIMOTHY J. STEPHENS - Timothy.Stephens@morganlewis.com

AUSTIN L. THOMPSON - Austin.Thompson@ag.ny.gov

KEVIN C. WALLACE - kevin.wallace@ag.ny.gov

**Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court**
Phone: 646-386-5956     Website: http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml

**NYSCEF Resource Center, nyscef@nycourts.gov**
Phone: (646) 386-3033 | Fax: (212) 401-9146 | Website: www.nycourts.gov/efile

Page 2 of  3

**A373**




# NYSCEF Confirmation Notice
## New York County Supreme Court

### 451685/2020
**The People of the State of New York, by Letitia James, Attorney General of the State of New York v. The Trump Organization, Inc. et al**
**Assigned Judge: Arthur F. Engoron**

---

### Email Notifications NOT Sent

| Role | Party | Attorney |
|------|-------|----------|
| Respondent | Ivanka Trump | No consent on record. |
| Respondent | Donald Trump | No consent on record. |

\* Court rules require hard copy service upon non-participating parties and attorneys who have opted-out or declined consent.

---

**Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court**
Phone: 646-386-5956      Website: http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml

**NYSCEF Resource Center, nyscef@nycourts.gov**
Phone: (646) 386-3033 | Fax: (212) 401-9146 | Website: www.nycourts.gov/efile

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
          -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiffs,*
*Donald J. Trump and Trump Organization LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DONALD J. TRUMP and TRUMP ORGANIZATION LLC, <br><br> Plaintiffs, <br><br> v. <br><br> LETITIA JAMES, in her official capacity as Attorney General for the State of New York, <br><br> Defendant. | Civil Action No.: 1:21-cv-01352-BKS-CFH <br><br><br> **DECLARATION OF ALINA HABBA, ESQ.** |

I, Alina Habba, pursuant to 28 U.S.C. § 1746, declare as follows:

1.       I am managing partner of Habba Madaio & Associates LLP, counsel for Plaintiffs,

Donald J. Trump and Trump Organization LLC (collectively, "Plaintiffs"), in the above-captioned

matter.

2.       I submit this declaration pursuant to Federal Rule of Civil Procedure 65 and Local

Rule 7.1, in connection with Plaintiffs' supplemental letter brief submitted in further support of

Plaintiffs' motion for a preliminary injunction and in further opposition to Defendants' motion to

dismiss. The facts herein are true and correct and, unless otherwise stated, are within my personal

knowledge.

3.      Attached as Exhibit A is a true and accurate copy of relevant excerpts of the hearing transcript of the proceedings before the Hon. Arthur S. Engoron held on February 17, 2022 in the matter of *People v. Trump Organization*, Index No. 451685/2020 (N.Y. Sup. Ct).

Respectfully submitted,

Dated: April 15, 2022
      New York, New York

_____
Alina Habba, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
            -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiffs,*
*Donald J. Trump and Trump Organization LLC*

1

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK - CIVIL TERM - PART 37
 2   -----------------------------------------------X

 3    PEOPLE OF THE STATE OF NEW YORK, BY LETITIA     Index No.
      JAMES, ATTORNEY GENERAL OF THE STATE OF NEW     451685/2020
 4    YORK,

 5                              Petitioner,

 6         -against-

 7

      THE TRUMP ORGANIZATION, INC.; DJT HOLDINGS
 8    LLC; DJT HOLDINGS MANAGING MEMBER, LLC;
      SEVEN SPRINGS, LLC; ERICK TRUMP; CHARLES
 9    MARTABANO; MORGAN, LEWIS & BOCKIUS, LLP; AND
      SHERI DILLON,
10

11                              Respondents.

12   -----------------------------------------------X
                                   60 Centre Street
13   PROCEEDINGS                   New York, New York
     (virtual)                     February 17, 2022
14

15    B E F O R E:

16            HONORABLE ARTHUR S. ENGORON,

17                       JUSTICE

18
     A P P E A R A N C E S:
19

20      OFFICE OF THE ATTORNEY GENERAL
        OF THE STATE OF NEW YORK - LETITIA JAMES
21          ATTORNEYS FOR THE PETITIONER
            28 Liberty Street
22          New York, New York 10005
        BY: KEVIN WALLACE, ESQ.
23      BY: COLLEEN K. FAHERTY, ESQ.
        BY: ANDREW AMER, ESQ.
24
                              (Appearances continued..)
25
```

2

```
 1    A P P E A R A N C E S:

 2

 3        HABBA MADAIO & ASSOCIATES, LLP
          ATTORNEYS FOR THE RESPONDENT, DONALD J. TRUMP
 4            1430 US-206, Suite 240
              Bedminster, New Jersey 07921
 5        BY:  ALINA HABBA, ESQ.

 6

 7        LAW OFFICES OF ALAN S. FUTERFAS
          ATTORNEYS FOR THE RESPONDENTS,
          DONALD J. TRUMP, JR. AND IVANKA TRUMP
 8            565 Fifth Avenue, 7th Floor
              New York, New York 10017
 9        BY: ALAN S. FUTERFAS, ESQ.
          BY: ELLEN RESNICK, ESQ.
10        BY: RICHARD BRUECKNER, ESQ.

11

          FISCHETTI & MALGIERI, LLP
12        ATTORNEYS FOR THE RESPONDENT, DONALD J. TRUMP
              565 Fifth Avenue, 7th Floor
13            New York, New York 10017
          BY: RONALD FISCHETTI, ESQ.
14

15

16

17

18

19

20

21

22

23
                          LISA M. DE CRESCENZO,
24                        OFFICIAL COURT REPORTER

25
```

Proceedings

1    case where we can prove selective prosecution because

2    she's put her words out there so much and taken every

3    opportunity to voice her vendetta against Donald Trump

4    and his family to take him down.

5         My client is entitled to the protections

6    afforded to him by the Constitution against egregious

7    prosecutorial misconduct.

8         THE COURT:  Let me just say, I'm not the

9    disciplinary committee, so some of the ethical

10   questions are not in front of me.  I tend to say

11   they're not part of this case that I have in front of

12   me.

13        MS. HABBA:  How can you say that?  They are

14   very much a part of this case.  You can't judge someone

15   based on your hatred for them.

16        MS. GREENFIELD: Counselor, when the Judge

17   speaks, you have to stop speaking.

18        MS. HABBA:  I thought he was done.  My

19   apology.

20        THE COURT:  Sometimes I'm a little slow.

21   I'll leave it as I am not the attorney disciplinary

22   committee.  You can do whatever you think is correct

23   there because you're bringing up what I think are

24   issues that are more in terms of yes, the ethics of the

25   participant rather than the legal issues in front of me

67

Proceedings

1    you say look what we found.  You found all the

2    evidence.  Don't you have to go back to whether your

3    investigation was correct ab initio from the start?

4         MR. WALLACE: This isn't a Fourth Amendment

5    claim, and I would note we have developed the evidence

6    through the productions that the Trump Organization has

7    agreed to.  Right?  We have proceeded with their

8    agreement.

9         They're not before the Court today, and I

10   would note that for the purposes of the subpoenas that

11   are before the Court today, even if we weren't

12   proceeding as to these individuals, the Trump

13   Organization hasn't challenged the fitness of this

14   investigation.

15        They have, in fact, acceded to the fact that

16   this is a proper investigation.  So, at the very least,

17   these three are witnesses to potential activity that

18   took place within the Trump Organization, and I don't

19   think that there's been any facts established that the

20   particular investigation was started for an improper

21   reason either.

22        THE COURT:  The other side disagrees with--

23        MR. WALLACE: Obviously, they disagree.

24        So, I wanted to highlight the fact we have

25   made our showing and we have found our evidence, and

Proceedings

1       Let's talk about the facts and whether they might

2       suggest a slightly different view of the law.

3                   MR. WALLACE:  No.  The assignment of the

4       attorney, of the assistant attorney general is to work

5       under the direction of the District Attorney is

6       sanctioned by the Court of Appeals.  The fact that the

7       two investigations are proceeding in parallel is a

8       common occurrence, you know, in both federal and state

9       practice.

10                  So, the legal issues aren't.  Mr. Trump is a

11      high profile individual, yes, that is unique.  You

12      know, I think it's unique that there are press releases

13      after we make filings and it gets picked up everywhere.

14                  It's unique that probably so many people are

15      paying attention to a rather dry hearing about subpoena

16      enforcement but the legal issues that we're dealing

17      with here are pretty standard; and, as your Honor made

18      the point, Mr. Trump is a citizen.  He has to come in

19      and appear just like anyone else.

20                  THE COURT:  Alina, would you want to address

21      the animus ab initio point or uniqueness of this case?

22      Or Alan.

23                  MS. HABBA:  Sure.  Sure, your Honor. I will

24      try to be brief.  There's a couple of things I want to

25      respond to.

*Lisa DeCrescenzo*



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

EXECUTIVE DIVISION
OFFICE OF FEDERAL INITIATIVES

May 3, 2022

**By ECF**
Honorable Brenda K. Sannes
United States District Judge
United States District Court
Northern District of New York
P.O. Box 7336
Syracuse, NY 13261

RE:    *Trump v. James*, NDNY No. 21 Civ. 1352 (BKS)(CFH)

Dear Judge Sannes,

The Office of the Attorney General ("OAG") represents Defendant, Attorney General Letitia James, in the above-captioned case.  We write in advance of the oral argument scheduled for May 13, 2022 to provide the Court with supplemental information concerning the procedural posture of the *People v. The Trump Organization, Inc.*, NY County, NY Supreme Court, (NYSCEF No. 451685/2020) (hereafter, the "NY Proceeding").  In particular, please find attached the following four documents to aid in the Court's understanding of the NY Proceeding:  (1) April 26, 2022 contempt ruling ordered by Justice Engoron in the NY Proceeding, at NYSCEF No. 758, which the Court referenced in its recent text order; (2) April 29, 2022 order denying Donald J. Trump's attempt to purge his contempt in the NY Proceeding, and directing Mr. Trump to produce a "*Jackson* affidavit" in order to purge his contempt, filed at NYSCEF No. 768; (3) counsel Alina Habba's 4/27/22 affidavit in support of Mr. Trump's request to purge his contempt, which addresses at paragraph 61 assertions concerning the "control" of certain documents in the possession of the Trump Organization and which bears on OAG's *res judicata* argument; and (4) the interim order issued today by Justice Kennedy of the Appellate Division, First Department denying Donald Trump's application for expedited relief seeking to stay the contempt order in the NY Proceeding pending appeal and referring the stay application to a full panel of the court, which will be fully submitted to the panel on May 23, 2022.

Respectfully submitted,

*/s/ Colleen K. Faherty*
Colleen K. Faherty
Assistant Attorney General

INDEX NO. 451685/2020

NYSCEF DOC. NO. 758    Case 1:21-cv-01352-BKS-CFH    Document 32-1    Filed 05/03/22    Page 2 of 4    RECEIVED NYSCEF: 04/26/2022

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

| PRESENT: | **HON. ARTHUR ENGORON** | PART | 37 |
|---|---|---|---|
| | *Justice* | | |

-------------------------------------------------------------X

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, | **INDEX NO.** 451685/2020 |
| | **MOTION DATE** 04/08/2022 |
| | **MOTION SEQ. NO.** 009 |

Petitioner,

- v -

THE TRUMP ORGANIZATION, INC., DJT HOLDINGS LLC,
DJT HOLDINGS MANAGING MEMBER LLC, SEVEN
SPRINGS LLC, ERIC TRUMP, CHARLES MARTABANO,
MORGAN, LEWIS & BOCKIUS LLP, SHERI DILLON,
DONALD J. TRUMP, IVANKA TRUMP, and DONALD
TRUMP, JR.,

**DECISION + ORDER ON
MOTION**

Respondents.

-------------------------------------------------------------X

The following e-filed documents, listed by NYSCEF document number (Motion 009) 668, 669, 670, 671, 672, 673, 674, 675, 695, 696, 720, 721, 722, 723, 724, 725, 726, 744

were read on this motion for _____ CONTEMPT _____ .

Upon the foregoing documents, it is hereby ordered that petitioner's motion to hold respondent Donald J. Trump in contempt of court is granted.

Background

In this special proceeding, familiarity with which the Court will assume, petitioner, the People of the State of New York, by Letitia James, Attorney General of the State of New York (hereinafter, "OAG") seeks to hold respondent Donald J. Trump in contempt of court for failing to comply with this Court's February 17, 2022 Decision and Order compelling him to produce certain documents.

On December 2, 2021, OAG served a subpoena on Donald J. Trump that sought, inter alia[1], documents and evidence, to be produced by December 17, 2021. Mr. Trump subsequently moved to quash such subpoena, which this Court denied on February 17, 2022. Said Decision and Order directed Mr. Trump to "comply in full, within 14 days of the date of this order, with that portion of the [OAG's] subpoena seeking documents and information." NYSCEF Doc. No. 654.

---

[1] OAG also served a subpoena for Donald J. Trump's testimony, which this Court compelled on February 17, 2022, and is currently on appeal before the Appellate Division, First Department.

451685/2020 PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.
Motion No. 009

Page 1 of 3

INDEX NO. 451685/2020
NYSCEF DOC. NO. 758        Case 1:21-cv-01352-BKS-CFH   Document 32-1   Filed 05/03/22   Page 3 of 4
RECEIVED NYSCEF: 04/26/2022

OAG and Mr. Trump subsequently entered into a stipulation, which this Court so-ordered, to extend the document production deadline from March 3, 2022 to March 31, 2022. The stipulation states that "Respondent Donald J. Trump shall comply in full with that portion of the OAG subpoena seeking documents and information by March 31, 2022." NYSCEF Doc. No. 660.

Instead of producing the documents called for in the subpoena, on March 31, 2022, Mr. Trump produced 16 pages of boilerplate objections and a four-page affirmation by counsel that states, summarily, that Mr. Trump was unable to locate any responsive documents in his custody. The affirmation fails to identify what search methods were employed, where they were employed, by whom they were employed, and when such searches took place.

OAG has moved to hold Mr. Trump in contempt and asks this Court to impose a sanction of $10,000 per day until Mr. Trump complies in full with OAG's subpoena.

Discussion

Judiciary Law § 753(A)(1) provides, in pertinent part, that: "[a] court of record has power to punish, by fine and imprisonment, or either, a neglect or violation of duty, or other misconduct, by which a right or remedy of a party to a civil action or special proceeding, pending in the court may be defeated, impaired, impeded, or prejudiced, in any of the following cases:... for disobedience to a lawful mandate of the court."

Additionally, CPLR 5104 provides that "[a]ny interlocutory or final judgment or order, or any part thereof, not enforceable under either article fifty-two or section 5102 may be enforced by serving a certified copy of the judgment or upon the party or other person required thereby or by law to obey it and, if he refuses or wilfully neglects to obey it, by punishing him for a contempt of the court."

Mr. Trump waived the right to raise boilerplate objections to the subpoena by not timely bringing such challenges in his motion to quash. "A motion to quash or vacate, of course, is the proper and exclusive vehicle to challenge the validity of a subpoena." Brunswick Hosp. Ctr., Inc. v Hynes, 52 NY2d 333, 339 (1981) (further finding that "[a]ny other rule would open the door to never-ending challenges to the validity of subpoenas, perhaps even years after initial issuance and compliance"). Accordingly, it was wholly improper for Mr. Trump to raise boilerplate objections to the subpoena after failing to raise such objections in his motion to quash. Furthermore, having stipulated to produce all the documents by March 31, 2022, Mr. Trump may no longer challenge the validity of the subpoena.

Furthermore, the "compliance affirmation" submitted by counsel for Mr. Trump is woefully inadequate, both under the terms of the subpoena and under controlling New York case law, which require an affiant conducting a search for records to attest to the "who," "what," "where," "when," and "how" the search was conducted. Jackson v City of New York, 185 AD2d 768, 770 (1st Dep't 1992) (holding that "[h]ere, after years of delay, the affidavit presented by the [defendant] made no showing as to where the subject records were likely to be kept, what efforts, if any, were made to preserve them, whether such records were routinely destroyed, or whether a search had been conducted in every location where the records were likely to be found").

451685/2020  PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.        Page 2 of 3
Motion No. 009

INDEX NO. 451685/2020
NYSCEF DOC. NO. 758    Case 1:21-cv-01352-BKS-CFH    Document 32-1    Filed 05/03/22    Page 4 of 4    RECEIVED NYSCEF: 04/26/2022

For example, Mr. Trump has not refuted, with admissible evidence, OAG's detailed assertions that he failed to search numerous file cabinets in various locations. NYSCEF Doc. No. 744.

In short, the affidavit provided the Court with no basis to find that the search had been a thorough one or that it had been conducted in a good faith effort to provide these necessary records to plaintiff. Not only did Mr. Trump fail to submit an affidavit himself, which this Court believes would have been the best practice, as he is the most obvious person to affirm where any responsive documents in his possession, custody, and control would be located, but the attorney affirmation submitted on behalf of Mr. Trump contained only conclusory statements, rather than details of a diligent search.

Accordingly, Mr. Trump has willfully disobeyed a lawful order of this Court.

> In order to find that contempt has occurred in given case, it must be determined that a lawful order of the court, clearly expressing an unequivocal mandate, was in effect. It must appear, with reasonable certainty, that the order has been disobeyed. Moreover, the party to be held in contempt must have had knowledge of the court's order, although it is not necessary that the order actually have been served upon the party. Finally, prejudice to the right of a party to the litigation must be demonstrated.

McCormick v Axelrod, 59 NY2d 574, 583 (1983) (internal citations omitted).

OAG, the people's representative, correctly states that any delay causes prejudice to "the rights or remedies of the State acting in the public interest." State v Stallings, 183 AD2d 574, 575 (1st Dep't 1992) (affirming motion for contempt brought on behalf of State). Moreover, each day that passes without compliance further prejudices OAG, as the statutes of limitations continue to run and may result in OAG being unable to pursue certain causes of action that it otherwise would.

Accordingly, OAG has satisfied its burden of demonstrating that Mr. Trump willfully disobeyed a lawful court order of which he had knowledge, prejudicing OAG. The purpose of civil contempt is not to punish, but, rather, to coerce and/or to compensate. OAG seeks to fine Mr. Trump $10,000 per day until he satisfies his obligations, which this Court, which has wide discretion in such matters, finds to be reasonable.

Thus, Donald J. Trump is in contempt of Court and must pay a fine of $10,000 per day, from the date of this Decision and Order, until he purges such contempt to the satisfaction of this Court.

| 4/26/2022 | | | | | ARTHUR ENGORON, J.S.C. | |
|-----------|---|---|---|---|------------------------|---|
| DATE | | | | | | |

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | |
|------------|---|---------------|---|---|---|-----------------------|---|
| | X | GRANTED | | DENIED | | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | REFERENCE |

451685/2020  PEOPLE OF THE STATE OF vs. TRUMP ORGANIZATION, INC.
Motion No.  009

Page 3 of 3

Case 1:21-cv-01352-BKS-CFH Document 32-2 Filed 05/03/22 Page 2 of 3

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:  **HON. ARTHUR ENGORON**          PART     37

                                     *Justice*

-----------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA    INDEX NO.     451685/2020
JAMES, ATTORNEY GENERAL OF THE STATE OF NEW
YORK,

                  Petitioner,                      OPINION AND ORDER

             - v -

THE TRUMP ORGANIZATION, INC., DJT HOLDINGS LLC,
DJT HOLDINGS MANAGING MEMBER LLC, SEVEN
SPRINGS LLC, ERIC TRUMP, CHARLES MARTABANO,
MORGAN, LEWIS & BOCKIUS LLP, SHERI DILLON,
DONALD J. TRUMP, IVANKA TRUMP, DONALD TRUMP
JR., and CUSHMAN AND WAKEFIELD, INC.,

               Respondents.

-----------------------------------------------------------------------X

Following a virtual conference held on April 29, 2022, at the request of respondent Donald J.
Trump, this Court hereby denies, without prejudice, Mr. Trump's request to purge his contempt.

On Monday, April 25, 2022, this Court held Mr. Trump in contempt of court for failure to supply
documents, or sufficient affidavits of diligent searches, to petitioner, the Office of the Attorney
General ("OAG"), in response to its subpoena issued to Mr. Trump on December 2, 2021.

On April 27, 2022, Mr. Trump's counsel emailed this Court two affirmations from counsel and
one affidavit from Mr. Trump himself, in an attempt to purge the contempt. NYSCEF Doc. No.
765. On April 29, 2022, OAG submitted a letter response stating that it did not believe Mr.
Trump had sufficiently complied with the subpoena such that his contempt should be purged.
NYSCEF Doc. No. 766. At the request of Mr. Trump, this Court held a virtual conference to
discuss the submissions.

This Court finds that Mr. Trump has not yet purged his contempt. The affirmations submitted by
counsel for Mr. Trump are insufficient in that they fail to specify who searched for each
respective request, at what time, where, and using what search protocols; it is not sufficient
simply to attach a list of people who participated in the searches. Moreover, the affirmations
submitted by counsel also fail to affirm that the subject electronic devices were imaged and
searched and with what search terms.

Furthermore, Mr. Trump's personal affidavit is completely devoid of any useful detail. Notably,
it fails to state where he kept his files, how his files were stored in the regular course of business,
who had access to such files, what, if any, the retention policy was for such files, and,

## OTHER ORDER – NON-MOTION

FILED: NEW YORK COUNTY CLERK 04/29/2022 03:02 PM
NYSCEF DOC. NO. 768

INDEX NO. 451685/2020
RECEIVED NYSCEF: 04/29/2022

Case 1:21-cv-01352-BKS-CFH   Document 32-2   Filed 05/03/22   Page 3 of 3

importantly, where he believes such files are currently located. It similarly fails to state if he turned over his personal electronic devices for imaging and searching. Thus, this Court now hereby orders Mr. Trump to submit a detailed "Jackson affidavit," swearing to the aforesaid details in order to purge his contempt. See Jackson v City of New York, 185 AD2d 768, 770 (1st Dep't 1992).

Moreover, counsel's claim that her conversations with respondent about the locations of the subpoena are covered by attorney-client privilege is without merit, as the mere identification of responsive documents does not involve "render[ing] legal advice or services to the client." Spectrum Sys. Intl. Corp. v Chemical Bank, 78 NY2d 371, 379 (1991).

Finally, the Court rejects Mr. Trump's assertions that OAG is not suffering any prejudice as a result of Mr. Trump's failure to comply. As this Court has previously noted, each day that passes without compliance further prejudices OAG, as the statutes of limitations continue to run and may result in OAG being unable to pursue certain causes of action that it otherwise would. Furthermore, any delay causes prejudice to "the rights or remedies of the State acting in the public interest." State v Stallings, 183 AD2d 574, 575 (1st Dep't 1992) (affirming motion for contempt brought on behalf of State).

Thus, Mr. Trump's request to purge his contempt is denied, without prejudice.

DATE: 4/29/2022

ARTHUR ENGORON, JSC

Check One:   [ ] Case Disposed   [X] Non-Final Disposition

Check if Appropriate:   [ ] Other (Specify _____ )

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York,<br><br>       Petitioner,<br><br>   v.<br><br>THE TRUMP ORGANIZATION, INC., DJT HOLDINGS LLC, DJT HOLDINGS MANAGING MEMBER LLC, SEVEN SPRINGS LLC, ERIC TRUMP, CHARLES MARTABANO, MORGAN, LEWIS & BOCKIUS, LLP, SHERI DILLON, DONALD J. TRUMP, IVANKA TRUMP, DONALD TRUMP, JR., and CUSHMAN AND WAKEFIELD, INC.,<br><br>       Respondents. | Index No.: 451685/2020<br><br><br><br>**AFFIDAVIT OF COMPLIANCE**<br>**WITH SUBPOENA** |

I, Alina Habba, Esq., being duly sworn, state as follows:

1. My office represents the respondent, Donald J. Trump ("Respondent"), in connection with the above-referenced action and is responsible for preparing and assembling Respondent's production and response to the *Subpoena Duces Tecum* dated December 1, 2021 (the "Subpoena"). My office also represents the respondent, The Trump Organization, Inc. (the "Trump Organization") in this action.

2. I submit this affirmation in compliance with Instruction C14 of the Subpoena.

3. Respondent previously submitted a Response and Objections to the Subpoena dated March 31, 2022 (the "Response"). Consistent with the Court's Order dated April 26, 2022, Respondent hereby withdraws all objections raised in the Response.

4. Respondent's productions and responses to the Subpoena are complete and correct

to the best of my knowledge and belief.

5.      No documents or information responsive to the Subpoena have been withheld from Respondent's production and response.

6.      Attached as Schedule A is a true and accurate record of all persons who prepared and assembled any productions and responses to the Subpoena, all persons under whose personal supervision the preparation and assembly of productions and responses to the Subpoena occurred, and all persons able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be.

7.      As described herein, I made or caused to be made a diligent, complete and comprehensive search for all documents and information requested by the Subpoena, in full accordance with the instructions and definitions set forth in the Subpoena.

8.      A detailed description of my search efforts is set forth below.

**Overview of Search Efforts**

9.      Commencing in January 2022, I personally reviewed portions of Respondent's chron files as to whether they contained any documents responsive to the Subpoena. Collectively, my firm performed a full, complete, and diligent search of the chron files. After the search, it was determined that any documents in the chron files that are responsive to the Subpoena had already been produced to the OAG.

10.      I had numerous in-person meetings, phone calls, and communications with co-counsel for the Trump Organization, LaRocca Hornik Rosen & Greenberg LLP ("TTO Co-Counsel"), the Trump Organization legal team (the "TTO Legal Dept."), including its General Counsel, for the purpose of assessing and verifying the extent of the searches performed in relation

to the Trump Organization's prior document productions.

11.    I reviewed each individual demand contained in the Subpoena with TTO Co-Counsel as to whether any responsive documents pertaining to Respondent had been previously produced by the Trump Organization to the OAG.

12.    I personally reviewed the weekly status reports provided by TTO Co-Counsel to the OAG.

13.    I personally reviewed the prior subpoenas served upon the Trump Organization by the OAG.

14.    Based upon the foregoing, it is my understanding that the following searches were previously performed in response to prior Subpoenas issued by the OAG (collectively, the "Prior Searches:

a.    <u>Physical Files Located in Trump Tower</u>:

i.    On or about January 24, 2020, a search was conducted of the physical files located in the file cabinets of the Trump Organization's corporate offices at Trump Tower located on the 25th and 26th floors. Any documents responsive to those searches were produced to the OAG by the Trump Organization. Any non-privileged materials identified were produced to the OAG.

ii.    On or about July 19, 2021, a search was conducted of Respondent's physical files located in Trump Tower, including his chron, hard-copy calendars (located in the storage room by his office), and the cabinets outside his office maintained by Rhona Graff and his other executive assistants. Any documents responsive to those searches were produced to the OAG by the Trump Organization.

b.   <u>Hard Copy Files of Executive Assistants</u>:

   i.   On or about November 12, 2021, a search was conducted of the hard copy/paper files maintained by Respondent's executive assistants Jessica Macchia, Chelsea Frommer, Holly Lorenzo, Kelly Malley, Katie Murphy, Kelli Rose, Thuy Colayco, Cammie Artusa, and Meredith McIver located in file cabinets by executives' desks and the Executive Office Storage Closet.   The files were thereafter reviewed by the Trump Organization's General Counsel for non-privileged responsive materials and, to the extent applicable, it was determined that there were no responsive documents to be produced to the OAG.

   ii.   On or about November 23, 2021, a search was conducted of the hard copy/paper files maintained by the executive assistants Randi Gleason, Lauren Kelly (Pleszewicz), Casey Kennedy, and Jacquline Fini at Trump Tower. No responsive documents were found.

c.   <u>Off-Site Documents</u>

   i.   On or about November 23, 2021, a search was conducted of the off-site storage log.

   ii.   In mid-January, 2020, a search was conducted of the inventories of files stored off-site to locate any potentially responsive documents.   The files that were identified as potentially responsive were shipped from the off-site storage facility to the Trump Organization's corporate offices at Trump Tower, where they were received on or about January 15, 2020.   The files were thereafter reviewed by the Trump Organization's General Counsel and

all non-privileged documents that were located were produced to the OAG.

15.     Throughout the course of my search efforts, I had many conversations with Respondent concerning the Subpoena and locations likely to hold responsive documents. The contents of those conversations are covered by attorney-client privilege but assisted in guiding my search for responsive documents.

16.     Based on these privileged communications and review of relevant documents, I determined that there are no additional responsive documents at his personal residences or personal offices in Trump National Golf Club Bedminster or Mar-a-Lago that have not already been produced to the OAG.

17.     Additionally, on March 17, 2022, I met with Respondent in-person at Mar-a-Lago and reviewed the Subpoena with him to verify whether he had any responsive documents in his possession, custody or control.

18.     On April 8, 2022, Mr. Madaio and I conducted a telephone interview with Respondent, as per Haystack ID's request. After completion, the completed HaystackID interview forms were submitted to HaystackID.

**<u>Demand No. 1</u>**

19.     With respect to Demand No. 1, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 1 and/or cross-checking whether any documents responsive to Demand No. 1 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served

upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

20.     I had numerous discussions with TTO Co-Counsel and the TTO Legal Dept. for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 1 and verifying whether potentially responsive documents had previously been produced to the OAG.

21.     In addition, Demand No. 1 of the Subpoena calls for "all documents and communications concerning any Statement of Financial Condition." I cross-checked the search terms used by the Trump Organization in connection with its searches in response to the 2019 Subpoena, which included the term "Statement of Financial Condition"; therefore, the documents responsive to Demand No. 1 of the Subpoena would have been produced to the OAG in connection with the Prior Searches.

22.     I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control responsive to Demand No. 1.

23.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 1, other than those documents that had already been produced by the Trump Organization.

### Demand No. 2

24.     Demand No. 2 calls for "[a]ll documents and communications concerning any valuation of any asset whose value is identified or incorporated into any Statement of Financial Condition." This identical demand was set forth in a subpoena dated December 27, 2019 that was previously served upon the Trump Organization by the OAG; therefore, the Prior Searches encompassed the items responsive to this demand.

25.     With respect to Demand No. 2, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 2 and/or cross-checking whether any documents responsive to Demand No. 2 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

26.     In addition, I had numerous discussions with TTO Co-Counsel and the TTO Legal Dept. for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 2 and verifying whether potentially responsive documents had previously been produced to the OAG.

27.     I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control with respect to Demand No. 2.

28.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 2, other than those documents that had already been produced by the Trump Organization.

**Demand No. 3**

29.     Demand No. 3 calls for "[a]ll documents reviewed, used, or relied on in the preparation of the Statements of Financial Condition, and all communications relating to any of the foregoing." This identical demand was set forth in a subpoena dated December 27, 2019 that was previously served upon the Trump Organization by the OAG; therefore, the Prior Searches

encompassed the items responsive to this demand.

30.     With respect to Demand No. 3, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 3 and/or cross-checking whether any documents responsive to Demand No. 3 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

31.     In addition, I had numerous discussions with TTO Co-Counsel and the TTO Legal Dept. for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 3 and verifying whether potentially responsive documents had previously been produced to the OAG.

32.     I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control with respect to Demand No. 3.

33.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 3, other than those documents that had already been produced by the Trump Organization.

### Demand No. 4

34.     Demand No. 4 calls for "[a]ll documents and communications concerning any financing or debt related to Trump International Hotel and Tower Chicago or Chicago Unit Acquisition LLC." This identical demand was set forth in a subpoena dated December 27, 2019

that was previously served upon the Trump Organization by the OAG; therefore, the Prior Searches encompassed the items responsive to this demand.

35.    With respect to Demand No. 4, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 4 and/or cross-checking whether any documents responsive to Demand No. 4 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

36.    In addition, I had numerous discussions with TTO Co-Counsel and the TTO Legal Dept. for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 4 and verifying whether potentially responsive documents had previously been produced to the OAG.

37.    I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control with respect to Demand No. 4

38.    Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 4, other than those documents that had already been produced by the Trump Organization.

**<u>Demand No. 5</u>**

39.    Demand No. 5 calls for "[a]ll documents and communications concerning the donation or potential donation of a conservation or preservation easement by [Respondent]." This

identical demand was set forth in a subpoena dated December 27, 2019 that was previously served upon the Trump Organization by the OAG; therefore, the Prior Searches encompassed the items responsive to this demand.

40.     With respect to Demand No. 5, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 5 and/or cross-checking whether any documents responsive to Demand No. 5 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

41.     In addition, I had numerous discussions with TTO Co-Counsel and the TTO Legal Dept. for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 5 and verifying whether potentially responsive documents had previously been produced to the OAG.

42.     I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control with respect to Demand No. 5.

43.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 5, other than those documents that had already been produced by the Trump Organization.

### Demand No. 6

44.     Demand No. 6 calls for "[a]ll documents and communications concerning any

planned or potential development or alteration of the Seven Springs Estate." This identical demand was set forth in a subpoena dated December 27, 2019 that was previously served upon the Trump Organization by the OAG; therefore, the Prior Searches encompassed the items responsive to this demand.

45.     With respect to Demand No. 6, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 6 and/or cross-checking whether any documents responsive to Demand No. 6 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

46.     In addition, I had numerous discussions with TTO Co-Counsel and the TTO Legal Dept. for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 6 and verifying whether potentially responsive documents had previously been produced to the OAG.

47.     I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control with respect to Demand No. 6.

48.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 6, other than those documents that had already been produced by the Trump Organization.

**<u>Demand No. 7</u>**

49.     With respect to Demand No. 7, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 7 and/or cross-checking whether any documents responsive to Demand No. 7 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

50.     In addition, I had numerous discussions with TTO Co-Counsel and the TTO Legal Dept. for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 7 and verifying whether potentially responsive documents had previously been produced to the OAG.

51.     I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control with respect to Demand No. 7.

52.     Further, with respect to item 7 of the Subpoena, which calls for "all documents and communications with Forbes Magazine…," I confirmed that all communications and documents with Forbes Magazine had been produced to the OAG through August 14, 2021.

53.     To supplement this search, on March 16, 2022, Mr. Madaio coordinated with the Trump Organization's IT team to commence a search for any responsive documents to Demand No. 7 (regarding Forbes Magazine) for the time period from January 1, 2021 through March 16, 2022. Search parameters included the term "forbes" and communications with "forbes.com" e-

mail addresses, and the e-mail addresses of ten Trump Organization individuals were searched, including Alan Garten, Eric Trump, Donald Trump, Jr., Allen Weisselberg, Amanda Miller, Kim Benza, Jeffrey McCooney, Patrick Birney, Ray Flores and Deborah Tarasoff.

54.     The search returned 1,386 documents and/or communications. Three employees of my firm, in coordination with HaystackID, reviewed these items as to whether they were responsive to Subpoena demand no. 7. After a full, complete and diligent search, it was determined that none of the documents were responsive.

55.     Additionally, I searched the chron files and did not find any documents responsive to the Subpoena which had not already been produced.

56.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 7, other than those documents that had already been produced by the Trump Organization.

**Demand No. 8**

57.     With respect to Demand No. 8, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 8 and/or cross-checking whether any documents responsive to Demand No. 8 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

58.     I personally interviewed Respondent as to whether he had any responsive

documents in his possession, custody or control with respect to Demand No. 8.

59.     Based on privileged communications with Respondent and communications with the Trump Legal Dept., I confirmed that insurance procurement, both personal and business-related were coordinated through the Trump Organization.

60.     Based on relevant search terms and the parameters of the Trump Organization's prior searches, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 8, other than those documents that had already been produced by the Trump Organization.

## **Stipulation**

61.     On behalf of Respondent, I hereby stipulate that the Trump Organization-produced documents can be used as if those documents were produced by Respondent because they were under Respondent's "control," in that they were documents in the possession of a company owned or controlled by a Respondent or a Trust owned by him, to the extent allowable by law. In so stipulating, Respondent does not waive any objections to such documents or the introduction of those documents in evidence that he would otherwise have if he had produced those documents solely because they were in the custody or control of a company owned or controlled by him or a Trust owned by him.

Alina Habba

4/27/2022
Date

**ACKNOWLEDGMENT**

STATE OF NEW JERSEY    )
COUNTY OF SOMERSET    )

On this 2 7 day of April in the year 2022, before me, the undersigned, a notary public in and for said state, personally appeared Alina Habba personally known to be or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.

Notary Public



FILED: APPELLATE DIVISION - 1ST DEPT 05/02/2022 04:07 PM      2022-01812

NYSCEF DOC. NO. 3                                    RECEIVED NYSCEF: 05/02/2022

## SUMMARY STATEMENT ON APPLICATION FOR
## EXPEDITED SERVICE AND/OR INTERIM RELIEF

(SUBMITTED BY MOVING PARTY)

Date: 5/2/2022                                     Case # 2022-01812

Title of Matter   The People of the State of New York, by Letitia James          Index/Indict/Docket # 451685/2020

v. The Trump Organization, et al.

Appeal by **Respondent** from   Order ☑ / Judgment ☐ / Decree ☐   of   Supreme ☑ / Surrogate's ☐ / Family ☐

County **New York**

Court entered on **April 26**, 20 **22**

Name of Judge Hon. Arthur Engoron, J.S.C.

Notice of Appeal filed on **April 27**, 20 **22**

If from   administrative determination, state agency

Nature of action or proceeding   Article 4 Special Proceeding (Exec. Law 63(12))

Provisions of   ☑ order / ☐ judgment / ☐ decree   appealed from   The appeal is taken from each and every part of the Decision and Order.

This application by   appellant / respondent   is for   The appeal is taken from each and every part of the Decision and Order.

If applying for a stay, state reason why requested   a stay of the Decision and Order appealed from, pending appeal, including a stay of the portion of Order imposing a $10,000 daily fine, and an interim stay pending the resolution of the motion to stay.

Has any undertaking been posted **No**                 If "yes", state amount and type

Has application been made to court below for this relief **No**          If "yes", state Disposition

Has there been any prior application here in this court **No**          If "yes", state dates and nature

Has adversary been advised of this application **Yes**          Does he/she consent **No**

Attorney for Movant

Name  Alina Habba, Esq.

Address  Habba Madaio & Associates LLP

1430 U.S. Highway 206, Suite 240

Bedminster, NJ 07921

Tel. No.  908-869-1188

Appearing by  Alina Habba, Esq., Michael Madaio, Esq.

ahabba@habbalaw.com

mmadaio@habbalaw.com

Attorney for Opposition

Eric Del Pozo, Esq. / Judith Vale, Esq.

Office of the Attorney General

28 Liberty Street

New York, NY 10005

800-771-7755

judith.vale@ag.ny.gov

eric.delpozo@ag.ny.gov

---

**(Do not write below this line)**

DISPOSITION

Interim application denied and the motion referred to a full Bench for determination.

_Hon. Tanya R. Kennedy_
Justice

May 3, 2022
Date

Motion Date  5/23/22     Opposition  5/17     Reply  5/23  10 am

EXPEDITE _____     PHONE ATTORNEYS _____     DECISION BY _____

ALL PAPERS TO BE SERVED PERSONALLY.

EUt
Court Attorney

"Revised 10/19"

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Attorney ID No.: 4931630
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
         -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiffs,*
*Donald J. Trump and Trump Organization LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DONALD J. TRUMP and TRUMP ORGANIZATION LLC,<br><br>         Plaintiffs,<br><br>    v.<br><br>LETITIA JAMES, in her official capacity as Attorney General for the State of New York,<br><br>        Defendant. | **ECF CASE**<br><br>  Civil Action No.: 1:21-cv-01352-BKS-CFH<br><br><br>**NOTICE OF CIVIL APPEAL** |

Notice is hereby given that plaintiffs, Donald J. Trump and the Trump Organization LLC,

(collectively "Plaintiffs") appeal to the United States Court of Appeals for the Second Circuit

from the Judgment and Decision and Order granting Defendant's Motion to Dismiss and denying

Plaintiff's Motion for Preliminary Injunction, attached hereto as Exhibit A, entered in this action

on May 27, 2022, ECF No. 36, and ECF No. 37.

Dated:     May 27, 2022           Respectfully submitted,
          New York, New York

                                   Alina Habba, Esq.
                                   **HABBA MADAIO & ASSOCIATES LLP**
                                   1430 U.S. Highway 206, Suite 240
                                   Bedminster, New Jersey 07921

-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiffs,*
*Donald J. Trump and Trump Organization LLC*

To: All Counsel of record via ECF