

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

BARBARA D. UNDERWOOD
SOLICITOR GENERAL
DIVISION OF APPEALS & OPINIONS

September 26, 2022

Catherine O'Hagan Wolfe
Clerk of the Court
U.S. Court of Appeals for
  the Second Circuit
40 Foley Square
New York, NY 10007

Re:   *Trump v. James*, No. 22-1175

Dear Ms. Wolfe:

I write on behalf of defendant-appellee New York Attorney General Letitia James, under FRAP 28(j), to update the Court on pertinent developments since the filing of appellee's brief.

Plaintiffs-appellants Donald J. Trump and the Trump Organization brought this lawsuit under 42 U.S.C. § 1983 seeking to enjoin an investigation by the New York State Office of the Attorney General (OAG). The district court dismissed the complaint based on res judicata and *Younger* abstention, the latter in deference to an ongoing subpoena-enforcement proceeding in which the state court held Mr. Trump in civil contempt. Appellee Br. 16-18.

In its appellee's brief, OAG explained that the contempt order, which Mr. Trump has appealed, supports *Younger* abstention (*id.* at 54-59), and OAG noted the possibly imminent filing of a substantive enforcement action in state court against the Trump Organization or Mr. Trump (*id.* at 59).

On September 21, 2022, OAG filed in state court a 214-page civil enforcement complaint under New York Executive Law § 63(12), charging the Trump Organization and Mr. Trump, among others, with engaging in persistent fraud and illegality in business. *See People ex rel. James v. Trump*, Index No. 452564/2022 (Sup. Ct. N.Y. County). A copy of the complaint is attached.

The state enforcement proceeding plainly qualifies for *Younger* abstention (Appellee Br. 59) and thus provides an alternative ground for affirmance. Although a civil case, the enforcement proceeding is "akin to a criminal prosecution in important respects." *Sprint Comm'cns, Inc. v. Jacobs*, 571 U.S. 69, 79 (2013). It results from a law-enforcement investigation and seeks to sanction plaintiffs here. *See id.* at 79-80. And it is brought by the Attorney General on behalf of a sovereign State to prevent fraud and illegality. *See People v. Lexington Sixty-First Assocs.*, 38 N.Y.2d 588, 598 (1976); *see also, e.g.*, *Trainor v. Hernandez*, 431 U.S. 434, 444 (1977) (holding abstention appropriate for civil proceeding brought by State to remedy fraud).

OAG is prepared to answer questions at oral argument about this development and will submit supplemental briefing if the Court so directs.

Respectfully submitted,

_____/s/ Eric Del Pozo_____
Eric Del Pozo
Assistant Solicitor General

cc:     Counsel of record (by ECF)

enc.

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Index No. _____ |
| Plaintiff, | |
| -against- | **SUMMONS** |
| DONALD J. TRUMP, DONALD TRUMP, JR., ERIC TRUMP, IVANKA TRUMP, ALLEN WEISSELBERG, JEFFREY MCCONNEY, THE DONALD J. TRUMP REVOCABLE TRUST, THE TRUMP ORGANIZATION, INC., TRUMP ORGANIZATION LLC, DJT HOLDINGS LLC, DJT HOLDINGS MANAGING MEMBER, TRUMP ENDEAVOR 12 LLC, 401 NORTH WABASH VENTURE LLC, TRUMP OLD POST OFFICE LLC, 40 WALL STREET LLC, and SEVEN SPRINGS LLC, | Date Index No. Purchased: _____ |
| Defendants. | |

TO THE ABOVE-NAMED DEFENDANTS:

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue pursuant to CPLR § 503(a) is that Plaintiff is located in New York County, with its address at 28 Liberty Street, New York, New York 10005, and because a substantial part of the events and omissions giving to the claims occurred in New York County.

Dated: New York, New York
September 21, 2022

LETITIA JAMES
*Attorney General of the State of New York*

By: _____
Kevin Wallace

Kevin Wallace
Andrew Amer
Colleen K. Faherty
Alex Finkelstein
Wil Handley
Eric R. Haren
Louis M. Solomon
Austin Thompson
Stephanie Torre

Office of the New York State
Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6376
kevin.wallace@ag.ny.gov

*Attorneys for the People of the
State of New York*

To:

DONALD J. TRUMP
*Habba Maddaio & Associates LLP*
112 West 34th Street,New York, New York 10120
*Fischetti Malgieri*
565 Fifth Ave., 7th Fl, New York, NY 10017

DONALD TRUMP, JR.
*Law Offices of Alan S. Futerfas*
  565 Fifth Ave., 7th Fl, New York, NY 10017

ERIC TRUMP
*Law Offices of Alan S. Futerfas*
  565 Fifth Ave., 7th Fl, New York, NY 10017

IVANKA TRUMP
*Law Offices of Alan S. Futerfas*
  565 Fifth Ave., 7th Fl, New York, NY 10017

ALLEN WEISSELBERG
*Friedman Kaplan Seiler Adelman*
  7 Times Sq., New York, NY 10036

JEFFREY MCCONNEY
*ArentFox Schiff*
  1301 Avenue of the Americas, 42nd floor, New York, NY 10019

THE DONALD J. TRUMP REVOCABLE TRUST
c/o The Trump Organization – 725 Fifth Avenue, New York, NY 10022
*LaRocca Hornik Rosen & Greenberg LLP*
  40 Wall Street, 32nd Floor, New York, NY 10005
*Habba Maddaio & Associates LLP*
  112 West 34th Street, 17th & 18th Floors, New York, NY 10120

THE TRUMP ORGANIZATION, INC.
*LaRocca Hornik Rosen & Greenberg LLP*
  40 Wall Street, 32nd Floor, New York, NY 10005
*Habba Maddaio & Associates LLP*
  112 West 34th Street, 17th & 18th Floors, New York, NY 10120

TRUMP ORGANIZATION LLC
*LaRocca Hornik Rosen & Greenberg LLP*
  40 Wall Street, 32nd Floor, New York, NY 10005
*Habba Maddaio & Associates LLP*
  112 West 34th Street, 17th & 18th Floors, New York, NY 10120

DJT HOLDINGS LLC
*LaRocca Hornik Rosen & Greenberg LLP*
  40 Wall Street, 32nd Floor, New York, NY 10005
*Habba Maddaio & Associates LLP*
  112 West 34th Street, 17th & 18th Floors, New York, NY 10120

Case 22-1175, Document 56, 09/26/2022, 3388914, Page6 of 224

DJT HOLDINGS MANAGING MEMBER
*LaRocca Hornik Rosen & Greenberg LLP*
  40 Wall Street, 32nd Floor, New York, NY 10005
*Habba Maddaio & Associates LLP*
  112 West 34th Street, 17th & 18th Floors, New York, NY 10120

TRUMP ENDEAVOR 12 LLC
c/o The Trump Organization – 725 Fifth Avenue, New York, NY 10022
*LaRocca Hornik Rosen & Greenberg LLP*
  40 Wall Street, 32nd Floor, New York, NY 10005
*Habba Maddaio & Associates LLP*
  112 West 34th Street, 17th & 18th Floors, New York, NY 10120

401 NORTH WABASH VENTURE LLC
c/o The Trump Organization – 725 Fifth Avenue, New York, NY 10022
*LaRocca Hornik Rosen & Greenberg LLP*
  40 Wall Street, 32nd Floor, New York, NY 10005
*Habba Maddaio & Associates LLP*
  112 West 34th Street, 17th & 18th Floors, New York, NY 10120

TRUMP OLD POST OFFICE LLC
c/o The Trump Organization – 725 Fifth Avenue, New York, NY 10022
*LaRocca Hornik Rosen & Greenberg LLP*
  40 Wall Street, 32nd Floor, New York, NY 10005
*Habba Maddaio & Associates LLP*
  112 West 34th Street, 17th & 18th Floors, New York, NY 10120

40 WALL STREET LLC
c/o The Trump Organization – 725 Fifth Avenue, New York, NY 10022
*LaRocca Hornik Rosen & Greenberg LLP*
  40 Wall Street, 32nd Floor, New York, NY 10005
*Habba Maddaio & Associates LLP*
  112 West 34th Street, 17th & 18th Floors, New York, NY 10120

SEVEN SPRINGS LLC
*LaRocca Hornik Rosen & Greenberg LLP*
  40 Wall Street, 32nd Floor, New York, NY 10005
*Habba Maddaio & Associates LLP*
  112 West 34th Street, 17th & 18th Floors, New York, NY 10120

Case 22-1175, Document 56, 09/26/2022, 3388914, Page7 of 224

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Index No. _____ |
| Plaintiff, | **VERIFIED COMPLAINT** |
| -against- | |
| DONALD J. TRUMP, DONALD TRUMP, JR., ERIC TRUMP, IVANKA TRUMP, ALLEN WEISSELBERG, JEFFREY MCCONNEY, THE DONALD J. TRUMP REVOCABLE TRUST, THE TRUMP ORGANIZATION, INC., TRUMP ORGANIZATION LLC, DJT HOLDINGS LLC, DJT HOLDINGS MANAGING MEMBER, TRUMP ENDEAVOR 12 LLC, 401 NORTH WABASH VENTURE LLC, TRUMP OLD POST OFFICE LLC, 40 WALL STREET LLC, and SEVEN SPRINGS LLC, | |
| Defendants. | |

Case 22-1175, Document 56, 09/26/2022, 3388914, Page8 of 224

## TABLE OF CONTENTS

I.   NATURE OF THE ACTION ...................................................................................... 1

A.   The Fraudulent Statements of Financial Condition .......................................... 3

B.   Relief Sought ................................................................................................... 11

II.  THE PARTIES ........................................................................................................ 12

III. JURISDICTION, APPLICABLE LAW, AND VENUE ......................................... 16

IV.  FACTUAL ALLEGATIONS .................................................................................. 19

A.   Overview of Trump Organization Assets ........................................................ 20

B.   Overview of the Statements of Financial Condition ....................................... 23

C.   The Asset Values and Associated Descriptions Presented in the Statements Were
     Fraudulent, Misleading, and Not Presented in Accordance with GAAP .......... 26

     1.   Cash and Cash Equivalents/Marketable Securities ................................. 26

     2.   Escrow and Reserve Deposits and Prepaid Expenses ............................. 29

     3.   Trump Park Avenue ................................................................................. 31

     4.   40 Wall Street .......................................................................................... 38

     5.   Niketown .................................................................................................. 47

          a.   June 30, 2011 and June 30, 2012 valuations of Niketown .............. 48

          b.   Valuations of Niketown from 2013 through 2018 ........................... 50

          c.   June 30, 2019 valuation of Niketown .............................................. 55

          d.   June 30, 2020 valuation of Niketown .............................................. 56

     6.   Trump Tower ............................................................................................ 58

          a.   Valuation of Trump Tower from 2011 to 2014 and 2016 to 2019 .... 59

          b.   2015 valuation of Trump Tower ...................................................... 65

     7.   Seven Springs .......................................................................................... 67

     8.   Mr. Trump's Triplex Apartment .............................................................. 75

     9.   1290 Avenue of the Americas and 555 California (Vornado Partnerships) ... 84

          a.   The Restricted Nature of Mr. Trump's Limited Partnership Interest ... 85

          b.   The False and Misleading Valuations of the Buildings ................... 87

     10.  Las Vegas (Ruffin Joint Venture) ............................................................ 92

     11.  Club Facilities and Related Real Estate .................................................. 98

          a.   Mar-a-Lago ..................................................................................... 101

          b.   Trump Aberdeen ............................................................................. 110

               i.   The Golf Course Valuations ..................................................... 111

               ii.  The Undeveloped Land Valuations .......................................... 114

i

c.   Trump Turnberry ........................................................................... 119

d.   TNGC Jupiter ................................................................................ 120

e.   TNGC Briarcliff ........................................................................... 122

   i.   The Golf Course Valuations ................................................. 123

   ii.   The Undeveloped Land Valuations ....................................... 125

f.   TNGC LA ...................................................................................... 126

   i.   The Golf Course Valuations ................................................. 127

   ii.   The Undeveloped Land Valuations ....................................... 128

g.   TNGC Colts Neck ......................................................................... 137

h.   TNGC Philadelphia ....................................................................... 139

i.   TNGC DC ...................................................................................... 140

j.   TNGC Charlotte ............................................................................ 142

k.   TNGC Hudson Valley ................................................................... 143

12.  Real Estate Licensing Developments ...................................................... 144

D.   The False and Misleading Statements of Financial Condition Were Used to Secure and Maintain Financial Benefits, Including Financing and Insurance, on Favorable Terms .. 147

   1.   Deutsche Bank Loan Facilities ................................................................ 148

   2.   Deutsche Bank Loan Issued in Connection with Trump National Doral Golf Club (Florida) ................................................................................................ 151

   3.   Deutsche Bank Loan Issued in Connection with Trump Chicago (2012)................... 159

   4.   Deutsche Bank Loan Issued in Connection with Trump Old Post Office Hotel in Washington, D.C. .................................................................................. 165

   5.   40 Wall Street Loan Issued by Ladder Capital .......................................... 171

   6.   Seven Springs Loan Issued by Royal Bank America / Bryn Mawr Bank.................... 174

   7.   Other Efforts To Use The False And Misleading Statements In Commercial Transactions ........................................................................................ 176

E.   Insurance-Related Benefits ............................................................................ 178

   1.   Insurance Fraud Against Surety Underwriters ........................................... 179

   2.   Insurance Fraud Against Directors & Officers Liability Underwriters....................... 183

F.   Ongoing Scheme and Conspiracy .................................................................. 189

V.   CAUSES OF ACTION ............................................................................... 198

VI.  PRAYER FOR RELIEF ............................................................................. 213

ii

Plaintiff, the People of the State of New York, by Letitia James, Attorney General of the State of New York, as and for their Verified Complaint, respectfully allege:

## I.   NATURE OF THE ACTION

1.      Following a comprehensive three-year investigation by the Office of the Attorney General ("OAG"), involving interviews with more than 65 witnesses and review of millions of pages of documents produced by Defendants and others, OAG has determined that Defendants Donald J. Trump ("Mr. Trump"), Trump Organization LLC and the Trump Organization, Inc. (collectively with the other named entities, the "Trump Organization"), Allen Weisselberg, and the other individuals and entities affiliated with Mr. Trump and his companies named as Defendants, engaged in numerous acts of fraud and misrepresentation in the preparation of Mr. Trump's annual statements of financial condition ("Statements of Financial Condition" or "Statements") covering at least the years 2011 through 2021.

2.      These acts of fraud and misrepresentation were similar in nature, were committed by upper management at the Trump Organization as part of a common endeavor for each annual Statement, and were approved at the highest levels of the Trump Organization—including by Mr. Trump himself. Indeed, Mr. Trump made known through Mr. Weisselberg that he wanted his net worth on the Statements to increase—a desire Mr. Weisselberg and others carried out year after year in their fraudulent preparation of the Statements.

3.      These acts of fraud and misrepresentation grossly inflated Mr. Trump's personal net worth as reported in the Statements by billions of dollars and conveyed false and misleading impressions to financial counterparties about how the Statements were prepared. Mr. Trump and the Trump Organization used these false and misleading Statements repeatedly and persistently to induce banks to lend money to the Trump Organization on more favorable terms than would

otherwise have been available to the company, to satisfy continuing loan covenants, and to induce insurers to provide insurance coverage for higher limits and at lower premiums.

4.      All of this conduct was in violation of New York Executive Law § 63(12)'s prohibition of persistent and repeated business fraud, which embraces any conduct that "has the capacity or tendency to deceive, or creates an atmosphere conductive to fraud." *People v. Northern Leasing Systems, Inc*., 193 A.D.3d 67, 75 (1st Dep't 2021).

5.      These misrepresentations also violated a host of state criminal laws, constituting repeated and persistent illegality in violation of Executive Law § 63(12). Among other laws, Defendants repeatedly and persistently violated the following: New York Penal Law § 175.10 (Falsifying Business Records); Penal Law § 175.45 (Issuing a False Financial Statement); and Penal Law § 176.05 (Insurance Fraud).[1]

6.      Each Statement from 2011 to 2021 provides Mr. Trump's personal net worth as of June 30 of the year it covers, was compiled by Trump Organization executives, and was issued as a compilation report by Mr. Trump's accounting firm. Each Statement provides on its face that its preparation was the responsibility of Mr. Trump, or starting in 2016, the trustees of his revocable trust, Donald Trump, Jr. and Allen Weisselberg.[2] Each Statement was personally

---

[1] While not a basis for recovery in this action, the conduct alleged in this action also plausibly violates federal criminal law, including 18 U.S.C. § 1014 (False Statements to Financial Institutions) and 18 U.S.C. § 1344 (Bank Fraud). Under those provisions, a defendant violates federal law by knowingly submitting a false document or statement in order to influence the decision of a federally-insured bank or to obtain money from a bank by means of false representations or pretenses. There is no requirement of loss or reliance. OAG is making a referral of its factual findings to the Office of the United States Attorney for the Southern District of New York.

[2] Mr. Weisselberg was removed as a trustee as of July 2021, after having been indicted by the New York District Attorney on charges of tax fraud. Mr. Weisselberg pleaded guilty to those charges on August 18, 2022.

2

Case 22-1175, Document 56, 09/26/2022, 3388914, Page12 of 224

certified as accurate by Mr. Trump, by one of his trustees, or in 2021 by Eric Trump, when

submitting the Statement to financial institutions with the purpose and intent that the information

contained in the Statement would be relied upon by those institutions.

7. Each year from 2011 to 2016, Mr. Trump and Mr. Weisselberg would meet to

review and approve the final Statement. When asked questions about those meetings under oath,

both men invoked their Fifth Amendment privilege against self-incrimination and refused to

answer. When asked under oath if he continued to review and approve the Statements after

becoming President of the United States in 2017, Mr. Trump invoked his Fifth Amendment

privilege and refused to answer.

8. As further evidence of their scheme to inflate the value of Mr. Trump's assets

when beneficial to his financial interests, Mr. Trump and the Trump Organization procured

inflated appraisals through fraud and misrepresentations in 2014 and 2015 for the purpose of

granting conservation easements over two of Mr. Trump's properties. Through these

conservation easements, Mr. Trump and the Trump Organization agreed to forgo their purported

rights to develop areas of the two properties that are the subjects of the easements, which enabled

them to treat as a charitable donation the difference in the value of each property with and

without the relinquished development rights as determined in the appraisals. In the same way

that Mr. Trump and the Trump Organization inflated the valuations of Mr. Trump's assets for the

Statements, they manipulated the appraisals to inflate the value of the donated development

rights with respect to both conservation easements.

### A. The Fraudulent Statements of Financial Condition

9. Each Statement of Financial Condition lists Mr. Trump's assets and liabilities,

and then presents his "net worth" as the difference between the two. On the asset side, each

Statement includes five basic categories: (i) "cash and cash equivalents;" (ii) monies held in

3

Case 22-1175, Document 56, 09/26/2022, 3388914, Page13 of 224

"escrow" and "reserve deposits;" (iii) interests in "partnerships and joint ventures;" (iv) real estate licensing fees; and (v) by far the largest category – real estate holdings. On the liability side, each Statement lists "accounts payable and accrued expenses," loans on "real and operating properties," and other mortgages and loans.

10.     Mr. Trump's Statements of Financial Condition for the period 2011 through 2021 were fraudulent and misleading in both their composition and presentation. The number of grossly inflated asset values is staggering, affecting most if not all of the real estate holdings in any given year. All told, Mr. Trump, the Trump Organization, and the other Defendants, as part of a repeated pattern and common scheme, derived *more than 200 false and misleading valuations* of assets included in the 11 Statements covering 2011 through 2021.

11.     Nearly every one of the Statements represented that the values were prepared by Mr. Trump and others at the Trump Organization in "evaluation[s]" done with "outside professionals," but that was false and misleading; no outside professionals were retained to prepare any of the asset valuations presented in the Statements. To the extent Mr. Trump and the Trump Organization received any advice from outside professionals that had any bearing on how to approach valuing the assets, they routinely ignored or contradicted such advice. For example, they received a series of bank-ordered appraisals for the commercial property at 40 Wall Street that calculated a value for the property at $200 million as of August 1, 2010 and $220 million as of November 1, 2012. Yet in the 2011 Statement, they listed 40 Wall Street with a value $524 million and increased the valuation to $527 million in the 2012 Statement, and to $530 million in 2013—more than twice the value calculated by the "professionals." Even more egregiously the valuation of more than $500 million was attributed to information obtained from the same

4

Case 22-1175, Document 56, 09/26/2022, 3388914, Page14 of 224

professional appraiser who prepared both valuations putting the building's value at or just over $200 million.

12. The inflated asset valuations in the Statements cannot be brushed aside or excused as merely the result of exaggeration or good faith estimation about which reasonable real estate professionals may differ. Rather, they are the result of the Defendants utilizing objectively false assumptions and blatantly improper methodologies with the intent and purpose of falsely and fraudulently inflating Mr. Trump's net worth to obtain beneficial financial terms from lenders and insurers.

13. Nor can the false and fraudulent asset values in the Statements be defended based on boilerplate disclaimers in the accountant's compilation report accompanying each Statement. While the accountants gave notice in the reports that they did not audit or review the Statements to verify the accuracy or completeness of the information provided by Mr. Trump or the Trump Organization, they confirmed that their clients were responsible for preparing the Statements in accordance with generally accepted accounting principles in the United States ("GAAP"). The disclaimers may relieve the accountants of certain obligations that would otherwise adhere to their work on a more rigorous audit engagement, but they do not give license to Mr. Trump or the Trump Organization to submit to their accountants fraudulent and misleading asset valuations for inclusion in the Statements.

14. Moreover, Mr. Trump and the Trump Organization have no excuse for issuing Statements of Financial Condition that repeatedly violated GAAP rules in multiple ways despite expressly representing in the Statements that they were prepared in accordance with GAAP. Among the many GAAP rules they violated are: (i) including as "cash" funds that Mr. Trump could not immediately liquidate because they did not belong to him and may never be distributed

5

to him; (ii) failing to determine the present value of projected future income when including the

income as part of an asset valuation; (iii) failing to disclose a substantial change in methodology

from the prior year's statement for how an asset value was derived; (iv) failing to value the

entirety of Mr. Trump's interest in a partnership, including all limitations and restrictions on his

interest; and (v) including intangibles such as internally-generated brand premiums when

calculating an asset's value.

15.     As discussed in greater detail in the sections that follow, Mr. Trump and others

affiliated with the Trump Organization who are named as Defendants employed a number of

deceptive strategies as part of the overall scheme to fraudulently and falsely inflate Mr. Trump's

assets in order to comply with Mr. Trump's instruction to increase his net worth. A chart

showing many of the deceptive strategies employed by Mr. Trump and other Defendants by asset

and year is attached as Exhibit 1, and includes the following, to list just a few:

     a.   Relying on objectively false numbers to calculate property values. For example, Mr. Trump's own triplex apartment in Trump Tower was valued as being 30,000 square feet when it was 10,996 square feet. As a result, in 2015 the apartment was valued at $327 million in total, or $29,738 per square foot. That price was absurd given the fact that at that point only one apartment in New York City had ever sold for even $100 million, at a price per square foot of less than $10,000. And that sale was in a newly built, ultra-tall tower. In 30 year-old Trump Tower, the record sale as of 2015 was a mere $16.5 million at a price of less than $4,500 per square foot.

     b.   Ignoring legal restrictions on development rights and marketability that would materially decrease property values. For example:

        i.   In the 2012 Statement, rent stabilized apartments at Trump Park Avenue were valued as if they were unrestricted, leading to a nearly $50 million valuation for those units—but an appraisal accounting for those units' stabilized status valued them collectively at just $750,000;

        ii.   The Mar-a-Lago club was valued as high as $739 million based on the false premise that it was unrestricted property and could be developed and sold for residential use, even though Mr. Trump himself signed deeds donating his residential development rights and sharply restricting changes to the

6

property – in reality, the club generated annual revenues of less than $25 million and should have been valued at closer to $75 million; and

iii.   For his golf course in Aberdeen, Scotland, the valuation assumed 2,500 homes could be developed when the Trump Organization had obtained zoning approval to develop less than 1,500 cottages and apartments, many of which were expressly identified as being only for short-term rental. The $267 million value attributed to those 2,500 homes accounted for more than 80% of the total $327 million valuation for the Aberdeen property on the 2014 Statement.

c.   Failing to use basic rules of valuation to ensure reliable and accurate results—such as discounting revenue or cash flow that might be obtained from a speculative development far into the future to its present value. For example, a series of high-value properties estimated the profits from developing and selling homes without accounting for the years it would take to plan, build, and sell the homes and instead operated under the impossible and thus false premise that the homes could be planned, built, and sold instantaneously.

d.   Using an inappropriate valuation method for a given category of assets. For example, for the period 2013 to 2020, Mr. Trump's golf course in Jupiter, Florida was valued using a fixed-asset approach even though that was not an acceptable method for valuing an operating golf course. And the bulk of the value in that fixed-asset approach was based on the use of an inflated purchase price from the purported assumption of "refundable" membership liabilities. Mr. Trump claimed to have paid $46 million for the club, consisting of $5 million in cash he actually paid and $41 million in assumed membership liabilities. In the Statement Mr. Trump did not disclose the inclusion of those inflated liabilities in the price of the club and in fact took the opposite position, stating that his potential liability for those membership deposits was zero.

e.   Increasing the value of golf clubs to incorporate a "brand premium" despite expressly advising in the Statements that brand value was not included in the figures and despite GAAP rules prohibiting inclusion of internally-generated intangible brand premiums. For example, in the 2013 Statement, the value of Mr. Trump's golf course in Jupiter, Florida was further inflated by fraudulently adding 30% for the Trump "brand." Combining the inflation from using the fixed-asset approach with the 30% brand premium, Mr. Trump claimed that a club he purchased for $5 million in 2012 was worth more than $62 million in 2013. The 2013 Statement included the same fraudulent 30% brand premium for six other golf clubs.

f.   Using inflated net operating income ("NOI") figures and arbitrarily low capitalization rates to calculate valuations using the income capitalization method, where value is derived by dividing NOI by a capitalization rate. For example, in some instances the NOI for Trump Tower relied on favorable numbers by mixing time periods, using future income that exceeded the Trump

7

Organization's internal budget projections while also using expense figures that were lower than past expenses in audited financials. Capitalization rates were derived by cherry-picking an unsupported figure from, or averaging the lowest two or three capitalization rates listed in, generic marketing reports and ignoring rates in those same reports for buildings that were closer and more comparable to Trump Tower.

g. Claiming as Mr. Trump's own "cash" monies belonging not to Mr. Trump but to partnerships in which Mr. Trump had only a limited partnership interest with no control over making disbursements. For example, one-third of the amount under "cash and cash equivalents" listed in the 2018 Statement belonged to Vornado Partnerships, not Mr. Trump. Those are partnerships in which he owns a minority 30% stake with no right to control distributions. Mr. Trump did the same thing in counting funds held in escrow. For example, one-half of the amount under "escrow" in the 2014 Statement belonged to the Vornado Partnership.

h. Including in the value of golf clubs anticipated income from inflated membership initiation fees. For example, at Mr. Trump's golf course in Westchester, the valuation for 2011 assumed new members would pay an initiation fee of nearly $200,000 for each of the 67 unsold memberships, even though many new members in that year paid no initiation fee at all. In some instances, Mr. Trump specifically directed club employees to reduce or eliminate the initiation fees to boost membership numbers.

16. Mr. Trump and the other Defendants also engaged in conduct intended to mislead Mazars in connection with its work compiling the Statements, including by concealing important information. Because Mazars was not conducting any review or audit procedures, but rather issuing a compilation in which Mr. Trump's and the Trustees' assertions were being *compiled* into financial-statement format, many of their fraudulent statements and strategies remained concealed from, or undetected by, Mazars.

17. As a result, shortly after some of the findings uncovered by OAG's investigation came to light in public filings to enforce OAG's investigative subpoenas, Mazars concluded that it had to end its long-term business relationship with Mr. Trump and the Trump Organization and withdraw the Statements it had compiled from 2011 to 2020. In a letter to the Trump Organization dated February 9, 2022, Mazars explained that it had "come to this conclusion based, in part, upon the filings made by the New York Attorney General on January 18, 2022,

8

our own investigation, and information received from internal and external sources," and advised "that the Statements of Financial Condition for Donald J. Trump for the years ending June 30, 2011—June 30, 2020, should no longer be relied upon." Mazars further instructed the Trump Organization to "inform any recipients thereof who are currently relying upon one or more of those documents that those documents should not be relied upon."

18.     Mr. Trump's Statements of Financial Condition were repeatedly and persistently submitted to banks insured by the Federal Deposit Insurance Corporation for the purpose of influencing the actions of those institutions. The Statements were used to obtain and maintain favorable loans over at least an eleven-year period, including: (a) Deutsche Bank's extension of a $125 million loan (or combination of loans) in connection with the Trump Organization's purchase of the property known as Trump National Doral; (b) Deutsche Bank's financing of up to $107 million in debt in connection with the Trump International Hotel and Tower, Chicago, in 2012, as well as a $54 million expansion of that loan in 2014; and (c) Deutsche Bank's financing of up to $170 million in funds in connection with the Trump Organization's purchase and renovation of the Old Post Office property in Washington, DC.

19.     As to each of those loans, the truthfulness and accuracy of the pertinent Statement, as certified by Mr. Trump, was a precondition to lending. Moreover, pursuant to the covenants of those loans, each year Mr. Trump or the trustees would submit a new Statement and certify its accuracy. Material misrepresentations on any loan document, including the Statements or the certifications as to their accuracy, would constitute an event of default under the terms of the loan agreements.

9

20.     The Statements, along with other false representations, were also used repeatedly and persistently to obtain beneficial terms on insurance policies from insurers participating on the Trump Organization's surety program and directors and officers liability policies.[3]

21.     The magnitude of financial benefit derived by Mr. Trump and the Trump Organization by means of these fraudulent and misleading submissions was considerable. Following the initiation of subpoena-enforcement litigation against Mr. Trump, and Mazars's withdrawal of ten years' worth of Mr. Trump's Statements of Financial Condition, Mr. Trump and the Trump Organization decided to repay hundreds of millions of dollars in debt early. But even that step, the equivalent of partial disgorgement, fails to account for substantial additional financial benefit obtained by Mr. Trump and the Trump Organization by means of the false and fraudulent Statements of Financial Condition. Mr. Trump and his operating companies obtained additional benefits from banks other than loan proceeds in the form of favorable interest rates that likely saved them more than $150 million over the prior ten-year period.

---

[3] Under the surety program, insurers underwrote surety bonds on behalf of the Trump Organization required for the company's business activities, primarily to secure judgments and mechanics liens and as needed on construction projects and for liquor licenses. Ordinarily, a surety underwriter requires the insured to put up collateral to secure the obligations assumed under the bonds, but here the underwriters waived the collateral requirements and accepted instead a personal indemnity from Mr. Trump coupled with the opportunity to review his Statement of Financial Condition. Under the directors and officers liability program, underwriters agreed to defend and indemnify the officers and directors of the Trump Organization in connection with any claims and investigations asserted against them arising out of their work for the company. As part of the underwriting negotiations, the insurers reviewed Mr. Trump's Statement of Financial Condition and questioned company executives about any pending or threatened claims and investigations.

22.     The Statements were also critical to the overall success of the investment in the Old Post Office property in Washington, D.C. Based on its own statement, the Trump Organization won the bidding as part of "one of the most competitive selection processes in the history of" the General Services Administration. Critical to the success of that bid was a demonstration of the "financial wherewithal" of the Trump Organization through the submission of his Statement of Financial Condition. The favorable interest rates obtained from Deutsche Bank were instrumental in the financial performance of the investment, which ultimately led to "the record breaking sale of the Trump International Hotel, Washington, D.C.," and a financial benefit to the Trump Organization of more than $100 million in May 2022.

23.     All of those benefits were derived from the improper, repeated, and persistent use of fraudulent and misleading financial statements and are, therefore, subject to disgorgement in this action under Executive Law § 63(12).

24.     It is no defense to claims for disgorgement under § 63(12) that the Trump Organization may have made all payments due under the loans and insurance policies. The remedy of disgorgement is available to deprive a wrongdoer of illegal benefit regardless of whether any entity suffered a financial loss.

**B.     Relief Sought**

25.     In this proceeding, the People seek an order and judgment granting the following relief to remedy the substantial, persistent, and repeated fraudulent and misleading conduct occurring since 2011:

      a.     Cancelling any certificate filed under and by virtue of the provisions of section one hundred thirty of the New York General Business Law for the corporate entities named as defendants and any other entity controlled by or beneficially owned by Donald J. Trump which participated in or benefitted from the foregoing fraudulent scheme;

11

    b.   Appointing an independent monitor to oversee compliance, financial reporting, valuations, and disclosures to lenders, insurers, and governmental authorities, at the Trump Organization, for a period of no less than five years;

    c.   Replacing the current trustees of the Donald J. Trump Revocable Trust with new independent trustees, and requiring similar independent governance in any newly-formed trust should the Revocable Trust be revoked and replaced with another trust structure;

    d.   Requiring the Trump Organization to prepare a GAAP-compliant, audited statement of financial condition audited by an independent auditing firm empowered to retain independent valuation personnel showing Mr. Trump's net worth, to be distributed to all recipients of his prior Statements of Financial Condition, with any statements of financial condition prepared for the next five years to also be subject to a GAAP-compliant audit;

    e.   Barring Mr. Trump and the Trump Organization from entering into any New York State commercial real estate acquisitions for a period of five years;

    f.   Barring Mr. Trump and the Trump Organization from applying for loans from any financial institution chartered by or registered with the New York Department of Financial Services for a period of five years;

    g.   Permanently barring Mr. Trump, Donald Trump, Jr., Ivanka Trump, and Eric Trump from serving as an officer or director in any New York corporation or similar business entity registered and/or licensed in New York State;

    h.   Permanently barring Allen Weisselberg and Jeffrey McConney from serving in the financial control function of any New York corporation or similar business entity registered and/or licensed in New York State;

    i.   Awarding disgorgement of all financial benefits obtained by each Defendant from the fraudulent scheme, including all financial benefits from lenders and insurers through repeated and persistent fraudulent practices of an amount to be determined at trial but estimated to be $250,000,000, plus prejudgment interest; and

    j.   Granting any additional relief the Court deems appropriate.

## II.   THE PARTIES

26.   The Attorney General is responsible for overseeing the activities of New York businesses and the conduct of their officers and directors, in accordance with the New York Executive Law and other applicable laws. She is expressly tasked by the Legislature with

Case 22-1175, Document 56, 09/26/2022, 3388914, Page22 of 224

policing any persistent or repeated fraud and illegal conduct in business. *See, e.g.*, Executive Law § 63(12).

27.     Defendant Donald J. Trump is the beneficial owner of the collection of entities he styles the "Trump Organization." Approximately 500 separate entities collectively do business as the Trump Organization and operate for the benefit, and under the control, of Donald J. Trump. Among the entities that comprise the Trump Organization are:

a.  Defendant Trump Organization, Inc. From May 1, 1981 to January 19, 2017, Mr. Trump was Director, President, and Chairman of the Trump Organization, Inc. From at least July 15, 2015 until May 16, 2016, Mr. Trump was the sole owner of the Trump Organization, Inc.

b.  Defendant Trump Organization LLC, a limited liability company doing business in the State of New York with a principal place of business in New York, NY.

c.  Defendant DJT Holdings LLC, a Delaware limited liability company with a principal place of business in New York, NY.

d.  Defendant DJT Holdings Managing Member, a Delaware limited liability company registered to do business in New York, NY.

28.     In addition, the Trump Organization incorporates a host of entities that either own property at issue in this action or received loans at issue in this action. Included among those entities are:

a.  Defendant Trump Endeavor 12 LLC, a Delaware limited liability company registered to do business in New York, NY. Trump Endeavor 12 LLC owns the resort property doing business as Trump National Doral.

b.  Defendant 401 North Wabash Venture LLC, a Delaware limited liability company that operates out of the Trump Organization offices in New York, NY. 401 North Wabash Venture LLC owns the building doing business as Trump International Hotel & Tower, Chicago.

c.  Defendant Trump Old Post Office LLC, a Delaware limited liability company with its principal place of business in New York, NY. Trump Old Post Office LLC held a ground lease from the federal government to operate the property doing business as the Trump International Hotel, Washington, DC.

13

Case 22-1175, Document 56, 09/26/2022, 3388914, Page23 of 224

d. Defendant 40 Wall Street LLC, a New York Limited Liability Corporation, which holds a ground lease for an office building located at 40 Wall Street, New York, NY.

e. Respondent Seven Springs LLC is a New York limited liability company that owns the Seven Springs estate, consisting of 212 acres of property within the towns of Bedford, New Castle, and North Castle in Westchester County, NY.

29. Donald J. Trump served as the President and Chairman of the Trump Organization from May 1, 1981 to January 19, 2017. While serving as President of the United States, Mr. Trump remained the inactive president of the Trump Organization. After leaving office, Mr. Trump resumed his position as the president of the Trump Organization.

30. Defendant Donald J. Trump Revocable Trust is a trust created under the laws of New York that is the legal owner of the entities constituting the Trump Organization. The Donald J. Trump Revocable Trust was created on April 7, 2014 and amended by Second Amendment to the Trust dated January 17, 2017. The purpose of the trust is to hold assets for the exclusive benefit of Donald J. Trump. Mr. Trump is the sole beneficiary of The Donald J. Trump Revocable Trust.

31. A complete organizational chart of the entities held by the Donald J. Trump Revocable Trust, that was prepared by the Trump Organization in 2017 for the purposes of obtaining insurance coverage, is attached as Exhibit 2.

32. Defendant Donald Trump, Jr. is an Executive Vice President of the Trump Organization. He maintains a business office at 725 Fifth Avenue, New York, NY. Donald Trump, Jr. oversees the Trump Organization's property portfolio and is involved in all aspects of the company's property development, from deal evaluation, analysis and pre-development planning to construction, branding, marketing, operations, sales and leasing. Donald Trump Jr. is also responsible for all of the commercial leasing for the Trump Organization which includes Trump Tower and 40 Wall Street.

14

33.     Defendant Ivanka Trump was an Executive Vice President for Development and Acquisitions of the Trump Organization through early January 2017. Among other responsibilities, Ms. Trump negotiated and secured financing for Trump Organization properties. While at the Trump Organization she directed all areas of the company's real estate and hotel management platforms. This included active participation in all aspects of projects, including deal evaluation, pre-development planning, financing, design, construction, sales and marketing, as well as involvement in all decisions relating to those activities—large and small. Among other duties, she negotiated the lease with the government and a loan related to the Old Post Office property. Ms. Trump also negotiated loans on Trump Organization properties at Doral and Chicago. On each of those transactions with Deutsche Bank, Ms. Trump was aware that the transactions included a personal guaranty from Mr. Trump that required him to provide annual Statements of Financial Condition and certifications.

34.     After leaving the Trump Organization, Ms. Trump retained a financial interest in the operations of the Trump Organization through a number of vehicles, including an interest in the Old Post Office property through Ivanka OPO LLC. In a 2021 federal filing, Ms. Trump reported total income from Trump Organization entities of $2,588,449, including income from Ivanka OPO LLC, TTT Consulting, LLC, TTTT Venture LLC and Trump International Realty.

35.     Defendant Eric Trump is an Executive Vice President of the Trump Organization, and Chairman of the Advisory Board of the Donald J. Trump Revocable Trust. He maintains a business office at 725 Fifth Avenue, New York, NY. Eric Trump is responsible for all aspects of management and operation of the Trump Organization including new project acquisition, development and construction. Eric Trump actively spearheaded the growth of Trump Golf including the addition of 13 golf properties since 2006.

15

36.     Defendants Donald Trump, Jr. and Eric Trump took over management of the Trump Organization from Mr. Trump in 2017.

37.     Defendant Allen Weisselberg was the Chief Financial Officer of the Trump Organization from 2003 until July 2021. During that time he maintained a business office at 725 Fifth Avenue, New York, NY. Among his responsibilities as CFO, from at least 2011 until 2020, Mr. Weisselberg supervised and approved the preparation of the valuations contained in the Statements of Financial Condition.

38.     Defendants Donald Trump, Jr. and Allen Weisselberg were trustees of the Donald J. Trump Revocable Trust until Mr. Weisselberg resigned in June 2021. On information and belief, Donald Trump, Jr. is now the sole Trustee of the Donald J. Trump Revocable Trust. Donald Trump Jr. is named in both his personal capacity and as the Trustee of the Donald J. Trump Revocable Trust.

39.     Defendant Jeffrey McConney is the Controller of the Trump Organization. He maintains a business office at 725 Fifth Avenue, New York, NY. Among his responsibilities as Controller, from 2011 to 2016, Mr. McConney prepared the valuations contained in the Statements of Financial Condition. From 2016 to the present, Mr. McConney supervised and approved the preparation of the valuations contained in the Statements of Financial Condition.

## III.    JURISDICTION, APPLICABLE LAW, AND VENUE

40.     This enforcement action is brought on behalf of the People of the State of New York pursuant to the New York Executive Law.

41.     Executive Law § 63(12) allows the Attorney General to bring a proceeding "[w]henever any person shall engage in repeated fraudulent or illegal acts or otherwise

demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business."

42.     Fraudulent conduct as used in § 63(12) includes acts that have the "capacity or tendency to deceive, or creates an atmosphere conducive to fraud." *People v. Applied Card Sys., Inc.*, 27 A.D.3d 104, 107 (3d Dep't 2005), *aff'd on other grounds*, 11 N.Y.3d 105 (2008); *see also People v. Northern Leasing Systems, Inc*., 193 A.D.3d 67, 75 (1st Dep't 2021). The terms "fraud" and "fraudulent" are "given a wide meaning so as to embrace all deceitful practices contrary to the plain rules of common honesty, including all acts, even though not originating in any actual evil design to perpetrate fraud or injury upon others, which do tend to deceive or mislead." *People ex rel. Cuomo v. Greenberg*, 95 A.D.3d 474, 483 (1st Dep't 2012). By its plain terms, Executive Law § 63(12) covers frauds committed by overtly false or fraudulent statements, by omission, or as part of a scheme to defraud. *See* Executive Law § 63(12) (defining the words "fraud" and "fraudulent" to include "*any* . . . misrepresentation, concealment, [or] suppression . . . .").

43.     A violation of any federal, state, or local law or regulation constitutes "illegality" within the meaning of Executive Law § 63(12). *See, e.g.*, *Applied Card Sys.*, 27 A.D.3d at 106, 109; *Oncor Commc'ns, Inc. v. State*, 165 Misc. 2d 262, 267 (Sup. Ct. Albany Cty. 1995), *aff'd*, 218 A.D.2d 60 (3d Dep't 1996); *People v. Am. Motor Club, Inc.*, 179 A.D.2d 277 (1st Dep't 1992), *appeal dismissed*, 80 N.Y.2d 893; *State v. Winter*, 121 A.D.2d 287 (1st Dep't 1986). "It long has been recognized that the statute affords the Attorney General broad authority to enforce federal as well as state law, unless state action in the area of federal concern has been precluded utterly or federal courts have exclusive jurisdiction of the matter." *Oncor Commc'ns, Inc. v. State,* 165 Misc. 2d 262, 267 (Sup. Ct. Albany Cty. 1995), *aff'd*, 218 A.D.2d 60 (3d Dep't 1996).

17

Thus, if conduct violates a provision of New York's Penal Law . . . it may be the subject of an action for equitable relief on the basis of "illegality" under Executive Law § 63(12).

44.      State laws other than Executive Law § 63(12) render unlawful certain fraudulent actions with respect to financial statements and their use. Falsification of business records is unlawful under the Penal Law—and is a felony when committed to aid or conceal the commission of another offense. *See, e.g.*, Penal Law § 175.10. The issuance of a false financial statement is likewise an offense under the Penal Law. *See, e.g.*, Penal Law § 175.45. A conspiracy—essentially, an agreement to commit an offense by a group of persons, and one overt act by one of the conspirators—is unlawful under the Penal Law as well. *See generally* Penal Law § 105.

45.      Fraud or illegality, within the meaning of Executive Law § 63(12), may be the subject of an enforcement action if it is either "repeated" or "persistent." Such conduct is "repeated," § 63(12) instructs, if it involves either "any separate and distinct fraudulent or illegal act, or conduct which affects more than one person." Executive Law § 63(12). Thus, under the statute, "the Attorney-General [may] bring a proceeding when the respondent was guilty of only one act of alleged misconduct, providing it affected more than one person." *State of New York v. Wolowitz*, 96 A.D.2d 47, 61 (2d Dep't 1983).

46.      The statute instructs that the term "persistent" includes the "continuance or carrying on of any fraudulent or illegal act or conduct." Executive Law § 63(12).

47.      Among the equitable remedies available to the Attorney General under Executive Law § 63(12) is disgorgement, which is designed to deprive the wrongdoer of illegal benefit regardless of whether any entity suffered a financial loss. *See People v. Ernst & Young, LLP*, 114 A.D.3d 569, 569-70 (1st Dep't 2014) ("Thus, disgorgement aims to deter wrongdoing by

18

Case 22-1175, Document 56, 09/26/2022, 3388914, Page28 of 224

preventing the wrongdoer from retaining ill-gotten gains from fraudulent conduct. Accordingly,

the remedy of disgorgement does not require a showing or allegation of direct losses to

consumers or the public; the source of the ill-gotten gains is 'immaterial'"). Multiple defendants

may be jointly and severally liable for disgorgement under § 63(12) when they have participated

in a common scheme. *See Fed. Trade Comm'n v. Shkreli*, No. 20 Civ. 706, 2022 WL 135026

(S.D.N.Y. Jan. 14, 2022). Disgorgement can also include salary and bonuses that are a result of

fraudulent activity. *See, e.g., SEC v. Razmilovic*, 738 F.3d 14, 32 (2d Cir. 2013).

48.     This Court has jurisdiction over the subject matter of this action, personal

jurisdiction over the Defendants, and authority to grant the relief requested pursuant to Executive

Law § 63(12).

49.     Pursuant to C.P.L.R. § 503, venue is proper in New York County, because

Plaintiff resides in that county, and because a substantial part of the events and omissions giving

rise to the claims occurred in that county.

## IV.  FACTUAL ALLEGATIONS

50.     The breadth of material presented here is considerable, necessitating a roadmap

for the Court. This complaint presents verified allegations regarding scores of fraudulent, false,

and misleading representations by Mr. Trump, the Trump Organization, and the other

Defendants. The financial statements in question were issued annually; each contained a

significant number of fraudulent, false, and misleading representations about a great many of the

Trump Organization's assets; and most played a role in particular transactions with financial

institutions. The substantial information presented in the complaint is organized in the following

manner:

    a.  an overview of the relevant assets of Mr. Trump presented in the
        Statement (¶¶ 51(a) – 51(n));

19

b. a general description of the Statements for the relevant years, 2011 through 2021 (¶¶ 52 – 65);

c. a detailed discussion of the inflated valuations contained in the Statements for each relevant asset (¶¶ 66 – 558);

d. a detailed discussion of the loans procured and maintained by Mr. Trump and the Trump Organization using the false and misleading Statements ((¶¶ 559 – 675);

e. a detailed discussion of the insurance procured by Mr. Trump and the Trump Organization procured through the use of the false and misleading Statements and other material misrepresentations and omissions (¶¶ 676 – 714); and

f. a detailed discussion of the ongoing nature of the fraudulent scheme and conspiracy among the defendants (¶¶ 715 – 747).

**A. Overview of Trump Organization Assets**

51.     In an effort to familiarize the Court with the pertinent assets reflected in the

Statements of Financial Condition, OAG provides the following brief descriptions below:

a. **Cash, marketable securities, and cash equivalents.** This category of asset reflects cash controlled by Mr. Trump, or securities (such as publicly traded stocks) that are readily convertible to cash. Under GAAP, cash equivalents constitute short-term, highly liquid investments that are readily convertible to known amounts of cash and that are so near their maturity that they present insignificant risk of changes in value because of changes in interest rates (such as a money market fund).

b. **Escrow and Reserve Deposits and Prepaid Expenses.** This category purports to include funds that belong to Mr. Trump but have been escrowed or subjected to some other restriction pursuant to a legal document such as a loan agreement.

c. **Trump Tower (commercial space) ("Trump Tower")**. Mr. Trump owns commercial space (office and retail) in a building at 725 Fifth Avenue in midtown Manhattan.

d. **Mr. Trump's triplex apartment ("Triplex").** Separately Mr. Trump owns an apartment in Trump Tower. This apartment is grouped with other assets in a category entitled "other assets" on the Statements of Financial Condition.

e. **4-6 East 57th Street ("Niketown").** Mr. Trump owns two ground leases that comprise a space adjoining Trump Tower. Mr. Trump pays rent on those ground leases to the landowners, and those ground leases are subject to long-

20

term rent schedules and adjustments. The retail space for many years was leased to Nike and is known as "Niketown."

f. **40 Wall Street ("40 Wall Street").** 40 Wall Street is a building located in lower Manhattan. Mr. Trump purchased a ground lease pertaining to the building in 1995 for $1.3 million. The building was completed in 1930 and contains a mix of office and retail space.

g. **Trump Park Avenue ("Trump Park Avenue").** This building, located at 502 Park Avenue in midtown Manhattan is a condominium that contains residential and retail units owned by Mr. Trump.

h. **Seven Springs ("Seven Springs").** Mr. Trump purchased this estate traversing the towns of Bedford, North Castle, and New Castle in Westchester County, New York in 1995 for $7.5 million. The estate consists of two large homes, undeveloped land, and a few other buildings.

i. **Trump International Hotel & Tower, Chicago ("Trump Chicago").** This condominium-hotel building is, or has been, comprised of a residential component and a hotel component. The building is located in Chicago, Illinois. Since 2009, its value has been excluded from the Statements of Financial Condition because, according to sworn testimony, Mr. Trump did not want to take a position on the Statements that would conflict with a position about the property's value he has represented to tax authorities. Investigation revealed that the tax position taken was that the property had become worthless according to Mr. Trump, and thus formed the basis of a substantial loss under the federal tax code. This building is relevant to this action because Mr. Trump and the Trump Organization obtained bank loans on the building or its components as collateral, and the Statements were part of that loan transaction.

j. **Trump Old Post Office, Washington, DC ("OPO").** This property refers to the "Old Post Office" on Pennsylvania Avenue in Washington, D.C. The Trump Organization obtained a ground lease from a federal agency (the General Services Administration) to redevelop this property into a luxury hotel doing business as Trump International Hotel, Washington, DC.

k. **Club Facilities and Related Real Estate.** The "Clubs" category of assets—for which no itemized value for any individual asset was ever disclosed—is comprised of the following golf and social clubs in the United States and abroad (among others) that are owned or leased by Mr. Trump, and collectively represent the single largest itemized asset on the Statement in each year:

     i. **Mar-a-Lago Social Club** ("**Mar-a-Lago**") in Palm Beach County, Florida;

     ii. **Trump National Golf Club in Briarcliff Manor ("TNGC Briarcliff")**, in Westchester County, New York;

    iii.    **Trump National Golf Club in Hudson Valley** ("**TNGC Hudson Valley**"), located in Dutchess County, New York, a property held via a ground lease;

    iv.    **Trump National Golf Club, Jupiter ("TNGC Jupiter")**, located in Palm Beach County, Florida;

    v.    **Trump National Golf Club, Los Angeles** ("**TNGC LA**"), in southern Los Angeles County, California;

    vi.    **Trump National Golf Club, Bedminster**, in Bedminster, New Jersey;

    vii.    **Trump National Golf Club, Washington, DC ("TNGC DC")**, located in Loudoun County, Virginia;

    viii.    **Trump National Golf Club – Philadelphia ("TNGC Philadelphia")**, located in Camden County, New Jersey;

    ix.    **Trump National Golf Club, Charlotte** ("**TNGC Charlotte**"), located in Iredell County, North Carolina;

    x.    **Trump National Doral** ("**Doral**"), located in western Miami-Dade County, Florida;

    xi.    **Trump International Golf Club in Scotland, Aberdeen ("Trump Aberdeen")**, located in Balmedie, Scotland; and

    xii.    **Trump International Golf Club in Scotland, Turnberry ("Trump Turnberry")**, located in Ayrshire, Scotland.

l.    **Partnerships and Joint Ventures.** Mr. Trump's Statements of Financial Condition incorporate values for the following two assets classified as partnerships and joint ventures:

    i.    **1290 Avenue of the Americas in New York, New York ("1290 Avenue of the Americas")** and **555 California Street in San Francisco, California ("555 California") (collectively, "Vornado Partnership Interests")**. This asset category, in general terms, refers to Mr. Trump's 30%, limited partnership interests in entities that own the two buildings. The Vornado Realty Trust, controlled by others and not by Mr. Trump, owns the remaining 70% stake and functions as the general partner that is empowered to make business decisions for the partnership.

    ii.    **Trump International Hotel and Tower – Las Vegas, Nevada ("Las Vegas").** This asset refers to Mr. Trump's 50% interest in a joint venture, with Philip Ruffin, in a hotel condominium tower in Las Vegas, Nevada.

22

    m.  **Real Estate Licensing Developments ("Licensing Value").** This category of assets claims to value potential future revenue that might be earned from purported licensing agreements with third parties.

    n.  **Other Assets.** This catch-all category includes a range of assets not valued elsewhere on the Statements of Financial Condition. All of the asset values contained in this category are summed to generate an overall figure for the category; individual asset values are not disclosed. Assets in this category include, depending on the year, the Triplex, Seven Springs, aircraft, a management company, loans to Mr. Trump's family members, and various homes (such as in Palm Beach, Florida; Beverly Hills, California; and the island of St. Martin).

**B.    Overview of the Statements of Financial Condition**

52.    Since no later than 2004, Mr. Trump and the Trump Organization have prepared an annual "Statement of Financial Condition of Donald J. Trump." Since 2017, commencing with the Statement for the year ending June 30, 2016, the Statements have been issued by the Trustees of the Donald J. Trump Revocable Trust. These Statements contain Mr. Trump's or the Trustees' assertions of Mr. Trump's net worth, based principally on asserted values of particular assets that Mr. Trump or the Trustees evaluated, minus outstanding liabilities.

53.    From 2004 until 2020, Mr. Trump's Statements of Financial Condition were compiled by accounting firm Mazars. Mazars ceased work on the Statements after issuing the Statement reflecting Mr. Trump's financial condition as of June 30, 2020.

54.    As alleged in greater detail below, the process for preparing the annual Statement of Financial Condition remained the same throughout the period 2011 through 2021. The valuations for the Statements would be prepared by staff at the Trump Organization, working at the direction of Donald J. Trump or his trustees, Allen Weisselberg, and Jeffrey McConney. Those valuations, which were reflected in an Excel spreadsheet, and the supporting documents would be forwarded to Mazars, which would generate a compilation report of those valuations. In other words, Mazars would generate the document that became the Statements. A draft was

23

sent back to the Trump Organization; while Mazars might ask questions of the Trump

Organization, it did not conduct an audit or review of the Statements. The responsibility for

insuring that the Statements were prepared in accordance with GAAP lay with the Trump

Organization. Mr. Trump and his trustees were responsible for providing full and complete

information to Mazars.

55.     As the engagement letters entered into between the Trump Organization and

Mazars made clear, other than expressly enumerated exceptions, the Statements of Financial

Condition were to be prepared in accordance with GAAP. For example, as the 2015 engagement

letter reads, "You"—referring to Allen Weisselberg as Chief Financial Officer of the Trump

Organization—"are responsible for . . . the preparation and fair presentation of the financial

statements in accordance with" GAAP; for "designing, implementing and maintaining internal

controls relevant to the preparation and fair presentation of the financial statements"; and for

"preventing and detecting fraud."

56.     Similarly, the engagement letters specifically obligated the Trump Organization to

provide Mazars with "access to all information of which you are aware [that] is relevant to the

preparation and fair presentation of the financial statement, such as records, documentation, and

other matters," and made clear that Mr. Weisselberg, as the Trump Organization's CFO, was

responsible for "the selection and application of accounting principles," and for "establishing and

maintaining internal controls." The engagement letters similarly obligated the Trump

Organization to "mak[e] all financial records and related information available to [Mazars] and

for the accuracy and completeness of that information."

57.     In addition to the engagement letters, for each year from 2011 to 2020, Mr.

Weisselberg as CFO of the Trump Organization signed a representation letter submitted by the

Case 22-1175, Document 56, 09/26/2022, 3388914, Page34 of 224

Trump Organization to Mazars in connection with Mazars's actual issuance of the completed Statement of Financial Condition. In the letter, Mr. Weisselberg represented that the Trump Organization was "responsible for the information provided to Mazars for each annual compilation," and that the information was "presented fairly and accurately in all material respects."

58.     In February 2022, Mazars advised the Trump Organization by letter that it was ending its long-term relationship with Mr. Trump and the Trump Organization, and that the Statements for the years ending June 30, 2011 through June 30, 2020 should not be relied upon.

59.     After Mazars ended the relationship, another accounting firm, Whitley Penn LLP, compiled the June 30, 2021 Statement.

60.     The relevant Statements of Financial Condition covering the period from 2011 to 2021 are attached as Exhibits 3 – 13.

61.     As noted, Mr. Trump or the Trustees would prepare valuations and data for the Statement, which Mazars (or for 2021, Whitley Penn) would then compile. Each year the Trump Organization personnel (including Mr. Weisselberg and Mr. McConney) would prepare a supporting data spreadsheet containing the valuations for the Statement and backup material supporting those valuations. Mazars (or for 2021, Whitley Penn) then compiled that information into financial-statement format.

62.     Until 2016, those supporting data spreadsheets were prepared by Trump Organization Senior Vice President and Controller, Defendant Jeffrey McConney, and were known as "Jeff Supporting Data," with "Jeff" referring to Mr. McConney. Defendant Allen Weisselberg, the Trump Organization's Chief Financial Officer, reviewed Mr. McConney's work on the spreadsheets.

63.     For the 2016 Statement forward, and beginning on or about November 16, 2016,

Mr. Weisselberg and Mr. McConney enlisted a junior employee, only a few years out of college

and with no professional accounting training or knowledge of GAAP, to be in charge of

preparing the valuations that would feed into the annual Statement—subject to their direction

and control.

64.     All of the supporting data spreadsheets, whether prepared by Mr. McConney or

the junior employee under his direction, are a principal locus of Defendants' repeated and

persistent fraudulent conduct. The relevant supporting data spreadsheets from 2011 to 2021 are

attached as Exhibits 14 – 24.

65.     The Trump Organization and its affiliates used the Statements to induce

counterparties to provide funding or insurance on favorable terms or to comply with the terms of

ongoing covenants with respect to transactions in which the parties were already engaged. In

particular, the Trump Organization and its affiliates and senior executives, including Mr. Trump

and the other company employees named as Defendants, submitted the Statements or arranged

for their submission to counterparties, including financial institutions, other lenders, and insurers,

as more fully described below.

### C.     The Asset Values and Associated Descriptions Presented in the Statements Were Fraudulent, Misleading, and Not Presented in Accordance with GAAP.

#### 1.     Cash and Cash Equivalents/Marketable Securities

66.     As a general matter, when a GAAP-compliant financial statement reports "cash,"

it is referring to an amount of liquid currency or demand deposits available to the person or

entity whose finances are described in the statement. *See* Financial Accounting Standards Board

("FASB"), Master Glossary - Cash. Similarly, when a financial statement reports "cash

equivalents," it is reporting "short-term, highly liquid investments" that both can be "readily

26

converted to known amounts of cash" and is "so near their maturity that they present

insignificant risk of changes in value because of changes in interest rates." *See* FASB, Master

Glossary – Cash Equivalents. When a financial statement refers to "marketable securities," it

refers to debt or equity securities for which market quotations are available, and such assets are

valued at "their quoted market prices." *See, e.g*., FASB, Accounting Standards Codification

("ASC") 274-10-35-5.

67. Mr. Trump's Statements of Financial Condition misrepresented his holdings of

cash, cash equivalent and marketable securities. Most notably, for several years included in his

"cash" were the amounts in the Vornado Partnership Interests in which Mr. Trump had a

minority stake and did not control. In some years these restricted funds accounted for almost

one-third of all the cash reported by Mr. Trump (for example, they accounted for $24 million of

the total $76 million in cash reported for 2018).

68. Mr. Trump has a 30% limited partnership stake in the Vornado Partnership

Interests. Vornado Realty Trust ("Vornado"), in which Mr. Trump has no ownership interest,

holds the other 70% stake in the Vornado Partnership Interests and functions as the General

Partner.

69. Under the partnership agreements governing the Vornado Partnership Interests,

the General Partner has "full control over the management, operation and activities of, and

dealings with, the Partnership Assets and the Partnership's properties, business and affairs," and

"the Limited Partners shall not take part in the management of the business or affairs of the

Partnership or control the Partnership business." Moreover, "[t]he Limited Partners may under

no circumstances sign for or bind the Partnership." The partnership agreements provide for cash

27

Case 22-1175, Document 56, 09/26/2022, 3388914, Page37 of 224

distributions in an amount, if any, that is "determined by the General Partner in its sole discretion."

70.     Mr. Trump was well aware of the restricted and limited nature of his 30% interest because he personally took part in extensive, contentious litigation regarding these partnerships in which control over partnership-held cash and partnership business choices was expressly addressed. *See, e.g.*, *Trump v. Cheng*, 9 Misc. 3d 1120(A), at \*7 (Sup. Ct. N.Y. Cty. Sept. 14, 2005) (quoting definition of "Cash Available for Distribution").

71.     As the court explained in that litigation, "[t]he Agreements do not obligate the general partners to distribute partnership assets or sale proceeds to the limited partners prior to [the partnerships' dissolution date in 2044]," and instead during the partnerships' existence provide for distributions of cash in the general partner's "sole discretion." *Id.* at \*7.

72.     Internal Trump Organization records acknowledge that cash residing in the Vornado Partnership Interests was not Mr. Trump's to access at his whim. Rather, as those records show, Trump Organization accounting personnel knew such funds could be distributed at Vornado's discretion only and that the prospect of a distribution was unknown: "Although there could be operating profits, distributions are at the discretion of Vornado at a rate of 30% to Trump. At this point we do not have all of the data that goes into Vornado's decision making, thus we are attributing no distribution for these properties."

73.     In a memo dated March 23, 2016, from Allen Weisselberg to Donald Trump, Jr., Ivanka Trump and Eric Trump, entitled "2015 Corporate Operating Financial Summary," Mr. Weisselberg noted that "Included in the Net Operating Cash Flow/Operating Profit above are 30% of the operating profits for 1290 Avenue of the Americas and 555 California Street. However, distributions are at the discretion of Vornado."

Case 22-1175, Document 56, 09/26/2022, 3388914, Page38 of 224

74.     Contrary to what is reflected in these internal records (which are consistent with the terms of the governing partnership documents and previous court rulings of which Mr. Trump was aware), Mr. Trump's Statement of Financial Condition from at least 2013 through 2021 included cash held by the Vornado Partnership Interests as Mr. Trump's own "cash" or similarly identified liquid assets (referred to in the Statements as either "cash equivalents" or "marketable securities"), often constituting a considerable portion of Mr. Trump's reported liquidity.

75.     The chart below shows the amount of cash attributable to Mr. Trump's 30% stake in the Vornado Partnership Interests over which he exercised no control and should have been excluded under GAAP:

| Statement Year | Amount Included Based On 30% Share In Vornado Property Interests |
|:---:|:---:|
| 2013 | $14.2 million |
| 2014 | $24.7 million |
| 2015 | $32.7 million |
| 2016 | $19.6 million |
| 2017 | $16.5 million |
| 2018 | $24.4 million |
| 2019 | $24.7 million |
| 2020 | $28.3 million |
| 2021 | $93.1 million |

76.     The decision to include cash in the Vornado Partnership Interests, as if it were Mr. Trump's own cash as reflected in the Statements and contrary to GAAP, was made by Mr. McConney and/or Mr. Weisselberg and was approved by Mr. Trump or his attorney-in-fact Donald Trump Jr.

**2.   Escrow and Reserve Deposits and Prepaid Expenses**

77.     Mr. Trump's Statements of Financial Condition, beginning with the June 30, 2014 Statement of Financial Condition, also included in the total for the "escrow and reserve deposits

29

and prepaid expenses" category of assets, 30% of the escrow deposits or restricted cash held on the balance sheets of the Vornado Partnership Interests.

78.     With respect to the "escrow and reserve deposits and prepaid expenses" category of assets, the Statements of Financial Condition generally identify when, for one of Mr. Trump's wholly owned properties, "[f]unds in the amount of [X] have been escrowed pursuant to" a legal document, such as a loan. The implication is that Mr. Trump is valuing escrowed funds that are his own but that are merely held in escrow or otherwise subject to restriction.

79.     That description was false and misleading with respect to escrowed or restricted cash held by the Vornado Partnership Interests but included within the total amount listed for "escrow and reserve deposits and prepaid expenses" as if they were Mr. Trump's escrowed funds.

80.     The chart below shows the total "escrow and reserve deposits and prepaid expenses" attributable to Mr. Trump's 30% stake in the Vornado Partnership Interests over which he exercised no control and should have been excluded under GAAP:

| Statement Year | Amount Included Based On 30% Share In Vornado Property Interests |
|:---:|:---:|
| 2014 | $20.8 million |
| 2015 | $15.98 million |
| 2016 | $14.47 million |
| 2017 | $8.75 million |
| 2018 | $8.18 million |
| 2019 | $11.2 million |
| 2020 | $7.11 million |
| 2021 | $12.7 million |

81.     As with assertions regarding funds held by Vornado Partnership Interests and listed as Mr. Trump's "cash" identified above, these escrowed funds held by Vornado

30

Partnership Interests were not Mr. Trump's own funds, and their inclusion as Mr. Trump's own escrowed or restricted funds in each Statement was false and misleading.

### 3. Trump Park Avenue

82.    Trump Park Avenue is included as an asset on Mr. Trump's Statement of Financial Condition for the years 2011 through 2021 with values ranging between $90.9 million and $350 million.

83.    The valuation of the building was based on estimates of both the valuation of the commercial space and unsold residential condominium units in the building. The unsold residential condominium units owned by Mr. Trump or the Trump Organization represented the lion's share of reported value for this property (in excess of 95% in some years). For example, in 2011, the commercial space was valued at $15 million based on an estimate prepared by Donald Trump, Jr. The unsold residential condominium units were valued at $293 million.

84.    Based on an outside appraisal and internal (but undisclosed) estimates of market value prepared by the Trump Organization, the values for the unsold residential units at Trump Park Avenue asserted in the Statements were false and misleading.

85.    An appraisal was performed in 2010 by the Oxford Group in connection with a $23 million loan from Investors Bank. As the appraisal identified, the collateral consisted of residential units (12 of which were rent stabilized), two commercial spaces, and six storage spaces. The appraisal valued the collateral at $72.5 million, of which approximately $55.1 million was derived from the residential units and storage spaces. The appraisal valued the 12 rent-stabilized units at $750,000 total, noting that the rent-stabilized units "cannot be marketed as individual units" for sale because the "current tenants cannot be forced to leave." The Trump Organization was well aware of the rent-stabilized nature of many units at the property, as any landlord would be. Indeed, Donald Trump, Jr. testified that the rent-stabilized tenants at the

31

building were, "the bane of [his] existence for quite some time." The Trump Organization also

engaged in litigation regarding rent-stabilization at the property and obtained particular types of

insurance for the rent-stabilized units.

86.     The Trump Organization had a copy of the Oxford Group appraisal in its own

files, and it was integral to the company's loan from Investors Bank, including to the release of

the collateral as unsold units were sold.

87.     Notwithstanding this 2010 appraisal, and the Trump Organization's knowledge

that numerous units at the property were rent-stabilized, Mr. Trump's Statements of Financial

Condition in 2011 and 2012 valued the unsold residential units in Trump Park Avenue without

regard for those restrictions or the appraisal's conclusion. The result was a valuation of more

than $292 million, or roughly six times the 2010 appraised value attributable to the residential

units and storage spaces.

88.     In July 2020, the Trump Organization received an appraisal with a value of $84.5

million but on the 2020 Statement the Trump Organization valued Trump Park Avenue at $135.8

million.

89.     The Trump Organization did not disclose to Mazars either the 2010 appraisal, the

2020 appraisal, or that several of the unsold units were subject to rent stabilization in connection

with the Statement of Financial Condition engagements from 2011 to 2020.

90.     The lead accountant for the compilation engagement, Donald Bender, testified

that he was "shocked by the size of the discrepancy" between the value for the rent stabilized

units in the 2010 appraisal and the Trump Organization valuation figures provided for the rent

stabilized units in the Statements of Financial Condition. He also stated that he would not have

issued the Statements with the values the client provided for Trump Park Avenue if he had been

aware of the 2010 appraisal, the 2020 appraisal, or the fact that several units were rent stabilized and that he found the failure to disclose this information.

91.      Additionally, the Trump Organization routinely prepared estimates of current market value for unsold residential units at Trump Park Avenue that were far lower than the values reported on Mr. Trump's Statements of Financial Condition.

92.      In the Statements of Financial Condition for 2011 through 2015 (the last of which was finalized in March 2016), the Trump Organization used offering plan prices to value unsold residential condominium units at Trump Park Avenue—not estimates of current market value.

93.      But as far back as 2012 (and perhaps earlier), the Trump Organization's in-house real estate brokerage arm (Trump International Realty) prepared Sponsor Unit Inventory Valuation spreadsheets reflecting *both* offering plan prices and *current market values* based on actual market data that included unsold units at Trump Park Avenue.

94.      Trump Organization employees used these "Sponsor Unit Valuation Spreadsheets"—reflecting internal estimates of market value and offering plan prices—for day-to-day operations and business planning purposes. But when they wanted to present a higher value for Mr. Trump's Statement, they disregarded the company's actual internal market valuations and instead reported offering plan prices that bore no necessary connection at the time to any market estimate.

95.      The result was a classic "two sets of books" situation: one internal set of records reached one conclusion regarding market value, but the figure presented on Mr. Trump's Statement was considerably higher:

33

Case 22-1175, Document 56, 09/26/2022, 3388914, Page43 of 224

| Year | Total Offering Plan Price used for Statement of Financial Condition | Total Current Market Value Prepared by Trump | Difference in Value |
|------|------|------|------|
| 2012 | $293,122,750 | $236,425,000 | $56,697,750 |
| 2013 | $326,854,500 | $285,795,000 | $41,059,000 |
| 2014 | $283,051,500 | $246,265,000 | $36,786,500 |

96. What is more, in nearly every instance in which this conduct occurred, the Trump Organization concealed its actual market value estimates from Mazars—sending the accounting firm only the portion of the "Sponsor Unit Valuation Spreadsheet" containing the offering plan prices and omitting the actual market value estimates. In one year, the Trump Organization did send both portions of the spreadsheet—but later deleted the actual market value estimates and directed the use of the offering plan prices.

97. Mr. Bender stated that the failure of the Trump Organization to provide the current market value estimates in connection with the Statement of Financial Condition engagements, where offering prices were used to value Trump Park Avenue, was inconsistent with their obligation to provide complete and accurate information and that it was misleading.

98. The Trump Organization's own conduct beginning in late 2016 or early 2017 reflects an understanding that reporting offering plan prices as the estimated current values of unsold Trump Park Avenue units—rather than its own, lower assessment of these units' actual current market values (albeit still inflated due to ignoring the impact of rent stabilization)—was incorrect and misleading. Beginning with the June 30, 2016 Statement of Financial Condition—finalized in March 2017—the Trump Organization changed its practice and began reporting its current market value estimates for purposes of that Statement.

99.     But even the "Sponsor Unit Valuation Spreadsheets" were grossly inflated because they did not include any reductions to account for the rent-stabilized units. If they had, the valuation of Trump Park Avenue would have been significantly lower based on the information available to the Trump Organization from the 2010 appraisal. For instance, in 2011 and 2012 the 12 rent stabilized units were valued collectively at $49,596,000—a rate over 65 times higher than the $750,000 valuation for those units in the 2010 appraisal, which was based on their rent-stabilized status.

100.     Valuations in 2013 through 2021 similarly ignored the restrictions imposed by rent-stabilization laws on the rent-stabilized units owned by Mr. Trump or the Trump Organization.

101.     The junior employee tasked with preparing the Statements of Financial Condition beginning in November 2016 was aware that some of the unsold apartments at Trump Park Avenue were rent stabilized, but did not consider or discuss with anybody whether to factor rent stabilization into the valuations, which did not account for rent stabilization at all.

102.     In addition to the grossly inflated values for the unsold apartments, the descriptions on Mr. Trump's Statements of Financial Condition reflecting the manner in which those valuations were reached are inaccurate and misleading. In particular, the Statements of Financial Condition from at least 2011 through 2019 reflect, in sum and substance, that the reported values were **"**based upon an evaluation made by Mr. Trump in conjunction with his associates *and outside professionals*," thereby leading the reader to believe that the manner of valuation included consultation with outside professionals.

103.    But there was no consultation with any outside professional in connection with reporting the value of unsold residential condominium units at Trump Park Avenue for the Statement of Financial Condition in those years.

104.    In 2020, Mr. McConney was interviewed by OAG as part of its investigation and asked about various references to "outside professionals" on the Statements of Financial Condition. After that interview, the Trump Organization changed the wording for the 2020 Statement, omitting any representation that any particular valuation was reached in consultation with "outside professionals" and instead listing outside professionals as merely one factor that may have been "applicable" in some unspecified manner.

105.    The Trump Organization's abrupt removal of any specific references to consultation with outside professionals in connection with specific valuations is a tacit admission that such references in prior years were inaccurate and misleading.

106.    Additionally, some of the unsold units were reported at values that were several times the prices Mr. Trump had agreed to sell them. For one of the unsold residential units, a penthouse apartment ("Penthouse A") rented by Ivanka Trump starting in 2011, Mr. Trump's Statement of Financial Condition reported a value much higher than the price at which Ms. Trump had been granted an option to purchase the unit in a lease that also granted her a rental payment substantially below the market rent for similar units in the building.

107.    Ms. Trump's rental agreement for Penthouse A in Trump Park Avenue included an option to purchase the unit for $8,500,000. But in the 2011 and 2012 Statements of Financial Condition, this unit was valued at $20,820,000—approximately two and a half times as much as the option price, with no disclosure of the existence of the option. For the 2013 Statement of

36

Financial Condition, the unit was valued at $25,000,000—more than three times the option price, again, with no disclosure of the existence of the option.

108.    In June 2014, Ms. Trump was given an option (which automatically vested the next year) to purchase a different, larger penthouse unit ("Penthouse B") at Trump Park Avenue for $14,264,000. That unit was valued at more than three times as much on the 2014 Statement— the unit's $45 million offering plan price on the 2014 Statement of Financial Condition. In that year, Ms. Trump's option to purchase the unit at a steep discount was included in a lease in which she was charged a rental payment substantially below the market rent for similar units in the same building.

109.    The Statement of Financial Condition for Trump Park Avenue in 2015 reflected the option price ($14,264,000) as the value for the unit instead of the much higher offering plan price ($45,000,000) that had been used in the 2014 Statement.

110.    From 2016 to 2020 the value of Penthouse B was listed at the price of $14,264,000 with a notation appearing in 2018 and forward that this price was "per rental agreement."

111.    Mr. Bender told the Trump Organization that reporting an offering plan price for a unit instead of the option price at which the Trump Organization already had agreed to sell the unit was inappropriate and urged that the option price be reported instead. He repeatedly over several years had to tell the Trump Organization to revise their valuations downward to account for the option.

112.    However, even the option price reported by the Trump Organization was inaccurate. In December 2016, Donald J. Trump, Ivanka Trump, and Jared Kushner signed a second amendment to the lease which lowered the option price to $12,264,000.

Case 22-1175, Document 56, 09/26/2022, 3388914, Page47 of 224

### 4. 40 Wall Street

113. The Trump Organization, through the entity 40 Wall Street LLC, a New York Limited Liability Company, owns a "ground lease" pertaining to 40 Wall Street. In other words, it holds a leasehold interest in the land and buildings on the land, but pays rent (known as ground rent) to the landowner.

114. By the terms of the ground lease, the rent on 40 Wall Street gradually increases over a series of years, with a reset to a percentage of market value in 2032 based on the overall value of the building. A "reset" is typically a significant event in a ground lease, because it can result in the holder of the lease paying substantially more rent to the landowner.

115. As indicated in the chart below, the values derived by Mr. Trump and the Trump Organization for this leasehold interest far exceeded the values determined by professionals in lender-ordered appraisals for the same property, including an unreasonably inflated lender appraisal prepared in 2015 that the Trump Organization sought to unduly influence:

| Statement Year | Statement Valuation | Lender-Ordered Appraisal |
|:---:|:---:|:---:|
| 2011 | $524,700,000 | $200,000,000 |
| 2012 | $527,200,000 | $220,000,000 |
| 2013 | $530,700,000 | |
| 2014 | $550,100,000 | |
| 2015 | $735,400,000 | $540,000,000 |
| 2016 | $796,400,000 | |
| 2017 | $702,100,000 | |
| 2018 | $720,300,000 | |
| 2019 | $724,100,000 | |
| 2020 | $663,600,000 | |
| 2021 | $663,600,000 | |

116.    From 2011 through 2015, the supporting data for Mr. Trump's Statement of

Financial Condition reported a valuation for 40 Wall Street that was calculated using an "income

capitalization approach," a method for estimating the value of real property based on the net

operating income, or NOI, the property generates. Under this valuation method, a property's NOI

is divided by a capitalization rate to arrive at an estimate of market value. (Because the value is

directly proportional to NOI and inversely proportional to the capitalization rate, the *higher* the

NOI or *lower* the capitalization rate, the higher the value.)

117.    Net operating income is typically defined as "[t]he actual or anticipated net

income that remains after all operating expenses are deducted from the effective gross income

but before mortgage debt service and book depreciation are deducted." Appraisal Institute, The

Dictionary of Real Estate Appraisal 158 (6th ed. 2015).

118.    For the Statements from 2011 through 2015, the Trump Organization routinely

inflated the leasehold's value on the Statements of Financial Condition by inflating the NOI for

the building and utilizing unrealistically low capitalization rates.

119.    Capital One (which held a $160 million mortgage on the property at the time)

raised substantial concerns about cash flow at the property as far back as August and September

2009, leading to in-person meetings with Mr. Trump, Mr. Weisselberg, and others. At one of

those meetings, Mr. Trump said that if the bank tried to restructure the loan because of a low

loan-to-value based on a bank appraisal, he would counter a low appraisal by creating a Trump

University lease for the vacant space and then order his own appraisal. According to Mr. Trump,

the lease would "pump up" the value and the net result would be either a third appraisal or some

sort of arbitration or litigation.

120.     Those discussions led to a loan modification executed in 2010 that attached the Trump Organization's own 2010 budget for the property. That 2010 budget projected for 2011 an NOI of just over $4.4 million.

121.     Yet for the 2011 Statement, Mr. Trump used an NOI figure of $26.2 million— nearly six times the budget projection—to derive a grossly inflated value for the property of $524.7 million.

122.     Outside appraisals further demonstrate that Mr. Trump's valuation of 40 Wall Street was false and misleading. In connection with the 2010 Capital One loan modification, an appraisal was performed by Cushman & Wakefield, Inc. ("Cushman") valuing the Trump Organization's interest at $200 million as of August 1, 2010. Cushman performed similar appraisals for the bank in 2011 and 2012 reaching valuations in that same range.

123.     A key component of valuing Mr. Trump's interest in 40 Wall Street in the 2012 appraisal was the reset of the ground lease in 2032. As noted above, a ground lease reset is a significant event because it can substantially increase the rent the leaseholder will have to pay. Any purchaser of Mr. Trump's interest in the ground lease at 40 Wall Street would have been keenly focused on the terms of the ground lease and of any rent reset. The 2012 appraisal concluded that the ground lease would reset from $2.8 million in rental expenses to more than $15.5 million beginning on January 1, 2033. Unlike professional appraisals of the ground lease, the Trump Organization's valuations ignored the reset entirely in the 2011 to 2015 valuations.

124.     The Trump Organization had the 2010 appraisal in its possession when it prepared the 2011 Statement. In addition, Mr. Weisselberg was aware that an appraisal of 40 Wall Street from the 2010 to 2012 time period had valued the property in the $200 million range prior to finalizing and issuing the 2012 Statement, but he nevertheless determined, along with Mr.

Trump, to assign the property a much higher value for purposes of the Statements of Financial Condition. The value for 40 Wall Street listed on the Statements of Financial Condition was $524.7 million in 2011, $527.2 million in 2012, and $530.7 million in 2013. These values are more than twice the value reached by the professional appraisals noted above.

125.    In 2015, the Trump Organization was able to negotiate favorable terms for a new loan working through Allen Weisselberg's son, then an employee at Ladder Capital Finance ("Ladder Capital"), an originator of securitized loans. The Ladder Capital loan would replace the Capital One loan based on an inflated appraisal prepared by Cushman. The 2015 appraisal did not reflect a good faith assessment of value; rather, it used false and misleading information and assumptions to arrive at a pre-determined value under pressure from the Trump Organization and Ladder Capital.

126.    Internal worksheets prepared by Cushman showed consideration of a Ladder Capital valuation of $600 million and a Trump valuation of $533 million, which was calculated by dividing $160 million (the amount of the loan the Trump Organization was seeking) by .30 (which would generate a loan-to-value for the transaction of 30 percent.)

127.    In preparing the 2015 appraisal, Cushman used unreasonably aggressive assumptions involving the discount rate and capitalization rate that contradicted the assumptions used in its earlier appraisals, and included a number of demonstrably false assumptions and representations. Among other things:

    a.    The appraisal assumed market rents for the building that were well in excess of any lease signed by the Trump Organization in the recent past. In fact, the appraisal used those inflated market rents despite including six leases effective as-of June 2015 – the same month as the appraisal – that were 10-17% below the market rents used by Cushman.

    b.    Cushman was well aware that rents in the building were not increasing commensurate with the assumptions in the appraisal. On June 18, 2015, Robert Nardella, the senior appraiser on the project and a Cushman Executive Managing

41

Director, emailed the other appraisers on the project as an "fyi" a piece from the "Real Deal" about a Wall Street Journal article in 2012 describing the "aggressive leasing deals" Mr. Trump was offering on 40 Wall Street and how rents "are essentially unchanged" from 15 years ago.

c.   The appraisal included as part of the rent roll a $1.4 million dollar lease with Dean & Deluca, even though the lease was still under negotiation and had not yet been signed. While Dean & Deluca did eventually sign a lease for the space, it never commenced operations in the building, it declared bankruptcy, and the Trump Organization sued in federal court for unpaid rent.

d.   The appraisal understated certain expenses for the building. For example, the appraisal recited management fees and expenses of $100,000 per year for 2012, 2013 and 2014, despite audited financials for the building showing management fees of $894,959 in 2012, $1,007,988 in 2013 and $939,689 in 2014. The appraisal assumed future management fees and expenses of $349,562, when actual management fees, per the audited financials for 40 Wall Street, were $1,211,909.

128.   Initially, Cushman's efforts were not enough to reach the $533 million value the Trump Organization urged as the target. The initial draft of the appraisal came in at a valuation of $500 million on June 18, 2015.

129.   Over the next week, Ladder Capital and the Trump Organization worked to manipulate the appraisal figure by unreasonably lowering expenses (thus increasing net income), in some instances by revising the building's budget to reclassify repeated annual costs as "one time expenses."

130.   Ultimately, the final appraisal came to a valuation of $540 million through a number of unreasonable adjustments, including reducing costs and changing the assumptions concerning the ground lease.

131.   Under the terms of the ground lease for 40 Wall Street – as outlined in the 2015 appraisal – in "2033 the lease payments are revalued to the greater of either: (a) 6.0% of [the] then value of the land considered as vacant and unimproved but with the right to construct a 900,000 square foot office building with grade retail; or, (b) 85.0% of the then lease payments."

42

Case 22-1175, Document 56, 09/26/2022, 3388914, Page52 of 224

Cushman applied those terms in each of its earlier 2011 and 2012 appraisals and in its June 18, 2015 draft appraisal. But in the final 2015 appraisal, Cushman assumed, for the first time, that there would be a 10% reduction in the square footage to account for "zoning floor area" based on mechanical space in the building. By applying this reduction for the first time, the ground lease reset was reduced from more than $16 million to $9.6 million. Incongruously then, while the value of the building purportedly more than doubled from 2012 to 2015, the ground lease reset, based on the value of the building, purportedly dropped.

132.    But for the purposes of the 2015 Statement of Financial Condition, even this increase was not enough for Mr. Trump and the Trump Organization. The Statement of Financial Condition as of June 30, 2015 valued the building at $735.4 million—more than a 35% increase over the already inflated $540 million Cushman appraisal of that same date.

133.    The Trump Organization arrived at a $735.4 million valuation for Mr. Trump's 2015 Statement using tactics similar to those employed on other assets previously. In particular, the Trump Organization provided only a 13-page summary of the already-inflated $540 million appraisal to Mazars—withholding the remainder of the document, including the comparable sales utilized and capitalization rate information, such as that the appraiser concluded a 4.25% capitalization rate was appropriate using the direct income capitalization method. To reach a $735.4 million value, the Trump Organization then falsely and misleadingly attributed to the *very same appraiser* who performed that appraisal a capitalization rate of 3.29% based upon a particular comparable sale, even though the appraiser had considered that same sale and concluded in the appraisal that 4.25% was the appropriate rate. The Trump Organization then further misleadingly described this approach, in which it had inflated the appraiser's conclusion, as "conservative."

43

Case 22-1175, Document 56, 09/26/2022, 3388914, Page53 of 224

134.    The degree to which the Statements overvalued 40 Wall Street was evident when the financial details for the building were disclosed as part of the securitization of the loan issued by Ladder Capital. For example, the ratings agency Morningstar made adjustments to the rental rates, NOI, and capitalization rates utilized by Cushman and Ladder Capital and calculated a value of $262.3 million. That valuation was consistent with a $260 million "projected market value" as of November 2015 that was included in the 2012 Cushman appraisal and an internal valuation of $257 million prepared by Capital One in November 2014.

135.    Thus, the 2015 Statement of Financial Condition overstated the value of 40 Wall Street by at least $195.4 million when compared to the inflated 2015 Cushman appraisal and $473.9 million when compared with the independent Morningstar analysis.

136.    By August 2016, the ratio of 40 Wall Street's income to its debt service expenses had dropped to the point that the Ladder Capital loan was added to a watchlist. In the ensuing 2016 Statement, the Trump Organization stopped using the "income capitalization approach" to value 40 Wall Street in favor of a "sales comparison approach," which multiplied the total square footage of the building by the price per square foot of a recent "comparable" sale. Although GAAP required the Trump Organization to disclose this change in methodology, the 2016 Statement contained no such disclosure.

137.    Under the new valuation methodology, using the sales comparison approach, from 2016 through 2021, the Statements of Financial Condition continuously overstated the value of 40 Wall Street by using inflated comparable prices, by not accounting for the full cost of the rising ground lease rent (or not accounting for ground rent expenses at all), and eventually by inflating the square footage of the building.

138.    For example, in 2016, the Trump Organization valued 40 Wall Street at $796.4 million by multiplying the total square footage of the building (1,164,286 square feet) by a price per square foot of $684. This price reflected a massive premium over the $464 price per square foot used a year earlier by Cushman in the 2015 appraisal for Ladder Capital and the $225 price per square foot used by Morningstar.

139.    The 2016 Statement of Financial Condition also used two other misleading assertions to reach the inflated $796.4 million valuation.

140.    First, the Trump Organization used the sale price of 60 Wall Street as its "comparable" sale. But the two buildings were in no way comparable. 60 Wall Street is a modern office building, completed in 1989, six decades after 40 Wall Street. The building was occupied by an institutional anchor tenant, Deutsche Bank. Indeed, the 2015 Cushman appraisal distinguishes between pre-war buildings like 40 Wall Street and modern office buildings "constructed since 1980" like 60 Wall Street, which the appraisal specifically identifies as being in this separate category. Notably, Cushman did not identify 60 Wall Street as comparable to 40 Wall Street.

141.    Second, the 2016 valuation did not account for the obvious economic impact of the ground lease or the reset in 2032.

142.    In 2017, the Statement of Financial Condition utilized the same techniques to reach an inflated valuation of $702.1 million. Once again, the supporting documentation cites a price of "$603 per sq ft from recent sales comps" that is well in excess of earlier valuations of the property. The supporting spreadsheets do not cite a specific comparable sale, but $603 per square foot is the average of the two highest sales on a spreadsheet provided by Cushman to the Trump Organization via email on August 21, 2017. Those properties were 60 Wall Street, which

45

was valued at $624 per square foot (not the $684 per square foot cited in 2016), and 85 Broad Street, a building built in 1983. Once again, the 2017 valuation did not account for the economic impact of the ground lease or the reset in 2032.

143. In 2018, the Statement of Financial Condition utilized similar techniques to reach an inflated valuation of $720.3 million. The supporting documentation cites a price of "$647 per sq ft from recent sales comps." The source for that price is described as "Sales price per sf comps provided by Michael Papagianopoulos of Cushman on 9/11/18." That communication from Mr. Papagianopoulos, however, has no specific discussion of appropriate comparable properties for 40 Wall Street. Instead, Mr. Papagianopoulos sent a list of 15 properties entitled "Summary of Downtown Office Improved Sales." The $647 per square foot valuation appears to reflect the second highest valuation on the list, 222 Broadway, a building built in 1961 and renovated in 2013 with the building 78% occupied by an institutional anchor tenant, Bank of America, and long-term leases in place with Conde Nast and We Work. Cushman had considered the sale of 222 Broadway in its 2015 appraisal and adjusted the price per square foot down to $454 to account for differences between the two buildings. The Trump Organization had a copy of that appraisal, which Mr. McConney sent to the junior employee responsible for preparing the 2018 Statement of Financial Condition in October 2015.

144. While the 2018 valuation does account for the ground lease, it fails to account for the present value impact of the ground lease reset in 2032.

145. In 2019, the Statement of Financial Condition utilized similar techniques to reach an inflated valuation of $724.1 million. The supporting documentation cites a price of "$630 per sq ft from recent sales comps." The source for that price is described as "Sales price per sf comps provided by Douglas Larson of Newmark on 7/8/19." That communication from Mr. Larson,

46

Case 22-1175, Document 56, 09/26/2022, 3388914, Page56 of 224

however, has no specific discussion of appropriate comparable properties for 40 Wall Street.

Instead, Mr. Larson included a series of attachments, including one entitled "Downtown Class A

Sales." The $630 per square foot valuation does not match any specific sale on the list, but it is

within $10 per square foot of the second highest sale on the list, 60 Wall Street. And once again,

while the 2019 valuation does account for the ground lease, it fails to account for the present

value impact of the ground lease reset in 2032.

146.    In 2020 and 2021, the Statements of Financial Condition utilized similar

techniques to reach an inflated valuation of approximately $664 million. The supporting

documentation cites as a comparable sale a price of "$692 per sq ft from 44 Wall Street sold

March 2020 (per NYC)." The Trump Organization then adds a "15% ppsf discount to account

for the difference in size of the building and covid." There are no sources cited for the

adjustment. Among other issues, the analysis appears to miscalculate the price per square foot of

the sale of 44 Wall Street, which came to $564 per square foot, not $692. That error alone added

$130 million to the value of 40 Wall Street. And once again, while the 2020 valuation does

account for the ground lease, it fails to account for the present value impact of the ground lease

reset in 2032.

### 5. Niketown

147.    The property identified as "Niketown" consists of two long-term ground leases

held by The Trump Organization, pertaining to land and buildings located between Fifth and

Madison Avenues on 57th Street in Manhattan.

148.    One of the ground leases, dated January 31, 1995, contained a rent schedule for

years 1995 through 2044 and has a provision that resets the rent in 2037 to the greater of a series

of figures, with one being "the annual fair market rental value of the demised premises," as

determined by an independent appraiser if the parties fail to agree. The lease was modified in 1996 to extend the term to 2094 and require a second reset of the rent in 2044.

149.     The second ground lease, dated October 23, 1995, contains a rent schedule of $400,000 per year from 2012 through 2015 and $450,000 from 2016 through 2020, with a reset in 2021 based on "7% of the fair market value of" the leased property. Similar resets would occur in 2041 and 2061, and the lease would expire in 2079.

*a.   June 30, 2011 and June 30, 2012 valuations of Niketown*

150.     The June 30, 2011 Statement of Financial Condition stated a value of $263,700,000 for the Trump Organization's interests in Niketown. The Statement represents that "[t]he current value of $263,700,000 reflects the net proceeds which Mr. Trump in conjunction with his associates and outside professionals expect to be derived from rental activities pursuant to the lease described above, as well as the residual value of the property."

151.     That representation regarding how the value of Niketown was computed was false and misleading. In reality, as stated in the supporting data, the valuation was "based on the par value of" certain bonds issued in November 1995. Under the actual valuation method, "the par value of the bonds is deemed to be 75% of the value of the asset. This amount has been increased 6% per year since the bonds were issued."

152.     Consistent with this description in the supporting data, the Trump Organization identified the value of bonds issued on the property in 1995 as $92,739,590, and then applied a loan to value ratio of 75% to derive a 1995 value for the Niketown property of $123,652,787. Then, the Trump Organization merely adjusted that figure upwards by 6% in each year—regardless of the property's actual performance or market conditions—to derive the values reported in the Statements, at least from 2007 forward.

48

Case 22-1175, Document 56, 09/26/2022, 3388914, Page58 of 224

153.    The net proceeds expected to be derived from rental activity played no role in the valuation. Indeed, such net proceeds do not appear in Mr. McConney's supporting data for the Statement and no calculation was done to compute the net proceeds, by taking gross revenue and subtracting expenses. Nothing in Mr. Trump's 2011 Statement of Financial Condition informed the reader that the amount of bonds issued in 1995 was the key determinative factor in deriving the value for the Niketown property 16 years later in 2011, without giving any consideration to the net operating proceeds.

154.    Nor did any "outside professional" provide any information as to the net proceeds to be derived from rental activities, contrary to the assertion in the 2011 Statement.

155.    The June 30, 2012 Statement of Financial Condition stated a value of $279,500,000 for the Trump Organization's interests in the Niketown property based on this same approach, applying a 6% increase over the value in the 2011 Statement.

156.    As with the 2011 Statement, the 2012 Statement contains the identical false and misleading description of how the value of Niketown was computed based on net operating proceeds.

157.    And just like with the 2011 Statement, the net proceeds expected to be derived from rental activity played no role in the 2012 valuation of Niketown. Such net proceeds do not appear in Mr. McConney's supporting data for the Statement and no calculation was done to compute the net proceeds by taking gross revenue and subtracting expenses.

158.    Nothing in Mr. Trump's 2012 Statement informed the reader that the amount of bonds issued in 1995 was the key determinative factor in deriving the value for the Niketown property in 2012, without giving any consideration to the net operating proceeds.

49

159.    Nor did any "outside professional" provide any information as to the net proceeds

to be derived from rental activities, contrary to the assertion in the 2012 Statement.

160.    Mr. Weisselberg was involved in the decision to "use the par value of the bonds"

as the basis for the 2011 and 2012 valuations of Niketown.

    *b.    Valuations of Niketown from 2013 through 2018*

161.    The Niketown valuations from 2013 through 2018 ranged from a low of $287.6

million to a high of $466.5 million, as indicated in the chart below, employing essentially the

same methodology:

| Statement Year | Niketown Valuation |
|:---:|:---:|
| 2013 | $287,600,000 |
| 2014 | $348,800,000 |
| 2015 | $466,500,000 |
| 2016 | $389,600,000 |
| 2017 | $432,600,000 |
| 2018 | $422,400,000 |

162.    In 2013, the Statement represented that the valuation "reflects the net proceeds

which Mr. Trump in conjunction with his associates and outside professionals expect to be

derived from rental activities pursuant to the lease described above, as well as the residual value

of the property."

163.    This language was false and misleading, and failed to disclose a substantial

change from the prior two years in the underlying valuation methodology for Niketown starting

in 2013, as required by GAAP.

164.    In actuality, at no point in preparing the 2013 valuations were any "outside

professionals" engaged to determine or forecast the "net proceeds" that the Trump Organization

would derive from rental activities, or otherwise to evaluate the "residual value of the property."

50

165.    In each of the years from 2014 through 2018, the Statement represented that the valuation "is based on an evaluation by Mr. Trump" (for the years 2014 and 2015) or by the Trustees (for 2016 through 2018) "in conjunction with [his/their] associates and outside professionals, applying a capitalization rate to" either "the net operating income" or "the cash flow to be derived pursuant to the buildings net rental stream."

166.    This language was false or misleading. In actuality, from 2014 to 2018, no "outside professional" participated in any evaluation by Mr. Trump or the Trustees of the property's net operating income or cash flow or of the appropriate capitalization rate to apply to those figures for purposes of the Statements.

167.    The method employed for the valuations from 2013 to 2018, except for the 2015 valuation, used two variables: (1) a one-year figure for NOI that was purely a function of income from the lease to Nike, minus the ground rent; and (2) a capitalization rate applied to that NOI.

168.    Both figures employed to derive the Niketown valuation in these years omit several key variables known to the Trump Organization.

169.    For the NOI figure, the choice to use only a single year's rental income and ground rent omitted consideration of key facts respecting ground rent: the certainty of substantially escalating rental expenses on a particular schedule, and resets in specific years in which ground rent would likely increase substantially.

170.    The impact of scheduled escalations under the terms of the ground leases on the valuations is substantial, as confirmed by the information contained in the Trump Organization's GAAP-compliant, audited financial statements. For example, the year-ending 2012 audited financial statements—also prepared by Mazars—reflect a ground lease rent expense of $3,608,385—approximately $1.72 million more than the expense figure used by the Trump

51

Organization for the valuation on the 2013 Statement. The reason the expense figure was higher in the GAAP-compliant statement is that, pursuant to GAAP, such statements factor in scheduled expense increases. Using the ground lease rent expense from the GAAP-compliant financials would have reduced the reported valuation, holding all else constant, by $58.5 million.

171.    By contrast, the 2020 and 2021 valuations of Niketown did account for escalating scheduled rent expenses—an approach that, despite increased revenue assumptions, dropped the reported value from the mid-$400 million range to the $225-$250 million range.

172.    The Trump Organization was aware from bank-ordered appraisals prepared by Cushman for 40 Wall Street that resets on a ground lease interest are important factors in valuing such an interest. That is because they are important variables in determining how much value is retained by the landowner. Despite that awareness, the Trump Organization did not factor expected ground rent resets into its valuations of Niketown from 2013 through 2018.

173.    The capitalization rate applied in the Niketown valuations for the Statements from 2013 to 2018 similarly lacked support and appropriate disclosures.

174.    First, the Statements in 2013 did not disclose the use of any capitalization rate at all to determine the value of Niketown.

175.    Second, the sole justification offered for the capitalization rate chosen in 2013, 2014, and 2016 through 2018 was identified in supporting data as a telephone conversation with appraiser Doug Larson, in which he purportedly advised that "cap rates for retail properties in upscale areas like Times Square and the Fifth Avenue area are usually almost 60 basis points lower than office space." Based on that purported advice, and "[t]o be conservative," the Trump Organization in each of these years "reduced the cap rate used on Trump Tower by 50 basis points to arrive at the cap rate used for NIKETOWN."

52

Case 22-1175, Document 56, 09/26/2022, 3388914, Page62 of 224

176.    But Mr. Larson denies the conversation ever happened and insists it is not advice

he would have ever given. In particular, Mr. Larson testified that the method used by the Trump

Organization "doesn't make any sense," that it was "very unlikely" he ever conveyed such

advice, that an assertion that he provided such advice in a conversation was inaccurate. Mr.

Larson also testified it would be a misstatement if the Trump Organization said it reached the

2013 valuation of Niketown (the first year the purported conversation was referenced) in

conjunction with him and that there was no valuation of Niketown done by him.

177.    Additionally, the date of the purported conversation shifted over time, casting

further doubt on the Trump Organization's contention it received such advice from Mr. Larson.

The supporting data for the 2013 and 2014 Statement represent that the purported conversation

with Mr. Larson occurred on September 17, 2013. The supporting data for the 2016 Statement

makes no mention of a conversation in 2013, and instead describes an identical telephone

conversation with Mr. Larson on September 17, 2016 – three years to the day from the purported

call in 2013. The supporting data for the 2017 Statement does not mention any conversation with

Mr. Larson in 2016, and instead reverts back to September 17, 2013, as the purported date for the

discussion. And the supporting data for the 2018 Statement describes in identical language a

telephone conversation with Mr. Larson purportedly on September 14, 2018.

178.    But regardless of whether there was any conversation with Mr. Larson either in

2013, 2016, or 2018, it was neither reasonable nor appropriate for the Trump Organization to

rely on such a purported conversation for valuations of a retail space. Simply reducing an office-

space capitalization rate by fifty basis points to determine a capitalization rate for a retail space is

inappropriate, as Mr. Larson confirmed to OAG. A determination of an appropriate capitalization

rate should involve considering market information, the spreads between capitalization rates on

different properties, rent rolls, and expenses, among other variables, as Mr. Larson himself confirmed to OAG.

179.    For the 2015 Statement, the Trump Organization took a different approach to calculate the capitalization rate based on advice from a different Cushman employee. The supporting data for the 2015 valuation of Niketown identifies as the basis for the capitalization rate a "10/26/15 email from Kurt Clauss of Cushman" that "reflects a cap rate on the sale of the Crown Building of 1.56%." Explaining that "[s]ince this cap rate is for a property on Fifth Avenue, and there weren't any other comps in the area," the Trump Organization used the "average of this cap rate (1.56%) and the cap rate we used last year of 2.63%."

180.    Contrary to this stated explanation, Mr. Clauss simply provided Mr. McConney by email with a generic list of sales on October 26, 2015—without providing an opinion regarding whether or how such information could be used to derive an appropriate capitalization rate for the Niketown property.

181.    Thus, the capitalization rate applied to Niketown for the 2015 Statement of Financial Condition was a function of: (a) the capitalization rate applied in 2014, which suffered from a number of problems, including the false and misleading claim that Mr. Larson participated in an evaluation that determined that rate; and (b) the Trump Organization's selection of a single rate from a generic market report provided by Mr. Clauss, who did not participate in the 2015 valuation.

182.    Because the capitalization rate applied to calculate the value of Niketown for the years 2013 through 2018 was a function of the chosen capitalization rate for Trump Tower (albeit through a different approach in 2015), the method for determining the Trump Tower

54

Case 22-1175, Document 56, 09/26/2022, 3388914, Page64 of 224

capitalization rate inflated not only the reported Trump Tower value but also the reported value of Niketown.

### c.  June 30, 2019 valuation of Niketown

183.    The June 30, 2019 Statement of Financial Condition stated a value of $445,000,000 for the Trump Organization's interests in the Niketown property.

184.    The June 30, 2019 Statement of Financial Condition's supporting data for the Niketown valuation (like the supporting data for the six prior years) omitted any consideration of escalating ground rent expenses that were accounted for in the Trump Organization's GAAP-compliant, audited financial statements for years up to the year ending December 31, 2016.

185.    The supporting data (like the supporting data for the prior six years) also omitted any consideration of ground rent resets and their impact on prospective net income that a buyer would consider.

186.    The NOI used to prepare the Niketown valuation in 2019 was false and misleading in another respect: it mismatched income and expense periods in a manner that inflated the result by using a forward-looking (higher) income figure and a backward-looking (lower) expense figure to derive the NOI. Had the Trump Organization used income and expense figures from the same time period, the NOI would have been lower because either the income would have been lower or the expenses would have been higher. The result of this mismatched approach was to overstate the value by approximately $37.3 million.

187.    The calculation of the capitalization rate used (2.4%) similarly reduced the Trump Tower rate by a fixed number of basis points, though fewer than in prior years. The supporting data for the 2019 Niketown valuation purportedly reflects a different conversation with Mr. Larson—this time, undated—in which Mr. Larson supposedly advised, "the 50 to 60 basis point reduction used in previous years probably does not stand in the market as of 6/30/19." Based on

this advice, and "to be conservative," the Trump Organization "reduced the cap rate used on Trump Tower by 25 basis points to arrive at the cap rate used for NIKETOWN."

188.     Just before the 2019 Statement was finalized, Mr. Larson testified before OAG. Speaking at that time about the 2018 Niketown valuation, Mr. Larson stated: "I didn't generate a valuation. I wasn't engaged to generate a valuation and I would never have put a value on the property." Mr. Larson was then asked whether it was fair to say that Mr. Trump's trustees, in conjunction with him, had applied a capitalization rate to Niketown's net operating income—and he responded, "Absolutely not." Given that testimony, the undated purported conversation with Mr. Larson to support the 2019 Niketown valuation did not occur.

189.     As with the prior year valuations, because the capitalization rate applied to Niketown for the 2019 Statement was a function of the chosen capitalization rate for Trump Tower, the Trump Tower capitalization rate inflated not only the reported Trump Tower value but also the reported value of Niketown.

### d. June 30, 2020 valuation of Niketown

190.     For the 2020 Statement, the Trump Organization discontinued use of the prior method employed—namely, a direct-capitalization approach with a single year's net operating income divided by a capitalization rate.

191.     The new method for 2020, as described in the Statement, was as follows: "The estimated current value of $252,800,000 was derived by using a 20 year discounted cash flow based on a future prospective single tenant user." The 2020 Statement—unlike prior statements—disclosed this change in method, confirming the Trump Organization's awareness that such a disclosure was required under GAAP.

192.     Unlike the valuations of Niketown in any of the prior years, the cash flow analysis used for the 2020 valuation does reflect consideration of escalating ground rent under at least one

of the ground leases. That lowered the reported value for Niketown by nearly half in a single year ($252,800,000 in 2020 versus $445,000,000 in 2019)--confirming the huge inflating effect of the Trump Organization's prior decision to ignore those escalating rent expenses.

193.    Despite using a discounted cash flow analysis that factored in the escalating ground rent, the Trump Organization's computation still included unwarranted, favorable assumptions that inflated the reported value.

194.    First, on the expense side, the discounted cash flow analysis erroneously assumed that the rent under the second of the two ground leases would remain at $450,000 per year (as it had been for several years) for the ensuing *20 years.* That assumption was known to the Trump Organization to be false or unsupported because the lease was subject to an imminent rent reset through an appraisal process. That process resulted in an agreement in March 2021 between the Trump Organization and the landowner to increase the ground rent from $450,000 to $892,500.

195.    Based on the time required for the Trump Organization and the landowner to retain appraisers and negotiate to conclusion this agreement by March 2021, the Trump Organization had to have known that the rent reset was likely to result in significant increased rent at the time it issued the 2020 Statement of Financial Condition in January 2021, which instead falsely assumed no increase in rent under the second lease for the next 20 years.

196.    Second, on the revenue side, the Trump Organization's discounted cash flow analysis assumed rental revenue in the first five years of more than $28 million per year and increasing by ten percent every five years. These revenue figures were far in excess (by a factor of more than two) of rental income ever obtained from the property by the Trump Organization.

197.    Moreover, the Trump Organization's assumption that the rental income for the Niketown space would nearly triple conflicted with market data in the Trump Organization's

57

possession. In Fall 2020, the Real Estate Board of New York ("REBNY") produced a "Manhattan Retail Report" – which the Trump Organization had in its files -- that showed rents had *declined* in the retail markets for Manhattan retail space.

198.    The 2021 Niketown valuation further indicates the 2020 valuation had been inappropriately inflated. In the 2020 valuation, the Trump Organization used a square footage over 93,000 in its discounted cash flow analysis. In the 2021 valuation, the Trump Organization used a different figure—approximately 66,000 "usable" square feet—to reach a valuation $27 million lower. There is no indication the square footage of the space changed during that time.

### 6. Trump Tower

199.    The valuations of Trump Tower from 2011 through 2019, with the exception of 2015, were derived by the Trump Organization by dividing NOI by a capitalization rate. For 2015, and only for that year, the Trump Organization—without disclosing the change as required by GAAP—used a different methodology, basing its valuation on the sale of a single nearby building described in the press as setting a new world record; doing so generated a value in 2015 that was nearly more than $170 million higher than the previous year's value, nearly $250 million higher than the following year's value, and $75 million higher than the value derived in any other year using the NOI/capitalization rate method.

200.    The valuations from 2011 through 2019 ranged from a low of $490 million to a high of $880.9 million (in 2015), as indicated in the chart below:

| Statement Year | Trump Tower Valuation |
|----------------|----------------------|
| 2011 | $490,000,000 |
| 2012 | $501,100,000 |
| 2013 | $526,800,000 |
| 2014 | $707,000,000 |
| 2015 | $880,900,000 |
| 2016 | $631,000,000 |
| 2017 | $639,400,000 |
| 2018 | $732,300,000 |
| 2019 | $806,700,000 |

201.    The valuation in all years from 2011 through 2019 is described in each Statement as being "based on an evaluation" by Mr. Trump (from 2011 through 2015) or the Trustees (from 2017 through 2019) "in conjunction with [his/their] associates and outside professionals."

202.    The representation in each year that an "outside professional" took part in "an evaluation" of the value of Trump Tower for purposes of the Statements of Financial Condition is false and misleading. There is no evidence that any "outside professional" performed or participated in an evaluation of the value of Trump Tower for purposes of the Statements of Financial Condition. Rather, as discussed below, the Trump Organization simply relied on information in generic market reports circulated by individuals at appraisal firms including Cushman.

           a.   *Valuation of Trump Tower from 2011 to 2014 and 2016 to 2019*

203.    The valuation of Trump Tower for each year's Statement from 2011 through 2019, except for the 2015 Statement, was calculated based on dividing an NOI figure by a capitalization rate.

204.    The Trump Organization's conduct in valuing Trump Tower in these involved a series of coordinated actions designed to artificially push the value higher, rather than reach a

reasonable value for the property based on market information. Those actions ranged from recording objectively false justifications for using a certain capitalization rate; to pairing an inflated NOI with cherry-picked, low capitalization rates; to misrepresenting the valuations performed.

205.    With respect to the capitalization rate, the supporting data for each year from 2011 to 2019 (except for 2015) relies on data cherry-picked by the Trump Organization from generic market reports provided by various individuals at appraisal firms including Cushman, rather than on any evaluation done specifically for Trump Tower or the Trump Organization. Indeed, no one at any appraisal firm evaluated Trump Tower for purposes of determining a capitalization rate or otherwise participated in calculating a valuation for that property for the Statement of Financial Condition. It was false and misleading for the Trump Organization to suggest that receipt of the generic market reports constituted an evaluation done in conjunction with an "outside professional" on the valuations.

206.    In each year from 2011 to 2019, except in 2015, the Trump Organization appears to have cherry-picked a few low capitalization rates from a range of rates provided in a generic market report and then used the average of those selected low rates as the rate for Trump Tower. And when providing the valuation to Mazars, the company in some instances misleadingly included only excerpted favorable portions of those generic market reports that excluded higher capitalization rates that would have produced lower values.

207.    The supporting data frequently provided no rationale for why the Trump Organization selected only from the low end of the range of capitalization rates in each generic market report to value Trump Tower, or why the company ignored higher capitalization rates for buildings that were comparable to Trump Tower. For example, the 2013 supporting data

provides no rationale for rejecting the 4.86% capitalization rate associated with a sale in March 2013 of nearby 767 Fifth Avenue (only two blocks north of Trump Tower on Fifth Avenue)—described in the generic market report to be "in excellent condition" and "a trophy Class A office tower . . . which is considered in the marketplace to be one of the best buildings in Manhattan due to its construction quality and location which provides some the best views in the City of Central Park." Nor does the Trump Organization provide a rationale for rejecting the 5.80% capitalization rate associated with a property sale in April 2013 in the "Plaza office submarket" on West 55th Street between Sixth and Seventh Avenues. The Trump Organization ignored these unfavorable rates and instead selected rates that were much lower to derive a rate of 3.44% for Trump Tower in 2013.

208.    Even if small numerically, the differences in rates have an enormous impact on the reported value based on the formulas used. And the Trump Organization was well aware of this impact. The method used was pure division: NOI divided by capitalization rate. A 3.44% capitalization rate means the value equals about 29 times NOI (1/.0344). But a 5.80% capitalization means the value equals about 17.2 times NOI (1/.058). In other words, just choosing a 3.44% rate over a 5.8% rate raises the value by almost 70% (29 is 68.6% greater than 17.2).

209.    In 2019, moreover, the Trump Organization went to great lengths to generate a valuation over $800 million by, among other things, using an extremely low capitalization rate and recording a false justification for doing so. Indeed, a junior employee wrote down the purported basis for these decisions, which he later acknowledged was false.

210.    In particular, in 2019, the Trump Organization used only a 2.67% capitalization rate to value Trump Tower and generated a valuation of $806.7 million. That capitalization rate

61

was derived from a generic market report reflecting a sale of 666 Fifth Avenue, which had been sold by the Kushner Companies back in 2018. The handwritten basis recorded in the backup materials provided to Mazars for using that sale—and *only* that sale—among all of the others in the generic market report was that it was the "only Plaza District sale in the last two years on Fifth Avenue (non-allocated)." The decision to use that sale for that stated reason was made by Allen Weisselberg.

211.    That justification was false (or, at a minimum, misleading). As the full market report revealed, a building one block away from Trump Tower on Fifth Avenue (at 711 Fifth Avenue) and identified as in the "Plaza District" was in contract to sell at a capitalization rate of 5.36%. And that other property in fact sold at a capitalization rate in that range well in the months *before* the 2019 Statement was completed, as information in the Trump Organization's possession made clear and as public records made otherwise easily available. The statement that the 666 Fifth Avenue transaction was "only sale in the last two years in the Plaza District on Fifth Avenue (non-allocated)" was false.

212.    What is more, during the course of the 2019 valuation of Trump Tower, Mr. Weisselberg systematically rejected numerous valuations that would have reached values between $161 million and $224 million less than the prior year's $732 million valuation. Multiple draft valuations were prepared by the junior employee charged with preparing the Statement using other, more recent Plaza District transactions with much higher capitalization rates of 4.65% and higher--but Mr. Weisselberg systematically rejected all of those market data points and decided to use a less recent, but much more favorable, 2.67% rate from the 666 Fifth Avenue sale to push the value north of $800 million. The justifications recorded by the junior employee for Mr. Weisselberg's decisions rejecting those other capitalization rates were,

62

Case 22-1175, Document 56, 09/26/2022, 3388914, Page72 of 224

alternatively, false or so cursory that they appear to have been crafted to justify a decision Mr. Weisselberg had already reached.

213.    Even the use of the 666 Fifth Avenue rate of 2.67% was misleading because the market data relied upon dictated using 4.45% as a capitalization rate when using "stabilized" NOI. The underlying market report, for the 666 Fifth Avenue transaction used by the Trump Organization for this valuation, provided a capitalization rate "*upon stabilization*" of 4.45%. The 2019 Trump Tower valuation expressly states that it is based on, "applying a capitalization rate to the *stabilized* net operating income." It was thus false or misleading to imply that the backup material for the valuation supported using a 2.67% capitalization rate when, on its face, it stated a capitalization rate nearly two full percentage points higher was appropriate "upon stabilization" and the Trump Organization's valuation purported to be upon stabilization.

214.    Furthermore, the NOI figures used by the Trump Organization were generally one-off figures prepared solely for purposes of the Statements, allowing for manipulation. In some instances, for example, the figures were inflated from the Trump Organization's actual or projected results for the property because expenses were taken from historical audited results for the property from a prior year, but revenues were taken from budgets from the current year, creating a mismatch in time periods. The result was an inflated NOI. Neither the Statements nor the supporting data explains why, for purposes of calculating an NOI for valuation purposes, it would be appropriate to use a revenue figure from one year and an expense figure from another year.

215.    Moreover, the NOI figures used in the valuations often were misrepresented in the Statements. The Statements in many instances describe the valuation method as being based on the "cash flow to be derived from the building's operations." When that representation was

63

Case 22-1175, Document 56, 09/26/2022, 3388914, Page73 of 224

made, it was false or misleading. In reality, even apart from the time period mismatches identified above, the Trump Organization padded its NOI for Trump Tower by adding in millions of dollars in "cash flow" it knew it would *not* "derive from the building's operations"— including revenue from space the Trump Organization had itself occupied for many years. The Statements until 2017 did not disclose that the NOI figures used by the Trump Organization to value Trump Tower were not actual or truly expected NOI results for the property.

216.    In other instances, expenses were artificially reduced; in particular, approximately $1 million in management fees for the property were stricken from the expense rolls—even though those management expenses were paid (according to the audited financials) and typical appraisal practice does factor in management fees as a property expense (as appraisals in the Trump Organization's possession made clear).

217.    Given the low capitalization rates used by the Trump Organization to calculate the valuations, even a relatively small increase in NOI results in a significantly inflated value. For example, a $1 million difference in NOI would result in an increase in value of $34.4 million at the 2.90% capitalization rate used in 2017.

218.    Additionally, for the years 2017 to 2019, the Trump Organization purported to use the "stabilized NOI," and in those years included the sort of padded revenue figures generated by inclusion of millions of dollars of revenue from space the Trump Organization did not expect to earn revenue from.

219.    No definition of the term "stabilized" was given in the Statements for these years. In the real estate industry, the term "stabilized" typically means that a building is at its average or typical occupancy that would be expected over a specified projection period or over its economic life.

220.    There is no indication that any analysis was done to conclude that all of the additions to NOI were done to reflect the typical or average occupancy (or vacancy) and financial performance Trump Tower would experience over any period of time—as distinct from generating a one-off figure that inflated NOI to be used solely for a valuation on Mr. Trump's Statement of Financial Condition.

221.    The representation that the NOI figure used to value Trump Tower was "stabilized" in these years was false and misleading.

222.    Moreover, for all years in which the Trump Organization padded its Trump Tower NOI by inclusion of millions of dollars in revenue it did not expect to earn, combining that tactic with the selection of the lowest or near-lowest capitalization it could pull from generic reports was misleading. To the extent either approach could be justified on the basis of "upside" in the property, using *both* tactics at the same time effectively double-counted such potential upside and thus was a wholly improper valuation approach. The Trump Organization either knew, or should have known, that approach was improper.

### b.    *2015 valuation of Trump Tower*

223.    The 2015 Statement of Financial Condition finalized in mid-2016 valued Trump Tower at $880,900,000—a 24.6% increase over the 2014 value, which already had increased 34.2% over the 2013 value.

224.    The 2015 valuation was purportedly "based on an evaluation by Mr. Trump in conjunction with his associates and outside professionals, based on comparable sales." Although the use of "comparable sales" represented a significant change in methodology from the company's use in the prior four years of NOI divided by a capitalization rate, there was no disclosure on the 2015 Statement of Financial Condition, as required by GAAP, that the Trump Organization had *changed* valuation methods.

65

225.    In any event, the representation that the valuation was "based on comparable sales" (plural) was false and misleading. Rather, the Trump Organization used only a single, highly favorable sale as the sole data point to derive a value for Trump Tower in 2015.

226.    The decision to use a single sale as the sole basis for deriving the value in 2015, to the exclusion of all other sales of comparable office buildings in the same period, was made by Mr. McConney and Mr. Weisselberg.

227.    The single sale involved the Crown Building at 730 Fifth Avenue, which sold for "a new world record for the price of an entire office building," according to press reports describing the sale.

228.    The 2015 supporting data provides no rationale for why the company considered Trump Tower to be comparable to a building that sold for a world record price per square foot, and not comparable to other office buildings sold during the same period. Nor does the Statement disclose that the that single, world record sale was the only sale used to value Trump Tower.

229.    In selecting the Crown Building sale as the sole data point for deriving the 2015 valuation for Trump Tower, Mr. McConney and Mr. Weisselberg ignored a host of unique factors about the sale that differentiated the Crown Building from Trump Tower. These factors included development and reconfiguration of retail space, conversion of a huge swath of floors into a hotel, and utilization of "existing, unused development air rights," among other things.

230.    The 2015 supporting data indicates that the information about the Crown Building sale came from a generic market report forwarded by Kurt Clauss at Cushman.

231.    But the 2015 Statement's representation that Mr. Clauss (the only "outside professional" identified in the supporting data) took part in "an evaluation made by Mr. Trump in conjunction with his associates and outside professionals" was false or misleading. Mr. Clauss

Case 22-1173, Document 56, 09/26/2022, 3388914, Page76 of 224

did not, by providing a generic market report, evaluate the value of Trump Tower along with Mr. Trump, Mr. McConney, or Mr. Weisselberg, let alone advise the company that it would be appropriate to use a single sale at a world record price, to the exclusion of other market data, to derive a value for Trump Tower.

232.    The effort by the Trump Organization to exploit the Crown Building sale to generate an unjustifiably high value for Trump Tower in 2015 became readily apparent when the company reverted to its prior "NOI/capitalization rate" method in 2016, again making a change in method without the necessary disclosure required by GAAP. After reverting to the earlier method, the value of the property precipitously dropped by 28.4% or approximately $250 million.

### 7.    Seven Springs

233.    Seven Springs is a parcel of real property that consists of approximately 212 acres within the towns of Bedford, New Castle, and North Castle in Westchester County. Seven Springs LLC, a Trump Organization subsidiary, purchased the property in December 1995 for $7.5 million.

234.    A 2000 appraisal prepared for the Royal Bank of Pennsylvania and sent to the Trump Organization estimated that Seven Springs had an "as-is" market value of $25 million for residential development.

235.    The same bank's records further indicate that a 2006 appraisal showed an "as-is" market value of $30 million.

236.    In sharp contrast to these bank-appraised market values, the Statements of Financial Condition from 2011 to 2021 include far higher valuations of Seven Springs, ranging between $261 million to $291 million.

237.    The 2011 Statement included under the category "Properties under Development" a value for Seven Springs of $261 million and the 2012, 2013, and 2014 Statements reported a value separately itemized for Seven Springs of $291 million. In each of these years, the Statement asserted that "[t]his property is zoned for 9 luxurious homes" and that the valuation was "based on an assessment made by Mr. Trump in conjunction with his associates of the projected net cash flow which he would derive as those units are constructed and sold, and the estimated fair value of the existing mansion and other buildings."

238.    According the supporting spreadsheets, the $261 million and $291 million valuations were "based on the sale of luxury homes net of cost." Specifically, the Trump Organization calculated that it had "7 mansions approved" that would each cost $12 million to develop and sell for $35 million, for a total profit of $161 million plus a residual value of $70 million for the "main mansion" in 2011, which increased to $100 million in 2012, 2013, and 2014 (without any explanation for the $30 million increase in value), plus another $30 million for the remaining land. All of these values were a fiction, totally unsupported by the development history of the property and contradicted by every professional valuation of the property.

239.    Beyond using these inflated numbers, the Statements from 2011 to 2014 stated that a "fair value" estimate of the "existing mansion and other buildings" was performed. But "fair value" is an accounting term of art, and no such analysis was done. The claim that it was done was false and misleading.

240.    Instead of including a proper "fair value" analysis, the supporting spreadsheets that the Trump Organization provided to Mazars for the purpose of compiling the 2012 Statement reported a "telephone conversation with Eric Trump (9/24/2012)" as one basis of the

68

valuation derived from the projected development, and also noted that portions of the Seven

Springs property were "land to be donated." The supporting data for 2013 and 2014 cited to

similar conversations with Eric Trump on later dates.

241.    Those projections for developing mansions from Eric Trump were false in almost

every particular. For example, even if the Trump Organization had approvals to build seven

homes that would sell at $35 million each, it would be inappropriate to include that full amount

without performing a discounted cash flow analysis to account for the years it would take to

construct infrastructure, build homes, obtain additional approvals, and sell the number of homes

identified in the supporting data, or to consider the business risk inherent in an uncertain

residential development of previously undeveloped land. The implication of such a valuation is

that the lots or homes were ready to sell, and would do so, instantaneously—a false and

misleading (and, indeed, impossible) assumption.

242.    Eric Trump and the Trump Organization knew that the development projections

were not feasible and that they did not have the approvals necessary to support such a

development. By the time Eric Trump was cited as a source for the 2012 valuation, he was

already working with the Trump Organization's outside land-use counsel Charles Martabano and

its engineer to gain development approvals just for the Bedford portion of the Seven Springs

property's development (but not for portions in New Castle or North Castle).

243.    Indeed, from 2011 through 2016, Eric Trump not only led the Trump

Organization's efforts to develop the property, but also worked with outside tax counsel Sheri

Dillon to plan for and complete a conservation easement donation over parts of the property to

get a federal tax deduction. The easement donation was a recognition that the Trump

69

Organization would never be able to develop the property for anything approaching a $161 million return.

244.    In the process of evaluating the potential easement donation in 2012 over just the New Castle portion of Seven Springs, the Trump Organization retained a licensed appraiser who valued six potential lots at about $700,000 each in December 2012. Despite knowledge of this appraisal from a licensed appraiser, the Trump Organization ascribed a value of $23 million each for similarly sized lots in the adjacent Town of Bedford for the 2013 valuation.

245.    Asked to explain various aspects of the 2012 and 2013 valuations, Eric Trump repeatedly invoked his Fifth Amendment privilege.

246.    As the approval process bogged down further, from 2014 through 2016 the company, acting through Eric Trump and tax counsel Sheri Dillion, sought to value and then donate an easement over parts of the Seven Springs Estate in all three Westchester towns (North Castle, New Castle, and Bedford).

247.    Eric Trump was deeply involved in this process, taking the lead on the Seven Springs property within his family and the Trump Organization. At various times from 2011 to 2016, Eric Trump spent time living at the property and repeatedly met with town officials for Bedford and North Castle to discuss potential development of the site. As a result of those meetings, and as reflected in other correspondence, Eric Trump was aware that the Town of Bedford had imposed limitations on the ability of the Trump Organization to develop the Seven Springs property. Eric Trump was also aware that there was effectively no way to ameliorate the impact of these limitations because the Nature Conservancy, which held rights to a neighboring site, imposed significant restrictions on development of the property – restrictions that the Trump Organization sought to challenge unsuccessfully in litigation. Eric Trump concealed those

limitations from appraisers in order to inflate the value of the Seven Springs estate and fraudulently increase the value of the tax deduction from the resulting easement donation.

248.     Specifically, in July 2014, acting as an agent of the Trump Organization, Sheri Dillon engaged Cushman to "provide consulting services related to an analysis of the estimated value of a potential conservation easement on all or part of the Seven Springs Estate." David McArdle, an appraiser at Cushman, performed this engagement, which was to provide, only verbally, a "range of value" of the Seven Springs property.

249.     Mr. McArdle valued the sale of eight lots in the Town of Bedford, six lots in New Castle, and ten lots in North Castle. He used two different techniques to reach his range of values.

250.     In one spreadsheet, which he called "a sellout analysis," Mr. McArdle reached an average per-lot sales value of $2 million for the New Castle and North Castle lots, and $2.25 million for the Bedford lots. After preparing a cashflow analysis anticipating the timing for the sale of the lots and 10% rounded costs over five years, Mr. McArdle reached a rounded present value for all 24 lots of $29,950,000. In other words, Mr. McArdle—accounting for the time it would take to develop the property and discounting revenues and expenses to their present value—computed a value of just under $30 million for 24 lots, in sharp contrast to the 2013 and 2014 Statement valuations by the Trump Organization that used $23 million for *each* of the lots in Bedford.

251.     Using another valuation technique, Mr. McArdle also reached values "Before" and "After" an easement donation. He noted the eight Bedford lots were presently worth $1.5 million to $2.5 million each, for a range of $12 million to $18 million total. He noted six lots in New Castle at an estimated range of $1.5 million to $2 million for a total of $9 million to $12

million. Likewise, he noted ten lots in North Castle at an estimated range of $1.5 million to $2 million, for a total of $15 million to $20 million. Mr. McArdle provided these individual ranges of value to the Trump Organization verbally in late August or September 2014, which put the total value at between $29.5 million to $50 million.

252.    The Trump Organization, including Eric Trump and Allen Weisselberg, was thus in possession of Mr. McArdle's verbal appraisal conclusions of the lots at Seven Springs well before the finalization of the 2014 Statement of Financial Condition on November 7, 2014.

253.    Despite the Trump Organization's receipt of two valuations by a professional appraiser of 24 lots across three Westchester townships reflecting a value for the 24 lots under a "sellout analysis" of just under $30 million and under a "before/after" analysis between $29.5 million and $50 million, the 2014 Statement of Financial Condition valued seven non-existent mansions in just one of those townships (Bedford) at $161 million—without factoring in the time it would take to build and sell such homes, a factor McArdle had considered. The $161 million value placed on those Bedford lots was false and misleading.

254.    After receiving the 2014 valuation from McArdle, the Trump Organization declined to proceed with an easement donation in 2014.

255.    The Trump Organization did ultimately decide to make the easement donation for tax year 2015. In connection with that donation, in March 2016, two Cushman appraisers retained by the Trump Organization completed another appraisal of Seven Springs and concluded that the entire property (including undeveloped land and existing buildings) as of December 1, 2015 was worth $56.5 million. Like Mr. McArdle's verbal consultation, this March 2016 appraisal substantially undermined the much higher valuations of Seven Springs in the

Statements of Financial Condition from 2011 through 2014, which reflect valuations that range from $261 million to $291 million.

256.    But even the 2016 appraisal is overstated and fraudulent. Among other things, the March 2016 appraisal omits consideration of central facts known to (and indeed negotiated by) the Trump Organization regarding the number of lots that could be developed and sold based on the restrictions imposed by local authorities, and relies on other false assumptions, like an impossibly accelerated pace of planning and obtaining environmental approvals.

257.    More specifically, the Trump Organization:

   a.   Failed to inform the appraisers of restrictions imposed by the Town of Bedford that (i) limited the total number of lots that could be developed, and (ii) required the lots to be developed sequentially, extending the development timeframe by years.

   b.   Failed to inform the appraisers of restrictions arising from the litigation against the neighboring Nature Conservancy, which had been pending for years and had exhausted appeals.

   c.   Pushed the appraisers to otherwise use an accelerated development timeline that ignored the prior nine years of unsuccessful development efforts. Counsel for the Trump Organization even went so far as to push the appraisers to cut the development "sellout" timeline from an already unrealistic year to a mere three to six months, telling them: "the Bedford subdivision area already has preliminary approvals; as a result, we understand from our client that final approvals would likely take another that 3-6 months, as opposed to one year. We would like you to consider whether this fact results in 6 or so lots being sold earlier in the sellout analysis."

   d.   Falsely informed the appraisers that a report by Insite Engineering indicated that "the property was very long, very well down the road toward getting approvals." In reality, Insite Engineering never drafted any such report.

258.    Each of these facts would have significantly lowered the valuation of the Seven Springs property. Because the Trump Organization concealed this information, the Cushman appraisal materially overstated the value of the Seven Springs property by tens of millions of dollars.

73

Case 22-1175, Document 56, 09/26/2022, 3388914, Page83 of 224

259.   That Cushman appraisal was submitted to the Internal Revenue Service as part of an easement tax donation that ultimately, and fraudulently, reduced Mr. Trump's tax liability by more than $3.5 million.

260.   To cover up this scheme, Mr. Trump and his agents sought to avoid creating a documentary record. Mr. Trump advised his employee handling his real estate affairs in the Lower Hudson Valley, which included Seven Springs, that he did not want communications between them put in writing. Likewise, on June 18, 2015, his tax attorney, Ms. Dillon, instructed her associate to "call [Cushman appraiser] Tim [Barnes] and advise him to limit substantive emails with Scott Blakely (engineer) and instead use the phone to the extent possible (want to avoid creating discovery unnecessarily)." On September 28, 2015, Ms. Dillon sent an email to another associate at her firm, "Please use a fresh email when communicating with appraisers so that we avoid to the extent possible, email chains." The Cushman appraisers acceded to Ms. Dillon's request. As Mr. Barnes, the senior appraiser, wrote to the junior appraiser, "Bedford conversations with engineer, broker, or attorney should be phone calls, not email whenever possible."

261.   But even this inflated appraisal reflected a massive drop of more than 80% from the $291 million valuation of the Seven Springs estate in 2012, 2013, and 2014. To cover up that drop, which would have had a material effect on Mr. Trump's overall net worth, the Trump Organization, through Allen Weisselberg and Jeffrey McConney, altered the way the estate was reported on the Statement of Financial Condition.

262.   For the years 2011 through 2014, the asserted value for Seven Springs was listed individually on the summary page or property description for each Statement. But the Statement dated as of June 30, 2015 (which was not issued until after receipt of the March 2016 appraisal),

Case 22-1175, Document 56, 09/26/2022, 3388914, Page84 of 224

does not identify any value for the Seven Springs property. Instead, the property was moved into a catch-all category entitled "other assets," where its value was part of that category's total but not separately itemized.

263.     Between the 2014 and 2015 Statements, the "other assets" category was reported to have increased in value by $219.6 million, with the Seven Springs property representing a significant asset transferred to this category. To a reader, that increase would appear to be the result of the addition of the Seven Springs estate. But in reality, the increase was largely attributable to a massive, and fraudulent, increase in the value of Mr. Trump's penthouse Triplex apartment in Trump Tower.

264.     In other words, the Trump Organization concealed the precipitous drop in the value of the Seven Springs property based on the March 2016 appraisal by two misleading maneuvers – the property was moved into the "other assets" bucket without being itemized, and it was lumped together with the value of Mr. Trump's Triplex apartment, which had suddenly jumped by $127 million.

265.     But as discussed in the next section, the $127 million increase in the value of the Triplex for the 2015 Statement was only one example of how the value of Mr. Trump's personal residence was manipulated to fraudulently inflate his net worth.

### 8.  Mr. Trump's Triplex Apartment

266.     Between 2011 and 2015, the value of Mr. Trump's Triplex incorporated into the Statements of Financial Condition increased more than 400% – from $80 million to $327 million. The value of the apartment as included in the Statement each year from 2011 to 2021 is reflected in the table below:

| Statement Year | Trump Triplex Valuation |
|---|---|
| 2011 | $80,000,000 |
| 2012 | $180,000,000 |
| 2013 | $200,000,000 |
| 2014 | $200,000,000 |
| 2015 | $327,000,000 |
| 2016 | $327,000,000 |
| 2017 | $116,800,000 |
| 2018 | $116,800,000 |
| 2019 | $113,800,000 |
| 2020 | $105,946,460 |
| 2021 | $131,281,244 |

267.     The bulk of this fraudulently inflated value came from the misrepresentation in the years 2012 through 2016 that the apartment was 30,000 square feet, when in reality the apartment was only 10,996 square feet. That wildly overstated size was then multiplied by an unreasonable price per square foot.

268.     The result was an implausible valuation that was obscured by including the Triplex in the "Other Assets" category, which could include more than a dozen different properties and assets.

269.     Tripling the size of the apartment for purposes of the valuation was intentional and deliberate fraud, not an honest mistake. Documents demonstrating the true size of Mr. Trump's Triplex (most notably the condominium offering plan and associated amendments for Trump Tower) were easily accessible inside the Trump Organization, were signed by Mr. Trump, and were sent to Mr. Weisselberg in 2012. And Mr. Trump was of course intimately familiar with the layout of both the building and the apartment, having personally overseen the construction of both.

270.    Indeed, Mr. Trump told one biographer: "This is a very complex unit. Building this unit, if you look at the columns and the carvings, this building, this unit was harder than building the building itself." Mr. Trump lived in the apartment for more than two decades, using it for interviews, photo spreads, as a filming location in "The Apprentice," and even to host foreign heads of state.

271.    Yet when discussing the use of the 30,000 square foot estimate, Mr. Weisselberg guessed that it might have been the work of a broker who worked for Trump International Realty for a year between 2012 and 2013.

272.    But Mr. Trump has been misrepresenting the size of the apartment for years and did so before 2012. In 2010, for example, as part of the underwriting for a homeowner's insurance policy with Chubb, Mr. Trump personally conducted a tour of the apartment with a Chubb appraiser and misrepresented the size of the apartment as between 25,000 and 30,000 square feet. As the appraiser wrote:

> This was a unique appraisal appointment, before the site visit I was told there would only be 15 minutes to see the apartment, Mr. Trump was home at the time of the appraisal and wanted to do the walk through himself, I was unable to see the master bedroom and Mrs. Trump's dressing room per request of Mr. Trump (Mrs. Trump was sleeping).

> Although I was able to spend slightly longer the 15 minutes in the house, the appointment was conducted at a speed directed by Mr. Trump and there was not ample time to take measurement while on site.  Square footage was also not noted in the prior appraisal.  When Mr. Trump was asked the square footage he said he was not sure but thought it was between 25,000-30,000 square feet.  This seems high based on the walk through, due to this confusion the square footage used (11,194 which was found on propertyshark.com for the penthouse units which were combined in 1986-1989 by Mr. Trump).

> The square footage was removed from the agent/client report copies due to the confusion noted above.  Due to the multiple methods used to analyze the replacement cost noted above I feel confident in the total replacement value.

273.     In 2015, Mr. Trump took journalists from Forbes on a tour of the Triplex—to persuade them to increase the magazine's $100 million valuation—and represented the size as 33,000 square feet. Describing the tour two years later, Forbes wrote: "During the presidential race, Donald Trump left the campaign trail to give Forbes a guided tour of his three-story Trump Tower penthouse—part of his decades-long crusade for a higher spot on our billionaire rankings. . . . [Mr. Trump] bragged that people have called his Manhattan aerie the 'best apartment ever built' and emphasized its immense size (33,000 square feet) and value (at least $200 million). 'I own the top three floors—the whole floor, times three!'"

274.     Mr. Trump's grossly inflated estimate of the apartment's size was incorporated into the Statement of Financial Condition from at least 2012 through 2016.

275.     In 2011 the Statement incorporated a value for the apartment of $80 million, though the supporting data spreadsheet offered no specific rationale for that number. But an $80 million valuation would have valued the apartment at more than $7,200 per square foot, when the highest price for an apartment in the building that year was $3,027 per square foot.

276.     In 2012, the value of the Triplex was increased by $100 million in the Statement to $180 million. Allen Weisselberg asked an employee at Trump International Reality to value the apartment based on the assumption that the apartment was 30,000 square feet. That employee then told Weisselberg, and later McConney, that: "At 30,000 sq ft. DJT's triplex is worth between 4K to 6K per ft – or 120MM to 180MM." McConney incorporated the top number into the Statement. No apartment sold in New York City had ever approached that price, with the highest overall sale that year occurring at 15 Central Park West, a building completed just five years earlier. That sale, a penthouse for $88 million, was a record high price in New York City at the time. The *increase* in valuation of Mr. Trump's Triplex between 2011 and 2012 therefore put

the value at an amount that was higher than the highest price ever paid for an apartment in the city's history to that point.

277.   The next year, the value of the Triplex on the Statement increased to $200 million. This time McConney asked another employee at Trump International Realty to estimate a listing price – not a selling price – for the apartment, which she did using $8,000 per square foot and the inflated 30,000 square foot figure. Specifically she wrote:

> Doing the list now. As far as DJT's. One unit just sold for over 5000 a foot. However, another just came on the market at over 11K /sq ft.
> Which is not necessarily indicative of the market.
> Based on the activity in the luxury market and given how unique the apartment is , as well a tied to celebrity, I don't see how one would list below 8K per sq ft at this point. which brings us to @240,000M.. 200,000M is a safe estimate

278.   But a $200 million selling price would have translated to more than $18,000 per square foot for the Triplex based on its actual size. Executives in the Trump Organization were well aware of the true selling price for apartments in the building. For example, in October 2013, Allen Weisselberg's son sent him an article reporting on the highest priced sale in the history of Trump Tower, $16.5 million for a 3,700 square foot unit, reflecting a price of $4,459 per square foot.

279.   In the 2015 Statement the value of the Triplex jumped up again. The supporting data for Mr. Trump's 2015 Statement reported the value of Mr. Trump's Triplex as $327 million, based on a price per square foot of $10,900 multiplied by the inflated 30,000 square foot figure. (In reality, based on the actual size of the apartment, the true price per square foot reflected in this value was an incredible $29,738.) As support for this assertion, McConney cited an email from yet another Trump International Realty employee, who reported her review of sales at buildings "most likely to be the highest: 15 CPW, One57, 432 Park Ave."

79

280.     The $10,900 price that McConney used in preparing the Statement was inappropriate for two reasons. First Mr. McConney pulled the number from a penthouse sale at One57 that the New York Times reported as marking the first sale above $100 million in Manhattan and "shattering the record for the highest price ever paid for a single residence in New York City."

281.     Second, Mr. McConney used an erroneously high price per square foot for the penthouse at One57. The sale price for the penthouse was actually $9,198 per square foot. As shown below, because the email contained a stray dollar sign in front of the square footage for the apartment at issue, Mr. McConney simply grabbed the highest number he could find (10,923), rounded it off to 10,900, and used it as the price per square foot even though it was actually the square footage of the apartment and the price per square foot was clearly shown as "$9,198 PPSQFT":

Highest was $9,390 PPSQT at 15 CPW only 2,761 sqft for $29,995,000
Highest among the larger unit was $9,198 PPSQT at One57 unit 90,  $10,923 sqft for $100,471,453. Closed on 12/23/14.
The rumored in contract at 432 Park Ave, PH at 95 mil for 8,255 sqft comes to $11,508 PPSQFT.  Unit 91A is currently on the market for $40,250,000, only 8,255 sqft comes to $11,308 PPSQFT. We heard few combined PH with 10,000 to 15,000 sqft fetched over $11,000 to $15,000 PPSQFT but no confirmation.

282.     In short, Mr. McConney, with the approval of Mr. Weisselberg, not only used the fraudulently inflated apartment size, but used a price per square foot 15% higher than a record-setting sale in a brand new building. And based on the actual smaller size of Mr. Trump's apartment, the value of $327 million for the apartment translated to a price per square foot that was more than *triple* the record-setting price per square foot paid for the penthouse at One57.

283.     As the New York Times reported in 2018, Trump buildings were no longer competitive with such newly built luxury buildings. "Even at Trump Tower, where Mr. Trump

80

has a triplex, sales peaked in 2013, with average prices at $3,000 per square foot, and have fallen

since then, according to . . . a real estate marketing consultant. Sales are now running about

$2,000 a square foot."

284.    That same article explicitly called out the difference with the buildings used as a

comparison in the Statement. "And when compared with the new generation of ultraluxury

buildings along Billionaire's Row, a stretch of 57th Street that includes Trump Tower, the

average Trump apartment is worth far less. The sales average, for instance, at 432 Park Avenue

was $5,564; $4,051 at Time Warner Center; and $3,812 at One 57, the skyscraper at 157 57th

Street, according to CityRealty."

285.    The Trump Organization used the fraudulent square footage again in the 2016

Statement of Financial Condition, despite being directly informed by Forbes Magazine that the

measurement was false. On March 3, 2017, just a week before the 2016 Statement was

published, Forbes emailed Alan Garten, General Counsel of the Trump Organization, a series of

questions about "President Trump and his business connections around the world." The email

included this question:

**TRUMP TOWER PENTHOUSE**

1) President Trump has told Forbes in the past that his penthouse occupies 33,000 square feet, comprising the entirety of floors 66-68 of Trump Tower. Property records (notably the latest amended condo declaration, dated October 11, 1994). Is the 1994 declaration accurate and up-to-date? It shows President Trump's apartment is 10,996.39 square feet.

286.    Mr. Garten forwarded the email to others in the Trump Organization, including

Donald Trump, Jr., Eric Trump and Allen Weisselberg. Donald Trump, Jr. responded, "Insane

amount of stuff there."

287.    Three days later, Mr. Garten wrote to Amanda Miller, a Vice President of

Marketing for the Trump Organization, that "I handled everything except Trump World Tower

and Trump Tower." Ms. Miller responded, "Thank you Alan – I spoke to Allen W. re: TWT and

TT – we are going to leave those alone."

     288.    On March 10, 2017, Donald Trump, Jr. and Allen Weisselberg represented to

Mazars that the information in the Statement was accurate and complied with GAAP. They

further certified that:

14) No events have occurred subsequent to the date of the statement of financial condition and through the date of this letter that would require adjustments to, or disclosure in, the personal financial statement.

15) We have responded fully and truthfully to all inquiries made to us by you during your compilation.

16) In regards to the financial statement preparation services performed by you, we have:
    a) Assumed all management responsibilities.
    b) Overseen the services by designating an individual who possesses suitable skill, knowledge, and/or experience.
    c) Evaluated the adequacy and results of the services performed.
    d) Accepted responsibility for the results of the services.

Very truly yours,

_____
Allen Weisselberg
Chief Financial Officer
Trustee, The Donald J. Trump Revocable
Trust dated April 7, 2014, as amended

_____
Donald J. Trump, Jr.
Executive Vice President
Trustee, The Donald J. Trump Recovable
Trust dated April 7, 2014, as amended

     289.    That same day Mazars published the 2016 Statement, which incorporated the false

30,000 square foot measurement that translated into a $327 million valuation of the Triplex.

     290.    Three days later, the Trump Organization sent the 2016 Statement to Deutsche

Bank as required by the terms of its loans, and Donald Trump, Jr. certified that the Statement

"presents fairly in all material respects the financial condition of the Guarantor at the period

presented."

Case 22-1175, Document 56, 09/26/2022, 3388914, Page92 of 224

291.    During his sworn testimony, before invoking his Fifth Amendment privilege, Mr.

Weisselberg conceded that using the false square footage had the effect of improperly inflating

the value of the apartment almost threefold. Mr. Weisselberg admitted that this amounted to an

overstatement of "give or take" $200 million, testifying in the following exchange: "Q: In fact,

[the value was] overstated by a factor of 3, is that correct? A: I didn't do the math, but it should

be one third, yes, I would agree with that. Q: So, it's on the order of a $200 million

overstatement, give or take? A: Give or take."

292.    Each year, from 2012 to 2016, the practice of fraudulently inflating the value of

the Triplex was carried out by McConney and Weisselberg, at the express direction of Donald J.

Trump. When asked about the scheme during his sworn testimony, Mr. Trump invoked his Fifth

Amendment privilege against self-incrimination by stating "same answer," which incorporated

by reference his initial invocation of the privilege at the beginning of his interview:

```
        Q.      You are aware that from 2012
through 2016, the value of your triplex
apartment in Trump Tower was calculated by
multiplying 30,000 square feet times a
price per square foot; is that correct?
        A.      Same answer.
        Q.      And you personally directed the
use of the 30,000-square-foot figure in
valuing your apartment for the Statement of
Financial Condition in those years; is that
correct?
        A.      Same answer.
        Q.      The 30,000-square-foot figure is
false; is that correct?
        A.      Same answer.
        Q.      When you directed the use of
that square footage to value your triplex,
you knew that the 30,000-square-foot figure
was false; correct?
        A.      Same answer.
```

83

293.     Only after Forbes published an article in May 2017 entitled "Donald Trump has Been Lying About the Size of His Penthouse" did the Trump Organization stop inflating the square footage for the apartment. For the 2017 Statement the valuation of the apartment dropped to $116,800,000. The reported value continued to drop to a low of $105,946,460 in the 2020 Statement before rising to $131,281,244 in 2021. And even those numbers inflated the true value of the Triplex based on a still-unreasonably high price per square foot based on sales of apartments in buildings that were not comparable to Trump Tower.

### 9.   1290 Avenue of the Americas and 555 California (Vornado Partnerships)

294.     Mr. Trump's Vornado Partnership Interests consist of 30% limited partnership interests in entities that own two commercial properties: 1290 Avenue of the Americas in New York City and 555 California Street in San Francisco.

295.     For the Statements of Financial Conditions from 2011 through 2021, Mr. Trump and the Trump Organization calculated the value of Mr. Trump's interest in the Vornado Partnership Interests by taking 30% of the values they calculated for the 1290 Avenue of the Americas and 555 California buildings, net of debt, without considering the nature of Mr. Trump's limited partnership interest, to derive the following amounts:

| Statement Year | Value of Limited Partnership Interest |
|:---:|:---:|
| 2011 | $729,900,000 |
| 2012 | $823,300,000 |
| 2013 | $745,800,000 |
| 2014 | $816,900,000 |
| 2015 | $946,000,000 |
| 2016 | $979,500,000 |
| 2017 | $1,195,800,000 |
| 2018 | $1,211,900,000 |

84

| Statement Year | Value of Limited Partnership Interest |
|:---:|:---:|
| 2019 | $1,307,900,000 |
| 2020 | $883,300,000 |
| 2021 | $645,600,000 |

296.     These values for Mr. Trump's interest in 1290 Avenue of the Americas and 555 California are false and misleading for many reasons, as discussed below.

> a.  *The Restricted Nature of Mr. Trump's Limited Partnership Interest*

297.     As set forth more fully *supra* at ¶¶ 68 – 71, the pertinent partnership agreements place the General Partner (*i.e.*, Vornado) in control of those partnerships, including with respect to the amount of any cash distributions (if any) or reinvestment decisions.

298.     Moreover, the pertinent partnership agreements sharply limit Mr. Trump's ability to exit the partnerships. In particular, the agreements provide: "The term of the Partnership *shall continue* until December 31, 2044, on which date the Partnership shall dissolve, unless sooner dissolved upon the occurrence of any of the events specified in Section 17.1." The few exceptions to that rule are outside of Mr. Trump's sole control.

299.     The pertinent partnership agreements also sharply limit withdrawal by any partner, or sale or transfer of a partner's interest in the partnership. "No partner may withdraw from the Partnership or assign or transfer its Partnership Interest in whole or in part, except as provided in Articles 10 and 11 hereof." Article 10 of the pertinent partnership agreements provides, among other things, that "a Partner may not, directly or indirectly, sell, assign, transfer or otherwise dispose of (collectively, "*Transfer*") all or any part of its Partnership Interest (including, without limitation, the right to receive allocations of income, profits and losses and/or distributions of cash flow) . . . without the prior written consent of the General Partner, which

85

consent may be granted or withheld in the sole discretion of the General Partner." Article 11

refers to the "dissolution, resignation or bankruptcy of the General Partner."

300.    Additionally, the partnership agreements bar Mr. Trump from pledging his

Vornado Partnership Interests to a bank to secure a loan except under limited circumstances that

do not apply.

301.    GAAP requires, when presenting the value of an interest owned in a partnership

or joint venture, that the specific interest that is owned be valued in its entirety—and that the

value of that interest be presented as one line item rather than broken apart and buried within

multiple line items in multiple categories of assets.

302.    All of the valuations of Mr. Trump's limited interest in the Vornado Partnership

Interests from 2011 to 2021 violate this standard. Indeed, they do not compute a value for Mr.

Trump's interest in these specific partnerships, with their associated restrictions on sale and cash

distributions. None of the valuations even attempts to ascertain what the value of Mr. Trump's

restricted interest would be on the open market, assuming he even were permitted to sell it.

Instead, the valuations are false and misleading because they are based on the fiction that by

virtue of his limited partnership interest, Mr. Trump owns 30% of two buildings, with Mr.

Trump's interest calculated by simply taking 30% of the value net of debt of each building the

partnerships owned.

303.    Any hypothetical buyer of Mr. Trump's limited stake in the Vornado partnerships

would consider the restrictions on sale and cash distributions when valuing such interest. Any

such buyer would appreciate the possibility (at Vornado's discretion) of receiving *no* cash or

profit distribution from the properties over an extended period of time—and factor that potential

limitation on the return on investment into its assessment. Similarly, any such hypothetical buyer

would understand that the partnership agreements, by their plain terms, limit exit from the investment for *decades*—another factor a reasonable buyer would consider in deciding whether to purchase Mr. Trump's interest and at what price. Nor was any discount applied reflecting the fact that Mr. Trump's limited minority stake entailed essentially no control over business operations.

304.     The Trump Organization's written descriptions of these valuations were misleading. From 2012 through 2018, for example, the Statements misleadingly asserted: "Mr. Trump owns 30% of *these properties*," as opposed to holding minority, restricted stakes in particular partnerships. In 2019 and 2020, the SOFC added that he owned "30% of these properties *as a limited partner*," but continued employing the same valuation method of reporting what Mr. Trump owned as simply 30% of the calculated buildings' value net of debt.

305.     Mr. Trump and the Trump Organization were well aware of restrictions on Mr. Trump's limited partnership interest—having engaged in extensive litigation regarding the Vornado partnership agreements. But nowhere do the Statements of Financial Condition or the supporting data consider the restricted nature of what Mr. Trump owns through his limited partnership interests (despite the Statements' representations that the valuations "reflect[ed]" his "interest"). Indeed, the first time the junior employee charged with preparing the Statement from 2016 forward saw one of the pertinent partnership agreements was during the course of OAG's investigation.

> b.   *The False and Misleading Valuations of the Buildings*

306.     As noted, in each year from 2011 to 2021, the Statement's valuations of the Vornado Partnership Interests were a function of simply apportioning at a 30% rate valuations of 1290 Avenue of the Americas and 555 California, net of debt.

307.     Those valuations were calculated based on dividing an NOI by a capitalization rate. During the period 2011 through 2021, evidence reveals that the Trump Organization in repeated instances manipulated components of that formula to inflate the value of the Vornado Partnership Interests.

308.     As with other properties, the Trump Organization misleadingly represented that "outside professionals" had done "an evaluation" with Mr. Trump or his trustees. In reality, the company's typical practice was to cherry-pick favorable capitalization rates from generic reports and then misleadingly represent the valuation was the result of "an evaluation" done with an outside professional.

309.     The supporting data often provided no rationale for why the Trump Organization selected only from the low end of the range of capitalization rates in the source materials to value the properties, or why the company ignored higher capitalization rates listed in the source material for buildings that were comparable to the Vornado properties. And, in several instances, the Trump Organization only provided to Mazars excerpts of the market data relied upon.

310.     For example, in the 2012 Statement, the Trump Organization relied on market reports circulated by Doug Larson of Cushman reflecting rates between 3.12% and 3.95% for office buildings on Lexington Avenue and Fifth Avenue between 51st and 53rd Streets to derive an "average" rate of 3.4% for 1290 Avenue of the Americas. Yet Mr. Larson had authored an appraisal for another entity in October 2012 that concluded an appropriate capitalization rate for 1290 Avenue of the Americas was 4.59%, producing a value ($2.0 billion) that was $800 million less than the Trump Organization's calculation.

311.     It was false and misleading for the Trump Organization to suggest that the valuation that derived a capitalization rate of 3.4% for 1290 Avenue of the Americas was done

"in conjunction" with Mr. Larson when he had not opined to the Trump Organization on the capitalization rate but instead determined in an essentially contemporaneous appraisal report for the same property that the appropriate rate was 4.59%.

312. The Trump Organization purported to rely on "an evaluation" done with Mr. Larson again in 2013 to use a capitalization rate of 3.12% for 1290 Avenue of the Americas—generating a value of $2.989 billion, $989 million higher than Mr. Larson actually had reached in an appraisal completed only months earlier. The Trump Organization even misleadingly relied on the "investment grade" nature of the property in that year, despite public investment reports providing the appraised value of $2.0 billion.

313. Indeed, in four instances – for 1290 Avenue of the Americas in 2016 through 2019 – the Trump Organization selected a low capitalization rate based on just the single sale of one property listed in generic market reports.

314. In 2016, the Trump Organization misleadingly attributed to Mr. Larson a capitalization rate of 2.90%, which was cherry-picked from a generic market report. Indeed, until a last-minute change, the Trump Organization used other figures that even it identified as coming from comparable buildings—but then opted to lower the cap rate and use a value $400 million higher. Mr. Larson testified that the supporting data's reference to him in connection with this valuation was inaccurate. In 2017, the Trump Organization continued to use that 2.90% figure, attributing it to a different appraiser who also testified he did not provide the Trump Organization with any indication of what particular capitalization rate to use.

315. Similarly, in 2017, for 555 California, the Trump Organization only received a generic market report and selected two sales to derive a 3.8% capitalization rate for the property.

89

Case 22-1175, Document 56, 09/26/2022, 3388914, Page99 of 224

Only an excerpt of that report was provided to Mazars. The full report contained a series of much higher rates for Class A office buildings.

316. The 2018 and 2019 valuations of 1290 Avenue of the Americas placed the value of the building over $4 billion, based on a misleading, cherry-picked choice of the same 2.67% capitalization rate used for Trump Tower in 2019.

317. The Trump Organization stated that it performed "an evaluation" with an outside professional, and the supporting data attributes the capitalization rate to information provided by an appraiser. But the Trump Organization knew the numbers chosen were flatly inconsistent with that appraiser's conclusion—because they actually asked him in May 2018 to confirm his statement that a capitalization rate in the 4-4.5% range was appropriate for 1290 Avenue of the Americas; and then the Trump Organization appears to have used what it understood to be the appraiser's view to push back on a valuation by a news organization.

318. As with the Trump Tower valuation in 2019, the use of the 2.67% figure in 2018 and 2019 for 1290 Avenue of the Americas was misleading. The market data point relied upon dictated using 4.45% –not 2.67%—as a capitalization rate when applied to "stabilized" NOI. The 2018 and 2019 valuations of 1290 Avenue of the Americas were, according to the Statements, based upon a "stabilized" NOI. Using 4.45% rather than 2.67% would have decreased the value of 1290 Avenue of the Americas by more than $1.5 billion in 2018 and 2019.

319. With respect to the NOI, the Trump Organization in many years misleadingly described such income as "the net operating income," suggesting this was the net cash *the Trump Organization would derive* from the buildings' operations. But the cash flow to Mr. Trump and the Trump Organization was limited by the terms of the partnership agreements and could be

90

zero in the exercise of the general partner's discretion. The Trump Organization instead computed the values of his Vornado Partnership Interests based on cash flow the *partnerships* would derive from the buildings' operations—not the cash flow Mr. Trump would derive (at Vornado's discretion).

320.    For the years 2017 to 2021, the Trump Organization purported to use the "stabilized net operating income" and claimed in supporting spreadsheets that the NOI figures to derive the values for the properties came from audited financial statements. Those statements were false and misleading. In reality, the Trump Organization, at the direction of Allen Weisselberg, frequently used unaudited reports and then adjusted them to suit its own purposes by adding millions of dollars in net operating income to the figures.

321.    In the real estate industry, the term "stabilized" typically means that a building is at its average or typical occupancy that would be expected over a specified projection period or over its economic life. No definition of the term "stabilized" was given in the Statements for these years. There is no indication that any analysis was done to conclude that the unaudited figures used, or the adjustments to them, reflected the typical or average occupancy and financial performance the properties would experience over any period of time – as distinct from generating a one-off figure that inflated NOI to be used solely for a valuation on Mr. Trump's Statement of Financial Condition.

322.    Moreover, for all years in which the Trump Organization padded the 1290 Avenue of the Americas NOI by inclusion of millions of dollars in revenue to achieve a purportedly "stabilized" figure, combining that tactic with the selection of the lowest or near-lowest capitalization it could pull from generic reports was misleading. To the extent either approach could be justified on the basis of "upside" in the property, using *both* tactics at the

same time effectively double-counted such potential upside and thus was a wholly improper valuation approach. The Trump Organization either knew, or should have known, that approach was improper.

### 10. Las Vegas (Ruffin Joint Venture)

323.     The Trump International Hotel and Tower – Las Vegas ("Trump Vegas") is a hotel condominium property in Las Vegas, Nevada. Mr. Trump and Philip Ruffin each own half of a joint venture that built the property and continues to own the hotel and all of the unsold condominium units.

324.     Prior to 2013, the Statements omitted Mr. Trump's 50% interest in the property.

325.     From 2013 through 2021, the Statements listed an inflated value for the property using some of the same deceptive techniques Mr. Trump and the Trump Organization used to fraudulently inflate valuations of Mr. Trump's other properties, including failing to discount future cash flows and projecting future income from the sale of residential units that assumed prices well in excess of what the units were actually selling for in the marketplace, while ignoring the values derived and methods used in earlier appraisals that were never disclosed.

326.     In 2011 and 2012, the Trump Organization hired an appraiser to contest property taxes assessed on Trump Vegas before the Clark County and Nevada tax authorities. The 2011 appraisal used a discounted cashflow analysis to appraise 932 unsold condominium units and the separate hotel unit, applying a discount rate of 12% to the units and 12.5% to the hotel. Eric Trump sent this appraisal—which valued the units and hotel at $115,689,000 and $12,690,000, respectively—to Allen Weisselberg, writing: "The tax appeal for the hotel component is happening today and appeal on the units themselves in scheduled for March 11th. I'll let you know how we make out later this afternoon...."

92

Case 22-1175, Document 56, 09/26/2022, 3388914, Page102 of 224

327. The Trump Organization ordered another appraisal of the condominium units using the same approach from the same appraiser in 2012. Based on a conclusion that the units would need 10 years to be fully sold—with the majority sold more than five years in the future—and applying a discount rate of 10% to these cashflows to calculate the present value of the income, the appraiser determined that the value of the unsold residential units was $111,500,000. This was far less than the roughly $178 million in outstanding loans payable on the property at the time—but that made the appraised value a favorable result for the Trump Organization, because a lower value would result in a lower tax bill.

328. After receiving this appraisal from outside tax counsel, Eric Trump wrote, "I take it you are happy with the work?" The attorney replied, "I am happy with the work and think the [Clark County Board of Equalization and the Nevada State Board of Equalization] will buy the value . . . . I am optimistic."

329. Thus, the Trump Organization and its executives, including Eric Trump and Allen Weisselberg, understood any analysis of the value of the property's future cash flows required the application of a discount rate—and they had expressly adopted that position in their submissions to the county and state government tax authorities.

330. Despite having submitted the 2011 and 2012 appraisals to government taxing authorities, the Trump Organization ignored those appraisals when valuing Trump Vegas for the 2013 Statement.

331. Instead, at Eric Trump's request, a Trump Organization employee provided an approach that discarded both the assumptions and methodology used by the appraiser and incorporated misleading figures from Mr. Weisselberg into a document that purported to illustrate cashflows to the Trump Organization from the sale of Trump Vegas condominium

93

Case 22-1175, Document 56, 09/26/2022, 3388914, Page103 of 224

units. Mr. McConney later sent a version of this approach to Mazars to include in the 2013 Statement.

332.    Where the appraiser had concluded it would take a decade to sell the remaining units, the Trump Organization assumed all units would be sold in half that time, by 2018. Where the appraiser had projected a sales price for the condominiums of roughly $369 per square foot and the Trump Organization had sold in bulk a number of units to Hilton for $400 per square foot, the Trump Organization—just a year later—used a range of projected sale prices starting with $528 per square foot in 2013 and topping out at $724 per square foot in 2018.

333.    And where the appraiser had used a 10% discount rate, the Trump Organization used none at all, instead treating the future revenue from condominium sales (calculated to be $123 million) as if it represented the present value of the property—in violation of GAAP.

334.    The failure to include a discount rate inflated the Trump Organization's valuation significantly. For example, $8,749,295 of projected Trump income from 2018—which, applying the appraiser's discount rate of 10%, should have been valued at about 62.5 cents on the dollar or $5.5 million—was valued at $8,749,925 in 2013.

335.    Notably, the $123 million valuation was a 10% increase over the tax appraisal's $111.5 valuation from January 2012—and this despite the facts that (1) the tax appraisal did not appraise Mr. Trump's 50% interest; (2) the tax appraisal's value did not subtract debt; and (3) between January 1, 2012 (the appraisal date) and June 30, 2013, more than one hundred condo units had sold, reducing the amount of property held by the Vegas joint venture.

336.    Examining additional appraisals obtained by the Trump Organization for tax purposes in 2015 and 2016 next to the valuations provided in the Statements for those same years highlights the fraudulent intent—and duplicity—of the Trump Organization's approach.

94

Case 22-1175, Document 56, 09/26/2022, 3388914, Page104 of 224

337.    In 2015, the Trump Organization obtained an appraisal to contest the tax
assessments for the hotel portion of Trump Vegas that reached a value of $24,950,000 after
identifying numerous risks factors that would decrease the property's value, including that the
property was a "first venture in the Las Vegas market of a stand-alone tower that is not directly
located along Las Vegas Boulevard South and contains no gaming."

338.    Outside tax counsel James Susa emailed the appraisal to Eric Trump.
Emphasizing that the goal of the appraisal was to reach a lower value, Mr. Susa wrote: "Here is
the appraisal of the hotel unit at just under $25 million. I had asked [the appraiser] to come in
around $20 million but you were making too much money for him to get that low."

339.    The appraisal had its intended effect; while it was initially rejected as too low by
the Clark County Assessor and the Clark County Board of Equalization, the Nevada State Board
of Equalization overturned those conclusions on appeal. As Mr. Susa described the State hearing
to Eric Trump, "We cleaned their clock . . . . First comment from the Board was 'this is a
complex appraisal assignment, the taxpayer brought us an appraisal, that does it.' Second
comment from the Board was 'move to approve the appraised number, second, all in favor,
unanimous, thanks for coming.'" The Trump Vegas tax assessment was lowered accordingly.

340.    By contrast, the Trump Organization's valuation of Trump Vegas that year for
purposes of the Statement was again designed to falsely inflate the value of Mr. Trump's stake in
the venture and disregarded the appraisal. Mr. McConney provided a valuation of $107,732,646
to Mazars. The valuation assumed a price per square foot for sales in 2016 of $506 and that all
units would be sold by 2020 with a price per square foot of $673 in that final year, without any
discount of these projected future revenues at all, again in violation of GAAP.

95

Case 22-1175, Document 56, 09/26/2022, 3388914, Page105 of 224

341.    In 2016, however, when the Trump Organization retained its appraiser to prepare another appraisal for tax purposes—to argue this time that the remaining unsold condo units were worth less—the appraiser reached a much different set of conclusions. He argued that the appropriate price per square foot for sales in 2016 was $450 (11% less than the Trump Organization's 2015 analysis) and that it would take nine more years to sell the remaining units. He applied a 12.5% discount rate to future cashflows, meaning that, for instance, revenues from 2020 sales would be valued at 55.5 cents on the dollar in the present day. Using these methods, he reached a valuation of $95,500,000 as of July 1, 2016.

342.    Trump Organization outside counsel, Mr. Susa, asked Eric Trump to carefully consider whether to submit this appraisal to taxing authorities: "I need you, in ALL your free time (kidding you a little), to tell me if there is anything in the appraisal that gives you heartburn from giving it to the Assessor's office."

343.    There was good reason for the Trump Organization to be concerned about disseminating the appraisal: just as in 2015, the valuation of Trump Vegas in the 2016 Statement—which was made as of June 30, 2016, just one day prior to the date of the 2016 appraisal—adopted much more aggressive assumptions to reach a much higher valuation of Mr. Trump's 50% stake in the remaining condo units of $107,508,863.

344.    Reflecting disappointing sales that year, the 2016 Statement valuation used about the same price per square foot as the appraiser had, $441. But it projected significant increases in the sales price every subsequent year, with units selling for $704 per square foot by 2019. By contrast, the 2016 appraisal had assumed units would sell at only $476 per square foot in 2019.

345.    These increased projections drove the value even higher because the 2016 Statement valuation—like every other since 2013—ignored the time value of money and failed

96

Case 22-1175, Document 56, 09/26/2022, 3388914, Page106 of 224

to discount future revenues. So, for instance, $34,047,415 in 2020 cashflows were valued as money in hand for the Trump Organization's Statement valuation. If the Trump Organization had used the 12.5% discount rate the appraiser had applied, that money would have been valued at 62.5 cents on the dollar, or about $21.3 million in 2016.

346.    By using the fraudulent valuation methods and assumptions described above, the Trump Organization was able to inflate the value of Trump Vegas in each of the years from 2013 to 2016. Eric Trump, invoking his Fifth Amendment right against self-incrimination, refused to answer questions related to his participation in the drafting of each of the 2013 through 2016 Statements.

347.    For the 2017 and 2018 Statements, the Trump Organization changed its approach to an even more blatantly fraudulent method to value the then-remaining Trump Vegas condominium units, which was done at the direction of Mr. Weisselberg or Mr. McConney. Instead of purporting to estimate revenue from the anticipated sale of the units over time, the Trump Organization simply added together "list" prices of the remaining units and treated this sum as the present value of the property (with certain adjustments to acknowledge expenses and the debt service on the loan secured by the property).

348.    The Trump Organization's use of "list" prices for the units to generate the 2017 and 2018 valuations was false and misleading in two respects. First, like earlier valuations, it ignored the requirement under GAAP to discount future cash flow to derive present value. Second, by using "list" prices, the valuation employed per-square-foot prices that were more than 50% greater than actual recent closed sales at the Trump Vegas property—as reflected on the backup material itself.

97

Case 22-1175, Document 56, 09/26/2022, 3388914, Page107 of 224

349.     In 2019, the Trump Organization modified its approach to include a 14% discount for "Sale Price vs List Price" and deductions for closing costs in connection with condominium sales, effectively conceding that its approach in the prior two years of using the "list" price without adjustment was false and misleading. But—despite performing a present-value analysis in connection with the hotel portion of the same property —the Trump Organization continued its misleading practice of valuing cash flow from condominium sales without discounting to present value.

350.     The Trump Organization continued to use this same approach in 2020 and 2021— again failing to discount to present value cash flow from future condominium sales—but acknowledging that the "list" prices needed to be adjusted downward.

351.     The records related to the 2021 valuation demonstrate how unrealistically aggressive the Trump Organization's previous projections had been with respect to how long it would take to sell all of the condominium units. For the 2013 valuation, the Trump Organization had assumed that all units would be sold by 2018, but in 2021 there were still 288 unsold units.

352.     And where the 2013 projections assumed a price per square foot reaching $724 by 2018, the most recent offer the Trump Organization had received in 2021 for a condominium was $462 per square foot. The Trump realtor who had received this offer—which was substantially below the Trump Organization's projected future price per square foot used in every Statement valuation since 2013—described it as "not bad."

**11. Club Facilities and Related Real Estate**

353.     The Statements of Financial Condition do not list separate values for each of Mr. Trump's club facilities. Instead, the values for those properties are lumped together into a single figure under the heading "Club Facilities and Related Real Estate." That figure represents far and away the single largest source of value in each year as reflected below:

Case 22-1175, Document 56, 09/26/2022, 3388914, Page108 of 224

| Statement Year | Total Club Value | % of Total Asset Value |
|---|---|---|
| 2011 | $1,314,600,000 | 28.6% |
| 2012 | $1,570,300,000 | 31.3% |
| 2013 | $1,656,200,000 | 30.1% |
| 2014 | $2,009,300,000 | 31.9% |
| 2015 | $1,873,300,000 | 28.5% |
| 2016 | $2,107,800,000 | 33.0% |
| 2017 | $2,159,700,000 | 34.1% |
| 2018 | $2,349,900,000 | 35.7% |
| 2019 | $2,182,200,000 | 33.2% |
| 2020 | $1,880,700,000 | 36.5% |
| 2021 | $1,758,000,000 | 35.3% |

354.     The result of using an aggregated figure is that a reader of the Statements receives only the total value ascribed to the clubs and related properties and cannot discern from the Statements the value assigned to any particular club in that category or the method of valuation used for any particular club.

355.     That practice by design allowed Mr. Trump and the Trump Organization to conceal significant swings in the value attributed to individual clubs and changes to the individual methods employed to arrive at those values. Those fluctuations were necessary to perpetuate the scheme of inflating Mr. Trump's net worth during the period 2011 to 2021.

356.     The Statements of Financial Condition for the years 2011 through 2019 claim, among other things, that the valuations for each property comprising the category "Club Facilities and Related Real Estate" were reached through an assessment or evaluation prepared by Mr. Trump working in conjunction with his associates and outside professionals.

357.     As with all other valuations prepared for these Statements, this asserted work with "outside professionals" when preparing the valuations for the club facilities was false.

99

Case 22-1175, Document 56, 09/26/2022, 3388914, Page109 of 224

358.    Outside professionals were not retained to prepare any of the valuations for any of "Club Facilities and Related Real Estate" properties for purposes of Mr. Trump's Statements of Financial Condition. The veneer of participation by independent professionals in the preparation of the valuations comprising this category was false and misleading.

359.    In 2020, employees of the Trump Organization were asked about the various references to "outside professionals" on the Statements of Financial Condition in sworn testimony before OAG. Thereafter, the Trump Organization changed the wording for the 2020 Statement, omitting any representation that any particular valuation was reached in consultation with "outside professionals" and instead listing outside professionals as merely one factor that may have been "applicable" in some unspecified manner.

360.    The Trump Organization's abrupt removal of any specific references to consultation with outside professionals in connection with specific club valuations is a tacit admission that such references in prior years were inaccurate and misleading.

361.    As detailed in the sections below discussing individual clubs, Mr. Trump and the Trump Organization employed various deceptive schemes at particular clubs in particular years to inflate the club values. These schemes included: (i) valuing the clubs based on the "fixed assets" of the clubs – in other words the money spent to acquire and maintain them – despite being informed by valuation professionals that this practice was inappropriate for a club operating as an on-going business; (ii) adding a "brand premium" despite the fact that including an internally developed intangible brand premiums is prohibited by GAAP and the Statements expressly claim to exclude brand value; (iii) estimating the anticipated income from developing and selling residential units on club property based on assuming sale prices that far exceed what the market will bear, ignoring zoning requirements, and failing to include any present value

100

calculation to account for the time required to build and sell the units; (iv) inflating the purchase price of the clubs by claiming to have assumed debt for refundable membership deposits, despite express disclosures in the Statements that Mr. Trump attributed no value to those liabilities; and (v) inflating the value of unsold memberships, often by over one hundred thousand dollars per membership, even in situations where such memberships were being given away for free at Mr. Trump's direction to boost membership numbers.

### a. Mar-a-Lago

362.    The Trump Organization and Mr. Trump knew that Mar-a-Lago was subject to a host of onerous restrictions and limitations—*agreed to and signed by Mr. Trump*—that precluded any usage of the property as anything other than a club, precluded the property's residential subdivision, and required considerable preservation expenses, among other limitations. Despite full knowledge and awareness of those facts, the Trump Organization valued Mar-a-Lago in each year from 2011 to 2021 based on the false premise that those restrictions did not exist. For these and a host of other reasons, all of the valuations of this property were false and misleading.

363.    As Mr. Trump's submission to the locality stated, the property was too expensive to be used and preserved as a private residence, that it was a "white elephant" that "was almost impossible to sell" in that form, and that it therefore needed to be converted to club usage so that its preservation could be "at the expense of a limited group of members, most of whom will be Palm Beach residents." As Mr. Trump has previously recognized, "both the U.S. Government and State of Florida deemed Mar-a-Lago unsuitable and too expensive for a retreat by government officials."

101

Case 22-1175, Document 56, 09/26/2022, 3388914, Page111 of 224

364.    In the course of urging approval for usage of Mar-a-Lago as a club, Mr. Trump and his agents disparaged residential development as an option and acknowledged that local authorities had rejected a residential subdivision on the property.

365.    Moreover, Mr. Trump and his agents, when seeking local approval to use Mar-a-Lago as a club, recorded an agreement with the Town of Palm Beach providing, among other things, that "[t]he use of the Land shall be for a private social club" and that "[t]he Land, as described herein, shall be considered as one (1) parcel and no portion thereof may be sold, transferred, devised or assigned except in its entirety, either voluntarily or involuntarily, by operation of law or otherwise." The agreement likewise contained onerous preservation restrictions covering "critical features" of Mar-a-Lago, a term that covered gates, walls, windows, the main house, open vistas, and even the topographical flow of the land.

366.    In 1995, Mr. Trump sought to obtain an income tax benefit from donating through a conservation easement—in a document entitled Deed of Conservation and Preservation—rights similar to what he already had stated he would forego in order to gain approval to use Mar-a-Lago as a club.

367.    This document, entitled "Deed of Conservation and Preservation Easement from Donald J. Trump to National Trust for Historic Preservation in the United States," was recorded with the County of Palm Beach in April 1995 and is signed by Mr. Trump as Grantor.

368.    The Mar-a-Lago Conservation Deed articulated that "many features of Mar-a-Lago, hereinafter collectively the 'Critical Features,'" including "vistas from the Mansion," possessed "significant architectural, historic, scenic and open space values of great importance" to Mr. Trump, Palm Beach, Florida, and the United States. "Critical Features" were defined, as

Case 22-1775, Document 56, 09/26/2022, 3388914, Page112 of 224

in the use agreement, to include gates, walls, driveways, doors, and, among other things, "open

vistas" toward the ocean and Lake Worth and the "topographical flow of the land."

369.    Under the Mar-a-Lago Conservation Deed, Mr. Trump was bound "at all times to

maintain the Critical Features in substantially the form and condition" then-existing. The Mar-a-

Lago Conservation Deed articulated that "additional structures on those portions of the Property

not included within the Critical Features may adversely impact the architectural, historic, scenic,

and open space values of the Critical Features." Among other restrictions, the Mar-a-Lago

Conservation Deed forbade destroying critical features, or constructing or erecting new

buildings, within and upon such areas defined as Critical Features.

370.    The Mar-a-Lago Conservation Deed also barred many actions without the

approval of the National Trust for Historic Preservation. These included "the right to replace,

alter, remodel, rehabilitate, enlarge, or remove, and change the appearance, materials,

topography, and colors of, any of the Critical Features," "the right to construct new permanent

structures on those portions of the Property that are not attached to, a part of, or contained within

the Critical Features, including but not limited to appurtenant docs or wharves, and additions

thereto," and "the right to divide or subdivide the property." No amendment to the conservation

deed was permitted that would "adversely impact the overall architectural, historic, scenic, and

open space values protected by this Easement."

371.    The Conservation Deed allocated approximately 23.5% of Mar-a-Lago's value to

the National Trust for Historic Preservation.

372.    In an apparent effort to further solidify the expansive reach of the Mar-a-Lago

Conservation Deed, and to lower property taxes on the property, Mr. Trump signed a deed of

development rights in 2002. In this deed, also publicly recorded, Mr. Trump and his affiliates

103

Case 22-1175, Document 56, 09/26/2022, 3388914, Page113 of 224

conveyed (to the extent not already conveyed) to the National Trust for Historic Preservation "any and all of their rights to develop the Property for any usage other than club usage."

373.    In this 2002 deed, Mr. Trump recognized that the 1995 Mar-a-Lago Conservation Deed "limits changes to the Property including, without limitation, division or subdivision" of Mar-a-Lago "for any purpose, including use as single family homes, the interior renovation of the mansion, which may be necessary and desirable for the sale of the Property as a single family residential estate, the construction of new buildings and the obstruction of open vistas." The deed likewise expresses Mr. Trump's understanding that the Mar-a-Lago Conservation Deed "requires the approval of changes that would be necessary for any change in use and therefore confines the usage of the Property to club usage without the express written approval of the National Trust." The 2002 deed articulated that "the Club and Trump intend to establish as explicitly as possible that the Preservation Easement perpetuates the club usage of the Property, consistent with the other limitations set forth in that Easement."

374.    Among other things, the net results of all these documents executed by Mr. Trump are: (1) to obtain permission to use Mar-a-Lago as a club, rather than as a "white elephant" private estate that was too expensive to maintain, he agreed to confine its usage to club usage and not to subdivide the property; (2) to obtain a tax benefit, he granted to the National Trust the right to control even minuscule changes to Mar-a-Lago; and (3) he executed and recorded deeds making unambiguous that he had signed away any right to use the property for "any usage other than club usage."

375.    Despite those restrictions—obviously known to Mr. Trump and his agents and made "as explicitly as possible" by them in the 2002 deed—the Statements of Financial Condition from 2011 to 2021 valued the property based on the false and misleading premise that

104

it was an unrestricted residential plot of land approaching or exceeding eighteen acres in size that could be sold and used as a private home.

376.    Moreover, despite restricting the property's usage to club usage, and securing lower property tax valuations based on that restricted usage, the Trump Organization on Mr. Trump's Statements did not value Mar-a-Lago as the operating business it was restricted to be—a social club—based on its financial performance. The Trump Organization never applied methods to value the property that it understood applied to other operating business, such as using NOI and capitalization rate to derive value.

377.    The Trump Organization was aware such methods would have led to valuations substantially below (and nowhere close to) the false and misleading valuations the Trump Organization generated by assuming the property could be developed without regard to any of the existing onerous restrictions.

378.    The Trump Organization accounting department employee who was responsible for preparing the supporting data spreadsheet for the Statements of Financial Condition from 2016 through 2021 determined that he was unable to get to the values listed by the Trump Organization in the Statements by using a valuation method based on Mar-a-Lago's financial performance.

379.    In other words, valuing Mar-a-Lago as an operating business would not have supported the sky-high numbers the Trump Organization had generated using a valuation method based on a hypothetical residential development without Mar-a-Lago's restrictions—so the Trump Organization simply chose not to value the property as the operating business it was.

380.    Rather than value Mar-a-Lago as a property subject to the restrictions to which Mr. Trump had personally agreed, Mr. Trump's Statements of Financial Condition from 2011

through 2021 ignore those restrictions entirely. Nowhere in the backup material are those restrictions referenced or accounted for; indeed, even the preservation obligations and expenditures are ignored.

381.    Instead of accounting for those limitations, the valuations from 2011 through 2021 proceed from the false premise they do not exist. Mr. Trump's Statements of Financial Condition from 2011 through 2021 purport to value Mar-a-Lago as if it were an unrestricted home to be "sold to an individual," rather than the heavily encumbered historical landmark restricted to club usage that it was. This premise, repeated in the valuations year after year from 2011 through 2021, is false and misleading in light of the legal restrictions of which the Trump Organization and Mr. Trump himself were aware—binding the property owner to continued club usage, and to undertake expensive preservation efforts, absent approval of the National Trust for Historic Preservation overriding such obligations.

382.    The valuation method, too, proceeds from another false premise: that Mar-a-Lago is a large, unrestricted residential plot of land that could be valued on a per-acre basis and sold off in that fashion, as if it could be subdivided. Reflecting that premise, the Trump Organization often used comparatively tiny (often one acre or less) residential properties and then extrapolated across all of Mar-a-Lago's acreage. But the premise that Mar-a-Lago could be valued that way conflicts with (1) the restrictions on Mar-a-Lago's usage to club usage and (2) the prohibitions on subdividing or condominiumizing Mar-a-Lago.

383.    In addition, the Trump Organization's valuations never accounted for the fact that the 1995 conservation easement entailed the donation of approximately 23.5% of Mar-a-Lago's value to the National Trust for Historic Preservation. In other words, assuming away all of the other problems described above, the Trump Organization still failed to inform a reader of the

Case 22-1175, Document 56, 09/26/2022, 3388914, Page116 of 224

Statement that Mr. Trump's ownership interest had been restricted. Nor did the final valuation reflect the reduction in value attributed to that donation.

384.    Indeed, the Trump Organization accounting department employee who was responsible for preparing the supporting data spreadsheets for the Statements of Financial Condition from 2016 through 2021 did not take into account the conservation and preservation easement at Mar-a-Lago or the 2002 deed signed by Mr. Trump, which he was not even aware existed at the time he was preparing the supporting data spreadsheets.

385.    The Trump Organization took other steps within the inappropriate valuation method it applied to inflate the valuations even further.

386.    In most years, the Trump Organization added a 30% club-based premium to the final result. In other words, despite purporting to value the property *as a home to be sold to one individual*, the Trump Organization tacked on another 30% because the property was a completed club operated under the "Trump" brand – hereafter referred to as the "Brand Premium Scheme." The company did not end this undisclosed scheme for Mar-a-Lago until the 2016 Statement (issued in February 2017).

387.    The Trump Organization also used a price-per-acre figure based on sales of purportedly "comparable" properties as a key component in deriving the valuations; the company would calculate an average price-per-acre based on such sales and then use that average as the figure to be multiplied by Mar-a-Lago's acreage. This price-per-acre figure also was inflated in all years from 2011 to 2021 in one or more ways.

388.    In particular, the Trump Organization inflated Mar-a-Lago's reported value by falsely reducing acreage of properties compared to Mar-a-Lago. Reducing the acreage of the properties it compared to Mar-a-Lago drove the price-per-acre variable higher, and thus the

Case 22-1175, Document 56, 09/26/2022, 3388914, Page117 of 224

reported value of Mar-a-Lago higher. For example, the 2016 Mar-a-Lago valuation relied upon a price-per-acre figure that was ***120% greater*** than the prior year's figure. This was based on, among other things, a purportedly "comparable" property the Trump Organization described as selling for $49.9 million on 1.61 acres. But the Trump Organization's own backup (a Zillow printout) described the property in the transaction as 2.61 acres—and the Trump Organization had used that same property, with its correct acreage, years earlier. Using the false and lower 1.61 figure as the acreage instead of the actual 2.61 acreage increased the price-per-acre input from that property by more than 50%—from $19.1 million to more than $30 million. That same manipulation of the price-per-acreage figure was also repeated in the data supporting the 2017 Statement.

389.     Similarly, the Trump Organization inflated the price-per-acre derived from another purportedly "comparable" property at 1695 North Ocean Way in Palm Beach for the 2016 and 2017 Statements. In both Statements, the Trump Organization computed a price-per-acre of more than $51 million—a major driver of the valuations in both years because it was far-and-away the highest price-per-acre used in the average. The $51 million figure was computed by dividing a selling price of $43.7 million by an acreage figure of 0.85. The acreage, though, was understated for both the 2016 and 2017 Mar-a-Lago valuations. Public records and press reports reflect—several months before the 2016 Statement was finalized—that the land actually transferred was approximately 2.5 acres, not 0.85 acres.

390.     The 2017 Statement, too, ignored that a neighboring property at 1565 North Ocean Way was purchased and combined with 1695 North Ocean Way under common ownership before the 2017 Statement was finalized. Through that transaction, recorded on June 29, 2017, the combined properties sold for approximately $11 million per acre—$67.4 million

for 6.1382 acres. Yet, for the 2017 Statement, the Trump Organization used a price-per-acre figure ($51 million) nearly five times as high to value Mar-a-Lago.

391.     The Trump Organization similarly inflated price-per-acre figures in the 2018, 2019, and 2020 Mar-a-Lago valuations. The Trump Organization included as a "comparable" for the 2018 and 2019 valuations a property at 1485 S. Ocean Boulevard that sold for $41,257,000 and that the company described as 1.0 acre. But the property is approximately 2.3 acres.

392.     The Trump Organization similarly falsified the price-per-acreage figure used for the 2019 and 2020 valuations involving on a property at 1295 S. Ocean Boulevard that was part of a transaction involving 4.7178 acres of oceanfront and lakefront land that sold for a total of $104.99 million (approximately $22 million per acre). Despite Mar-a-Lago consisting of lakefront, interior, and some oceanfront land, the Trump Organization segmented the more valuable 2.61-acre oceanfront component of that $104.99 million sale to generate an inflated $30 million price-per-acre figure.

393.     The Trump Organization also otherwise cherrypicked sales to use as "comparables" from available data. For example, in 2019 and 2020, the Trump Organization used 60 Blossom Way—a $99.1 million, 3.5-acre sale to a buyer, who was assembling an ocean-to-lake compound. But the company ignored recent sales to the same buyer as part of the same compound with much lower price-per-acre figures. Documents confirm the Trump Organization (at least in 2020) knew that same buyer was assembling a compound, but nevertheless isolated the single sale at 60 Blossom Way to value Mar-a-Lago.

394.     Another way the Trump Organization inflated Mar-a-Lago's value was by using "asking prices" for properties rather than the much lower actual sales prices reflected in public records. For example, among the properties relied upon in 2012 were 1220 S. Ocean Boulevard

Case 22-1175, Document 56, 09/26/2022, 3388914, Page119 of 224

and 1275 S. Ocean Boulevard. Both sold well below the asking prices used by the Trump Organization to value Mar-a-Lago in that year.

395. Sales data for properties in Palm Beach, and the acreage and square footage of those properties, is easily accessible from local authorities. The Trump Organization was aware of that fact throughout most, if not all, of the relevant time period. Despite that ready availability, no documentation reflects any consideration by the Trump Organization of sales of properties in Palm Beach other than the ones the company cherrypicked to generate high price-per-acre figures.

396. In most years, the Trump Organization also added tens of millions of dollars' worth of club-related construction and other club-related property to the Mar-a-Lago value. For example, through 2021, the Trump Organization added between $15 million and $25 million for the construction costs of the club's Grand Ballroom, beach cabanas, and a tennis pavilion and teahouse (in some cases applying a 30% premium to them). The company did so despite the property purportedly being valued as a *home* to be sold to an individual, based on price-per-acre figures of residential sales. And, after adding $16.8 million to the valuation for "furniture, fixtures, and equipment" ("FF&E") in 2013, with the stated reason that the single sale used to value Mar-a-Lago was a "spec house and sold without FF&E," the Trump Organization continued adding that amount (or at least more than $14 million) for FF&E after its initial reason for doing so no longer applied.

### b. Trump Aberdeen

397. The value assigned to Trump Aberdeen in each year is comprised of two components: one value for the golf course and another value for the development of the non-golf course property, *i.e.*, the "undeveloped land."

110

398. These components and the total value of the property in each year are set forth in the chart below:

| Statement Year | Value of Golf Course | Value of Undeveloped Land | Total Value |
|---|---|---|---|
| 2011 | $41,000,000 | $119,000,000 | $160,000,000 |
| 2012 | $64,703,600 | $117,600,000 | $182,303,600 |
| 2013 | $76,715,600 | $114,450,000 | $191,165,600 |
| 2014 | $74,169,082 | $361,393,344 | $435,562,426 |
| 2015 | $60,570,463 | $267,016,090 | $327,586,553 |
| 2016 | $50,679,806 | $226,043,750 | $276,723,556 |
| 2017 | $49,691,890 | $221,155,584 | $270,847,474 |
| 2018 | $50,832,046 | $223,217,779 | $274,049,825 |
| 2019 | $49,460,737 | $220,989,724 | $270,450,461 |
| 2020 | $38,355,969 | $101,272,826 | $139,628,795 |
| 2021 | $21,012,667 | $114,317,896 | $135,330,563 |

399. Both components were derived each year using improper methods and based on facts and assumptions that were materially false and misleading, were known by Mr. Trump and others within the Trump Organization to be materially false and misleading, and which substantially inflated the valuations as described more fully below.

       *i.   The Golf Course Valuations*

400. In each year, Mr. Trump derived the value of the golf course based on his capital contributions since the inception of his ownership adjusted by a "multiplier,"[4] which is a fixed-assets approach, and without factoring in any depreciation – hereafter referred to as the "Fixed-Assets Scheme." But using fixed assets to derive the market value of a golf course is contrary to industry custom and practice, as Mr. Trump himself acknowledged to the IRS in 2012 when

---

[4] The capital contributions were multiplied by a 30% premium for the assembly of land parcels.

111

Case 22-1175, Document 56, 09/26/2022, 3388914, Page121 of 224

seeking to maximize the value of a conservation easement related to another one of his golf

courses in Bedminster, New Jersey.

401.    In pushing back against the IRS's planned reduction to the amount of the

Bedminster conservation easement, Mr. Trump's attorney argued on his behalf that the income

producing capacity of the golf course – *i.e.*, an income-based approach – was the relevant metric

for a potential purchaser. As his lawyer advised the IRS: "The price at which a golf course will

trade depends on the revenues that it can produce."

402.    Similarly, in an appraisal that the Trump Organization submitted to the IRS in

connection with the same dispute, the appraisal firm stated that an income-based approach, or

secondarily a sales-comparison approach, are the acceptable methods for valuing a golf course.

The appraisal firm did not propose using a fixed-assets approach.

403.    Indeed, throughout (and even before) the relevant time period, the Trump

Organization was in possession of numerous appraisals of golf course properties that squarely

rejected the only appraisal approach bearing any resemblance to the fixed-asset method the

Trump Organization used. These appraisals, some of which the Trump Organization itself

commissioned, rejected the use of a "cost approach"[5] as simply not what a prospective purchaser

of a golf course would consider. These appraisals instead performed valuations based on the

clubs' financial performance (the income approach) and sales of comparable properties (the

comparable sales approach). As a Trump Organization-commissioned appraisal articulated: "The

Cost Approach has no bearing on what investors would pay for a golf course in today's

---

[5] The "cost approach" factors into a value "the cost to construct the existing structure and site
improvements" and "then deducts all accrued depreciation in the property being appraised from
the cost of the new structure." The Appraisal of Real Estate 335 (11th Ed. 1996). When using the
"fixed assets" approach, the Trump Organization did not deduct accumulated depreciation from
the fixed-asset figures that were used.

Case 22-1175, Document 56, 09/26/2022, 3388914, Page122 of 224

environment," "we find major deficiencies in its application," and "[w]e have found examples of golf courses that sold for a fraction of what they cost to build."[6] The Trump Organization withheld from Mazars the fact that it possessed numerous appraisals rejecting the cost approach to value a golf course and instead using income and sales-comparison approaches, even though it was required to provide that information consistent with its obligation to provide complete and accurate information to Mazars.

404.    The Trump Organization even contacted an outside consultant to advise the company on how to value golf courses and he advised that an income-based approach – using gross revenue adjusted by an appropriate multiplier – was the relevant metric for the valuation of a golf course. The Trump Organization ignored this consultant's advice and never shared this advice with Mazars, even though it was required to do so consistent with its obligation to provide Mazars with complete and accurate information.

405.    Finally, the Trump Organization has consistently relied on an income-based approach when assessing golf courses for property tax assessment purposes. For example, the Trump Organization has repeatedly relied on income figures when arguing for lower tax assessments, noting that using fixed assets "often results in a higher valuation then [sic] the income approach."

406.    Employing the Fixed-Assets Scheme rather than using an income-based approach improperly and materially inflated the value of the golf course at Trump Aberdeen.

407.    The golf course opened in 2012 and the business has operated *at a loss* each year since then, even without considering depreciation. Because the golf course has operated at a loss

---

[6] The appraisal went on to enumerate courses that had sold for between 50 and 74% lower than their "cost to build."

Case 22-1175, Document 56, 09/26/2022, 3388914, Page123 of 224

each year, using values for the golf course ranging between $21 million to $76 million in the

Statements from 2011 to 2021 based on employing the Fixed-Assets Scheme is materially false

and misleading; the golf course should have been valued at a much lower figure.

ii.     *The Undeveloped Land Valuations*

408.    In each year from 2011 to 2021, the larger component of the valuation – and for

many years by a factor of four or more – was the estimated value of developing the undeveloped

land portion of Trump Aberdeen. The valuation of the undeveloped land was grossly inflated for

several reasons.

409.    In 2011, the valuation for Trump Aberdeen in the supporting data provided to

Mazars included an estimate of the value for the undeveloped land of £75 million, or $119

million based on the then-current exchange rate, citing as the sole basis a "George Sorial email

[dated] 9/6/2011."

410.    The referenced email from Mr. Sorial, Executive Vice President and Counsel at

the Trump Organization, had the subject line "Forbes Magazine" and contained a quote Mr.

Sorial provided to an accountant in Scotland who was then expected to pass the information on

to *Forbes* Magazine. The quote stated: "Although a formal appraisal has not been prepared at

this point, after speaking with specialists in the field and having closely watched this

development transform itself over the last five years, we are informed that the value for the

residential/hotel land parcels could achieve a value in excess of 75 million [British pounds

sterling]."

411.    Accordingly, the value of the undeveloped land at the property used for Mr.

Trump's 2011 Statement was based on nothing more than an unsubstantiated quote prepared by a

Trump Organization employee for *Forbes* Magazine.

114

412.     Mr. Sorial's 2011 *Forbes* Magazine quote also served as the sole basis for the Trump Organization's 2012 and 2013 valuations for the undeveloped land at Trump Aberdeen of $117.6 million and $114.45 million, respectively, based on valuing £75 million at the then-current exchange rate.

413.     For the 2014 Statement, the Trump Organization no longer relied on Mr. Sorial's *Forbes* Magazine quote and instead assumed that 2,500 homes could be built on the property and sold at £83,000 pounds per home. This more than *tripled* the value of the undeveloped land from the prior year, to approximately $361.4 million.

414.     The price per home of £83,000 was taken from an email with an appraiser at the firm Ryden LLP, who provided a list of land sales that he stated "may not be particularly comparable for your site." The Trump valuation does not make any adjustment to the list of sales to account for site differences and does not include an allowance for affordable housing or affordable housing payments as required by the Scottish Government. Nor did the valuation account for the time it would take to secure any needed approvals, develop the property, and market the property.

415.     In addition to these misleading elements, there was no factual basis for assuming that 2,500 homes could be built and sold.

416.     The 2014 Statement of Financial Condition reports that the Trump Organization "received outline planning permission in December 2008 for . . . a residential village consisting of 950 holiday homes and 500 single family residences and 36 golf villas." This is a total of 1,486 homes, not 2,500 homes.

417.     Moreover, in deriving the value for the 2014 Statement, the Trump Organization assumed all of the homes would have the same value. This ignores the fact that, as the Statement

notes, 950 of the homes were to be "holiday homes" and 36 were to be "golf villas." Such properties—under the terms governing Trump Aberdeen—would be rental properties that could be rented for no more than six weeks at a time, a restriction that would significantly lower their value.

418.     Indeed, according to material the Trump Organization submitted to the Scottish Government, the holiday homes and golf villas would not be profitable and therefore would not add value to the project. At the inception of the project in 2007, economic impact assessments commissioned by the Trump Organization found that for the holiday homes alone, without the private residential component, the net present value of the project ranged from negative £34 million to positive £21 million. So in addition to calculating a value for the undeveloped land based on 2,500 homes rather than the 1,486 homes actually approved, the Trump Organization falsely valued the 986 rental properties (holiday homes and golf villas) as if they were private residences to be sold.

419.     This strategy of using unrealistically high prices to estimate the profit from a future residential development that ignored zoning requirements and failed to include any cash flow analysis to compute the present value of future income – hereafter referred to as the "Inflated Home Sale Scheme" –vastly overstated the value of the undeveloped land at Trump Aberdeen.

420.     From 2015 through 2018, the valuation of the undeveloped land at Trump Aberdeen relied on the same Inflated Home Sale Scheme as 2014.

421.     As a result, the Statements of Financial Condition in years 2014 to 2018 inflated the value of the undeveloped property in a material way. Indeed, simply adjusting the valuations to correct for using 2,500 private homes rather than the 500 private homes actually approved,

Case 22-1175, Document 56, 09/26/2022, 3388914, Page126 of 224

keeping all other variables constant, results in a reduction in the valuation of the undeveloped land component of Trump Aberdeen of more than $175 million in each year.

422.    In May 2018, the Trump Organization applied to the Aberdeen City Council to reduce the scope of the development project to 550 dwellings. The new proposal was to build 500 private residences, 50 cottages, and no holiday homes because the company determined the holiday homes were not economically viable.

423.    In September 2019, the Aberdeen City Council approved the Trump Organization's reduced proposal to build only 550 dwellings, consisting of 500 private residences and 50 cottages.

424.    Nevertheless, the 2019 Statement, finalized a month later in October 2019, continued to employ the Inflated Home Sale Scheme, deriving a value of just under $221 million for the undeveloped land based on *2,035 private homes*, so fewer than the 2,500 homes assumed in prior years but still far more than the number of homes the City Council had just approved.

425.    The 2020 and 2021 Statements derived much lower values of $101 million and $114 million, respectively, for the undeveloped land based on 1,200 homes, still more than twice the number of homes the City Council had approved in 2019.

426.    As in prior years, the 2019 to 2021 valuations employed the Inflated Home Sale Scheme.

427.    Moreover, the Trump Organization's decision to employ the Inflated Home Sale Scheme during the period 2011 through 2017, and more specifically to fail to conduct any cash flow analysis, was particularly egregious in light of Mr. Trump's decision during this entire period to *indefinitely postpone all development plans* on the property due to the Scottish Government's approval of a proposed wind farm in Aberdeen Bay that would be visible from the

117

Case 22-1175, Document 56, 09/26/2022, 3388914, Page127 of 224

property. As he confirmed in testimony to the Scottish Government in April 2012, Mr. Trump determined that he "cannot proceed with [the development] if the hotel is going to be looking at industrial turbines, and no one here would do so if they were in my position."

428.     The Trump Organization confirmed in a public, audited financial statement shortly before finalizing Mr. Trump's 2014 Statement that it did not intend any residential development on the property *for the foreseeable future*. Specifically, in the audited "Director's report and financial statements for the year ended 31 December 2013," submitted to a UK regulator and signed by Mr. Weisselberg on September 29, 2014, the Trump Organization wrote: "the hotel, second golf course, and future phases of the project have been postponed until such time that the Scottish Government and regional Councils have reversed their stance on supporting the wind farm development being considered for Aberdeen Bay."

429.     The Trump Organization also sought to challenge the Scottish Government's approval of the wind farm through litigation. Shortly after the Scottish Government approved the Aberdeen Bay wind farm in March 2013, the Trump Organization commenced a lawsuit against the Scottish Government to halt the project. The lower court rejected the suit in February 2014, which was upheld on appeal to the Scottish Court of Session (2015 CSIH 46) and, in December 2015, by the UK Supreme Court (2015 UKSC 74).

430.     The wind farm was completed and began producing electricity by mid-2018.

431.     After losing the court battle in 2015 to halt the wind farm, and without reversing his position that development would be indefinitely postponed because of the wind farm, Mr. Trump continued to attribute an inflated value ranging between $267 million and $221 million to the undeveloped land for the years 2015 through 2017.

118

Case 22-1175, Document 56, 09/26/2022, 3388914, Page128 of 224

432.    Between 2011, when Mr. Trump decided to indefinitely postpone development

due to the planned wind farm, and 2018, when he apparently reversed his position and applied

for a reduced development of only 550 homes, neither Mr. Trump nor the Trump Organization

factored into the valuation the indefinite postponement of any development plans, whether to

account for the potential lack of any development at all or at least the delay in when homes could

be built and sold should the "indefinite postponement" be lifted.

### c. *Trump Turnberry*

433.    In 2014, through the entity Golf Recreation Scotland Ltd, the Trump Organization

purchased the hotel and golf course known as Trump Turnberry for approximately $60 million.

The golf club had its first full year of operations in 2017.

434.    From 2017 through 2021, the Trump Organization employed the Fixed-Assets

Scheme to value the club, combining its "initial investment" of £41,667,000 with various

"additions" over time to derive values ranging between $123 million to $126.8 million.

435.    Consistent with the improper use of the Fixed-Assets Scheme for other clubs, the

Trump Organization did not factor in any depreciation of the assets, with the exception of the

2021 Statement; in that year, for the first time, the Trump Organization included "Estimated

depreciation from 1/1/15 to 6/30/21" of $16,309,538 – an implicit acknowledgement that

ignoring depreciation in prior years was improper.

436.    Since opening in 2017, the golf course has operated at a loss each year. As a result

using values for the golf course ranging between $123 million and $126.8 million based on

employing the Fixed Asset Scheme is materially false and misleading; the golf course should

have been valued at a much lower figure.

119

Case 22-1175, Document 56, 09/26/2022, 3388914, Page129 of 224

d. *TNGC Jupiter*

437.　In November 2012, the Trump Organization, through the entity Jupiter Golf Club LLC, purchased TNGC Jupiter for $5 million in cash. Less than a year later, Mr. Trump valued the same property at $62 million on the 2013 Statement of Financial Condition. That inflation represented a markup of 1,100%. Indeed, for every year from 2013 to 2020, virtually all of the value attributed to Jupiter was fraudulently overstated due to several deceptive methods and assumptions.

438.　The primary means of overstating the value of TNGC Jupiter was to fraudulently inflate the acquisition cost of the club and use that inflated figure as the key component in the valuation when employing the Fixed-Assets Scheme. But anyone reading the disclosures in the Statements through 2019 would not know that the club was valued using fixed assets because there was no mention in the Statement disclosures about factoring in the purchase price of the club.

439.　As part of the purchase of the club, the Trump Organization assumed liability for the refundable membership deposits of the club's members. Those deposits had a face value of $41 million. The Trump Organization treated that $41 million as if it was debt that it purchased with the club, which it then deemed to increase the total purchase price to more than $46 million – hereafter referred to as the "Membership Deposit Scheme."

440.　But the Trump Organization was not assuming an immediate $41 million of liability. The terms of the "refundable" membership agreements for the club provided that only those members who remain in good standing for *30 years* are eligible to obtain a full refund of their membership deposits. Therefore, the liabilities for "refundable" memberships would need to be paid out only decades in the future, if at all.

120

Case 22-1175, Document 56, 09/26/2022, 3388914, Page130 of 224

441.     Under the applicable GAAP rules, the Trump Organization was required to determine the present value of the liabilities it assumed, not just the total cash value of payouts decades into the future.

442.     While the Trump Organization did not prepare such a present value assessment, the seller of the property, Ritz-Carlton, did. The seller retained the National Golf and Resort Properties Group of Marcus & Millichap, a leading real estate advisory and valuation firm, to prepare a "Market Positioning and Price Analysis" for the club as-of June 15, 2012 – five months before the sale closed. That analysis included a calculation of the present value of the membership liabilities, which reached a "conservative" assessment valuing them at $2,158,341 – far below the $41 million value used by the Trump Organization to inflate the purchase price of the club under the Fixed-Assets Scheme.

443.     The Trump Organization obtained and utilized a copy of Ritz-Carlton's analysis in seeking a potential reduction in its local property taxes. However, the Trump Organization ignored the analysis and chose for each year from 2013 through 2020 not to utilize the net present value of the membership liabilities in calculating the purchase price of the club for purposes of the Statements. Instead, the Trump Organization employed the Membership Deposit Scheme, falsely assuming the full cash value of the refundable memberships was a liability acquired as part of the sale that should be included in the purchase price.

444.     And remarkably, the company did this even though Mr. Trump valued his liability for the membership deposits to be zero. For example, the 2013 Statement explains: "The fact that Mr. Trump will have the use of these [membership deposit] funds . . . without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero."

Case 22-1175, Document 56, 09/26/2022, 3388914, Page131 of 224

445.    Additionally, the Trump Organization overstated the value of TNGC Jupiter by employing the Brand Premium Scheme, adding for the "Trump brand" an additional 30% from 2011 through 2014 and 15% from 2015 through 2020—even though the Statements disclaimed that any of the valuations included a brand premium.

446.    Finally, the Trump Organization included in the value in nearly all years the outstanding receivables from members for food and dues. This is not consistent with any recognized valuation technique, much less a calculation based on a fixed-asset approach.

*e.  TNGC Briarcliff*

447.    Based on the supporting data, the value for TNGC Briarcliff in each year is comprised of two components: the value for the golf course and the value for the development of the undeveloped land.

448.    These components and the total value of the property in each year are set forth in the chart below:

| Statement Year | Value of Golf Course | Value of Undeveloped Land | Total Value |
|---|---|---|---|
| 2011 | $43,603,300 | $25,100,000 | $68,703,300 |
| 2012 | $74,407,000 | $25,100,000 | $99,507,000 |
| 2013 | $74,514,000 | $101,748,600 | $176,262,600 |
| 2014 | $75,132,941 | $101,748,600 | $176,881,541 |
| 2015 | $74,745,190 | $101,748,600 | $176,493,790 |
| 2016 | $75,949,132 | $101,748,600 | $177,697,732 |
| 2017 | $77,435,891 | $101,748,600 | $179,184,491 |
| 2018 | $78,310,201 | $101,748,600 | $180,058,801 |
| 2019 | $78,104,818 | $105,561,050 | $183,665,868 |
| 2020 | $78,104,818 | $90,311,250 | $168,416,068 |
| 2021 | $37,058,718 | $86,498,800 | $123,557,518 |

122

Case 22-1175, Document 56, 09/26/2022, 3388914, Page132 of 224

449.     Both components were derived each year using improper methods and based on

facts and assumptions that were materially false and misleading, and known by Mr. Trump and

others within the Trump Organization to be materially false and misleading, and which

substantially inflated the valuations as described more fully below.

            i.     *The Golf Course Valuations*

450.     In each year, except 2011, Mr. Trump derived the value of the golf course based

on employing the Fixed-Assets Scheme.

451.     In 2011, the supporting data reflects that the golf course was valued at

$43,603,300. That amount included estimated initiation fees for 67 unsold memberships totaling

$12,775,000. Although the supporting data spreadsheet states that the club was currently "getting

$150,000" in initiation fees per membership, the Trump Organization derived the $12,775,000

figure by assigning a much higher value for the initiation fees of 47 of the 67 unsold

memberships, in many instances as high as $250,000. Instances in which the Trump

Organization used unsold memberships at prices far higher than their own internal records

reflect, without performing a discounted cash flow analysis on future revenue, is hereinafter

referred to as the "Unsold Memberships Scheme."

452.     Valuing more than two-thirds of the unsold memberships as worth materially

more than $150,000 each was without any basis and improperly inflated the amount of the golf

course value. Indeed, according to membership records, even the representation that the club was

"getting $150,000" per membership for initiation fees in 2011 was false; records indicate that

many members paid no initiation fee for their memberships at all in 2011 and 2010.

453.     In addition, as part of the Unsold Membership Scheme, the Trump Organization

failed to take into account how long it would take to sell the memberships at the inflated prices

reflected in the supporting data. Mr. Trump knew this was improper because when he filed a

123

Case 22-1175, Document 56, 09/26/2022, 3388914, Page133 of 224

protest with the IRS regarding a conservation easement for his golf course in Bedminster, New Jersey, his attorney argued on his behalf that golf course revenue in a valuation should be subject to a discounted cash flow analysis.

454.    In March 2012, Mr. Trump instructed his staff to waive the initiation fee for new members at TNGC Briarcliff as part of a new strategy to bring in 75 new members in order to increase revenue for the club. As a result of this instruction, and as confirmed by membership records, no new members paid an initiation fee in 2012.

455.    But Mr. Trump's decision to waive initiation fees in order to increase membership would have resulted in a sharp reduction in the valuation of the club based on the prior year's approach of valuing the unsold memberships based on collecting hefty initiation fees. To avoid this result, Mr. Trump and the Trump Organization abandoned the Unsold Membership Scheme, ignored the unsold memberships, and instead employed the Fixed-Assets Scheme to value the golf course – a change in method that was not disclosed in violation of GAAP rules.

456.    Under the Fixed-Assets Scheme, the golf course was valued at $71,200,000 in the 2012 Statement, an increase of approximately $30 million in the total valuation of TNGC Briarcliff from 2011 to 2012.

457.    Mr. Trump and the Trump Organization continued to employ the Fixed-Assets Scheme for the 2013 to 2020 Statements, which resulted in values ranging from $74.5 million to $79 million for the club component of the valuation.

458.    In 2021, The Trump Organization made a slight modification to the Fixed-Assets Scheme by averaging the fixed assets figure with the gross revenue times a multiplier, purportedly based on the advice of the same outside consultant whose advice the company had previously ignored and who said nothing about averaging gross revenue and fixed assets.

Case 22-1175, Document 56, 09/26/2022, 3388914, Page134 of 224

459.    This modification to the Fixed-Assets Scheme resulted in an increase in value of about $12 million.

460.    Finally, Mr. Trump and the Trump Organization knew that employing the Fixed-Assets Scheme specifically for TNGC Briarcliff was improper and derived grossly inflated valuations based on the appraisal the Trump Organization had Cushman prepare for purposes of valuing a conversation easement for TNGC Briarcliff to obtain a tax deduction. In the appraisal report, issued in April 2014, Cushman used two approaches to value the golf course – looking at comparable sales and the property's income-producing capabilities. Cushman did not use a fixed-asset approach.

461.    Under both approaches, the report determined the value of the golf club as of April 2014 was $16.5 million, less than one-fourth the golf club value used for the Statements from 2012 through 2020 and less than half the golf club value used for the Statements in 2011 and 2021.

ii.    *The Undeveloped Land Valuations*

462.    In each year from 2011 to 2021, Mr. Trump and the Trump Organization separately derived a value for the undeveloped land at TNGC Briarcliff by employing the Inflated Home Sale Scheme based on estimating the value of building and selling mid-rise apartment units. For 2013 to 2021, the estimates for the undeveloped land comprised the larger component of the valuation of the entire property.

463.    In 2011 and 2012, Mr. Trump and the Trump Organization derived a value of $25,100,000 for the expected profit from the sale of 31 mid-rise units, or $809,677 per unit. The supporting data fails to provide any detail on basis for this estimate.

125

Case 22-1175, Document 56, 09/26/2022, 3388914, Page135 of 224

464.    From 2013 to 2018, the value of the undeveloped land *quadrupled*, to $101,748,600. This dramatic increase was accomplished by adding 40 more units to the estimate (for a total of 71 units) and increasing the profit per unit by 76%, to $1.433 million.

465.    Based on the supporting data, the only source for the increase in the number of units and profit per unit were telephone conversations with Eric Trump.

466.    From 2019 to 2021, the value of the undeveloped land fluctuated between $105.5 million and $86.5 million while still estimating the expected profit from the sale of 71 units.

467.    Moreover, the supporting data confirms that during the entire period, from 2011 to 2021, the development plans remained "on hold," yet there is no indication in any of the supporting data that Mr. Trump or the Trump Organization performed a discounted cash flow analysis to account for the delay due to putting the development plans "on hold."

468.    Finally, Mr. Trump and the Trump Organization knew the estimated profits from the sale of the mid-rise units they were using for the Statements were wildly inflated based on a 2013 preliminary valuation of about $45 million and an April 2014 Cushman appraisal. That appraisal valued the undeveloped land at $43.3 million, about $58 million less than the value they used for the undeveloped land in the 2013 to 2018 Statements. Eric Trump, the specific source of the valuation during this period had access to the lower appraisal number from Cushman prior to the issuance of each Statement from 2013 to 2018.

### f.    TNGC LA

469.    The value assigned to TNGC LA in each year is comprised of two components: one value for the golf course and another value for the development of the undeveloped land.

470.    These components and the total value of the property in each year are set forth in the chart below:

| Year | Value of Golf Course | Value of Undeveloped Land | Total Value |
|------|---------------------|---------------------------|-------------|
| 2011 | $23,800,000 | $310,300,000 | $334,100,000 |
| 2012 | $23,800,000 | $283,250,000 | $307,050,000 |
| 2013 | $73,505,900 | $152,000,000 | $225,505,900 |
| 2014 | $74,300,642 | $139,390,000 | $213,690,642 |
| 2015 | $56,615,895 | $84,095,000 | $140,710,895 |
| 2016 | $52,426,829 | $82,485,000 | $134,911,829 |
| 2017 | $52,670,127 | $69,200,000 | $121,870,127 |
| 2018 | $51,322,079 | $62,075,000 | $113,397,079 |
| 2019 | $54,734,733 | $62,260,000 | $116,994,733 |
| 2020 | $54,734,733 | $52,975,655 | $107,710,388 |
| 2021 | $28,446,251 | $63,663,391 | $92,109,642 |

471. Both components were derived each year using improper methods and based on facts and assumptions that were materially false and misleading, were known by Mr. Trump and others within the Trump Organization to be materially false and misleading, and which substantially inflated the valuations as described more fully below.

*i.    The Golf Course Valuations*

472. In 2011 and 2012, the Trump Organization valued the golf course at TNGC LA at $23.8 million based on the original loan and improvements.

473. Starting in 2013 and continuing through 2020, and without any disclosure of the change in methodology in violation of GAAP rules, the Trump Organization employed the Fixed-Assets Scheme to value the golf club component of TNGC LA. During this period, the company also added 30% to the value in 2013 and 2014 and 15% to the value in 2015 through 2020 under the Brand Premium Scheme.

127

Case 22-1175, Document 56, 09/26/2022, 3388914, Page137 of 224

474.    In 2021, the company modified its fixed-assets approach, again without the required disclosure of a change in metodology, and derived the golf course value by averaging gross revenue times a multiplier and the value derived by the Fixed-Assets Scheme (but using "Net Fixed Assets" which factored in depreciation rather than just "Fixed Assets" without any depreciation as in prior years); this modification was purportedly based on advice of "golf course industry experts" Marcus & Millichap, despite receiving prior advice from that firm that using a fixed-assets approach for an operating golf course was improper. The use of a net figure for fixed assets that factors in depreciation is an implicit acknowledgement that ignoring depreciation in prior years was improper.

475.    In every year from 2011 to 2020, the golf course has operated with a net income that barely reached the low seven figures, often at $1.5 million or lower, and in some cases lower than $1 million. As a result, using values for the golf course ranging between $23.8 million to $74.3 million in the Statements from 2011 to 2021 based on employing the Fixed-Assets Scheme, coupled with the Brand Premium Scheme starting in 2013 that tacked on an additional 30% or 15% in all years except 2021, is materially false and misleading; the golf course should have been valued at a much lower figure.

ii.    *The Undeveloped Land Valuations*

476.    Throughout the period 2011 to 2021, the TNGC LA valuation incorporated an inflated value for a substantial number of potential lots for sale in the areas around the golf course using the Inflated Home Sale Scheme.

477.    TNGC LA was originally known as Ocean Trails Golf Club. Construction on the course started in 1997 and by June 1999, the golf course was almost complete—until a landslide dropped 300 yards of the 18th hole fairway into the Pacific Ocean. The landslide also caused most of the 18th hole to slide 50 feet toward the ocean, including the fairway and green.

128

Case 22-1175, Document 56, 09/26/2022, 3388914, Page138 of 224

Development on the property ceased after the landslide and the Ocean Trails Golf Course construction project went into bankruptcy. VH Property Corp., a Trump Organization subsidiary, acquired the property out of bankruptcy in November 2002 for a reported price of $27 million.

478.    Given the site's instability, the landslide, and the site's proximity to the Pacific Coast, the Trump Organization needed approval from the City of Rancho Palos Verdes to develop the site. The Trump Organization's geologist worked with a Rancho Palos Verdes geologist to develop a geologic model and reach an understanding of any improvements necessary before the site could be further developed. This presented a particular hurdle for 16 planned lots on the driving range and putting green. In June 2011, the Trump Organization's geologist produced a report stating that 104 "shear pins," stabilizing implements drilled into the ground to provide engineering stability, would be required to develop the lots safely.

479.    Given these difficulties in developing the lots, the Trump Organization began to consider another option: donating a conservation easement over the 16 proposed lots that would preclude any development but allow continued use of the area as a driving range and putting green.

480.    Nevertheless, for the purposes of the Statement of Financial Condition, the Trump Organization valued the property as if there were no practical limitations on the development of the lots, in addition to assigning inflated values to each of those lots. For example, the 2011 valuation of $334 million had two components: the $23.8 million valuation of the clubhouse (which the valuation attributed to the value of a loan plus improvements) and the putative sales price of 70 housing lots valued at $310.3 million, which incorporated two lots that had been "priced out" at $8.8 million together, another $7.15 million lot under contract, and 67 remaining lots priced at an "average price" of $4.5 million. The valuation, which provides no source for this

136 of 222

average price, noted that "[a]lthough 17 lots have been used for a driving range, we can still convert the lots back to housing." The driving range lots would later be the subject of the Trump Organization's conservation easement in 2014.

481.    The 2012 valuation of $307 million took a similar approach. For this year, 12 lots were listed as priced out at a total of $35,750,000 at an average of roughly $3 million per lot. These included two of the lots that had been previously listed as "priced out" at an average of $4.4 million per lot in 2011. Despite the lower lot prices for these two lots, the 2012 valuation retained the $4.5 million average price per lot for the remaining 55 lots, and the clubhouse remained valued at $23.8 million.

482.    But this valuation was contradicted by advice the Trump Organization received from "outside professionals," specifically appraisers from Cushman asked to conduct a preliminary valuation to aid consideration of a potential easement donation over the driving range property.

483.    After the issuance of the 2012 Statement, Trump Organization outside tax counsel Sheri Dillon engaged Cushman appraisers Richard Zbranek and Brian Curry to put a value on the potential easement donation. Ms. Dillon also hired an engineer to work on the project. The Cushman appraisers were to provide "initial valuation conclusions" for 16 lots on the TNGC LA driving range. This initial evaluation would not involve a formal written report or assess value enhancement for the full Trump-owned parcel. If this valuation met with the Trump Organization's approval, the appraisers would then move on to provide a valuation suitable for supporting a charitable donation.

130

Case 22-1175, Document 56, 09/26/2022, 3388914, Page140 of 224

484.    The Trump Organization, through Bingham McCutchen LLP (Ms. Dillon's law firm at the time), conveyed to the appraisers that it believed the lots might be worth a total of $40 or $50 million.

485.    In December 2012, Cushman, relying on costs and other information prepared by an engineer (also retained by Dillon and Bingham), reached a preliminary value conclusion for the development potential of the lots of only $17,725,000. As Mr. Curry described it to Mr. Zbranek, "They did paper napkin analysis and suggested 40 to 50 million dollars. I sent them my analyses, we walked through the whole thing, and they couldn't argue with it. More like. 'Oh'."

486.    After this preliminary valuation, the Trump Organization put the conservation easement project on hold and did not pursue it further in 2012 or 2013.

487.    While the 2013 Statement did not adopt the Cushman price estimate, it nevertheless reflected a decrease in the valuation of the development of the lots from $247.5 million in 2012 to $152 million in 2013. The drop was due to lower average sales prices: for the 11 lots priced out in 2013, the sales price was a mere $22 million, or an average of $2 million a lot. Three additional lots were under contract for a total of $4.65 million, or $1.55 million each. Given these lower prices, the company based the estimate for the remaining lots on an average sales price of $2.5 million—instead of $4.5 million—significantly reducing the calculated value of those 52 lots. But this valuation was still massively inflated over the price assessment the Trump Organization received from Cushman, which valued the 16 lots on the driving range at only $17,725,000 (or roughly $1.1 million per lot after accounting for development time).

488.    To reach a total valuation of $225 million in 2013, the Trump Organization had to change its approach to valuing the golf club by utilizing the Brand Premium Scheme, without disclosing the change in the Statement in violation of GAAP rules. Instead of imputing a value

131

Case 22-1175, Document 56, 09/26/2022, 3388914, Page141 of 224

from the amount of a loan plus improvements as it had in previous years, in 2013 the Trump

Organization identified the book value of the club as $56,543,000 and added a "Premium for

fully operational branded facility @ 30%" of $16,962,900, to reach a $73.5 million valuation—

creating an almost a $50 million increase in the valuation of the golf club. This significant

increase in the golf club valuation masked the decrease in the value of the housing lots.

489.     The 2014 valuation of $213 million continued this approach. The club

"appreciated" slightly to $74,300,642 with the 30% brand premium, 24 units were "priced out"

at $41,890,000 (an average of about $1.75 million), and the 39 remaining lots were listed at an

estimated $2.5 million ($97,500,000 total).

490.     This valuation, however, was undermined when the Trump Organization also

decided to pursue the easement donation over the driving range property after all and began the

process of obtaining the necessary formal appraisal to support the donation. By August 2014,

Trump tax counsel Sheri Dillon had engaged Cushman appraisers Brian Curry and Richard

Zbranek to value the TNGC LA property in 2014 for purposes of donating a conservation

easement over 16 lots that comprised the driving range. On October 16, 2014, Mr. Curry reached

a preliminary valuation for the property of "around $27 to $28MM for the driving range

property." Given the 16 lots at issue in this valuation, Mr. Curry's estimate put the value of each

lot at $1,687,500 to $1,750,000—much lower than the $2.5 million used by the Trump

Organization. The next day, Eric Trump authorized Ms. Dillion to obtain a formal appraisal of

the driving range property.

491.     During the process of preparing that appraisal, Mr. Trump personally pushed to

increase the value of the parcel, arguing that lots were in a "more prestigious" zip code than

other lots on the property and could thus command a "'zip code' premium." Mr. Curry asked Ms.

Dillon to confirm whether the lots were in a different zip code. Trump Organization in-house counsel concluded they were not.

492. But even those preliminary numbers were significantly inflated. Indeed, when Cushman appraisers began to prepare a formal appraisal, they lowered the value of the driving range property down to as little as $20.5 million. They then realized that the engineer concluded that costs associated with developing the lots had been "underestimated," which would have lowered the value even further. The engineer in fact subsequently submitted substantially increased cost estimates on December 10. But during in the process of finalizing the appraisal, Ms. Dillion and the Trump Organization pushed Cushman to increase the appraised value of the driving range parcel, which in turn would increase the value of the easement donation. At one point Mr. Curry wrote to Mr. Zbranek that "Trump is fighting for every $1."

493. Ultimately the appraisal submitted to the Internal Revenue Service valued the donation at $25 million. But the appraisers only reached this valuation by fraudulently manipulating the valuation. Among other things, the appraisers:

   a. Failed to use the final engineering report prepared by the engineer retained to assess the costs of developing the lot. Instead of using the final report which would have raised the cost of developing the lot and hence decreased the value of the donation, the appraisers used a draft report with lower costs and incorporated an unsupported development timeline.

   b. Failed to account for a cost savings to the Trump Organization from the donation. By giving away development rights for the driving range property, the Trump Organization avoided an obligation to build two affordable housing units.

   c. At the last moment, cut by one-third the value to the golf course of having a driving range available to golfers. By dropping the benefit of retaining the driving range from $1.5 million to $1 million, the appraisers inflated the value of the donation by $500,000.

494. In January 2015, the donation of the easement to the Palos Verdes Peninsula Land Conservancy was publicly disclosed. Ms. Dillion advised against the press conference for a host

133

Case 22-1175, Document 56, 09/26/2022, 3388914, Page143 of 224

of reasons, including a desire to avoid drawing undue scrutiny to the transaction. On January 14, 2015, she wrote to an in-house lawyer at the Trump Organization: "Remind him that the larger the value and the more he makes of it, then he is telling the world how large a tax deduction he is taking for it. In this case, this is tantamount to the US taxpayers paying Donald Trump to keep his driving range and use it for exactly what he is already using it for - and some could argue that as long as he is operating the golf course, he would continue to keep the driving range - effectively, the US taxpayers are paying him to do what he would already do anyway, and perhaps this isn't the best use of taxpayer dollars. Bottom line - the more publicity this gets, the more we invite scrutiny. This may cause renewed interest in the issue."

495. Mr. Trump nevertheless decided to hold a press conference at TNGC LA to announce the donation. Mr. Trump explained: "It's something I've been thinking about for a year, maybe a little longer than a year, and I decided to pull the trigger and do it," adding that giving up entitlements to develop the land "was not an easy thing to do" because it is valued at "much more than $25 million."

496. Having publicly disclosed the donation, in 2015, the Trump Organization adjusted its valuation—partially—to conform to the appraisal that Cushman prepared in connection with Mr. Trump's donation of a conservation easement over the driving range. The valuation acknowledged that 16 donated lots could no longer be built after the donation. It purported to value 23 remaining lots at a value reached in the appraisal, $50,450,000 (about $2.2 million per lot). Unlike the appraisal, however, the Trump Organization failed to discount that value back to present value.

497. Adopting some of the figures from the appraisal superficially conformed with the valuation provided by Cushman. However, the Trump valuation assumed that the lots would be

developed promptly even though the Trump Organization had no intent to develop the lots, and
disregarded the discounted cash flow analysis Cushman performed. And, in fact, as depicted
below, the lots remain cleared of vegetation but bare of development today.



498.    As for the golf course component of the TNGC LA valuation, in 2015, after a
shift from the previous 30% brand premium to a 15% brand premium—in accordance with the
Trump Organization's change in valuation for the other clubs that year but contrary to the
disclosure in the Statement that no brand value was included—the value was reduced to
$56,615,895.

499.    But even this reduced valuation was still higher than the (inflated) valuation
reached by the Cushman appraisers for purposes of the tax deduction. The appraisal prepared by

Mr. Zbranek and Mr. Curry reached a valuation of the golf club using "direct capitalization" and sales comparison approaches. Their analysis placed the property's value at a mere $16 million—less than 30% of the value on Mr. Trump's Statement.

500. From 2016 through 2018, the Trump Organization continued the same approach to valuation it used in 2015: superficially purporting to use the valuation reached by Cushman to value the 23 lots it never developed, adopting inflated estimates for other unsold lots, failing to use the Cushman appraisal's valuation of the golf course itself, and applying an undisclosed brand premium that inflated the value of the golf club.

501. For 2019 and 2020, the Trump Organization used a similar approach. In 2019 and 2020, the Trump Organization adopted values purportedly "from a 3rd party real estate agent" rather than the Cushman appraisal or their internal sales records regarding sales prices at the site. And the Trump Organization did not do a discounted cash flow analysis that would have accounted for the time it would take to develop the site and sell the lots. Moreover, far from receiving updated pricing "from a 3rd party real estate agent," as the supporting data spreadsheets indicate, 2020 backup information indicates the "pricing" came from within the Trump Organization, from a person at Trump International Realty with a trumporg.com email address.

502. In 2021, the Trump Organization continued the same approach of adopting inflated estimates for unsold lots, relying this time on "2021 pricing from [Trump International Realty] and updated internal costs" to reach a higher value still of $63,663,391, or about $2.77 million per lot – again without performing a discounted cash flow analysis to account for development and sales time. The 2021 pricing schedule appears to be in the same form as the

Case 22-1775, Document 56, 09/26/2022, 3388914, Page146 of 224

2019 and 2020 schedules, indicating had been false to state that those schedules ever came from a third party agent.

> g.   *TNGC Colts Neck*

503.     In July 2008, the Trump Organization, through the entity Trump National Golf Club Colts Neck LLC, purchased TNGC Colts Neck for $28 million.

504.     The valuations of TNGC Colts Neck on the Statements of Financial Condition from 2011 to 2020 were false and misleading in ways that mirror the valuations of other club facilities.

505.     The 2011 Statement of Financial Condition valuation of TNGC Colts Neck was infected by false and misleading statements in the supporting data and the Statement itself.

506.     The valuation in this year had two essential components: (1) purchase price and improvements of the clubhouse, and (2) the purported value of unsold memberships. These figures were both false and misleading in important respects.

507.     As for the purchase price of the clubhouse and improvements, those figures were inflated by employing the Membership Deposit Scheme.

508.     As for the unsold memberships, the Trump Organization employed the Unsold Membership Scheme, pricing the vast majority of unsold membership at two to more than three times the then-current $50,000 price of a membership and failing to account for the considerable time it would take to sell those memberships, which would require a cash flow analysis applying a discount rate to bring the projected income to present value.

509.     Nor is there any evidence to suggest that the membership prices and figures reflected in the supporting data were bona fide projections of membership revenue. Indeed, in the entire 2010 calendar year, the Trump Organization collected $419,667 in initiation fees at TNGC Colts Neck. At the price listed in the supporting data that would mean about 8 members joined

the club—not the 25 stated to pay $50,000 or the 177 stated to pay higher amounts. And, in July 2011, the Trump Organization established a promotional program where they waived initiation fees for any member who joined for a minimum of three years. In 2011, the Trump Organization collected less than $300,000 in initiation fees from TNGC Colts Neck.

510.    Beginning in 2012, the Trump Organization shifted to employing the Fixed-Assets Scheme, the Membership Deposit Scheme, and starting in 2013, the Brand Premium Scheme to inflate the valuation, without disclosing the change in violation of GAAP rules.

511.    Specifically for the membership deposits, despite advising recipients of the Statements that these were worthless liabilities, the Trump Organization included their full face value ($11.7 million) to inflate the purchase price of the club to approximately $40 million from 2012 to 2021.

512.    On top of that inflated purchase price, the Trump Organization from 2013 to 2020 added a brand premium, even though the Statements represented that no amount was included for the Trump brand. Adding a brand premium not only conflicted with the description in the Statements, but violated the GAAP rule requiring that brand premium be excluded.

513.    In 2021 the Trump Organization switched to valuing the club based on 10 times earnings before interest, taxes, depreciation, and amortization or "EBITDA," per the advice of the outside golf consultant they had ignored in earlier years. The resulting valuation of $27,583,948 is about half of the valuation from 2020 of $55,191,322.

514.    Therefore, when valued based on an income approach after thirteen years of ownership and capital expenditures by Mr. Trump, TNGC Colts Neck is worth less than the original $28 million purchase price absent membership deposits paid in 2008.

Case 22-1175, Document 56, 09/26/2022, 3388914, Page148 of 224

### h. *TNGC Philadelphia*

515.     Through an entity called TNGC Pine Hill LLC, Mr. Trump purchased a ground lease interest in TNGC Philadelphia located in Pine Hill, NJ, for a purchase price of $4,750,000 in 2009.

516.     The Statements of Financial Condition from 2011 to 2021 do not disclose that Mr. Trump owns a leasehold interest for TNGC Philadelphia. Instead, the Statements misleadingly suggest that Mr. Trump holds a fee simple interest, and value the club either by employing the Unsold Memberships Scheme or by employing the Fixed-Assets Scheme. This was false and misleading for a number of reasons.

517.     First, each of the Statements from 2011 to 2013 indicated that TNGC Philadelphia was valued based on "an assessment of the cash flow that is expected to be derived from club operations." This was false and misleading for a number of reasons, including because the Fixed-Assets Scheme does not consider cash flow from operations.

518.     Second, the supporting data for the years 2011 through 2020 confirms that the Trump Organization did not account for ground lease expenses when computing valuations of the property. The valuations failed to include rent payments required under the terms of the ground lease or account for the fact that the ground lease agreement requires consent of the landlord in order for Mr. Trump to transfer his leasehold interest to non-related parties.

519.     Third, the Trump Organization employed the Unsold Membership Scheme in 2011 and 2012. For example, in 2011 the listed initiation fee was only $10,000, but the company valued all of the unsold memberships at prices ranging between $15,000 and $35,000. And in 2012 the unsold memberships were valued at prices ranging between $15,000 to $30,000. In reality, Trump Organization records showed that most initiation fees were waived for new members of TNGC Philadelphia from 2010 to 2013.

Case 22-1175, Document 56, 09/26/2022, 3388914, Page149 of 224

520.     Fourth, the Trump Organization employed the Membership Deposit Scheme, including as part of the purchase price the full face value of refundable membership deposits of $953,237 despite declaring in the Statements that the liability for the membership deposits was zero dollars.

521.     At the very least, in accordance with GAAP, the Trump Organization should have used the present value of the liability Mr. Trump assumed for the membership deposits. According to the Trump Organization's internal analysis, the first repayment of a deposit for TNGC Philadelphia was not expected until 2027 and the present value of the obligations would be less than one-third of the "actual" or nominal dollar value.

522.     Fifth, from 2013 to 2020, the Trump Organization employed the Brand Premium Scheme, even though the Statements disclaimed adding brand value and GAAP rules prohibit such premiums.

523.     In 2021 the club was valued using the average of net fixed assets and gross revenue times a multiplier. This led to a reduction in value of almost $10 million from 2020.

*i.*     *TNGC DC*

524.     The valuations of TNGC DC on the Statements of Financial Condition from at least 2011 to 2021 were false and misleading in ways that mirror the valuations of other club facilities.

525.     The valuations of TNGC DC in the 2011 and 2012 Statements of Financial Condition had two essential components: (1) purchase price plus improvements; and (2) the purported value of unsold memberships.

526.     For 2011 and 2012, the cost of a full individual golf membership was $25,000 and the cost of a corporate membership was $125,000. Nevertheless, employing the Unsold Membership Scheme for the valuations in those years, the company valued nearly all of the

140

Case 22-1175, Document 56, 09/26/2022, 3388914, Page150 of 224

unsold memberships well above those prices—mostly in a range between $75,000 and

$225,000—without any cash flow analysis..

527.    Beginning in 2013 and continuing through 2021, the Trump Organization

employed the Fixed-Assets Scheme—without disclosing the change in violation of GAAP rules–

which produced valuations that were false and misleading in numerous respects.

528.    First, each of the Statements from 2011 to 2013 indicated that TNGC DC was

valued based on "an assessment of the cash flow that is expected to be derived from club

operations." This was false and misleading for a number of reasons, including because the Fixed-

Assets Scheme does not consider cash flow from operations.

529.    Second, the Trump Organization employed the Membership Deposit Scheme,

including as part of the purchase price from 2013 to 2020 the full face value of refundable

membership deposits of $16,131,075 despite declaring in the Statements that the liability for the

membership deposits was zero dollars.

530.    At the very least, in accordance with GAAP, the Trump Organization should have

used the present value of the liability Mr. Trump assumed for the membership deposits.

According to the Trump Organization's internal analysis, the first repayment of a deposit for

TNGC DC was not expected until 2022 and the present value of the obligations would be a small

fraction of the "actual" or nominal dollar value.

531.    Third, from 2013 to 2020, the Trump Organization employed the Brand Premium

Scheme, adding either 30% or 15% (depending on the year) to fixed assets, even though the

Statements represented that no brand value was included and GAAP rules prohibit adding any

such internally developed intangible brand premiums.

Case 22-1175, Document 56, 09/26/2022, 3388914, Page151 of 224

532.    In 2021, when the club switched to using an EBITDA multiplier, the valuation

fell by $17 million from the 2020 figure.

### j.    TNGC Charlotte

533.    The valuations of TNGC Charlotte on the Statements of Financial Condition from

2012 to 2020 were false and misleading in ways that mirror the valuations of other club facilities.

534.    For the 2012 Statement of Financial Condition valuation of TNGC Charlotte, the

Trump Organization employed the Membership Deposit Scheme -- including the full face value

of refundable membership deposits of $4,080,550 despite declaring in the Statements that the

liability for the membership deposits was zero dollars – and the Unsold Membership Scheme,

and also included a value for the "club improvement fund."

535.    With respect to the membership deposits, at the very least, in accordance with

GAAP, the Trump Organization should have used the present value of the liability Mr. Trump

assumed. According to the Trump Organization's internal analysis, the first repayment of a

deposit for TNGC Charlotte was not expected until 2028 and the present value of the obligations

would be a small fraction of the "actual" or nominal dollar value.

536.    For 2013 and continuing through 2020, the Trump Organization continued to

employ the Membership Deposit Scheme, adding to the purchase price the full face value of

refundable membership deposits of $4,080,550.

537.    Also during these years, the Trump Organization employed the Brand Premium

Scheme, adding either 30% or 15% (depending on the year) to fixed assets, even though the

Statements represented that no brand value was included and GAAP rules prohibit adding any

such internally developed intangible brand premiums.

142

Case 22-1175, Document 56, 09/26/2022, 3388914, Page152 of 224

*k.  TNGC Hudson Valley*

538.    Mr. Trump purchased a ground lease interest in TNGC Hudson Valley through an entity called TNGC Dutchess County LLC for a stated purchase price of $3 million in 2009.

539.    The Statements of Financial Condition from 2011 to 2021 do not disclose that Mr. Trump owns a leasehold interest for TNGC Hudson Valley. Instead, the Statements misleadingly suggest that Mr. Trump holds a fee simple interest, and value the club either by employing the Unsold Memberships Scheme or by employing the Fixed-Assets Scheme. This was false and misleading for a number of reasons.

540.    First, each of the Statements from 2011 to 2013 indicated that TNGC Hudson Valley was valued based on "an assessment of the cash flow that is expected to be derived from club operations." This was false and misleading for a number of reasons, including because the Fixed-Assets Scheme does not consider cash flow from operations.

541.    Second, the supporting data for the years 2011 through 2021 confirms that the Trump Organization did not account for ground lease expenses when computing valuations of the property. The valuations failed to include rent payments required under the terms of the ground lease or account for the fact that the ground lease agreement requires consent of the landlord in order for Mr. Trump to transfer his leasehold interest to non-related parties.

542.    Third, the Trump Organization employed for the valuations in 2011 and 2012 the Unsold Membership Scheme. For example, in 2011 and 2012 the listed initiation fee was only $10,000, but in 2011 the company valued more than 93% of 161 unsold memberships at prices between $15,000 and $25,000, and in and 2012 the company valued 78% of the 254 unsold memberships at prices ranging between $15,000 and $30,000; meanwhile, Trump Organization records showed that most initiation fees were waived for new members of TNGC Hudson Valley from 2010 to 2012.

143

Case 22-1175, Document 56, 09/26/2022, 3388914, Page153 of 224

543.     Fourth, the Trump Organization employed the Membership Deposit Scheme, including as part of the purchase price the full face value of refundable membership deposits of $1,235,619 despite declaring in the Statements that liability for the membership deposits was zero dollars. At the very least, in accordance with GAAP, the Trump Organization should have used the present value of the liability Mr. Trump assumed for the membership deposits. According to the Trump Organization's internal analysis, the present value of the obligations would be a fraction of the "actual" or nominal dollar value.

544.     Fifth, from 2013 to 2020, the Trump Organization employed the Brand Premium Scheme, even though the Statements disclaimed adding brand value and GAAP rules prohibit such premiums.

545.     In 2021 the club was valued using a combination of fixed assets and income, and the valuation fell by almost $4 million – roughly 25% – from the 2020 figure.

### 12. Real Estate Licensing Developments

546.     From 2011 to present, Mr. Trump's Statement has included a category entitled Real Estate Licensing Developments.

547.     This category is represented to value "associations with others for the purpose of developing and managing properties" and the "cash flow that is expected to be derived . . . from these associations as their potential is realized."

548.     The value assessment included in the Statements was represented to include "only situations which have evolved to the point where signed arrangements with the other parties exist and fees and other compensation which will be earned are reasonably quantifiable."

549.     Mr. Trump and the Trump Organization fraudulently inflated the valuation of the Real Estate Licensing Developments category in a number of ways.

144

550.     One means of inflation was by including from 2015 to 2018 speculative and non-existent deals as components of the value—deals expressly identified on financial records supporting the valuation as "TBD," i.e. to be determined. These TBD deals included arrangements in Asia and the Middle East, were described in a list of purported "new openings," and were based on purely speculative projections that included thousands of new hotel rooms and millions of dollars in additional revenue. The inclusion of these TBD deals conflicted with the express representation in the Statements that only deals that "exist" and for which compensation was "reasonably quantifiable" were included.

551.     And including the TBD deals in the 2016 and 2017 Statements was misleading for an additional reason. Both of these Statements were issued after January 20, 2017 – the date of the inauguration – when the Trump Organization purportedly ceased pursuing foreign deals consistent with public representations by Mr. Trump and his company and express restrictions incorporated into Mr. Trump's revocable trust, as confirmed by Donald Trump, Jr., a trustee under that trust, that precluded any Trump Organization entity from entering into any new management agreement in any foreign jurisdiction that uses the Trump brand. But the valuation on these two Statements still included prospective new foreign deals. Assuming the Trump Organization adhered to the ban on foreign deals put in place as of January 20, 2017, it was false and misleading to include such prohibited foreign deals in the 2016 and 2017 Statement valuations.

552.     The impact of including the TBD deals was substantial. As shown in the chart below, the TBD deals accounted for between 20-30% of the total Real Estate Licensing Development valuations from 2015 to 2018:

Case 22-1175, Document 56, 09/26/2022, 3388914, Page155 of 224

| Year | Total (only figure on the Statement) | Future Management Portfolio – TBD Deals | % of Total |
|------|--------------------------------------|-----------------------------------------|------------|
| 2015 | $339,000,000 | $103,536,391 | 30.5% |
| 2016 | $227,400,000 | $46,312,797 | 20.4% |
| 2017 | $246,000,000 | $52,731,562 | 21.4% |
| 2018 | $202,900,000 | $45,198,994 | 22.3% |

553.     According to Allen Weisselberg: "Licensing generally was handled by Ivanka in that I'll call it twenty-fifth floor, that's where they're located, it was a whole licensing department down there and they worked on those deals."

554.     Ms. Trump and her brothers Donald Trump, Jr. and Eric Trump were also well aware of the actual revenue derived from licensing in general, and international licensing in particular given their financial interest in those projects. Each of them were paid a "consulting fee" on international licensing deals through an entity called TTT Consulting, LLC, which was jointly owned by the three children. Each child owned 33.3% of the company and they received regular distributions, including Ivanka Trump after she left the company in January 2017.

555.     Another means of inflation was including in this category a number of deals between entities within the Trump Organization concerning its own properties, including Doral, OPO, and Trump Chicago—deals in accounting parlance that are known as "related party transactions" because they are not arms-length deals in the marketplace but rather deals between affiliates. Including these related party transactions was contrary to the representation in the Statements that this category included only the value derived from "associations with others" that materialized into actual, signed agreements when in fact the value was substantially inflated through the inclusion of self-dealing agreements among and between Trump Organization affiliates.

146

Case 22-1175, Document 56, 09/26/2022, 3388914, Page156 of 224

556.     Including the value of related party transactions also constituted a substantial,

undisclosed departure from GAAP, which generally requires disclosure of details of related party

transactions because, among other reasons, such self-dealing transactions are not arms-length

transactions in the marketplace. See, e.g., Accounting Standards Codification (ASC) No. 850.

Here, if properly disclosed, a reader would have understood that the Trump Organization was

valuing its own intracompany deals—not deals negotiated at arms-length in the marketplace.

557.     Finally, the Trump Organization inflated the valuations in this category from 2011

to 2018 by including so-called incentive licensing fees in a fraudulent and misleading manner.

These are fees that are anticipated to be earned over the life of a project typically expected to last

several years but were treated for purposes of the valuations as if the revenue would be received

over a much shorter period of one or two years. As with other valuations, the Trump

Organization's treatment of incentive licensing fees failed to include a cash flow analysis and

ignored the speculative nature of the anticipated future income.

558.     Starting with the 2019 Statement (issued after the commencement of OAG's

investigation), the Trump Organization applied a discount factor to the valuation of the incentive

licensing fees, and in their calculations indicated that a majority of the deals would be paid out

over a period as long as seven to ten years.

**D.    The False and Misleading Statements of Financial Condition
Were Used to Secure and Maintain Financial Benefits,
Including Financing and Insurance, on Favorable Terms.**

559.     Mr. Trump and the Trump Organization utilized the false and misleading

Statements of Financial Condition in an array of financial transactions, most prominently in

obtaining real estate loans and insurance coverage.

560.     Between 2011 and the present, the Trump Organization has obtained hundreds of

millions of dollars in real estate loans in reliance on, among other things, Mr. Trump's net worth

as reported in his Statements of Financial Condition. The Statements were critical to these loans because in addition to being secured by real property or an "interest in" real property, they were backed by Mr. Trump's personal guaranty—either for the full amount of the loan, for a partial amount of the loan, or for the full amount of the loan in a manner that would "step down" to a partial or zero guaranty depending on the ratio of the loan amount to the value of the underlying real property interest.

561.    The Statements were also a key component of the Trump Organization's insurance submissions to underwriters. For purposes of soliciting and binding one of its insurance programs, the Trump Organization used Mr. Trump's Statements of Financial Condition to satisfy requirements for financial disclosure for Mr. Trump's personal guaranty in lieu of collateral, and specifically misrepresented to underwriters that the valuations of the properties listed in two of the Statements were prepared by outside appraisers. In connection with renewing its directors and officers liability insurance, the Trump Organization also relied on the Statements to satisfy financial disclosure obligations and concealed the existence of at least one governmental investigation involving Mr. Trump and other company employees despite the company's intent and later efforts to seek coverage for defense costs associated with that investigation.

### 1. Deutsche Bank Loan Facilities

562.    The financial relationship between Deutsche Bank and the Trump Organization dates back to the late 1990's and involved multiple loans for hundreds of millions of dollars in total. But at the start of 2011, the Trump Organization had a single outstanding loan held by Deutsche Bank on Trump Chicago with just over $140 million outstanding. The Trump Chicago loan was originated by the Commercial Real Estate ("CRE") lending group in Deutsche Bank.

148

Case 22-1175, Document 56, 09/26/2022, 3388914, Page158 of 224

563.    Starting in 2011 the relationship with Deutsche Bank was revitalized when Mr.
Trump and the Trump Organization initiated a relationship with bankers in the Private Wealth
Management ("PWM") division of Deutsche Bank, which enabled them to obtain more favorable
terms than they could have received through the CRE division by having Mr. Trump personally
guarantee the loans based on his net worth as reflected in his Statements of Financial Condition.

564.    In essence, rather than obtain credit facilities through the wing of Deutsche Bank
with an expertise in commercial real estate, Mr. Trump began to seek funds from a wing of
Deutsche Bank focused on servicing ultrawealthy clients. Hence, Mr. Trump's personal
guaranty, and his representations regarding his finances that backed up that guaranty, featured
prominently in Mr. Trump's loan transactions through the PWM wing of Deutsche Bank.

565.    Between 2011 and May 2022, Deutsche Bank served as the largest single lender
to the Trump Organization and Mr. Trump. At the beginning of May 2022, the Trump
Organization owed the bank approximately $340 million in principal and was spending tens of
millions of dollars annually to service the debt. These loans, each originated by the PWM
division, consisted of: (1) a $170 million facility covering OPO; (2) a $125 million facility
covering Doral; and (3) a $45 million facility covering Trump Chicago. By the end of May 2022,
the Trump Organization had repaid to the bank approximately $295 million of the debt. The
Trump Organization repaid the $170 million OPO loan upon the sale of that property and repaid
the Doral loan by refinancing with another financial institution.

566.    The initial introduction to the PWM division at Deutsche Bank came in
September 2011, when Jared Kushner, the husband of Ivanka Trump, introduced his brother-in-
law Donald Trump, Jr. to Rosemary Vrablic, a Managing Director at the bank in the PWM
division. Kushner told Donald Trump, Jr. that while "Rosemary only lends with recourse,"

meaning with a personal guaranty from the borrower, "the flexibility, rate and service you get is unparalleled." As part of this initial exchange, Vrablic confirmed the need for recourse in PWM loans telling Donald Trump, Jr. "Sorry about the recourse issue - a dirty word, I know - but it is a requirement in private banking."

567.     Kushner was correct that PWM did provide Donald Trump, Jr. – and eventually his father Donald J. Trump and the Trump Organization – unparalleled rates on loans. Each of the three loans outstanding as of May 2022 were shopped to other banks as well as the CRE division within Deutsche Bank. The interest rates offered by PWM were significantly lower than any other offers. As Ivanka Trump wrote after receiving one term sheet from the PWM division: "It doesn't get better than this." And a personal guarantee of each loan by Donald J. Trump was necessary to meet the "recourse" requirement in order to obtain those preferential rates.

568.     As a result of the personal guarantee, the annual Statement of Financial Condition was central to each of those loans. By personally guaranteeing the loans and providing evidence of his liquidity and net worth through his Statements, Mr. Trump obtained for his company a significant improvement in the interest rates on the loans.

569.     The personal guaranty and other loan documents entailed a certification by Mr. Trump of his Statement of Financial Condition as a requirement before any funds would be lent. The regular submission of the Statements of Financial Condition also helped the Trump Organization and Mr. Trump avoid having the loans placed into default, because annual certifications of the accuracy of Mr. Trump's Statements were required. All told, the interest rate savings from the issuance of the false and misleading Statements of Financial Condition totaled between $85 million and $150 million.

Case 22-1175, Document 56, 09/26/2022, 3388914, Page160 of 224

570.     In 2020 when Deutsche Bank learned of the alleged misrepresentations in the Statements from the pendency of the action by OAG to enforce its investigative subpoenas against the Trump Organization and related parties, it asked the Trump Organization a series of questions about those Statements. The Trump Organization refused to respond. Thereafter, Deutsche Bank decided, given the Trump Organization's failure even to answer simple questions concerning the Statements, to exit its relationship with the company. Given the then-outstanding credit facilities totaling hundreds of millions of dollars, that exit would take some time, as each facility had an expiration a few years away.

### 2. Deutsche Bank Loan Issued in Connection with Trump National Doral Golf Club (Florida)

571.     In November 2011, the Trump Organization executed a $150 million purchase and sale agreement for the Doral Golf Resort and Spa as part of a bankruptcy proceeding. The Trump Organization was to serve as a stalking horse bidder in a bankruptcy auction, with an eye toward closing the transaction in June 2012.

572.     The formal process for soliciting the Doral loan began in late October 2011, when Ivanka Trump sent an "Investment Memo" and financial projections for the Doral property to two Deutsche Bank employees.

573.     In November 2011, Mr. Trump began personally contacting banks to secure a loan to purchase Doral. On November 13, 2011, Mr. Trump spoke with Richard Byrne, the CEO of Deutsche Bank Securities to ask if the bank was interested in working with him on financing for the purchase of Doral. Mr. Byrne in turn forwarded the request to the Global Head of the CRE division at the bank who wrote that Doral was "a tough asset and our initial reaction was not enthusiastic."

574.     Nevertheless, on November 14, 2011, the two bankers spoke with Mr. Trump and Ivanka Trump about the loan. The next day, Mr. Trump sent Mr. Byrne a letter, copying Ivanka Trump, enclosing his Statement of Financial Condition and writing, "As per our conversation, I am pleased to enclose the recently completed financial statement of Donald J. Trump (hopefully you will be impressed!)" The letter continued, "I am also enclosing a letter that establishes my brand value, which is not included in my net worth statement."

575.     On November 21, 2011 the CRE division offered the Trump Organization a $130 million loan at LIBOR + 800 basis points, with a LIBOR floor of 2 percent – a minimum 10% interest rate.

576.     The Trump Organization did not accept those terms and continued to look for financing for Doral. In December 2011, Mr. Trump and Ivanka Trump met with Rosemary Vrablic to discuss a potential loan through the PWM division. On December 6, 2011, Ms. Trump emailed Ms. Vrablic that, "My father and I are very much looking forward to meeting with you tomorrow to discuss Doral. I have attached our investment memo as well as some basic information on our golf and hotel portfolios." Ms. Trump copied her husband, Mr. Kushner, on the email who then wrote back just to her saying, "Also – push the relationship AND doral [sic]. Not Doral and the relationship . . . ."

577.     The two sides began negotiating terms and on December 15, 2011, Ms. Vrablic sent Ms. Trump a term sheet proposing a $125 million loan with an interest rate of LIBOR + 225 basis points during a renovation period for the resort and LIBOR + 200 basis points during an amortization period for the resort. The terms of the loan included recourse through a personal guarantee by Mr. Trump of all principal and interest due on the loan and the operating expenses

Case 22-1175, Document 56, 09/26/2022, 3388914, Page162 of 224

of the resort. The proposal also included a number of covenants including requirements that Mr. Trump maintain a minimum net worth of $3 billion and unencumbered liquidity of $50 million.

578.    Ivanka Trump forwarded the proposal to Allen Weisselberg, Jason Greenblatt (Executive Vice President and Chief Legal Officer), and Dave Orowitz (Senior Vice President, Acquisitions and Development) writing: "It doesn't get better than this . . . . I am tempted not to negotiate this though."

579.    Mr. Greenblatt wrote back: "I will review, but [note] immediately that this is a FULL principal and interest and operating expense personal guaranty. Is DJT willing to do that? Also, the net worth covenants and DJT indebtedness limitations would seem to be a problem?"

580.    Ms. Trump then responded: "That we have known from day one. We wanted to get a great rate and the only way to get proceeds/term and principle where we want them is to guarantee the deal. As the market has illustrated getting leverage on resorts right now is not easy (ie 125 plus an equity kicker for 25 percent or Beal with full cash flow sweeps and steep prepayment penalties.)"[7]

581.    Mr. Greenblatt again responded writing: "Obviously this is not my decision, but this is completely inconsistent with what he told me he would ever do again when we had the Chi and vegas issues and the magnitude of this is much bigger. He was so angry that he got himself 'into the chi/vegas mess' and told me he NEVER wanted to do this again." Mr. Greenblatt closed by noting "While none of this is my call, this is a highly risky proposition."

582.    On December 18, 2011, Ivanka Trump sent a revised term sheet back to Ms. Vrablic, copying Allen Weisselberg, seeking to reduce Mr. Trump's net worth covenant from $3

---

[7] "Beal" is a reference to Beal Bank, another financial institution the Trump Organization contacted about a loan for Doral.

Case 22-1175, Document 56, 09/26/2022, 3388914, Page163 of 224

billion to $2 billion, and to reduce loan payments by making the full term of the loan interest-only (as opposed to having a period when payments would be principal plus interest).

583.    In an internal credit report dated December 20, 2011, Deutsche Bank employees from the PWM division sought the approval of a $125 million term commitment for the Doral property. This report noted "[t]he Facility will also be supported by a full and unconditional guarantee provided by DJT of (i) Principal and Interest due under the Facility, and (ii) operating shortfalls of the Resort . . . ."

584.    The credit memo listed this guaranty as a source of repayment, and recommended approval of the loan. The memo stated that "[t]he Facility is being recommended for approval based on" a series of factors, the first of which was "Financial Strength of the Guarantor" and another of which was the nature of the personal guaranty. In connection with that recommendation, the credit memo evaluated assets reported on Mr. Trump's Statement of Financial Condition for the year ending June 30, 2011. For many of the assets listed on Mr. Trump's Statement, the credit memo identified Mr. Trump's valuation and then a "DB Valuation." The DB Valuation included reductions to asset values based on applying "haircuts" to account for the risk that an asset's value might change in the future and the risk that the borrower's valuation might be overly optimistic. These reductions were not intended to account for fraud or knowing misrepresentations by a borrower. The result of those "DB Valuations" was to derive a "DB Adjusted" net worth for Mr. Trump for purposes of the bank's evaluation.

585.    In support of the loan application, the Trump Organization submitted an appraisal of the Doral property prepared by CBRE for a different financial institution (Beal Bank based in Texas). When this appraisal was received, one of Deutsche Bank's appraisal reviewers was asked to "drop everything" and review it. That reviewer identified numerous problems with the

Case 22-1175, Document 56, 09/26/2022, 3388914, Page164 of 224

appraisal, and understood (as reflected in contemporaneous emails) that the matter would

escalate internally once he raised those problems: "PWM wants to do the deal and I am rejecting

the appraisal. [PWM Banker] said this is a very high profile deal and that her bosses will be

elevating this . . . ."

586.    In response to those concerns, Deutsche Bank personnel in February 2012

submitted a new credit memo to alter the terms of their prior credit memo. As a result of those

changes, one tranche of the loan – amounting to $19 million – became an unsecured personal

loan.

587.    The Doral loan closed on June 11, 2012, with a loan to Trump Endeavor 12 LLC

personally guaranteed by Mr. Trump. Interest on the loan was set for LIBOR + 2.25 during a

renovation period, and LIBOR + 2.0 thereafter.

588.    The loan agreement, signed by Mr. Trump, required that Mr. Trump's June 30,

2011 Statement of Financial Condition have been provided to the bank as a precondition of

lending.

589.    In multiple instances, the loan agreement required that Mr. Trump certify the

accuracy of that statement. In particular, the agreement contained a provision entitled, "Full and

Accurate Disclosure." This provision required Mr. Trump to make a representation that no

information contained in any loan document or in "any written statement furnished by or on

behalf of Borrower or any other party pursuant to the terms of the" loan or associated documents

"contains any untrue statement of a material fact or omits to state a material fact necessary to

make any material statements contained herein or therein not misleading in light of the

circumstances under which they were made." Similarly, issuance of the loan was noted to be

subject to several conditions precedent, including that "[t]he representations and warranties of

Case 22-1175, Document 56, 09/26/2022, 3388914, Page165 of 224

Borrower contained in this Agreement and in all certificates, documents and instruments delivered pursuant to this Agreement and the Loan Documents shall be true and correct on and as of the Closing Date."

590. The loan required submission of annual financial statements by the Doral operating entity on an unaudited basis but certified as presenting fairly that entity's financial condition and results in all material respects. The loan further included a debt service coverage ratio ("DSCR") covenant and a loan-to-value ("LTV") ratio covenant.

591. Mr. Trump's personal guaranty, which he signed, included various financial representations. Mr. Trump, as guarantor, was required to certify the truth and accuracy of his Statement of Financial Condition as a condition of the guaranty—reliance on which Mr. Trump agreed the loan itself was granted. As the guaranty spells out, "In order to induce Lender to accept this Guaranty and to enter into the Credit Agreement and the transactions thereunder, Guarantor hereby makes the following representations and warranties as of the date hereof." One of those representations was: "Guarantor has furnished to Lender his Prior Financial Statements. Such Prior Financial Statements are true and correct in all material respects and (i) Guarantor's Statement of Financial Condition presents fairly Guarantor's financial condition as of June 30, 2011." Further, the guaranty stated: "there has been no material adverse change in any condition, fact, circumstance or event that would make the Prior Financial Statements, reports, certificates or other documents submitted by Guarantor in connection with this Guaranty and the other Credit Documents to which he is a party inaccurate, incomplete or otherwise misleading in any material respect." The guaranty further stated that "all the Guaranteed Obligations," referring to the entirety of the loan and other obligations Mr. Trump guaranteed, "shall be conclusively presumed to have been created in reliance hereon."

592.     Pursuant to the guaranty, Mr. Trump was required to maintain $50 million in unencumbered liquidity, and a minimum net worth of $2.5 billion to be "tested and certified to on an annual basis based upon the Statement of Financial Condition delivered to Lender during each year." That language means the bank would determine Mr. Trump's compliance with his net worth covenant by reference solely to the net worth Mr. Trump *reported* and certified to the bank.

593.     Mr. Trump was also required to "keep and maintain complete and accurate books and records" and periodically to "deliver to Lender or permit Lender to review," a series of documents under the guaranty's financial reporting requirements. One of those submissions was a statement of financial condition, which was to be delivered annually with a compliance certificate certifying the statement "presents fairly in all material respects the financial condition of Guarantor at the period presented."

594.     False certifications of such financial statements were expressly identified as events of default under the loan agreement. Under the loan, "[a]ny representation or warranty of Borrower or Guarantor herein or in any other Loan Document or any amendment to any thereof shall prove to have been false and misleading in any material respect at the time made or intended to be effective" was one of several "events of default." The term "Loan Documents" includes the loan agreement, guaranty, and, *inter alia*, "any other document, agreement, consent, or instrument which has been or will be executed in connection with" the agreement and guaranty, and thus would include annual signed certifications, which provide they would be executed by Mr. Trump.

595.     Mr. Trump submitted Statements of Financial Condition to Deutsche Bank accompanied by certifications required as described above for the years 2014 through 2021

157

(executed either personally or, for years 2016 and later, by Donald Trump, Jr. or Eric Trump, as attorney-in-fact for Mr. Trump). When combined with certifications related to other loans, Mr. Trump (or his attorney-in-fact) certified the accuracy of his Statement of Financial Condition to Deutsche Bank for every year from 2011 through 2021.

596.      Subsequent to the loan's origination, Deutsche Bank in a credit memo in July 2013 approved a modified version of the guaranty that enabled Mr. Trump's guaranteed obligation to step down, on a percentage basis, as the LTV ratio of the loan improved. This step-down scale kept Mr. Trump's guaranty at 100% of the guaranteed obligations if the LTV ratio fell between 66% and 85%, stepping down to 40% (LTV 56-65%), 20% (LTV 46-55%), 10% (LTV 36-45%), and 0% (LTV 35% and below). Mr. Trump's net worth covenant under this loan would also step down, based on the percentage of the guaranty that applied (in other words, if the guaranty had stepped down to 40%, then the governing net worth covenant would be 40% of $2.5 billion). The step-down in the guaranty would correlate with an increase in the loan's DSCR covenant amount (in essence, corroborating that the property's cash flow increased to balance the bank's risk in reducing the guaranty level). This credit memo document, which also was part of the annual review of the Trump Doral loan, evaluated Mr. Trump's 2011 and 2012 Statements of Financial Condition. An amended Doral guaranty dated August 12, 2013 indicates the guaranty would be "terminated" upon the reduction of the step-down percentage to 0%.

597.      Incorporating figures from Mr. Trump's Statements of Financial Condition submitted in conjunction with compliance certificates, Deutsche Bank conducted annual reviews of the Doral loan in July 2013, May 2014, July 2015, July 2016, July 2017, July 2018, September 2019, July 2020, and July 2021.

598.     Pursuant to an appraisal provided by the Trump Organization in 2015, the loan-to-value ratio dropped to 34%--sufficient to eliminate Mr. Trump's personal guaranty. But, according to a bank credit memo, "Trump has requested to maintain a 10% guarantee on the combined loan amount of both tranches resulting in the facility being priced at L+1.75%"—in other words, the Trump Organization maintained a personal guaranty to keep the interest rate at a preferred level.

599.     The loan remained outstanding until May 2022. As a result, Deutsche Bank received Mr. Trump's Statements of Financial Condition as of June 30, 2019, June 30, 2020 and June 30, 2021.

600.     On May 26, 2022, the Trump Organization refinanced the loan through Axos Bank, repaying the $125 million of principal outstanding to Deutsche Bank.

### 3. Deutsche Bank Loan Issued in Connection with Trump Chicago (2012)

601.     Roughly contemporaneously with the Doral loan's closing in June 2012, the Trump Organization sought another loan from the PWM group at Deutsche Bank in connection with the Trump Chicago property—in essence, a refinancing of an existing $130 million from the CRE group at Deutsche Bank on that property.

602.     Dueling proposals within Deutsche Bank were under discussion in or about March 2012. A memo drafted by the credit risk management group articulated the differences between them. One proposal from the CRE group was for a non-recourse (meaning, no personal guaranty) loan facility with an interest rate of LIBOR plus 800 basis points. The other proposal from the PWM group was for a loan facility *with* a personal guaranty at LIBOR plus 400 basis points—so, four percentage points lower, in terms of the interest rate. Both proposals were for two-year terms, though they may have had other differences. The difference between these two proposals indicates that Mr. Trump's personal guaranty, which was to be procured by means of

159

his Statement of Financial Condition, accounted for a difference in interest rate of approximately

four percentage points on the loan. The memo notes as "Credit Support" that "Donald Trump has

reported Net Worth of $4.0 billion with liquidity of approximately $250 million."

603.     In October 2012, PWM recommended approval of a loan of up to $107 million to

401 North Wabash Venture LLC, guaranteed personally by Donald J. Trump. Given the mixed

nature of the hotel-condo property, the loan was broken down into two facilities. One facility

(Facility A) concerned the residential component—unsold residential condominium units,

deeded parking spaces, storage spaces, and the like. The second facility (Facility B) concerned

the commercial component—"a full service hotel, including 339 condo-hotel rooms, of which

175 are Borrower owned," and various other commercial operations at the property. Facility A

was to be for up to $62 million, for a 4-year term, at a rate of LIBOR plus 3.35%; Facility B was

to be for up to $45 million, for a 5-year term, at a rate of LIBOR plus 2.25%. For Facility A, the

bank listed the primary source of repayment as the sale of the remaining un-sold condo units, and

for facility B the cash flow generated by commercial components.

604.     For both facilities, a source of repayment was "[f]ull and unconditional guarantee

of DJT which eliminates any shortfall associated with operating and liquidation of the

Collateral." In addition, the memo noted its "recommendation" was based in part on "Financial

Strength of the Guarantor," the "Nature of the Guarantee," and a developing relationship

between the bank and Mr. Trump and his family.

605.     As with the Doral credit memo from 2011, this credit memo assessed Mr.

Trump's Statements of Financial Condition. In connection with that assessment, the credit memo

stated: "Although Facilities are secured by the Collateral, given its unique nature, the credit

exposure is being recommended based on the financial profile of the Guarantor." The memo

Case 22-1175, Document 56, 09/26/2022, 3388914, Page170 of 224

assessed Mr. Trump's 2011 and 2012 Statements. The bank in this memo derived a "DB

Adjusted" net worth for Mr. Trump by starting with Mr. Trump's reported values, reducing them

to adjusted values to account for the risk that an asset's value might change in the future and that

the borrower's valuation might be overly optimistic, and then totaling assets and subtracting

liabilities.

606.    The loans under the two facilities closed on November 9, 2012. As with the Doral

loan, Mr. Trump personally guaranteed both Trump Chicago loan facilities.

607.    The loan agreements, signed by Mr. Trump, required that Mr. Trump's June 30,

2012 Statement of Financial Condition or his then-most-recent Statement of Financial Condition

have been provided to the bank as a precondition of lending. Mr. Trump's June 30, 2012

Statement of Financial Condition was provided to the bank in October 2012 and figures from

that statement are reflected in the bank's internal consideration of the loans.

608.    In multiple instances, the loan agreements required that Mr. Trump certify the

accuracy of that Statement of Financial Condition. In particular, the agreements contained a

provision entitled, "Full and Accurate Disclosure." This provision required Mr. Trump to make a

representation that no information contained in any loan document or in "any written statement

furnished by or on behalf of Borrower or any other party pursuant to the terms of the" loan or

associated documents "contains any untrue statement of material fact or omits to state a material

fact necessary to make any material statements contained herein or therein not misleading in

light of the circumstances under which they were made." Similarly, both loan documents

contained conditions precedent to lending, including that "[t]he representations and warranties of

Borrower contained in this agreement and in all certificates, documents and instruments

delivered pursuant to this Agreement and the Loan documents shall be true and correct on and as of the Closing Date."

609.    The 2012 Trump Chicago loans each entailed a personal guaranty signed by Mr. Trump. Mr. Trump, as guarantor, was required to certify the truth and accuracy of his Statement of Financial Condition as a condition of the guarantees—reliance on which Mr. Trump agreed the loans themselves were granted. The terms of each 2012 Trump Chicago loan's guarantees were materially identical to the Doral guaranty: Mr. Trump was required to maintain a minimum net worth, based upon his statement of financial condition, of $2.5 billion, and he was required to provide an annual statement of financial condition to the bank accompanied by an executed compliance certificate certifying that the statement "presents fairly in all material respects the financial condition of Guarantor at the period presented." In addition, both loans "shall be conclusively presumed to have been created in reliance" on their respective guarantees.

610.    Each guaranty similarly provided that "Guarantor has furnished to Lender his Prior Financial Statements. Such Prior Financial Statements are true and correct in all material respects and (i) Guarantor's Statement of Financial Condition presents fairly Guarantor's financial condition as of June 30, 2012."

611.    Each guaranty similarly provided that "there has been no material adverse change in any condition, fact, circumstance or event that would make the Prior Financial Statements, reports, certificates or other documents submitted by Guarantor in connection with this Guaranty and the other Credit Documents to which he is a party inaccurate, incomplete or otherwise misleading in any material respect."

Case 22-1175, Document 56, 09/26/2022, 3388914, Page172 of 224

612. False certifications of such financial statements were expressly identified as events of default under the loan agreements, with the same or similar language as had been used in the Doral agreement.

613. Annual reviews including Trump Chicago facilities were conducted in May 2014, July 2015, July 2016, July 2017, July 2018, September 2019, July 2020, and July 2021.

614. During the period between the Trump Chicago closing and the first annual review in May 2014 (with extensions in the interim to align the Trump Chicago annual review with other reviews), the Trump Organization paid down the Trump Chicago loan from an overall balance of $98 million to $19 million from the proceeds of condominium sales.

615. Based upon the purported strength of Mr. Trump's financial profile, the Trump Organization requested an additional $54 million in loan funds from Deutsche Bank to be fully guaranteed by Mr. Trump. According to the Trump Chicago annual review from 2014, "The Borrower has requested a $54 million increase to the current outstanding balance of $19 million for a total loan amount of $73 million." This credit memo states: "The proceeds will be used for business purposes including further real estate acquisitions and working capital." Collateral for the loan would be the seven remaining unsold condominium units and the Trump International Hotel Chicago, and the loan would be "fully guaranteed by Mr. Trump for all principal, interest and operating shortfalls until the balance of the facility is less than $45 million (34% LTV)." Specifically, as set forth in this memo, the modified Trump Chicago loan would include a step-down guarantee like the one for the Doral loan--with the guarantee percentage stepping down based on the LTV ratio, and the DSCR stepping up as the guarantee level dropped. The net worth covenant would also drop on a percentage basis with the guarantee.

163

Case 22-1175, Document 56, 09/26/2022, 3388914, Page173 of 224

616.     The credit memo recommending approval did so based on the "Financial Strength

of the Guarantor," the "DB Relationship" with Mr. Trump and his family, the "quality of the

collateral and LTV," an accelerated repayment schedule, the property's cash flow, and potential

refinancing in the future. Amended loan documents implementing the above covenants and

financial reporting terms closed on June 2, 2014.

617.     As with earlier credit memos, this 2014 credit memo (which also recommended

approval for the $170 million loan in connection with the Old Post Office discussed below)

evaluated Mr. Trump's Statements of Financial Condition. In particular, this credit memo

incorporated figures from the 2011, 2012, and 2013 Statements. In connection with that

assessment, the credit memo stated: "Although Facilities are secured by Collateral, given the

unique nature of these credits, the credit exposure is being recommended based on the financial

profile of the Guarantor." The bank in this memo derived a "DB Adjusted" net worth for Mr.

Trump as of June 30, 2013 by starting with Mr. Trump's reported values, reducing them to

adjusted values to account for the risk that an asset's value might change in the future and that

the borrower's valuation might be overly optimistic, and then totaling assets and subtracting

liabilities.

618.     Amended Trump Chicago loan documents—including an agreement and a

personal guaranty—were executed by Mr. Trump in May 2014. These new loan documents

contained terms and conditions governing submission, certification, and misrepresentation of Mr.

Trump's Statements of Financial Condition that were substantially similar to those describe

above for the Doral and 2012 Trump Chicago loans. In the amended Trump Chicago guaranty,

Mr. Trump certified that his June 30, 2013 Statement of Financial Condition was true and correct

in all material respects and that the Statement "presents fairly Guarantor's financial condition as of June 30, 2013."

619.     By the time of the annual review in July 2015, the Trump Organization had paid down the Trump Chicago loan to an overall balance of $45 million. Since the property had been appraised at $133 million, Mr. Trump's personal guarantee was eliminated because the LTV ratio was 34%--below the 35% threshold in the stepdown provision. A subsequent credit report states: "the loan documentation identifies the Guaranty reduction as a permanent event, meaning appraisals that are completed going forward will not change the Guaranty level, regardless of their value."

620.     Either Mr. Trump, Eric Trump or his trustees certified the accuracy of the Statement of Financial Condition in connection with the Trump Chicago loans discussed herein for every year from 2013 through 2021, either through the execution of an amended guaranty or through the submission of a compliance certificate.

### 4. Deutsche Bank Loan Issued in Connection with Trump Old Post Office Hotel in Washington, D.C.

621.     In approximately July 2013, Deutsche Bank began considering whether to extend credit for the Trump Organization's redevelopment of OPO in Washington, DC.

622.     The Trump Organization had obtained the right to redevelop the property as the result of a bidding process by the U.S. General Services Administration that company described as "one of the most competitive selection processes in the history of the agency." According to the Trump Organization:

> Over twenty of the top hotel companies in the world bid on the project, and The Trump Organization was awarded the job based on the strength of Trump development capabilities, financial wherewithal, vision for the property, and dedication to the preservation of the historic structure.

165

623.    The Statement of Financial Condition was central to that successful effort, captained by Ivanka Trump. The GSA's request for proposals provided that a bidder's "Financial Capacity and Capability" was to be a factor in the government's decision, and required submission of the most recent three years of financial statements.

624.    Mr. Trump's Statements, prepared in the same process described above, were submitted as part of Mr. Trump's July 2011 bid.

625.    Mr. Trump and Ivanka Trump participated personally in the bidding process in 2011. In particular, Ivanka Trump was involved in crafting communications to the GSA in connection with the bid and in responding to deficiency comments raised by the GSA. Those communications concerned, among other topics, Mr. Trump's Statements of Financial Condition, including their departures from GAAP and contained detailed information about Mr. Trump's financial capabilities as well as his ability to perform the obligations under the lease at issue. The GSA questioned the use of Mr. Trump's Statements, and Mr. Trump and Ms. Trump participated in an in-person presentation to address GSA's concerns about those topics and others.

626.    After addressing those issues, the Trump Organization was ultimately selected by GSA in February 2012 to redevelop the property and signed a lease for that purpose on August 5, 2013.

627.    In advance of executing the lease, the Trump Organization reached out to the CRE group at Deutsche Bank about potential financing for the project. Despite the request coming into the CRE group, Rosemary Vrablic from the PWM group of the bank—at the urging of Ivanka Trump—kept close tabs on the bank's consideration of the request.

628.    By October 2013, the CRE group had proposed a term sheet offering the Trump Organization a $140 million loan at LIBOR + 400 basis points.

166

Case 22-1175, Document 56, 09/26/2022, 3388914, Page176 of 224

629.    The next month, in November 2013, employees at the Trump Organization took that offer to the PWM group to see what terms that group could provide on an OPO loan.

630.    By Monday, December 2, 2013 (the Monday after the Thanksgiving holiday), the bank's PWM group provided a draft term sheet directly to the Trump Organization. In an email to Ivanka Trump and Dave Orowitz, Deutsche Bank attached the term sheet and noted that, although the term sheet reflected a $160mm commitment, "[w]e understand the request is for $170 million and are working on getting the step-up approved."

631.    The PWM term sheet was different in a number of respects from the CRE term sheet. For example:

- Mr. Trump would personally guaranty the full loan amount in the PWM term sheet (whereas the CRE proposal was unresolved as to whether there would be a 10% guaranty);

- The PWM term sheet had a loan term of ten years, versus a CRE term of approximately 42 months;

- The PWM term sheet had a loan amount, initially, of up to $160 million (and up to $170 million would ultimately be approved), whereas the CRE term sheet had a maximum loan amount of $140 million;

- Interest rates in the PWM term sheet were about half of what they were in the CRE term sheet: PWM's proposal was LIBOR + 2% during the "redevelopment period," and LIBOR + 1.75% during the "post-redevelopment period"; and

- The PWM term sheet required a $2.5 billion net worth (higher than any of net worth covenants proposed by CRE, which topped out at $500 million).

632.    Ultimately the Trump Organization and the PWM group agreed on a term sheet that was executed on January 13 and 14, 2014. The executed term sheet's terms largely mirror those above: $170 million loan amount; a 10-year term; 100% personal guaranty; interest rates of LIBOR + 2% or 1.75% (depending on the period); and covenants including $2.5 billion in net worth, $50 million in unencumbered liquidity, and no additional indebtedness in excess of $500

167

Case 22-1175, Document 56, 09/26/2022, 3388914, Page177 of 224

million. Mr. Trump, as guarantor, would be required to provide his annual statement of financial condition to the bank; there were other financial reporting requirements as well.

633.     A May 2014 Deutsche Bank credit memo approved the $170 million loan to Trump Old Post Office LLC. This credit memo incorporated information from Mr. Trump's 2011, 2012, and 2013 Statements of Financial Condition.

634.     Mr. Trump's net worth and his Statements of Financial Condition were critical to the final terms of the loan, executed on August 12, 2014. As with the Doral and Trump Chicago loans described above, the loan agreement for the OPO project required that Mr. Trump's Statement of Financial Condition be provided to the bank. The Statement required to be submitted was as of June 30, 2013.

635.     In multiple instances, the loan agreement required that Mr. Trump certify the accuracy of that Statement. In particular, the agreement contained a provision entitled, "Full and Accurate Disclosure." This provision required Mr. Trump to make a representation that no information contained in any loan document or in "any written statement furnished by or on behalf of Borrower or any other party pursuant to the terms of the" loan or associated documents "contains any untrue statement of material fact or omits to state a material fact necessary to make any material statements contained herein or therein not misleading in light of the circumstances under which they were made." Similarly, issuance of the loan was noted to be subject to several conditions precedent, including that "[t]he representations and warranties of Borrower contained in this Agreement and in all certificates, documents and instruments delivered pursuant to this Agreement and the Loan Documents shall be true and correct on and as of the Closing Date."

636.     In addition, because the OPO loan was a construction loan to be disbursed over a long series of tranches, the loan agreement made clear that the bank was not obligated to make

Case 22-1175, Document 56, 09/26/2022, 3388914, Page178 of 224

such disbursements unless representations by the borrowing entity and the guarantor (Mr. Trump) were true and accurate at the time of the requested disbursement. One "condition" of such disbursements was that, "The representations and warranties made by Borrower and Guarantor in the Loan Documents" (including the guaranty and subsequent certifications) "shall be true and accurate in all material respects on and of the date of the requested Disbursement with the same effect as if made on such date."[8]

637.     As with the Doral and Trump Chicago loan documents, an "Event of Default" in the OPO loan document was defined to include when "[a]ny representation or warranty of Borrower or Guarantor herein or in any other Loan Document or any amendment to any thereof shall prove to have been false and misleading in any material respect at the time made or intended to be effective."

638.     Mr. Trump's personal guaranty on the OPO loan, which he signed, is dated August 12, 2014.

639.     Mr. Trump's personal guaranty also included various financial representations. Mr. Trump, as guarantor, was required to certify the truth and accuracy of his Statement of Financial Condition as a condition of the guarantees—reliance on which Mr. Trump acknowledged when the loans themselves were granted. As the guaranty states, "In order to induce Lender to accept this Guaranty and to enter into the Loan Agreement and the transactions thereunder, Guarantor hereby makes the following representations and warranties as of the date hereof." One such representation and warranty was: "Guarantor has furnished to Lender his Prior Financial Statements. Such Prior Financial Statements are true and correct in all material respects

---

[8] The agreement spelled out an exception for such representations that were "no longer true and correct in all material respects solely as a result of" the passage of time, but a statement that was inaccurate when made would not have satisfied that exception.

169

Case 22-1175, Document 56, 09/26/2022, 3388914, Page179 of 224

and (i) Guarantor's Statement of Financial Condition presents fairly Guarantor's financial condition as of June 30, 2013[.]"

640.    Further, the guaranty stated: "there has been no material adverse change in any condition, fact, circumstance or event that would make the Prior Financial Statements, reports, certificates or other documents submitted by Guarantor in connection with this Guaranty and the other Loan Documents to which he is a party inaccurate, incomplete or otherwise misleading in any material respect."

641.    Pursuant to the guaranty, Mr. Trump was required to maintain $50 million in unencumbered liquidity, and a minimum net worth of $2.5 billion to be "tested and certified to on an annual basis based upon the Statement of Financial Condition delivered to Lender during each year." That language means the bank would determine Mr. Trump's compliance with his net worth covenant by reference to the net worth Mr. Trump reported and certified to the bank.

642.    Mr. Trump was also required to "keep and maintain complete and accurate books and records" and periodically to "deliver to Lender or permit Lender to review," a series of documents under the guaranty's financial reporting requirements. One of those submissions was a statement of financial condition, which was to be delivered annually with a compliance certificate certifying the statement "presents fairly in all material respects the financial condition of Guarantor at the period presented."

643.    False certifications of such financial statements were expressly contemplated as events of default under the loan agreement. Under the loan, "[a]ny representation or warranty of Borrower or Guarantor herein or in any other Loan Document or any amendment to any thereof shall prove to have been false and misleading in any material respect at the time made or intended to be effective" was one of several "events of default." The term "Loan Documents"

Case 22-1175, Document 56, 09/26/2022, 3388914, Page180 of 224

includes the loan agreement, guaranty, and, inter alia, "any other document, agreement, consent, or instrument which has been or will be executed in connection with" the agreement and guaranty, and thus would include annual signed certifications, which provide they would be executed by Mr. Trump.

644. The bank conducted annual reviews of the OPO loan in July 2015, July 2016, July 2017, July 2018, September 2019, July 2020 , and July 2021.

645. Because the OPO loan was a construction loan, the $170 million loan amount was not disbursed on or about the closing date; instead, the loan was disbursed in a series of "draws" or disbursements over time. The first was on or about June 22, 2015 in a "Request for Disbursement" signed by Mr. Trump. Draws continued throughout 2015 and 2016; generally, requests for those draws were signed by Mr. Trump personally. However, on December 21, 2016, Ivanka Trump signed a draw request in the amount of $4,334,772.83. On February 22, 2017, Eric Trump signed a final draw request in the amount of $2,757,897.30, bringing the total amount dispersed up to $170 million.

646. On or about May 11, 2022 the Trump Organization sold the OPO property for $375 million. Of those proceeds, $170 million were used to repay the loan to Deutsche Bank.

**5. 40 Wall Street Loan Issued by Ladder Capital**

647. In approximately November 2015, the Trump Organization (through 40 Wall Street LLC) refinanced an existing $160 million mortgage from Capital One Bank on the office building property at 40 Wall Street, New York, NY.

648. The loan from Capital One had an interest rate of 5.7% and required a principal payment of $5 million in November 2015. In January 2015, after consulting with Eric Trump, Allen Weisselberg wrote to Capital One asking the bank to waive the principal payment, explicitly citing the $550 million valuation in the Statement of Financial Condition:

171

Case 22-1175, Document 56, 09/26/2022, 3388914, Page181 of 224

Mr. Trump's latest financial statement dated June 30, 2014 shows a valuation of $550,000,000 for the building based upon NOI & CAP rates on that date This would put your loan at a 30% loan to value.

In light of the aforementioned valuation and considerable capital investment, along with a much improved cash flow (which will continue to grow as new tenant free rent continues to burn off) and an occupancy rate of 91%, which will be 96% after pending leases totaling 34,862 square feet ate signed, we respectfully request that the required $5 million principal payment due in November 2015 be waived.

649.     Capital One, which internally valued the building at roughly $260 million, declined to waive the principal payment. Mr. Weisselberg then began working with his son, a Director at Ladder Capital Finance, to refinance the $160 million mortgage at a rate that would be advantageous to the Trump Organization.

650.     This new mortgage was issued by Ladder Capital Finance, and subsequently securitized pursuant to agreements between Ladder Capital and a number of banks. The loan required Mr. Trump to maintain a net worth of at least $160 million and liquidity of at least $15 million. In connection with those covenants, Mr. Trump was required to provide his annual financial statements "prepared in a form previously provided to Lender by Guarantor from an independent firm of certified public accountants acceptable to Lender (Lender agreeing that WeiserMazars LLP is an acceptable firm) and prepared in accordance with GAAP in all material respects (except as disclosed therein), including a balance sheet, and certified by Guarantor as being true, correct and complete and fairly presenting the financial condition and results of such Guarantor."

651.     In connection with this refinancing loan, Cushman performed an appraisal of the Trump Organization's leasehold interest in 40 Wall Street, concluding that this interest had an "as is" market value of $540 million on June 1, 2015. The appraisal reached this conclusion both through a discounted cash flow approach and a direct capitalization approach. The latter, a direct

172

Case 22-1175, Document 56, 09/26/2022, 3388914, Page182 of 224

function of NOI divided by a capitalization rate, used the figure of $23,203,919 as the property's NOI—noting that this figure was "Plus Year 1 Free Rent." The free rent figure is noted as $7,776,980—suggesting that NOI *without* counting free rent was, instead, $15,432,939. That figure dovetails with the results presented in an income-and-expense table, similar to that contained in the 2010, 2011, and 2012 Cushman appraisal of 40 Wall Street. This table showed, for example, an NOI for 2012 of $6.5 million; for 2013, of $15.4 million; for 2014, $10.6 million; a budgeted NOI for 2015 (the year in question) of $14.2 million; and a Cushman forecast for the same year of $15.43 million.

652. Internal Ladder Capital documents indicate that Ladder underwrote the $160 million loan based on the $23 million NOI figure—and note that Mr. Trump had personally guaranteed tenants' free rent in the first year in the loan documents. A presentation to Ladder's Risk and Underwriting Committee contained an executive summary stating that the loan's underwriting net cash flow DSCR was 2.10x, meaning that net cash flow was more than twice debt service payments according to Ladder's underwriting team.

653. Other listed strengths included Mr. Trump's reported net worth of $5.8 billion as of June 30, 2014, and the property's strong recent leasing activity and below-market rents (which could roll into higher-paying tenants). The presentation also noted that the property's NOI, per the Cushman appraisal, was "$23,203,919," with a footnote stating: "The Appraisal NOI reported above excludes free rent due to tenants during the first year of the Loan. Under the terms of the Loan Documents, Donald Trump will guarantee all outstanding Free Rent at closing of the Loan."

173

Case 22-1175, Document 56, 09/26/2022, 3388914, Page183 of 224

**6.  Seven Springs Loan Issued by Royal Bank America / Bryn Mawr Bank**

654.    In 2000, Seven Springs LLC took out an approximately $8 million mortgage from Royal Bank America ("RBA"), later acquired by Bryn Mawr Bank in 2017. Donald J. Trump personally guaranteed the mortgage.

655.    Mr. Trump's Statements of Financial Condition were submitted to RBA and Bryn Mawr on multiple occasions in connection with the Seven Springs mortgage. A 2011 credit memo records that the financial statement was "compiled annually with a 6-30 date" and that the bank "typically receives the information in October." A 2014 credit memo from Bryn Mawr contains data drawn from Mr. Trump's 2011 and 2013 Statements.

656.    The memo states that because of the "personal financial strength of Mr. Trump, as evidenced by liquid assets of $339 million (cash and marketables) and net worth of $5 billion, Royal Bank America previously waived the requirement of personal tax returns." Another 2014 credit review document notes that the "primary shortfall" in the loan was the lack of cash flow at the property, because the annual loan payments (more than $1 million) is "a large number to cover," and notes figures from Mr. Trump's 2012 Statement.

657.    Indeed, Bryn Mawr retained in its files Mr. Trump's Statements of Financial Condition for 2010, 2011, 2012, 2013, 2014, 2015, and 2016. Typically the Statements were sent under the cover of a letter from Jeffrey McConney at the Trump Organization, stating that Mr. Trump's Statement was being provided pursuant to the mortgage.

658.    The Statement of Financial Condition was material to not only the origination of the mortgage, but also to the regular maintenance of the loan and a series of extensions. For example, the Trump Organization obtained a series of extensions of the maturity date in 2001, 2002, 2003, 2006, 2009, 2011, 2014, and 2019. In connection with at least some of these modifications, the bank relied upon Mr. Trump's Statements. In particular, the modification

174

documents in 2011, 2014, and 2019 reiterate various representations and warranties made by the

Borrower (Seven Springs LLC) in the original loan documents. Mr. Trump re-affirmed his

personal guaranty prior to becoming President, and the 2019 modification was signed by Eric

Trump "as attorney in fact" for Donald J. Trump.

659.    The personal guaranty for this loan was described by Bryn Mawr in internal

records as a positive component of the loan for the bank. For example, one 2011 memo stated,

under the heading "pro" (vs. con), "Experienced and financially strong guarantor, with a reported

$3.9 Billion net worth." A 2014 memo similarly noted that renewal of the loan was

recommended based on, among other factors, "Strong Guarantor Support" and "Personal

financial strength of Mr. Trump evidenced by a reported net worth of $5 Billion and liquid assets

of $354MM."

660.    During the 2019 loan modification Jeffrey McConney originally asked for a quote

on the price of extending the loan without the personal guaranty of Donald J. Trump. He was

told that he would be required to place about $700,000 in escrow at closing and was quoted an

interest rate about half a percentage point higher per annum than if there was a guaranty. After

receiving these terms, he and Eric Trump decided to extend the loan with the personal guaranty

of Donald J. Trump in place.

661.    Bryn Mawr personnel relied on Mr. Trump's Statements for purposes of

extending and maintaining the mortgage and accepted that they were complete and accurate as

represented to the bank.

175

Case 22-1175, Document 56, 09/26/2022, 3388914, Page185 of 224

### 7.  Other Efforts To Use The False And Misleading Statements In Commercial Transactions

662.     In or about February 11, 2016, the Trump Organization—via a communication from Ivanka Trump to Rosemary Vrablic—sought an additional $50 million loan secured by the Doral property.

663.     Ms. Vrablic further explained two "things to note" with respect to "the $50mm request" in a response email. First, Ms. Vrablic explained that a new appraisal would be required because the Financial Institutions Reform, Recovery, and Enforcement Act would not allow the bank to use the Trump Organization-ordered appraisal from the prior year.

664.     Second, the "[u]se of proceeds must be clearly detailed so as not to be involved in any political or campaign uses of events." "Dave O" (referring to Dave Orowitz) "had mentioned to Josh Frank in Lending that it would be used for Trump Turnberry improvements," referring to a Trump golf course in Turnberry, Scotland, "and we would need to see the budgets etc…. To confirm this so we are both covered should the files be picked up by the regulators."

665.     On Monday, February 15, 2016, Ms. Vrablic wrote to a colleague at Deutsche Bank relaying the request from the Trump Organization that the bank either (a) agree to extend additional credit secured by the Doral property, with a full personal guaranty for the additional credit by Mr. Trump, or (b) agree to a wholly unsecured line of credit that, in "one year," could be "[pa]id off" with an increased mortgage after a new appraisal would be ordered.

666.     Ultimately, Deutsche Bank declined the request to extend further credit to Mr. Trump, then a presidential candidate, because it "could lead to the perception that DB was not politically neutral which posed an unacceptable level of reputational risk."

667.     Earlier, in July 2014, Donald J. Trump and the Trump Organization made a $1 billion bid to purchase the Buffalo Bills football team. Up to $800 million of that $1 billion bid

Case 22-1175, Document 56, 09/26/2022, 3388914, Page186 of 224

could have been financed. As part of that bid, DJT and the Trump Organization needed a confidence letter from a financial institution to submit with his bid package. Mr. Trump asked Deutsche Bank (through Rosemary Vrablic) for that letter.

668.     Mr. Trump, Mr. Weisselbnerg, and Mr. McConney met with Deutsche Bank personnel in connection with the request in July 2014. Mr. McConney then certified as to Mr. Trump's liquidity as of June 30, 2014, and that there had been "no material decrease" from the 2013 Statement of Financial Condition figures previously certified by Mr. Trump. Mr. Weisselberg would typically have executed the certification, but Mr. McConney executed it instead because Mr. Weisselberg was not in the office.

669.     Mr. Trump's bid package—which was partially successful, in that Mr. Trump did advance further into the bid process—included a letter signed by Ms. Vrablic indicating that based upon the bank's review of Mr. Trump's financial information he would have the "financial wherewithal" to fund his bid to purchase the Bills football team.

670.     Although Mr. Trump's 2013 Statement of Financial Condition (inflated pursuant to the deceptive strategies described above) reported a net worth of approximately $5.1 billion, Mr. Trump sent a separate letter, under his own signature, using an even higher figure in an effort to win the bidding: "I have a net worth in excess of Eight Billion Dollars (financial statements to be provided upon request) . . . ."

671.     Finally, in 2010 the Trump Organization, through Allen Weisselberg, submitted an offer to the City of New York for a concession to operate, maintain, and manage an 18-hole golf course and related facilitates at Ferry Point Park, Bronx, NY.

177

672. Mr. Trump's Statements of Financial Condition featured in the process of obtaining the contract, as well as the Trump Organization's maintaining its obligations under the contract.

673. In particular, the Trump Organization's bid enclosed a letter from Weiser LLP (Mazars' predecessor) incorporating Mr. Trump's Statement of Financial Condition, referencing his net worth and cash position. A similar December 2011 letter was also submitted to the City.

674. The award granting the Trump Organization the concession cites Mr. Trump's wealth as one basis for award, and the contract documents include a personal guaranty by Mr. Trump. The guaranty stated that the full 2010 Statement of Financial Condition had been furnished to the City.

675. After 2012, when the Trump Organization won the contract, it was required (as part of Mr. Trump's personal guaranty on the contract) to represent periodically that there had been no material change in Mr. Trump's financial position. It did so by letters from Mazars that were expressly based on the then-most-recent Statement of Financial Condition. The Trump Organization submitted "no material change letters" to the City in 2010, 2011, 2013, 2016, 2017, 2018, and 2021.

### E. Insurance-Related Benefits

676. Under New York Penal Law § 176.05, the submission of false information in a written statement submitted as part of an application for commercial insurance or to claim a benefit under an insurance policy is insurance fraud.

677. The Trump Organization and other Defendants committed insurance fraud by submitting Mr. Trump's false and misleading Statements, along with making other false representations, to obtain financial benefits under insurance policies from insurers participating

Case 22-1175, Document 56, 09/26/2022, 3388914, Page188 of 224

on the Trump Organization's surety program and directors and officers liability program, as more fully described below.

### 1. Insurance Fraud Against Surety Underwriters

678.    The Trump Organization submitted Mr. Trump's Statements of Financial Condition to insurers and its insurance broker by allowing underwriters only to review a copy of the Statements at the Trump Organization's offices. One of those insurers was Zurich North American ("Zurich").

679.    From 2007 through 2021, Zurich underwrote a surety bond program (the "Surety Program") for the Trump Organization through insurance broker AON Risk Solutions ("AON"). Under the Surety Program, Zurich issued surety bonds on behalf of the Trump Organization within specified dollar limits in exchange for a premium calculated based on a rate times the face amount of the bonds. Most of the bonds were statutorily required for the Trump Organization's real estate business, such as liquor license bonds for golf courses or release of lien bonds for construction projects.

680.    Over the course of the Surety Program, based on the financial disclosures made by the Trump Organization, Zurich agreed to increasingly more favorable terms—periodically increasing the limits and decreasing the rate. For example, in 2011, the Surety Program had a single bond limit of $500,000, an aggregate limit for all bonds of $2,000,000, and a rate of $20 per thousand. When the Surety Program was canceled in 2021, the single bond limit was $6,000,000, the aggregate limit was $20,000,000, and the rate was $10 per thousand. Over the course of the relationship, in accordance with its standard underwriting guidelines for surety business, Zurich required the Trump Organization to provide an indemnification against any loss should Zurich be required to pay under a bond.

179

Case 22-1175, Document 56, 09/26/2022, 3388914, Page189 of 224

681.    From the inception of the Surety Program, the Trump Organization met this

indemnification requirement through a General Indemnity Agreement ("GIA") executed by

Donald J. Trump, pursuant to which (similar to a personal guaranty on a loan) he personally

agreed to indemnify Zurich for claims under the Surety Program. The GIA also included an

annual requirement that Mr. Trump disclose to Zurich's underwriter his personal financial

statements. This annual financial disclosure requirement permitted Zurich to ensure that the

indemnification from Mr. Trump was sufficient to support the continued renewal of the Surety

Program.

682.    Indeed, on multiple occasions when AON was unable to secure in a timely

manner the required financial disclosure—which took the form of an on-site review of the

Statements in a conference room at the Trump Organization's offices—Zurich put the Surety

Program into "cut-off" status, which means Zurich ceased writing new bonds and would cancel

existing bonds on expiration, until Mr. Trump's Statements were made available for review.

683.    The indemnity was such a critical aspect of the Surety Program, that in early

January 2017, with Mr. Trump's inauguration fast approaching, Zurich insisted as a condition to

renewing the Surety Program that the indemnification be modified to address the potential

difficulty Zurich might have in seeking to enforce the GIA against a sitting president. After some

negotiation, during which the Trump Organization's lawyers sought to persuade Zurich that there

was no legal impediment to suing a sitting president, Zurich and the Trump Organization agreed

to resolve the issue by adding DJT Holdings LLC as an additional indemnitor on the GIA

effective January 17, 2017.

684.    The Trump Organization obtained Zurich's approval to renew the Surety Program

on at least two occasions through intentional misrepresentations concerning Mr. Trump's

180

Statements. During the on-site review that occurred on November 20, 2018 for the 2019 renewal, Zurich's underwriter was shown the June 30, 2018 Statement. The Statement listed as assets the Trump Organization's real estate holdings with valuations that Allen Weisselberg represented to Zurich's underwriter were determined each year by a professional appraisal firm "such as Cushman" "using cap rates and NOI as factors."

685.    Zurich's underwriter considered the valuations to be reliable based on Weisselberg's representation that they were prepared by a professional appraisal firm and recorded such information in her underwriting file. Also, based on her interactions with Weisselberg during the review, Zurich's underwriter found him to be "highly professional, well educated, and conscientious about" his work. Weisselberg's representations about how the valuations were determined and the underwriter's impressions of Weisselberg factored favorably into her analysis leading to her recommendation that Zurich renew the Surety Program for 2019 on the existing terms, which it did.

686.    During the on-site review for the next renewal, the Trump Organization disclosed to Zurich's underwriter Mr. Trump's 2019 Statement. Weisselberg again represented to Zurich's underwriter that the valuations for the real estate holdings listed in the Statements were derived annually by a professional appraisal firm. Further, he specified that the appraisals for the current Statement were performed by Newmark Group and had previously been prepared by Cushman, explaining that "[t]he reason for the change is the individual at Cushman with whom [the Trump Organization] had a longstanding relationship with moved to work at Newmark."

687.    Again, Zurich's underwriter considered the valuations to be reliable based on Weisselberg's representation that they were prepared by the professional appraisal firm Newmark Group, and specifically by the same individual (Larson) who had purportedly derived

181

Case 22-1175, Document 56, 09/26/2022, 3388914, Page191 of 224

the previous valuations when he was an employee of Cushman. The underwriter again assessed

Weisselberg to be "highly professional, well educated, and conscientious about the operations"

of the Trump Organization. Her impressions of Weisselberg and the representation that

Newmark prepared the valuations all factored favorably into her analysis leading to her

recommendation that Zurich renew the Surety Program in 2020 on the existing terms, which it

did.

688.    Weisselberg's representations to Zurich's underwriter that the valuations listed in

Mr. Trump's Statements were prepared annually by professional appraisal firms were false. As

discussed in detail above, the Trump Organization did not retain any professional appraisal firm

to prepare any of the valuations used for the Statements; instead, the valuations were prepared by

Trump Organization personnel, contrary to what Zurich's underwriter was expressly told and

believed, and in almost all instances in a false and misleading manner.

689.    Had Weisselberg told Zurich's underwriter the truth about how the valuations for

the Statements she reviewed had actually been prepared, she would have accorded them less

weight and it would have negatively impacted her underwriting analysis. Moreover, had Zurich's

underwriter discovered during the renewal process that Weisselberg had misrepresented to her

how the valuations were prepared, it would have caused her to doubt the veracity of the rest of

the information disclosed by the Trump Organization during the renewal and would have called

into serious question whether Zurich should continue its insurance relationship with the Trump

Organization, or renew on terms less favorable to the Trump Organization.

690.    The Trump Organization also failed to disclose that the valuation for the golf

courses listed on Mr. Trump's Statements within the "Clubs" category, which was approximately

$2.2 billion in the 2019 Statement, included a substantial brand premium baked into the reported

Case 22-1175, Document 56, 09/26/2022, 3388914, Page192 of 224

valuation. Under Zurich's underwriting guidelines, intangible assets such as brand value are to be excluded.

691.    Had Weisselberg disclosed to Zurich's underwriter that the valuation listed for "Clubs" included the Trump brand premium, she would have been required under the guidelines to reduce that valuation to exclude the premium.

### 2.    Insurance Fraud Against Directors & Officers Liability Underwriters

692.    As of December 2016, the Trump Organization had in place Directors & Officers ("D&O) liability coverage consisting of a single primary policy providing a limit of $5,000,000 from Everest National Insurance Company ("Everest") at a premium of $125,000.

693.    Everest had provided D&O liability coverage to the Trump Organization in 2013 and 2014 as well.

694.    For purposes of that coverage, similar to the process described above with Zurich, the Trump Organization provided underwriters no more than fleeting access to Mr. Trump's Statements, through a monitored in-person review at Trump Tower. Pursuant to a non-disclosure agreement ("NDA"), the Everest underwriter would incorporate information from Mr. Trump's annual Statement provided by Allen Weisselberg for purposes of the annual renewal. At no point during such financial reviews were the underwriters informed about the false and misleading valuations contained within the Statement.

695.    On December 6, 2016, AON reached out to an underwriter in the D&O Group of Tokio Marine HCC ("HCC") seeking a quote for additional limits of $5,000,000 to sit above the Everest policy. In presenting the opportunity to his supervisor, the HCC underwriter noted "[t]here are no financials to look at. Everest saw them for 30 minutes, under NDA at renewal but AON has never seen them."

183

Case 22-1175, Document 56, 09/26/2022, 3388914, Page193 of 224

696.     The HCC underwriter received authority to quote a policy for the requested limits above the Everest policy through the expiration date of February 17, 2017 for a flat premium of $40,000 subject to reviewing the financials at renewal, which the underwriter conveyed in a formal quote to AON later in the day on December 6 and which the Trump Organization accepted.

697.     In advance of the policy expiration, AON scheduled a "D&O Underwriting Meeting" at the Trump Organization's offices on January 10, 2017 between Trump Organization personnel (including Weisselberg) and various underwriters, including HCC's underwriter. Among the agenda items for discussion was Mr. Trump's financial condition. According to the HCC underwriter's email to his supervisor written the same day as the meeting, the Trump Organization was looking to cancel the existing policies and rewrite the program on the day of Mr. Trump's presidential inauguration with significantly higher limits of $50,000,000 – a tenfold increase in the D&O coverage that existed under the Everest policy. AON advised HCC's underwriter that HCC would be "in play" to take over the primary layer from Everest.

698.     The underwriters at the meeting were provided very few financials but did see the balance sheet for year-end 2015, which showed total assets of $6.6 billion, cash of $192 million and total debt of $519 million with no single debt larger than $160 million and no concentration of maturities – all as reported in the 2015 Statement. The Trump Organization representatives assured the underwriters that the balance sheet for year-end 2016 that would be completed in a few weeks would be even better than the year-end 2015 balance sheet.

699.     In response to specific questioning from the underwriters, the Trump Organization personnel represented that there was no material litigation or inquiry from anyone that could potentially lead to a claim under the D&O coverage. The HCC underwriter relied on

184

Case 22-1175, Document 56, 09/26/2022, 3388914, Page194 of 224

this representation in concluding that there were no investigations by law enforcement agencies that could potentially trigger coverage under the D&O policies.

700.    On January 20, 2017, after considering the information conveyed during the January 10 meeting, HCC offered terms for a primary $10,000,000 policy with a $2,500,000 retention for a premium of $295,000 subject to certain conditions. Coverage per these terms was bound on January 31, 2017, with effective dates of January 30, 2017 to January 30, 2018.

701.    Despite the representations made to underwriters by the Trump Organization personnel during the January 10 meeting that there was no material litigation or inquiry from anyone that could potentially lead to a claim, there was at the time of the meeting an ongoing investigation by OAG into the Trump Foundation and Trump family members Donald J. Trump, Donald Trump, Jr., Ivanka Trump, and Eric Trump, all of whom were at the time directors and officers of the Trump Organization.

702.    In September 2016, four months before the January 10 meeting, OAG had sent a notice of violation to the Trump Foundation and a letter to Trump Organization outside counsel Sheri Dillon requesting documents, to which Ms. Dillon replied on October 16, 2016. In October 2016, OAG had also issued third-party subpoenas in connection with its investigation and examined Allen Weisselberg, one of the attendees at the January 10 meeting.

703.    Neither Mr. Weisselberg nor any other Trump Organization representative disclosed to the underwriters at the January 10 meeting or at any other time prior to the January 30 renewal of the D&O policies the existence of OAG's investigation into the Trump Foundation and Trump family members who were directors and officers of the Trump Organization. They withheld this information despite their understanding and belief that the OAG investigation could potentially lead to a claim under the D&O coverage, as evidenced by the notice of claim they

185

Case 22-1175, Document 56, 09/26/2022, 3388914, Page195 of 224

submitted to the D&O insurers HCC, Starpoint, Swiss Re, Argo, and Allianz through AON on

January 17, 2019 seeking coverage in connection with OAG's enforcement action resulting from

the investigation.

704. Other notices of claims and circumstances from AON tendered under the D&O

policies soon followed.

705. In June 2017, the Donald J. Trump Revocable Trust, a named insured under the

D&O policies, provided notice of claim on behalf of Michael Cohen in connection with a

subpoena issued to him by the House of Representatives Permanent Select Committee on

Intelligence ("House Intelligence Committee") seeking documents and testimony in connection

with the House Intelligence Committee's investigation into Russian interference in the 2016

presidential election.

706. On January 12, 2018, just prior to the next renewal on January 30, 2018, AON

provided notice of claim on behalf of Donald Trump, Jr., in connection with his involvement in

the investigations by the Senate Committee on the Judiciary, the Senate Select Committee on

Intelligence, the House Intelligence Committee, and Special Counsel Robert Mueller into

Russian interference in the 2016 presidential election.

707. These claim notices raised issues for HCC's underwriter. Specially, on January

26, 2018, HCC's underwriter asked AON to obtain a response to the question: "Is the Trump

Organization aware of any other individuals (other than Cohen and Don Jr) in the Trump

Organization who are involved or could reasonably expect to be involved in the current

investigation?" HCC's underwriter agreed to extend the policy expiration date to February 10,

2018 to provide time to obtain a response.

186

Case 22-1175, Document 56, 09/26/2022, 3388914, Page196 of 224

708.     AON provided the response from Trump Organization's General Counsel Alan

Garten on February 1, 2018, identifying four individuals who had been requested to testify in

addition to Michael Cohen and Donald Trump, Jr. No other individuals were identified in

response to the HCC underwriter's inquiry about others who are involved or could reasonably be

expected to be involved in the investigations that were the subject of the two claim notices.

709.     Nor did anyone from the Trump Organization disclose during the renewal

negotiations in early 2018 the existence of any other investigations or inquiries that could

potentially lead to a claim under the D&O policies.

710.     On February 5, 2018, based on the information provided during the renewal

negotiations, HCC agreed to extend its $10,000,000 policy with a $2,5000,000 retention for the

expiring premium of $295,000 for another 12 months, ending February 10, 2019.

711.     Based on further correspondence exchanged in 2018 between AON on behalf of

the insureds and HCC's coverage counsel disputing whether coverage existed for the tendered

claims on behalf of Michael Cohen and Donald Trump, Jr., HCC's underwriter determined that

the exposure on the risk was significantly higher than previously assessed. As a result, on

January 24, 2019, HCC offered to renew the $10,000,000 policy for a substantially increased

premium of $1,600,000, more than five times the expiring premium. The Trump Organization

declined to accept the renewal terms.

712.     On February 8, 2019, two days before the expiration of the policy term, AON

provided notice to the D&O underwriters of the following "claims and/or circumstances which

may reasonably be expected to give rise to Claims (as defined in the Policies) against the

insureds under the Policies":

- letters from Congressional members or committees seeking information
  regarding a June 2016 meeting with Natalia Veselnitskaya at Trump Tower, other

187

campaign-related communications with Russian persons or entities relating to Hillary Clinton and/or the 2016 presidential election, and/or efforts by the Trump Organization or its affiliates to develop or partner with a developer to build a Trump-branded property in Moscow;

- letters from Congressional members or committees seeking information regarding Mr. Trump's compliance with the Emoluments Clause in the U.S. Constitution and/or conflicts of interest arising from Trump or Kushner-affiliated entities' business with foreign entities;

- a letter from a member of Congress seeking information regarding the use of a private email server by Ivanka Trump and Jared Kushner;

- two letters from Congressional members or committees seeking information regarding (a) payments made to Stephanie Clifford and Karen McDougal in violation of campaign finance laws, and/or (b) payments that the Trump Organization made to Michael Cohen relating to his payment of Ms. Clifford;

- an investigation by the U.S. Attorney's Office for the Southern District of New York regarding the payments to Ms. Clifford, Ms. McDougal, and Mr. Cohen;

- the investigation by Special Counsel Mueller;

- an investigation by the U.S. Attorney's Office for the Southern District of New York regarding the Presidential Inaugural Committee;

- "possible investigations" by multiple jurisdictions and investigative authorities (ICE, Dept. of Labor, State Attorneys General); and

- "possible investigations" by multiple investigative authorities (IRS, NYS Dept. of Taxation and Finance) regarding employer-provided housing and vehicles.

713. Trump Organization personnel made no disclosure at the January 10, 2017 meeting with underwriters or at any time prior to binding the policies that incepted on January 30, 2017 about any circumstances involving Russia and the 2016 presidential election, including the June 2016 meeting at Trump Tower with Ms. Veselnitskaya, or the effort to develop a Trump-branded property in Moscow.

714. With the exception of the House Intelligence Committee investigation and Mueller investigation into Russian interference in the 2016 presidential election, none of the investigations and inquiries referenced in AON's February 8, 2019 claim notice, or the

188

circumstances giving rise to those investigations and inquiries, had previously been disclosed by Trump Organization personnel to underwriters during renewal negotiations.

### F.   Ongoing Scheme and Conspiracy

715.    The foregoing allegations constitute a continuous, integrated scheme to inflate Mr. Trump's net worth in order to obtain financial benefits.

716.    Specifically, Defendants each agreed to participate in a scheme to use false and misleading information to increase Mr. Trump's stated net worth on the Statement of Financial Condition for each year from 2011 through the present. Defendants further agreed to use those inflated Statements to obtain economic and financial benefits from 2011 through the present day.

717.    When asked if he had an ongoing agreement from at least 2005 through the present with Mr. Weisselberg, Mr. McConney, and others to prepare the Statement of Financial Condition in a manner that included intentional overvaluations, Mr. Trump invoked his Fifth Amendment privilege against self-incrimination and refused to answer.

718.    When asked if he had an ongoing agreement from at least 2005 to the present with Mr. Weisselberg, Mr. McConney and others to prepare the Statement of Financial Condition in a manner that included false and misleading valuation statements, Mr. Trump invoked his Fifth Amendment privilege against self-incrimination and refused to answer.

719.    Mr. Weisselberg and Mr. McConney directed other employees to prepare the Statements in a fraudulent manner and in a way that insured that Mr. Trump's wealth increased each year.

720.    As Executive Vice Presidents of the Trump Organization, Donald Trump Jr., Ivanka Trump and Eric Trump were also aware of, and knowingly participated in, the scheme. Indeed, the fraudulent scheme was integral to the business of the Trump Organization and required the participation of Mr. Trump and his children.

189

721.     As Executive Vice Presidents, the three children were intimately involved in the operation of the Trump Organization's business. They were aware of the true financial performance of the company, whether through Donald Trump Jr.'s work on commercial leasing, Ivanka Trump's work on Doral, Trump Chicago and OPO, or Eric Trump's work on the golf course portfolio.

722.     Indeed, the Trump Organization took extensive steps to keep them all up to date on the company's operations. For example, the Trump Organization maintained a "Master Office Calendar" for Mr. Trump, Donald Trump, Jr., Ivanka Trump and Eric Trump.

## Master Office Calendar* - 5/7/15

| Distribution List# |
| --- |
| Donald J. Trump |
| Donald J. Trump, Jr. |
| Ivanka Trump |
| Eric Trump |

723.     While the calendar would also be distributed to lower level employees, it allowed the four executives to track key obligations of the business. Those included submission of "DJT June 30 Statement of Financial Condition" in connection with Doral, Trump Chicago and OPO. The master office calendar also reflected detail about financing, payment due dates, financial statements on individual properties and partnerships; in sum, all of the information that allowed Donald Trump, Jr., Ivanka Trump and Eric Trump to understand the true valuation of the properties contained in the Statement of Financial Condition.

724.     Donald Trump, Jr., Ivanka Trump and Eric Trump were also familiar with the true performance of the properties compiled in the Statements of Financial through financial

190

Case 22-1175, Document 56, 09/26/2022, 3388914, Page200 of 224

reporting from Allen Weisselberg and others. For example, in February 2016, Mr. Weisselberg

prepared a detailed report on the Trump Organization's performance in 2015, with a cover memo

headed:

> To:     Don Jr., Ivanka & Eric
> From:   Allen Weisselberg
> Date:   February 24, 2016
>
> Re: 2015 Corporate Operating Financial Summary
>
> As per your request enclosed please find a detailed analysis setting forth our various business segments and their resulting operations for calendar year 2015.

725.     The enclosed report included individualized breakdowns on golf courses, hotels,

Trump Tower, Niketown, 40 Wall Street, and virtually every component of the Statement of

Financial Condition.

726.     And in their roles as Executive Vice Presidents, each of the three Trump children

had familiarity with, responsibility for, and made use of, the Statements of Financial Condition

in commercial transactions.

727.     Donald Trump, Jr., a graduate of the Wharton School of Business at the

University of Pennsylvania, was a source of valuations in the Statement of Financial Condition

for properties like Trump Park Avenue. He was familiar with the financial performance of the

properties incorporated in the Statement, including through his responsibility for commercial

leasing in buildings like 40 Wall Street and Trump Tower. As a Trustee of the Donald J. Trump

Revocable Trust, Donald Trump, Jr. was responsible for the preparation of the Statement for

every year from 2016 to the present. Donald Trump, Jr. certified to the accuracy of the Statement

in 2017, 2018 and 2019.

191

728.     Ivanka Trump, an honors graduate of the Wharton School of Business at the University of Pennsylvania, was familiar with the Statements of Financial Condition, making presentations on them to the GSA in 2011, and using them to facilitate loans from Deutsche Bank in 2012 and 2013. Ms. Trump maintained responsibility for those loans, which required annual submission of the Statements and confirmation that there had been no material changes in Mr. Trump's net worth. Ms. Trump was familiar with the financial performance of the properties incorporated in the Statement, including through her responsibility for Trump International Realty.

729.     Eric Trump, an honors graduate of Georgetown University with a degree in Finance and Management, was a source of valuations in the Statement of Financial Condition for properties like Seven Springs. Eric Trump certified to the accuracy of the Statement in 2020 and 2021. When asked if he ever assisted in the preparation of the Statement of Financial Condition, Eric Trump invoked his Fifth Amendment privilege against self-incrimination and refused to answer. Eric Trump was familiar with the financial performance of the properties incorporated in the Statement, including through his responsibility for the Trump Golf properties.

730.     The corporate Defendants each participated in the scheme through the actions of their high managerial agents – including Mr. Trump, Donald Trump, Jr., Ivanka Trump, Eric Trump, Allen Weisselberg and Jeffrey McConney – acting within the scope of the agent's employment.

731.     Some aspects of the scheme were well known publicly. For example, Mr. Trump's desire to keep his reported net worth high was widely reported. In a 2015 article, Forbes wrote that of all the individuals who have appeared on its list of the 400 wealthiest Americans, "not one has been more fixated with his or her net worth estimate on a year-in, year-out basis

192

Case 22-1175, Document 56, 09/26/2022, 3388914, Page202 of 224

than Donald J. Trump." The article described Mr. Trump's net worth as a "subject that he cares about to the depths of his soul."

732.    That same article quotes Mr. Trump on his motivation for inflating his net worth: "It was good for financing."

733.    This public desire to inflate his net worth was well known amongst his children and employees. As far back as March 2007, the European Bureau Chief of Forbes wrote to Donald Trump, Jr. and Ivanka Trump with the subject matter "Still awfully rich . . . ." In that email, the bureau chief wrote that: "Your dad called. He's always good to me. He mentioned that he'd seen his wealth quoted at $2.6 billion in the local paper. That didn't sound right to me. I just checked: We've still got him at $2.9 billion, same as September. I told Kelly already but if you talk to him, mention it."

734.    The scheme to inflate Mr. Trump's net worth also remained consistent year after year. The supporting data spreadsheet for each annual Statement incorporated the prior year's valuations and tracked changes to insure the total valuation increased as directed by Mr. Trump and Mr. Weisselberg. Starting in 2014, the supporting spreadsheets included a column entitled "change in clubs" that tracked the overall rise or fall in the value of the clubs individually and as a group. Properties were grouped together in broad buckets to disguise annual fluctuations in value of individual properties. Properties would move from one group to another to disguise significant declines. Single conversations with "professionals" and others would serve as the basis to inflate values over multiple years. For example, a single 2013 conversation with an executive at ClubCorp, a large, privately owned golf management company, served as the basis for adding a premium to the value of Trump golf clubs through 2018.

193

Case 22-1175, Document 56, 09/26/2022, 3388914, Page203 of 224

735. The loans obtained through the use of the inflated Statements likewise required performance and confirmation year after year. Each of the Deutsche Bank loans, for example had terms extending past 2022 and each had continuing obligations to maintain a net worth of at least $2.5 billion and unencumbered liquidity of $50 million. Each of the loans required the annual submission of the Statement of Financial Condition to meet these covenants as well as a certification that the Statements were true and accurate and there had been no material changes to either Mr. Trump's net worth or his liquidity.

736. Defendants also went to great lengths to conceal their fraud. In submitting information to Mazars, Defendants would exclude key information, like lender-ordered appraisals on a given property or limitations on development like the easements on Mar-a-Lago. In presenting the Statements, Defendants hid the precise valuation of individual properties by grouping them together into categories like "Club facilities and related real estate." When properties dropped in value, the change was covered up by increasing the valuation of other properties in the same category, or moving them into different categories, the way Seven Springs was moved into "other assets" following receipt of the appraisal for the easement donation.

737. The Trump Organization also sought to limit the ability of counter-parties to review the Statements of Financial Condition or disseminate them more broadly. Some insurers would only be able to sit in a room to review the Statements. Often the Trump Organization would only send hard copies of the Statements to lenders.

738. The Trump Organization also took steps to conceal Defendants' fraud in response to direct inquiries from Deutsche Bank. Specifically, on October 29, 2020, Deutsche Bank wrote to Donald Trump, Jr.:

194

Case 22-1175, Document 56, 09/26/2022, 3388914, Page204 of 224

Deutsche Bank Trust Company Americas ("DBTCA") has recently become aware of certain public factual allegations concerning the accuracy of financial information and representations submitted to DBTCA in connection with various loan facilities extended to affiliates of the Trump Organization and subject to the personal financial guaranty of Donald J. Trump. These allegations have been raised, among other places, in public court filings by the Office of the New York Attorney General ("OAG"), as well as in public reporting by the *New York Times* related to certain tax return information reportedly obtained by that organization.

The factual allegations appear to directly relate to the accuracy of certain Statements of Financial Condition submitted to DBTCA in Donald J. Trump's capacity as guarantor to the relevant loan facilities. The allegations pertain to, among other things, the value and other attributes of certain assets referenced in such Statements of Financial Condition, including but not limited to the Mansion at Seven Springs and the Trump National Golf Club in Los Angeles.

739. The bank asked a series of specific questions about the easement donations and an article in the New York Times discussing an inquiry by the IRS into a $72.9 million tax refund claimed in 2009.

740. The Trump Organization offered no response until December 7, 2020, when Alan Garten, Chief Legal Officer, emailed Deutsche Bank to say that the letter had only just come to the company's attention.

741. Deutsche Bank wrote back on December 14, 2020, requesting a response and providing additional detail:

195

As you know, Donald J. Trump is required under the terms of his loan guaranties to provide annual financial statements to Deutsche Bank and to ensure that those statements "are true and correct in all material respects." *See, e.g.,* Old Post Office ("OPO") Guaranty Agreement, § 9(ix). This information is used by the Bank to assess the borrowers' and Mr. Trump's compliance with loan and guaranty covenants, as non-compliance with such covenants may result in an event of default. *See, e.g.,* OPO Loan Agreement, § 7.1(b). Failure to provide accurate valuations of financial assets may fundamentally impact the Bank's view of borrowers' and Mr. Trump's compliance with such covenants. Additionally, Mr. Trump must submit annually a signed certificate certifying, among other things, his compliance with covenants relating to his net worth, debt, and unencumbered liquid assets, and further certifying that his Statement of Financial Condition "presents fairly in all material aspects" his financial condition. *See, e.g.,* Old Post Office Guaranty Agreement, Section 11(i)(D). The loan agreements and guaranties provide that an event of default occurs when "[a]ny representation or warranty of Borrower or Guarantor herein or in any other Loan Document or any amendment to any thereof shall prove to have been false or misleading in any material respect at the time made or intended to be effective." *See, e.g.,* OPO Loan Agreement, § 7.1(d).

742.     On December 16, 2020, Mr. Garten said he hoped to have a response "within the next few days." Deutsche Bank wrote back on January 8, 2020 asking for a response. Ultimately none was forthcoming.

743.     Defendants did try to limit their exposure on the Deutsche Bank loans in 2022 by selling the OPO property, paying off the loan to Deutsche Bank, and recovering their capital investment and any accrued profits. Shortly thereafter, Defendants exited the Doral loan by refinancing with Axos Bank.

744.     During the negotiations with Axos Bank in February 2022, the Trump Organization sought to avoid submitting a Statement of Financial Condition or making representations about Mr. Trump's net worth. Instead, the Trump Organization pushed to provide a schedule of material real estate assets and liabilities and leave it to the lender to calculate net worth. As counsel for the Trump Organization wrote on February 11, 2022:

196

**Subject:** RE: Trump Tower/Axos - Loan Documents (Remaining Comments)

David,

In the Partial Payment Guaranty, can you please add the "material" as you did in the other Guaranty, and in each Guaranty add a reasonableness standard for Lender's determination of New Worth (see below). Other than that, no further comments. Thanks.

(a)    Financial Reporting. Within forty-five (45) days after the end of each calendar quarter, Guarantor shall furnish to Lender a schedule of material real estate assets and all related material liabilities, including material contingent liabilities, and a calculation of Net Worth and Liquidity (as such terms are defined below), all in form and content acceptable

Net Worth shall be determined by Lender **in its reasonable direction**, taking into consideration the financial information delivered to Lender in accordance with Section [4/5] of this Agreement, together with Lender's **reasonable** determination of the value of the real estate assets identified therein.

745.    The Trump Organization also sought to limit the liability of Donald Trump, Jr. as trustee, with the bank eventually drawing the line at exculpating him for fraud. As counsel for Axos Bank wrote:

2.    With respect to the request to exculpate Donald J. Trump, Jr. in his role as trustee, we are generally ok with the language proposed by your trust counsel, provided that we do not believe the exculpation should eliminate liability for fraud or for a misrepresentation by trustee (1) in the certifications made in the Trust Certificate (in particular as it relates to authority to bind the trust) or (2) with respect to ongoing deliverables provided by the Guarantor under the Loan Documents. We will provide proposed language tomorrow and can discuss any concerns that you may have.

746.    Finally, Defendants sought to conceal their fraud through repeated failures to provide documents in response to subpoenas from OAG. As reflected over the course of extensive litigation in the matter *People v. The Trump Organization*, No. 451685/2020, pending in this Court:

a.    The Trump Organization failed to do a thorough search for electronic documents in response to an initial subpoena in December 2019, including failing to identify the fact that certain responsive documents had not been collected because of errors in a data migration. That issue was only identified and addressed upon inquiry by OAG. As a result, the Trump Organization hired a third-party vendor to review the collection process pursuant to a stipulated order. The Trump Organization did not certify that its production was complete until April 2022.

197

b. Even that production failed to include all responsive documents for Donald J. Trump, which were only obtained after a follow-up subpoena from OAG and Mr. Trump was held in contempt by this Court for failure to properly certify a response to that subpoena. The contempt was not purged until June 29, 2022.

747. But even after almost two years of litigation it appears that it may still be the case that not all responsive documents were produced. Among other things, in litigation over a search warrant executed at Mar-a-Lago on August 8, 2022, the United States District Court for the Middle District of Florida noted that "the seized materials include . . . correspondence related to taxes, and accounting information." *Trump v. United States*, 22 Civ. 81294, Order, Docket 64 (S.D. Fla. Sept. 5, 2022). Documents concerning taxes and accounting information would appear to be responsive to OAG's subpoenas, but no such documents for Mr. Trump were produced by counsel for Mr. Trump despite a representation by that counsel that: I "diligently searched each and every room of Respondent's private residence located at Mar-a-Lago, including all desks, drawers, nightstands, dressers, closets, etc. I was unable to locate any documents responsive to the Subpoena that have not already been produced to the OAG by the Trump Organization."

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
Executive Law § 63(12) – Persistent and Repeated Fraud
(Against All Defendants)

748. Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

749. New York Executive Law § 63(12) empowers the Attorney General to seek restitution, damages, and injunctive relief when any person or business entity has engaged in repeated fraudulent or illegal acts or otherwise demonstrates persistent fraud or illegality in the carrying on, conducting or transaction of business.

750. At all relevant times, Defendants have engaged in carrying on, conducting, or the transaction of business in New York within the meaning of Executive Law § 63(12).

198

Case 22-1175, Document 56, 09/26/2022, 3388914, Page208 of 224

751.    Fraud under Executive Law § 63(12) is broadly defined to include "any device, scheme, or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

752.    Fraudulent conduct as used in § 63(12) includes acts that have the "capacity or tendency to deceive, or create[ ] an atmosphere conducive to fraud." *People v. Applied Card Sys., Inc.*, 27 A.D.3d 104, 107 (3d Dep't 2005), *aff'd on other grounds*, 11 N.Y.3d 105 (2008); *see also People v. Northern Leasing Systems, Inc.*, 193 A.D.3d 67, 73 (1st Dep't 2021). The terms "fraud" and "fraudulent" are "given a wide meaning so as to embrace all deceitful practices contrary to the plain rules of common honesty, including all acts, even though not originating in any actual evil design to perpetrate fraud or injury upon others, which do tend to deceive or mislead." *People ex rel. Cuomo v. Greenberg*, 95 A.D.3d 474, 483 (1st Dep't 2012).

753.    Persistent fraud or illegality under Executive Law § 63(12) is broadly defined to include continuance or carrying on of any fraudulent or illegal act or conduct.

754.    Repeated fraud or illegality under Executive Law § 63(12) includes "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person."

755.    Defendants' acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12) in that Defendants engaged in persistent and repeated fraudulent acts. As set forth in the allegations above, Defendants made or caused to be made misrepresentations, false or misleading statements, and statements that were misleading by omission, concealment, or suppression of information. All of this conduct, moreover, occurred in an atmosphere conducive to fraud—in which the goal of increasing Mr. Trump's reported net worth on the Statements was well known and carried out by his agents and subordinates. Further, all of that

199

Case 22-1175, Document 56, 09/26/2022, 3388914, Page209 of 224

conduct was directed toward presenting misleading statements to others—including lenders, insurance companies, and governmental entities.

756.    The acts of fraud alleged here were repeated—entailing, among other things, dozens of specific numerical entries in financial spreadsheets; dozens of verbal representations in financial statements; and other fraudulent and misleading conduct by the Defendants.

757.    The acts of fraud alleged here also were repeated, in the sense that they affected more than one person under Executive Law § 63(12). In particular, the acts of fraud alleged herein affected lenders, employees who worked for those lenders and insurers, the accounting firm that compiled the Statements, and personnel of that firm.

758.    The acts of fraud alleged herein were also persistent, which connotes the "continuance" or "carrying on" of fraudulent conduct. Here, the key individual players remained the same over the course of several years: Jeffrey McConney (prepared or supervised preparation of supporting spreadsheets); Allen Weisselberg (reviewed and approved spreadsheets, and, as trustee, certified Statements' accuracy); Donald J. Trump (reviewed and approved Statements and certified their accuracy), Donald Trump, Jr. (as trustee, certified the Statements' accuracy). Moreover, these Defendants engaged in the same or similar conduct consistently over the course of several years—relying on prior years' information to prepare new valuations, continuing the use of deceptive wording to describe valuations performed, and continuing deceptive strategies used on the prior year's Statements.

759.    Executive Law § 63(12) also proscribes, as one type of fraud, "any . . . scheme or artifice to defraud." Defendants' conduct constituted one or more schemes to defraud under § 63(12). In particular, Defendants' conduct was committed to obtain property (including bank funds and insurance proceeds) by means of false or fraudulent pretenses or representations;

200

Case 22-1175, Document 56, 09/26/2022, 3388914, Page210 of 224

involved common and closely related techniques, misrepresentations, omissions and concealments of material facts over a period of years; and involved a common nucleus of actors, namely the Trump Organization, its constituent entities, its executives, and its other agents. *See, e.g.*, *People v. First Meridian Corp.*, 80 N.Y.2d 608, 616-17 (1995) (holding that it was appropriate to infer the existence of a "unitary scheme to defraud" under Penal Law using similar factors).

760.    Defendants are also liable for persistent and repeated fraud under Executive Law § 63(12) as participants in a long-running conspiracy. Although not an independent cause of action in New York, a civil conspiracy, if it exists, may "connect the actions of separate defendants with an otherwise actionable tort." *Abacus Federal Savings Bank v. Lim*, 75 A.D.3d 472, 474 (1st Dep't 2010). Here, the actions of the Defendants—including making numerous false and misleading entries and omissions in financial statements and supporting materials in a similar manner over the course of more than a decade, and then submitting them to financial institutions as certified by Mr. Trump or his trustees—reflect the existence of an agreement to commit fraud within the meaning of § 63(12). *Cf. People v. Flanagan*, 28 N.Y.3d 644 (2017) (unlawful agreement often shown by circumstantial evidence). Indeed, when asked if he, Mr. Weisselberg, and Mr. McConney, since at least as far back as 2005, had an ongoing agreement to generate false or misleading financial statements, Mr. Trump invoked his Fifth Amendment privilege. Each Defendant knowingly participated in the conspiracy and engaged in overt acts in furtherance of it: helping craft the Statements, using them to secure favorable financial terms, or certifying their accuracy to third parties. Overt acts in furtherance of the conspiracy occurred as late as 2019, 2020, 2021, and 2022.

## SECOND CAUSE OF ACTION
### Pursuant to Executive Law § 63(12), Repeated and Persistent
### Illegality: Falsifying Business Records under New York Penal Law
### (Against All Defendants)

761.    Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

762.    New York Executive Law § 63(12) empowers the Attorney General to seek restitution, damages, and injunctive relief when any person or business entity has engaged in repeated fraudulent or illegal acts or otherwise demonstrates persistent fraud or illegality in the carrying on, conducting or transaction of business.

763.    At all relevant times, Defendants have engaged in carrying on, conducting, or the transaction of business in New York within the meaning of Executive Law § 63(12).

764.    Persistent fraud or illegality under Executive Law § 63(12) is broadly defined to include continuance or carrying on of any fraudulent or illegal act or conduct.

765.    Repeated fraud or illegality under Executive Law § 63(12) includes "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person."

766.    Falsifying business records in the second degree, New York Penal Law § 175.05, is committed when, with intent to defraud, a person:

   a. Makes or causes a false entry in the business records of an enterprise; or

   b. Alters, erases, obliterates, deletes, removes or destroys a true entry in the business records of an enterprise; or

   c. Omits to make a true entry in the business records of an enterprise in violation of a duty to do so which he knows to be imposed upon him by law or by the nature of his position; or

   d. Prevents the making of a true entry or causes the omission thereof in the business records of an enterprise.

202

Case 22-1175, Document 56, 09/26/2022, 3388914, Page212 of 224

767.    The elements of falsifying business records in the first degree are met when a person commits falsifying business records in the second degree, and when the intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof. *People v. Reyes*, 69 A.D.3d 537 (1st Dep't 2010).

768.    Defendants, through their conduct described above, have made or caused to be made false entries and/or made or caused to be made the omission of true entries in the business records of an enterprise. Examples of falsified business records or portions thereof identified in the allegations above include false figures used to value properties, false claims that liquid assets belonged to Mr. Trump when they did not, false verbiage about how underlying valuations were prepared, and financial statements and supporting documents that omit true facts.

769.    In addition, through their conduct described above, Defendants have made or caused to be made false entries and or made or caused to be made the omission of true entries in the business records of an enterprise with the intent to commit another crime or aid or conceal the omission thereof—including the issuance of a false financial statement under Penal Law § 175.45 and insurance-fraud violations below.

770.    Defendants' conduct in this regard was "repeated" in the sense that it occurred multiple times and affected more than one person.

771.    Defendants' conduct in this regard was "persistent" because it continued and was carried on over the course of several years.

772.    With respect to Defendants that are not natural persons, they are liable for the additional reasons that the unlawful falsification of records was committed by one or more of their high managerial agents acting within the scope of the agent's employment.

Case 22-1775, Document 56, 09/26/2022, 3388914, Page213 of 224

773.    Consequently, Defendants have engaged in repeated and persistent illegality in violation of Executive Law§ 63(12) by falsifying business records.

### THIRD CAUSE OF ACTION
Pursuant to Executive Law § 63(12) Repeated and Persistent
Illegality: Conspiracy to Falsify Business Records under New
York Penal Law
(Against All Defendants)

774.    Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

775.    New York Executive Law § 63(12) empowers the Attorney General to seek restitution, damages, and injunctive relief when any person or business entity has engaged in repeated fraudulent or illegal acts or otherwise demonstrates persistent fraud or illegality in the carrying on, conducting or transaction of business.

776.    At all relevant times, Defendants have engaged in carrying on, conducting, or the transaction of business in New York within the meaning of Executive Law § 63(12).

777.    Persistent fraud or illegality under Executive Law § 63(12) is broadly defined to include continuance or carrying on of any fraudulent or illegal act or conduct.

778.    Repeated fraud or illegality under Executive Law § 63(12) includes "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person."

779.    In New York, a criminal conspiracy consists of an "agreement to cause a specific crime to be committed together with the actual commission of an overt act by one of the conspirators in furtherance of the conspiracy." *Robinson v. Snyder*, 259 A.D.2d 280, 281 (1st Dep't 1999).

780.    Defendants' acts and practices, such as making or causing to be made false entries in the business records of an enterprise, reflect the existence of an agreement to falsify the

204

Case 22-1175, Document 56, 09/26/2022, 3388914, Page214 of 224

Statements of Financial Condition, supporting data spreadsheets, and other business records with requisite intent for that conduct to violate the Penal Law.

781.     At least one of the Defendant co-conspirators engaged in an overt act in furtherance of the conspiracy. Those acts included entering or causing to be entered false entries in the business records of an enterprise, or knowingly omitting to make true entries in those business records, or using the Statements of Financial Condition for purposes of obtaining financial benefits.

782.     Thus, Defendants engaged in a conspiracy to falsify business records as defined by New York Penal Law.

783.     Defendants' conduct in this regard was "repeated" in the sense that it occurred multiple times or affected more than one person.

784.     Defendants' conduct in this regard was "persistent" because it continued and was carried on over the course of several years.

785.     Overt acts in furtherance of the conspiracy occurred as late as 2019, 2020, 2021, and 2022.

786.     With respect to Defendants that are not natural persons, they are liable for the additional reasons that the unlawful conspiracy to falsify business records was committed by one or more of their high managerial agents acting within the scope of the agent's employment.

787.     Consequently, Defendants have engaged in repeated and persistent fraud or illegality in violation of Executive Law§ 63(12) by conspiring to falsify business records.

Case 22-1175, Document 56, 09/26/2022, 3388914, Page215 of 224

## FOURTH CAUSE OF ACTION
Pursuant to Executive Law § 63(12) Persistent Illegality: Issuing
False Financial Statements under New York Penal Law § 175.45
(Against All Defendants)

788.    Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

789.    New York Executive Law § 63(12) empowers the Attorney General to seek restitution, damages, and injunctive relief when any person or business entity has engaged in repeated fraudulent or illegal acts or otherwise demonstrates persistent fraud or illegality in the carrying on, conducting or transaction of business.

790.    At all relevant times, Defendants have engaged in carrying on, conducting, or the transaction of business in New York within the meaning of Executive Law § 63(12).

791.    Persistent fraud or illegality under Executive Law § 63(12) is broadly defined to include continuance or carrying on of any fraudulent or illegal act or conduct.

792.    Repeated fraud or illegality under Executive Law § 63(12) includes "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person."

793.    Pursuant to Executive Law § 63(12), Defendants' acts and practices constitute issuing false financial statements under the New York State Penal Code.

794.    A person issues a false financial statement, under New York Penal Law § 175.45, when the person, with intent to defraud, (1) knowingly makes or utters a written instrument which purports to describe the financial condition of some person and which is inaccurate in some material respect, or (2) represents in writing that a written instrument purporting to describe a person's financial condition as of a particular date is accurate with respect to such person's current financial condition, knowing it is materially inaccurate in that respect.

206

Case 22-1175, Document 56, 09/26/2022, 3388914, Page216 of 224

795.     Defendants, through their conduct described above, have, with intent to defraud, knowingly made or uttered materially inaccurate written instruments purporting to describe Donald Trump's financial condition.

796.     Defendants' conduct in this regard was "repeated" in the sense that it occurred multiple times and affected more than one person.

797.     Defendants' conduct in this regard was "persistent" because it continued and was carried on over the course of several years.

798.     With respect to Defendants that are not natural persons, they are liable for the additional reasons that the unlawful issuance of a false financial statement was committed by one or more of their high managerial agents acting within the scope of the agent's employment.

799.     Consequently, Defendants have engaged in repeated and persistent fraud or illegality in violation of Executive Law§ 63(12) by issuing false financial statements.

### FIFTH CAUSE OF ACTION
Pursuant to Executive Law § 63(12) Repeated and Persistent
Illegality: Conspiracy to Falsify False Financial Statements under
New York Penal Law
(Against All Defendants)

800.     Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

801.     New York Executive Law § 63(12) empowers the Attorney General to seek restitution, damages, and injunctive relief when any person or business entity has engaged in repeated fraudulent or illegal acts or otherwise demonstrates persistent fraud or illegality in the carrying on, conducting or transaction of business.

802.     At all relevant times, Defendants have engaged in carrying on, conducting, or the transaction of business in New York within the meaning of Executive Law § 63(12).

207

803. Persistent fraud or illegality under Executive Law § 63(12) is broadly defined to include continuance or carrying on of any fraudulent or illegal act or conduct.

804. Repeated fraud or illegality under Executive Law § 63(12) includes "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person."

805. In New York, a criminal conspiracy consists of an "agreement to cause a specific crime to be committed together with the actual commission of an overt act by one of the conspirators in furtherance of the conspiracy." *Robinson v. Snyder*, 259 A.D.2d 280, 281 (1st Dep't 1999).

806. Defendants' acts and practices, such as making or causing to be made materially inaccurate written instruments purporting to describe Donald Trump's financial condition, reflect the existence of an agreement to issue false financial statements as defined under the New York Penal Law.

807. At least one of the Defendant co-conspirators engaged in an overt act, such as preparing the Statements, certifying the Statements' accuracy, signing letters necessary to the Statements' issuances, preparing supporting information, contributing supporting information, or conveying such information to third parties, in furtherance of the agreement.

808. Overt acts in furtherance of the conspiracy occurred as late as 2019, 2020, 2021, and 2022.

809. Thus, Defendants engaged in a conspiracy to issue false financial statements as defined by New York Penal Law.

810. Defendants' conduct in this regard was "repeated" in the sense that it occurred multiple times or affected more than one person.

208

Case 22-1175, Document 56, 09/26/2022, 3388914, Page218 of 224

811.    Defendants' conduct in this regard was "persistent" because it continued and was carried on over the course of several years.

812.    With respect to Defendants that are not natural persons, they are liable for the additional reasons that the unlawful conspiracy to issue false financial statements was committed by one or more of their high managerial agents acting within the scope of the agent's employment.

813.    Consequently, Defendants have engaged in repeated and persistent fraud or illegality in violation of Executive Law§ 63(12) by conspiring to issue false financial statements.

### SIXTH CAUSE OF ACTION
Pursuant to Executive Law § 63(12) Repeated and Persistent
Illegality: Insurance Fraud under New York Penal Law § 176.05
(Against All Defendants)

814.    Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

815.    New York Executive Law § 63(12) empowers the Attorney General to seek restitution, damages, and injunctive relief when any person or business entity has engaged in repeated fraudulent or illegal acts or otherwise demonstrates persistent fraud or illegality in the carrying on, conducting or transaction of business.

816.    At all relevant times, Defendants have engaged in carrying on, conducting, or the transaction of business in New York within the meaning of Executive Law § 63(12).

817.    Persistent fraud or illegality under Executive Law § 63(12) is broadly defined to include continuance or carrying on of any fraudulent or illegal act or conduct.

818.    Repeated fraud or illegality under Executive Law § 63(12) includes "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person."

209

Case 22-1175, Document 56, 09/26/2022, 3388914, Page219 of 224

819.     Pursuant to Executive Law § 63(12), Defendants' acts and practices constitute insurance fraud under the New York State Penal Code.

820.     Under New York State Penal Law §176.05, "[a] fraudulent insurance act is committed by any person who, knowingly and with intent to defraud presents, causes to be presented, or prepares with knowledge or belief that it will be presented to or by an insurer . . . or any agent thereof: 1. any written statement as part of, or in support of, an application for the issuance of . . . a commercial insurance policy, . . . or a claim for payment or other benefit pursuant to an insurance policy . . . for commercial or personal insurance that he or she knows to: (a) contain materially false information concerning any fact material thereto; or (b) conceal, for the purpose of misleading, information concerning any fact material thereto."

821.     Defendants, through their conduct described above, knowingly and with the intent to defraud presented, caused to present, or prepared, written statements in support of applications for insurance knowing they contained materially false information concerning facts material to those applications, and/or concealed, for the purpose of misleading insurers, information concerning facts material to those written statements.

822.     Defendants' conduct in this regard was "repeated" in the sense that it occurred multiple times and affected more than one person.

823.     Defendants' conduct in this regard was "persistent" because it continued and was carried on over the course of several years.

824.     With respect to Defendants that are not natural persons, they are liable for the additional reasons that the insurance fraud was committed by one or more of their high managerial agents acting within the scope of the agent's employment.

Case 22-1175, Document 56, 09/26/2022, 3388914, Page220 of 224

825.     Consequently, Defendants have engaged in repeated and persistent illegality in violation of Executive Law § 63(12) by committing insurance fraud.

### SEVENTH CAUSE OF ACTION
Pursuant to Executive Law § 63(12) Repeated and Persistent Fraud
or Illegality: Conspiracy to Commit Insurance Fraud under New
York Penal Law
(Against All Defendants)

826.     Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

827.     New York Executive Law § 63(12) empowers the Attorney General to seek restitution, damages, and injunctive relief when any person or business entity has engaged in repeated fraudulent or illegal acts or otherwise demonstrates persistent fraud or illegality in the carrying on, conducting or transaction of business.

828.     At all relevant times, Defendants have engaged in carrying on, conducting, or the transaction of business in New York within the meaning of Executive Law § 63(12).

829.     Persistent fraud or illegality under Executive Law § 63(12) is broadly defined to include continuance or carrying on of any fraudulent or illegal act or conduct.

830.     Repeated fraud or illegality under Executive Law § 63(12) includes "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person."

831.     In New York, a criminal conspiracy consists of an "agreement to cause a specific crime to be committed together with the actual commission of an overt act by one of the conspirators in furtherance of the conspiracy." *Robinson v. Snyder*, 259 A.D.2d 280, 281 (1st Dep't 1999).

832.     Defendants' acts and practices, such as causing to present, or preparing, written statements in support of insurance applications, knowing such statements to contain materially

211

Case 22-1175, Document 56, 09/26/2022, 3388914, Page221 of 224

false information concerning facts material to those applications, and/or concealing information concerning facts material to those written statements, reflect the existence of an agreement to commit insurance fraud as defined under the New York Penal Law.

833.    At least one of the Defendant co-conspirators engaged in an overt act, causing to present, or preparing, written statements in support of insurance applications, knowing such statements to contain materially false information concerning facts material to those applications, and/or concealing information concerning facts material to those written statements, in furtherance of the agreement.

834.    Thus, Defendants engaged in a conspiracy to commit insurance fraud as defined by New York Penal Law.

835.    Defendants' conduct in this regard was "repeated" in the sense that it occurred multiple times and affected more than one person.

836.    Defendants' conduct in this regard was "persistent" because it continued and was carried on over the course of several years.

837.    With respect to Defendants that are not natural persons, they are liable for the additional reasons that the conspiracy to engage in insurance fraud was committed by one or more of their high managerial agents acting within the scope of the agent's employment.

838.    Consequently, Defendants have engaged in repeated and persistent illegality in violation of Executive Law§ 63(12) by conspiring to commit insurance fraud.

Case 22-1175, Document 56, 09/26/2022, 3388914, Page222 of 224

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an order and judgment granting the following relief to remedy the substantial, persistent, and repeated fraudulent and misleading conduct in the business of the Trump Organization occurring since 2011:

A.    Cancelling any certificate filed under and by virtue of the provisions of section one hundred thirty of the General Business Law for the corporate entities named as defendants and any other entity controlled by or beneficially owned by Donald J. Trump which participated in or benefitted from the foregoing fraudulent scheme;

B.    Appointing an independent monitor to oversee compliance, financial reporting, valuations, and disclosures to lenders, insurers, and tax authorities, at the Trump Organization, for a period of no less than five years;

C.    Replacing the current trustees of the Donald J. Trump Revocable Trust ("Revocable Trust") with new independent trustees, and requiring similar independent governance in any newly-formed trust should the Revocable Trust be revoked and replaced with another trust structure;

D.    Requiring the Trump Organization to prepare on an annual basis for the next five years a GAAP-compliant, audited statement of financial condition showing Mr. Trump's net worth, to be distributed to all recipients of his prior Statements of Financial Condition;

E.    Barring Mr. Trump and the Trump Organization from entering into any New York State commercial real estate acquisitions for a period of five years;

F.    Barring Mr. Trump and the Trump Organization from applying for loans from any financial institution chartered by or registered with the New York Department of Financial Services for a period of five years;

G.    Permanently barring Mr. Trump, Donald Trump, Jr., Ivanka Trump, and Eric Trump from serving as an officer or director in any New York corporation or similar business entity registered and/or licensed in New York State;

I.    Permanently barring Allen Weisselberg and Jeffrey McConney from serving in the financial control function of any New York corporation or similar business entity registered and/or licensed in New York State;

213

J.      Awarding disgorgement of all financial benefits obtained by each Defendant from the fraudulent scheme, including all financial benefits from lenders and insurers through repeated and persistent fraudulent practices of an amount to be determined at trial but estimated to be $250,000,000, plus prejudgment interest; and

K.      Granting any additional relief the Court deems appropriate.


Dated: New York, New York
 September 21, 2022

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: _____
      Kevin Wallace

Kevin Wallace
Andrew Amer
Colleen K. Faherty
Alex Finkelstein
Wil Handley
Eric R. Haren
Louis M. Solomon
Austin Thompson
Stephanie Torre

Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6376
kevin.wallace@ag.ny.gov

*Attorneys for the People of the State of New York*

Case 22-1175, Document 56, 09/26/2022, 3388914, Page224 of 224

## VERIFICATION

Kevin Wallace, an Attorney admitted to the Bar of this State, hereby affirms and certifies that:

1.      I am an attorney in the Office of Letitia James, Attorney General of the State of New York, who appears on behalf of the People of the State of New York as Plaintiff in this proceeding. I am duly authorized to make this verification and am acquainted with the facts in this matter.

2.      I have read the annexed verified complaint, know the contents thereof, and state that the same are true to my knowledge, except for those matters alleged to be upon information and belief, and as to those matters, I believe them to be true.

Dated:  New York, New York
        September 21, 2022

Kevin Wallace