

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

**LETITIA JAMES**
ATTORNEY GENERAL

**BARBARA D. UNDERWOOD**
SOLICITOR GENERAL
DIVISION OF APPEALS & OPINIONS

November 8, 2022

Catherine O'Hagan Wolfe
Clerk of the Court
U.S. Court of Appeals for
  the Second Circuit
40 Foley Square
New York, NY 10007

    Re:    *Trump v. James*, No. 22-1175

Dear Ms. Wolfe:

I write on behalf of defendant-appellee New York Attorney General Letitia James, under FRAP 28(j), to update the Court regarding a pertinent development since the filing of appellee's brief.

As we advised the Court by letter dated September 26, 2022, the New York State Office of the Attorney General ("OAG") filed a civil enforcement proceeding on September 21, 2022, in Supreme Court, New York County, under New York Executive Law § 63(12), alleging that the Trump Organization, Mr. Trump, and others engaged in persistent fraud and illegality in business. On November 3, 2022, the state court granted OAG's motion for a preliminary injunction. *See* Decision & Order on Mot., *People ex rel. James v. Trump*, Index No. 452564/2022 (Sup. Ct. N.Y. County), NYSCEF Doc. No. 183 (appeal filed Nov. 7, 2022). A copy of the decision is attached.

The state court found OAG's uncontested evidence to be "particularly compelling" and "more than sufficient to demonstrate OAG's likelihood of success on the merits" of its fraud and illegality claims. *Id.* at 6, 9. The court further concluded that the balance of "equities tips, strongly, if not completely, in favor of granting a preliminary injunction, particularly to ensure that

defendants do not dissipate their assets." *Id.* at 9. The court thus prohibited the defendants from disposing of significant property without advance notice, and ordered the appointment of an independent monitor to review the defendants' financial reporting and potential movement of significant assets, during the lawsuit. *Id.* at 10. The monitor will be chosen by the court from among the parties' recommendations. *Id.* at 10-11.

These developments underscore both the legitimacy of OAG's investigation into appellants' conduct and the propriety of abstaining from hearing this last-minute collateral attack on that investigation—an attack which now effectively seeks to enjoin the state court's injunction. *See generally Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 79-80 (2013); *Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191, 199-200 (2d Cir. 2002). OAG is prepared to answer questions at oral argument about this topic and to submit supplemental briefing at the Court's request.

Respectfully submitted,

   /s/ Eric Del Pozo
Eric Del Pozo
Assistant Solicitor General

cc: Counsel of record (by ECF)

enc.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

| | | | |
|---|---|---|---|
| PRESENT: | HON. ARTHUR F. ENGORON | PART | 37 |
| | *Justice* | | |

-------------------------------------------------------------------X

PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK,

INDEX NO.        452564/2022

MOTION DATE      10/13/2022

MOTION SEQ. NO.  001

Plaintiff,

- v -

DONALD J. TRUMP, DONALD TRUMP JR, ERIC TRUMP, IVANKA TRUMP, ALLEN WEISSELBERG, JEFFREY MCCONNEY, THE DONALD J. TRUMP REVOCABLE TRUST, THE TRUMP ORGANIZATION, INC., TRUMP ORGANIZATION LLC, DJT HOLDINGS LLC, DJT HOLDINGS MANAGING MEMBER, TRUMP ENDEAVOR 12 LLC, 401 NORTH WABASH VENTURE LLC, TRUMP OLD POST OFFICE LLC, 40 WALL STREET LLC, SEVEN SPRINGS LLC,

**DECISION + ORDER ON MOTION**

Defendants.

-------------------------------------------------------------------X

The following e-filed documents, listed by NYSCEF document number (Motion 001) 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 119, 120, 121, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 138, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 182

were read on this motion for a    PRELIMINARY INJUNCTION AND APPOINTMENT OF AN INDEPENDENT MONITOR    .

Upon the foregoing documents, and after oral argument held on November 3, 2022, it is hereby ordered that plaintiff's motion for a preliminary injunction and appointment of an independent monitor is granted as detailed herein.

Background

This action arises out of a three-year investigation conducted by plaintiff, the Office of the Attorney General of the State of New York ("OAG"), into the business practices of defendants from 2011 through 2021. OAG alleges that defendant Donald J. Trump ("Mr. Trump") and the other named defendants engaged in ongoing and extensive acts of fraud in the preparation and

452564/2022   PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL    Page 1 of 11
Motion No. 001

1 of 11

submission of Mr. Trump's annual Statements of Financial Condition (the "SFCs"), violating New York Executive Law § 63(12) and a multitude of state criminal laws.[1]

OAG commenced this action on September 21, 2022, and service was thereafter effectuated on all parties. OAG now moves for a preliminary injunction and the appointment of an independent monitor to oversee the submission of certain financial information by defendants pending the final disposition of this case. Defendants have not yet answered the complaint, although they vigorously oppose OAG's motion.

New York Executive Law § 63(12)
New York Executive Law § 63, under which OAG brings this action, was enacted specifically to outline the "General Duties" of the New York Attorney General. Executive Law § 63(12) reads as follows:

> Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of section four hundred forty of the former penal law or section one hundred thirty of the general business law, and the court may award the relief applied for or so much thereof as it may deem proper. The word "fraud" or "fraudulent" as used herein shall include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions. The term "persistent fraud" or "illegality" as used herein shall include continuance or carrying on of any fraudulent or illegal act or conduct. The term "repeated" as used herein shall include repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person. Notwithstanding any law to the contrary, all monies recovered or obtained under this subdivision by a state agency or state official or employee acting in their official capacity shall be subject to subdivision eleven of section four of the state finance law.
>
> In connection with any such application, the attorney general is authorized to take proof and make a determination of the relevant

---

[1] OAG brings this action exclusively under New York Executive Law § 63(12) but alleges violations of New York Penal Law § 175.10 (Falsifying Business Records), New York Penal Law 175.45 (Issuing a False Financial Statement), and New York Penal Law § 176.05 (Insurance Fraud) to demonstrate defendants' propensity to commit fraud.

452564/2022 PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL
Motion No. 001                                                                 Page 2 of 11

2 of 11

> facts and to issue subpoenas in accordance with the civil practice law and rules. Such authorization shall not abate or terminate by reason of any action or proceeding brought by the attorney general under this section.

Legal Standing and Capacity to Sue

Defendants assert that OAG has neither standing nor legal capacity to bring this action. Defendants argue that OAG cannot demonstrate standing because it cannot establish an "injury in fact—an actual legal stake in the matter being adjudicated." Defendants further argue that OAG cannot meet the elements required to bring a *parens patriae* action to sue in the public interest. NYSCEF Doc. No. 126, pg. 9.

Defendants are mistaken. The Court of Appeals has made clear that "Executive Law § 63(12) is the procedural route by which the Attorney-General may apply to Supreme Court for an order enjoining repeated illegal or fraudulent acts." State by Abrams v Ford Motor Co., 74 NY2d 495, 502 (1989).

The *parens patriae* doctrine provides a basis for a State to bring an action against a defendant whose conduct has or will impact the health or well-being of the State's citizens. See e.g., Alfred L. Snapp & Son, Inc. v Puerto Rico, ex rel., Barez, 458 US 592, 593 (1982) (to bring *parens patriae* action, Attorney General must identify quasi-sovereign interest in public's well-being, that touches substantial segment of population, and articulate "an interest apart from the interests of particular private parties"). Although to maintain an action in Federal Court, a state Attorney General must demonstrate the prima facie requirements of the *parens patrie* doctrine, such a demonstration is unnecessary where, as here, the New York legislature has specifically empowered the Attorney General to bring such an action in a New York state court. People by Schneiderman v Credit Suisse Sec. (USA) LLC, 31 NY3d 622, 633 (2018) ("it is undisputed that Executive Law § 63(12) gives the Attorney General standing to redress liabilities recognized elsewhere in the law, expanding the scope of available remedies").

However, in any event, OAG satisfies the *parens patrie* doctrine by sufficiently articulating a quasi-sovereign interest that touches a substantial segment of the population and is distinct from the interests of private parties. State of N.Y. by Abrams v Gen. Motors Corp., 547 F Supp 703, 705 (SDNY 1982) ("[t]he State's goal of securing an honest marketplace in which to transact a business is a quasi-sovereign interest"); People ex rel. Cuomo v Coventry First LLC, 52 AD3d 345, 346 (1st Dep't 2008) ("the claim pursuant to Executive Law § 63(12) constituted proper exercises of the State's regulation of businesses within its borders in the interest of securing an honest marketplace"); New York by James v Amazon.com, Inc., 550 F Supp 3d 122, 130-131 (SDNY 2021) ("[T]he State's statutory interest under § 63(12) encompasses the prevention of either 'fraudulent or illegal' business activities. Misconduct that is illegal for reasons other than fraud still implicates the government's interests in guaranteeing a marketplace that adheres to standards of fairness…").

Defendants' argument that OAG's complaint is improperly lodged because it is not aimed at actions surrounding "consumer protection" is wholly without merit. New York v Feldman, 210 F Supp 2d 294, 299-300 (SDNY 2002) ("[D]efendants' claim that section 63(12) is limited to

452564/2022 PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL
Motion No. 001                                                Page 3 of 11

3 of 11

consumer protection actions is simply incorrect. The New York Attorney General has repeatedly used section 63(12) to secure relief for persons who are not consumers in cases that are not consumer protection actions") (internal citations omitted).

Similarly, defendants' contention that OAG does not have capacity to sue because "Executive Law § 63(12) does not authorize Plaintiff to commence this type of proceeding" (NYSCEF Doc. No. 126, pgs. 19-20) is belied by the plain language of the statute and by prevailing authority. Matter of People by Schneiderman v Trump Entrepreneur Initiative LLC, 137 AD3d 409, 417 (1st Dep't 2016) ("[E]ven apart from prevailing authority, the language of the statute itself appears to authorize a cause of action; like similar statutes that authorize causes of action, § 63(12) defines the fraudulent conduct that it prohibits, authorizes the Attorney General to commence an action or proceeding to foreclose that conduct, and specifies the relief, including equitable relief, that the Attorney General may seek").

The Purported Disclaimers

The defendants further argue that the allegations contained in the complaint are unsustainable based on documentary evidence, citing to language that appears at the beginning of each of the SFCs. The relevant language was included by Mr. Trump's former accounting firm, Mazars[2], and states, as here pertinent:

> We have compiled the accompanying statement of financial condition of Donald J. Trump as of June 20, 2012. We have not audited or reviewed the accompanying financial statement and, accordingly, do not express an opinion or provide any assurance about whether the financial statement is in accordance with accounting principles generally accepted in the United States of America.
>
> Donald J. Trump is responsible for the preparation and fair presentation of the financial statement in accordance with accounting principles generally accepted in the United States of America and for designing, implementing, and maintaining internal control relevant to the preparation and fair presentation of the financial statement.

NYSCEF Doc. No. 6. Contrary to defendants' assertions, the Mazars disclaimer does not avail Mr. Trump at all. First, the disclaimer was issued by Mazars, not by Mr. Trump or any of the other named defendants. Second, the Mazars disclaimer makes abundantly clear that Mr. Trump was fully responsible for the information contained within the SFCs. SFCs serve an important function in the real world; allowing blanket disclaimers to insulate liars from liability would completely undercut that function.

---

[2] Although Mazars provided the cover letter for Mr. Trump's SFCs for 2011 through 2020 (NYSCEF Doc. Nos. 5-14), accountant Whitley Penn LLP provided the cover letter for Mr. Trump's 2021 SFC, which contains similar language indicating that it "did not audit or review the financial statement" nor did it "perform any procedures to verify the accuracy or completeness of the information provided by the Trustee of Donald J. Trump Revocable Trust..." NYSCEF Doc. No. 15.

452564/2022  PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL    Page 4 of 11
Motion No. 001

4 of 11

Further, the case law cited by defendants arises out of causes of action for justifiable reliance, not Executive Law § 63(12). Nonetheless, "[t]he law is abundantly clear that" using a disclaimer as a defense to a justifiable reliance claim requires proof that: "(1) the disclaimer is made sufficiently specific to the particular type of fact misrepresented or undisclosed; and (2) the alleged misrepresentations or omissions did not concern facts peculiarly within the [defendant's] knowledge." Basis Yield Alpha Fund (Master) v Goldman Sachs Grp., Inc., 115 AD3d 128, 136 (1st Dep't 2014) (holding "a [plaintiff] may not be precluded from claiming reliance on misrepresentation of facts peculiarly within the [defendant's] knowledge"). As the SFCs were unquestionably based on information peculiarly within defendants' knowledge, defendants may not rely on such purported disclaimers as a defense.

Moreover, the Mazars' language to which defendants refer does nothing to alert its recipients that Mr. Trump himself cautions them not to rely on its contents. Joel v Weber, 166 AD2d 130, 137 (1st Dep't 1991) (denying motion to dismiss based on disclaimer and finding language "cannot be classified as a disclaimer, since the wording of the note does not in any manner caution [recipient] not to rely upon the financial statement of which it was a part" and "[i]n fact, rather than being a disclaimer, we further find that this note conveys the unequivocal impression that it is a good faith attempt to approximate current market value").

Preliminary Injunction
"A municipality seeking a preliminary injunction to enforce compliance with its ordinances or regulations in order to protect the public interest… need only demonstrate a likelihood of success on the merits and that the equities weigh in its favor." City of New York v Beam Bike Corp., 206 AD3d 447, 447-448 (1st Dep't 2022).

Defendants strenuously argue that OAG's motion should be denied because OAG has failed to demonstrate that "the Trump Parties have ever even been late on so much as one loan payment over the past decade" such that they could not possibly have engaged in fraud. NYSCEF Doc. No. 126, pg. 9. This argument fails, as OAG need not demonstrate irreparable harm when seeking a preliminary injunction under Executive Law § 63(12)—OAG must only demonstrate a likelihood of success on the merits and that the balance of equities weighs in its favor. Beam Bike Corp., 206 AD3d at 447-448.

Moreover, as discussed *supra*, the State's "statutory interest under § 63(12)" is to protect "the government's interests in guaranteeing a marketplace that adheres to standards of fairness." Amazon, 550 F Supp 3d at 130. Additionally:

> Where, as here, there is a claim based on fraudulent activity, disgorgement may be available as an equitable remedy, notwithstanding the absence of loss to individuals or independent claims for restitution. Disgorgement is distinct from the remedy of restitution because it focuses on the gain to the wrongdoer as opposed to the loss to the victim. Thus, disgorgement aims to deter wrongdoing by preventing the wrongdoer from retaining ill-gotten gains from fraudulent conduct. Accordingly, the remedy of disgorgement does not require a showing or allegation of direct

452564/2022 PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL
Motion No. 001                                                                    Page 5 of 11

5 of 11

losses to consumers or the public; the source of the ill-gotten games is "immaterial."

People v Ernst & Young, LLP, 114 AD3d 569, 569-70 (1st Dep't 2014).

Likelihood of Success on the Merits

Contrary to defendants' allegations, OAG's motion is not based solely on the "verified allegations" set forth in its 222-page complaint. Rather, OAG attaches dozens of exhibits that contain documentary evidence not subject to interpretation (i.e., the SFCs speak for themselves) that support OAG's contention that it is likely to succeed on the merits. Conversely, defendants have failed to submit an iota of evidence, or an affidavit from anyone with personal knowledge, rebutting OAG's comprehensive demonstration of persistent fraud.

Although, for present purposes, the Court need not detail every instance of fraud found in the record, the following examples are particularly compelling:

### Trump Tower Triplex

Mr. Trump formerly resided in a triplex apartment (the "Triplex") in Manhattan located within Trump Tower. It is undisputed that the square footage of the Triplex is 10,996 square feet. NYSCEF Doc. No. 49. However, from 2012 until at least 2016, Mr. Trump represented that the Triplex was 30,000 square feet. Mr. Trump further used this extreme exaggeration to inflate wildly the value of the Triplex on his SFCs for those years. In 2011, Mr. Trump represented that the Triplex's value was $80 million, which would have valued the apartment at more than $7,200 per square foot, when the highest price paid for an apartment in that building was $3,027 per square foot. In 2012, Mr. Trump's SFC represented the value of the same apartment as $180 million.[3]

Over the next four years, Mr. Trump reported massive increases in the value of the Triplex on his SFCs, reporting the value of the Triplex as $200 million in 2013 and 2014 and $327 million in 2015 and 2016. Defendant Allen Weisselberg ("Mr. Weisselberg"), the Trump Organization's former Chief Financial Officer, testified under oath that the valuation overstated the apartment's value by "give or take" $200 million. NYSCEF Doc. No. 53, pg. 4.

To the extent that defendants assert that the over-valuation of approximately $200 million was not intentional but an inadvertent mistake[4], such argument is irrelevant under Executive Law § 63(12).

> Good faith or lack of fraudulent intent is not an issue. The definition of 'fraud' as contained in Section 63, subd.12 of the

---

[3] As of 2012, the highest price ever paid for an apartment in New York City was $88 million, nearly $100 million less than Mr. Trump's valuation of his Triplex. NYSCEF Doc. No. 1, pg. 85.

[4] Although intent is not relevant under Executive Law § 63(12), it belies all common sense to assert that Mr. Trump, who resided in the Triplex for over 35 years and who purports to be "one of the top businesspeople" was not aware that he was over-representing the size of his home by nearly 200%. See Jill Colvin, Associated Press, https://apnews.com/article/north-america-donald-trump-ap-top-news-cabinets-maryland-2bb960fda0264c488d454632628cb193 [last accessed Nov. 3, 2022].

452564/2022 PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL    Page 6 of 11
Motion No. 001

6 of 11

> Executive Law is equivalent to that contained in Section 352 of the General Business Law… which has been construed to include acts which tend to deceive or mislead the public, whether or not they are the product of scienter or an intent to defraud.

State by Lefkowtiz v Interstate Tractor Trailer Training, Inc., 66 Misc 2d 678, 682 (Sup Ct 1971).

### Trump Park Avenue Rent-Stabilized Apartments

Mr. Trump included Trump Park Avenue as an asset on his SFCs for the years 2011 through 2021. In 2012 the Oxford Group performed an appraisal that identified 12 rent-stabilized apartments in the building and assessed their collective value at $750,000, noting that the rent-stabilized units "cannot be marketed as individual units" for sale because the "current tenants cannot be forced to leave." NYSCEF Doc. No. 61. Notwithstanding[5], Mr. Trump's 2011 and 2012 SFCs valued the 12 unsold residential units without taking into account the rent-stabilization restrictions, reporting their collective value at a staggering $50 million. Mr. Trump's own accountant, Donald Bender, testified that he was "shocked by the size of the discrepancy" between the appraised value of $750,000 and the self-reported value of $50 million. NYSCEF Doc. No. 41, pg. 8.

### 40 Wall Street

The Trump Organization, through the entity 40 Wall Street LLC, owns a "ground lease" at 40 Wall Street. In 2010, non-party Cushman & Wakefield ("C&W") appraised the Trump Organization's interest in that ground lease at $200 million.[6] NYSCEF Doc. No. 55, pg. 3.

Notwithstanding, Mr. Trump listed the value of his interest in 40 Wall Street as $524.7 million on his 2011 SFC, $527.2 million on his 2012 SFC, and $530.7 million on his 2013 SFC, more than twice the value that C&W reached. Mr. Trump's longtime accountant, Donald Bender, testified that it was "misleading" for Mr. Trump not to provide the C&W appraisal to Mazars to consider in issuing its SFC, and that if he had been aware of it, that could have led to the SFC not being issued. NYSCEF Doc. No. 41, pg. 4.

### Donald Trump Jr.'s Disclaimer of Responsibility for SFCs' Accuracy

Defendant Donald Trump Jr. is a senior executive at the Trump Organization and a trustee of the Donald J. Trump Revocable Trust, which was responsible for certifying the SFCs accuracy to banks and other institutions. He personally signed representation letters to Mazars on each Statement Engagement while serving as a trustee, and those letters included the representation that "[w]e acknowledge our responsibility and have fulfilled our responsibilities for the preparation and fair presentation of the personal financial statement in accordance with accounting principles generally accepted in the United States of America." NYSCEF Doc. No.

---

[5] Although OAG need not prove intent, there is no doubt that defendants were aware the apartments were rent-stabilized, as defendant Donald Trump Jr. testified that the rent-stabilized tenants were "the bane of my existence for quite some time." NYSCEF Doc. No. 45, pg. 7.

[6] OAG alleges many more instances of fraud arising out of defendants' valuation of their interest in 40 Wall Street. However, for present purposes, the Court need not address each and every one.

452564/2022 PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL
Motion No. 001                                                                           Page 7 of 11

7 of 11

48. The statement further said that "[w]e have not knowingly withheld from you any financial records or related data that in our judgment would be relevant to your compilation." Id.

Notwithstanding such representations, Donald Trump Jr. testified at his deposition that he had no knowledge of Generally Accepted Accounting Principles ("GAAP") outside of "Accounting 101 at Wharton," and that he "had no knowledge as [GAAP] relates to what it was for, for the Statement of Financial Condition or not." NYSCEF Doc. No. 45, pg. 10-11. He further testified that despite personally vouching for their accuracy, he "had no real involvement in the preparation of the Statement of Financial Condition[s] and don't really remember ever working on it with anyone." Id.

Accordingly, at a minimum, Donald Trump Jr. signed off on representations to Mazars without performing the due diligence necessary to ensure their accuracy or compliance with GAAP, raising serious doubt as to the reliability of future SFCs for which Donald Trump Jr. may be responsible. Furthermore, the record is replete with evidence that Donald Trump Jr.'s statement that "we" have not knowingly withheld pertinent information is blatantly false.

### Mar-a-Lago

In 1995, Mr. Trump signed a Deed of Conservation and Preservation that gave up his rights to use the property for any purpose other than as a social club. NYSCEF Doc. No. 64. Additionally, in 2002, Mr. Trump signed a Deed of Development Rights conveying to the National Trust for Historic Preservation "any and all of [his] rights to develop the Property for any usage other than club usage." NYSCEF Doc. No. 65. Despite these prohibitive legal restrictions, Mr. Trump signed SFCs between 2011 and 2021 valuing the property at between $347 million and $739 million, based on the false premise that it was an unrestricted plot of land that could be sold and used as a private home, rather than the heavily encumbered historical landmark that it was. NSYCEF Doc. Nos. 16-26.

### Zurich Insurance Fraud

The only method by which defendants disclosed Mr. Trump's SFCs to insurance company Zurich North American ("Zurich") was to permit its underwriters to review a copy of the SFCs at the Trump Organization's offices, under the watchful gaze of Mr. Weisselberg. While a Zurich underwriter was at the Trump offices reviewing such SFCs, Mr. Weisselberg represented to the Zurich underwriter that the fair values of the properties within the SFCs were determined by outside professional firms such as C&W, when, in fact, the Trump Organization itself concocted them out of whole cloth. NYSCEF Doc. Nos. 90-92. Zurich's underwriter testified that Mr. Weisselberg's representations "weighed favorably" into her recommending that Zurich renew the Surety Program. NYSCEF Doc. No. 90, pg. 7.

### Invocation of the Fifth Amendment

Although not dispositive on any single issue, this Court is permitted, and is here persuaded, to draw a negative inference from Mr. Trump's invocation of his Fifth Amendment right against self-incrimination more than 400 times in response to questions posed to him during his deposition. See El-Dehdan v El-Dehdan, 26 NY3d 19, 37 (2015) ("a negative inference may be drawn in the civil context when a party invokes the right against self-incrimination").

452564/2022 PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL
Motion No. 001                                                              Page 8 of 11

8 of 11

For example, when asked if he knew that each SFC from 2011 through 2021 contained false and misleading valuations and statements, Mr. Trump invoked his right against self-incrimination. NYSCEF Doc. No. 42, pgs. 10-12. When asked if Mr. Weissselberg, Mr. McConney and others worked at his direction and followed his instructions to inflate the asset valuations in the SFCs between 2011 and 2021, Mr. Trump invoked his right against self-incrimination. Id.

Similarly, when Mr. Weisselberg was asked whether Mr. Trump directed him to make any changes to the SFCs between 2011 and 2015, Mr. Weisselberg invoked his right against self-incrimination. NYSCEF Doc. No. 44, pgs. 4-8.

Although the above examples are by no means exhaustive, they are more than sufficient to demonstrate OAG's likelihood of success on the merits.

Balancing of the Equities
"The balancing of the equities requires the court to determine the relative prejudice to each party accruing from a grant or denial of the requested relief." Barbes Rest. Inc. v ASRR Suzer 218, LLC, 140 AD3d 430, 432 (1st Dep't 2016).

Here, the balancing of the equities tips, strongly, if not completely, in favor of granting a preliminary injunction, particularly to ensure that defendants do not dissipate their assets or transfer them out of this jurisdiction. OAG seeks to enjoin defendants from transferring any material asset to a non-party affiliate or otherwise disposing of material assets absent approval of this Court. In the event that defendants believe they have a legitimate reason to do so, they may apply to this Court for permission.

In the absence of an injunction, and given defendants' demonstrated propensity to engage in persistent fraud, failure to grant such an injunction could result in extreme prejudice to the people of New York. Further, the relief sought is appropriately tailored to curbing unlawful conduct and ensuring that funds are available for potential disgorgement at the conclusion of this case.

Notably, New York City is the epicenter of global finance. To take an example close to home, Deutsche Bank, headquartered in Germany, lent hundreds of millions of dollars to a New York real estate conglomerate that owns properties all over the world. New Yorkers derive enormous economic and other benefits from all the money coursing through the veins of Wall Street and real estate. Our executive, legislative, and judicial institutions are obligated to ensure that financial transactions are conducted truthfully, not fraudulently.

Appointment of an Independent Monitor
Defendants' opposition conflates the appointment of an "independent monitor" with that of a "receiver," when, in fact, they perform two very different functions: the former oversees, the latter controls.

In its motion, OAG asks for the appointment of an independent monitor to oversee the: (1) submission of financial information provided to any accounting firm compiling a 2022 SFC for Mr. Trump; (2) submission of all financial disclosures to lenders and insurers; and (3) corporate

452564/2022 PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL
Motion No. 001

Page 9 of 11

9 of 11

restructuring or disposition of significant assets. This limited function is entirely different from the functions of a receiver, who would, in effect, take control of the entire organization. CPLR 5228. Accordingly, defendants' claims that this amounts to a "nationalization" of the Trump Organization are entirely without merit.

Furthermore, given the persistent misrepresentations throughout every one of Mr. Trump's SFCs between 2011 and 2021, this Court finds that the appointment of an independent monitor is the most prudent and narrowly tailored mechanism to ensure there is no further fraud or illegality that violates § 63(12) pending the final disposition of this action.

The Court has considered defendants' other arguments and finds them unavailing and/or non-dispositive.

Conclusion

Thus, for the reasons set forth herein, OAG's motion for a preliminary injunction and appointment of an independent monitor is granted; and

Defendants are hereby preliminary enjoined from selling, transferring, or otherwise disposing of any non-cash asset listed on the 2021 Statement of Financial Condition of Donald J. Trump, without first providing 14 days written notice to OAG and this Court; and

This Court will appoint an independent monitor, to be paid by defendants, for the purpose of ensuring compliance with this order. If the monitor reasonably determines that defendants have violated this order, the monitor shall immediately report that matter to OAG, defendants, and this Court; and

Defendants are hereby ordered to provide the monitor any financial statement, statement of financial condition, other asset valuation disclosure, or other financial disclosure to a lender, insurer, or other financial institution, any non-privileged document, book, record, or other information bearing on any of the foregoing or reasonably necessary to assess the accuracy of any representation, and to comply with all reasonable requests by the monitor for such information; and

Defendants are hereby ordered to provide the monitor with a full and accurate description of the structure and liquid and illiquid holdings and assets of the Trump Organization, its subsidiaries, and all other affiliates, no later than two weeks after the monitor's appointment; and

Defendants are hereby ordered to provide the monitor, at least 30 days in advance, information regarding any planned or anticipated restructuring of the Trump Organization, its subsidiaries, and all other affiliates, or of any plans for disposing or refinancing of significant Trump Organization assets, or disposing significant liquidity; and

This Court will appoint an independent monitor from names recommended by OAG and defendants, who shall have until November 10, 2022 to identify no more than three potential monitors for the Court's consideration. The parties shall have until November 15, 2022 to

INDEX NO. 452564/2022

452564/2022 PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL
Motion No. 001

Page 10 of 11

10 of 11

comment, if they so choose, on their adversaries' selections. Once a monitor is appointed by this Court, the monitor shall remain in place until further order of this Court; and

This order binds defendants and all other persons or entities acting in concert with them, or under their direction or control, directly or indirectly, including defendants' officers, employees, representatives, servants, or other agents, and including the Donald J. Trump Revocable Trust through any of its trustees; and

The parties are hereby ordered to appear in person for a preliminary conference on November 22, 2022 at 10:00 am at 60 Centre Street, New York, New York, Courtroom 418.

_____11/3/2022_____                              _____/s/ Arthur F. Engoron_____
DATE                                                ARTHUR F. ENGORON, J.S.C.

CHECK ONE:          [ ] CASE DISPOSED          [X] NON-FINAL DISPOSITION
                    [X] GRANTED   [ ] DENIED   [ ] GRANTED IN PART   [ ] OTHER
APPLICATION:        [ ] SETTLE ORDER           [ ] SUBMIT ORDER
CHECK IF APPROPRIATE: [ ] INCLUDES TRANSFER/REASSIGN  [ ] FIDUCIARY APPOINTMENT  [ ] REFERENCE

452564/2022   PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL        Page 11 of 11
Motion No. 001

11 of 11